Dale M. Cendali
Johanna Schmitt
Brendan T. Kehoe
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
dale.cendali@kirkland.com
johanna.schmitt@kirkland.com
brendan.kehoe@kirkland.com

Robert J. Schoenberg
RIKER DANZIG SCHERER HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962-1981
Telephone: (973) 538-0800
rschoenberg@riker.com

Attorneys for Plaintiffs and Counterclaim Defendants
Tetris Holding, LLC and The Tetris Company, LLC

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TETRIS HOLDING, LLC and THE TETRIS COMPANY, LLC,<br><br>          Plaintiffs and<br>          Counterclaim<br>          Defendants,<br><br>   - against -<br><br>XIO INTERACTIVE INC.,<br><br>          Defendant and<br>          Counterclaim Plaintiff. | Case No. 3:09-cv-6115 (FLW) (DEA)<br><br>Hon. Freda L. Wolfson, U.S.D.J.<br>Hon. Douglas E. Arpert, U.S.M.J.<br><br><br>**MEMORANDUM OF LAW IN<br>SUPPORT OF PLAINTIFFS'<br>RULE 37(A) MOTION TO<br>COMPEL AND FOR COSTS**<br><br>***Document Filed Electronically*** |

## **TABLE OF CONTENTS**

I.  PRELIMINARY STATEMENT ....................................................................1

II.  BACKGROUND ........................................................................................4

    A.  Xio Infringed TTC's Copyrights and Trade Dress Rights in *Tetris* Willfully and in Bad Faith ............................................................4

    B.  Xio Selectively Produced Evidence Regarding its Communications with Attorneys in Support of its Defenses, But Refused to Produce Evidence of Other Attorney Communications on the Same Issue ...................................................8

    C.  TTC's Attempts to Resolve this Discovery Dispute ..........................16

III.  ARGUMENT ...........................................................................................19

    A.  Xio Has Waived the Privilege with Regard to Pre-Litigation Communications Concerning Whether *Mino* Infringes *Tetris* ...........19

        1.  Xio Is Improperly Using the Privilege as Both a "Sword and Shield" ...............................................................................21

        a.  It Is Improper for Xio to Rely on Communications to Attorneys While Simultaneously Withholding Communications from Attorneys on the Same Topic .............24

        2.  Xio Has also Waived the Privilege by Failing to Exercise Reasonable Care in Preventing the Disclosure of Potentially Privileged Materials.................................................29

    B.  TTC Is Entitled to Reimbursement of its Costs for Bringing this Motion .............................................................................................30

IV.  CONCLUSION..........................................................................................34

i

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bensel v. Air Line Pilots Ass'n.*,
    248 F.R.D. 177 (D.N.J 2008) ................................................................ 20, 30

*Bowne of NYC, Inc. v. AmBase Corp.*,
    161 F.R.D. 258 (S.D.N.Y. 1995).................................................... 30, 31, 33

*Columbia Pictures Television v. Krypton Broad. of Birmingham, Inc.*,
    259 F.3d 1186 (9th Cir. 2001) ......................................................................28

*Dorr-Oliver Inc. v. Fluid-Quip, Inc.*,
    834 F. Supp. 1008 (N.D. Ill. 1993)...................................................... passim

*In re Human Tissue Prods. Liability Litig.*,
    255 F.R.D. 151 (D.N.J. 2008) .............................................................. 19, 21

*Knitwaves, Inc. v. Lollytags Ltd. (Inc.)*,
    71 F.3d 996 (2d Cir. 1995) ........................................................................... 8

*Luxury intern., Inc. v. U.S.*, 24 C.I.T. 168, 90 F. Supp. 2d 1294 (Ct. Int'l
    Trade  2000)................................................................................................... 6

*Zip Dee, Inc. v. Domestic Corp.*,
    1997 WL 323814 (N.D. Ill. 1997)................................................... 18, 20, 28

**Statutes**

17 U.S.C. § 504(c)(2)................................................................................................. 8

**Other Authorities**

Mem. to Anthony O. Cormier from Joanne R. Stump, Chief, U.S. Customs
    Service, Intellectual Property Rights Branch, re:  Pocket Arcade 256
    Games in 1 (U.S. Copyright Office Registration No. PAu 1,284,318),
    Oct. 25, 2001, 2001 WL 1754754 (Customs) ........................................ 6, 22

Mem. to Director of Los Angeles/Long Beach Seaport from Jerry Laderberg,
    Acting Chief, Intellectual Property Rights Branch,
    re: TETRIS (U.S. Copyright Office Registration No. PAu 1,284,318),
    Nov. 4, 1999 (Customs).................................................................................. 6

**Rules**

FED. R. CIV. P. 37(a)..............................................................................................3, 31

## I.     **PRELIMINARY STATEMENT**

Plaintiffs and counterclaim-defendants Tetris Holding, LLC and The Tetris Company, LLC (collectively "TTC") own multiple U.S. copyright registrations covering the audiovisual expression of their iconic and famously successful videogame, *Tetris,* which was created in the 1980s.  Over the years, TTC has successfully enforced these copyrights against third parties who have tried to capitalize on *Tetris'* success and distribute games that look like *Tetris.*  Indeed, the U.S. Customs Headquarters (which has expertise in determining copyright infringement) has ruled multiple times that TTC's copyrights were infringed by companies trying to import games that copied the visual expression of *Tetris,* including, among other things, the shape and dimension of the playing field, the shape of the playing pieces, and the movement of those pieces.  One of these rulings was affirmed by the Court of International Trade.

In this case, TTC contends that defendant and counterclaimant Xio Interactive Inc.'s ("Xio") *Mino* and *Mino Lite* games (collectively, "*Mino*") are copy-cat games that infringe the copyright and trade dress rights in and to *Tetris.* *Mino* looks virtually identical to *Tetris* and copies, among other things, the shape and dimensions of the *Tetris* playing field, the shape and appearance of the *Tetris* playing pieces (called "Tetriminos"), and the movement of those pieces—all elements that were found to be protectable by copyright by a court.  In response,

Xio has asserted an "innocent infringer" defense and denies that it infringed TTC's rights willfully—despite the fact that Xio's principals were well aware of TTC's *Tetris* game, TTC's copyright registrations, and at least one of the above-referenced U.S. Customs decision before *Mino* was developed.  In addition, it appears that **Xio had received advice from at least one attorney that *Mino* would likely infringe *Tetris***.

As discussed below, Xio is misusing attorney-client privilege in order to support its "innocent infringer" defense and assertion of good faith.  Specifically, Xio is engaged in a classic example of using the privilege as both a "sword and shield" by simultaneously withholding privileged information that is harmful to its position while producing privileged information that supports its position.  On the one hand, Xio is hiding evidence that supports TTC's position that Xio is not an innocent infringer and that it acted willfully on the grounds of privilege—namely evidence that at least one attorney (Jeffrey Neu) advised Xio that *Mino* likely infringed *Tetris*.  At the same time, Xio has produced privileged evidence on the very same issue that Xio contends supports its position that it is an innocent infringer and that it acted in good faith—namely (i) evidence that Xio sought legal advice from attorneys on the issue of infringement and (ii) evidence of Xio's legal analyses, which Xio claims are "independent," but which were formed *after* Xio began consulting with attorneys and thus reflect input from those attorneys.  Such

improper use creates a misleading factual record and is extremely prejudicial to TTC because it gives the misimpression that attorneys told Xio that *Mino* would not infringe *Tetris* and thus Xio proceeded in good faith (when, in reality, it appears that at least one attorney told Xio that *Mino* would infringe *Tetris* and thus Xio acted willfully).

As such, by selectively withholding and producing certain privileged evidence on the same issue and improperly using privilege as both a "sword and shield," Xio has waived any privilege with regard to its communications with attorneys regarding the issue of whether *Mino* infringes *Tetris*.

In addition, Xio has waived any privilege over its communications with attorneys regarding the issue of whether *Mino* infringes *Tetris* for another independent reason, namely that Xio failed to exercise reasonable care in preventing the disclosure of these privileged materials.  As discussed below, Xio neglected to undertake an adequate privilege review of its documents and failed to "claw back" a privileged document even *after* TTC expressly notified Xio about their production.

Accordingly, pursuant to Federal Rule of Civil Procedure 37(a), TTC respectfully moves (i) to compel disclosure of all documents and other evidence (including deposition testimony) that reflects Xio's communications with attorneys before the commencement of this lawsuit regarding the issue of whether *Mino*

infringes *Tetris,* including communications about what parts of *Tetris* constitute

protectable expression, or, in the alternative, (ii) to preclude Xio from relying on

any of such evidence in support of its "innocent infringer" defense, to rebut TTC's

allegation of willful infringement, or for any other purpose in this lawsuit.

Moreover, given Xio's inconsistent positions regarding its assertion of

privilege, unreasonable refusal to yield its position that it should be allowed to use

privilege as a "sword and shield," and overall dilatory tactics throughout discovery

which have increased TTC's costs tremendously, TTC respectfully seeks an award

of attorneys' fees and costs it has incurred in connection with making this motion.

## II.   BACKGROUND

### A.   Xio Infringed TTC's Copyrights and Trade Dress Rights in *Tetris* Willfully and in Bad Faith

In early October 2008, Xio's CEO, Desiree Golen—a recent college graduate

with no computer programming or game design experience—was aware that people

were making up to $125,000 a month from successful iPhone apps (like *Tetris*).

(*See* Declaration of Johanna Schmitt, Esq., dated April 21, 2011 ("Schmitt Decl.")

¶ 2, Ex. A.)  In an attempt to cash in without having to create something new, Ms.

Golen decided to start a company (which would later be named Xio) and enlist her

friends "to make a [m]ulti[p]layer game similar to *Tetris* for the iPhone."  (*Id.*)

Indeed, Ms. Golen declared that "*Tetris* is my favorite game."  (Schmitt Decl. ¶ 3,

Ex. B.)

4

On October 18, 2008, Ms. Golen contacted TTC to "inquire about [its] licensing options and packages" for making "a game similar to *Tetris* for the mobile platform." (Schmitt Decl. ¶ 4, Ex. C.)  Also on October 18, 2008, a Xio representative downloaded an officially-licensed version of *Tetris* on his iPhone, which Xio reviewed when developing *Mino*. (Schmitt Decl. ¶ 5, Ex. D; Ex. E (M. Carter 30(b)(6) Dep. (Jan. 31, 2011) 101:25-102:14).)  This version of *Tetris* (like all authorized versions) prominently displays a copyright notice. (Schmitt Decl. ¶ 6.)

After being denied a license for *Tetris* by TTC on October 20, 2008, (Schmitt Decl. ¶ 7, Ex. C), starting at least as early as October 29, 2008, Ms. Golen and another Xio representative, Maura Carter, began contacting multiple intellectual property attorneys in order to prepare for possible infringement claims by TTC. (Schmitt Decl. ¶ 8, Ex. G.)  In early November 2008, Ms. Golen and Ms. Carter communicated with Jeffrey Neu, Esq., who was eventually retained by Xio as its intellectual property counsel, at least fifteen different times, including for the purpose of Mr. Neu analyzing "information received" from Xio. (Schmitt Decl. ¶ 9, Ex. G.)

By November 2008 (before development of *Mino* began in earnest), Xio was aware that TTC owned numerous copyright registrations covering the audiovisual elements of *Tetris* and that the *Tetris* games played by Xio had a copyright notice

identifying TTC as the copyright owner of the game.  (*See* Schmitt Decl. ¶¶ 5-6; 10, Ex. B.)   Xio was also aware of one of U.S. Customs Headquarters decisions, which had previously determined that the visual elements of *Tetris* are copyrightable and had been infringed by third-party games, contrary to Xio's position in this case.  (*See* Schmitt Decl. ¶ 11, Ex. J.)[1]  Xio had also been advised by others who were "less encouraging and very doubtful" of Xio's position on infringement.  (*See* Schmitt Decl. ¶ 12, Ex. M.)   Nonetheless, Xio decided to proceed with its plans to make a *Tetris* game.  (*Id.*)

While developing its game at the end of 2008 and beginning of 2009, Xio's developers routinely referred to Xio's game as "Tetris."  For example, in November 2008, Xio's CEO, Desiree Golen, and Xio's CTO and its Rule 30(b)(6) witness, Michael Carter, referred to the game they were developing as "Tetris." (*See* Schmitt Decl. ¶ 13, Exs. N and O.)  Also, Xio's business plan refers to its

---

[1] A copy of this U.S. Customs decision is attached as Exhibit K to the Schmitt Declaration.  *See* Mem. to Anthony O. Cormier from Joanne R. Stump, Chief, U.S. Customs Service, Intellectual Property Rights Branch, re:  Pocket Arcade 256 Games in 1 (U.S. Copyright Office Registration No. PAu 1,284,318), Oct. 25, 2001, 2001 WL 1754754 (Customs)).  In fact, the U.S. Customs Headquarters has decided, in a series of rulings, that the visual features of *Tetris* are copyrightable and have been infringed by third party games, including one such ruling that has been affirmed by the Court of International Trade.  *See* Schmitt Decl. ¶ 11, Ex. L (*Luxury intern., Inc. v. U.S.*, 24 C.I.T. 168, 90 F. Supp. 2d 1294 (Ct. Int'l Trade  2000) *aff'g* Mem. to Director of Los Angeles/Long Beach Seaport from Jerry Laderberg, Acting Chief, Intellectual Property Rights Branch, re: TETRIS (U.S. Copyright Office Registration No. PAu 1,284,318), Nov. 4, 1999 (Customs).)

game as the "Tetris App." (*See* Schmitt Decl. ¶ 14, Ex. P.)  Further, one of Xio's

game designers asked whether it would be "un-tetris-like" to make a game with

playing pieces that were all the same color (as *Tetris'* playing pieces use different

colors).   (*See* Schmitt Decl. ¶ 15, Ex. Q.)  In addition, during development, Xio's

representatives continued to communicate with attorneys on the issue of whether

*Mino* infringed *Tetris* until *Mino* was released on Apple Inc.'s iTunes Store in the

spring of 2009.  (*See* Schmitt Decl. ¶ 16.)

Xio achieved its stated goal of making a game similar to *Tetris*.  As the

following comparison illustrates, *Mino* (far right) is virtually identical to *Tetris*

(left and middle) and copies verbatim almost every visual aspect of the game:



| **Tetris® Zone** | **Tetris® Evolution** | **Infringing *Mino* Game** |

On August 3, 2009, TTC sent a take-down notice pursuant to the Digital

Millennium Copyright Act to Apple Inc., which removed *Mino* from its iTunes

Store in response.  (D.I. 6, Am. Compl. ¶ 40; Schmitt Decl. ¶ 17.)  Xio, however,

refused to stop infringing TTC's valuable intellectual property rights and sought to

reinstate *Mino* on the Apple iTunes Store.  (Schmitt Decl. ¶ 18; D.I. 6, Am. Compl. ¶¶ 41-42.)  Xio's efforts to reinstate *Mino* were taken despite the fact that Xio's intellectual property attorney, Jeffrey Neu, disagreed with Xio on some "fundamental issues" and "prefer[red] not to confront the issue of the copyrightability of TETRIS game mechanics."  (Schmitt Decl. ¶ 19, Exs. S and T.)

Having no other practicable option, on December 2, 2009, TTC sued Xio for copyright infringement, trade dress infringement, trademark infringement, and related state-law claims.  (D.I. 1, Compl.)  Xio continued to consult with attorneys on the issue of whether *Mino* infringed *Tetris* up until the time the complaint was filed.  (*See* Schmitt Decl. ¶ 20.)

**B.    Xio Selectively Produced Evidence Regarding its Communications with Attorneys in Support of its Defenses, But Refused to Produce Evidence of Other Attorney Communications on the Same Issue**

In this action, TTC alleges that Xio acted willfully and in bad faith by copying the original and distinctive elements of TTC's *Tetris* game to create Xio's infringing *Mino* game.  (D.I. 6, Am. Compl. ¶¶ 1-4, 32-38.)   In order to prove that Xio's infringement was willful, TTC must establish that Xio acted with reckless disregard of TTC's intellectual property rights.  *See Knitwaves, Inc. v. Lollytags Ltd. (Inc.)*, 71 F.3d 996, 1010-11 (2d Cir. 1995).  Xio has denied TTC's allegations of willfulness and also has asserted an "innocent infringer" affirmative defense. (D.I. 13, Answer.)  To rebut Xio's "innocent infringer" defense, TTC needs to

show that Xio was aware or had "reason to believe" that *Mino* infringed *Tetris*. *See* 17 U.S.C. § 504(c)(2) (allowing for increased damages for willful infringement and decreased damages for innocent infringement).

As such, during fact discovery, TTC requested all documents and communications relating to whether Xio had reason to believe that *Mino* infringes *Tetris* before the start of this lawsuit, including "all documents concerning whether *Mino* infringes the intellectual property rights [of TTC], including, but not limited to, any clearance memoranda and opinion letters of counsel," and all documents supporting Xio's "innocent infringer" defense. (Schmitt Decl. ¶ 21, Ex. U (TTC's First Set of Reqs. Prod. ("First RFPs"), Req. Nos. 34, 101).) In particular, Xio's communications to and from its attorneys discussing infringement issues are relevant because a party may rely on the advice from counsel to demonstrate that it acted in good faith and in support of an "innocent infringer" defense.

In response, Xio objected to these requests to the extent they sought privileged information. (Schmitt Decl. ¶ 22.) Xio later confirmed that it was not relying on an "advice of counsel" defense and that it never obtained an opinion letter from counsel that *Mino* did not infringe *Tetris*. (*Id.*)

On September 30, 2010, Xio produced the bulk of its documents.[2]  (Schmitt Decl. ¶ 23.)  In the course of its review, TTC discovered *dozens* of privileged documents that had been produced by Xio on various topics.[3]  (Schmitt Decl. ¶ 24.)  Notably, despite the fact that Xio had objected to producing privileged documents regarding whether *Mino* infringes *Tetris* and its "innocent infringer" defense, Xio produced privileged documents on these very topics, including:

- a detailed legal analysis regarding whether *Mino* infringes the visual expression of *Tetris*, including a side-by-side comparison of the games and what constitutes protectable expression (the "Legal Notes");

- notes of a conversation between Xio's CEO, Desiree Golen, and Xio's attorney, Jeffrey Neu, reflecting Mr. Neu's copyright infringement analysis of *Mino* (the "Copyright Analysis Notes"); and

- a memorandum from Mr. Neu's law firm to Xio regarding "copyright infringement analysis."

(Schmitt Decl. ¶ 25, Ex. X.)

---

[2] It is clear that Xio's strategy from the onset of the document production phase of discovery was to bury TTC in documents by producing tens of thousands of irrelevant and non-responsive documents, including spam and personal e-mail that had nothing to do with the case.  (*See* Schmitt Decl. ¶ 23.)  This tactic, of course, made it extremely difficult and costly for TTC to discover the documents that were actually relevant to its case and to uncover Xio's inconsistent positions with respect to its assertion of the privilege.  In addition to being a "dump" of all the company's documents, Xio's production contained numerous flaws and technical problems, which further hampered TTC's ability to review the documents and significantly increased the costs of TTC's review.  (*See id.*)

[3] Many of these documents were likely produced because Xio failed to conduct a routine page-by-page privilege review (like the one conducted by TTC), and instead ran unspecified electronic search terms, which seemingly did not include such basic search terms as "privilege," "confidential," or "work product."  (Schmitt Decl. ¶ 24.)

On October 20, 2010, TTC promptly alerted Xio's counsel and identified dozens of privileged documents by Bates number, including the documents cited above, giving Xio the opportunity to request that TTC return the documents. (Schmitt Decl. ¶ 26.)  As a result, Xio's counsel "clawed back" approximately 100 documents from its production on the basis of privilege.  These "clawed back" documents included some, but not all, of the documents that TTC had identified as potentially privileged.  (Schmitt Decl. ¶ 27.)  For example, Xio chose to "claw back" the memorandum from Mr. Neu's firm regarding "copyright infringement analysis."  (Schmitt Decl. ¶ 28.)  However, Xio chose *not* to "claw back" certain privileged documents that TTC had identified, such as the Copyright Analysis Notes and the Legal Notes, and stated that "Tetris may continue with its review of [these] documents." (*Id.*)

On December 1, 2010, Xio served its privilege log, identifying numerous pre-litigation communications regarding whether *Mino* infringed *Tetris* that Xio had withheld on the grounds of the attorney-client privilege and work product immunity.[4]  (Schmitt Decl. ¶ 29, Ex. S.)  Like Xio's document production, Xio's privilege log was replete with errors and inconsistencies, such as (i) including

---

[4] *See e.g.*, Schmitt Decl. ¶ 29, Ex. S (XXX-PRIV-XXX-XIO-DG-0100730-31 ("Email from [Jeffrey Neu] attaching research memo"); XXX-PRIV-XXX-XIO-DG-0100214 ("Email from [Jeffrey Neu] re: trade dress issues"); XIO-HD-XIO-0000039 ("Email re assessment of Tetris' trademark claims").

documents that Xio had produced and had not "clawed back," (ii) omitting documents that Xio had expressly "clawed back," (iii) identifying other documents that had already been produced.  (Schmitt Decl. ¶ 30.)

On January 4, 2011, Xio served an amended privilege log, which also contained numerous errors and inconsistencies, which Xio has not corrected despite numerous requests by TTC.  (Schmitt Decl. ¶ 31.)  As of the date of the filing of this motion, Xio has not produced a corrected privilege log, though it has indicated that one will be provided on April 22, 2011.  (Schmitt Decl. ¶ 32.)

During depositions of Xio's witnesses in January and February 2011, Xio continued to take an inconsistent position about privilege—selectively producing information that it believed would be helpful to its position and refusing to produce information that it apparently believed was harmful.  For example, Xio's witnesses refused to answer questions during their depositions regarding certain communications with attorneys on the subject of whether *Mino* infringed *Tetris* on privileged grounds.[5]  In addition, Xio belatedly "clawed back" the Copyright

_____

5 *See e.g.*, Schmitt Decl. ¶ 33, Ex. F (D. Golen Dep. (Jan. 28, 2011) 267:3-12 ("Q. But you didn't hire a lawyer to give you an opinion letter that this Customs decision would be no bar to the release of Mino; isn't that true? You didn't get a lawyer who would understand this saying to you no problem, go ahead, release Mino, right? MS. MAITRA: Objection; mischaracterizes testimony. I instruct you not to answer. THE WITNESS: Um -- MS. MAITRA: I instruct you not to answer completely."); *id.* at 283:22-284:3 ("Q. And was part of that view based on your conversations with lawyers? MS. MAITRA: Objection; to the extent that this calls for privileged communications, I instruct you not to
(Continued…)

Analysis Notes during Ms. Golen's deposition on January 28, 2011, several months *after* Xio had expressly told TTC that it was not asserting privilege, and Ms. Golen was instructed not to answer questions regarding the document on privilege grounds.  (Schmitt Decl. ¶ 34.)

At the same time, Xio testified about other pre-litigation communications with attorneys it had consulted on the issue of infringement.[6]  Also, Ms. Golen

---

answer. THE WITNESS: I'm not sure. I know I spoke with many lawyers."); *id.* at 297:7-16 ("Q. Does this reflect communication -- well, was this -- does this document reflect communication with one of your lawyers, Ms. Golen? A. By "communication," what do you mean? MS. MAITRA: So what I would like to do is instruct the witness not to answer any document -- sorry, any questions about this document. I believe this to be privileged. I have no reason to believe that it wasn't privileged."); Ex. E (M. Carter 30(b)(6) (Feb. 17, 2011) Dep. 374:25-375:8  ("... My question to you is, isn't it true that your counsel -- isn't it true that Mr. Neu had told you that Mino would likely to be infringing? MS. MAITRA: Okay. I instruct you not to answer that. That's attorney-client privilege. And this deposition is over....THE WITNESS: I can't answer that based on the attorney-client privilege.").

[6] *See, e.g.*, Schmitt Decl. ¶ 35, Ex. H, D. Golen Dep. (Feb. 10, 2011) 327:5-14 ("Q. And before Mino was launched on the App Store, did Mr. DeBruine tell you that he thought it did not infringe my client's rights in Tetris? A. So I don't recall exactly what he said, and I think there's a lot of legal terms in there that I don't completely understand. I'm not a lawyer. And again, it was a long time ago, but the purpose of meeting with these lawyers was kind of to solidify my understanding of copyright at that time ... "); *id.* at 339:2-13 ("Q. Did Ms. Turner ever tell you before Mino was launched that it would not infringe anyone's rights? ... THE WITNESS: Again, when I was meeting with these lawyers, the purpose was to solidify my understanding of copyright and video games. I don't remember specifically what she told me or what we talked about. But in, in general, I remember that I came out of these meetings with the understanding that we could produce a game with our own native source code, image files, music files, graphic files, and that would be legal."); *id.* at 335:18-4 ("Q. Did anyone at that firm, including Mr. Cook and Mr. Chapman, tell you that Mino would not infringe anyone's rights before it was launched on the App Store? A. I don't exactly remember what they told me specifically, but, again, I was meeting with these lawyers to solidify my understanding of (Continued…)

testified that Xio's legal analyses were predicated on communications with the lawyers that were contacted.  (Schmitt Decl. ¶ 36, Ex. F (D. Golen Dep. (Jan. 28, 2011) 251:11-255:25 ("Q. What people did you speak to that you were relying on in forming your [legal] opinion . . . before releasing Mino? A. Okay. So that would be Julie Turner, Jeffrey Neu, Sean DeBruine, Colin Chapman, I believe. . . . Q. And how many of those people are lawyers?  A. To my understanding, all of those people are lawyers.").).

Moreover, in February 2011, TTC was forced to re-open the deposition of Ms. Golen (Xio's CEO) on two separate occasions—resulting in increased costs for TTC and a disruption of TTC's deposition strategy.  First, Ms. Golen's deposition was reopened on February 10, 2011, after Xio belatedly served an interrogatory response (almost a year after the interrogatory was served) identifying the individuals with whom it had communicated about, among other things, whether *Mino* infringed *Tetris.*   (Schmitt Decl. ¶ 37.)  During her reopened deposition, Ms. Golen *waived* Xio's long-asserted privilege regarding her discussions with several lawyers listed in the interrogatory response whose communications had been withheld for months and listed on Xio's privilege log. (*See* Schmitt Decl. ¶ 38.)

---

copyright and video gaming and our work with Mino. So I do remember that I came out with the understanding that we could produce our own game natively in-house with our own source code, music files, graphic files, and that that was perfectly legal.).

14

Subsequently, on February 11, 2011 (one week before the close of fact discovery), Xio produced dozens of documents that had previously been withheld as privileged, such as communications seeking legal advice on the issue of whether *Mino* infringed *Tetris* when Xio was trying to get *Mino* reinstated on the Apple iTunes store. (Schmitt Decl. ¶ 39.) Due to this last-minute production, TTC was forced to reopen Ms. Golen's deposition a *second* time on February 18, 2011 to ask her about these documents. (Schmitt Decl. ¶ 40.) During the deposition, Ms. Golen continued to assert privilege over communications with Mr. Neu regarding infringement issues,[7] despite Xio having produced to TTC a draft communication to Mr. Neu regarding his view of infringement, which stated that "we have been unsatisfied with the approach your firm would like to take on this case (namely that you would prefer not to confront the issue of the copyrightability of TETRIS game mechanics) . . .." (Schmitt Decl. ¶ 41, Ex. I.)

---

[7] *See* Schmitt Decl. ¶ 41, Ex. R (D. Golen Dep. (Feb. 18, 2011) 436:21-437:15 ("Q . Were you terminating your relationship with Mr. Neu because he disagreed with your legal position in this case? MR. GRATZ: Objection. You can answer the question, but in answering the question I want to caution the witness not to reveal the content of any attorney-client communications. THE WITNESS: Okay. So my communications with Jeffrey Neu, to my understanding, are privileged communications. But what I can tell you is that Xio Interactive terminated our relationship with Jeffrey Neu because we didn't believe he would be a strong litigation attorney. BY MR. KEHOE: Q Are there any other reasons? MR. GRATZ: Same caution to the witness. THE WITNESS: Again, in the constraints of not disclosing privileged communications, that's all I can say.").

### C.   TTC's Attempts to Resolve this Discovery Dispute

As indicated above, it is clear that Xio is attempting to rely on selectively-produced communications with attorneys in order to support its "innocent infringer" defense and to show that it proceeded in good faith, while simultaneously shielding other communications from discovery which may support TTC's position that Xio proceeded willfully and in bad faith. Such improper use of the privilege creates a misleading factual record and is extremely prejudicial to TTC because it gives the misimpression that attorneys told Xio that *Mino* would not infringe *Tetris* and thus that Xio proceeded in good faith, when, in fact, it did not.

In order to address these concerns, counsel for the parties met and conferred about this issue multiple times. (Schmitt Decl. ¶ 42.) TTC asked that Xio disclose all communications with attorneys prior to the commencement of this litigation regarding the narrow issue of whether *Mino* infringes *Tetris*, which includes communications about what parts of *Tetris* constitute protectable expression. (*Id.*) In the alternative, TTC requested that Xio agree not to rely on any of this evidence in the case, which Xio has refused. (Schmitt Decl. ¶ 43.)

Because the parties were unable to come to an agreement, TTC had no choice but to raise this discovery dispute in a letter to the Court on March 9, 2011, pursuant to Local Rule 37.1(a)(1). (*See* Schmitt Decl. ¶ 44, Ex. V.) In Xio's one-

16

page letter in opposition, it did not address the legal positions or authorities set out in TTC's letter to the Court, namely that Xio had waived the privilege regarding the subject matter of whether *Mino* infringes *Tetris*, and, as a separate basis, that Xio had waived the privilege based on its disclosure of privileged communications to third parties and to TTC in the course of this lawsuit.  (*See* Schmitt Decl. ¶ 45.)

At a status conference with the Court on March 10, 2011, Xio's counsel stated that she could prove that Xio had undertaken an "independent" legal analysis, which TTC challenged given Ms. Golen's above-referenced testimony that Xio's legal opinion was formed, in part, by communications with attorneys. (Schmitt Decl. ¶ 46.)  Nonetheless, the Court instructed Xio to try to prove this to TTC's counsel's satisfaction, or, failing that, TTC could seek additional guidance from the Court.  (Schmitt Decl. ¶ 47.)   At a conference on April 5, 2011, the Court granted TTC leave to file a motion today if this issue could not be resolved by the parties.  (*Id.*)

On April 6, 2011, TTC's counsel contacted Xio's counsel in order to discuss the issue further, and sent a detailed summary of TTC's position and a proposal requesting that Xio stipulate to the following terms in lieu of producing the documents requested by TTC:

- Xio agrees not to rely on communications *to or from* attorneys for any purpose, including the fact that Xio contacted attorneys prior to launching *Mino*; and

17

- Xio agrees that it will not rely on evidence of Xio's legal analysis that was drafted after it started consulting with attorneys in late October 2008.

(Schmitt Decl. ¶ 49, Ex. W.)  Xio never responded in writing to TTC's proposal.

(Schmitt Decl. ¶ 50.)  Nor has Xio addressed the authorities cited by TTC,

including *Dorr-Oliver Inc. v. Fluid-Quip, Inc.*, 834 F. Supp. 1008, 1012 (N.D. Ill.

1993), and *Zip Dee, Inc. v. Domestic Corp.*, 1997 WL 323814, at *2 (N.D. Ill.

1997), discussed below, which clearly demonstrate that TTC is entitled to the relief

it seeks in this motion.  (*See* Schmitt Decl. ¶ 51.)

Instead, contrary to this authority, Xio's counsel again stated during an April

15, 2011 meet and confer session that Xio plans to rely on communications from

Xio *to* its attorneys seeking legal advice, as well as legal analyses that Xio claims

are "independent," but which were drafted after Xio started communicating with

lawyers and thus reflect legal advice.  (*See* Schmitt Decl. ¶ 52.)  TTC strongly

objects to Xio's position because it would be highly prejudicial to the jury, giving

the false impression that Xio received the advice of counsel that *Mino* does not

infringe *Tetris*, when, in fact, it appears that Xio's attorney provided exactly the

opposite advice—namely, that the Court will likely find that *Mino* does infringe

*Tetris.*  In addition, Xio's position prevents TTC from testing whether its so-called

18

"independent" legal analysis was reasonable in light of the advice Xio had been getting from various attorneys.

## III.   ARGUMENT

### A.   Xio Has Waived the Privilege with Regard to Pre-Litigation Communications Concerning Whether *Mino* Infringes *Tetris*

There are two independent bases for finding that Xio has waived the privilege with regard to pre-lawsuit communications with attorneys regarding whether *Mino* infringes *Tetris*.  First, as discussed more fully below, it is black-letter law that Xio has waived any privilege by affirmatively putting certain communications at issue and planning to rely on them in order to show that it was an "innocent infringer" and proceeded in good faith.  Xio's position is akin to relying on an advice of counsel defense.  In other words, if Xio chooses to support its defenses by citing to evidence that it sought legal advice from attorneys and evidence that reflects certain advice given by attorneys, then it has waived privilege and must produce *all* evidence of pre-litigation communications with attorneys on the issue of whether *Mino* infringes *Tetris*.  *See In re Human Tissue Prods. Liability Litig.*, 255 F.R.D. 151, 158 (D.N.J. 2008) ("[C]ourts have found an implied waiver of the attorney-client and/or attorney work product privilege where a client affirmatively places otherwise privileged information at issue in the case," such as by asserting good faith.); *see also Dorr-Oliver Inc. v. Fluid-Quip, Inc.*, 834 F. Supp. 1008, 1012 (N.D. Ill. 1993) ("Defendants cannot have it both ways; they

cannot seek refuge in consultation with counsel as evidence of their good faith yet prevent [Plaintiffs] from discovering the contents of the communication.").

Second, as discussed more fully below, Xio has failed to exercise reasonable care in preventing the disclosure of privileged materials. *See Bensel v. Air Line Pilots Ass'n*, 248 F.R.D. 177, 180-81 (D.N.J 2008) (holding that privilege was waived because the producing party did not take reasonable precautions to prevent the disclosure of documents that, among other things, had the law firm's name on them).[8]  Here, Xio failed to conduct a routine page-by-page review for privileged communications, and instead opted for an inadequate electronic search to identify privileged documents, which failed to identify documents containing the word "privilege."  Moreover, Xio failed to "claw back" notes of a conversation with its attorney when TTC notified Xio about them.  Instead, Xio waited for months after it was produced to assert privilege over this document.

Accordingly, all such evidence regarding Xio's pre-litigation communications with attorneys about whether *Mino* infringed *Tetris* must be disclosed, or in the alternative, Xio must be precluded from relying on *any* such evidence.  *See Zip Dee, Inc. v. Domestic Corp.*, 1997 WL 323814, at *2 (N.D. Ill.

---

[8] In addition, section 13 of the Stipulated Protective Order in this case provides that the privilege is waived where the producing party "failed to exercise reasonable care in light of the facts and circumstances surrounding the inadvertent production."  (D.I. 25, Stipulated Protective Order.)

1997) (compelling production of defendant's communications with its counsel on infringement-related issues because defendant intended to rely on non-privileged opinions of two other attorneys); *Dorr-Oliver Inc.*, 834 F. Supp. at 1012 (precluding defendants from relying on fact that they consulted with attorneys─when they refused to disclose advice given by attorneys─as part of their assertion of good faith).

### 1.    Xio Is Improperly Using the Privilege as Both a "Sword and Shield"

It is black letter law that a party may not use the attorney-client privilege and work-product immunity as both a sword and a shield.  *See In re Human Tissue Prods. Liability Litig.*, 255 F.R.D. at 158; *Dorr-Oliver Inc.*, 834 F. Supp. at 1012. In other words, "a litigant cannot at one and the same time make use of those privileged communications which support his position while hoping to maintain the privilege as those communications which undercut his legal position." *Dorr-Oliver Inc.*, 834 F. Supp. at 1012.

Here, it is clear that Xio is attempting to use the privilege as both a sword and shield.  On the one hand, Xio is using privilege as a "sword" by selectively disclosing information that it believes will supports its position that it is an innocent infringer and has acted in good faith when it distributed *Mino* and later tried to get it reinstated on the iTunes store.  Such evidence includes the fact that it

consulted with and sought advice from multiple attorneys on the issue of whether

*Mino* infringes *Tetris,* and evidence of Xio's legal analyses that conclude that *Mino*

does not infringe *Tetris* and were formed by communications with attorneys.[9]

On the other hand, Xio seeks to use privilege as a "shield" to hide evidence

on the same topic that may weaken Xio's position—including evidence about

communications with its attorney, Jeffrey Neu, before this litigation commenced.

(*See* Schmitt Decl.¶ 9, Ex. G.)  TTC believes that Xio is withholding this evidence

because Mr. Neu told Xio that *Mino* would likely be found to infringe TTC's *Tetris*

game—which is not surprising given TTC's copyright registrations and prior

decisions about games that infringed the look of *Tetris*.  For example, in an e-mail,

dated November 13, 2008, Xio's CEO wrote that "… some say that I clearly would

win any case against the TTC, while others are less encouraging and very

---

[9] TTC has grave doubts as to the dependability of any such "advice" given the fact that Xio did not even show these attorneys the games at issue so they could conduct a side-by-side analysis. *See, e.g.,* Schmitt Decl. ¶ 35, Ex. H, D. Golen Dep. (Feb. 10, 2011) 322:22-323:9 ("Q. And did you show [Ms. Kasler] the Mino game? A. No, I don't believe we did. I don't think at that time we even had a Mino game. Q. Did you show her any prototype of a Mino game?  A. I don't believe so.); *id.* at 326:2-14 ("Q. Did you show Mr. DeBruine Mino? A. I don't remember exactly. I probably didn't at that first networking event because I don't think we had Mino. And then I don't -- I don't believe I showed him Mino.); *id.* at 333:9-334:4 ("Q. ... Who did you show Mino to before it was launched? A. I actually don't really remember. All this happened a long time ago, and I don't recall exactly. Q. So is there anybody on this list that you remember sending Mino to? ... THE WITNESS: Before Mino was launched, I don't recall. …).  Nor does it appear that Xio told them about relevant law, such as U.S. Customs decisions which held that many visual aspects of *Tetris* (including ones that are copied in *Mino*) are copyrightable.

doubtful." (Schmitt Decl.¶ 12.)  It is important to note that, at this time,

development on *Mino* had not begun in earnest and it was months before the game

was finished and released—thus giving Xio ample time to reconsider and decide to

create a new, original game as opposed to merely copying *Tetris*.  Similarly,

documents that have been produced indicate that, in October 2009, Mr. Neu

disagreed with Xio on some "fundamental issues."  (Schmitt Decl.¶ 19.)  Xio,

however, did not cease its efforts to try to reinstate *Mino* on iTunes.  These

documents indicate that Xio received unfavorable opinions from Mr. Neu and

perhaps others regarding whether *Mino* infringed TTC's rights, yet they proceeded

anyway.

Further, Xio's lack of a formal "advice of counsel" defense is no excuse

from producing all of this evidence where, as here, Xio is affirmatively putting

attorney communications at issue by selectively producing certain evidence of

communications with attorneys to support its innocent infringer defense and to

demonstrate good faith and lack of willfulness.  In other words, it is improper and

prejudicial to TTC if Xio is allowed to rely on select advice from counsel in

support of its innocent infringer defense while withholding other evidence of

advice from counsel simply because Xio has not asserted a formal "advice of

counsel" defense.  *See Dorr-Oliver, Inc.*, 834 F. Supp. at 1012 (holding that

defendant's offering of communications with counsel as evidence of their good

faith and lack of willful infringement injected the opinion of counsel into the case and was a waiver of privilege, even though the defendant was not asserting an advice of counsel defense).

> **a.   It Is Improper for Xio to Rely on Communications <u>to</u> Attorneys While Simultaneously Withholding Communications <u>from</u> Attorneys on the Same Topic**

As discussed above, in recent meet and confer sessions, Xio has indicated that it is willing to agree that it will not rely on any communications *from* attorneys (i.e., the advice given to Xio).  However, Xio wants to be able to rely on communications *to* attorneys which show that it sought legal advice on the issue of infringement before *Mino* was released and before the lawsuit was filed— presumably in order to show that it acted in good faith and was an innocent infringer.

Allowing Xio to rely on evidence that it sought legal advice from attorneys is wholly improper as it leaves unanswered the questions of what type of advice Xio received and whether it followed such advice.   In other words, allowing Xio to use the attorney-client privilege in this manner would be misleading and highly prejudicial to TTC because it gives the impression that Xio acted in good faith without disclosing all relevant evidence bearing on this issue—such as what Xio disclosed to the attorneys, what advice the attorneys provided in response, and

whether Xio heeded such advice.[10]  *See Dorr-Oliver, Inc.*, 834 F. Supp. at 1012 (precluding defendants from relying on fact that they had contacted counsel without revealing the substance of counsel's advice).

> **b.      It is Improper for Xio to Rely on Legal Analyses that Reflect Advice from Attorneys While Simultaneously Withholding Evidence of Advice on the Same Topic**

In addition, during meet and confer sessions, Xio has indicated that it seeks to rely on its legal analyses that are purportedly "independent," arguing that they are wholly devoid of any input from lawyers.  It appears that these analyses were drafted by Desiree Golen or Michael Carter (Xio's two principals), or Mr. Carter's sister, Maura Carter.  When these analyses were drafted, these three individuals were recent college graduates in their early 20s, and none of them were lawyers or had studied law. (*See* Schmitt Decl. ¶ 2.)  Given that Xio's objective was to release a game that copied the successful *Tetris* game, it is not surprising that these legal analyses concluded that *Mino* would not infringe *Tetris*.

Recently, Xio's counsel cited to a November 13, 2008, e-mail from Desiree Golen to Gary Reback, an intellectual property attorney in Silicon Valley, as an example of such "independent" analysis.  (*See* Schmitt Decl. ¶ 53, Ex. M.)

---

[10] Moreover, evidence that Xio merely contacted attorneys is not relevant to the issue of good faith.  *Dorr-Oliver, Inc.*, 834 F. Supp. at 1012 ("[m]erely asking a lawyer a question is not in itself probative evidence of good faith," which instead turns on what legal advice was received and whether that advice was followed).

However, according to Xio's own privilege log and documents, Xio was communicating with attorneys *weeks before* this e-mail was sent—as early as October 29, 2008. (Schmitt Decl. ¶ 54, Ex. G).   Further, Xio had been communicating "in anticipation of litigation" with its intellectual property attorney, Jeffrey Neu, beginning at least as early as November 6, 2008, which was one week prior to the November 13, 2008 e-mail to Mr. Reback.   (*See id.*)  Moreover, this email to Mr. Reback was originally withheld as privileged by Xio with the description, "Email re: potential representation," making clear that it was a privileged email seeking legal advice.  (*See id.*)  Thus, it is simply not credible that Ms. Golen's e-mail to Mr. Reback represents her own "independent" legal analysis as it is clearly seeking legal advice and came on the heels of her numerous communications with Xio's intellectual property attorney, Mr. Neu.[11]

Similarly, other documents that Xio apparently asserts reflect purely "independent" legal analysis also appear to reflect Xio's communications with various attorneys, including:

---

[11] In addition to the nature of the communication, the e-mail to Mr. Reback plainly seeks legal advice: "Copyright infringement?", "My question for you," and "Would you say I have a case against the Tetris Company LLC?"  (*See* Schmitt Decl. ¶ 53, Ex. M.)  Thus, it is impermissible for Xio to rely on this email without disclosing the content of the advice it received from attorneys.  *See Dorr-Oliver, Inc.*, 834 F. Supp. at 1012 (precluding defendants from relying on fact that they had contacted counsel without revealing the substance of counsel's advice).

- An analysis of two copyright cases by Maura Carter, which was written on November 12, 2008, several days after she consulted with Mr. Neu (along with Desiree Golen) on November 6, 2008.

- Ms. Golen's blog regarding intellectual property rights associated with *Tetris*, which was written in December 2008 and January 2009, after Ms. Golen had been in touch with several attorneys regarding potential infringement issues.

- Xio's Legal Notes, dated September 29, 2009, which were written almost a year after Xio first contacted Mr. Neu, and appear to have been finalized on the same day that Xio received a privileged memo regarding copyright infringement issues from Mr. Neu.   These Legal Notes are far more detailed and extensive than the initial e-mails that Xio was writing to attorneys in the fall of 2008.

(*See* Schmitt Decl. ¶ 55.)

Moreover, Xio cannot plausibly argue that the contents of these documents reflect Xio's "independent" analysis of any legal issues as Xio's CEO, Ms. Golen, testified that Xio's legal opinion was predicated on and formed by communications with lawyers.  (*See* Schmitt Decl. ¶ 36, Ex. F.)[12]

In addition, TTC is entitled to discover all communications with lawyers on this topic in order to test the reasonableness of Xio's purportedly "independent" legal analyses.  In other words, it would be prejudicial for Xio to be able to rely on its own legal analyses (which self-servingly concluded that *Mino* would not

---

[12] On a separate note, even if Xio had undertaken its own purely "independent" legal analysis prior to contacting attorneys in October 2008, TTC contends that such analysis would be irrelevant to the issues in this case.  In other words, Xio's state of mind in October 2008 is not relevant to Xio's state of mind when the game was released six months later and when Xio was trying to get Mino reinstated on Apple's iTunes Store prior to the filing of the lawsuit—especially since Xio had consulted with numerous attorneys in the interim.

infringe *Tetris*) as evidence of good faith while withholding evidence that attorneys' gave them contrary advice which they ignored.

      In sum, Xio should not be allowed to selectively produce evidence of pre-litigation communications with attorneys that gave them purportedly favorable advice regarding whether *Mino* infringed *Tetris* (such as legal analyses concluding that *Mino* would not infringe *Tetris* that were drafted after communicating with multiple attorneys)*,* while withholding communications with other attorneys on the same issue that may not be favorable to Xio's position in this case.  *See Zip Dee*, 1997 WL 323814, at *1 ("[O]nce a party has produced a favorable opinion as a defense to a willfulness claim . . . it cannot pick and choose among its disclosures by concealing any unfavorable opinions that it may have received.").  Nor is it proper for Xio to be allowed to rely on its communications *to* attorneys without producing all communications *from* attorneys on such topic.

      Such use of privilege as both a sword and a shield is improper and highly prejudicial to TTC.  *See, e.g., Columbia Pictures Television v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1196 (9th Cir. 2001) ("Where a party raises a claim which in fairness requires disclosure of the protected communication, the privilege may be implicitly waived."); *Zip Dee, Inc.*, 1997 WL 323814, at *2 (finding that it would be highly prejudicial to allow a party to selectively disclose certain attorney communications, while shielding others).

Thus, Xio has waived any privilege on this issue and thus should produce all evidence on this issue, or in the alternative, Xio should be precluded on relying on any such evidence in this lawsuit.

> **2.    Xio Has also Waived the Privilege by Failing to Exercise Reasonable Care in Preventing the Disclosure of Potentially Privileged Materials**

In addition, as discussed above, Xio's total lack of diligence and inconsistent positions with regard to privileged materials is utterly shocking.  Throughout discovery, Xio has produced privileged documents only to later claw them back.  In addition, Xio has withheld documents for months on the grounds of privilege only to produce them later after key depositions, which has forced TTC to incur the cost and burden of reopening such depositions.

Notably, as discussed above, Xio failed to conduct an adequate privilege review before producing its documents to TTC, and instead relied on an utterly flawed electronic search for privileged documents.  (*See* Schmitt Decl. ¶¶ 24-32.)  Such electronic search apparently did not include such basic search terms as "privilege," "confidential," or "work product."  (*See* Schmitt Decl. ¶ 24.)  Further, Xio's counsel failed to assert privilege over certain documents—including the Copyright Analysis Notes—even *after* TTC brought such documents to Xio's attention as privileged and identified them by Bates number.  (*See* Schmitt Decl. ¶ 28.)  Instead, Xio waited months before changing its mind and asserting privilege

over the Copyright Analysis Notes when it was introduced as a deposition exhibit. (*See* Schmitt Decl. ¶¶ 28-34.)

As such, it is clear that Xio failed to exercise reasonable care in preventing the disclosure of certain privileged materials.  *See Bensel*, 248 F.R.D. at 180-81. *See also* D.I. 25, Stipulated Protective Order ¶ 13 (stating that the "inadvertent production" of privileged documents shall be deemed a waiver of such privilege if "the Producing Party failed to exercise reasonable care in light of the facts and circumstances surrounding the inadvertent production").  Accordingly, any such privilege in these materials has been waived and they should be produced, or in the alternative, Xio should be precluded from relying on any of this evidence.

### B.    TTC Is Entitled to Reimbursement of its Costs for Bringing this Motion

Provided that the Court grants this motion, an award of fees to TTC is mandatory, unless the Court finds that Xio acted justifiably.  FED. R. CIV. P. 37(a)(5); *see Bowne of NYC, Inc. v. AmBase Corp.*, 161 F.R.D. 258, 262 (S.D.N.Y. 1995).  Here, it is clear that Xio's objections are not justified and that an order requiring Xio to pay TTC's costs and fees is just.  *See Bowne of NYC, Inc.*, 161 F.R.D. at 262 (affirming Magistrate Judge's award of fees because non-moving party had withdrawn a significant number of privilege determinations once challenged, had not offered legal basis for its position during meet and confer

sessions or before the Magistrate Judge, and had failed to address legal authorities cited by the moving party).

First, an award of fees is justified because Xio has acted recklessly, and has failed to take reasonable precautions, with regard to withholding privileged documents in this case. *See Bowne of NYC, Inc.*, 161 F.R.D. at 263. As discussed above, Xio failed to undertake a reasonable privilege review and produced dozens of privileged documents and only clawed them back after TTC discovered them in the course of its document review and identified them to Xio. (*See* Schmitt Decl. ¶ 24.) Further, Xio waited until the deposition of its CEO, Desire Golen, to claw back the Copyright Analysis Notes document, which was one of the documents that TTC had originally identified months earlier as being potentially privileged, and which Xio had expressly decided not to claw back. (*See* Schmitt Decl. ¶ 34.)

Second, an award of fees is also justified due to the egregiously inconsistent positions Xio has taken with respect to its privileged documents since the start of this litigation, without a legal basis. Xio's improper conduct has significantly increased the costs and burden on TTC of pursuing discovery. (*See* Schmitt Decl. ¶¶ 37-41.) It also has forced TTC to reopen Ms. Golen's deposition thereby disrupting the flow of TTC's depositions of Xio's witnesses. *See Bowne of NYC, Inc.*, 161 F.R.D. at 266. For example, the two reopened depositions of Ms. Golen referenced above had to be taken by video conference, rather than in person, unless

31

TTC paid the additional cost of sending its attorneys from New York to California two more times.  (*See* Schmitt Decl. ¶¶ 40-41.)

As discussed above, Xio produced dozens of communications with attorneys originally identified on its privilege log on February 11, 2011—just one week before the end of fact discovery and after all depositions had occurred.  (*See* Schmitt Decl. ¶ 39.)  This dilatory tactic was clearly calculated to preclude TTC from asking Xio's witnesses about the documents during depositions and from raising this discovery dispute earlier.

Moreover, during the reopened deposition of Ms. Golen regarding these documents, Xio's counsel continued to instruct Ms. Golen not to answer questions regarding whether another attorney (Jeffrey Neu) had advised Xio that *Mino* infringed *Tetris*, (*see* Schmitt Decl. ¶¶ 40-41), even though Xio had waived the privilege by producing a draft communication to Mr. Neu on this topic.  (Schmitt Decl. ¶ 41.)

Third, Xio's position, that it seeks to rely on some communications with attorneys, but continues to withhold others on the same topic, is unreasonable and has no basis in the law.  *See Dorr-Oliver Inc.*, 834 F. Supp. at 1012 ("Defendants cannot have it both ways; they cannot seek refuge in consultation with counsel as evidence of their good faith yet prevent [plaintiff] from discovery requests and deposition questions.").

32

And, TTC has raised this issue repeatedly with Xio over the course of several months, explaining TTC's legal position and citing relevant authorities. (*See* Schmitt Decl. ¶¶ 44-45; 49-51.)  To date, Xio has not addressed the authorities cited by TTC, nor has it offered support for its position.  In these circumstances, it is clear that Xio's objections are not justified.  *See Bowne of NYC, Inc.*, 161 F.R.D. at 266 (non-moving party precluded from later arguing legal basis when it did not do so earlier in the dispute before the Magistrate Judge).

Fourth, an award of fees to TTC is not unjust in this context.  TTC has incurred significant expense sorting through the thousands of irrelevant and non-responsive documents produced by Xio, reopening depositions because Xio decided to produce privileged documents after depositions have occurred, and being forced to continue to press for a corrected privilege log, which Xio had still not provided at the time of the filing of this motion.  (*See* Schmitt Decl. ¶¶ 31-32.) In fact, TTC would not be surprised if Xio attempts to make additional revisions to its privilege log yet again in response to this motion.  In addition, if this motion is granted, TTC may be forced to re-open several depositions, incurring even more costs that could have been avoided but for Xio's inconsistent positions with respect to asserting privilege.

IV.   **CONCLUSION**

For the reasons stated above, TTC respectfully requests that the Court (i) compel Xio to  disclose all documents and other evidence that reflects Xio's communications with attorneys before the commencement of this lawsuit regarding the issue of whether *Mino* infringed *Tetris* (including communications about what parts of *Tetris* constitute protectable expression), or (ii) in the alternative, preclude Xio from relying on any of such evidence in support of its "innocent infringer" defense or for any other purpose in this lawsuit.  In addition, TTC respectfully requests that the Court award TTC reimbursement for its attorneys' fees and costs incurred in connection with making this motion.

Date: April 21, 2011                    Respectfully submitted,

                                          /s/ Dale M. Cendali
                                          Dale M. Cendali
                                          Johanna Schmitt
                                          Brendan T. Kehoe
                                          KIRKLAND & ELLIS LLP
                                          601 Lexington Avenue
                                          New York, New York 10022
                                          Tel: 212-446-4800
                                          Fax: 212-446-4900
                                          dale.cendali@kirkland.com
                                          johanna.schmitt@kirkland.com
                                          brendan.kehoe@kirkland.com

/s/ Robert J. Schoenberg_____
Robert J. Schoenberg
RIKER DANZIG SCHERER HYLAND
 & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962-1981
Telephone: (973) 538-0800
rschoenberg@riker.com

Attorneys for Plaintiffs and Counterclaim
Defendants
*Tetris Holding, LLC and The Tetris
Company, LLC*

35