Dale M. Cendali
Johanna Schmitt
Brendan T. Kehoe
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
dale.cendali@kirkland.com
johanna.sch mitt@kirkland.com
brendan.kehoe@kirkland.com

Robert J. Schoenberg
RIKER DANZIG SCHERER HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962-1981
Telephone: (973) 538-0800
rschoenberg@riker.com

Attorneys for Plaintiffs and Counterclaim Defendants
Tetris Holding, LLC and The Tetris Company, LLC

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TETRIS HOLDING, LLC and THE TETRIS COMPANY, LLC, | Case No. 3:09-cv-6115 (FLW) (DEA) |
| Plaintiffs and Counterclaim Defendants, | Hon. Freda L. Wolfson, U.S.D.J.<br>Hon. Douglas E. Arpert, U.S.M.J. |
| - against - | |
| XIO INTERACTIVE INC., | **DECLARATION OF JOHANNA SCHMITT, ESQ. IN SUPPORT OF PLAINTIFFS' RULE 37(A) MOTION TO COMPEL AND FOR COSTS** |
| Defendant and Counterclaim Plaintiff. | ***Document Filed Electronically*** |

I, Johanna Schmitt, Esq., hereby declare as follows:

1.     I am a partner of the law firm of Kirkland & Ellis LLP, counsel to plaintiffs and counterclaim-defendants Tetris Holding, LLC and The Tetris Company, LLC (collectively "TTC") in this action.  I am an attorney admitted to practice in the state of New York and have been admitted *pro hac vice* to practice before this Court.   I submit this declaration in support of TTC's motion pursuant to Federal Rule of Civil Procedure 37(a) to compel and for costs.  This declaration is based on my personal knowledge and my knowledge based on my review of the documents produced in this case and the testimony provided during depositions.

**Xio's Infringement of TTC's Valuable Intellectual Property Rights**

2.     In early October 2008, Xio's CEO, Desiree Golen -- a recent college graduate with no computer programming, game design experience, or legal training -- was aware that people were making up to $125,000 a month from successful iPhone apps .  *See* XIO-DG-0000927, a true and correct copy of which is attached to this Declaration as Exhibit **A**.  Ms. Golen decided to start a company (which would later be named Xio) and enlist her friends "to make a [m]ulti[p]layer game similar to *Tetris* for the iPhone."  *Id.*

3.      Ms. Golen declared that "*Tetris* is my favorite game."  *See* XIO-DG-0001766, a true and correct copy of which is attached to this Declaration as Exhibit **B**.

4.      On October 18, 2008, Ms. Golen contacted TTC to "inquire about [its] licensing options and packages" for making "a game similar to *Tetris* for the mobile platform."  *See* XIO-DG-0001220, a true and correct copy of which is attached to this Declaration as Exhibit **C**.

5.      Also on October 18, 2008, a Xio representative downloaded an officially-licensed version of *Tetris* on his iPhone, which Xio reviewed when developing *Mino*.  *See* XIO-MH-0005575, a true and correct copy of which is attached to this Declaration as Exhibit **D**.  *See also* M. Carter 30(b)(6) Dep. (Jan. 31, 2011) 101:25-102:14), a true and correct copy of which is attached to this Declaration as Exhibit **E**.

6.      This version of *Tetris* prominently displayed a copyright notice indicating that TTC owned the copyright.

7.      TTC denied Xio a license to make a game similar to *Tetris* for the mobile platform on October 20, 2008.  *See* Exhibit **C**.

8.     Beginning at least as early as October 29, 2008, Ms. Golen and another Xio representative, Maura Carter, began contacting multiple intellectual property attorneys in order to prepare for possible infringement claims by TTC.  A true and correct copy of excerpts of the Amended Privilege Log produced by Xio on January 4, 2011, which demonstrate this point, are attached to this Declaration as Exhibit **G**.

9.     In early November 2008, Ms. Golen and Ms. Carter communicated with Jeffrey Neu, Esq., who was eventually retained by Xio as its intellectual property counsel, at least fifteen different times, including for the purpose of Mr. Neu analyzing "information received" from Xio.  *See* Exhibit **G**.

10.    By November 2008 (before development of Mino began in earnest), Xio was aware that TTC owned numerous copyright registrations covering the audiovisual elements of *Tetris*.  *See* Exhibit **B**.

11.    Xio was also aware of a decision by the U.S. Customs Headquarters, which determined that the visual elements of *Tetris* are copyrightable and had been infringed by third-party games.  *See* XIO-DG-0002153 (linking to the U.S. Customs Headquarters opinion), a true and correct copy of which is attached to this Declaration as Exhibit **J**.  In addition, a true and correct copy of this U.S. Customs decision is attached to this declaration as Exhibit **K**.  *See* Mem. to Anthony O.

3

Cormier from Joanne R. Stump, Chief, U.S. Customs Service, Intellectual Property

Rights Branch, re: Pocket Arcade 256 Games in 1 (U.S. Copyright Office

Registration No. PAu 1,284,318), Oct. 25, 2001, 2001 WL 1754754 (Customs)).

*See also Luxury intern., Inc. v. U.S.*, 24 C.I.T. 168, 90 F. Supp. 2d 1294 (Ct. Int'l

Trade  2000) *aff'g* Mem. to Director of Los Angeles/Long Beach Seaport from

Jerry Laderberg, Acting Chief, Intellectual Property Rights Branch, re: TETRIS

(U.S. Copyright Office Registration No. PAu 1,284,318), Nov. 4, 1999 (Customs),

a true and correct copy of which is attached to this Declaration as Exhibit **L**.

12.     Xio claimed to have also been advised by others who were "less

encouraging and very doubtful" of Xio's position on infringement.  *See* XIO-DG-

0002141, a true and correct copy of which is attached to this Declaration as Exhibit

**M**.  Nonetheless, Xio decided to proceed with its plans to make a *Tetris* game.

13.     In November 2008, Xio's principals, Desiree Golen and Michael

Carter, referred to the game they were developing as "Tetris."  *See* XIO-MC-

0019056 and XIO-DG-0002277, true and correct copies of which are attached to

this Declaration as Exhibits **N** and **O**, respectively.

14.     Also, Xio's business plan refers to its game as the "Tetris App."  *See*

XIO-HD-XIO-0000034, a true and correct copy of which is attached to this

Declaration as Exhibit **P**.

4

15.     Further, one of Xio's game designers asked whether it would be "un-tetris-like" to make a game with playing pieces that were all the same color (as *Tetris'* playing pieces use different colors).  *See* XIO-XI-0000083, a true and correct copy of which is attached to this Declaration as Exhibit **Q**.

16.     In addition, it is reflected on Xio's privilege log that during development, Xio's representatives continued to communicate with attorneys on the issue of whether *Mino* infringed *Tetris* until *Mino* was released on Apple Inc.'s iTunes Store in the spring of 2009.

17.     On August 3, 2009, TTC sent a take-down notice pursuant to the Digital Millennium Copyright Act to Apple Inc., which removed *Mino* from its iTunes Store in response.

18.     Xio, however, refused to stop infringing TTC's valuable intellectual property rights and sought to reinstate *Mino* on the Apple iTunes Store.

19.     On October 20, 2009, Ms. Golen disclosed a draft e-mail to Mr. Neu to another attorney.  In the e-mail, Ms. Golen stated that Xio's intellectual property attorney, Jeffrey Neu, apparently disagreed with Xio on some "fundamental issues" and "prefer[red] not to confront the issue of the copyrightability of TETRIS game mechanics."  *See* XIO-DG-0100821, a true and correct copy of which is attached to this Declaration **T**.  On November 3, 2009, Ms. Golen disclosed the

5

same draft e-mail to Mr. Neu to another attorney.  *See* Exhibit **I**, XIO-DG-
0100927.  Both of these e-mails were produced to TTC on February 11, 2011.

20.     According to Xio's privilege log, Xio continued to consult with
attorneys on the issue of whether *Mino* infringed *Tetris* up until the time the
complaint was filed.

**Xio Selectively Produced Evidence Reflecting Communications with
Attorneys on the Issue of Whether *Mino* Infringes *Tetris***

21.     During fact discovery, TTC requested all documents and
communications relating to whether Xio had reason to believe that *Mino* infringes
*Tetris* before the start of this lawsuit, including "all documents concerning whether
*Mino* infringes the intellectual property rights [of TTC], including, but not limited
to, any clearance memoranda and opinion letters of counsel," and all documents
supporting Xio's "innocent infringer" defense.  *See* TTC's First Set of Reqs. Prod.
("First RFPs"), Req. Nos. 34, 101, a true and correct copy of which is attached to
this Declaration as Exhibit **U**.

22.     In response, Xio objected to these requests to the extent they sought
privileged information.   Xio later confirmed that it was not relying on an "advice
of counsel" defense and that it never obtained an opinion letter from counsel that
*Mino* did not infringe *Tetris*.

6

23.     On September 30, 2010, Xio produced the bulk of its documents. TTC produced tens of thousands of irrelevant and non-responsive documents, including spam and personal e-mail that had nothing to do with the case.  As a result, it was extremely difficult and costly for TTC to discover the documents that were actually relevant to its case and to uncover Xio's inconsistent positions with respect to its assertion of the privilege.  In addition, Xio's production contained numerous flaws and technical problems, which further hampered TTC's ability to review the documents and significantly increased the costs of TTC's review.

24.     In the course of its review, TTC discovered dozens of privileged documents that had been produced by Xio on various topics.  TTC later learned that Xio failed to conduct a routine page-by-page privilege review (like the one conducted by TTC), and instead ran unspecified electronic search terms, which seemingly did not include such basic search terms as "privilege," "confidential," or "work product."

25.     Despite the fact that Xio had objected to producing privileged documents regarding whether *Mino* infringes *Tetris* and its "innocent infringer" defense, Xio produced privileged documents on these very topics, including:

- A detailed legal analysis regarding whether *Mino* infringes the visual expression of *Tetris*, including a side-by-side comparison of

7

the games and what constitutes protectable expression (the "Legal Notes").

- Notes of a conversation between Xio's CEO, Desiree Golen, and Xio's attorney, Jeffrey Neu, reflecting Mr. Neu's copyright infringement analysis of *Mino* (the "Copyright Analysis Notes"). The document was originally produced as XIO-DG-0016404.

- Amemorandum from Mr. Neu's law firm to Xio regarding "copyright infringement analysis."  The document was originally produced as XIO-HD-DG-010000000007.  The privilege log entry describing this document is attached to this Declaration as Exhibit **X**.

26.     On October 20, 2010, TTC promptly alerted Xio's counsel and identified dozens of privileged documents by Bates number, including the documents cited above, giving Xio the opportunity to request that TTC return the documents.

27.     As a result, Xio's counsel "clawed back" approximately 100 documents from its production on the basis of privilege.  These "clawed back" documents included some, but not all, of the documents that TTC had identified as potentially privileged.

28.     For example, Xio chose to "claw back" the memorandum from Mr. Neu's firm regarding "copyright infringement analysis," which had originally been produced at XIO-DG-0016404.  However, Xio chose *not* to "claw back" certain privileged documents that TTC had identified, such as the Copyright Analysis

8

Notes and the Legal Notes, and stated in an October 20, 2010, e-mail that "Tetris may continue with its review of [these] documents."

29.    On December 1, 2010, Xio served its privilege log, identifying numerous pre-litigation communications regarding whether *Mino* infringed *Tetris* that Xio had withheld on the grounds of the attorney-client privilege and work product immunity.  *See* Exhibit **S**, which is a true and correct copy of excerpts of Xio's original Privilege Log produced on December 1, 2010.

30.    Xio's privilege log was replete with errors and inconsistencies, such as (i) including documents that Xio had produced and had not "clawed back," (ii) omitting documents that Xio had expressly "clawed back," (iii) identifying other documents that had already been produced.

31.    On January 4, 2011, Xio served an amended privilege log, which also contained numerous errors and inconsistencies, which Xio has not corrected despite numerous requests by TTC.

32.    As of the date of the filing of this motion, Xio has not produced a corrected privilege log, though counsel for Xio has informed me that one will be provided on April 22, 2011.

33.     During depositions of Xio's witnesses in January and February 2011,
Xio's witnesses refused to answer questions during their depositions regarding
certain communications with attorneys on the subject of whether *Mino* infringed
*Tetris* on privileged grounds.  *See* D. Golen Dep. (Jan. 28, 2011) 267:3-12; 283:22-
284:3; 297:7-16, a true and correct copy of which is attached to this Declaration as
Exhibit **F**; *see also* Exhibit **E**, M. Carter 30(b)(6) (Feb. 17, 2011) Dep. 374:25-
375:8.

34.     In addition, Xio "clawed back" the Copyright Analysis Notes during
Ms. Golen's deposition on January 28, 2011, and Ms. Golen was instructed not to
answer questions regarding the document on privilege grounds.

35.     Xio witnesses testified about other pre-litigation communications with
attorneys it had consulted on the issue of infringement.  *See* D. Golen Dep. (Feb.
10, 2011) 327:5-14; 335:18-336:4; 339:2-13, a true and correct copy of which is
attached to this Declaration as Exhibit **H**.  *See also* Exhibit **H**, D. Golen Dep. (Feb.
10, 2011) 322:22-323:9; 326:2-14; 333:9-334:4.

36.     Also, Ms. Golen testified that Xio's legal analyses were predicated on
communications with the lawyers that were contacted.  *See* Exhibit **F**, D. Golen
Dep. (Jan. 28, 2011) 251:11-255:25.

37.     Moreover, in February 2011, TTC had to re-open the deposition of Ms. Golen (Xio's CEO) on two separate occasions—resulting in increased costs for TTC and a disruption of TTC's deposition strategy.  First, Ms. Golen's deposition was reopened on February 10, 2011, after Xio belatedly served an interrogatory response (almost a year after the interrogatory was served) identifying the individuals with whom it had communicated about, among other things, whether *Mino* infringed *Tetris*.  This reopened deposition occurred by video conference so TTC's counsel would not have to travel from New York to San Francisco again.

38.     During her reopened deposition, Ms. Golen testified about her discussions with several lawyers listed in the interrogatory response whose communications had been withheld for months and listed on Xio's privilege log.

39.     On February 11, 2011 (one week before the close of fact discovery), Xio produced dozens of documents that had previously been withheld as privileged, such as communications seeking legal advice on the issue of whether *Mino* infringed *Tetris* when Xio was trying to get *Mino* reinstated on the Apple iTunes store.

40.     Due to the production on February 11, 2011, TTC reopened Ms. Golen's deposition a second time on February 18, 2011 to ask her about these

11

documents.  This reopened deposition occurred by video conference so TTC's counsel would not have to travel from New York to San Francisco again.

41.     During the deposition on February 18, 2011, Ms. Golen continued to assert privilege over communications with Mr. Neu regarding infringement issues. Xio had produced to TTC a draft communication to Mr. Neu regarding his view of infringement, which stated that "we have been unsatisfied with the approach your firm would like to take on this case (namely that you would prefer not to confront the issue of the copyrightability of TETRIS game mechanics) . . ."  *See* Exhibit **I**. *See also* Ex. D. Golen Dep. (Feb. 18, 2011) 436:21-437:15, a true and correct copy of which is attached to this Declaration as Exhibit **R**.

**TTC's Attempts to Resolve this Discovery Dispute**

42.     In order to attempt to resolve this dispute, counsel for the parties met and conferred about this issue multiple times by teleconference.  TTC asked that Xio disclose all communications with attorneys prior to the commencement of this litigation regarding the narrow issue of whether *Mino* infringes *Tetris*, which includes communications about what parts of *Tetris* constitute protectable expression.

43.     In the alternative, TTC requested that Xio agree not to rely on any of this evidence in the case, which Xio has refused.

12

44.     Because the parties were unable to come to an agreement, TTC raised this discovery dispute in a letter to the Court on March 9, 2011, pursuant to Local Rule 37.1(a)(1).  A true and correct copy of this letter is attached to this Declaration as Exhibit **V**.

45.     In Xio's one-page letter in opposition, dated March 10, 2011.

46.     At a status conference with the Court on March 10, 2011, Xio's counsel stated that she could prove that Xio had undertaken an "independent" legal analysis.

47.     The Court instructed Xio to try to prove this to TTC's counsel's satisfaction, or, failing that, TTC could seek additional guidance from the Court.

48.     At a status conference on April 5, 2011, the Court granted TTC leave to file a motion today if this issue could not be resolved by the parties.

49.     On April 6, 2011, TTC's counsel contacted Xio's counsel in order to discuss the issue further, and sent a detailed written summary of TTC's position and a proposal requesting that Xio stipulate to the following terms in lieu of producing the documents requested by TTC:

- Xio agrees not to rely on communications *to or from* attorneys for any purpose, including the fact that Xio contacted attorneys prior to launching *Mino*; and

- Xio agrees that it will not rely on evidence of Xio's legal analysis that was drafted after it started consulting with attorneys in late October 2008.

A true and correct copy of this e-mail from B. Kehoe to S. Maitra is attached to this Declaration as Exhibit **W**.

50.     Xio never responded in writing to TTC's proposal.

51.     Nor has Xio addressed the authorities cited by TTC.

52.     Xio's counsel again stated during an April 15, 2011 meet and confer session that Xio plans to rely on communications from Xio <u>to</u> its attorneys seeking legal advice, as well as legal analyses that Xio claims are "independent," but which were drafted after Xio started communicating with lawyers.

53.     Xio's counsel cited to a November 13, 2008, e-mail from Desiree Golen to Gary Reback, an intellectual property attorney in Silicon Valley, as an example of such "independent" analysis.  *See* Exhibit **M**.

54.     According to Xio's own privilege log and documents, Xio was communicating with attorneys as early as October 29, 2008.  *See* Exhibit **G**. Further, Xio had been communicating "in anticipation of litigation" with its intellectual property attorney, Jeffrey Neu, beginning at least as early as November 6, 2008.  Moreover, this email to Mr. Reback was originally withheld as privileged by Xio with the description, "Email re: potential representation."  *See id.*

55.     Documents that Xio apparently asserts reflect "independent" legal analysis include:

- An analysis of two copyright cases by Maura Carter, which was written on November 12, 2008, several days after she consulted with Mr. Neu (along with Desiree Golen) on November 6, 2008, which was produced at XIO-DG-0002118.  *See* Exhibit **G**.

- Ms. Golen's blog regarding intellectual property rights associated with *Tetris*, which was written in December 2008 and January 2009, after Ms. Golen had been in touch with several attorneys regarding potential infringement issues, located at http://desiree47.wordpress.com/.

- Xio's Legal Notes, dated September 29, 2009, which were written almost a year after Xio first contacted Mr. Neu, and appear to have been finalized on the same day that Xio received a privileged memo regarding copyright infringement issues from Mr. Neu, which was produced at XIO-HD-DG-0016182.

(Signature on the next page)

15

Executed this 21st day of April 2011 at New York, New York.

_____

Johanna Schmitt, Esq.