# EXHIBIT A

**From:** "Desiree Golen"
**To:** tgolen@aol.com, "Golen, Thomas"
**Cc:**
**Bcc:**
**Date:** Mon, 6 Oct 2008 14:42:55 -0700
**Subject:** iPhone App

Hey dad. I'm trying to get a company started to make a MultiPlayer game similar to Tetris for the iPhone.

The market for iPhone games has exploded ever since apple opened its doors to outside developers (the apple Standard Developers Kit which is used to program iPhones, iPods, Mac OS, etc. is now free and available to anyone on the apple website).

I've met with Wayne Westerman, the man who invented the touch screen and the accelerometer interfaces for the iPhone and is Steve Job's right hand man. (Coincidentally he is Michael's sister's boyfriend). He gave me some inside advice, telling me the time to get games out is now.

The appstore is the platform from which these games run. Heres how it works: If you own an iPhone, you access iTunes either on your phone or on you mac. You browse through the different applications that are for sale (apple maintains "whats hot", "top ten paid app" and "top ten free app" sections.), click on one, and it appears on your phone. Its simple and goes straight to your bill. Meanwhile, apple takes a 30% cut out of profits, and sends the game owner a check.

What this means is easy marketing for developers and a direct means of reaping what you sow. Generally, gaming programmers have to jump through hoops to advertise and expose their games. They work on building a community (which is a long and pricey process that usually involves giving your product away for free) and subsequently either 1) opt to sell their company or 2) run advertisements and make money this way. Only after this process do they see any return.

With the Appstore, independent developers name the price, and the product goes directly to the user.

Why apple does this: it wants to attract attention, it wants the iPhone to have snazzy games that appear magically, and it wants to take a significant chunck of the earnings.

60 days after the release of the SDK, the sale of a developers license ($100 for independents and $300 for large companies), and the opening of the appstore, apple hit its 1Million download marker! No doubt because iPhone users define themselves as technically sophisticated, are on average under 30 years of age, and are financially stable. They are the products of the email/internet HERE and NOW generation. They like easy, smooth, features, and they download and use an average of 10 apps per month.

Simple games like Trism (http://blog.wired.com/gadgets/2008/09/indie-developer.html), 2 Across (http://arstechnica.com/journals/apple.ars/2008/08/04/app-store-bringing-in-strong-revenue-for-some-iphone-devs), air hockey, and racing games made by private developers have made 250K each in 2 months! (This is after the 30% cut, after paying back start-up costs, and after paying for the SDK/Developers license).

Large companies have also released games, but have paid less attention to detail. The current Tetris game (which has about 1000 customer reviews, meaning that over 165,000 users have downloaded the app) has only a 2.5 rating out of 5. Customers complain about bugs and the game crashing. (The only reported perks are its nice graphics.) Regardless, Tetris sells at ~10.00 per game and is bringing in money. The only reason they buy the game is because there aren't alternatives.

 What is going on in the www is social networking: Facebook, Myspace, Twitter, Pownce, etc. What everyone would like to see is a multiplayer/social approach to iPhone games.

Currently there is only one multiplayer iPhone app game (Galcon). Coincidentally, Michael worked with the developer, Phil Hassey on the desktop version. So, he put me in contact with Phil, who disclosed his numbers to me: he has sold 10,000 games in a month (at ~$10 per game). The issue with Galcon is that it attracts a very narrow audience. It is a game of strategy and manipulation, and it is hard to get into. Its not something just anyone would play. Its big among developers themselves, but too complicated for the average user. Despite this, he has made ~$100,000. Also, Phil is a good friend of Michael's and is willing to share all of his experience to help my company succeed. He loves the idea of a MP approach to a simpler game.

One night, after discussing the iPhone appstore at length, I thought of Tetranet. **Tetra** is the Greek derivative for numerical units of four. **Net** implies a social network/community. Tetranet is a fast-paced puzzle game which involves arranging blocks of four-subunits on a screen and simultaneously competing with other players. With the iPhone's UI, a lot can be done with Tetranet including implementing poke, flick, and drag properties as well as the tilt and flip (taking advantage of the accelerometer).

By marketing Tetranet as a competative and social entity, we have the power to foster a strong community built by score boards, online buddy systems, and challenge functions (where one user can choose to challenge another player for a higher position on the score board).

**The inherent value of a multiplayer game can double/tripple sales...**

We have the unique opportunity to take advantage of a marketing scheme based on a multiplayer platform: That is, we allow Tetranet owners (hosts) to send challenges out to friends in their address book (guests). Tetranet guests can then download a free version of Tetranet that only permits playing against a host.

The benefit of this is twofold:

1) Our marketing is done for free -- who wouldn't want to challenge friends for free? This

exposes the product. Eventually, guests will be drawn to purchase tetranet (full version) in order to

- play when they want
- challange who they want
- appear on the national scoreboard

2) Being able to play friends who aren't willing to pay is a huge feature that makes the game more valuable.

Phil Hassey took this very approach with his desktop version of Galcon, and this tactic alone created his empire.

In sum, the three reasons why tetranet will absolutely succeed are as follows:

1) The concept is popular- everyone knows about it
2) Its simple to play (dead-simple rules, high replay value), and its simple to develop (much less challenging than poker, for example) and will be FAR better than the existing Tetris flop (which suffers from glitches and thus low ratings).
3) Its multiplayer- first mover advantage/ chance to take advantage of social network


**Why no one else has done this yet...**

When EA announced Tetris, no one thought it would be as bad as it is. At this point, its just a matter of time until someone beats them.

I am in the unique position of having direct, daily contact with some of the best engineers, artists, and electronic musicians in the industry. The number-one problem that businesses is face is recruiting good talent. However, Michael has provided me with bios of different developers with whom he has worked, and he knows which ones are the most efficient, creative, and driven.

Ive got a team together that is eager to get started (music producer, game app developer, network developer, and UI coder).

**My position**

The only way I can get a large cut in this is if I take care of everything BUT programming. My responsibilities are to secure funding, incorporate, and to take care of negotiations/lawyers/license, and advertising. This way, all that remains is sitting my team down and letting them do what they are good at.

In their minds, I have done and will continue to do all of the "hard work". This way, I set the terms.

I have calculated $5,000 start-up expenses. (See spreadsheet)

**My options for funding, in no particular order, are as follows:**

1) Use what we have (my macbook, one of the deveoper's iPhones), take lower cut because my role is less significant; they might be able to do it on their own.

2) Wait to months: Earn $2,000 income, then fund the project by myself on bare minimum funds

3) Fund project completely on credit, earn $2000 later if startup fails

4) Seed Investor Pomona alumn, full $5k for 5-10%

5) Michael's mom $5,000 at 5%

6)  Incorporate first. (Latancy period long.) Find and apply to established seed investor (I have two personal introductions to angel investors).

I can explain each of these further on the phone.

My questions to you are:

1) Is it possible to fund on credit/is the personal risk too high? If not, how do I go about extending my credit limit/ setting fixed interest rates or at least negotiating the best interest rates? Would some banks be better for this than others?

2) Do you think its a bad idea to get funding from MC's mom, considering the personal relationship?

3) Pomona alumn investor: pro is that we can start ASAP, con is that he seems to want to micromanage and will most likely want a higher cut

Also, I am doing some research about incoroprating a business. So far, I have read that a C-corp is good to begin in delaware because a good evnironmet exists for business owners ("business is always right" mentality). In CA, on the other hand, users are always right. BUT doing a c-corp out-of-state disqualifies you from 800$ first year rebate for CA businesses. Plus, you have to pay fees ($400) for running out of CA.

A C-corp in CA would not be wise for a small business (taxed twice).

S-corp seems to be best option for Ca:
- exempt from corporate tax
- Can update to C-corp smoothly
- Better for small businesses with individual owners (not VC companies)
- more likely to be considered for buy-out later on (than LLC)

As far as I know, no s-corp status exists in delaware.

Any input here?

-Des

**Attachment**: startup_expenses.ods

# EXHIBIT B

**From:** "Desiree Golen"
**To:** jturner@julieturnerlaw.com
**Cc:**
**Bcc:**
**Date:** Sat, 8 Nov 2008 02:43:14 -0800
**Subject:** Pro Bono Legal Consultation

Dear Julie,

Thank you for getting back to us!. I am very excited to be able to get some answers to my questions. I would love to meet sometime this coming week to discuss a few things.

I am currently in the process of developing a Tetromino game (http://en.wikipedia.org/wiki/Tetromino) with multi-player capabilities and new added features such as special keys, called TetraNet.

I have been following the Tetris story for the last few weeks and have learned a lot about patents, copyrighted materials, and trademark. As far as I know, and this is why I am requesting counsel, The Tetris Company LLC has no patent on the game concept of Tetris. Furthermore, my understanding of copyright in a programming context is as follows: it is certainly a copyright infringement to steal a developer's codebase without permission and SELL his/her product. However, unless a concept is patented, it is perfectly legal to create the "same" application from the ground up. By "same", I mean an application with identical features, NOT an application produced through stolen code.

The code for TetraNet is native. We have written everything completely from the ground up (Objective C in Xcode, available through Apple's SDK). We did not somehow get our hands on the the Tetris Company's code for their iPhone application and paste it into Xcode.

Moreover, as far as I know, "Tetris", or more correctly put, "Tetromino" is not a patented game. It was first created in Russia under the Soviet Union. Because private ownership was not an option, the developers of the original Tetromino game never claimed a patent. By the time Tetris (what it was later called) became popular in other countries including Japan, private game companies could not claim a patent because Tetromino was already widely popular and available in Russia.

Despite all of this, Henk Rogers and his legal hounds have been scavenging the Internet and terrorizing individual game developers (who use their own code, graphics, and music to develop and extend on the original Tetris) only to shut them down and steal their ideas.

In the last few months, The Tetris Company has attacked various iPhone developers who have attempted to compete with Tetris' buggy and overpriced application on the iPhone mobile platform.I have corresponded with Noah Witherspoon, the developer of Tris, who sent me a transcript of the Cease and Desist letter he received from the Tetris Company LLC. (see attached for file)

The developers of Teto Teto, Touchris, Shaker, and Kafablo received similar letters. Unfortunately, each developer was legally (and financially) unprepared to contradict the Tetris Company's claims of infringement with any legal backing. So, Apple, choosing to avoid any legal entanglement, submitted to The Tetris Company's request and terminated each application, one after another. (Attached is Noah's correspondence with Apple on the issue)

Tetris is my favorite game! I have been experimenting with new concepts for TetraNet, but I first would like to ensure that I fully understand the legal issues surrounding this controversy before I release my application. I would also like to draft an appropriate response to the C&D employed by the Tetris Company LLC.

Here is my most important question for you that perhaps we can discuss this coming week: does the Tetris Company have any valid claim to take action under the United States Copyright law? Because it seems to me that the Tetris Company is using the term "copyright" and "copy" incorrectly to bully third party developers (and apple) into removing their work from the appstore unjustly.

Some additional Information on my application, TetraNet:

1) Name: Tetra=greek derivative of four; Net= implies a social gaming network. (I.e two player and multi-player capabilities)

2) Description: TetraNet is a puzzle game which consist of arranging tetrominos on a screen in order to clear rows. Additional features include network play and "special keys". When you clear a row that contains a "special key" embedded in a tetromino piece, a function is called: "C" for example clears your opponent's board. "S" switched boards. "X" scrambles opponent's board.

Further informative websites I found helpful:
Below are some links that I found helpful:
http://everything2.com/index.pl?node_id=776131
http://abednarz.net/wp/?option=com_content&task=view&id=13&Itemid=45 (Kafablo)
http://www.whatsoniphone.com/node/5618 (Shaker)
http://www.macworld.com/article/135200/2008/08/iphone_tetris.htm/ (tris)

As I said previously, I would absolutely love to get together and discuss the above issues. I am also a big fan of Red Rock, if its convenient for you. I am available on Tuesday after 2:00 pm, and basically all day Wednesday and Thursday. Please let me know what works best for you.

Thank you for all of your time. I really appreciate it; Any advise or guidance you can offer will bring me one step closer to ensuring an open Tetromino market!

Thank you once more,

Desiree Golen


On Thu, Nov 6, 2008 at 3:13 PM, Julie Turner <jturner@julieturnerlaw.com> wrote:

Hi Maura,

I would be more than happy to sit down with you and your partner and have a conversation about some of the contours of the law and the more specific questions on your mind. In order to prepare (and to make sure I have no conflicts), it would help me greatly if you could tell me the name of the other company (the one sending the cease and desist letters) and what they claim to have rights in.

I'm in Palo Alto. We could meet up at your office or at a Mountain View coffee house if you'd like.

Cheers,
Julie



Julie S. Turner
Turner Boyd LLP

Office: 650-494-1530
Fax: 650-472-8028
Cell: 408-914-1456

---

**Attachment**: noah_CD.doc

---

**Attachment**: noah_Apple.doc

# EXHIBIT C

**From:** "Desiree Golen"
**To:** "Michael Carter"
**Cc:**
**Bcc:**
**Date:** Mon, 20 Oct 2008 12:47:43 -0700
**Subject:** Fwd: Tetris Licensing Packages

---------- Forwarded message ----------
From: **Gerilynn Okano** <gerilynn@blueplanetsoftware.com>
Date: Mon, Oct 20, 2008 at 12:39 PM
Subject: Re: Tetris Licensing Packages
To: Desiree Golen <desiree.golen@gmail.com>

Hi Desiree,

Thank you for your email.  I work for Blue Planet Software, Inc., the licensing agent for
The Tetris Company, LLC.  While we appreciate your interest in licensing Tetris for the
mobile platform, we cannot grant you a license for Tetris because we already have an
exclusive licensee on this platform.

Best regards,
Gerilynn M. Okano
Administrator, Legal Affairs
Blue Planet Software, Inc.
55 Merchant Street, 17th Floor
Honolulu, HI 96813
Tel: 808.954.6114
Fax: 808.954.6101
Email: gerilynn@blueplanetsoftware.com

Blue Planet Software, Inc. is the sole agent for
The Tetris Company, LLC.

On Oct 18, 2008, at 4:33 PM, Desiree Golen wrote:

> Hi, my name is Desiree Golen. I am considering developing a game similar to
> Tetris for the mobile platform, and I am emailing to inquire about your licensing
> options and packages.
>
> Thank you for your time,

I look forward to your response,

Desiree Golen

# EXHIBIT D

**From:** iTunes Store
**To:** mghunt@gmail.com
**Cc:**
**Bcc:**
**Date:** Sat, 18 Oct 2008 22:40:10 -0700 (PDT)
**Subject:** Your receipt #6080985807

**Billed To:**
mghunt@gmail.com
Martin Hunt
151 Calderon Ave, Apt #253
Mountain View, CA 94041

**Order Number:** MGJFWKDDH9
**Receipt Date:** 10/18/08
**Order Total:** $7.99
**Billed To:** MasterCard .... 1719

| Item Number | Description | Unit Price |
|---|---|---|
| Q1267 | TETRIS, v1.0.86, Seller: Electronic Arts | $7.99 |
| | Report a Problem | |



| | | |
|---|---|---|
| | Subtotal: | $7.99 |
| | Tax: | $0.00 |
| | Order Total: | $7.99 |

iBowl
SGN

Crash Bandicoot Nitro Kart 3D
Vivendi Games Mobile

Vegas Pool Sharks Lite
Chillingo Ltd

**Please retain for your records.**
Please See Below For Terms And Conditions Pertaining To This Order.

**Apple Inc.**
You can find the iTunes Store Terms of Sale and Sales Policies by launching your iTunes application and clicking on Terms of Sale or Sales Policies

Answers to frequently asked questions regarding the iTunes Store can be found at http://www.apple.com/support/itunes/store/

Account Information • Purchase History

Apple respects your privacy.
Information regarding your personal information can be viewed at http://www.apple.com/legal/privacy/

Copyright © 2008 Apple Inc. All rights reserved

# EXHIBIT E

# In The Matter Of:

*TETRIS HOLDING, LLC*
*v.*
*XIO INTERACTIVE INC.*

_____

## *MICHAEL CARTER - 30(b)6*
### *January 31, 2011*

_____

**MERRILL CORPORATION**
LegaLink, Inc.

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

## Page 101

12:58:29  1    MS. MAITRA: Objection; vague; calls for a
12:58:32  2  legal conclusion.
12:58:33  3    THE WITNESS: You know, I'm not really sure
12:58:35  4  about the terms here, whether something is the same as a
12:58:39  5  branded game or not. What I can say is that Mino, as
12:58:45  6  produced by -- as developed by Xio, takes a lot of
12:58:50  7  similar rules from a whole slew of games, and there's no
12:58:53  8  exact set of rules we've taken. And I think it's very
12:58:57  9  likely that the rules -- the rules of some of the games
12:59:00  10  that your client has a copyright registration to are
12:59:03  11  similar to some of the rules that we have.
12:59:05  12    MS. CENDALI: Q. So Xio was aware of the
12:59:08  13  Tetris iPhone game when it created Mino; isn't that
12:59:12  14  true?
12:59:13  15    MS. MAITRA: Objection; asked and answered.
12:59:15  16    THE WITNESS: As I said earlier --
12:59:19  17    MS. CENDALI: Q. Can you answer that yes?
12:59:20  18  Xio was aware of the Tetris iPhone game when it created
12:59:24  19  Mino? Yes or no. Are you capable of answering that yes
12:59:28  20  or no?
12:59:28  21    MS. MAITRA: Objection; asked and answered.
12:59:29  22  And he answered it completely straightforwardly before.
12:59:32  23    THE WITNESS: So I think I said before that
12:59:33  24  yes, Xio Interactive was aware --
12:59:35  25    MS. CENDALI: Q. And isn't it in fact true

## Page 102

12:59:37  1  that in developing Mino, Xio downloaded the Tetris
12:59:44  2  iPhone game and studied it?
12:59:49  3    MS. MAITRA: Objection; compound and vague.
12:59:53  4    THE WITNESS: So I don't think that that is a
12:59:55  5  true statement that you made. I don't think that Xio,
01:00:04  6  in developing Mino, downloaded EA Tetris and studied it.
01:00:10  7    MS. CENDALI: Q. Did it download it?
01:00:11  8    A. So Martin Hunt downloaded, I believe, EA's
01:00:17  9  Tetris, and I know that myself and Desiree and Martin
01:00:25  10  then looked at it for the purpose of understanding the
01:00:27  11  competition, and to see -- really what we wanted to see
01:00:32  12  was why a game in this space would have such a poor
01:00:36  13  rating. And, you know, we mostly did it because we were
01:00:40  14  interested in the competition in our space.
01:00:57  15    Q. Let me show you what's been marked as
01:00:59  16  Exhibit 7.
01:01:06  17    (Whereupon, Deposition Exhibit 7 was
01:01:06  18    marked for identification.)
01:01:07  19    MS. CENDALI: Q. Is Exhibit 7 a printout of
01:01:09  20  some of the expenses of Xio Interactive relating to the
01:01:15  21  development of Mino?
01:01:18  22    A. Uh-huh. So what are you asking again? Sorry.
01:01:22  23  You're asking if it is the expense report?
01:01:26  24    Q. Yes. I'm just establishing that isn't this a
01:01:29  25  copy of a spreadsheet from Xio that was produced to us

## Page 103

01:01:37  1  in discovery?
01:01:37  2    A. Yes, I believe that to be the case.
01:01:39  3    Q. Okay. And this discusses -- this document
01:01:44  4  indicates what was purchased and when in relation to
01:01:48  5  the development of Mino; isn't that true?
01:01:52  6    A. Yes.
01:01:53  7    Q. And isn't it true that this document
01:01:58  8  indicates --
01:01:59  9    A. Sorry. I don't know that everything here
01:02:01  10  relates to the development of Mino. I know that it
01:02:04  11  relates to the expenses of Xio Interactive as a whole.
01:02:08  12    Q. And the only game that Xio Interactive ever
01:02:12  13  released was Mino, right?
01:02:12  14    A. Xio Interactive released Mino, as well as Mino
01:02:17  15  Lite, and developed other games that they didn't
01:02:20  16  release.
01:02:21  17    Q. Right. Look at the heading on October 18th,
01:02:25  18  2008.
01:02:26  19    A. Yes.
01:02:27  20    Q. Isn't it -- doesn't that show that, as you
01:02:32  21  have characterized it, Xio spent $7.99 to purchase the
01:02:38  22  Tetris EA App Store game?
01:02:42  23    MS. MAITRA: Objection; mischaracterizes
01:02:43  24  testimony.
01:02:45  25    THE WITNESS: So what I was saying before is

## Page 104

01:02:47  1  that Martin purchased the game for his iPhone, and we
01:02:51  2  then looked at it to have an understanding of why
01:02:54  3  competitors in our space would have such a low rating,
01:02:58  4  and I think that this indicates that we either intended
01:03:02  5  to or considered reimbursing Martin Hunt.
01:03:06  6    MS. CENDALI: Q. Right. So isn't it true
01:03:08  7  that Martin Hunt, one of the shareholders of Xio and one
01:03:14  8  of the people who worked on developing Mino, downloaded
01:03:19  9  and purchased the Tetris EA iPhone game on October 18th,
01:03:24  10  2008?
01:03:26  11    MS. MAITRA: Objection; lacks foundation; and
01:03:28  12  asked and answered.
01:03:32  13    THE WITNESS: I don't know that it was exactly
01:03:33  14  October 18th, 2008. It may well have been that's when
01:03:37  15  we considered reimbursing Martin, but it was likely
01:03:41  16  around that date that Martin downloaded and purchased a
01:03:45  17  version of a game by EA called Tetris.
01:03:48  18    MS. CENDALI: Q. And isn't it true in
01:03:50  19  developing Mino, you and the other folks at Xio looked
01:03:57  20  at the Tetris EA game?
01:03:59  21    MS. MAITRA: Objection; vague; and asked and
01:04:01  22  answered.
01:04:02  23    THE WITNESS: I'm not sure what you mean by
01:04:04  24  "in developing Mino." When we were developing Mino, we
01:04:08  25  primarily were looking at our graphics, assets, and our

MICHAEL CARTER - 2/17/2011

322

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF NEW JERSEY

3                    --oOo--

4    TETRIS HOLDING, LLC and THE        )
     TETRIS COMPANY, LLC,               )

5                                       )
              Plaintiffs and            )

6             Counterclaim-Defendants,)
                                        )

7        vs.                           )Civil Action No.
                                       )3:09-CV-6115(FLW)(DEA)

8                                       )
     XIO INTERACTIVE INC.,              )

9                                       )
              Defendant and            )

10            Counterclaim-Plaintiff. )
     _____)

11

12

13            VIDEOTAPED DEPOSITION OF

14                 30(b)(6)

15              MICHAEL CARTER

16      _____

17            February 17, 2011

18         Volume II (Pages 322 - 378)

19

20

21   REPORTED BY:

22   JULIE ANNE ZEIGLER, RPR, CSR 9750        JOB #433584

23

24

25

MICHAEL CARTER - 2/17/2011

01:19:01 1  power to ensure that anything that was expressive we
01:19:02 2  created uniquely and authored uniquely ourselves. And
01:19:44 3  so, by doing so, we made sure that we would not infringe
01:19:45 4  on any expressive elements in any other product by
01:19:49 5  anyone. So, you know, that's the -- I believe the facts
01:19:34 6  surrounding that defense.
01:19:37 7      Q. And isn't it true that you spoke to various
01:19:50 8  lawyers who told you that it was iffy as to whether
01:19:57 9  Mino would infringe or not?
01:19:50 10     MS. MAITRA: Objection; vague.
01:20:02 11     THE WITNESS: So, you know, I don't know if
01:20:06 12 any lawyer said that or not. What I do remember is, in
01:20:50 13 general, that, you know -- I can't talk about the
01:20:54 14 lawyers that we actually sought legal counsel with the
01:20:59 15 expectation of privilege, and I know that, you know, I
01:29:03 16 can't really talk about that under privilege, but I know
01:29:06 17 that the sort of cursory discussions we had with lawyers
01:29:20 18 who we weren't seeking legal counsel from was that it
01:29:25 19 was -- in general, IP is -- IP law is complicated, and
01:29:20 20 that, you know, you have to look at the specifics in
01:29:25 21 order to make any sort of judgment. And I don't think
01:29:28 22 that we really sought further time with any of those --
01:29:20 23 with any lawyers then to have them put in the effort to
01:29:35 24 write an opinion letter that would describe whether or
01:29:38 25 not the elements were functional or nonfunctional or

371

01:20:29 1  on those documents. They relate directly to the
01:20:29 2  innocent infringement defense, and we're entitled to
01:20:30 3  inquire on them. And the only reason that we weren't
01:20:33 4  able to proceed more efficiently today was because your
01:20:52 5  client continued to make long-winded speeches as opposed
01:20:54 6  to directly answering questions.
01:20:50 7      MS. MAITRA: I entirely disagree.
01:20:50 8      MS. CENDALI: I would like to mark Exhibit 108
01:21:03 9  for the record.
01:21:56 10     MS. MAITRA: Is this your last question? And
01:22:05 11 if it's not your last question, then we're going to walk
01:22:09 12 out. Okay?
01:22:09 13     MS. CENDALI: That's your choice.
01:22:10 14 I'm marking -- show him Exhibit 108.
01:22:17 15     (Whereupon's, Deposition Exhibit 108
01:22:18 16     was marked for identification.)
01:22:22 17     THE WITNESS: Can you be clear that this is
01:22:23 18 the last question.
01:22:28 19     MS. MAITRA: No, no, if she keeps going, then
01:22:35 20 we'll walk out.
01:22:23 21     THE WITNESS: I'd rather walk out now if it's
01:22:27 22 not the last question.
01:22:25 23     MS. MAITRA: Okay. It's your choice.
01:22:25 24     MS. CENDALI: I haven't even asked the
01:22:29 25 question yet.

373

1  expressive or nonexpressive.
2      MS. MAITRA: Okay, Dale, that's it. We're
3  walking out. We had long discussions --
4      MS. CENDALI: I'm going to --
5      MS. MAITRA: Hold on. Hold on. Let me
6  finish, please.
7      MS. CENDALI: Go ahead, finish.
8      MS. MAITRA: We had long discussions about the
9  time limit for this particular deposition. Your counsel
10 expressly agreed that it would be no more than one hour.
11 We expressed our concern whether or not you would hold
12 to that one hour, and your counsel expressly said yes,
13 it will only be one hour, and for only that reason are
14 we sitting here today. You've gone well over an hour
15 now. And now I will let you ask one more question and
16 then we're leaving. Okay?
17     MS. CENDALI: No.
18     MS. MAITRA: You can raise it with the Court
19 if you want to.
20     MS. CENDALI: And I will. You produced last
21 night a whole bunch of documents that should have been
22 previously produced.
23     MS. MAITRA: Absolutely not. What happened
24 last night --
25     MS. CENDALI: We are entitled to a deposition

372

1      MS. MAITRA: I said one last question. So she
2  can ask the last question.
3      MS. CENDALI: Q. Look at Exhibit 108, which
4  is an e-mail from Desiree Golen to Sean DeBruine dated
5  November 3rd, 2009. In this e-mail, she writes, "Hi
6  Sean, I thought I would update you on what's going on
7  with our legal situation. I spoke with many attorneys
8  after our lunch meeting last month, and I'm considering
9  a pretty good arrangement with Mark Lemley's new firm
10 Durie Tangri. I am in the process of drafting a letter
11 to the firm I am now working with to inform them that I
12 would like to terminate our agreement and seek alternate
13 legal representation. I have never done this before,
14 and I could use any advice you may have." She goes on
15 to then attach her draft letter to her previous law
16 firm, Xio's previous law firm, Jeff Neu, and it says,
17 "Dear Jeff, I would like to thank you for your time and
18 effort thus far in our case with the Tetris Company.
19 Unfortunately, we have been unsatisfied with the
20 approach your firm would like to take on this case;
21 namely that you would prefer not to confront the issue
22 of the copyrightability of Tetris game mechanics, and we
23 would like to look for alternative legal representation
24 more in line with our goals." Do you see that? My
25 question to you is, isn't it true that your counsel --

374

Merrill Corporation - San Francisco

MICHAEL CARTER - 2/17/2011

| | |
|---|---|
| 01:22:59 | 1  isn't it true that Mr. Neu had told you that Mino would |
| 01:23:24 | 2  likely be infringing? |
| 01:23:28 | 3       MS. MAITRA:  Okay.  I instruct you not to |
| 01:23:27 | 4  answer that.  That's attorney-client privilege.  And |
| 01:23:30 | 5  this deposition is over. |
| 01:23:32 | 6       MS. CENDALI:  Okay.  Fine. |
| 01:23:34 | 7       THE WITNESS:  I can't answer that based on the |
| 01:23:35 | 8  attorney-client privilege. |
| 01:23:37 | 9       MS. CENDALI:  Fine.  We will go to Court.  We |
| 01:23:39 | 10  will get more time.  These documents should have been |
| 01:23:42 | 11  produced long ago, and your clients should be sanctioned |
| 01:23:46 | 12  for the way they're answering questions.  Goodbye. |
| 01:23:52 | 13       THE VIDEOGRAPHER:  The marks the end of |
| 01:23:54 | 14  Videotape No. 1 in the deposition -- |
| 01:23:57 | 15       MS. CENDALI:  Wait, wait.  No, no.  Go back on |
| 01:23:58 | 16  the record.  Go back on the record. |
| 01:24:00 | 17       THE VIDEOGRAPHER:  Still on.  Still on. |
| 01:24:02 | 18       MS. CENDALI:  I would like the record to |
| 01:24:03 | 19  reflect that I would like to ask the witness about all |
| 01:24:06 | 20  the documents that were produced late last night that we |
| 01:24:11 | 21  have not had a chance to ask him or Desiree Golen, the |
| 01:24:15 | 22  author of the documents, about.  And we would like |
| 01:24:18 | 23  either Mr. Carter or Ms. Golen to be produced for |
| 01:24:23 | 24  deposition forthwith so we can ask them about these late |
| 01:24:28 | 25  produced documents. |

375

```
 1        THE VIDEOGRAPHER:  This marks the end of
 2  Videotape No. 1 in the deposition of Michael Carter.
 3  Going off the record.  The time is 1:24.
 4
 5        (Whereupon, the deposition was
 6        adjourned at 1:24 p.m.)
 7
 8        --oOo--
 9
10        I declare under penalty of perjury that the
11  foregoing is true and correct.  Subscribed at
12  _____, California, this ____ day of
13  _____, 2011.
14
15
16
17
18        _____
19             MICHAEL CARTER
20
21
22
23
24
25
```

376

```
 1            CERTIFICATE OF REPORTER
 2
 3
 4        I, JULIE ANNE ZEIGLER, a Certified Shorthand
     Reporter, hereby certify that the witness in the foregoing
 5  deposition was by me duly sworn to tell the truth, the
     whole truth and nothing but the truth in the
 6  within-entitled cause;
 7        That said deposition was taken down in shorthand
     by me, a disinterested person, at the time and place
 8  therein stated, and that the testimony of the said witness
     was thereafter reduced to typewriting, by computer, under
 9  my direction and supervision;
10        That before completion of the deposition, review
     of the transcript was requested, if requested, any changes
11  made by the deponent (and provided to the reporter) during
     the period allowed are appended hereto.
12
13        I further certify that I am not of counsel or
     attorney for either or any of the parties to the said
14  deposition, nor in any way interested in the event of this
     cause, and that I am not related to any of the parties
15  thereto.
16        DATED: February 25, 2011
17
18
19
20
21        _____
22             JULIE ANNE ZEIGLER, RPR, CSR 9570
23
24
25
```

```
 1                  February 25, 2011
 2  Michael Carter
    333 Franklin St. No. 8
 3  Mountain View, CA  94041
 4
    Re:  Tetris Holding, LLC vs. Xio Interactive, Inc.
 5
 6  Dear Mr. Carter:
 7  Please be advised that the original transcript of your
    deposition taken February 17, 2011 in the above-entitled
 8  matter is available for reading and signing  The original
    transcript will be held at the offices of Merrill Legal
 9  Solutions, 135 Main Street, Fourth Floor, San Francisco,
    CA 94105 (415) 357-4300, for thirty (30) days in
10  accordance with Federal Rules of Civil Procedure Section
    30 (e).  If you do not sign your deposition within 30
11  days, it may be used as fully as though signed.
12  If you are represented by counsel in this matter, you may
    wish to ask your attorney how to proceed.  If you are not
13  represented by counsel and wish to review your transcript,
    please contact our office for a mutually convenient
14  appointment to review your deposition.
15  Thank you for your cooperation in this matter.
16
17  Sincerely yours,
18
19  JULIE ANNE ZEIGLER, RPR, CSR 9570
20  cc:  Original transcript
         Dale Cendali, Attorney at Law
21       Sonali Maitra, Attorney at Law
22
23
24
25
```

# EXHIBIT F



**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
---oOo---
TETRIS HOLDING, LLC and THE      )
TETRIS COMPANY, LLC,             )
                                 )
        Plaintiffs and           )
        Counterclaim-Defendants, )
                                 )
    vs.                          )Civil Action No.
                                 )3:09-CV-6115(FLW)(DEA)
XIO INTERACTIVE INC.,            )
                                 )
        Defendant and            )
        Counterclaim-Plaintiff.  )

VIDEOTAPED DEPOSITION OF

DESIREE GOLEN

January 28, 2011

REPORTED BY:
JULIE ANNE ZEIGLER, RPR, CSR 9750      JOB #4432442

---

**2**

    I N D E X
    INDEX OF EXAMINATIONS
                                     Page
EXAMINATION BY
MS. CENDALI                           10

    EXHIBITS MARKED FOR IDENTIFICATION
No.      Description        Page
Exhibit 1  E-mail from Desiree Golen to    29
    Thomas Golen dated October 6, 2008.
    Subject:  IPhone app.
    Bates stamped XIO-DG 927 - 931.

Exhibit 2  E-mail from Thomas Golen to Desiree    63
    Golen dated October 7, 2008.
    Subject: iPhone app.  Bates stamped
    XIO-DG 200021.
Exhibit 88  WordWeb Online dictionary definition   70
    for "look like."

Exhibit 3  E-mail from Desiree Golen to Kathryn    78
    Flynn dated October 6, 2008.
    Subject: iPhone app. Bates stamped
    XIO-DG 200016 - 200019.
Exhibit 4  Document entitled "Securities           88
    Register."

Exhibit 5  Document entitled "Startup Expenses." 91
    Bates stamped XIO-DG 932.
Exhibit 6  Document entitled "Sheet 1" dated    121
    10/18/08 from Desiree Golen's desktop.
    Bates stamped XIO-HD 1449.
Exhibit 7  E-mail from Desiree Golen to         124
    licensing@tetris.com dated October 18,
    2008. Subject: Tetris Licensing
    Packages. Bates stamped XIO-DG 1194.

---

**3**

    EXHIBITS MARKED FOR IDENTIFICATION CONTINUED
No.      Description        Page
Exhibit 8  E-mail from Desiree Golen to Michael  130
    Carter dated October 20, 2008.
    Subject: Tetris Licensing Packages.
    Bates stamped XIO-DG 1220 - 1221.

Exhibit 9  E-mail from Desiree Golen to Maura   131
    Carter dated October 23, 2008.
    Subject: Tetris Licensing Packages.
    Bates stamped XIO-DG 1297 - 1298.
Exhibit 10  E-mail from Desiree Golen to        132
    mauracarter@gmail.com dated October
    22, 2008. Subject: iPhone Phun!
    Bates stamped XIO-DG 1272.

Exhibit 11  Document with the file name "Business 135
    Plan."  Bates stamped XIO-HD 34.
Exhibit 12  Initial Disclosures of Defendant    145
    Xio Interactive, Inc.

Exhibit 13  E-mail from Michael Carter to        147
    Martin Hunt dated November 15, 2008.
    Subject:  Go see Mike Jurewitz
    present about iPhone dev.
    Bates stamped XIO-MH 7567.

Exhibit 14  E-mail from Desiree Golen to         150
    Michael Carter dated November 20,
    2008.  Subject: Haha Tetris Article.
    Bates stamped XIO-DG 20062.
Exhibit 15  E-mail from Michael Carter to        152
    Martin Hunt, cc'd Desiree Golen
    dated November 22, 2008. Subject:
    Open GL.  Bates stamped XIO-MC
    19056 - 19057.
Exhibit 16  E-mail from Michael Carter to        154
    xiointeractive@googlegroups.com
    dated December 28, 2008. Subject:
    Feature: Multiplayer room size?
    Bates stamped XIO-XI 8 - 9.

---

**4**

    EXHIBITS MARKED FOR IDENTIFICATION CONTINUED
No.      Description        Page
Exhibit 17  E-mail from Desiree Golen to Richard 164
    Lewis dated January 12, 2009.
    Subject: Greetings!  Bates stamped
    XIO-DG 3936.

Exhibit 18  E-mail from Martin to Xio            167
    Interactive dated January 19, 2009.
    Subject: Menu Screen.  Bates
    stamped XIO-XI 20 - 22.
Exhibit 19  E-mail from Desiree to Xio           175
    Interactive dated January 6, 2009.
    Subject: Music. Bates stamped
    XIO-XI 12.

Exhibit 20  E-mail from Martin Hunt to          179
    xiointeractive@googlegroups.com
    dated January 25, 2009. Subject:
    User Input Feedback.  Bates
    stamped XIO-XI 25 - 26.

Exhibit 21  E-mail from Martin Hunt to          180
    xiointeractive@googlegroups.com
    dated February 3, 2009. Subject:
    Multiplayer features: back to back
    line clearing bonuses. Bates
    stamped XIO-XI 33.
Exhibit 22  E-mail from Desiree Golen to        182
    xiointeractive@googlegroups.com
    dated February 11, 2009. Subject:
    glacier tiles.  Bates stamped
    XIO-XI 83.
Exhibit 23  E-mail from Jacob Rus to            184
    xiointeractive@googlegroups.com
    dated February 11, 2009. Subject:
    Nightmare Mode. Bates stamped
    XIO-XI 91.
Exhibit 24  E-mail from Mario Balibrera to      185
    xiointeractive@googlegroupls.com
    dated February 12, 2009. Subject:
    Nightmare Mode. Bates stamped
    XIO-XI 99 - 100.

DESIREE GOLEN - 1/28/2011

## 249

```
06:23:16   1    copyrightable features of the Tetris game."
06:23:19   2        Q.  Right.  And you yourself had read the Customs
06:23:21   3    House decision, didn't you?
06:23:23   4        A.  I definitely read that document at some point
06:23:27   5    in time.  I don't -- again, I don't remember exactly all
06:23:31   6    the details of that document or when I read it or how
06:23:34   7    many times I read it.
06:23:36   8        Q.  Well, let's take a look at -- let's take a
06:23:50   9    look at what we'll mark as Exhibit 39.
06:23:53  10            (Whereupon, Deposition Exhibit 39 was
06:23:53  11        marked for identification.)
06:23:56  12        MS. CENDALI:  Q.  Is this an e-mail exchange
06:23:58  13    of November 10th, 2008 with you and Todd Bilsborrow?
06:24:17  14        A.  I'm not completely familiar with this article.
06:24:19  15    I haven't read it in completion for probably about two
06:24:22  16    or three years, but I think that's -- I have no reason
06:24:25  17    to believe that it's an e-mail from me to Todd.
06:24:27  18        Q.  And Todd was the person you were talking
06:24:30  19    about earlier who had done the Kafablo game that was
06:24:37  20    taken down, right?
06:24:39  21        A.  Yes, Todd was a Tetrimino developer.
06:24:42  22        Q.  Right.  And the second page of this document,
06:24:49  23    he's talking about communications with lawyers from
06:24:52  24    Tetris.  Do you see that?
06:24:55  25        A.  Which paragraph?
```

## 250

```
06:24:56   1        Q.  Second paragraph down.  "A few days later, I
06:24:59   2    sent an e-mail to the Tetris lawyer asking them to
06:25:02   3    withdraw their infringement game not really expecting a
06:25:05   4    response, but she actually did respond.  She referred
06:25:08   5    me to a decision that may help elucidate the
06:25:10   6    copyrightable expression which is protected in our
06:25:14   7    client's video game.  Then she sent me a copy of the
06:25:18   8    decision found here."  Do you see that?
06:25:21   9        A.  Um-hum.
06:25:22  10        Q.  And he goes on to say, "Which is pretty much
06:25:25  11    a joke if their defense is based on a letter from some
06:25:29  12    random Customs agent."  Do you see that?
06:25:32  13        A.  Yes.
06:25:33  14        Q.  And you responded to him at the top of the
06:25:38  15    Exhibit 39, "Dear Todd, thanks for your response.  I
06:25:43  16    agree:  This Customs letter is a rather bogus bedrock
06:25:48  17    for a case," exclamation point.  What did you mean by
06:25:54  18    saying that the Customs letter was a rather bogus
06:25:57  19    bedrock for a case?
06:25:59  20        A.  Again, I wrote this a long time ago, so I
06:26:03  21    don't specifically remember what I meant, but I do
06:26:06  22    remember that after I read the Customs letter -- well,
06:26:09  23    before I read the Customs letter, I was under the
06:26:13  24    understanding that in terms of copyright -- well, in
06:26:17  25    terms of video games, anyone can make a game that has
```

## 251

```
06:26:21   1    the ideas, game mechanics, rules, or game functionality
06:26:26   2    of another game, and that's what we did for Mino.  And I
06:26:30   3    was confused why the Tetris Company was -- was sending
06:26:39   4    out these cease and desist letters, and I think it had
06:26:43   5    something to do with that case about in regards to
06:26:50   6    elements that I understood to be functional elements of
06:26:55   7    a game.
06:26:56   8        Q.  In your expert experience?
06:26:58   9        A.  No, in my personal understanding based on the
06:27:00  10    research that I did and the people that I talked to.
06:27:03  11        Q.  What people did you speak to that you were
06:27:06  12    relying on in forming your opinion?
06:27:08  13        A.  The people that I spoke to while I was coming
06:27:12  14    to an understanding of intellectual property, my own
06:27:15  15    personal understanding:  Jeffrey Neu, Julie Turner, Sean
06:27:22  16    DeBruine, Chris Collins, I think his name was, I guess
06:27:31  17    the lawyers at Durie Tangri.
06:27:31  18        Q.  I'm talking about people you spoke to before
06:27:37  19    releasing Mino.
06:27:39  20        A.  Okay.  So that would be Julie Turner, Jeffrey
06:27:42  21    Neu, Sean DeBruine, Colin Chapman, I believe.  There
06:27:53  22    might have been more or less.  And actually, I'm not
06:27:56  23    sure if I spoke to Colin Chapman and Sean DeBruine
06:28:00  24    before or after we released Mino.
06:28:03  25        Q.  And how many of those people are lawyers?
```

## 252

```
06:28:05   1        A.  To my understanding, all of those people are
06:28:07   2    lawyers.
06:28:08   3        Q.  And are you claiming the privilege as to what
06:28:17   4    those lawyers told you?
06:28:18   5        MS. MAITRA:  So, Desiree, to be clear,
06:28:19   6    remember that we're claiming privilege in two respects:
06:28:19   7    One, with attorneys -- conversations with attorneys that
06:28:21   8    you actually retained; and two, conversations with
06:28:26   9    attorneys where you had an expectation of
06:28:28  10    confidentiality and made those communications for the
06:28:31  11    purpose of seeking legal advice.
06:28:33  12        THE WITNESS:  So yes.
06:28:36  13        MS. CENDALI:  Q.  So you're sitting here
06:28:38  14    saying that lawyers told you that -- things that made
06:28:42  15    you believe that you could copy Tetris, but that you are
06:28:48  16    going to shield from discovery what those lawyers
06:28:52  17    actually said to you; is that right?
06:28:54  18        MS. MAITRA:  Objection; mischaracterizes
06:28:56  19    testimony.
06:28:56  20        THE WITNESS:  What I'm saying is the
06:28:58  21    understanding that I gathered after speaking with those
06:29:02  22    lawyers is that we could create a game with a certain
06:29:06  23    rule set, ideas, game mechanics, and functionality, and
06:29:11  24    at that time it would be of a Tetrimino game.  And I was
06:29:17  25    aware that we could create a Tetrimino game at that
```

DESIREE GOLEN - 1/28/2011

## 253

| | | |
|---|---|---|
| 06:29:20 | 1 | time, and the lawyers that I spoke to solidified that |
| 06:29:25 | 2 | understanding for me. |
| 06:29:26 | 3 | MS. CENDALI:  Q.  I see.  And are |
| 06:29:28 | 4 | communications with those lawyers present on your |
| 06:29:30 | 5 | privilege log in this case? |
| 06:29:34 | 6 | A.  I'm assuming they are.  I don't really know |
| 06:29:38 | 7 | much about production. |
| 06:29:47 | 8 | Q.  When you wrote, "I agree:  This Customs |
| 06:29:49 | 9 | letter a rather bogus bedrock for a case," did some |
| 06:29:54 | 10 | lawyer tell you the Customs decision was a bogus |
| 06:29:57 | 11 | bedrock? |
| 06:30:02 | 12 | MS. MAITRA:  Again, to the extent this calls |
| 06:30:03 | 13 | for privileged communications, I instruct you not to |
| 06:30:08 | 14 | answer. |
| 06:30:08 | 15 | THE WITNESS:  So I've been instructed not to |
| 06:30:09 | 16 | answer. |
| 06:30:11 | 17 | MS. MAITRA:  To the extent. |
| 06:30:12 | 18 | THE WITNESS:  Oh, okay, sorry. |
| 06:30:14 | 19 | MS. MAITRA:  To the extent.  I did not |
| 06:30:15 | 20 | instruct you not to answer the question, but only to |
| 06:30:20 | 21 | extent. |
| 06:30:20 | 22 | THE WITNESS:  Okay.  I don't -- I don't know |
| 06:30:23 | 23 | exactly what a lawyer told me word for word, but, again, |
| 06:30:29 | 24 | based on my conversations with various intellectual |
| 06:30:32 | 25 | property lawyers, what I understood was that we could |

## 254

| | | |
|---|---|---|
| 06:30:35 | 1 | make a Tetrimino game. |
| 06:30:37 | 2 | MS. CENDALI:  Q.  I asked you whether a lawyer |
| 06:30:39 | 3 | told you that the Customs letter was a bogus bedrock? |
| 06:30:45 | 4 | MS. MAITRA:  And again, to the extent that |
| 06:30:48 | 5 | this calls for communications with your lawyers, I |
| 06:30:54 | 6 | instruct you not to answer. |
| 06:30:57 | 7 | THE WITNESS:  Okay.  So you're asking me what |
| 06:30:59 | 8 | a lawyer would have told me, and all the lawyers I spoke |
| 06:31:02 | 9 | with -- |
| 06:31:05 | 10 | MS. CENDALI:  Q.  I'm asking you whether, when |
| 06:31:07 | 11 | you wrote "the Customs letter is a rather bogus bedrock |
| 06:31:10 | 12 | for a case," is that something that you got from a |
| 06:31:13 | 13 | lawyer? |
| 06:31:14 | 14 | MS. MAITRA:  So can we go off the record for |
| 06:31:16 | 15 | one minute, please?  We keep asking the same question. |
| 06:31:20 | 16 | I think there's a misunderstanding, and I would like to |
| 06:31:22 | 17 | make it out -- to discuss it out in the open with you. |
| 06:31:24 | 18 | I can make it on the record, too, if you'd like. |
| 06:31:26 | 19 | MS. CENDALI:  Make it on the record. |
| 06:31:27 | 20 | MS. MAITRA:  So we are not claiming advice of |
| 06:31:29 | 21 | counsel -- we're not claiming any sort of defense based |
| 06:31:33 | 22 | on advice of counsel.  And so to the extent that you are |
| 06:31:38 | 23 | gathering testimony to prove that we are using |
| 06:31:42 | 24 | communications with attorneys as a sword and not a |
| 06:31:45 | 25 | shield, I object. |

## 255

| | | |
|---|---|---|
| 06:31:48 | 1 | MS. CENDALI:  Are you claiming good faith? |
| 06:31:50 | 2 | MS. MAITRA:  Absolutely.  Absolutely |
| 06:31:50 | 3 | 100 percent. |
| 06:31:52 | 4 | MS. CENDALI:  Okay.  If her basis -- if part |
| 06:31:52 | 5 | of your basis of good faith -- and this witness was |
| 06:31:56 | 6 | identified in your initial disclosure as Mino's good |
| 06:31:59 | 7 | faith belief that it did not infringe, and a part of |
| 06:32:03 | 8 | that good faith is based, as Ms. Golen has testified, on |
| 06:32:08 | 9 | what lawyers have told her, that's using the privilege |
| 06:32:10 | 10 | as a sword versus a shield, and you've waived the |
| 06:32:13 | 11 | privilege. |
| 06:32:14 | 12 | MS. MAITRA:  And I'm telling you that none of |
| 06:32:15 | 13 | our good faith belief is based -- a defense is based on |
| 06:32:21 | 14 | conversations with attorneys. |
| 06:32:22 | 15 | MS. CENDALI:  Well, unfortunately, Ms. Golen |
| 06:32:25 | 16 | has testified that her opinion as to what she was |
| 06:32:30 | 17 | allowed to do was formed, in part, by what all these |
| 06:32:34 | 18 | lawyers told her, and that's a problem. |
| 06:32:37 | 19 | MS. MAITRA:  But that doesn't mean, from a |
| 06:32:39 | 20 | legal standpoint, that that is the basis for our legal |
| 06:32:42 | 21 | defense for good faith -- for good faith defense. |
| 06:32:47 | 22 | MS. CENDALI:  I'm sorry, you can't -- well, |
| 06:32:50 | 23 | we're not going to debate it.  We disagree.  Let's move |
| 06:32:53 | 24 | on. |
| 06:32:53 | 25 | MS. MAITRA:  Okay. |

## 256

| | | |
|---|---|---|
| 06:32:54 | 1 | MS. CENDALI:  Q.  Ms. Golen, in this exhibit, |
| 06:32:56 | 2 | Exhibit 39, Todd writes to you -- |
| 06:33:01 | 3 | MS. MAITRA:  Thirty-eight. |
| 06:33:04 | 4 | MS. CENDALI:  This is 39.  We skipped 38. |
| 06:33:09 | 5 | MS. MAITRA:  I'm sorry, okay. |
| 06:33:10 | 6 | MS. CENDALI:  Q.  In 39, Mr. Todd Bilsborrow |
| 06:33:16 | 7 | writes to you, "Which is pretty much of a joke if their |
| 06:33:18 | 8 | defense is based on a letter from some random Customs |
| 06:33:23 | 9 | agent."  You see that? |
| 06:33:24 | 10 | A.  Is this on the second page? |
| 06:33:26 | 11 | Q.  Yes.  We looked at it before. |
| 06:33:29 | 12 | A.  Second paragraph? |
| 06:33:29 | 13 | Q.  Same paragraph we read before.  "She sent me |
| 06:33:32 | 14 | a copy of the decision found here, which is pretty much |
| 06:33:35 | 15 | of a joke if their defense is based on a letter from |
| 06:33:38 | 16 | some random Customs agent."  You see that? |
| 06:33:41 | 17 | A.  Yes, I see that. |
| 06:33:43 | 18 | Q.  And you responded, "Thanks for your response. |
| 06:33:45 | 19 | I agree:  This Customs letter is a rather bogus bedrock |
| 06:33:49 | 20 | for a case."  Did you understand that the Customs |
| 06:33:52 | 21 | letter was written by a federal judge and not some |
| 06:33:56 | 22 | random Customs agent? |
| 06:34:01 | 23 | A.  I wasn't aware of who wrote the document |
| 06:34:05 | 24 | exactly.  I was aware that it was a Customs case with |
| 06:34:10 | 25 | two parties involved. |

## 265

```
06:45:32   1   features of the Tetris game as covered by the Tetris
06:45:36   2   registration includes," and it goes on for 13 lines as
06:45:39   3   to what it includes, right, and you sitting here today
06:45:42   4   say I think those are rules and are not things you can
06:45:45   5   copyright; is that your opinion?
06:45:48   6        A.  My opinion, again, is that a lot of these
06:45:53   7   elements are rules for Tetrimino games that cannot be
06:45:56   8   protected under copyright registration.
06:46:00   9        Q.  So you disagree with the judge?
06:46:11  10        A.  I don't believe that some of these elements --
06:46:16  11   I don't believe that game rules can be protected by
06:46:19  12   copyright registration.
06:46:23  13        Q.  So do you believe that the list here that the
06:46:25  14   judge wrote where he said these are copyrightable
06:46:28  15   features, in your opinion, as a 2008 graduate of Pomona
06:46:33  16   College majoring in psychology that you know better
06:46:37  17   than the judge; is that right?
06:46:42  18        A.  I wouldn't say I know better than any judge.
06:46:46  19   What I do know is that I was confused about the context
06:46:48  20   of this letter, and I think I said, "I am curious what
06:46:53  21   the context of this letter is, and if there are any
06:46:55  22   further public archives that document your case
06:46:57  23   entirely."
06:46:59  24        Q.  And you noticed in the Customs letter, which
06:47:03  25   is Exhibit 38, the paragraph that I just read enough to
```

## 266

```
06:47:14   1   copy it and put it in your letter to Mr. Cormier,
06:47:22   2   Exhibit 39, and your letter to Mr. Reback, Exhibit 40,
06:47:26   3   right?
06:47:28   4        A.  It looks like the same text.  There's an
06:47:31   5   overlap in text between my letter to Mr. Cormier and
06:47:35   6   Mr. -- I'm not sure about the Reback one -- yes, and the
06:47:41   7   Reback one looks like --
06:47:43   8        Q.  And in both of them, you included the
06:47:55   9   paragraph that we've been discussing on Exhibit 38,
06:47:57  10   where the judge detailed in 13 lines the copyrightable
06:47:57  11   features of the Tetris game, right?
06:47:58  12        A.  Again, that paragraph is something that I was
06:48:04  13   curious about because I wasn't sure of the context of
06:48:07  14   that letter.  I didn't know what it meant, that that was
06:48:11  15   a letter.
06:48:12  16        Q.  Right.  And you knew when it said that the
06:48:15  17   copyrightable features of the Tetris game included
06:48:18  18   those things, that that could be a problem for Mino,
06:48:21  19   right?
06:48:23  20        A.  It seems like based on my response to Todd, I
06:48:30  21   didn't think that was a solid bedrock of a case.  And I
06:48:33  22   think it had to do with the fact that I was unclear as
06:48:36  23   to the context of this letter, and I think I remember
06:48:42  24   discussing the -- and I'm not a lawyer.  I'm not an
06:48:47  25   expert.  I don't know better than any judge, but I
```

## 267

```
06:48:51   1   remember being confused as to federal cases and cases
06:48:56   2   that had to do with importing and the Customs office.
06:49:02   3        Q.  But you didn't hire a lawyer to give you an
06:49:05   4   opinion letter that this Customs decision would be no
06:49:11   5   bar to the release of Mino; isn't that true?  You
06:49:18   6   didn't get a lawyer who would understand this saying to
06:49:20   7   you no problem, go ahead, release Mino, right?
06:49:24   8        MS. MAITRA:  Objection; mischaracterizes
06:49:24   9   testimony.  I instruct you not to answer.
06:49:30  10        THE WITNESS:  Um --
06:49:30  11        MS. MAITRA:  I instruct you not to answer
06:49:32  12   completely.
06:49:33  13        MS. CENDALI:  Q.  And in your view, do you
06:49:34  14   believe -- focusing on the paragraph we've been talking
06:49:36  15   about and the judge's opinion, do you believe that any
06:49:40  16   of the items listed by there of the judge as
06:49:45  17   copyrightable features are not copyrightable features,
06:49:49  18   in your wisdom?
06:49:52  19        A.  Yes, I believe that all of the game rules
06:49:55  20   referenced in this paragraph to Tetrimino games are not
06:50:00  21   protected by copyright.
06:50:01  22        Q.  So, you tell me in this paragraph, in your
06:50:05  23   opinion, what is not protected by copyright?
06:50:08  24        MS. MAITRA:  Objection; calls for a legal
06:50:10  25   conclusion.
```

## 268

```
06:50:10   1        THE WITNESS:  Okay.  So I'm not a lawyer, and,
06:50:12   2   again, the context of this letter had to do with the
06:50:17   3   Customs office, and I knew that we wouldn't be importing
06:50:20   4   Emo -- Mino, so I wasn't sure if it was relevant.
06:50:30   5        MS. CENDALI:  Q.  Well, you know that it was
06:50:32   6   cited against your friend by the Tetris Company's lawyer
06:50:35   7   as relevant when he inquired about Kafablo, which was
06:50:42   8   taken down as well, right?
06:50:42   9        A.  I know that Todd was sent an attachment to
06:50:46  10   this --
06:50:50  11        Q.  And he told you that the Tetris Company
06:50:55  12   lawyer sent it to him saying that this decision -- that
06:51:01  13   this might be a decision which may help elucidate the
06:51:06  14   copyrightable expression which is protected in our
06:51:10  15   client's video game.  You knew that, right?
06:51:20  16        A.  What I knew at the time was that -- what I
06:51:25  17   understood at the time was that the Tetris Company was
06:51:28  18   sending out cease and desist letters, and I thought that
06:51:32  19   it was a way to intimidate independent developers off
06:51:36  20   their specific platforms.
06:51:36  21        Q.  Do you own a single copyright, Ms. Golen?
06:51:38  22        A.  I'm not a lawyer, so I don't know the specific
06:51:42  23   details of copyright.
06:51:44  24        Q.  I see.  In this exhibit, Exhibit 38, where
06:51:47  25   the judge wrote, "The copyrightable features of the
06:51:52
```

DESIREE GOLEN - 1/28/2011

## 281

```
07:08:31    1    Tetrimino game.
07:08:34    2    Q.  Actual creation of a game, actual
07:08:37    3    programming.
07:08:38    4    A.  Actual programming.  I'm not sure when the
07:08:41    5    actual programming began.
07:08:45    6    Q.  Despite being listed on the initial
07:08:47    7    disclosures as knowledge about the game development and
07:08:50    8    despite being the CEO, you have no idea of when
07:08:54    9    programming began on Mino; is that right?
07:08:56   10    MS. MAITRA:  Objection; mischaracterizes
07:08:57   11    testimony.
07:08:58   12    THE WITNESS:  What I would say is that it was
07:08:59   13    about two or three years ago.  So I can't tell you
07:09:02   14    exactly when we began development.
07:09:05   15    MS. CENDALI:  Q.  So you write your dad and
07:09:08   16    you write your boyfriend's mom about this idea for a
07:09:15   17    multiplayer game similar to Tetris at that same month
07:09:20   18    you're contacting lawyers who might represent you pro
07:09:27   19    bono; is that right?
07:09:33   20    A.  I had contacted Michael's mother and my
07:09:36   21    father, and I think, by this time, I asked -- I sent
07:09:45   22    an e-mail to the EFF myself, and I think I had asked for
07:09:47   23    Maura to contact the EFF in order to get more
07:09:52   24    information on intellectual property and video games.
07:09:55   25    Q.  And isn't it true that you had asked Maura
```

## 282

```
07:09:58    1    earlier that month to find you pro bono counsel?
07:10:03    2    A.  I don't recall specifically.  I think I asked
07:10:11    3    if she could contact the EFF and help us try to find
07:10:18    4    someone who would see the vision of our company and find
07:10:25    5    a low cost way, potentially, of working with them.
07:10:30    6    Q.  And in this e-mail, you -- Ms. Carter wrote
07:10:34    7    to you, "Several persons at Apple has informed me that
07:10:37    8    conflict resolution policies vary, and there are two
07:10:41    9    options.  1) Create a different kind of game app.  2)
07:10:45   10    Build a case using legal assistance for stronger
07:10:49   11    negotiations."  What did you understand Ms. Carter
07:10:56   12    meant when you read the "build a case using legal
07:11:01   13    assistance for stronger negotiations"?  What was your
07:11:06   14    understanding when you read that of what was meant?
07:11:10   15    A.  I don't know exactly what my understanding was
07:11:12   16    at the time.  It was about three years ago.  But sitting
07:11:15   17    here now, I can tell you that I probably understood that
07:11:19   18    there are two ways to resolve a conflict involving
07:11:24   19    Apple, and one was to create a different type of game or
07:11:26   20    to build a case using legal assistance.
07:11:29   21    Q.  Did you consider creating a different type of
07:11:34   22    game that was wholly original to Xio?
07:11:40   23    MS. MAITRA:  Objection; vague.
07:11:44   24    THE WITNESS:  I believe that Mino was an
07:11:47   25    original game.  We created everything from scratch.  And
```

## 283

```
07:11:53    1    I think at some points we discussed creating other
07:11:57    2    games, like Combo Lock, but it wasn't -- right.
07:12:06    3    MS. CENDALI:  Q.  Why didn't you -- was Combo
07:12:09    4    Lock based on any preexisting game?
07:12:12    5    A.  I don't exactly remember Combo Lock very well.
07:12:16    6    It was another game developer's vision.  I think what I
07:12:21    7    remember was that it had something to do with unlocking
07:12:28    8    a safe.
07:12:30    9    Q.  And why didn't you create Combo Lock instead
07:12:35   10    of proceeding with Mino in the face of the copyright
07:12:44   11    registrations and other rights owned by my clients?
07:12:51   12    MS. MAITRA:  Objection; vague.
07:12:51   13    THE WITNESS:  I would say that the reason we
07:12:53   14    created Mino was because we wanted to create a
07:12:57   15    multiplayer Tetrimino game, and my understanding at the
07:13:03   16    time before development and during development and now
07:13:07   17    is that there's no patent.  Though I'm not a lawyer, my
07:13:13   18    understanding is that what places part of an idea or set
07:13:17   19    of rules or functionality of a game is a patent, and I
07:13:22   20    was not aware of a patent that anyone ever secured for
07:13:26   21    the original game.
07:13:29   22    MS. CENDALI:  Q.  And was part of that view
07:13:30   23    based on your conversations with lawyers?
07:13:33   24    MS. MAITRA:  Objection; to the extent that
07:13:37   25    this calls for privileged communications, I instruct you
```

## 284

```
07:13:40    1    not to answer.
07:13:42    2    THE WITNESS:  I'm not sure.  I know I spoke
07:13:43    3    with many lawyers.
07:13:48    4    MS. CENDALI:  Q.  Let's look at Exhibit 45.
07:13:50    5    (Whereupon, Deposition Exhibit 45 was
07:13:50    6    marked for identification.)
07:13:53    7    THE WITNESS:  Can I grab some water?
07:13:56    8    MS. CENDALI:  Sure.
07:13:56    9    Go off the record.
07:13:58   10    THE VIDEOGRAPHER:  Going off the record.  The
07:14:06   11    time is 7:14.
07:14:06   12    (Break in proceedings.)
07:17:52   13    THE VIDEOGRAPHER:  We're back on the record.
07:17:53   14    The time is 7:18.
07:17:55   15    MS. CENDALI:  Q.  Ms. Golen, is Exhibit 45 a
07:17:59   16    screenshot of the application description of Mino that
07:18:02   17    was available on Apple's iTunes?
07:18:05   18    A.  It looks like this is a screenshot.
07:18:08   19    Q.  And it says in the upper left-hand corner
07:18:11   20    "Release May 9th, 2009, Version 1.0."  Was that when
07:18:17   21    Mino was first made available on iTunes?
07:18:23   22    A.  I know iTunes are -- the App Store had some
07:18:29   23    weird algorithm for their release date, but it was
07:18:36   24    released at least by May 9th, 2009, I think.
07:18:40   25    Q.  This is Version 1.0.  Were there other
```

## 297

| | | |
|---|---|---|
| 07:36:04 | 1 | MS. MAITRA:  What's the Bates number on this? |
| 07:36:06 | 2 | MR. PATHIYAL:  XIO-DG 0016404. |
| 07:36:14 | 3 | MS. MAITRA:  Okay, this I am clawing back |
| 07:36:17 | 4 | under the protective order.  I have reason to believe |
| 07:36:20 | 5 | that this is privileged, and it was inadvertently |
| 07:36:23 | 6 | produced. |
| 07:36:28 | 7 | MS. CENDALI:  Q.  Does this reflect |
| 07:36:29 | 8 | communication -- well, was this -- does this document |
| 07:36:37 | 9 | reflect communication with one of your lawyers, |
| 07:36:39 | 10 | Ms. Golen? |
| 07:36:50 | 11 | A.  By "communication," what do you mean? |
| 07:36:52 | 12 | MS. MAITRA:  So what I would like to do is |
| 07:36:54 | 13 | instruct the witness not to answer any document -- |
| 07:36:57 | 14 | sorry, any questions about this document.  I believe |
| 07:37:00 | 15 | this to be privileged.  I have no reason to believe that |
| 07:37:02 | 16 | it wasn't privileged. |
| 07:37:03 | 17 | MS. CENDALI:  Okay.  We reserve all our |
| 07:37:05 | 18 | rights, and we'll discuss it -- |
| 07:37:07 | 19 | MS. MAITRA:  Absolutely. |
| 07:37:07 | 20 | MS. CENDALI:  -- separately. |
| 07:37:11 | 21 | MS. MAITRA:  Yes. |
| 07:37:26 | 22 | MS. CENDALI:  Q.  I'm going to show you |
| 07:37:27 | 23 | Exhibit 54. |
| 07:37:28 | 24 | (Whereupon, Deposition Exhibit 54 was |
| 07:37:28 | 25 | marked for identification.) |

## 298

| | | |
|---|---|---|
| 07:37:29 | 1 | MS. CENDALI:  Q.  It says "Tetris Company |
| 07:37:31 | 2 | Legal Notes."  Who authored this document? |
| 07:38:23 | 3 | A.  I believe Michael Carter authored this |
| 07:38:26 | 4 | document. |
| 07:38:27 | 5 | Q.  When was this document authored? |
| 07:38:30 | 6 | A.  You'd have to ask Michael Carter. |
| 07:38:32 | 7 | Q.  What is your understanding as to why this |
| 07:38:34 | 8 | document was authored? |
| 07:38:39 | 9 | A.  You'd have to ask Michael why he authored and |
| 07:38:43 | 10 | created this document. |
| 07:38:46 | 11 | Q.  How was this document used, if at all? |
| 07:38:52 | 12 | A.  I'm not sure exactly how it was used.  I |
| 07:38:54 | 13 | know -- I think we might have shared it with different |
| 07:39:02 | 14 | lawyers that we had met with. |
| 07:39:10 | 15 | Q.  Let's look at Exhibit 50. |
| 07:39:14 | 16 | (Whereupon, Deposition Exhibit 50 was |
| 07:39:14 | 17 | marked for identification.) |
| 07:39:16 | 18 | A.  Is this an e-mail you sent |
| 07:39:18 | 19 | to Maura Carter or November 11, 2008 attaching a copy of |
| 07:39:23 | 20 | the -- of a portion of a copyright office circular? |
| 07:39:30 | 21 | A.  That looks -- that looks right.  This is an |
| 07:39:36 | 22 | attachment, you said?  Or it's part -- I think it's an |
| 07:39:40 | 23 | attachment. |
| 07:39:42 | 24 | Q.  Yes, it looks like an attachment. |
| 07:39:44 | 25 | MS. MAITRA:  Actually -- |

## 299

| | | |
|---|---|---|
| 07:39:45 | 1 | MS. CENDALI:  Oh, no, excuse me, forgive me -- |
| 07:39:45 | 2 | MS. MAITRA:  -- I don't see -- I think it's |
| 07:39:45 | 3 | the Web site that was referenced in the e-mail itself. |
| 07:39:52 | 4 | MS. CENDALI:  You're right.  You're right. |
| 07:39:51 | 5 | Q.  It says, "Finally, I went on the U.S. |
| 07:39:53 | 6 | Copyright Office's Web site and found the terms of |
| 07:39:56 | 7 | copyright for games.  We are totally in the clear," and |
| 07:40:00 | 8 | there's an URL, and does that appear to be the URL for |
| 07:40:04 | 9 | the copyright circular that you were referring to |
| 07:40:06 | 10 | there? |
| 07:40:07 | 11 | A.  I think that's the -- that's a URL I referred |
| 07:40:12 | 12 | her to. |
| 07:40:14 | 13 | Q.  Did you understand this circular to refer to |
| 07:40:16 | 14 | video games? |
| 07:40:18 | 15 | A.  I read this a long time ago, but if I was |
| 07:40:22 | 16 | sending it -- yes, I think I understood it to mean video |
| 07:40:34 | 17 | games. |
| 07:40:34 | 18 | Q.  And turning to the page of the circular, it |
| 07:40:35 | 19 | says at the bottom of the first paragraph, "Copyright |
| 07:40:36 | 20 | protects only the particular manner of an author's |
| 07:40:38 | 21 | expression in literary, artistic or musical form."  Do |
| 07:40:41 | 22 | you see that? |
| 07:40:42 | 23 | A.  I do. |
| 07:40:42 | 24 | And it goes on to say in the next paragraph, |
| 07:40:46 | 25 | "Material prepared in connection with a game may be |

## 300

| | | |
|---|---|---|
| 07:40:48 | 1 | subject to copyright if it contains sufficient amount |
| 07:40:53 | 2 | of literary or pictorial expression."  Do you see that? |
| 07:40:57 | 3 | A.  I see that. |
| 07:40:58 | 4 | Q.  What did you understand that to mean? |
| 07:41:01 | 5 | A.  At the time I don't know exactly what I |
| 07:41:03 | 6 | understood these things to mean. |
| 07:41:04 | 7 | Q.  And it goes on to say, "For example, the text |
| 07:41:08 | 8 | matter describing the rules of the game or the |
| 07:41:11 | 9 | pictorial matter appearing on the game board or |
| 07:41:15 | 10 | container may be registerable."  What did you |
| 07:41:18 | 11 | understand that to mean at the time? |
| 07:41:20 | 12 | A.  At the time I don't know what I specifically |
| 07:41:22 | 13 | understood that to mean. |
| 07:41:24 | 14 | Q.  But you wrote in this e-mail to Ms. Carter |
| 07:41:29 | 15 | that "we are totally in the clear."  Do you see that? |
| 07:41:33 | 16 | A.  Um-hum. |
| 07:41:34 | 17 | Q.  You think it would have been helpful to know |
| 07:41:37 | 18 | what those things I just read meant before forming your |
| 07:41:44 | 19 | opinion that you were totally in the clear? |
| 07:41:47 | 20 | MS. MAITRA:  Objection; mischaracterizes |
| 07:41:48 | 21 | testimony. |
| 07:41:49 | 22 | THE WITNESS:  I don't remember exactly how I |
| 07:41:52 | 23 | interpreted each one of those sentences, but I do |
| 07:41:54 | 24 | remember that my general understanding, after reading |
| 07:41:57 | 25 | that, was that the ideas and functional elements and |

# EXHIBIT G

AMENDED PRIVILEGE LOG
XIO INTERACTIVE, INC.

| ID NUMBER | AUTHOR | RECIPIENT | CC | BCC | ADD'L RECIPIENTS | DATE | DOCUMENT DESCRIPTION | PRIVILEGE CLAIMED |
|---|---|---|---|---|---|---|---|---|
| XIO-DG-0001195 | Desiree Golen | Desiree Golen | | | | 10/18/2008 | Draft of letter to attorney re: termination from App Store | Attorney-client privilege (Fed. R. Evid. 502(g)(1); prepared in anticipation of litigation |
| XIO-DG-0001675-76 | Desiree Golen | Desiree Golen | | | | 11/6/2008 | Draft of letter to attorney re: termination from App Store | Attorney-client privilege (Fed. R. Evid. 502(g)(1); prepared in anticipation of litigation |
| XIO-DG-0001766-68 | Desiree Golen | **Julie Turner** | | | | 11/8/2008 | Email re: potential representation | Attorney-client privilege (Fed. R. Evid. 502(g)(1); prepared in anticipation of litigation |
| XIO-DG-0001876-79 | **Julie Turner** | Desiree Golen | | | | 11/8/2009 | Email re: potential representation | Attorney-client privilege (Fed. R. Evid. 502(g)(1); prepared in anticipation of litigation |
| XIO-DG-0001897-900 | Desiree Golen | **Julie Turner** | | | | 11/8/2008 | Email re: potential representation | Attorney-client privilege (Fed. R. Evid. 502(g)(1); prepared in anticipation of litigation |
| XIO-DG-0001904-07 | **Julie Turner** | Desiree Golen | | | | 11/8/2008 | Email re: potential representation | Attorney-client privilege (Fed. R. Evid. 502(g)(1); prepared in anticipation of litigation |
| XIO-DG-0001932-35 | Desiree Golen | **Julie Turner** | | | | 11/8/2008 | Email re: potential representation | Attorney-client privilege (Fed. R. Evid. 502(g)(1); prepared in anticipation of litigation |
| XIO-DG-0002051 | Michael Carter | Desiree Golen | | | | 11/11/2008 | Email re: potential representation | Attorney-client privilege (Fed. R. Evid. 502(g)(1); prepared in anticipation of litigation |
| XIO-DG-0002062 | Desiree Golen | Desiree Golen | | | | 11/11/2008 | Notes for conversation with **Jeffrey C. Neu** re: potential representation | Attorney-client privilege (Fed. R. Evid. 502(g)(1); prepared in anticipation of litigation |
| XIO-DG-0002111-14 | Desiree Golen | Desiree Golen | | | | 11/11/2008 | Draft of email to **G. Reback** re: potential representation | Attorney-client privilege (Fed. R. Evid. 502(g)(1); prepared in anticipation of litigation |
| XIO-DG-0002116 | Desiree Golen | Desiree Golen | | | | 11/12/2008 | Note re: potential representation | Attorney-client privilege (Fed. R. Evid. 502(g)(1); prepared in anticipation of litigation |

LEGEND:
Counsels' names in **bold**.

Attorney-Client Privilege;
Attorney Work-Product.

AMENDED PRIVILEGE LOG

XIO INTERACTIVE, INC.

| ID NUMBER | AUTHOR | RECIPIENT | CC | BCC | ADD'L RECIPIENTS | DATE | DOCUMENT DESCRIPTION | PRIVILEGE CLAIMED |
|---|---|---|---|---|---|---|---|---|
| XIO-DG-0002141-43 | Desiree Golen | **G. Reback** | | | | 11/13/2008 | Email re: potential representation | Attorney-client privilege (Fed. R. Evid. 502(g)(1); prepared in anticipation of litigation |
| XIO-DG-0002147-49 | Desiree Golen | **Anthony Cormier** | | | | 11/13/2008 | Email re: potential representation | Attorney-client privilege (Fed. R. Evid. 502(g)(1); prepared in anticipation of litigation |
| XIO-DG-0002152 | Desiree Golen | Michael Carter | | | | 11/13/2008 | Email re: meeting with counsel and pending tasks | Attorney-client privilege (Fed. R. Evid. 502(g)(1); prepared in anticipation of litigation |
| XIO-DG-0002298 | Desiree Golen | Desiree Golen | | | | 11/19/2008 | Draft of notes for conversation with **Jeffrey C. Neu** re: potential strategy | Attorney-client privilege (Fed. R. Evid. 502(g)(1); prepared in anticipation of litigation |
| XIO-DG-0002353 | Julie Turner | Desiree Golen' | | | | 11/22/2008 | Email re: legal analysis | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XIO-DG-0002722 | Desiree Golen | Desiree Golen | | | | 12/12/2008 | Note re: patent and trademark analysis | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XIO-DG-0003039 | Desiree Golen | Mario Balibrera | | | | 12/19/2008 | Email re: activities of **Jeffrey C. Neu** in product preparation | |
| XIO-DG-0006576 | Desiree Golen | Michael Carter | | | | 3/20/2009 | Email re: materials forwarded to attorney | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XIO-DG-0007901 | Desiree Golen | Desiree Golen | | | | 4/28/2009 | Draft of email to potential counsel | Attorney-client privilege (Fed. R. Evid. 502(g)(1); prepared in anticipation of litigation |
| XIO-DG-0008032 | Desiree Golen | Desiree Golen | | | | 4/30/2009 | Draft of email to potential counsel | Attorney-client privilege (Fed. R. Evid. 502(g)(1); prepared in anticipation of litigation |

LEGEND:

Counsels' names in **bold**.

Attorney-Client Privilege;

Attorney Work-Product.

AMENDED PRIVILEGE LOG

XIO INTERACTIVE, INC.

| ID NUMBER | AUTHOR | RECIPIENT | CC | BCC | ADD'L RECIPIENTS | DATE | DOCUMENT DESCRIPTION | PRIVILEGE CLAIMED |
|---|---|---|---|---|---|---|---|---|
| XIO-HD-DG-0007339 | Desiree Golen | Desiree Golen | | | | 8/5/2009 | Notes re: conversation with **Jeffrey C. Neu** | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XIO-HD-DG-0013253 | Desiree Golen | Desiree Golen | | | | 9/25/2009 | Notes re: conversation with **Jeffrey C. Neu** | Attorney-client privilege (Fed. R. Evid. 502(g)(1); prepared in anticipation of litigation |
| XIO-HD-DG-0016147 | Desiree Golen | Desiree Golen | | | | 11/6/2008 | Notes re: retention of counsel | Attorney-client privilege (Fed. R. Evid. 502(g)(1); prepared in anticipation of litigation |
| XIO-HD-DG-0016148 | Desiree Golen | Desiree Golen | | | | Undated | Golen notes pertaining to Toyota lawsuit involving other family member | Attorney-client privilege (Fed. R. Evid. 502(g)(1); prepared in anticipation of litigation |
| XIO-HD-DG-0016174 | Desiree Golen | Desiree Golen | | | | 8/5/2009 | Notes re: conversation with **Jeffrey C. Neu** | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XIO-HD-DG-0016218 | Desiree Golen | Desiree Golen | | | | 9/25/2009 | Email re conversation with **Jeffrey C. Neu** | Attorney-client privilege (Fed. R. Evid. 502(g)(1); prepared in anticipation of litigation |
| XIO-HD-DG-0016845 | Desiree Golen | Desiree Golen | | | | 5/13/2009 | Notes re: teleconference with **Jeffrey C. Neu** | Attorney-client privilege (Fed. R. Evid. 502(g)(1); prepared in anticipation of litigation |
| XIO-HD-MH-0009515 | **Joseph Gratz** | Michael Carter | Desiree Golen | | | 6/18/2010 | Email re: Retainer Agreement | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2) |
| XIO-HD-XIO-0000014 | Desiree Golen | **G. Reback** | | | | 11/11/2008 | Email re: potential representation | Attorney-client privilege (Fed. R. Evid. 502(g)(1); prepared in anticipation of litigation |
| XIO-HD-XIO-0000021 | Desiree Golen | **Anthony Cormier** | | | | 11/13/2008 | Email re: potential representation | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |

LEGEND:
Counsels' names in **bold**.

Attorney-Client Privilege;
Attorney Work-Product.

AMENDED PRIVILEGE LOG

XIO INTERACTIVE, INC.

| ID NUMBER | AUTHOR | RECIPIENT | CC | BCC | ADD'L RECIPIENTS | DATE | DOCUMENT DESCRIPTION | PRIVILEGE CLAIMED |
|---|---|---|---|---|---|---|---|---|
| XIO-HD-XIO-0000039 | **L. Hudd** | xiointeractive@googlegroups.com | | | | Undated | Email re: assessment of Tetris' trademark claims | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XIO-HD-XIO-0000043 | Desiree Golen | Desiree Golen | | | | Various | Drafts of letter to potential counsel | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XIO-HD-XIO-0001455 | Desiree Golen | **Anthony Cormier** | | | | 11/13/2008 | Email re: potential representation | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XIO-HD-XIO-0001484 | Desiree Golen | **G. Reback** | | | | 11/11/2008 | Email re: potential representation | Attorney-client privilege (Fed. R. Evid. 502(g)(1); prepared in anticipation of litigation |
| XIO-HD-XIO-0001593 | Desiree Golen | Desiree Golen | | | | 5/13/2009 | Email notes re: teleconference with **Jeffrey C. Neu** | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XIO-HD-XIO-K-0000010 | Desiree Golen | Desiree Golen | | | | 5/13/2009 | Notes re: teleconference with **Jeffrey C. Neu** | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XIO-HD-XIO-K-0000019 | Desiree Golen | Desiree Golen | | | | 5/14/2009 | Notes re: teleconference with **Jeffrey C. Neu** | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XIO-MB-0008181 | Desiree Golen | Mario Balibrera | | | | 11/17/2009 | Email re: retention of counsel | Attorney-client privilege (Fed. R. Evid. 502(g)(1) |
| XIO-MB-0008182 | Mario Balibrera | Desiree Golen | | | | 11/17/2009 | Email re: retention of counsel | Attorney-client privilege (Fed. R. Evid. 502(g)(1) |

LEGEND:                                              Attorney-Client Privilege;

Counsels' names in **bold**.                         Attorney Work-Product.

AMENDED PRIVILEGE LOG

XIO INTERACTIVE, INC.

| ID NUMBER | AUTHOR | RECIPIENT | CC | BCC | ADD'L RECIPIENTS | DATE | DOCUMENT DESCRIPTION | PRIVILEGE CLAIMED |
|---|---|---|---|---|---|---|---|---|
| XIO-MH-0039077-78 | Desiree Golen | xiointeractive@googlegroups.com | | | | 12/21/2009 | Email re: status, document retention issues and pending tasks for meeting with attorney | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2) |
| XIO-MH-0039117-18 | Michael Carter | xiointeractive@googlegroups.com | | | | 12/21/2009 | Email re: status, document retention issues and pending tasks for meeting with attorney | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2) |
| XIO-MH-0039119 | Jacob Rus | xiointeractive@googlegroups.com | | | | 12/21/2009 | Email re: status, document retention issues and pending tasks for meeting with attorney | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2) |
| XIO-MH-0039124 | Mario Balibrerad | xiointeractive@googlegroups.com | | | | 12/21/2009 | Email re: status, document retention issues and pending tasks for meeting with attorney | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2) |
| XIO-MH-0040651 | Desiree Golen | Michael Carter; Martin Hunt; Jacob Rus Jacob Rus | | | | 1/10/2010 | Email re: litigation strategy and document retention instructions | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2) |
| XXX-PRIV-XXX-XIO-DG-0100022 | **Richard C. Litman** | Desiree Golen | | | | 10/29/2008 | Email re: patentability of invention | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XXX-PRIV-XXX-XIO-DG-0100029-30 | Maura Carter | **Jeffrey C. Neu** | | | | 11/6/2008 | Email re: potential representation | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |

LEGEND:
Counsels' names in **bold**.

Attorney-Client Privilege;
Attorney Work-Product.

AMENDED PRIVILEGE LOG

XIO INTERACTIVE, INC.

| ID NUMBER | AUTHOR | RECIPIENT | CC | BCC | ADD'L RECIPIENTS | DATE | DOCUMENT DESCRIPTION | PRIVILEGE CLAIMED |
|---|---|---|---|---|---|---|---|---|
| XXX-PRIV-XXX-XIO-DG-0100031 | **Jeffrey C. Neu** | Maura Carter; Desiree Golen | | | | 11/6/2008 | Email re potential representation | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XXX-PRIV-XXX-XIO-DG-0100049-53 | Desiree Golen | **Jeffrey C. Neu** | | | | 11/8/2008 | Email re: potential representation | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XXX-PRIV-XXX-XIO-DG-0100059 | **Jeffrey C. Neu** | Desiree Golen | | | | 11/10/2008 | Email re potential representation | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XXX-PRIV-XXX-XIO-DG-0100060-66 | Desiree Golen | **Jeffrey C. Neu** | | | | 11/10/2008 | Email re: potential representation | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XXX-PRIV-XXX-XIO-DG-0100067 | Desiree Golen | **Jeffrey C. Neu** | | | | 11/10/2008 | Email re: potential representation | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XXX-PRIV-XXX-XIO-DG-0100068 | Desiree Golen | **Jeffrey C. Neu** | | | | 11/10/2008 | Email re: potential representation | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XXX-PRIV-XXX-XIO-DG-0100069-75 | Desiree Golen | **Jeffrey C. Neu** | | | | 11/11/2008 | Email re: potential representation | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |

LEGEND:
Counsels' names in **bold**.

Attorney-Client Privilege;
Attorney Work-Product.

AMENDED PRIVILEGE LOG

XIO INTERACTIVE, INC.

| ID NUMBER | AUTHOR | RECIPIENT | CC | BCC | ADD'L RECIPIENTS | DATE | DOCUMENT DESCRIPTION | PRIVILEGE CLAIMED |
|---|---|---|---|---|---|---|---|---|
| XXX-PRIV-XXX-XIO-DG-0100076 | Desiree Golen | **Jeffrey C. Neu** | | | | 11/11/2008 | Email re: potential representation | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XXX-PRIV-XXX-XIO-DG-0100077 | Desiree Golen | **Jeffrey C. Neu** | | | | 11/11/2008 | Email re: potential representation | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XXX-PRIV-XXX-XIO-DG-0100088-93 | **Jeffrey C. Neu** | Desiree Golen | | | | 11/12/2008 | Email re: analysis of information received | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XXX-PRIV-XXX-XIO-DG-0100094-100 | Desiree Golen | **Jeffrey C. Neu** | | | | 11/12/2008 | Email re: analysis of information received | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XXX-PRIV-XXX-XIO-DG-0100101-07 | **Jeffrey C. Neu** | Desiree Golen | | | | 11/12/2008 | Email re: analysis of information received | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XXX-PRIV-XXX-XIO-DG-0100108-114 | Desiree Golen | **Jeffrey C. Neu** | | | | 11/12/2008 | Email to attorney providing additional information | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XXX-PRIV-XXX-XIO-DG-0100115-121 | **Jeffrey C. Neu** | Desiree Golen | | | | 11/12/2008 | Email re: analysis of information received | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |

LEGEND:

Counsels' names in **bold**.

Attorney-Client Privilege;

Attorney Work-Product.

AMENDED PRIVILEGE LOG

XIO INTERACTIVE, INC.

| ID NUMBER | AUTHOR | RECIPIENT | CC | BCC | ADD'L RECIPIENTS | DATE | DOCUMENT DESCRIPTION | PRIVILEGE CLAIMED |
|---|---|---|---|---|---|---|---|---|
| XXX-PRIV-XXX-XIO-DG-0100137 | Desiree Golen | **Jeffrey C. Neu** | | | | 11/14/2008 | Email to attorney providing additional information | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XXX-PRIV-XXX-XIO-DG-0100138 | Desiree Golen | **Jeffrey C. Neu** | | | | 11/14/2008 | Email to attorney following up on meeting and pending tasks | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XXX-PRIV-XXX-XIO-DG-0100139 | **Jeffrey C. Neu** | Desiree Golen | | | | 11/15/2008 | Email from attorney following up on meeting and pending tasks | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XXX-PRIV-XXX-XIO-DG-0100140 | Desiree Golen | **Jeffrey C. Neu** | | | | 11/15/2008 | Email to attorney transmitting additional information requested at meeting | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XXX-PRIV-XXX-XIO-DG-0100141 | **Jeffrey C. Neu** | Desiree Golen | | | | 11/15/2008 | Email from attorney re: additional information received subsequent to meeting | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XXX-PRIV-XXX-XIO-DG-0100142 | **Jeffrey C. Neu** | Desiree Golen | | | | 11/15/2008 | Email from attorney re: additional information received subsequent to meeting | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XXX-PRIV-XXX-XIO-DG-0100143 | Desiree Golen | **Jeffrey C. Neu** | | | | 11/15/2008 | Email to attorney transmitting additional information requested at meeting | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |

LEGEND:
Counsels' names in **bold.**

Attorney-Client Privilege;
Attorney Work-Product.

AMENDED PRIVILEGE LOG

XIO INTERACTIVE, INC.

| ID NUMBER | AUTHOR | RECIPIENT | CC | BCC | ADD'L RECIPIENTS | DATE | DOCUMENT DESCRIPTION | PRIVILEGE CLAIMED |
|---|---|---|---|---|---|---|---|---|
| XXX-PRIV-XXX-XIO-DG-0100144 | Desiree Golen | **Jeffrey C. Neu** | | | | 11/15/2008 | Email to attorney transmitting additional information requested at meeting | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XXX-PRIV-XXX-XIO-DG-0100145 | **Jeffrey C. Neu** | Desiree Golen | | | | 11/15/2008 | Email from attorney re: additional information received subsequent to meeting | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XXX-PRIV-XXX-XIO-DG-0100146 | **Jeffrey C. Neu** | Desiree Golen | | | | 11/15/2008 | Email from attorney re: additional information received subsequent to meeting | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XXX-PRIV-XXX-XIO-DG-0100147 | Desiree Golen | **Jeffrey C. Neu** | | | | 11/17/2008 | Email to attorney transmitting additional information requested at meeting | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XXX-PRIV-XXX-XIO-DG-0100197 | Desiree Golen | **Jeffrey C. Neu** | | | | 12/7/2008 | Email to attorney re: fair use issues | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XXX-PRIV-XXX-XIO-DG-0100198 | **Jeffrey C. Neu** | Desiree Golen | | | | 12/7/2008 | Email from attorney re: fair use issues | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |
| XXX-PRIV-XXX-XIO-DG-0100199-200 | Desiree Golen | **Jeffrey C. Neu** | | | | 12/7/2008 | Email to attorney re: fair use issues | Attorney-client privilege (Fed. R. Evid. 502(g)(1); work-product protection (Fed. R. Evid. 502(g)(2); prepared in anticipation of litigation |

LEGEND:
Counsels' names in **bold**.

Attorney-Client Privilege;
Attorney Work-Product.

# EXHIBIT H

# In The Matter Of:

## *TETRIS HOLDING, LLC, ET AL.*
## *v.*
## *XIO INTERACTIVE INC.*

———————————————————————

## *DESIREE  GOLEN - Vol. 2*
### *February 10, 2011*

———————————————————————

**MERRILL CORPORATION**

**LegaLink, Inc.**

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

DESIREE  GOLEN - 2/10/2011

| | |
|---|---|
| 11:12:40 1 | THE VIDEOGRAPHER: Please proceed. |
| 11:12:43 2 | EXAMINATION BY MS. SCHMITT |
| 11:12:48 3 | MS. SCHMITT: Q. Thank you. I'd like to mark |
| 11:12:52 4 | as -- I'd like to introduce Exhibit 101. |
| 11:12:55 5 | (Whereupon, Deposition Exhibit 101 was |
| 11:12:59 6 | marked for identification.) |
| 11:12:59 7 | MS. SCHMITT: Q. Ms. Golen, have you seen |
| 11:13:02 8 | this document before? |
| 11:13:06 9 | A. I believe I have. |
| 11:13:09 10 | Q. And your counsel has represented to us that |
| 11:13:44 11 | you are verifying these interrogatory responses. Do |
| 11:13:53 12 | you understand that? |
| 11:13:58 13 | A. Yes. |
| 11:15:02 14 | Q. Can you turn to the response to interrogatory |
| 11:15:08 15 | number nine, which -- these pages aren't numbered, |
| 11:15:08 16 | but -- the first bullet point in that response says |
| 11:15:41 17 | Maura Carter. Do you see that? |
| 11:15:45 18 | A. I do. |
| 11:15:46 19 | Q. So this -- who is Paula Kasler? |
| 11:15:50 20 | A. Paula Kasler is an attorney that I met at a -- |
| 11:15:56 21 | kind of like a networking event in Palo Alto. |
| 11:15:58 22 | Q. When did you meet her? |
| 11:16:00 23 | A. I don't remember exactly. It was probably |
| 11:16:07 24 | either in 2008 or 2009, yeah. |
| 11:16:40 25 | Q. And when's the last time you had contact with |
| | 319 |

| | |
|---|---|
| 1 | her? |
| 2 | A. The last time I had contact with her was via |
| 3 | e-mail sometime, I think, in 2009. She introduced me to |
| 4 | a friend of hers who was a game designer. |
| 5 | Q. Who was that? |
| 6 | A. I don't exactly remember his full name. I |
| 7 | think his -- Bernard. I think it was Bernard. |
| 8 | Q. Bernard Schmalzried? |
| 9 | A. Yes. |
| 10 | Q. Okay. |
| 11 | Julie, that's S-C-H-M-A-L-Z-R-I-E-D. |
| 12 | And the interrogatory response provides that |
| 13 | Xio communicated with Paula Kasler regarding the |
| 14 | intellectual property rights of video games and |
| 15 | Tetrimino games; is that correct? |
| 16 | A. Yes. So at this networking event, it was just |
| 17 | a lot of lawyers, and they were talking about what they |
| 18 | were interested in, and I was talking a little bit about |
| 19 | the fact that we were making a Tetrimino game. And I |
| 20 | think I probably brought up that there were a few other |
| 21 | Tetrimino game developers who had received cease and |
| 22 | desist letters from the Tetris Company. So I don't |
| 23 | exactly remember everything that we talked about, but I |
| 24 | think I probably mentioned -- talked a little bit about |
| 25 | intellectual property rights of video games. |
| | 320 |

| | |
|---|---|
| 11:15:07 1 | Q. And what did you talk about -- what did you |
| 11:15:09 2 | say about the intellectual property rights of video |
| 11:15:05 3 | games? |
| 11:15:03 4 | A. I don't remember. Again, it was, like, about |
| 11:15:08 5 | two years ago. So, in general, what I do remember is we |
| 11:15:58 6 | talked about them, that that subject was brought up. I |
| 11:16:06 7 | don't remember the specifics, though. |
| 11:16:06 8 | Q. And other than that networking event, did you |
| 11:16:06 9 | speak to Ms. Kasler about intellectual property rights |
| 11:16:26 10 | after that event? Or other than that event, sorry, did |
| 11:16:26 11 | you speak to Ms. Kasler about IT rights? |
| 11:16:29 12 | MS. MAITRA: Objection; vague. |
| 11:16:23 13 | THE WITNESS: I don't exactly know. I'm not |
| 11:16:26 14 | sure when all these communications happened. I know I |
| 11:16:38 15 | met her at this networking event, and I brought up that |
| 11:16:48 16 | we were making a Tetrimino game. And then mostly |
| 11:16:54 17 | likely -- I think we were in a group of people -- we |
| 11:16:58 18 | might have talked about video games, intellectual |
| 11:16:55 19 | property rights. I think, like I said, she sent me an |
| 11:16:57 20 | e-mail introduction to someone else. So she might have |
| 11:16:48 21 | asked for like a status of where we were, and I'm not |
| 11:16:60 22 | sure exactly what I -- any of our communications beyond |
| 11:16:60 23 | that. |
| 11:16:56 24 | MS. SCHMITT: Q. Okay. So other than the |
| 11:16:57 25 | e-mail that you referenced and then this networking |
| | 321 |

| | |
|---|---|
| 1 | event, you can't recall any other communications with |
| 2 | her? |
| 3 | A. Yeah, to the best of my knowledge, I can't |
| 4 | recall anything else. |
| 5 | Q. And the networking event was an affair with |
| 6 | many people in attendance? |
| 7 | MS. MAITRA: Objection; vague. |
| 8 | THE WITNESS: Yes, it was a -- it was just, I |
| 9 | think, a firm's opening party. They were launching, and |
| 10 | I was invited. |
| 11 | MS. SCHMITT: Q. Okay. And how long did you |
| 12 | speak to Ms. Kasler at that event? |
| 13 | A. I don't recall exactly. We talked about other |
| 14 | things; her daughter and, you know, I think education. |
| 15 | So I'd say maybe an hour or so. |
| 16 | Q. Did Ms. Kasler work for a law firm? |
| 17 | A. I believe she did. |
| 18 | Q. What was the name of her law firm? |
| 19 | A. I don't recall. |
| 20 | Q. And did you retain Ms. Kasler? |
| 21 | A. No. |
| 22 | Q. And did you show her the Mino game? |
| 23 | A. No, I don't believe we did. I don't think at |
| 24 | that time we even had a Mino game. |
| 25 | Q. Did you show her any prototype of a Mino |
| | 322 |

DESIREE  GOLEN - 2/10/2011

---

**Page 323**

11:19:39   1   game?

11:19:37   2       A.  I don't believe so.  I don't remember what I

11:19:28   3   brought with me to that networking event.  Most likely I

11:19:29   4   had a few business cards, and, you know, I didn't really

11:19:40   5   carry much around.  So I think I probably just came with

11:19:42   6   myself and conversation.

11:19:45   7       Q.  So other than maybe a business card, you

11:19:46   8   didn't show Ms. Kasler any materials; is that correct?

11:19:49   9       A.  Not that I can recall.

11:19:55  10       Q.  Okay.  Did you discuss the Customs opinion

11:19:54  11   with her?  And when I say "Customs opinion," I mean the

11:20:00  12   Customs opinion that was marked in your deposition as

11:20:05  13   Exhibit 38, which had to do with Tetris and an

11:20:08  14   infringing Tetris game.

11:20:09  15       MS. MAITRA:  So are you going to show us the

11:20:07  16   Customs decision?

11:20:09  17       MS. SCHMITT:  Sure, if you don't remember it.

11:20:19  18   Frank, please show it to them.

11:20:23  19       MR. CARLOW:  Sure.

11:20:25  20       MS. MAITRA:  Is this Exhibit 2 to this?

11:20:38  21       MS. SCHMITT:  No.  Well, this was marked as

11:20:38  22   Exhibit 38 in Ms. Golen's -- it's already been marked.

11:20:29  23   We just don't have the marked copy back.

11:20:42  24       MS. MAITRA:  Sorry, the interrogatory was

11:20:46  25   Exhibit 1?

---

**Page 324**

 1       MR. CARLOW:  101.

 2       MS. MAITRA:  Okay.

 3       THE WITNESS:  I'm sorry, what was your

 4   question?

 5       MS. SCHMITT:  Q.  Did you discuss this Customs

 6   decision with Ms. Kasler?

 7       A.  I don't believe I did.  I don't remember when

 8   the networking event was, and I don't remember when I

 9   read this exactly, and I don't think I would have talked

10   to her about it.  She wasn't an IP attorney.  It was

11   mostly just a good person who I met.

12       Q.  Did she -- did she say that she thought your

13   game would not infringe on my client's rights in the

14   Tetris game?

15       A.  I don't believe we talked about any specific

16   questions like that.  Again, we -- I think I might have

17   mentioned that I was doing a Tetrimino game, and we

18   might have talked a little bit about video game

19   intellectual property rights, but she wasn't an IP

20   lawyer, so we talked about other things.

21       Q.  Okay.  And who is Sean DeBruine?

22       A.  Sean DeBruine is another lawyer that I met at

23   that networking event, and I found out in passing that

24   he worked on the Lotus versus Borland case.  So I got

25   really excited.  I remember I think I had read that case

---

**Page 325**

11:20:09   1   a few nights before, and I was super excited to meet

11:20:05   2   someone on the case.

11:20:09   3       Q.  Did the Lotus v. Borland case have to do with

11:21:00   4   video games?

11:21:05   5       A.  You know, it's been a long time since I read

11:21:02   6   that case and kind of came to -- made a strong analysis

11:21:08   7   of it in my own head.  So I don't actually remember the

11:21:13   8   specifics of that case at all.  I think it was about two

11:21:18   9   years ago that I read it for the first time.

11:21:40  10       Q.  And Sean, I'm sorry DeBruine is how you

11:21:42  11   pronounce his name?

11:21:42  12       A.  I think so.

11:21:43  13       Q.  Okay.  And you met him at the same networking

11:21:46  14   event that you met Ms. Kasler?

11:23:04  15       A.  That's correct.

11:23:30  16       Q.  Okay.  And other than that networking event, did you

11:23:12  17   have any contact with Mr. DeBruine?

11:23:12  18       A.  I think we kept in contact via e-mail a few

11:23:30  19   times, and we went out to lunch another time.  And,

11:23:43  20   again, with a lot of these lawyers, they would check in

11:23:46  21   with me and ask for a status update, and, occasionally,

11:23:48  22   I would just tell them what was going on.

11:23:51  23       Q.  What -- did Mr. DeBruine work for a firm?

11:21:59  24       A.  Yeah, he worked -- he did work for a firm.  I

11:22:02  25   don't remember the name of that firm off the top of my

---

**Page 326**

 1   head.

 2       Q.  Did you show Mr. DeBruine Mino?

 3       A.  I don't remember exactly.  I probably didn't

 4   at that first networking event because I don't think we

 5   had Mino.  And then I don't -- I don't believe I showed

 6   him Mino.  It's possible -- it's possible that I might

 7   have sent a promo code to a few of these people, but I

 8   don't -- I don't recall off the top of my head.

 9       Q.  But you don't recall showing Mr. DeBruine

10   Mino before it was launched on the iTunes Store?

11       A.  I don't remember.  I don't remember when we

12   met for lunch, and I don't remember how that kind of

13   comes into the timeline of when we launched.  And I

14   don't -- I don't specifically remember showing him Mino.

15       Q.  Did you show Mr. DeBruine any of the games

16   called Tetris?

17       A.  By "show," what exactly do you mean?

18       Q.  Sent him a video clip of gameplay, show him

19   screenshots from a game, show him an actual game on

20   your computer or his computer, something like that.

21       A.  Can you repeat the question?

22       Q.  Yeah.

23       Can you repeat the question, Julie?

24       (Record read as follows:

25       Q.  Did you show Mr. DeBruine any

         of the games called Tetris?)

---

DESIREE GOLEN - 2/10/2011

11:25:04  1    THE WITNESS: I don't think I showed him any
11:25:06  2  games called Tetris. Again, I don't really remember off
11:25:42  3  the top of my head. I think most of our conversations
11:25:45  4  were kind of academic.
11:25:49  5    MS. SCHMITT: Q. And before Mino was launched
11:25:51  6  on the App Store, did Mr. DeBruine tell you that he
11:25:55  7  thought it did not infringe my client's rights in
11:26:06  8  Tetris?
11:26:00  9    A. So I don't recall exactly what he said, and I
11:26:02 10  think there's a lot of legal terms in there that I don't
11:26:07 11  completely understand. I'm not a lawyer. And again, it
11:26:17 12  was a long time ago, but the purpose of meeting with
11:26:18 13  these lawyers was kind of to solidify my understanding
11:26:53 14  of copyright at that time, which, again, is the same as
11:26:52 15  my understanding now, which is that, you know, you can
11:26:02 16  use ideas, functional elements, and game rules of a
11:26:02 17  game --
11:26:08 18    Q. Okay. Thank you. Did you show him any
11:26:18 19  games?
11:26:18 20    A. I don't -- I don't recall.
11:26:45 21    Q. Okay. Did he give you an opinion letter that
11:26:49 22  instructed you that it was okay to proceed with Mino
11:26:52 23  before it was launched on the iTunes App Store?
11:26:56 24    A. Um, I don't recall. I don't even really know
11:26:58 25  what an opinion letter is, and I don't think I requested

                                                              327

11:27:28  1  an opinion letter. I think that that's the first time
11:28:49  2  I've kind of heard that term. So I don't think he sent
11:28:57  3  me something called an opinion letter.
11:28:58  4    Q. Did you discuss the Customs decision with
11:29:03  5  Mr. DeBruine before Mino's launch on the App Store?
11:29:08  6    A. I don't recall.
11:29:09  7    Q. And just going back to Ms. Kasler, did she
11:29:15  8  ever give you a formal opinion letter telling you that
11:29:16  9  it was okay to proceed with Mino before it was launched
11:29:19 10  on the App Store?
11:29:30 11    A. Again, I don't really know what an opinion --
11:29:59 12  a formal opinion letter is, and she never sent me a
11:29:08 13  document entitled a formal opinion Letter. And
11:29:40 14  furthermore, she was more of a friend. She wasn't an
11:29:42 15  intellectual property attorney. She was someone I met
11:29:46 16  in passing and really enjoyed her company.
11:29:49 17    Q. And Mr. DeBruine, did he send you any written
11:29:35 18  communication that said it was okay to proceed with
11:29:00 19  Mino before it was launched on the iTunes Store?
11:29:05 20    MS. MAITRA: Objection; vague.
11:29:09 21    THE WITNESS: Are you saying did he write an
                22  opinion letter?
                23    MS. SCHMITT: Q. I'm -- since you don't
                24  understand what an opinion letter means, I'm taking that
                25  off the table. I'm saying did Mr. DeBruine ever tell

                                                              328

11:27:28  1  you, either orally, in an e-mail, over lunch, in any
11:28:49  2  kind of communication, that he thought that Mino -- that
11:28:57  3  you could launch Mino and it wouldn't infringe anyone's
11:28:58  4  rights?
11:28:03  5    A. I don't recall exactly --
11:28:08  6    MS. MAITRA: Objection; vague.
11:28:09  7    THE WITNESS: Sorry.
11:28:15  8    MS. MAITRA: You can answer.
11:28:46  9    THE WITNESS: Okay. I don't recall exactly
11:28:49 10  his words that he used, but the general understanding
11:28:36 11  that I got from our communications was that we could
11:28:30 12  make a game from scratch using our own code base and
11:28:59 13  images and music files to create a game, and that was
11:28:05 14  perfectly legal and, you know, celebrated.
11:28:08 15    MS. SCHMITT: Q. But you did not show him any
11:28:40 16  games, correct, or any images of what Mino looked like
11:28:42 17  or what other games looked like; that's what you said,
11:28:46 18  right?
11:28:49 19    A. I don't recall if I did or didn't.
11:28:50 20    Q. Do you have any reason to believe that you
11:28:55 21  did?
11:29:04 22    A. I don't know. I remember, you know, I was
11:29:09 23  studying this stuff for a long time, and I had many
11:29:05 24  documents that I was referencing personally, and I don't
11:29:09 25  know if I would have, you know, showed those to which

                                                              329

          1  people and not other people. So I don't really recall.
          2    Q. Okay. Who is Pamela Samuelson?
          3    A. Pamela Samuelson is a -- I believe she's an IP
          4  professor at Berkeley University.
          5    Q. And you communicated with her regarding
          6  intellectual property rights?
          7    A. So Sean DeBruine, I think he studied under
          8  her, and he mentioned that he would put us in
          9  communication with each other. I think he forgot, and I
         10  ended up just kind of e-mailing her out of the blue, and
         11  she responded by sending me an article that she had
         12  written, and I don't actually remember if I ever got to
         13  reading that article or not.
         14    Q. And when -- and other than that e-mail or
         15  correspondence you just referenced, have you had any
         16  other communications with her?
         17    A. I don't believe so.
         18    Q. And when did you e-mail her?
         19    A. I'm not sure exactly. Definitely after the
         20  time I had met Sean.
         21    Q. And when was that again?
         22    A. I don't know exactly. I'd have to, you
         23  know -- I'm not sure exactly.
         24    Q. But it was after you had decided to create
         25  Mino, correct?

                                                              330

Pages 327 to 330

DESIREE GOLEN - 2/10/2011

| | |
|---|---|
| 11:29:31 | |

1  A.  By this time -- (conference room phone rings.)
2      MS. MAITRA:  It's not here.
3      MS. SCHMITT:  No, no. it's here, sorry.
4  Somebody just walked in the room.
5      Anyway, I'm sorry, could we -- could we --
6  could you read back my last question?  It was a little
7  distracting.
8      (Record read as follows:
        Q.  But it was after you had
9        decided to create Mino, correct?)
10     THE WITNESS:  Yes, I think that's fair to say.
11     MS. SCHMITT:  Q.  And it was before Mino was
12  launched, correct?
13     A.  I don't know.
14     Q.  Okay.  Did you produce the e-mail between --
15  the e-mail correspondence between you and Professor
16  Samuelson?
17     A.  I turned over my Google account to my lawyers
18  for production.  So anything related to Xio Interactive
19  should have been produced.
20     Q.  And did Professor Samuelson -- did you show
21  Professor Samuelson Mino?
22     A.  When you say "show," again, are you talking
23  about a screenshot, a video?
24     Q.  In any way, sending her screenshots, sending
25  her videos, sending her a link, sending her a copy of

331

1  the game, anything.
2     A.  I don't recall exactly.
3     Q.  Did you send her any materials about Mino?
4     A.  I don't know.
5     Q.  Do you have any reason to believe you did?
6     A.  Again, I had a lot of content that I was kind
7  of juggling, and when I was reaching out to people, I
8  would send some things their way and others not.  So I
9  don't know what I would have sent to whom and when and
10  why.
11     Q.  Who on this list do you recall sending images
12  of Mino to?
13     MS. MAITRA:  And for the record, you're
14  referring to the further supplemental response to
15  interrogatory number nine, correct?
16     MS. SCHMITT:  Yes.
17     THE WITNESS:  Let's see.  Sorry, was that
18  screenshots of Mino?
19     MS. SCHMITT:  Q.  Anything.  Screenshots,
20  video clips, a copy of the game, sketches of the
21  prototype.  I mean any -- anything you're showing about
22  Mino, who did you send materials like that to?
23     A.  So do you want to just go through the list?
24     Q.  Sure.
25     A.  Okay.  So Maura Carter, I think at one point

332

1  she mentioned that she had downloaded Mino off the App
2  Store.  So I think she had a copy of Mino.  I'm not sure
3  about Julie Turner.  I think I might have sent her a
4  promo code.
5     Q.  Okay.  All right.  What I'm interested in is
6  before Mino was launched on the iTunes Store.
7     A.  Okay.
8     Q.  So if people got a copy once it was on the
9  iTunes store, I'm not interested in that.  Who did you
10  show Mino to before it was launched?
11     A.  I actually don't really remember.  All this
12  happened a long time ago, and I don't recall exactly.
13     Q.  So is there anybody on this list that you
14  remember sending Mino to?
15     MS. MAITRA:  And objection.  You mean before
16  Mino was launched, correct?
17     MS. SCHMITT:  Correct.
18     THE WITNESS:  Before Mino was launched, I
19  don't recall.  Again, it's probably in my e-mail.  It is
20  in my e-mail if I sent them anything.  And I remember
21  reviewing my e-mails in order to write this up, but it's
22  been a few weeks since I wrote this, and I don't recall
23  exactly.
24     MS. SCHMITT:  Q.  So what you're saying is you
25  don't recall anyone now.  If you did send any materials

333

1  about Mino to these people before Mino was launched, it
2  would be reflected in your e-mails, and those would have
3  been produced to us?
4     A.  I believe that's what I'm saying.
5     Q.  Who is Joshua Cook?
6     A.  Joshua Cook is another -- I think he's an
7  intellectual property lawyer.  Oh, no, Joshua is a
8  corporate lawyer that I met at a networking event, and
9  he ended up introducing me to Colin D. Chapman.
10     Q.  And was this networking event the same
11  networking event that you met Mr. DeBruine and
12  Ms. Kasler?
13     A.  No.
14     Q.  When was this networking event that you met
15  Mr. Cook?
16     A.  I don't remember exactly.  I know it was after
17  the first networking event that I met Paula and Sean.  I
18  don't remember exactly when it was other than it was
19  after that one.
20     Q.  Approximately how long after?
21     A.  I have almost no idea.  Maybe between one to
22  four months.  Maybe more.
23     Q.  Was it -- was this networking event before
24  Mino was launched?
25     A.  I don't remember.

334

Pages 331 to 334

DESIREE  GOLEN - 2/10/2011

**Page 335**

| | |
|---|---|
| 11:34:59 | 1 |
| 11:34:52 | 2 |
| 11:34:55 | 3 |

Q.   Other than meeting him at the networking
event, did you have further communications with
Mr. Cook?
A.   Yeah, I think he put me in touch with his --
his firm's intellectual property lawyer, Colin D.
Chapman, and the three of us met sometime after that
initial networking event.
Q.   And what was the firm?
A.   It's on the tip -- I don't remember the name
of the firm.  If I heard it, I could probably recognize
it, though.
Q.   Did anyone at -- did you -- sorry, excuse me.
Let me start again.
        Did you retain Mr. Cook's firm to represent
you or Xio?
A.   We didn't sign a retainer agreement with
Joshua Cook or Colin D. Chapman or their firm.
Q.   Did anyone at that firm, including Mr. Cook
and Mr. Chapman, tell you that Mino would not infringe
anyone's rights before it was launched on the App
Store?
A.   I don't exactly remember what they told me
specifically, but, again, I was meeting with these
lawyers to solidify my understanding of copyright and
video gaming and our work with Mino.  So I do remember

that I came out with the understanding that we could
produce our own game natively in-house with our own
source code, music files, graphic files, and that that
was perfectly legal.
Q.   But you did not show Mr. Cook, Mr. Chapman,
or anyone else at their firm any images of your work on
Mino, correct?
A.   I don't remember if I did or if I didn't.  I
just don't remember.
Q.   And you didn't show Mr. Cook or Mr. Chapman
or anyone else at their firm any games called Tetris;
is that correct?
A.   Again, I don't remember what I showed them
specifically.
Q.   Do you have any reason to believe that you
showed them any images from a game called Tetris?
A.   There was at one point a -- there was a
screenshot.  There were two images of -- if you do a
Google search, I think there's a screenshot for Tris and
EA's iPhone game called Tetris, and I think I might have
brought that up.  I don't know exactly because I
remember studying that image, but that's the only thing
I can think of if I did bring that up.  I might have
told them to reference that.
Q.   When did -- you said you studied that image

**Page 336**

you found on Google?
A.   I think I brought it up and I looked at it,
yeah.
Q.   And when did you look at that?
A.   I don't remember exactly.  I think there's --
Q.   Was it before the launch of -- it was before
the launch of Mino?
A.   I think so.  I think it was before the launch
of Mino.
Q.   And did you show that EA Tetris screenshot to
anyone on this list in interrogatory number nine?
A.   I don't remember exactly.  I just remember
that was an image.  I think Michael drew up a document
called Tetris Company Legal Notes, or something like
that, and I think he might have used that screenshot in
there as well.  So I know that was -- that was something
that we were kind of looking at, and we might have shown
people at some point.  So we might not have.  I just
don't remember who we did and didn't, and when we
actually game into possession of that.
Q.   Can you remember showing -- okay.  My
question was can you remember showing anyone on this
list in interrogatory number nine the screenshot from
EA's Tetris game?
A.   I don't -- I don't remember specifically, but

I think with Julie Turner, we -- she might have looked
at that.  We all had laptops.  So I think she might have
pulled it up on Google.  I don't remember specifically.
Q.   Did you -- did she compare the EA Tetris
screenshot to any images of Mino?
A.   I don't remember if we showed her Mino, if we
had Mino at that time.  All I remember is that we were
talking about the game rules of certain games, and we
kind of went through a certain number of game rules with
these two screenshots.
Q.   The two screenshots being Tris and EA's
Tetris game?
A.   I believe so.
Q.   Did Ms. Turner ever -- to your knowledge, did
Ms. Turner ever compare EA's Tetris game to Mino?
A.   I'm not sure if she compared any games to
Mino.  I'm not -- I don't know if she had access to
Mino.
Q.   Okay.  And did Ms. -- Ms. Turner was a
lawyer, right?
A.   Um-hum.
Q.   Or is a lawyer.  Did she work for a law firm?
      MS. MAITRA:  Objection; asked and answered.
      THE WITNESS:  Yes, she does.
      MS. SCHMITT:  Q.  And did she give you --

**Page 337**

**Page 338**

Pages 335 to 338

DESIREE GOLEN - 2/10/2011

---

11:40:07  1   Ms. Turner give you -- or let me start again.
11:40:51  2       Did Ms. Turner ever tell you before Mino was
11:40:56  3   launched that it would not infringe anyone's rights?
11:40:58  4       MS. MAITRA:  Objection; vague.
11:40:59  5       THE WITNESS:  Again, when I was meeting with
11:41:01  6   these lawyers, the purpose was to solidify my
11:41:03  7   understanding of copyright and video games.  I don't
11:41:07  8   remember specifically what she told me or what we talked
11:41:09  9   about.  But in, in general, I remember that I came out
11:41:14  10  of these meetings with the understanding that we could
11:41:16  11  produce a game with our own native source code, image
11:41:20  12  files, music files, graphic files, and that would be
11:41:22  13  legal.
11:41:33  14      MS. SCHMITT:  Q.  I don't think you answered
11:41:36  15  my question.
11:41:39  16      Julie, would you mind reading it back, please.
11:41:38  17      (Record read as follows:
                    Q.  Did Ms. Turner ever tell you
11:41:47  18       before Mino was launched that it would
11:41:44          not infringe anyone's rights?)
11:41:50
11:41:58  19
11:41:58  20      THE WITNESS:  Anyone's rights --
11:43:04  21      MS. MAITRA:  Sorry, same objection.
11:43:00  22      THE WITNESS:  Okay.  Can you read the question
11:41:52  23  again?
11:43:10  24      (Record read as follows:
                    Q.  Did Ms. Turner ever tell you
11:43:04  25       before Mino was launched that it would
11:43:17          not infringe anyone's rights?)

                                                            339

---

1   MS. MAITRA:  Same objection.
2   THE WITNESS:  So again, I don't know
3   specifically what she told me.  It was a long time ago,
4   and my understanding after we left was that we were in
5   the clear legally and would not have reason to believe
6   that we would be stepping on anyone's toes by making
7   Mino, and that's the understanding I had.
8
9       MS. SCHMITT:  Q.  But you don't recall -- but
10  you don't recall ever showing her Mino, right --
11      MS. MAITRA:  Objection --
12      MS. SCHMITT:  Q.  -- before it was launched?
13      MS. MAITRA:  Objection; asked and answered.
14      THE WITNESS:  I don't recall.
15      MS. SCHMITT:  Q.  And who is Seth Schoen?
16  A.  I think Seth was a representative at the
17  Electronic Frontier Foundation.
18  Q.  Is he a lawyer?
19  A.  I don't know if he's a lawyer.
20  Q.  I'm sorry, going back to Ms. Turner, did you
21  ever discuss the Customs opinion with her?
22  A.  I don't recall.
23  Q.  And did you ever discuss the Customs opinion
24  with Mr. Cook, Mr. Chapman, or anyone else at their
25  firm?

                                                            340

---

11:44:59  1   A.  I don't recall.
11:45:00  2   Q.  Did you have an expectation that your
11:45:08  3   communications with Ms. Turner would remain
11:45:06  4   confidential?
11:45:15  5   A.  I believe I did.  Again, I'm not really a
11:45:18  6   lawyer, so I don't really know how these things work,
11:45:19  7   but I knew that when we were speaking it was a private
11:45:45  8   conversation about, you know, things that we were doing
11:45:48  9   as a company, and I was going to her for some advice,
11:45:58  10  and she was an attorney, yeah.
11:46:00  11  Q.  Okay, but you obviously think -- you didn't
11:45:05  12  have an expectation that that conversation was
11:45:08  13  privileged, right, you're talking about it now?
11:45:20  14  A.  My understanding of privilege is a little --
11:45:28  15  Sonali has to debrief me on it, like, a lot.  So it's
11:45:34  16  still a little confusing to me.  What do you mean by
11:45:36  17  "privileged"?
11:45:20  18  Q.  Well, privileged information is -- I mean,
11:45:27  19  I'm asking you whether you considered it to be
11:45:40  20  privileged, whatever your meaning of that word is?
11:45:59  21      MS. MAITRA:  Objection; vague.
11:45:52  22      THE WITNESS:  I don't really know.  I don't
11:45:52  23  think I understand enough about a privileged
11:45:53  24  communication.  I do know that I had these conversations
11:45:55  25  with her about intellectual property and video games,

                                                            341

---

1   and our -- what our company was doing.
2       MS. SCHMITT:  Q.  Did you -- did you have an
3   expectation that conversations with Ms. Kasler would be
4   confidential or privileged?
5   A.  Again --
6       MS. MAITRA:  Objection; compound; and vague.
7       THE WITNESS:  Can you repeat the question?
8       MS. SCHMITT:  Q.  Do you have an expectation
9   that your conversations with Ms. Kasler would be
10  confidential?
11  A.  I don't really know what you mean by
12  confidential.
13  Q.  You don't know what confidential means?
14  A.  I'm assuming it has some kind of legal
15  connotation, which I'm not very familiar with.
16  Q.  Did you think Ms. Kasler was under an
17  obligation legally not to disclose what you and she
18  talked about?
19  A.  I'm not a lawyer.  I don't really know the
20  specifics of confidentiality in the legal realm.  So I
21  don't know.
22  Q.  I guess that wasn't part of the research you
23  were doing back then?
24  A.  Is that -- the research that I was doing was
25  related to intellectual property and video games.

                                                            342

# EXHIBIT I

**From:** Desiree Golen
**To:** "DeBruine, Sean"
**Cc:**
**Bcc:**
**Date:** Tue, 3 Nov 2009 13:59:46 -0800
**Subject:** Thoughts and Feedback Please

Hi Sean,

I thought I would update you on whats been going on with our legal
situation: I spoke with many attorneys after our lunch meeting last
month, and am considering a pretty good arrangement with Mark Lemley's
new firm, Durie Tangri Page Lemley Roberts & Kent LLP.

I am in the process of drafting a letter to the firm I am now working
with to inform them that I would like to terminate our agreement and
seek alternate legal representation. I have never done this before,
and could use any advice you might have. I don't want to offend, but I
want to be direct. Below is what I've put together so far.

If you have time, I would appreciate your thoughts.

Thank you so much for all of your help thus far!

-Desiree

----------------------------------------------------------------------------------------------------------
----------------------------------------
Dear Jeff,

I would like to thank you for your time and effort thus far on our
case with the Tetris Company. Unfortunately, we have been unsatisfied
with the approach your firm would like to take on this case (namely
that you would prefer not to confront the issue of the
copyrightability of TETRIS game mechanics), and we would like to look
for alternate legal representation more in line with our goals.

Previously you and I spoke on the phone and in person about the
specifics of our arrangement: that the initial letter writing to Apple
and to the Tetris Company would be completed on a pro-bono basis, and
that once we progressed to a different stage (ie settlement or
litigation) we would then discuss a financial plan to cover legal
costs and fees.

Because we are still in the letter writing phase, Xio should not have
incurred any fees with IC Neu and Associates,

XIO-DG-0100927

on good terms.

Thank you for your time,

Desiree Golen

-----------------------------------------------------------------------------------------------------------------

----------------------------------------

Desiree Golen
CEO, Xio Interactive
Network Game Development on the Mobile Platform
xiointeractive.com
Mountain View, CA
(650) 866-5583

XIO-DG-0100928

# EXHIBIT J

**Custodian: Desiree Golen**

**Filename: cormier_letter.doc**

**Filetype: application/msword**

11/13/2008 3:06AM   XIO-DG-0002153

aocormier@sbcglobal.net

Dear Mr. Cormier, esq.,

Hi, my name is Desiree Golen. I am writing because I am in the process of developing a Tetromino game to release on the iPhone platform very shortly.

Since August, however, the Tetris Company LLC has intimidated five independent iPhone Tetromino game developers into terminating their applications  (Kafablo, Shaker, TetoTeto, Tris, and Touchris) by sending out cease and desist letters.

The C&D's accuse each developer of "violat(ing) the copyright in the Tetris(R) game because it is a copy of (their) client's game and was created and is being reproduced and sold on  (the Appstore) without (their) client's prior permission or authorization." (see attached for full copy)

Unfortunately, the developers of Kafablo, Shaker, TetoTeto, Tris and Touchris were all legally and financially unprepared to contradict the Tetris Company's claims of infringement. So, Apple, in an attempt to avoid any legal entanglement, "encouraged" each developer to agree to remove their applications from the Appstore.

When Todd Billsorrow, the developer of Kafablo, wrote to the Tetris Company to declare non-infringement and inquire further about their licensing, (see attached), the Tetris Company referred him to a correspondence between a US Customs Agent and yourself http://www.faqs.org/rulings/rulings2002HQ471487.html and proceeded to use this letter as justification to claim that,

"As in the Philips case, the games under consideration herein presents with numerous similarities. The copyrightable features of the TETRIS game, as covered by the copyright registration, includes the downward, lateral, and rotating movements of the differently oriented four-brick playing pieces, and the shape and appearance of the four-brick playing pieces, both in the "dots" that appear within the individual bricks themselves, as well as in the configuration of the four-brick combinations comprising the playing pieces. Additional copyrighted features include: the scoring features, the feature displaying the next four-brick playing piece that will fall down the playing field matrix, the disappearance of any completed horizontal row, the subsequent consolidation of the playing pieces remaining on the playing field as a result of the downward shift into the space vacated by the disappearing row, the resulting score, the background music, the specific sounds generated as the four-brick playing pieces are rotated, and the sounds generated as a row is completed and points are earned. Further, the makeup of the playing field itself, i.e., the vertical matrix, higher than it is wide, with a base of ten individual "bricks" per horizontal row, and generally twenty individual "bricks" per vertical line, is also copyrightable expression."

**I am curious what the context of this letter is, and if there are any further public archives that document your case entirely. You represented the opposition to the Tetris Company; was this dispute settled in Court?**

I am also writing to ask your professional opinion about TTC's claims of copyright infringement proposed in the cease and desist letters.
My understanding is that a game concept is not copyrightable material:

"Copyright protection does not extend to any idea, system, method, device, or trademark material involved in the development, merchandising, or playing of a game. Once a game has been made public, nothing in the copyright law prevents others from developing another game based on similar principles." (US Copyright Office)

Furthermore, Reback's victory in Borland vs. Lotus has been cited to show the distinction in copyright law between the interface of a software product and its immplementation, where the implementation is subject to copyright.  However, the set of available operations and the mechanics of how they are activated are not copyrightable. If this extends to the "operation and mechanics" of a tetromino game, this standard should allow software developers to create original "clones" of copyrighted software products without infringing the copyright. (http://en.wikipedia.org/wiki/Lotus_v._Borland)

Finally, I found reference to the case of the Tetris and Arcade (but have had trouble locating a complete public record of the entire case) demonstrates that the game concept of Tetris is limited by the subject matter portrayed by the game. Therefore, copyright infringement happens ONLY if the second game copies the first game *identically,* or if the code is copied*: **"the scope of a graphic copyright for a tile-on-grid design is necessarily limited by the common nature of (the) subject matter portrayed. Because of this limitation, copying in this category of products would have to be virtually identical to create even a suspicion of piratical copying."***
*(*http://www.faqs.org/rulings/rulings2002HQ471487.html)

Finally, the audiovisual effects of my tetromino game (as well as those of Kafablo, Shaker, TetoTeto, Tris, and Touchris ) are clearly distinct from those of Tetris. See:
http://arstechnica.com/journals/thumbs.ars/2008/08/26/free-tetris-clone-pulled-from-itunes-app-store
Furthermore, these games were developed completely independently with original codebase, art, and music, and contain no copyrighted material.

I have come to believe that the Tetris Company has been using its Copyright claims unjustly in order to profit from a monopoly on an unpatented game by bullying independent developers who do not know any better. I am completely appalled by this and I would like to finally see an end to the Tetris Company's unquestioned "authority" an open market for Tetromino Games!!

I am hoping that with your professional background and history with the Tetris company, you might be able to offer some more information, guidance, or encouragement to me. I realize you must be very busy, but I thought I would try emailing you.

Thank you for your time. I look forward to your response,

Desiree Golen

# EXHIBIT K

Case 3:09-cv-06115-FLW-DEA   Document 35-3   Filed 04/21/11   Page 55 of 82 PageID: 286

Re: Ruling Request; "Pocket Arcade 256 Games in 1" hand-held electronic LCD game; "TETRIS" (U.S. Copyright Office Registration No. PAu 1,284,318, U.S. Customs Service Recordation No. COP89-00202); ZAO Elorg.

HQ 471487

October 25, 2001

ENF 4-02-RR:IT:IP 471487   GFM

CATEGORY:  17 U.S.C. 602; Copyright

Anthony O. Cormier, Esq.

21700 Oxnard Street

Suite 1750

Woodland Hills  CA  91367

RE:     Ruling Request; "Pocket Arcade 256 Games in 1" hand-held electronic LCD game; "TETRIS" (U.S. Copyright Office Registration No. PAu 1,284,318, U.S. Customs Service Recordation No. COP89-00202); ZAO Elorg.

Dear Mr. Cormier:

This is in reply to your letter dated August 13, 2001, in which you request a Headquarters ruling as to whether the above-referenced hand-held LCD games constitute violations of the subject TETRIS copyright. You state that you have been instructed by your client, (Westminster Inc. of Atlanta, Georgia, the supplier of the subject LCD games), to lodge this ruling request.

FACTS:

The "Pocket Arcade 256 Games in 1" hand-held electronic LCD game under consideration herein incorporate what you have described as a "tile and grid" graphic format which allows one to play a number of games which are different in name, yet somewhat similar in play.  In your request, you contend that these devices do not constitute violations of the protected TETRIS copyright because, you allege, the only similarities between the subject games and the protected works are "the use of tile-on-grid graphics" and that the artistic details of the respective graphics are "as different as the subject matter allows."  In support of your contention, you have provided 10 visual screen prints from four of the five games resident within the device which are specifically featured on the game's packaging (e.g. Auto Racing, Shooting Gallery, Leap Frog, and Seek & Destroy).  We noticed, however, that screen prints from the fifth game--Block Game—the game upon which

any Customs actions against the
protected copyright would be based, were missing.  In order to remedy this oversight, we have included below, screen

prints from the "Block Game"
contained within the subject game.

Photos of visual images contained within game and outer game package of seized device

Photo of visual image contained within the genuine, protected TETRIS work

ISSUE:    Whether the subject "Pocket Arcade 256 Games in 1" hand-held electronic LCD games constitute violations of the protected TETRIS copyright.

LAW AND ANALYSIS:

The role of Customs in issuing substantive decisions of copyright infringement as to imported merchandise was addressed in *The Miss America Organization v. Mattel, Inc.*, 945 F.2d 536 (2d Cir. 1991). Citing section 603 of the Copyright Act of 1976 (17 U.S.C.  603), the court recognized Customs authority to enforce the provisions of the law prohibiting importations of infringing goods. *Id.* at 538.

Also, the court acknowledged that as a result of its duties, Customs has developed expertise in determining whether merchandise does or does not infringe. *Id.* at 539. Further, the court stated that since sections 602 and 603 (17 U.S.C.  602, 603) direct the Secretary of the Treasury to enact regulations to aid in combating copyright infringement, it is implicit in these directions that the agency (Customs) would be involved in making infringement determinations. *Id.* at 541.  Therefore, because the Treasury Department has been assigned the duty to enforce the copyright laws in cases where there is a reason to believe infringement exists with regard to an imported item, it follows that it is within Customs jurisdiction to take appropriate action to fulfill this duty. *Id.* at 542.

Further, Customs has some independence and autonomy in making infringement determinations regarding imported merchandise. *Id.* at 544.  Accordingly, as the court stated, that there is no reason to enjoin Customs from performing its statutory duties so long as the agency proceeds in conformity with the statutory scheme. *Id.*

In such cases, under Customs regulations, the copyright owner bears the burden of proving copyright infringement.  In order to prove copyright infringement, the copyright owner must show:  (1) ownership of a valid copyright; and (2) copying by the creator of the imported work.  *Act Young Imports, Inc. v. B and E Sales Co., Inc.,* 673 F. Supp. 672, 673 (S.D.N.Y. 1987).  "Copying" can be established by showing that:  (1) the claimed infringer had access to the copyright owner's work, and (2) the protected elements of the two works are substantially similar.  *Levine v. McDonald's Corp.,* 735 F. Supp. 92, 95 (S.D.N.Y. 1990); *see also*, 3 M. Nimmer, *Nimmer On Copyright*  13.01, at 13-3 (1981) ("Nimmer").

Regarding ownership of a valid copyright, section 410(c) of the Copyright Act of 1976, as amended, states that "the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C.  410(c).  In the present case, a valid copyright registration covering the subject copyrighted work exists.

Regarding access to the copyright owner's work, access is presumed where an item is generally available on the open market. *Arnstein v. Porter,* 154 F.2d 464, 468 (2d Cir. 1946); *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1092 (2d Cir. 1977).  In the present case, the worldwide availability of the subject copyrighted work sufficiently establishes access.

As in most cases of copyright infringement, however the determination rests upon whether the works are "substantially similar."   With regard to the issue of substantial similarity, courts often look to the two-part test for similarity as outlined in *Sid & Marty Krofft Television v. McDonald's Corp.*, 562 F.2d 1157, 1162 (9th Cir. 1977).  In that case, the Ninth Circuit adopted a two-part test. The first step, labeled the "extrinsic test", requires a determination of substantial similarity between the ideas which includes an analysis of the type of artwork at issue, the materials used, the subject matter at issue, and the setting for that subject matter. The second step, labeled the "intrinsic test", involves a determination of substantial similarity between the ideas

which depends not on expert testimony or analytic dissection, but instead on the response of the ordinary lay person. That is, the determination focuses largely on whether the suspect work captures the "total concept and feel" of the copyrighted work. *See, Spectravest v. Mervyn's, Inc.*, 673 F.Supp. 1486, 6 U.S.P.Q. 2d 1135, 1138 (N.D. Cal. 1987); *Baxter v. MCA Inc.*, 812 F.2d 421,

Case 3:09-cv-06115-FLW-DEA   Document 35-3   Filed 04/21/11   Page 57 of 82 PageID: 288

424 (9th Cir. 1987).

With regard to the matter now before us, as regards the "extrinsic test" for similarity, it can clearly be established that the two items involve the same subject matter:  hand-held electronic game devices containing LCD falling "brick" games.

As regards the "intrinsic test" for similarity, we note that it is not improper to engage in a side-by-side comparison of the designs in order to reach a determination on the issue of substantial similarity. *Knickerbocker Toy Co., Inc. v. Genie Toys, Inc.*, 491 F.Supp. 526, 528 (E.D. Mo. 1980).  "Substantial similarity" is defined as a showing that the ordinary observer, not set out to detect the differences between two works, would be disposed to overlook the differences and regard the aesthetic appeal of the two works to be the same. *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir. 1960); *In re "Rock `n Flowers"*, C.S.D. 90-67, 24 Cust. B. & Dec. No. 23 (March 21, 1990).  "Substantial similarity" is also defined as whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work.  *Ideal Toy Corp. v. Fab-Lu Ltd. (Inc.),* 360 F.2d 1021, 1022 (2d Cir. 1966); *Durham Industries, Inc. v. Tomy Corporation,* 630 F.2d 905, 912 (2d Cir. 1980).

In a case similar to the one at hand involving video game copyright infringement, *Atari, Inc. et. al. v. North American Philips Consumer Electronics Corp., et. al.*, 214 U.S.P.Q. 33  (CA 7, 1982) (hereinafter, *Philips*), the U.S. Circuit Court of Appeals for the Seventh Circuit ruled that overwhelming similarities inherent in the features of two video works, PAC-MAN and K.C. Munchkin, warranted a finding of infringement.  In its decision, the court noted that the defendant not only adopted the same basic characters, but also portrayed them in a manner which made its game appear substantially similar to the protected work.  As in the present case, numerous similarities, such as the relative size and shape of the characters' "bodies," the V-shaped "mouths," distinctive gobbling actions (with related appropriate sounds), the ways in which they disappeared upon being captured, similar peculiar "eye" and "leg" movements, and the role reversal and "regeneration" process present in both games were so similar that an ordinary observer could only conclude that the defendant copied the plaintiff's work.

The defendant in *Philips* pointed to a laundry list of specific differences.  In response, the Court noted that although numerous differences may influence the impressions of the ordinary observer, "slight differences between a protected work and an accused work will not preclude a finding of infringement" where the works are substantially similar in other respects.  *Id.* at 42; *citing Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 913; *see Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49 (2d Cir.), *cert. denied*, 298 U.S. 669, 56 S. Ct. 835, 80 L. Ed. 1392 (1936).  The Court further stated that "exact reproduction or near identity is not necessary to establish infringement.  An infringement...includes also the various modes in which the matter of any work may be adopted, imitated, transferred, or reproduced, with more or less colorable alterations to disguise the piracy." *Id.*

In overturning the lower district court decision, the Court in *Phillips* noted that the lower court "focused on certain differences in detail and seemingly ignored (or at least failed to articulate) the more obvious similarities."  *Id.* at 42.  It further stated that "the sine qua non of the ordinary observer test, however, is the overall similarities rather than the minute differences between the two works." *Id.*, *citing Peter Pan Fabrics*, 274 F.2d at 489.

Also, importantly, the court noted that  "in order to assess the impact of certain differences, one factor to consider is the nature of the protected material and the setting in which it appears." *Philips* at 42.   The Court continued:

Video games, unlike an artist's painting or even other audiovisual works, appeal to an audience that is fairly undiscriminating insofar as their concern about more subtle differences in artistic expression. The main attraction of [such] games lies in the stimulation provided by the intensity of the competition.  A person who is entranced by the play of the game "would be disposed to overlook" many of the minor differences in detail and "regard their aesthetic appeal as the same." *Id.* at 43 (*citing Kroft, supra* at 1166-67 [children would view accused characters as substantially similar to the protected characters despite differences in detail]).

As in the *Philips* case, the games under consideration herein presents with numerous similarities.  The copyrightable features of the TETRIS game, as covered by the copyright registration, includes the downward, lateral, and rotating movements of the differently oriented four-brick playing pieces, and the shape and appearance of the four-brick playing pieces, both in the "dots" that appear within the individual bricks themselves, as well as in the configuration of the four-brick combinations comprising the playing pieces.  Additional copyrighted features include:  the scoring features, the feature displaying the next four-brick playing piece that will fall down the playing field matrix, the disappearance of any completed horizontal row, the subsequent consolidation of the playing pieces remaining on the playing field as a result of the downward shift into the space vacated by the disappearing row, the resulting score, the background music, the specific sounds generated as the four-brick playing pieces are rotated, and the sounds

generated as a row is completed and points are earned.  Further, the makeup of the playing field itself, i.e., the vertical matrix, higher than it is wide, with a base of ten individual "bricks" per horizontal row, and generally twenty individual "bricks" per vertical line, is also copyrightable expression.

The "Pocket Arcade 256 Games in 1" brick game units utilize the same individual brick shapes, the same four-brick configuration playing pieces, the same rotating, lateral, and downward movements of the playing pieces, and the same sequential configuration of the various shapes of the four-brick playing pieces.  The "Pocket Arcade 256 Games in 1" game uses the same depiction of the next playing piece that will fall down the playing field matrix, and also use an almost identical playing field matrix design in the height, width and layout, to that of the TETRIS game.  Other similar elements include the scoring elements, the disappearing completed rows and the subsequent consolidation of the remaining incomplete rows left below, the accompanying sounds to the rotating, lateral and downward movements of the playing pieces, and the sounds that occur upon completion of a row and the earning of points.  Like TETRIS, the " Pocket Arcade 256 Games in 1" brick game also ends when the playing field matrix is "filled up" with incomplete horizontal rows left on the playing field.

Despite these similarities, the requester avers that  "the scope of a graphic copyright for a tile-on-grid design is necessarily limited by the common nature of (the) subject matter portrayed.  Because of this limitation, copying in this category of products would have to be virtually identical to create even a suspicion of piratical copying." (Request at page 3).

Although not specifically cited, the requester appears to be espousing a view of the idea/expression model raised in cases such as *Atari, Inc. v. Amusement World, Inc.*, 547 F.Supp. 222 (D. Md. 1981) (hereinafter *Amusement World*) which presents similar, yet distinguishable issues.  In that case, the court, ruling on a precursor of modern video games involving line drawings of spaceships and "asteroids," in the face of some twenty-two material similarities, underlined; declined to find infringement.  Instead, the court, believing that the idea/expression dichotomy could not be kept separate, reasoned that the numerous similarities were:

 "*inevitable*, given the requirements of the idea of a game involving a spaceship combating space rocks and given the technical demands of the medium of a video game.  There are certain forms of expression that one *must necessarily* use in designing a video game in which a player fights his way through space rocks and enemy spaceships.  The player *must* be able to rotate and move his craft.  All the spaceships must be able to fire weapons which can destroy targets.  The game *must* be easy at first and gradually get harder, so that bad players are not frustrated and good ones are challenged.  Therefore, the rocks *must* move faster as the game progresses.  In order for the game to look at all realistic, there must be more than one size of rock.  Rocks *cannot* split into very many pieces, or else the screen would quickly become filled with rocks and the player would lose too quickly.  All video games have characteristic sounds and symbols designed to increase the sensation of action.  The player *must* be awarded points for destroying objects, based on the degree of difficulty involved.

All these requirements of a video game in which the player combats space rocks and spaceships combine to dictate certain forms of expression that *must appear* in any version of such a game.  In fact, these requirements account for most of the similarities between ï¿½Meteors' and ï¿½Asteroids.'  Similarities so accounted for do not constitute copyright infringement, because they are part of plaintiff's idea and are not protected by plaintiff's copyright." *Id.* at 229. (Emphasis added).

However, Customs' position on this issue has followed that articulated by the court in *Philips* rather than that adopted by the court in *Amusement World*.  Consequently, Customs does not regard the similarities noted in *Amusement World* to be "inevitable."  In addition, we do not regard the enumerated features of the works considered in *Amusement World* to be "forms of expression that must appear in ï¿½any version' of such a game."  While such a result may once have seemed plausible, since then there has been considerable progress in digital graphic technology.  In view of current technological capabilities alone, it has become clear that boundaries of expression that may have seemed fixed in the past have significantly expanded in recent years ï¿½ so much so as to enable creators to overcome once seemingly insurmountable technical demands, severing unintended and undesired bonds of idea and expression.

In contrasting the *Amusement World* case to the case at issue, we would first state that many other video games involve the use of square blocks on a screen in various configurations that can be manipulated by the player and that interact to score points.  *See Atari Games Corp. v. Oman*, 24 U.S.P.Q. 2d 1993 (D.C. Cir. 1992) (relating to copyright registerability of BREAKOUT game).  The "idea" of using simple squares or blocks on the screen to be assembled into specific shapes and manipulated by the player in a race against time or against the computer is not protectable as such.  The Court in *Atari v. Oman* found the synergistic selection and arrangement of elements in a video game that (individually) may not qualify for copyright to exceed the "minimal degree of creativity" needed to bring the work within the protection of the copyright laws.  *Id.* at 1936; *see Feist Publications v. Rural  Tel. Serv. Co,*, 111 S. Ct. 1282, 1289 (1991).  Other games, including others contained within the imported games that do not infringe the TETRIS copyright, express the idea of using manipulable and interacting square blocks to form, among other things, race cars that move along a track and around barricades, tanks that rotate and shoot at each other or at barricades, Ping-Pong, and

Case 3:09-cv-06115-FLW-DEA   Document 35-3   Filed 04/21/11   Page 59 of 82 PageID: 290

"bombing" or drop games, as well as the BREAKOUT game discussed in *Atari v. Oman, supra*. Each of these examples clearly includes protectable expression based on the same underlying idea but does not include the expression of the TETRIS game.

As distinguished from other games which may have real life, or at least science fiction, counterparts, *Amusement World, supra,* and *Data East USA, Inc. v. Epyx, Inc.*, 9 U.S.P.Q. 2d 1332 (9th Cir. 1988) (scene-a-faire videogame featuring common depictions of Karate fighting), the TETRIS game's expression of the manipulable block configuration idea is a wholly fanciful creation, without reference to the real world. *Philips, supra* at 42.  The nature of the protected material and the setting in which it appears is an important factor when comparing games in an infringement analysis. *Id.*  An abstract representation is "neither an 'obvious' nor an 'inevitable' choice." *Atari v. Oman*, 24 U.S.P.Q. 2d at 1937.

While the court in *Amusement World* gave a very narrow scope of protection to the ASTEROIDS game, the court did not find that the video game lacked any protectable expression.  Instead, it found that the defendant had taken only the 'idea' of the game and expressed it in a different way. It found that the "overall 'feel' of the way the games play is different." *Id.* at 230. Conversely, in the instant case, the overall "feel" of the games is identical.

The *Amusement World* court recognized protectable expression in the "design features" of the ASTEROIDS game. These included "the symbols that appear on the display screen, the ways in which those symbols move around the display screen, and the sounds emanating from the game cabinet." *Id.* at 227.  The court there found that the defendants used "symbols, movements, and sounds that are different from those used in plaintiff's game." *Id.*  In the instant case, the imported game not only adopts the entire set of game pieces and scoring scheme of the TETRIS game, it copies nearly the entire presentation. These copied features include the size and

shape (ten blocks wide by twenty blocks high) of the playing field; the number, shape and appearance (dot inside of each square) of each game piece; the depiction along the sidelines of the next piece to appear; the scoring; and the use of very similar sounds corresponding to movements and scoring, as well as background and introductory music.

HOLDING:

The subject " Pocket Arcade 256 Games in 1" game units present with numerous features similar to those contained in the copyrighted TETRIS work.  The presence of these copyrightable features in the game units would deem them  substantially similar copies of the protected works which, if imported, would properly be considered clearly piratical and subject to seizure under 19 U.S.C  1595a(c)(2)(C) for a violation of 17 U.S.C.  602, as implemented by 19 CFR   133.42.

Sincerely,

Joanne Roman Stump, Chief

Intellectual Property Rights Branch

# EXHIBIT L

Slip Op. 00-27

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

| | | |
|---|---|---|
| LUXURY INTERNATIONAL, INC., | : | |
| Plaintiff, | : | |
| v. | : | Court No. 99-02-00093 |
| UNITED STATES; RAYMOND KELLY, COMMISSIONER OF CUSTOMS; IRENE JANKOV, PORT DIRECTOR, LOS ANGELES CUSTOMS DISTRICT, UNITED STATES CUSTOMS SERVICE, | : | |
| Defendants, | : | |
| and | : | |
| ZAO ELORG and THE TETRIS COMPANY, LLC, | : | |
| Defendant-Intervenors. | : | |

Plaintiff, Luxury International, Inc. ("Luxury"), seeks an order: (1) compelling the United States Customs Service ("Customs") to release its LCD hand-held video games ("LCD games") from detention; and (2) requiring Customs to deliver to it the security posted by the defendant-intervenors, ZAO Elorg ("Elorg") and The Tetris Company, LLC ("Tetris"). Luxury contends that Customs' remand determination finding that its LCD games infringed on Elorg/Tetris' copyright was erroneous and that, therefore, the continued detention of the LCD games and the security is unlawful. Defendant-intervenors, on the other hand, request that the Court: (1) affirm Customs' remand determination; (2) instruct Customs to seize the LCD games; (3) order Customs to return the security to them; and (4) grant their motion to dismiss.

Held: Customs' remand determination is affirmed. Luxury's request for an order compelling Customs to release its LCD games and to deliver the security to it is denied. Elorg/Tetris' request for an order compelling Customs to seize the LCD games and return the security to them is granted. Elorg/Tetris' motion to dismiss is granted.

Court No. 99-02-00093                                    **Page 2**

Dated: March 17, 2000

Law Offices of Elon A. Pollack (Elon A. Pollack and Eugene P. Sands) for plaintiff.

David W. Ogden, Acting Assistant Attorney General; Joseph I. Liebman, Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (Saul Davis); of counsel: Yelena Slepak, Office of Assistant Chief Counsel, International Trade Litigation, United States Customs Service, for defendants.

Leboeuf, Lamb, Greene & MacRae, L.L.P. (Melvin S. Schwechter, David P. Sanders and Julie A. Coletti) for defendant-intervenors.

## OPINION

**TSOUCALAS, Senior Judge:**   Plaintiff, Luxury International, Inc. ("Luxury"), seeks an order: (1) compelling the United States Customs Service ("Customs") to release its LCD hand-held video games ("LCD games") from detention; and (2) requiring Customs to deliver to it the security posted by the defendant intervenors, ZAO Elorg ("Elorg") and The Tetris Company, LLC ("Tetris").   Luxury contends that Customs' remand determination finding that its LCD games infringed on Elorg/Tetris' copyright was erroneous and that, therefore, the continued detention of the LCD games and the security is unlawful.   Defendant-intervenors, on the other hand, request that the Court: (1) affirm Customs' remand determination; (2) instruct Customs to seize the LCD games; (3) order Customs to return the security to them; and (4) grant their motion to dismiss.

**Court No. 99-02-00093**                                        **Page 3**

## BACKGROUND

On February 19, 1999, Luxury brought an action in this Court contesting Customs' denial of its protest, challenging the continued detention of its LCD games.[1]  The Court determined that while it could properly exercise jurisdiction over Customs' denial of Luxury's protest under 28 U.S.C. § 1581(a) (1994), Luxury had prematurely commenced the action in the Court and had effectively circumvented the administrative process by which Customs would have ultimately issued a determination on whether the LCD games infringed on Elorg/Tetris' copyright.  On September 23, 1999, the Court issued an order remanding the matter to Customs to decide the issues pertaining to copyright infringement pursuant to 28 U.S.C. § 2643(c)(1)(1994).

On November 17, 1999, the Court conducted a telephone conference and heard arguments by the parties with regard to Luxury's application for an injunction. On November 18, 1999, this Court issued an injunction prohibiting the Commissioner of Customs, Raymond Kelly, and the Port Director of the Los Angeles Customs District, Irene Jankov, from releasing any funds or other security until the Court reached a decision pertaining to copyright infringement and Customs' detention of the merchandise.      On

---

[1]  The facts surrounding this action are detailed in this Court's previous opinion and familiarity with them is presumed. See Luxury Int'l, Inc. v. United States, 23 CIT ___, 69 F. Supp. 2d 1364 (1999).

**Court No. 99-02-00093**                                    **Page 4**

November 22, 1999, the Court issued an order prohibiting Customs
from instituting seizure proceedings pending resolution of the case
or until the Court granted permission to commence seizure
proceedings, and further decreed that the failure of Customs to
institute seizure proceedings after the finding of infringement by
Customs would not constitute a breach or violation of any Customs
regulation.

## JURISDICTION

The Court retains jurisdiction over this matter pursuant to 28
U.S.C. § 1581(a) (1994), which provides the Court "shall have
exclusive jurisdiction of any civil action commenced to contest the
denial of a protest, in whole or in part, under section 515 of the
Tariff Act of 1930." Section 515 of the Tariff Act, 19 U.S.C. §
1515 (1994 & Supp. III 1997), details the process by which Customs
modifies and performs administrative review of its decisions and
"provides for the allowance or denial of a protest filed pursuant
to section 514 of the Tariff Act of 1930." Lowa, Ltd. v. United
States, 5 CIT 81, 84, 561 F. Supp. 441, 444 (1983) (citation
omitted).

**Court No. 99-02-00093**                                      **Page 5**

### DISCUSSION

**I.   Entitlement to Protect Copyright**

Elorg licenses the intellectual property in its trademarks and
copyright registrations to various entities, including Nintendo of
America, Inc. ("Nintendo"). See Ex. in Supp. of Luxury's Resp. Re
Infringement ("Luxury's Ex.") O at 1.  Nintendo is the copyright
claimant for the copyright at issue, PAU 1,284,318 ("Copyright"),
and recorded it with Customs under Customs Recordation No. 89-170.
See id. at 4.   The Copyright is based on  four underlying
copyrights: Copyright Registration Nos. PA 412,170; PA 1,214,036;
PA 1,214,035; and PA 412,169.  See id.   The four underlying
copyright registrations are held by Elorg and cover the underlying
computer code and the audio-visual aspects of the Tetris game. See
id.  In the Copyright's registration, Nintendo identifies it as a
derivative work based on Elorg's PA 412,170 and describes the
additional material as some "[n]ew music and background sounds;
some new visual display; [and the] computer program" that enables
the Tetris game to be played on Nintendo's NES system.   Luxury's
Ex. D at 2.

Luxury claims that neither Elorg nor Tetris was identified as
the owner of the Copyright, that neither recorded the Copyright for
import protection and that, therefore, neither entity was entitled
to file a demand for exclusion, post a bond or participate in the
administrative proceedings.  See Luxury's Response Re Infringement

**Court No. 99-02-00093**                                    **Page 6**

("Luxury's Response") at 2-3. Luxury claims that only Nintendo of
America, Inc. ("Nintendo") is entitled to perform those actions
because it was the entity who filed the Copyright with the
Copyright Office and recorded it with Customs for import
protection. See id. at 3.

Section 133.31 of part 19 of the Code of Federal Regulations
provides that "[c]laims to copyright which have been registered in
accordance with the Copyright Act . . . may be recorded with
Customs for import protection." 19 C.F.R. § 133.31(a) (1998).
Section 133.31 further provides that the entity eligible to record
for import protection is the "copyright owner, including any person
who has acquired copyright ownership through an exclusive license,
assignment, or otherwise, and claims actual or potential injury .
. . ." 19 C.F.R. § 133.31(b).

In this case, a dispute arises because the party who recorded
the Copyright for import protection, Nintendo, was not the same
party who took the measures outlined in 19 C.F.R. § 133.43 (1998)
to protect the Copyright; Elorg and Tetris took steps to protect
the Copyright. The regulations, however, do not state that only
the copyright owner who recorded for protection is permitted to
file a written demand, post a bond and participate in the
administrative proceedings. See 19 C.F.R. § 133.43. The Customs
regulations simply provide that imported articles detained on

FROM                                    (FRI) 3. 17' 00 18:03/ST. 18:00/NO. 4860102434 P  9

Court No. 99-02-00093                                              Page 7

suspicion that they are infringing "will be released to the
importer unless . . . the copyright owner files . . . a written
demand for the exclusion from entry . . . [and a] bond" within
specified time limits.  19 C.F.R. § 133.43(b)(6).  The regulations
also provide that the "copyright owner" has the right to
participate in the administrative proceedings for the disputed
claim of infringement.  19 C.F.R. § 133.43(d)(1).  The regulations
do not require that the copyright owner who recorded the copyright
be the same copyright owner to protect the copyright.  Thus, the
failure of Elorg and Tetris to record the Copyright will not
prevent them from enforcing their rights if they can properly be
considered copyright owners.

The term "'[c]opyright owner,'" with respect to any one of the
exclusive rights comprised in a copyright, refers to the owner of
that particular right."  19 C.F.R. § 133.31(b).  It includes "any
person who has acquired copyright ownership through an exclusive
license, assignment, or otherwise, and claims actual or potential
injury . . . ."  Id.  It cannot be disputed that Elorg is a
copyright owner within the meaning of the regulations.  The
Copyright is registered under the name of Nintendo, who is a
licensee of Elorg.[2]  The Copyright registration, however, states

_____

[2]    Nintendo of America, Inc. and its parent, Nintendo Co.,
Ltd., were the exclusive worldwide licensees of Elorg for the
versions of the Tetris game until 1996, after which they became the
non-exclusive sub-licensee of The Tetris Company, LLC.  See Def.-

**Court No. 99-02-00093**                                      **Page 8**

that an earlier version of the Copyright, namely, PA 412,170, has

already been registered.  See Luxury's Ex. D at 2.  PA 412,170 is

owned by Elorg and encompasses most of the intellectual property

which forms the basis of the Copyright.  In fact, the Copyright

differs from Elorg's PA 412,170 only in some "'new music and

background sounds; some new visual display, [and the] computer

program' that allows the TETRIS game to be played on Nintendo's NES

home-entertainment system." Luxury's Ex. O at 4.  Thus, Elorg is

properly considered a copyright owner by virtue of its ownership of

the intellectual property upon which the Copyright is based.

Similarly, Tetris is a copyright owner under the regulations

because it has held Elorg's exclusive rights to license the Tetris

game to third parties in both the United States and other countries

worldwide since 1996.  See Def.-Intervenors' Rebuttal to Luxury's

Resp. Re Infringement, Ex. A ¶3 and Ex. B ¶3.

Furthermore, distinguishing between the copyright owner who

records for import protection and the copyright owner who acts to

protect its copyright makes little sense in this case.  The purpose

of § 133.43 is to provide notice to persons claiming an interest in

a copyright of a potentially infringing importation so that they

can defend the copyright.  See 17 U.S.C. § 602 (b) (1994); 19 C.F.R.

---

Intervenors' Rebuttal to Luxury's Resp. Re Infringement, Ex. A ¶3
and Ex. B ¶3.

Court No. 99-02-00093                                    Page 9

§ 133.43.   That purpose was served here when Customs notified
Nintendo of the nature of Luxury's goods and Nintendo notified
Tetris, the holder of the exclusive rights to license the Tetris
game, and Elorg, the holder of the underlying copyrights upon which
the Copyright was based.

In sum, because Elorg owns the rights at issue and Tetris is
the exclusive licensee, both entities fall within the meaning of
"copyright owner" as defined by 19 C.F.R. § 133.31.  Because the
regulations do not require that the copyright owner who recorded
the copyright be the same copyright owner to protect the copyright,
and because Elorg and Tetris are copyright owners, Elorg and Tetris
were entitled to take the steps provided in Customs regulations to
keep Luxury's merchandise from entering the United States stream of
commerce.

II.  Timeliness of Demand for Exclusion and Posting of Bond

Having found that Elorg and Tetris were entitled to file a
demand for exclusion, post a bond and participate in the
administrative proceedings, the Court proceeds to the issue of
whether Tetris' demand for exclusion and posting of the bond were
timely.

According to 19 C.F.R. § 133.43(b)(6), one who claims that his
copyright is being infringed upon must make a "written demand for

FROM                                        (FRI) 3.17' 00 18:04/ST. 18:00/NO. 4860102434 P 12

**Court No. 99-02-00093**                                        **Page 10**

the exclusion from entry of the detained imported article" and also post a bond "conditioned to hold the importer or owner of the imported article harmless from any loss or damage resulting from Customs detention in the event the Commissioner or his designee determines that the article is not an infringing copy." 19 C.F.R. 133.43(b)(6)(1998). The written demand and bond must be filed with the port director within 30 days of Customs' notice that the imported articles will be released to the importer unless such action is taken. See id.

Luxury's position is that Elorg and Tetris did not file a timely demand for exclusion nor post a timely bond. See Luxury's Resp. at 14. Luxury maintains that the copyright owner had until October 4, 1998, 30 days from the date of Customs' September 4, 1998 notice of detention, to file a written demand for exclusion of the LCD games and to post a bond. See Luxury's Compl. at 3. Elorg and Tetris, on the other hand, contend that because October 4, 1998 was a Sunday, they had until October 5, 1998 to file a written demand for exclusion and to post a bond. See Def.-Intervenors Mot. To Dismiss ("Mot. to Dismiss") at 9.

Tetris alleges that on October 5, 1998, it attempted to post the bond by tendering $150,000 in cash to Customs, which Customs refused to accept. See id. On October 6, 1998, however, Customs indicated that it would accept cash and accepted it. Elorg and

(FRI) 3.17'00 18:04/ST. 18:00/NO. 4860102434 P 13

**Court No. 99-02-00093**                                    **Page 11**

Tetris argue that Customs' error in not accepting the permissible

cash security in lieu of a bond caused the delay in complying with

the regulations and that they should not suffer the consequences of

Customs' mistake.  See id. at 11.

The court takes judicial notice of the fact that October 4,

1998 was a Sunday.  See Fed. R. Evid. 201(b); Norman G. Jensen,

Inc. v. United States, 33 Cust. Ct. 377, 1954 WL 7344 (1954).

Because October 4, 1998 was a Sunday, Tetris had until October 5,

1998 to file a written demand for exclusion and to post a bond.

See Armstrong v. Tisch, 835 F.2d 1139 (5th Cir. 1988) (citing Street

v. United States, 133 U.S. 299 (1890)) (holding that when last day

of federal regulation fell on weekend or holiday, time limit was

extended until end of next business day).  Because Tetris' written

demand for exclusion was delivered to Customs on October 5, 1998,

it was timely.

Tetris also posted a timely bond as required by law.  Tetris

tendered a timely check on October 5, 1998, but Customs refused to

accept a cash payment.  Customs was in error in not accepting the

cash, as the regulations provide that cash may be posted in lieu of

a bond.  See 19 C.F.R. §113.40 (1998) ("In lieu of sureties on any

bond required or authorized by any law, regulation, or

instruction[,] . . . the port director is authorized to accept

United States money . . . in an amount equal to the amount of the

**Court No. 99-02-00093**                                    **Page 12**

bond."). Tetris fulfilled its obligation under 19 C.F.R. §

133.43(b)(6) and there is no reason why Tetris should be penalized

for Customs' error. Customs was correct in denying Luxury's

protest of its decision to continue to detain the games because the

written demand for exclusion and the posting of the bond were

timely.

### III. Customs' Determination of Infringement

Luxury had refused to participate in the proceedings commenced

by Customs to determine whether the LCD games infringe on

Elorg/Tetris' copyright. Instead of waiting for Customs'

determination on the issue of infringement, Luxury commenced this

action contesting the denial of its protest. Luxury's filing of

the action contesting Customs' denial of its protest was premature

and circumvented the proper course of Customs' administrative

procedure.

The Court, therefore, remanded the matter to Customs in order

to allow the administrative process to resume its normal course,

that is, to allow Customs to determine whether Luxury's LCD games

infringed on the copyright of Elorg/Tetris. Specifically, the

Court ordered Customs to "determine administratively whether there

is infringement of ZAO's copyright." Luxury, 23 CIT at___, 69 F.

Supp. 2d at 1370.

Court No. 99-02-00093                                    Page 13

    Customs complied with the Court's order to make a determination as to infringement, which resulted in Customs finding that Luxury's LCD games infringed on the Copyright.  See Mem. to Director, Los Angeles/Long Beach Support from Acting Chief, IPR Branch (Nov. 4, 1999).  Customs acted properly pursuant to its power to make determinations concerning copyright infringement while fulfilling its duty to prohibit importation of infringing merchandise.  See Miss America Org. v. Mattel, Inc., 945 F.2d 536, 538-39 (2d Cir. 1991).

    The proper procedure upon Customs finding an infringement mandates that "the port director shall seize the imported article" and return the bond to the copyright owner.  19 C.F.R. § 133.44(a) (1998).  Accordingly, the port director must seize the LCD games and return the bond to Tetris.

.·FROM

**Court No. 99-02-00093**                                        **Page 14**

### CONCLUSION

Since Customs has decided that Luxury's LCD games infringe on
the copyright of Elorg and Tetris, the Court orders that Customs
seize the LCD games and return the bond to Tetris.  This case is
dismissed.

NICHOLAS TSOUCALAS
SENIOR JUDGE

Dated: March 17, 2000
       New York, New York

## UNITED STATES COURT OF INTERNATIONAL TRADE

### Slip Op. 00-27

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

| | |
|---|---|
| LUXURY INTERNATIONAL, INC., | : |
| Plaintiff, | : |
| v. | : Court No. 99-02-00093 |
| UNITED STATES; RAYMOND KELLY, COMMISSIONER OF CUSTOMS; IRENE JANKOV, PORT DIRECTOR, LOS ANGELES CUSTOMS DISTRICT, UNITED STATES CUSTOMS SERVICE, | : |
| Defendants, | : |
| and | : |
| ZAO ELORG and THE TETRIS COMPANY, LLC, | : |
| Defendant-Intervenors. | : |

### JUDGMENT

This case, having been duly submitted for decision, and the Court, after due deliberation, having rendered a decision herein, now, in accordance with said decision, it is hereby

**ORDERED** that the United States Customs Service ("Customs") seize the LCD hand-held video games; and it is further

**ORDERED** that Customs return the security posted by the defendant-intervenor, The Tetris Company, LLC; and it is further

**ORDERED** that this case is dismissed.

NICHOLAS TSOUCALAS
SENIOR JUDGE

Dated: March 17, 2000
       New York, New York

cvd 11/22 01:38PM (04:14) on Frost & Ja Line 02 for SUPERVISOR  WORKSRV1 printed SUP3839473B6AD6 on 11/22/1999 01:38PM * Pg 3/9

NOV. -22' 99(MON) 10:27   US CUSTOMS/S&P                    TEL:3105146830                    P. 003

# *Memorandum*

**UNITED STATES GOVERNMENT**
DEPARTMENT OF THE TREASURY
UNITED STATES CUSTOMS SERVICE



Date:  November 4, 1999

RR:IT:IP
467175 GFM

**TO:**       Director, Los Angeles/Long Beach Seaport

**FROM:**   Acting Chief, IPR Branch

**RE:**       "TETRIS" (U.S. Copyright Office Registration No. PAu 1,284,318, U.S. Customs
            Service Recordation No. COP89-00202), held by Nintendo of America, Inc.; ZAO
            Elorg; Luxury International, Inc.; Violative status of 22,000 pieces of imported
            "brick" games; ISET Case No. 98-0249; Entry No. G51-01725358.

        This is in regard to your referral of December 24, 1998, forwarding for our review the
above-referenced case file for administration.

        Subsequent to the receipt of your referral, the importer (Luxury International, Inc.)
commenced an action against U.S. Customs in the Court of International Trade based upon
alleged procedural irregularities incident to the detention and adversarial process undertaken
pursuant to Title 19, Customs Regulations, Section 133.43.  On September 23, 1999, the Court
remanded the case to U.S. Customs Headquarters for a determination relative to the substantive
copyright infringement elements of this case.  Our determination follows:

        The subject case involves the importation of 22,000 LCD hand-held electronic game
pieces which were detained under 19 CFR § 133.43 as constituting "possibly piratical" copies of
the above-referenced "TETRIS" copyright.  In accordance with procedures under 19 CFR  §
133.43, Customs detained the shipment, the importer denied the allegations, and both the
importer and copyright owner were afforded opportunities to provide input to Customs
supporting their respective contentions.  Although the copyright holder did submit supporting
briefs and evidence supporting its substantive contentions to Customs, we note that the importer
did not.

A:\467175.WPD

:d 11/22 01:38PM (04:14) on Frost & Ja line 02 for SUPERVISOR  WORKSRV1 printed SUP3B39473B6AD6 on 11/22/1999 01:38PM ¥ Pg 4/9

- 2 -

The role of Customs in issuing substantive decisions of copyright infringement as to imported merchandise was addressed in *The Miss America Organization v. Mattel, Inc.*, 945 F.2d 536 (2d Cir. 1991). Citing section 603 of the Copyright Act of 1976 (17 U.S.C. § 603), the court recognized Customs authority to enforce the provisions of the law prohibiting importations of infringing goods. *Id.* at 538. Also, the court acknowledged that as a result of its duties, Customs has developed expertise in determining whether merchandise does or does not infringe. *Id.* at 539. Further, the court stated that since sections 602 and 603 (17 U.S.C. §§ 602, 603) direct the Secretary of Treasury to enact regulations to aid in combating copyright infringement, it is implicit in these directions that the agency (Customs) would be involved in making infringement determinations. *Id.* at 541. Therefore, because the Treasury Department has been assigned the duty to enforce the copyright laws in cases where there is a reason to believe infringement exists with regard to an imported item, it follows that it is within Customs jurisdiction to take appropriate action to fulfill this duty. *Id.* at 542.

Further, Customs has some independence and autonomy in making infringement determinations regarding imported merchandise. *Id.* at 544. Accordingly, as the court stated, there is no reason to enjoin Customs from performing its statutory duties so long as the agency proceeds in conformity with the statutory scheme. *Id.*

In such cases, under Customs regulations, the copyright owner bears the burden of proving copyright infringement. 19 CFR § 133.43(c)(1). In order to prove copyright infringement, the copyright owner must show: (1) ownership of a valid copyright; and (2) copying by the creator of the imported work. *Act Young Imports, Inc. v. B and E Sales Co., Inc.*, 673 F. Supp. 672, 673 (S.D.N.Y. 1987). "Copying" can be established by showing that: (1) the claimed infringer had access to the copyright owner's work, and (2) the protected elements of the two works are substantially similar. *Levine v. McDonald's Corp.*, 735 F. Supp. 92, 95 (S.D.N.Y. 1990); *see also*, 3 M. Nimmer, *Nimmer On Copyright* § 13.01, at 13-3 (1981) ("Nimmer").

Regarding ownership of a valid copyright, section 410(c) of the Copyright Act of 1976, as amended, states that "the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). In the present case, a valid copyright registration covering the subject copyrighted work exists.

Regarding access to the copyright owner's work, access is presumed where an item is generally available on the open market. *Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir. 1946); *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1092 (2d Cir. 1977). In the present case, the worldwide availability of the subject copyrighted work sufficiently establishes access.

Case 3:09-cv-06115-FLW-DEA Document 35-3 Filed 04/21/11 Page 78 of 82 PageID: 309
cvd 11/22 01:38PM (04:14) on Frost & Ja line 02 for SUPERVISOR WORKSRV1 printed SUP383947386AD6 on 11/22/1999 01:38PM • Pg 5/9

NOV.-22'99(MON) 10:27    US CUSTOMS/S&P                    TEL:3105146830                    P.005

- 3 -

As in most cases of copyright infringement, however, the determination rests upon whether the works are "substantially similar." With regard to the issue of substantial similarity, courts often look to the two-part test for similarity as outlined in *Sid & Marty Kroft Television v. McDonald's Corp.*, 562 F.2d 1157, 1162 (9th Cir. 1977). In that case, the Ninth Circuit adopted a two-part test. The first step, labeled the "extrinsic test", requires a determination of substantial similarity between the ideas which includes an analysis of the type of artwork at issue, the materials used, the subject matter at issue, and the setting for that subject matter. The second step, labeled the "intrinsic test", involves a determination of substantial similarity between the ideas which depends not on expert testimony or analytic dissection, but instead on the response of the ordinary lay person. That is, the determination focuses largely on whether the suspect work captures the "total concept and feel" of the copyrighted work. *See, Spectravest v. Mervyn's. Inc.*, 673 F. Supp. 1486, 6 U.S.P.Q. 2d 1135, 1138 (N.D. Cal. 1987); *Baxter v. MCA Inc.*, 812 F.2d 421, 424 (9th Cir. 1987).

With regard to the matter now before us, as regards the "extrinsic test" for similarity, it can clearly be established that the two items involve the same subject matter: hand-held electronic game devices containing LCD falling "brick" games.

As regards the "intrinsic test" for similarity, we note that it is not improper to engage in a side-by-side comparison of the designs in order to reach a determination on the issue of substantial similarity. *Knickerbocker Toy Co.. Inc. v. Genie Toys, Inc.*, 491 F. Supp. 526, 528 (E.D. Mo. 1980). "Substantial similarity" is defined as a showing that the ordinary observer, not set out to detect the differences between two works, would be disposed to overlook the differences and regard the aesthetic appeal of the two works to be the same. *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960); *In re "Rock 'n Flowers"*, C.S.D. 90-67, 24 Cust. B. & Dec. No. 23 (March 21, 1990). "Substantial similarity" is also defined as whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work. *Ideal Toy Corp. v. Fab-Lu Ltd. (Inc.)*, 360 F.2d 1021, 1022 (2d Cir. 1966); *Durham Industries, Inc. v. Tomy Corporation*, 630 F.2d 905, 912 (2d Cir. 1980).

In a case similar to the one at hand involving video game copyright infringement, *Atari, Inc. et. al. v. North American Phillips Consumer Electronics Corp., et. al.*, 214 U.S.P.Q. 33 (CA 7 1982) (hereinafter, *Philips*), the U.S. Circuit Court of Appeals for the Seventh Circuit ruled that overwhelming similarities inherent in the features of two video works, PAC-MAN and K.C. Munchkin, warranted a finding of infringement. In its decision, the court noted that the defendant not only adopted the same basic characters, but also portrayed them in a manner which made its game appear substantially similar to the protected work. As in the present case, numerous similarities, such as the relative size and shape of the characters' "bodies," the V-shaped "mouths," distinctive gobbling actions (with related appropriate sounds), the ways in which they disappeared upon being captured, similar peculiar "eye" and "leg" movements, and the role reversal and "regeneration" process present in both games were so similar that an ordinary observer could only conclude that the defendant copied the plaintiff's work.

A:\467175.WPD

The defendant in *Philips* pointed to a laundry list of specific differences. In response, the court noted that although numerous differences may influence the impressions of the ordinary observer, "slight differences between a protected work and an accused work will not preclude a finding of infringement" where the works are substantially similar in other respects. *Id.* at 42; *citing Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 913; *see Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49 (2d Cir.), *cert. denied*, 298 U.S. 669, 56 S. Ct. 835, 80 L. Ed. 1392 (1936). The Court further stated that "exact reproduction or near identity is not necessary to establish infringement. An infringement...includes also the various modes in which the matter of any work may be adopted, imitated, transferred, or reproduced, with more or less colorable alterations to disguise the piracy." *Id.*

In overturning the lower district court decision, the court in *Philips* noted that the lower court "focused on certain differences in detail and seemingly ignored (or at least failed to articulate) the more obvious similarities." *Id.* at 42. It further stated that "the sine qua non of the ordinary observer test, however, is the overall similarities rather than the minute differences between the two works." *Id.*, *citing Peter Pan Fabrics*, 274 F.2d at 489.

Also, importantly, the court noted that "in order to assess the impact of certain differences, one factor to consider is the nature of the protected material and the setting in which it appears. *Philips* at 42. The Court continued:

Video games, unlike an artist's painting or even other audiovisual works, appeal to an audience that is fairly undiscriminating insofar as their concern about more subtle differences in artistic expression. The main attraction of [such] games lies in the stimulation provided by the intensity of the competition. A person who is entranced by the play of the game "would be disposed to overlook" many of the minor differences in detail and "regard their aesthetic appeal as the same." *Id* at 43 (*citing Kroft, supra* at 1166-67 [children would view accused characters as substantially similar to the protected characters despite differences in detail]).

As in the *Philips* case, the case under consideration herein presents with numerous similarities. In the present case, the copyrightable features of the TETRIS game, as covered by the copyright registration, includes the downward, lateral, and rotating movements of the differently oriented four-brick playing pieces, and the shape and appearance of the four-brick playing pieces, both in the "dots" that appear within the individual bricks themselves, as well as in the configuration of the four-brick combinations comprising the playing pieces. Additional copyrighted features include: the scoring features, the feature displaying the next four-brick playing piece that will fall down the playing field matrix, the disappearance of any completed horizontal row, the subsequent consolidation of the playing pieces remaining on the playing field

:vd 11/22 01:38PM (04:43 GY Frost & Ja The 02 For SUPERVISOR WORKSRV7 printed SUP38394738BADD on 04/22/1999 04:38PM PG 7/9

:• NOV. -22' 99(MON) 10:28   US CUSTOMS/S&P                TEL:3105146830                    P. 007

as a result of the downward shift into the space vacated by the disappearing row, the resulting
score, the background music, the specific sounds generated as the four-brick playing pieces are
rotated, and the sounds generated as a row is completed and points are earned. Further, the
makeup of the playing field itself, i.e., the vertical matrix, higher than it is wide, with a base of ten
individual "bricks" per horizontal row, and generally twenty individual "bricks" per vertical line, is
also copyrightable expression.

The imported "brick games" utilize the same individual brick shapes, the same four-brick
configuration playing pieces, the same rotating, lateral, and downward movements of the playing
pieces, and the same sequential configuration of the various shapes of the four-brick playing
pieces. The "brick games" also use the same depiction of the next playing piece that will fall
down the playing field matrix, and also uses an almost identical playing field matrix design in the
height, width and layout, to that of the TETRIS game. Other similar elements include the
background music, the scoring elements, the disappearing completed rows and the subsequent
consolidation of the remaining incomplete rows left below, the accompanying sounds to the
rotating, lateral and downward movements of the playing pieces, and the sounds that occur upon
completion of a row and the earning of points. Like TETRIS, the "brick game" also ends when
the playing field matrix is "filled up" with incomplete horizontal rows left on the playing field.

The evidence clearly shows that "brick games" contained in the detained shipment present
with numerous features similar to those contained in the copyrighted TETRIS work. The
presence of these copyrightable features leads us to conclude that the imported games constitute
substantially similar copies of the protected works and that the goods are properly considered
piratical.

In reaching this determination, although provided with no supporting briefs or evidence by
the importer, we have taken care to research and consider related relevant cases. One such case,
*Atari, Inc. v. Amusement World, Inc., et.al.*, 547 F.Supp 222 (Dist. Ct. Maryland) (hereinafter
*Amusement World*) decided nearly 20 years ago presents similar, yet distinguishable issues. In
that case, the District Court for the District of Maryland, in the face of some 22 material
similarities, *declined* to find infringement. The court, believing that the idea/expression
dichotomy could not be kept separate, reasoned that the numerous similarities were:

"*inevitable*, given the requirements of the idea of a game involving a spaceship
combating space rocks and given the technical demands of the medium of a video
game. There are certain forms of expression that one *must necessarily* use in
designing a video game in which a player fights his way through space rocks and
enemy spaceships. The player *must* be able to rotate and move his craft. All the
spaceships must be able to fire weapons which can destroy targets. The game *must*
be easy at first and gradually get harder, so that bad players are not frustrated and
good ones are challenged. Therefore, the rocks *must* move faster as the game
progresses. In order for the game to look at all realistic, there must be more than one

Case 3:09-cv-06115-FLW-DEA   Document 35-3   Filed 04/21/11   Page 81 of 82 PageID: 312
Rcvd 11/22 01:38PM (04:14) on Frost & Ja Line 02 for SUPERVISOR  WORKSRV1 printed SUP383947386AD6 on 11/22/1999 01:38PM  Pg 8/9

size of rock.  Rocks *cannot* split into very many pieces, or else the screen would quickly become filled with rocks and the player would lose too quickly.  All video games have characteristic sounds and symbols designed to increase the sensation of action.  The player *must* be awarded points for destroying objects, based on the degree of difficulty involved.

All these requirements of a video game in which the player combats space rocks and spaceships combine to dictate certain forms of expression that *must appear* in any version of such a game.  In fact, these requirements account for most of the similarities between "Meteors" and "Asteroids." Similarities so accounted for do not constitute copyright infringement, because they are part of plaintiff's idea and are not protected by plaintiff's copyright. *Id.* at 229. (Emphasis added).

We are decidedly not as inclined as the District Court of Maryland was to limit the horizons of intellectual creativity so as to describe such similarities as "inevitable." Nor are we inclined to agree with the Court's pronouncement that the enumerated features of the works considered in *Amusement World* were "forms of expression which must appear in 'any version' of such a game." While such a conclusion may have seemed plausible to some in 1982, considering the quantum leap in the advancement of digital graphic technology that has taken place since, such notions now seem unsupported by reality.  Given current technological capabilities alone, it has become clear that the boundaries of expression which may have seemed fixed in the past have significantly expanded in recent times—so much so as to enable creators to overcome once seemingly insurmountable technical demands, severing unintended and undesired bonds of idea and expression.

In contrasting the *Amusement World* case to the case at bar, we would first state that many other video games involve the use of square blocks on a screen in various configurations that can be manipulated by the player and that interact to score points. *See Atari Games Corp. v. Oman*, 24 U.S.P.Q. 2d 1993 (D.C. Cir. 1992) (relating to copyright registerability of BREAKOUT game).  The "idea" of using simple squares or blocks on the screen to be assembled into specific shapes and manipulated by the player in a race against time or against the computer is not protectable as such.  The Court in *Atari v. Oman* found the synergistic selection and arrangement of elements in a video game that (individually) may not qualify for copyright to exceed the "minimal degree of creativity" needed to bring the work within the protection of the copyright laws. *Id.* at 1936; *see Feist Publications v. Rural Tel. Serv. Co,*, 111 S. Ct. 1282, 1289 (1991).  Other games, including others contained within the imported games that do not infringe the TETRIS copyright, express the idea of using manipulable and interacting square blocks to form, among other things, race cars that move along a track and around barricades, tanks that rotate and shoot at each other or at barricades, Ping-Pong, and "bombing" or "drop" games, as well as the BREAKOUT game discussed in *Atari v. Oman, supra*.  Each of these examples clearly includes protectable expression based on the same underlying idea but does not include the expression of the TETRIS game.

A:\467175.WPD

Case 3:09-cv-06115-FLW-DEA   Document 35-3   Filed 04/21/11   Page 82 of 82 PageID: 313
:vd 11/22 01:38PM (04:14) on Frost & Ja line 02 for SUPERVISOR  WORKSRV1 printed SUP3839473B6AD6 on 11/22/1999 01:38PM  Pg 9/9

NOV. -22' 99(MON) 10:30   US CUSTOMS/S&P                TEL:3105146830                 P. 009

- 7 -

As distinguished from other games which may have real life, or at least science fiction, counterparts, *Amusement World, supra,* and *Data East USA, Inc. v. Epyx, Inc.,* 9 U.S.P.Q. 2d 1332 (9th Cir. 1988) (scene-a-faire video game featuring common depictions of Karate fighting), the TETRIS game's expression of the manipulable block configuration idea is a wholly fanciful creation, without reference to the real world. *Philips, supra* at 42. The nature of the protected material and the setting in which it appears is an important factor when comparing games in an infringement analysis. *Id.* An abstract representation is "neither an 'obvious' nor an 'inevitable' choice." *Atari v. Oman,* 24 U.S.P.Q. 2d at 1937.

While the court in *Amusement World* gave a very narrow scope of protection to the ASTEROIDS game, the court did not find that the video game lacked any protectable expression. Instead, it found that the defendant had taken only the 'idea' of the game and expressed it in a different way. It found that the "overall 'feel' of the way the games play is different." *Id.* at 230. Conversely, in the instant case, the overall "feel" of the games is identical.

The *Amusement World* court recognized protectable expression in the "design features" of the ASTEROIDS game. These included "the symbols that appear on the display screen, the ways in which those symbols move around the display screen, and the sounds emanating from the game cabinet." *Id.* at 227. The court there found that the defendants used "symbols, movements, and sounds that are different from those used in plaintiff's game." *Id.* In the instant case, as clearly shown in the videotaped side-by-side comparison supplied by the copyright owner with its brief, the imported game not only adopted the entire set of game pieces and scoring scheme of the TETRIS game, it copied nearly the entire presentation. These include the size and shape (ten blocks wide by twenty blocks high) of the playing field; the number, shape and appearance (dot inside of each square) of each game piece; the depiction along the sidelines of the next piece to appear; the scoring; and the use of very similar sounds corresponding to movements and scoring, as well as background and introductory music.

As stated, the evidence clearly shows that the "brick games" contained in the detained shipment copy several original copyrighted features of the protected TETRIS work. The imported games constitute piratical copies of the subject protected works.

As this matter is currently under the jurisdiction of the Court of International Trade, we are not recommending that the subject goods be seized at this time. In remanding this matter to Customs, Judge Tsoucalas of the Court ordered Customs to "decide the issues pertaining to copyright infringement"; the court made no mention of taking the additional enforcement action of seizure with respect to this case which under its jurisdiction. You will be advised later as to further action by either our office or the Office of the Chief Counsel.

Jerry Laderberg

A:\467173.WPD