Donald A. Robinson
ROBINSON, WETTRE & MILLER LLC
One Newark Center, 19th Floor
Newark, NY  07102
973-690-5400
drobinson@rwmlegal.com

Mark A. Lemley
Joseph C. Gratz
Sonali D. Maitra
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA  94111
415-362-6666

*Attorneys for Defendant*
*Xio Interactive Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| TETRIS HOLDING, LLC and THE TETRIS COMPANY, LLC, <br><br> Plaintiffs, <br><br> -against- <br><br> XIO INTERACTIVE INC., <br><br> Defendant. | Civil Action No. 3:09-CV-6115 (FLW) (DEA) <br><br> Honorable Freda L. Wolfson, U.S.D.J. <br> Honorable Douglas E. Alpert, U.S.M.J. |

**XIO INTERACTIVE INC.'S
MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT OF NON-INFRINGEMENT**

**TABLE OF CONTENTS**

PAGE

I.   INTRODUCTION ...................................................................................1

II.  STATEMENT OF FACTS .......................................................................3

III. ARGUMENT.........................................................................................8

     A.   Game Rules And Other Functional Features Are Not
          Copyrightable ..............................................................................8

          1.   Section 102(b), *Baker v. Selden*, and the Distinction
               Between Patent and Copyright....................................................8

          2.   Post-*Baker* Law Confirmed the Uncopyrightability of
               Functional Features, Including Game Rules...............................9

          3.   Section 102 (b) Codified Pre-Existing Law.............................12

          4.   Video Games Are Subject to the Same Rules As
               Ordinary Games .......................................................................13

               a)   Videogame Rules Are Patented......................................13

               b)   Copyright Protects *Neither* Ideas *Nor* Rules .................14

               c)   The Videogame Case Law Refuses Copyright
                    Protection for Rules and Functional Elements ..............17

          5.   Definition of Rules....................................................................22

     B.   Xio Does Not Infringe Because Plaintiffs Only Accuse Copying
          of Rules and Other Unprotectable Elements of *Tetris* .......................26

          1.   Overview of the Rules of *Tetris*................................................26

          2.   Every Individual Element Accused of Infringement Is a
               Rule or Otherwise Functional ....................................................33

     C.   Plaintiffs' Non-Copyright Claims are Invalid......................................43

IV.  CONCLUSION.............................................................................................45

TABLE OF AUTHORITIES

PAGE(S)

## Cases

*Affiliated Enters. v. Gruber*,
    86 F.2d 958 (1st Cir. 1936)..................................................................9, 10

*Affiliated Enters., Inc. v. Gantz,*
    86 F.2d 597 (10th Cir. 1936) ...............................................................11

*Affiliated Hosp. Prods, Inc. v. Merdel Game Mfg. Co.*,
    513 F.2d 1183 (2d Cir. 1975) ..............................................................10

*Allen v. Academic Games League of America*,
    89 F.3d 614 (9th Cir. 1996) .................................................................11

*Anti-Monopoly, Inc. v. Gen. Mills Fun Grp.*,
    611 F.2d 296 (9th Cir. 1979) ...............................................................11

*Atari Games Corp. v. Oman*,
    888 F.2d 878 (D.C. Cir. 1989)..............................................................21

*Atari, Inc. v. Amusement World, Inc.*,
    574 F. Supp. 222 (D. Md. 1981)..........................................................19

*Atari, Inc. v. N. Am. Consumer Elecs. Corp.*,
    672 F.2d 607 (7th Cir. 1982) .......................................... 15, 17, 18, 26

*Baker v. Selden*,
    101 U.S. 99 (1879)................................................... 8, 9, 11, 13

*Bretford Mfg., Inc. v. Smith Sys. Mfg. Co.*,
    286 F. Supp. 2d 969 (N.D. Ill. 2003)..................................................44

*Brown Instrument Co. v. Warner*,
    161 F.2d 910 (D.C. Cir. 1947)...............................................................9

*Chamberlain v. Uris Sales Corp.*,
    56 F. Supp. 987 (S.D.N.Y. 1944), *aff'd*, 150 F.2d 512 (2d Cir. 1945).................11

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
    539 U.S. 23 (2003).................................................. 43, 44

ii

TABLE OF AUTHORITIES (CONT'D)

PAGE(S)

*Data East USA, Inc. v. Epyx, Inc.,*
    862 F.2d 204 (9th Cir. 1988) ................................................................. 18, 19

*Durham Indus., Inc. v. Tomy Corp.,*
    630 F.2d 905 (2d Cir. 1980) ....................................................................11

*Eli Lilly and Co. v. Roussel Corp.*
    23 F. Supp. 2d 495 (D.N.J. 1998) ...........................................................43

*Holiday Inns, Inc. v. Trump¸*
    617 F. Supp. 1443 (D.N.J. 1985) ............................................................43

*Hoopla Sports & Entm't Co. v. Nike, Inc.,*
    947 F. Supp. 347 (N.D. Ill. 1996) ...........................................................11

*Incredible Technologies, Inc. v. Virtual Technologies, Inc.,*
    400 F.3d 1007 (7th Cir. 2005) .............................................................. 20, 21

*Keane v. Fox Television Stations, Inc.,*
    297 F. Supp. 2d 921 (S.D. Tex. 2004) .....................................................44

*Landsberg v. Scrabble Crossword Game Players, Inc.,*
    736 F.2d 485 (9th Cir. 1984) ..................................................................11

*Larkin Grp., Inc. v. Design Consultants, Inc.,*
    323 F. Supp. 2d 1121 (D. Kan. 2004) ......................................................44

*Lotus Dev. Corp. v. Borland Int'l, Inc.,*
    516 U.S. 233 (1996) ................................................................................17

*Lotus Dev. Corp. v. Borland Int'l, Inc.,*
    49 F.3d 807 (1st Cir. 1995) .....................................................................16

*Midway Mfg.Co. v. Bandai-Am., Inc.,*
    546 F. Supp. 125 (D.N.J. 1982) ........................................................... 15, 18

*Morrissey v. Proctor & Gamble Co.,*
    379 F.2d 675 (1st Cir. 1967) ...................................................................10

## TABLE OF AUTHORITIES (CONT'D)

PAGE(S)

*Prima v. Darden Rests., Inc.*,
  78. F. Supp. 2d 337 (D.N.J. 2000) ........................................................6

*Ringgold v. Blank Entm't Television*,
  126 F.3d 70 (2d Cir. 1997) ....................................................................6

*Russell v. Ne. Publ'g Co.*,
  7 F. Supp. 571 (D. Mass. 1934) ..........................................................11

*Seltzer v. Sunbrock*,
  22 F. Supp. 621 (S.D. Cal. 1938) ........................................................11

*Taylor Instrument Cos. v. Fawley-Brost Co.*,
  139 F.2d 98 (7th Cir. 1943) ............................................................9, 10

*TraFix Devices, Inc. v. Mktg. Displays, Inc.*,
  532 U.S. 23 (2001) ...............................................................................43

*Whist Club v. Foster*,
  42 F.2d 782 (S.D.N.Y. 1929) ..............................................................10

**Statutes**

15 U.S.C. § 1125 ........................................................................................43

17 U.S.C. § 102 ................................................................................. passim

17 U.S.C. § 302 ...........................................................................................9

35 U.S.C. § 154 ...........................................................................................9

**Other Authorities**

2 William A. Patry,
  *Patry on Copyright* § 4:20 (2007) ................................................ 23, 32

Bruce E. Boyden, *Games and Other Uncopyrightable Systems*,
  18 Geo. Mason L. Rev. 439 (2011) .....................................................22

H.R. 1197, 88th Cong. (1964) ..................................................................12

TABLE OF AUTHORITIES (CONT'D)

PAGE(S)

H.R. Rep. No. 94-1476 at 57 (1976)........................................................................13

Hearings on S. 597 Before the Subcomm. On Patents,
   Trademarks, and Copyrights of the S. Commm. On the Judiciary,
   90th Cong. at 192-99.................................................................................12

J.A.H. Hunter & Joseph S. Madachy,
   *Mathematical Diversion* 79-86 (1963) ...............................................................3

Jesper Juul,
   *Half-Real* 58 (2005) ..................................................................................... 22, 31

Martin Gardner,
   *Hexaflexagons and Other Mathematical Diversions* 124-150 (1959) ...................3

Oxford English Dictionary; "rule" (2011) ...............................................................22

S. 3008, 88th Cong. (1964) ......................................................................................12

S. 543, 91st Cong. (1969) ........................................................................................12

Solomon W. Golomb,
   *Polyominoes* 19 (1968) .......................................................................................3, 35

Tyler T. Ochoa,
   *Patent and copyright term extension and the Constitution:*
   *a historical perspective,*
   49 J. Copyright Soc'y U.S.A. 19, 28-32, 52-53 (2001) .........................................9

**Copyright / Patent**

Copyright Reg. No. VAu000362713 ("Nautically designed chess set")................23

Copyright Reg. No. VAu000666397 ("Chess set, sculpture of Michelangelo").....23

U.S. Application No. US 2010/0069133 A1 ...........................................................14

U.S. Patent No. 1,562,149 (filed Apr. 2, 1925) .....................................................12

U.S. Patent No. 1,616,884 (filed Mar. 5, 1926)......................................................11

## TABLE OF AUTHORITIES (CONT'D)

PAGE(S)

U.S. Patent No. 2,159,174 (filed Apr. 12, 1938) ....................................................12

U.S. Patent No. 5,265,888 (filed Nov. 3, 1993) ....................................................14

U.S. Patent No. 5,868,388 (filed Nov. 26, 1996) ............................................ 13, 14

U.S. Patent No. 6,062,978 (filed Dec. 11, 1995) ..................................................13

U.S. Patent No. 6,264,198 (filed June 29, 1999) ..................................................13

U.S. Patent No. 6,669,565 (filed June 5, 2001) ....................................................13

Plaintiffs Tetris Holding, LLC and Tetris Company, LLC have sued

Defendant Xio Interactive Inc. for copyright infringement, trade dress infringement

(under both the Lanham Act and New Jersey state law), and common law unfair

competition.  Xio submits this memorandum in support of its motion for summary

judgment on all Plaintiffs' claims.

## I.      INTRODUCTION

Alexey Pajitnov invented *Tetris* in 1984.  It is an amazing game, and has

enjoyed global popularity for decades.  Plaintiffs have brought a claim of copyright

infringement against Xio's game *Mino*, which has the same rules as *Tetris*.

But game rules are protected by patent, not copyright.  And Plaintiffs have

no patent on *Tetris.*  Copyright expressly exempts from its scope procedures,

processes, systems, and methods of operation.  ████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████ This is not surprising, given that the only

things the two games have in common must be considered rules of the game—such

as the size of the board, using puzzle pieces shaped as tetrominos on the board,

rotating those puzzle pieces to fit on the board, and the clearing of completed

horizontal lines from the board.

To overcome this fundamental problem with their case, Plaintiffs have

contrived a nonsensical definition of game rules—"███████████████ ████████████"—and claim that the game rules are limited to the following vague features of *Tetris* (and hundreds of other games): "an object appears on a playing field and the player manipulates the object to a final resting spot, to create a shape which is then removed from the playing field." These are not the rules of *Tetris*.

There is no question that *Mino* and *Tetris* look alike. But the only similarities between the two games are elements not protected by copyright. This is no coincidence. Before developing its games, Xio analyzed the intellectual property laws to determine what parts of *Tetris* they could use and what parts they couldn't. Xio discovered that no one had a patent to the rules and other functional elements of *Tetris*. Xio carefully, intentionally, and purposefully crafted its games to exclude all protected, expressive elements. It wrote the computer code from scratch, used only the game rules of *Tetris*, and independently created all expressive features—such as music, colors, background art, and all graphical files.

Plaintiffs have enjoyed a monopoly over the rules for more than 25 years— notwithstanding that any patent for the game rules would have expired years ago. Because the term of copyright is the life of the author plus 70 years, Plaintiffs now ask the Court to transform a 20-year monopoly Plaintiffs never sought from the Patent and Trademark Office into one that requires no PTO review and would last at least a century.

2

## II.    STATEMENT OF FACTS

Plaintiffs claim that Xio's game *Mino* infringes their rights to the electronic

puzzle game *Tetris*, invented in 1984 by Alexey Pajitnov.[1]  *See* Declaration of

Sonali D. Maitra in Support of Xio's Motion for Summary Judgment of Non-

Infringement submitted herewith ("Maitra Dec.") Exs. 2 & 3.

One of the predominant features of *Tetris* is the use of "tetrominos" as the

puzzle pieces for the game.  A tetromino is a geometric shape composed of four

squares connected at the sides, just like a domino is a similar shape with two

squares and a pentomino is one with five.  *See* Martin Gardner, *Hexaflexagons and*

*Other Mathematical Diversions* 124-150 (1959); J.A.H. Hunter & Joseph S.

Madachy, *Mathematical Diversion* 79-86 (1963); Solomon W. Golomb,

*Polyominoes* 19 (1968).

Mr. Pajitnov did not invent the tetrominos of *Tetris*.  For example, as early

as 1968, American mathematician Solomon Golumb depicted the tetrominos as

follows, including the explanation that they could be "*rotated* (turned 90, 180, or

270 degrees) or *reflected* (flipped over)," as they are in *Tetris*:

---

[1] A YouTube demonstration of *Tetris* can be found here:
http://www.youtube.com/watch?v=6Wz4dlYF91o.  And a YouTube demonstration
of *Mino* can be found here:  http://www.youtube.com/watch?v=5X11MMZ6GUU.



*Figure 1. The simpler polyomino shapes.*

*Id.* (emphasis in original).

Nor did Mr. Pajitnov invent the use of such shapes in a puzzle game, as evidenced by the ancient game pentaminos—a puzzle game in which a player tries to fit pentominos together in a box. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇ In addition, more than a decade before the invention of *Tetris*, Parker Brothers published a puzzle game called *Universe*. *See id.* ¶ 7. In this game, players rotate brightly-colored pentominos (of which the squares are individually delineated) and fit them on a grid that ranges from ten by ten to a larger space, depending on the number of players:



*Id.* ¶ 7 & Ex. 6.

4

Plaintiffs claim copyright over, and infringement of, the following features

of *Tetris*:

(1)     The long vertical rectangle playing field or matrix, which is higher than wide.

(2)     The seven tetrominos as playing pieces.

(3)     The seven tetrominos being brightly colored.

(4)     The squares of the tetrominos being individually delineated.

(5)     The appearance of the tetrominos at the top of the matrix.

(6)     The starting orientation of the tetrominos.

(7)     The downward, lateral, and rotating movements of the tetrominos.

(8)     The disappearance of any completed horizontal line.

(9)     The subsequent consolidation of the tetrominos remaining on the playing field as a result of the downward shift into the space vacated by the disappearing line.

(10)    The display of "garbage lines" with at least one missing square in random order.

(11)    The appearance of a "ghost" or shadow tetromino under the tetromino.

(12)    The display of the next tetromino that will fall down the matrix above the playing field.

(13)    The change in color of the tetrominos when they are in lock-down mode.

(14)    The screen layout in multiplayer versions with the player's matrix appearing most prominently on the screen and the opponent's matrices appearing smaller than the player's matrix and to the side of the player's matrix.

(15)    The appearance of squares automatically filling in the matrix from the bottom to the top when the game is over.

*See id.* Exs. 2&7.  Xio admits that *Mino* contains these features, but contends that

none of these features are protected by copyright.[2]

---

[2] Element (15)—the appearance of squares automatically filling in the matrix from the bottom to the top when the game is over—has been removed from *Mino* since

5

In the fall of 2008, Xio decided it wanted to develop a game application for Apple Inc.'s iPhone.  *Id.* Ex. 8.  The developers at Xio liked *Tetris* games and, while *Mino* was still in its nascence, analyzed intellectual property laws to ensure that the game they would write would not infringe anyone's rights.  *Id.* Exs. 8-22. Xio discovered that Plaintiffs did not own a patent to the rules, game mechanics, or functional elements of *Tetris*—that Plaintiffs only had copyright, trademark, and trade dress rights to the game.  *Id.* Exs. 11, 15-17, 19-22.  Copyright, trademark, and trade dress expressly do not protect rules, game mechanics, and functional elements, as discussed extensively below.  This is a basic tenet of intellectual property law, widely discussed on the internet—including on the Copyright Office circular, which states:

> Copyright does not protect the idea for game, its name or title, or the method or methods for playing it.  Nor does copyright protect any idea, system, method, device, or trademark material involved in developing, merchandising, or playing a game.  Once a game has been made public, nothing in the copyright law prevents others from developing another game based on similar principles.  Copyright

---

May of 2010, and is therefore not addressed herein.  Maitra Dec. at ¶ 77.  To the doubtful extent that this feature is copyrightable, which Mino does not concede, any past infringement of this element should be considered *de minimis*. *See Prima v. Darden Rests., Inc.*, 78. F. Supp. 2d 337, 350-51 (D.N.J. 2000) (explaining that *de minimis* copying is "a technical violation of a right so trivial that the law will not impose legal consequences" or "copying . . . to such a trivial extent as to fall below the quantitative threshold of substantial similarity, which is always a required element of actionable copying") (citing *Ringgold v. Blank Entm't Television*, 126 F.3d 70, 74 (2d Cir. 1997)).  And in any event it cannot serve as the basis for an injunction.

protects only the particular manner of an author's expression in
literary, artistic, or musical form.

http://www.copyright.gov/fls/fl108.html.[3]

Relying on this circular, conversations with intellectual property attorneys
(one of whom said that Xio's "legal analysis is spot on"), and a detailed internal
memorandum confirming that features *Mino* had in common with *Tetris* were
functional, Xio used only the rules and other functional elements of *Tetris* in *Mino*.
*See id.* Exs. 18-22.  Xio wrote the computer code from scratch.  *Id.* Exs. 22&23.  It
independently created the music for the game (and scrapped a *"Tetris*-like" song
for fear of infringement), independently developed the colors for the game using a
unique algorithm it invented, and independently created all graphical files used in
the game.  *Id.* Exs. 25-34.  And where there are arguably creative choices in
*Tetris*—in the colors, the music, the background—the authors of *Mino* made
different choices.  *Id.*

---

[3] Some other examples from the internet are:
http://en.wikipedia.org/wiki/Trade_dress;
http://copymarkblog.com/category/trademark-law-trade-dress/;
http://www.ivanhoffman.com/copyrightprotection.html;
http://web.archive.org/web/20030406011138/;
http://www.abednarz.net/webfoot.html;
http://web.archive.org/web/20070208134326/lpf.ai.mit.edu/Copyright/laf-fallacies.html.

## III.   ARGUMENT

### A.   Game Rules And Other Functional Features Are Not Copyrightable

#### 1.   Section 102(b), *Baker v. Selden*, and the Distinction Between Patent and Copyright

Section 102(b) of the Copyright Act states:

> In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

17 U.S.C. § 102(b).  In using the word "or," the statute lists these exclusions—ideas, procedures, processes, systems, methods of operation, concepts, or discoveries—disjunctively.  Thus, each has independent force and effect.

The foundation for section 102(b) and, more generally, modern copyright law can be traced to the United States Supreme Court case *Baker v. Selden*, 101 U.S. 99 (1879).  The Court examined whether a book describing a system of accounting was copyrightable.  *Id.* at 100.  The Court held that it was not, holding that systems, methods, and rules—even if embodied in copyrightable works—could not be protected by copyright.  The Court explained that "the teachings of science and the rules and methods of useful art have their final end in application and use."  *Id.* at 104.  Such things "can only be secured, if [they] can be secured at all, by letters-patent."  *Id.* at 104-05.

This distinction makes sense.  Patent protects useful, functional and

utilitarian works (i.e., works that the public could make practical use of), while copyright protects fanciful and expressive ones.  Although federal law provided an exclusive monopoly for both types of works, the standards for copyrightability are relatively lax as compared to those for patentability.  As the *Baker* court explained: "To give the author of the book an exclusive property in the art described therein, when no examination of its novelty has ever been officially made, would be a surprise and fraud upon the public."  *Id*. at 102.[4]

### 2.    Post-*Baker* Law Confirmed the Uncopyrightability of Functional Features, Including Game Rules

Subsequent cases followed Baker's lead, holding that copyright did not protect systems, methods, processes, or procedures, since those things were the within the domain of patent.  *See, e.g.*, *Taylor Instrument Cos. v. Fawley-Brost Co.*, 139 F.2d 98 (7th Cir. 1943) (holding charts for temperature recording technology systems uncopyrightable); *Brown Instrument Co. v. Warner*, 161 F.2d 910 (D.C. Cir. 1947) (same); *Affiliated Enters. v. Gruber*, 86 F.2d 958 (1st Cir. 1936) (discussed below).

In *Taylor*, the Seventh Circuit explained that Congress provided "two

---

[4] In addition, even in 1880 a copyright lasted longer than a patent.  *See* Tyler T. Ochoa, *Patent and copyright term extension and the Constitution: a historical perspective*, 49 J. Copyright Soc'y U.S.A. 19, 28-32, 52-53 (2001).  Today, the term of a copyright monopoly is significantly longer than that of patent:  less than 20 years for patents as opposed to the life of the author plus 70 years for copyright. 35 U.S.C. § 154; 17 U.S.C. § 302.

separate and distinct fields of protection, the copyright and the patent." *Taylor*,

139 F.2d at 99.  Considering all the patents for temperature recording systems, the

Court concluded that the system and the charts embodying the system could not be

copyrighted.  It reasoned that finding copyright protection for plaintiff's works

would be "intolerable," because the plaintiff could thereby "extend indefinitely the

fifty-six years of protection afforded by the copyright laws." *Id.* at 101.

These early cases also made clear that game rules and the overall systems

created by game rules were uncopyrightable.  For example, in *Gruber*, the First

Circuit held that the rules and overall system for a lottery game "Bank Night"

could not be copyrighted, reasoning:  "However good and valuable an idea, plan,

scheme, or system is, the moment it is disclosed to the public without the

protection of patent, it becomes public property[.]"  86 F.2d at 961; *see also*

*Morrissey v. Proctor & Gamble Co.*, 379 F.2d 675 (1st Cir. 1967) (holding rules

for a sweepstakes contest uncopyrightable); *Affiliated Hosp. Prods, Inc. v. Merdel*

*Game Mfg. Co.*, 513 F.2d 1183 (2d Cir. 1975) ("No claim is of course made that

appellant can protect the game of Caroms or its variations which are in the public

domain.  The rules of the game are perforce in the public domain as well as the

game itself."); *Whist Club v. Foster*, 42 F.2d 782 (S.D.N.Y. 1929) ("In the

conventional laws or rules of a game, as distinguished from the forms of modes of

expression in which they may be states, there can be no literary property

susceptible of copyright."); *Russell v. Ne. Publ'g Co.*, 7 F. Supp. 571 (D. Mass. 1934) (relying on *Baker* to hold uncopyrightable a book describing a set of rules and problems relating to contract bridge).[5]

The Ninth Circuit explained the principle of excluding protection for game rules in *Allen v. Academic Games League of America*:

> This doctrine of merger is particularly applicable with respect to games "since they consist of abstract rules and play ideas." . . . Allen has not shown that it is possible to distinguish the expression of the rules of his game manuals from the idea of the rules themselves. Thus, the doctrine of merger applies and although Allen may be entitled to copyright protection for the physical form of his games, he is not afforded protection for the premises or ideas underlying those games. To hold otherwise would give Allen a monopoly on such commonplace ideas as a simple rule on how youngsters should play their games.

89 F.3d 614, 617-618 (9th Cir. 1996) (citations omitted).

Game rules are not copyrighted, they are patented. For example, "[d]uring the years 1935 to 1952, Parker Brothers relied primarily on its patents to protect its monopoly of 'Monopoly.'" *Anti-Monopoly, Inc. v. Gen. Mills Fun Grp.*, 611 F.2d 296, 299 (9th Cir. 1979); *see, e.g.*, U.S. Patent No. 1,616,884 (filed Mar. 5, 1926)

---

[5] There are many other cases holding the rules of a game uncopyrightable. *See, e.g., Affiliated Enters., Inc. v. Gantz,* 86 F.2d 597 (10th Cir. 1936); *Durham Indus., Inc. v. Tomy Corp.,* 630 F.2d 905 (2d Cir. 1980); *Landsberg v. Scrabble Crossword Game Players, Inc.,* 736 F.2d 485, 489 (9th Cir. 1984); *Hoopla Sports & Entm't Co. v. Nike, Inc.*, 947 F. Supp. 347 (N.D. Ill. 1996); *Chamberlain v. Uris Sales Corp.*, 56 F. Supp. 987, 988 (S.D.N.Y. 1944), *aff'd*, 150 F.2d 512 (2d Cir. 1945); *Seltzer v. Sunbrock*, 22 F. Supp. 621, 630 (S.D. Cal. 1938).

(patent for rules of a game called "ad poker" issued in 1927); U.S. Patent No.

2,159,174 (filed Apr. 12, 1938) (patent for rules of a pitching game issued in

1939); U.S. Patent No. 1,562,149 (filed Apr. 2, 1925) (patent for card game rules

issued 1925).

### 3.      Section 102 (b) Codified Pre-Existing Law

In 1964, the Register of Copyrights proposed a revision to the copyright

laws to define the scope of copyrightable subject matter:

> Copyright protection subsists . . . in original works of authorship fixed
> in any tangible medium of expression, now known or later developed,
> from which they can be perceived, reproduced, or otherwise
> communicated, either directly or with the aid of a machine or a
> device.

*See* H.R. 1197, 88th Cong. (1964) and S. 3008, 88th Cong. (1964).  This language

exists today in Section 102(a) of the Copyright Act.

The stated proposal, on its face, brought within reach computer programs,

and there was concern that this would bring within the scope of copyright

"functional items."  Hearings on S. 597 Before the Subcomm. On Patents,

Trademarks, and Copyrights of the S. Commm. On the Judiciary, 90th Cong. at

192-99.  A new copyright bill was then introduced, clarifying that copyright would

neither protect functional items nor abstract ideas.  S. 543, 91st Cong. (1969).  This

bill kept the above language regarding the scope of copyright protection, but

further included a set of exclusions: abstractions (ideas, concepts, discoveries, and

principles) and more complex functional features (procedures, processes, systems, methods of operation). *Id.* This set of exclusions is now incorporated in Section 102(b).

> Congress explained the inclusion of Section 102(b) as follows:

> Some concern has been expressed lest copyright in computer programs should extend to the methodology or processes adopted by the programmer, rather than merely to the "writing" expressing his ideas. Section 102(b) is intended, among other things, to make clear the expression adopted by the programmer is the copyrightable element in a computer program, and that the actual processes or methods embodied in the program are not within the scope of copyright law.

*See* H.R. Rep. No. 94-1476 at 57 (1976). It further explained that it did not intend to change the scope of copyright protection but rather to adopt the existing common-law rules established in *Baker* and its progeny. *See id.*

### 4. Video Games Are Subject to the Same Rules As Ordinary Games

#### a) Videogame Rules Are Patented

Today, patents protect the rules and functionality of games—including videogames. *See, e.g.*, U.S. Patent No. 6,062,978 (filed Dec. 11, 1995) (patent claiming rules for rotating cube videogame); U.S. Patent No. 6,264,198 (filed June 29, 1999) (patent claiming rules for jigsaw puzzle videogame); U.S. Patent No. 6,669,565 (filed June 5, 2001) (rules for a fantasy sports game); U.S. Patent No. 5,868,388 (the "'388 Patent") (filed Nov. 26, 1996) (discussed below); U.S. Patent

No. 5,265,888 (the "'888 Patent") (filed Nov. 3, 1993) (discussed below); U.S. Application No. US 2010/0069133 A1 (recently-filed application for a puzzle game rules in which puzzle blocks are manipulated and cleared).

In fact, patents protect the very features that *Tetris* now claims are protected by copyright.  For example, the '388 Patent claims the rules of a game whereby a player uses polyomino pieces, including pentominos and tetrominos, to form larger shapes.  *See* '388 Patent Claims 1-54.  For another example, in the '888 Patent, Nintendo has a patent for the rules of the videogame, Dr. Mario, which employs many similar rules to *Tetris*.  The '888 Patent claims such things as a predetermined playing field shape, the display of playing pieces on that playing field to be manipulated by the player, the vertical movement of the playing pieces through the playing field from an upper to a lower region of the playing field, the resting and stacking of the playing pieces on the playing field upon contact, the clearing of playing pieces from the playing field, coloring or gray-scaling the playing pieces to distinguish themselves, and the insertion of "garbage" objects in an opponent's playing field.  *See* '888 Patent Claims 1-21.

### b)    Copyright Protects *Neither* Ideas *Nor* Rules

Videogame rules are patentable, they are not copyrightable.  Plaintiffs do not appear to dispute this fundamental tenet.  █████████████████████████
█████████████████████████████████████████████████████



The audiovisual display of a videogame can be copyrightable.  *See Midway Mfg.Co. v. Bandai-Am., Inc.*, 546 F. Supp. 125, 149 (D.N.J. 1982); *Atari, Inc. v. N. Am. Consumer Elecs. Corp.*, 672 F.2d 607, 615 (7th Cir. 1982).  However, copyright does not extend to the unprotectable aspects of the display.  *Id*.  Thus, abstractions (ideas, concepts, discoveries, and principles) and more complex functional features (procedures, processes, systems, methods of operation) of videogame displays are not copyrightable.  *See* 17 U.S.C. § 102(b).  And, due to the disjunctive phrasing of section 102(b), *either* abstractness *or* functionality is a basis to find a feature uncopyrightable.  *Id.*

In cases involving accused infringement of a videogame display, courts often apply a test to determine what the abstract, unprotectable idea of the game is. The court abstracts the copyrighted work to determine the underlying idea of the work as distinguished from its expression, and compares the protectable portion of the work to the accused work to determine infringement.  If the idea of the work is indistinguishable from the expression—*i.e.*, "merged" such that there are a limited number of ways of expressing the idea—then copyright will protect against only identical copying.  *See, e.g.*, *N. Am. Philips Consumer Elecs.*, 672 F.2d at 615-16.

15

This analysis is perfectly appropriate when determining the underlying idea of the work.  But it is inapposite when determining the functionality of the game.

In *Lotus Development Corp. v. Borland International, Inc.*, Borland wrote its own spreadsheet program, but included in its computer programs a virtually identical copy of the menu command structure—including the specific words and arrangement of the structure—contained in Lotus's competing spreadsheet program.  49 F.3d 807, 810 (1st Cir. 1995).  The Court found that the menu command structure was an uncopyrightable "method of operation," as listed in section 102(b).  *Id.* at 815.  It explained:

> Accepting the district court's finding that the Lotus developers made some expressive choices in choosing and arranging the Lotus command terms, we nonetheless hold that the expression is not copyrightable because it is part of Lotus 1-2-3's "method of operation."  We do not think that "methods of operation" are limited to abstractions; rather they are the means by which a user operates something . . . .
>
> The fact that the Lotus developers could have designed the Lotus menu command hierarchy differently is immaterial to whether it is a "method of operation."  In other words, our initial inquiry is not whether the Lotus menu command hierarchy incorporates any expression.  Rather, our initial inquiry is whether the Lotus menu command hierarchy is a "method of operation."

*Id.* at 816 (footnote omitted).  The Court found irrelevant that there were many different ways of implementing the menu command hierarchies, explaining that "it still functions as a method of operating the computer and as such is uncopyrightable."  *Id.* at 818.  The Supreme Court affirmed.  *Lotus Dev. Corp. v.*

*Borland Int'l, Inc.*, 516 U.S. 233 (1996).

The *Borland* Court similarly refused to apply an abstraction analysis to the elements of Lotus's copyrighted work:

> We think that abstracting menu command hierarchies down to their individual word and menu levels and then filtering idea from expression at that stage . . . obscures the more fundamental question of whether a menu command hierarchy can be copyrighted at all.

*Id.* at 815.  As in *Borland*, the fundamental question here is not at what level of abstraction a game's rules must be compared, but whether a game's rules can be copyrighted at all.

### c)      The Videogame Case Law Refuses Copyright Protection for Rules and Functional Elements

The results in the videogame cases are consistent with the basic proposition that the rules of a game are not copyrightable.  The Third Circuit has not ruled on this issue directly, but other circuits have.

In *Atari v. North American Philips Consumer Electronics Corp.*, the Seventh Circuit examined whether the videogame *K.C. Munchkin* infringed the famous game *PAC-MAN*.  The court dismissed certain functional commonalities of two games—the maze and scoring table, the tunnel exits, the dots that gauge and reward the player—as uncopyrightable.  672 F.2d at 617.  It found infringement based on the following wholly expressive elements:

> Rather, it is the substantial appropriation of the PAC-MAN characters that requires reversal of the district court.  The expression

17

> of the central figure as a "gobbler" and the pursuit figures as "ghost monsters" distinguishes PAC-MAN from conceptually similar video games . . . . PAC-MAN's particular artistic interpretation of the game was designed to create a certain impression which would appeal to a nonviolent player personality. *The game as such, however, does not dictate the use of a "gobbler" and "ghost monsters*."

*Id.* at 617-18 (emphasis added) (footnotes omitted).  Thus, the specific depiction of the *PAC-MAN* characters—which was not necessary to the functioning of the game—was the basis of the Court's finding of infringement.  *See also Midway Mfg. Co.*, 546 F. Supp. at 151-52 (finding the protectable features of *PAC-MAN* to be the depiction of the characters, the musical themes, and a cartoon sequence played before the beginning of the game).  That is, "the game as such" did not mandate the use of these elements—thus, they were copyrightable.

In *Data East USA, Inc. v. Epyx, Inc.*, a karate game accused of infringement had fifteen features in common with the plaintiffs' work—most of which were karate game moves.[6]  862 F.2d 204, 209 (9th Cir. 1988).  The Court held these features to be unprotectable, reasoning that these were "game procedure, common karate moves, the idea of the background scenes, a time element, a referee,

---

[6] Specifically, the similarities were: (1) fourteen karate moves, (2) two-player option, (3) one-player option, (4) forward and backward somersault moves and about-face moves, (5) squatting reverse punch wherein the heel is not on the ground, (6) an upper-lunch punch, (7) back-foot sweep, (8) jumping sidekick, (9) low kick, (10) walk-backwards position, (11) changing background scenes, (12) 30-second countdowns, (13) one referee, (14) the referee says "begin," "stop," "white," "red" in a cartoon-style speech balloon, and (15) 100 bonus points per remaining second.

computer graphics, and bonus points, [that] result[ed] from either constraints inherent in the sport of karate or computer retsraints." Once those similarities in function were filtered out, the court found no infringement.  *Id.*

In *Atari, Inc. v. Amusement World*, *Inc*., the Court found no infringement of the audiovisual display of Atari's *Asteroids* by that of Amusement World's *Meteors*.  574 F. Supp. 222, 225 (D. Md. 1981).  The 22 similarities between the two games were dictated by the rules and other functional elements of the game,[7] whereas the differences were primarily in expressive, non-functional elements.[8]

---

[7] (1) There are three sizes of rocks, (2) The rocks appear in waves, each wave being composed initially of larger rocks, (3) Larger rocks move more slowly than smaller ones, (4) When hit, a large rock splits into two medium rocks, a medium rock splits into two small ones, and a small rock disappears, (5) When a rock hits the player's spaceship, the ship is destroyed, (6) There are two sizes of enemy spaceships, (7) The larger enemy spaceship is an easier target than the smaller one, (8) The player's ship and enemy ship shoots projectiles, (9) When a spaceship's projectiles hit a rock or another ship, the latter is destroyed immediately, (10) The destruction of any rock or spaceship is accompanied by a symbol of an explosion, (11)  When an enemy spaceship is on the screen, the player hears a beeping tone, (12) There is a two-tone beeping noise in the background throughout the game, and the tempo of this noise increases as the game progresses, (13) The player gets several spaceships for his quarter. The number of ships remaining is displayed with the player's score, (14) The score is displayed in the  upper left corner for one player and the upper right and left corners for two players, (15) The control panels are painted in red, white, and blue, (16) Four control buttons from left to right, rotate the player's spaceship counter-clockwise, rotate it clockwise, move it forward, and fire the weapon, (17) When a player presses the "thrust" button, his spaceship moves forward and when he releases the button the ship begins to slow down gradually (although it stops more quickly in "Meteors"), (18) The player gets an extra spaceship if he scores 10,000 points, (19)  Points are awarded on an increasing scale for shooing (a) large rock, (b) medium rock, (c) small rock, (d)

And *Incredible Technologies, Inc. v. Virtual Technologies, Inc.* stands directly for the proposition that copyright does not protect the functional features of videogames.  400 F.3d 1007 (7th Cir. 2005).  The Seventh Circuit examined whether a video golf game infringed another.  The Court opened its analysis of the two games by explaining that "copyright protection does not extend to any 'method of operation . . . regardless of the form in which it is described, explained, illustrated, or embodied in such work.'  17 U.S.C. § 102(b)."  *Id.* at 1012.  Citing *Borland*, the Court explained "[e]ven if there are multiple methods by which an operation can be performed, a plaintiff's choice of a particular method of operation is not eligible for protection."  *Id.*  It further explained that "[u]seful articles and functional elements" are not entitled to copyright protection, and invoked the

---

large alien craft, (e) small alien craft, (20) When all rocks are destroyed a new wave of large rocks appears, (21) Each new wave of rocks has progressively more large rocks than the previous waves to increase the challenge of the game, (22) A general overhead view of the battle field is presented.

[8] (1) "Meteors" is in color, while "Asteroids" is in black and white.  (2) The symbols for rocks and spaceships in "Meteors" are shaded to appear three-dimensional, unlike the flat, schematic figures in "Asteroids." (3) The rocks in "Meteors" appear to tumble as they move across the screen. (4) "Meteors" has a background that looks like distant stars.  (5) At the beginning of "Meteors," a player's spaceship is shown blasting off the earth, whereas "Asteroids" begins with the player's spaceship in outer space. (6) The player's spaceship in "Meteors" rotates faster.  (7) The player's spaceship in "Meteors" fires faster and can fire continuously, unlike the player's spaceship in "Asteroids," which can fire only bursts of projectiles.  (8) The pace of the "Meteors" game is faster at all stages.  (9) In "Meteors," after the player's spaceship is destroyed, when the new spaceship appears on the screen, the game resumes at the same pace as immediately before the last ship was destroyed.  In "Asteroids" the game resumes at a slower pace.

20

patent/copyright distinction as the underlying policy consideration for this rule:

"The exclusion of functional features from copyright protection grows out of the

tension between copyright and patent laws.  Functional features are generally

within the domain of patent laws."  *Id.*

The *Incredible Technologies* court concluded that the layout of the

controls—while similar in the two games—was functional in nature:

> To a large degree, the layout of the controls seems to have been
> dictated by functional considerations.  The trackball almost
> necessarily must be in the center of the control panel so that right- and
> left- handed players can use it equally well.  It must not be so close to
> the upright video display that a player would smash her hand into the
> screen too forcefully after making a shot. . . . We do not find an abuse
> of discretion in the district court's conclusions that the buttons appear
> to have been placed where there are for purposes of convenience and
> cannot be said to be expressive.

*Incredible Techs.*, 400 F.3d at 1014. [9]

In sum, the video game case law reaches the same conclusion as the earlier

board game cases: where a feature of a videogame is dictated by functional

---

[9] Throughout the case, Plaintiffs appeared to rely heavily on *Atari Games Corp. v. Oman*, 888 F.2d 878 (D.C. Cir. 1989).  There, the D.C. Circuit reversed the Copyright Register's decision that the game *Breakout* was an uncopyrightable work.  The Court expressly noted the limited scope of its decision, stating that it was copyrightable "although perhaps only meriting only 'thin' protection when the character of its 'expression' is tested in an infringement suit."  *Id.* at 886.  Xio does not here contend that *Tetris*, *Breakout*, and audiovisual displays are as a general matter uncopyrightable.  Certain aspects of those games might be copyrightable, as explained below.  Thus, the analysis in *Oman* does not apply here.

considerations, regardless of whether there may be a number of different ways to implement that feature's functionality, copyright does not protect that feature.

### 5.    Definition of Rules

As explained, Plaintiffs do not appear to dispute that the rules of *Tetris* are uncopyrightable.  Nor can they, for the reasons just explained.  So the question becomes, "What are the rules of a videogame?"

Xio's videogame expert has set forth a common-sense definition for rules: the limitations and affordances of the game.  Maitra Dec. Ex. 36 at ¶ 16.  This definition is explained by the world-renowned game designer and scholar Jesper Juul:

> Rules specify *limitations* and *affordances*.  They prohibit players from performing actions and this affords players meaningful actions that were not otherwise available; rules give games structure.  The board game needs rules that let the players move their pieces as well as preventing them from making illegal moves the video game needs rules that let the characters move as well as rules that prevent the character from reaching the goal immediately.

Jesper Juul, *Half-Real* 58 (2005) (emphasis in original).  Juul's definition is in accord with other widely-accepted definitions of game rules.  *See, e.g.*, Oxford English Dictionary; "rule" (2011) ("a regulation determining the methods or course of a game or the like"); Bruce E. Boyden, *Games and Other Uncopyrightable Systems*, 18 Geo. Mason L. Rev. 439, 450 (2011) ("[T]he rules of the game are sometimes thought as the instructions for playing the game, but they are not; rules

do not tell players precisely what to do.  Rather, they place broad constraints on what players can do and conversely define certain actions as valid within the scope of the game.").

Applying this definition, the line between the rules and the expressive, non-functional aspects of a game is clear.  Consider the game of chess.  The rules of the game are familiar and, even if invented today, uncopyrightable.  Yet creators often receive copyright protection for chess sets.  *See*, *e.g.*, Copyright Reg. No. VAu000362713 ("Nautically designed chess set"); Copyright Reg. No. VAu000666397 ("Chess set, sculpture of Michelangelo").  A nautical chess set and a Michelangelo chess set would have identical rules (i.e., limitations and affordances).  The differences lie in the expressive/non-functional elements of the games.  That is, the king of the nautical chess set might be a ship captain; the king of the Michelangelo chess set might be David.  Altering these aspects would not have any impact on the functioning of the game.  And all this is true regardless of whether the game is in board or electronic form.  *See generally* 2 William A. Patry, *Patry on Copyright* § 4:20 (2007) ("Computer programs that permit the play of electronic chess games may be protected, but on a basis no different from any other computer program.  The actual chess game pieces are sometimes highly creative works of sculpture and may be protected as such, as may a 'chess set' that consists of original chess pieces and original text sold as an ensemble.").

23



Take an even simpler example:  Tic-Tac-Toe.  The rules of the game are

well-known:

    (1)    the playing field is a three by three grid.

    (2)    two players alternate marking those squares, the first player
            using a mark belonging to herself and the second player using a
            different mark belonging to himself.

    (3)    If one player places three of the same marks in a row, that
            player wins.

    (4)    If all squares are filled without a winner, the game is a draw.

Generally, the first player's mark is an "X" and the second's is an "O."  But the

rules would not change if the "X" was changed to an "A," a banana, or a monkey

and if the "O" was changed to a "B," an orange, or a giraffe.  The type of mark

doesn't matter to the functioning of the game, provided that the two marks are

distinguishable from each other.

24

This reasoning is no different in the videogame context.  Xio's expert

explains:

> Take the original *Super Mario Bros*. and *Sonic The Hedgehog* games.
> The two have nearly identical rules. In both games the player must
> reach a target point far away to the right of their starting point. In both
> games this is done by running through the environment, jumping over
> obstacles, and jumping onto enemies. In both games if the character
> runs into (as opposed to jumping on top of) an enemy, the character
> "dies" and the player must restart.  Both games feature "power ups"
> that enhance the character's abilities.  Both games feature collectible
> objects (coins and rings, respectively) that award the player an extra
> life upon collecting 100.
>
> The rules of these two games are very similar, but the expression
> given to those rules is vastly different.  Nobody would confuse
> Nintendo's iconic Mario with Sega's iconic Sonic.  The stories these
> games tell are also different: Mario is an Italian plumber, originally
> from Brooklyn, who travels to the Mushroom Kingdom where he
> repeatedly saves the Princess.  Sonic's world has no tie to the real
> world, and his mission is to save small animals from being
> transformed into killer robots and to find the "chaos emeralds" before
> his nemesis does.

Maitra Dec. Ex. 35 at ¶¶ 87-88.

Plaintiffs define the rules of a game as "███████████████████

████████████" *Id.* Ex. 38 at 24:17-25.  It is difficult to make much sense of this

definition.  At minimum, it is not consistent with any common-sense understanding

of the term "rules," and it does not appear to be drawn from any work, text, or

authority.  More importantly, this definition does not allow for any meaningful

differentiation between the copyrightable and uncopyrightable aspects of a game.

Instead, it allows copyright plaintiffs to arbitrarily define the protectable aspects of

their videogames—as Plaintiffs have done here.

**B.      Xio Does Not Infringe Because Plaintiffs Only Accuse Copying of Rules and Other Unprotectable Elements of *Tetris***

To prove copyright infringement, a plaintiff must prove that the defendant copied *protected* elements of plaintiffs' copyrighted work.  *See N. Am. Philips Consumer Elecs.*, 672 F.2d at 615.  Because game rules and other functional elements of a work are not protected by copyright, Xio does not infringe if the only elements the two works share are unprotectable ones.

**1.      Overview of the Rules of *Tetris***

Xio prevailed in a motion to compel production of a copy of a basic *Tetris* demo, over Plaintiffs' strenuous objections.  Plaintiffs' internal documentation described the source code for this demo as follows: ████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████ Here is a screenshot of the demo:



*Id.* Ex. 36 at ¶ 23. ███████████████████████



██████████████████████████████████████████████

████████████████████████

The licensed games, on the other hand, contain a number of nonfunctional, expressive features.  For example, compare the *Tetris* demo with the licensed game *Tetris Zone*:



Exs. 1&36 at ¶ 23.  The red circles indicate the expressive aspects of the game.  Specifically:  **(1)** *Tetris Zone* has a graphic design encircling the display of the "next pieces" to fall in the playing field.  This element has nothing to do with game functioning; it is a non-functional, expressive element, ████████████████████████ ████████████████████  **(2)** Each square in *Tetris Zone* is textured to provide dimension, with internal highlights, shadows, and an overall beveled graphic effect.  There is no functional purpose for this; this is an expressive choice. ██

████████████████████████████████████

28

███████████████████████████████████ **(3)** In *Tetris Zone*, there is a prominently featured logo—again, another purely non-functional, expressive element that has nothing to do with game functioning. ████████████ ██████████████ **(4)** *Tetris Zone* has an animated background: a willowy blue streak across the background—which is careful not to interrupt the playfield—that fades to darker blue then black. ██████████████████████████████████████ ██████████████ **(5)** *Tetris Zone* has a blur effect that trails the falling tetromino. This blur effect has no bearing on the functioning of the game—it does not guide the player's piece or affect movement in any way. It is a nonfunctional element. Further examples with other *Tetris* games are provided in Xio's expert report, at paragraphs 26 through 35. *See id.* Ex. 36 at ¶¶ 26-35.

Plaintiffs have provided a number of admissions that confirm this basic understanding of the rules of *Tetris*. ████████████████████████ ████████████████████████████████ ████████████████████████████████ ███████████████████████████████████████ ██████████████████████





███████████████████████████████████

███████████████████████████████████

██

In contrast to these plain statements, this is Plaintiffs' litigation-driven statement of the rules of *Tetris*:  "an object appears on a playing field and the player manipulates the object to a final resting spot, to create a shape which is then removed from the playing field."  *Id.* Ex. 46.  This is arbitrary and contradicted by common sense, the case law to date, and Plaintiffs' own statements.  Indeed, Plaintiff's definition would apply to games that look nothing like *Tetris*, like *Connect Four*, and arguably even checkers and chess.  This abstract statement is simply not a "rule set" in any meaningful sense, because it does not suffice to define what players can and cannot do in *Tetris*.  Juul, *supra* at 58.

Plaintiffs also cannot rely on the argument that the definition of "rules" should change depending on whether the game is a board game or a video game. Plaintiffs have two copyrighted board games based on *Tetris*:  Milton Bradley's *Tetris* and the just-released *Tetris Link*, described on Plaintiffs' website.  *See* Maitra Dec. ¶¶ 2, 49 & Ex. 48.  *Tetris Link* looks like this:



*Id.* at ¶ 49 & Ex. 48.  The board game *Tetris Link* has a number of features

identical to the video game *Tetris*:  on a 10 by 20 grid, players manipulate seven

brightly-colored tetrominos, whose blocks are individually delineated, and which

rotate and move laterally and downwards—and all of these common features are

properly considered rules of the respective games.  *Id.*  The same logic applies to a

chess board game and a chess video game—the rules do not change from one

medium to another.  *See generally* Patry, *supra* at § 4:20.  And Plaintiffs

themselves have indicated that they believe the copyrights in both to be the same:

*Tetris Link* bears a copyright notation dating to the invention of *Tetris*, 1985.

Maitra Dec. at ¶ 2.

Further consider Parker Brothers' board game *Universe*, which has a

copyright date of 1967 and has a number of features in common with *Tetris*—

specifically, players rotate and reflect brightly-colored pentominos (whose blocks

are individually delineated) and place them on a grid ranging from ten by ten to a

larger grid.  *Id.* ¶ 7 & Ex. 6.  Here is a side-by-side comparison of *Universe* (left) with *Tetris* (right):



*Id.*; *id.* Ex. 36 at ¶ 23.  Parker Brothers could not argue that *Tetris* infringes its copyright to *Universe*—not because one is a board game and the other is a video game, but rather because the only features in common between these games are rules and other functional aspects.

### 2. Every Individual Element Accused of Infringement Is a Rule or Otherwise Functional

Plaintiffs have identified a number of elements of the *Tetris* game which appear in *Mino*.  Given Xio's careful and purposeful replication of only the rules—and not any expressive elements—of *Tetris*, it comes as no surprise that each of the common features is not copyrightable.  An element-by-element analysis follows.[12]

---

[12] A more detailed analysis can be found in Xio's expert report.  *Id.* Ex. 36 at ¶¶ 38-80.

**(1)    The long vertical rectangle playing field or matrix, which is higher than wide.**

The size of the playing field is a rule, a limitation and affordance directly affecting the functioning of the game.  If the standard rectangular playing field of twenty cells high by ten cells wide were changed to an eight by eight grid, clearing lines might be simpler given that that fewer pieces would be needed to complete a horizontal line.  At the same time, gameplay might be more difficult in that the total space in the matrix, and, relatedly, the time to place a piece on the board would decrease.

**(2)** **The seven tetrominos as playing pieces.**

Using tetrominos as playing pieces is a fundamental rule—a limitation and affordance—of the game. The number of squares in a playing piece directly affects the resources available to the player. For example, reducing the number of squares in a playing piece from four to three or two—*i.e.*, to trominos or dominos—results in fewer playing pieces in total, thereby reducing the player's options and simplifying her decisions. ██████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████

Increasing the number of squares in a piece to, say, pentominos (five-squared shapes) would result in more pieces total and different ways of fitting those pieces together. ███████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

35

█████████████ And he did not choose particular tetrominos; he used all the four-square shapes that exist.  *See* Golomb, *supra* at 19.

**(3)    The tetrominos being brightly colored.**

It is notable that Plaintiffs do not accuse *Mino* of copying the *particular* colors chosen, because *Mino* uses different colors for its tetrominos than does *Tetris*.  The claim is that using color at all is copyrighted.  Brightly coloring the tetrominos—while not a rule—is a functional aspect of the game, ensuring that the pieces are recognizable against the background.  ██████████████████

████████████████████████████

██████████████████████████████

███████████████████████████

██████████████████████████

█████████████████████████████

██████████████████████████

**(4)    The squares of the tetrominos being individually delineated.**

This aspect of *Tetris* is also functional.  Delineating the individual squares of the tetromino enables a player to see where the tetromino that is in play fits on the grid and its relationship to the other tetrominos already on the board.  Without this feature, the game would be more difficult to play.

36

**(5)     The appearance of the tetrominos at the top of the board.**

This element is another rule—it determines the starting position of the tetromino, along with element (6) directly below.  This is a limitation and affordance of the game:  if tetrominos appeared not at the top, but halfway down, the game would be more difficult as players would have less time within which to place the tetrominos.  Or if tetrominos appeared at one of the sides of the board, it would be more difficult to get a piece to the other side of the board. ███████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████

**(6)     The starting orientation of the tetrominos.**

The starting orientation of the tetrominos directly affects the functioning of the game.  The number of times a player has to rotate a piece to place it in a desired spot is directly related to the starting orientation of the piece.

Notably, the starting orientation of the tetrominos is not the same across the *Tetris* games that Plaintiffs accuse Xio of infringing.  *See id.* ¶ 3.  As just one example, compare *Tetris Pop*, demonstration available at http://www.youtube.com/watch?v=LlZqiKstRHs, with *Tetris DX*, demonstration available at http://www.youtube.com/watch?v=6sPRJPaHENQ.  Thus, under Plaintiffs' theory, most combinations of starting orientations would infringe.

37

**(7)     The downward, lateral, and rotating movements of the tetrominos.**

The downward, lateral, and rotating movement of the tetrominos is one of the most basic rules of the game:  how the pieces move on the board.  The game doesn't make sense without this feature.  If the tetrominos didn't move downward, lines wouldn't clear.  If they didn't move laterally, it would be impossible to complete a horizontal line.  ███████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████  And the shape of the tetrominos—which Plaintiffs did not create—determines how they look when they are turned.

**(8)     The disappearance of any completed horizontal line.**

This element, too, is a basic rule of the game.  One of the most fundamental affordances in the game is that players arrange tetrominos to create horizontal lines, which are thereby cleared from the board—preventing the stacked tetrominos from reaching the top of the playing field and ending the game.  Without this feature, fundamental game functioning would change.  █████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

██████████████████████████████████

███████████████████████████████

██████████████████████████████

████████████████████

**(9)    The subsequent consolidation of the playing pieces remaining on the playing field as a result of the downward shift into the space vacated by the disappearing line.**

This element is a rule, and goes hand-in-hand with the clearance of a completed horizontal line.  Without a downward shift subsequent to a line clear, there would be no way to reduce the height of the blocks already on the board.  As a result, it would be impossible the clear more than 20 lines on a 20 by 10 board, and the game would be over before a player had time to blink.  ██████████████

██████████████████████████████

█████████████████████████████

████████████████

**(10)   The display of "garbage lines" with at least one missing block in random order.**

"Garbage lines"—horizontal lines placed on the board that are not completely filled—are a limitation placed on a player.  They are often employed in multiplayer mode whereby a player is rewarded for good performance by placing garbage lines on her opponent's board, which raises the height of pieces on the opponent's board and brings the opponent closer to defeat.  █████████████

39



**(11)   The appearance of a "ghost" or shadow piece under the playing piece.**

The "ghost piece" is a shadow of the tetromino currently in play that shows where that tetromino will fall on the board.  It is a rule—specifically, an affordance of the game. It would be harder to play a game that lacked this feature.

**(12)   The display of the next tetromino that will fall down the matrix above the playing field.**

The next piece display is another rule of the game and, as with the ghost piece, it is an affordance of the game.  The ability to view what piece will come next allows the player to better strategize where to place the current piece in play.

██████████████████████████████████████████████

██████████████████████████████████████████████

████████.  As with the ghost tetromino, it would be harder to play a game that lacked this feature.  ████████████████████████████

████████████████████

**(13)   The change in color of the tetrominos when they are in lock-down mode.**

This is a functional aspect of the game.  Lock-down mode occurs when a tetromino is no longer in play, when it settles into its final position on the board. Changing the color of the pieces that are no longer in play communicates two messages:  that the locked-down tetromino is no longer active and that a new tetromino is in play.  The player is better able to focus on the active tetromino as it descends down the board.  ██████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████

**(14)  The screen layout in multiplayer versions with the player's board appearing most prominently on the screen and the opponent's boards appearing smaller than the player's board and to the side of the player's board.**

This is a functional element of *Tetris* games because it highlights a player's board over her opponents' boards.  Reversing this—with an opponent's board as the largest—would not make sense.  And having all boards equally sized would unnecessarily confuse the player's board with her opponents'.

**(15)  Combination of all elements**

All of the above elements are functional—either because they are a limitation and/or affordance of the game or because they otherwise play a functional role in the game.  Copyright can sometimes subsist in a creative combination of individual elements.  But here the combination of these elements too is functional, part of the thing that makes the game the game.  Each element affects the other, and the combination of the elements working together is necessarily functional as well.  Xio's expert explains the interrelatedness of these elements:

> Adjusting or altering any of the rules elements would have repercussions for the other elements as well.  For example, if the pieces did not move downward, other rules would have to be adjusted to make the game workable.  The player might have to move the piece down manually, or the goal might have to change from clearing lines

42

> to something else altogether.  If the pieces could not rotate, forming
> lines would become much harder and other rules (such as the matrix
> width) would need to be adjusted to compensate.  If the pieces could
> not be moved laterally, there would be no reason to include the ghost
> piece, etc. etc.

*Id.* Ex. 36 at ¶ 79.

## C.  Plaintiffs' Non-Copyright Claims are Invalid

The rejection of Plaintiffs' remaining claims for (1) trade dress infringement

under the Lanham Act, (2) trade dress infringement under New Jersey statute

sections 56:4-1 *et seq.*, and (3) common law unfair competition necessarily follows

from the conclusion that the accused elements are functional and uncopyrightable.

*See* 15 U.S.C. § 1125(a)(3) (Section 43(a) of the Lanham Act stating that a person

asserting trade dress protection has the burden of proving that the claimed trade

dress is not functional); *TraFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23,

25 (2001) (citation omitted) (restating and applying the long-standing proposition

that trade dress does not protect functional features of a product, which are those

features that are "essential to the use or purpose of the article" or "affects the cost

or quality of the article"); *Eli Lilly and Co. v. Roussel Corp.* 23 F. Supp. 2d 495-96

(D.N.J. 1998) (holding that N.J. Stat. Ann § 56:4-1 should be treated the same as

section 43(a) of the Lanham Act for analytical purposes); *Holiday Inns, Inc. v.*

*Trump¸* 617 F. Supp. 1443 (D.N.J. 1985) (requiring a minimum showing of unfair

practices to make out a claim for common law unfair competition).  Plaintiffs' non-

copyright claims fail for the same reason their copyright claims fail: because the elements that *Tetris* and *Mino* have in common are functional rules of the game.

Plaintiffs' trade dress claims are also preempted by the Copyright Act, as announced in the U.S. Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003).  In *Dastar*, the defendant had purchased videotapes of a 1948 World War II documentary, and copied, edited, and repackaged them without attributing any credit to the documentary.  The copyright on that work had expired, so the owners of the rights to the documentary sued on the basis of section 43(a) of the Lanham Act.  The Supreme Court rejected that claim, holding that the Lanham Act reached only goods and services, and not the underlying ideas or expression, which are the exclusive province of patent and copyright law, respectively.  *Id.* at 32-37.  Courts have subsequently held that *Dastar* precludes Plaintiffs from bringing Lanham Act claims for uncopyrightable aspects of their works as well as for works in which the copyright has expired. *See, e.g.*, *Keane v. Fox Television Stations, Inc.*, 297 F. Supp. 2d 921, 935 (S.D. Tex. 2004) (citing *Dastar* for the proposition that "the Lanham Act does not create a cause of action for plagiarism, that is, the use of otherwise unprotected works and inventions without attribution") (internal quotations omitted); *Bretford Mfg., Inc. v. Smith Sys. Mfg. Co.*, 286 F. Supp. 2d 969, 971-72 (N.D. Ill. 2003); *Larkin Grp., Inc. v. Design Consultants, Inc.*, 323 F. Supp. 2d 1121, 1126 (D. Kan. 2004) ("In

44

this case, plaintiff's reverse-passing-off claims are materially identical to those at issue in *Dastar*, *Bretford Manufacturing*, and *Tao*. Plaintiff is essentially claiming that defendants took plaintiff's uncopyrighted and unpatented ideas and concepts, edited and repackaged them, and passed them off as their own without attributing any credit to plaintiff."). Similarly here, Plaintiffs cannot do an end-run around copyright by claiming trade dress protection for uncopyrightable elements of *Tetris*.

## IV.   CONCLUSION

For the reasons explained above, Xio does not infringe or otherwise violate any of Plaintiffs' rights in the game *Tetris*.


Dated:  September 30, 2011          ROBINSON, WETTRE & MILLER LLC
                                    One Newark Center, 19th Floor
                                    Newark, New Jersey 07102
                                    (973) 690-5400
                                    drobinson@rwmlegal.com


                         By:            */s/ Donald A. Robinson*
                                    Donald A. Robinson

                                    -and-

                                    Mark A. Lemley
                                    Joseph C. Gratz
                                    Sonali D. Maitra
                                    DURIE TANGRI LLP
                                    217 Leidesdorff Street
                                    San Francisco, CA  94111
                                    45

415-362-6666

*Attorneys for Defendant*
*XIO Interactive, Inc.*

## **CERTIFICATE OF SERVICE**

I certify that on September 30, 2011, I caused a copy of defendant's motion to seal certain documents to be served upon plaintiffs' counsel of record via the Court's electronic filing system.

*/s/ Donald A. Robinson*
_____
Donald A. Robinson

47