**From:** "Michael Carter"
**To:** "Desiree Golen"
**Cc:**
**Bcc:**
**Date:** Tue, 11 Nov 2008 02:29:07 -0800
**Subject:** Tetris links (1)

http://web.archive.org/web/19991010031703/www.wired.com/news/news/culture/story/16619.html
http://web.archive.org/web/20030406011138/www.abednarz.net/webfoot.html
http://web.archive.org/web/20070401203047/lpf.ai.mit.edu/Copyright/look-and-feel.html
http://web.archive.org/web/20070208134326/lpf.ai.mit.edu/Copyright/laf-fallacies.html
http://www.wired.com/culture/lifestyle/news/1998/12/16619
http://web.archive.org/web/20070706071602/http://www.abednarz.net/tetris.html



INTERNET ARCHIVE
WayBackMachine BETA   http://www.wired.com/news/news/culture/story/16619.html   Go

28 captures
21 Feb 99 - 28 Aug 05

FEB   OCT   NOV   Close
◄   10   ►
1998   1999   2000   Help



Safety from the people who know

Security
Safety   Trust

The new
HP DeskJet 970C.

**W1RED NEWS**   updated 3:00 a.m. 9.Oct.99.PDT

Wired News   ·   [SEARCH]

**SECTIONS**
Top Stories
Business
Culture
Technology
Politics

**WIRE SERVICE NEWS**
Top Headlines
Sports
Finance

**FREE DELIVERY**
enter email   GO

**STOCKS**
Get Quote:
GO

Financial Services




Today's Summary
Wired Index | All Indexes
Portfolios

**FIND A BOOK**
Business Top 20
Computers
Computer Games
Current Affairs
GO
Powered by
barnesandnoble.com

**WIRED MAGAZINE**



Issue 7.10
Subscribe to Wired.
Special offer!

**HOTWIRED**
Frontdoor
Webmonkey
Webmonkey Guides
RGB Gallery
Animation Express
Suck.com

**HOTBOT**
Search
Shopping

Wired News staff

**Contact us**

## Tetris Pressures Game Act-Alikes
by Judy DeMocker

3:00 a.m.  4.Dec.98.PST
The falling blocks have letters, not shapes, that fit together. Otherwise Mace Software's game, Alphatris, is a lot like Tetris. At least The Tetris Company thinks so, and it's taken action to have Tetris-like games removed from gaming sites.

But Gary Mace, president of Mace Software, isn't backing down.

"If I were taking the exact Tetris game and selling it, I would understand," Mace said. "But they're trying to say the concept of falling blocks being maneuvered -- and any game that operates similar to that -- is copyrighted. They're simply wrong."

Tetris may appear to be squelching online fun, but copyright enforcer Henk Rogers says it is trying to bring the best software to market while protecting its own business interests.

"I don't want to come off as the jerk behind The Tetris Company. We love Tetris just as much as anybody," said Rogers, CEO of Blue Planet Software, charged with development, licensing, and marketing for all Tetris products. The company has licensed over 50 million copies of Tetris, making it the most popular computer game in history.

Blue Planet also controls licenses for the gaming software that runs on PCs, Nintendo Gameboys, and Playstations, and it is currently completing a deal that would add Tetris to America Online.

Although Tetris hasn't filed any lawsuits, it has sent threatening letters to dozens of small developers, demanding that their Tetris-like games be removed from sites. So far, most have capitulated. But developers are resentful, claiming the game should be freely available for everyone's amusement.

"It's really a cultural issue. Everybody wants a free and open information-sharing environment on the Web, but we're running into the cold hard facts of

Printing? Use this version.
Fax this for free.
Email this to a friend.

**CULTURE**
Today's Headlines

Bugsy, as Newspapers Knew Him

Music Awards Sing Familiar Tune

Net Throws the Dog a Bone

A Sin-ful Movie

Grappling With a New Medium

LA Hosts Online Music Awards

Colleges Hitting Low Notes

Surfers Get Second Chance

Rolling the Dice on a D&D Movie

Vintage Tech's Bells and Whistles

Students Like the Web, Sort Of

Technically, It's Art

Wired News delivered
by PalmPilot,
Outlook Express,
In-Box Direct,
or PointCast

the law," said Blair Bouchier, president of Base2 Software. "We're not going to fight them on this."

Base2 removed its game, Descending Blocks, from its site two months ago.

In the age of the Internet, enforcing intellectual-property rights is tough. Dozens of Tetris knockoffs still exist out there, some with small twists, like Java Tetris and 3-D Tetris. But the differences aren't enough to qualify them as new games, said game creator Alexey Pajitnov.

"If somebody makes the game that has nothing to do with falling shapes, we don't care about that," said Pajitnov. "But if somebody just repeats the game, with some insignificant feature, and calls it Tetris or something close to Tetris, then they're violating our rights to the game."

In other words, go make your own damned game.

### *Related Wired Links:*
- - - - - - - - - - - - - - - - -
**AOL Asks Online Gamers to Ante Up**
17.Jun.97

- - - - - - - - - - - - - - - -



Send us feedback | Work at Wired Digital | Advertise with us
About Wired Digital | Our Privacy Policy

Copyright © 1994-99 Wired Digital Inc. All rights reserved.

INTERNET ARCHIVE
WayBackMachine BETA

http://www.abednarz.net/webfoot.html    Go    MAR

16 captures
6 Apr 03 - 8 Feb 07

2002

**Webfoot Technologies Response to the news that it settled out of court with Hasbro.**

I'm one of the owners of Webfoot Technologies, a company that was sued by Hasbro. For the past 6 months we've had to sit back quietly (advise of our attorneys) and keep quiet. I'd like to clear up some facts and offer some opinions.

```
1. Our games were made BEFORE Hasbro was in the software business.
2. Our games are not clones.
3. We did not admit to any copyright violation. This was not part of the settlement.
4. The settlement offer was too good for us to refuse.
5. We did not agree to any future restrictions on the types of games we may make.
```

Our games were made 2 years BEFORE Hasbro's retro games. That's right. Hasbro wasn't even in the software business when we made our games! It looks like some large publishers may have saw all us retro fans finding a market, and decided to join in after we had tested out the market. I really don't know... all I know is that Webfoot was making retro games long before Hasbro purchased Atari.

Webfoot has been making retro games since 1994, shortly after Atari announced it was abandoning retro. We made the games because we love these games, we grew up with them, and none of the big guys were making them at that time. It's specifically because the big companies had abandoned retro that we wanted to see more games made.

Our games are anything but direct clones or rip-offs. I invite anyone to check out our games and see just how close they are to the Atari properties. Our games are so incredibly different, we are puzzled as to why we were sued while makers of exact clones still continue to sell their cloned games in stores. Here are links to a couple of the games involved in the lawsuit:

http://www.webfootgames.com/catalog/3dgeo.htm
http://www.webfootgames.com/catalog/3dfrog.htm

If you just look at the screen-shots, you'll be puzzled as to why we were sued for copyright violation. The game play rules are different and massively expanded beyond any 20 year-old retro game. All the game art, levels, music, and sounds are original. Copyright laws do not protect basic ideas. They protect the unique expression of a work (the graphics, the program code, the sounds, the levels), but not the underlying game idea. Patent law would protect gameplay rules, but no patents are owned with respect to these games. If a patent had existed, it would have expired by now. But copyrights do not protect these ideas, and to this day we strongly believe no copyrights were violated in this case.

Also, the names of the games do not belong to the developers. The titles are registered trademarks of eGames and the other publishers. That's why the trademark issues did not effect Webfoot.

Our attorneys were baffled that we were being accused of copyright violation, since our games in most people's opinions who actually see them, clearly do not seem to infringe on any Hasbro copyrights (or 20 year old Atari properties).

In fact, through the settlement agreement Webfoot does not admit any copyright violation took place. We absolutely refused to sign such a settlement agreement because we firmly believe that our games do not infringe. In fact, at one point Webfoot and MVP Software had dropped out of settlement talks specifically over this matter. We were comfortable litigating this matter, all the way to trial if necessary. We also refused to sign anything that would limit our ability to make any kind of game in the future. Most of the settlement text is public information. I encourage everyone to look at the settlement text and you'll see that it really wasn't a "win" for anyone, but a painful compromise for all parties involved, as is the nature of settlements.

So why did we settle? Because we were offered with a settlement that was just too good to turn down. These games were almost 3 years old and were being removed from the stores with or without Hasbro's help. We were willing to fight for a matter of principle, but the last settlement offer was too good.

No one gets rich making retro games (I wish someone had warned Hasbro about this in 1997). You do it for the love of gaming. Some people like FPS, some people like RPG, and some of us like retro. It's really just a matter of taste.

I would ask that anyone posting opinions please take a look at the games before posting. It seems sometimes that corporations who are able to spend the most money spreading their propaganda are able to spread information that isn't factual. Please look at the games and look at the facts. Don't be fooled by expensive propaganda.

Ask yourself why the games that are exact clones are still being sold in stores today?

The answer may be that there is an intense turf-war going on between eGames and Hasbro over the drug-store market. It seems eGames has achieved a position as the sole distributor to many drug-store chains, including Rite-Aid and Walgreens. In fact, the CEO of eGames told me personally that the lawsuit was filed just days after a direct confrontation with Hasbro over the drug-store arena.

Had this been a stunning victory for Hasbro, then eGames would have been forced out of business, all the defendants would have admitted to copyright violation, and massive restrictions would have been placed on us all. None of these things happened. In fact, the lawsuit is not over. Andre LeMoth of Xtreme Games will continue to litigate this case until the end. We wish him luck and a little more, since we're donating to his legal defense fund (www.xgames3d.com).

I'd like to thank the development community for their incredible support. We were very surprised by the alliance created by this lawsuit! It certainly helped us get through a very difficult time knowing so many were offering their help and support. I wish all those great independent developers out there the best of luck, and for those of you who love retro gaming, let's hope it will always be our decision as to which products we wish to play.

Dana Dominiak, President
Webfoot Technologies, Inc.

INTERNET ARCHIVE
WayBackMachine BETA

http://lpf.ai.mit.edu/Copyright/look-and-feel.html    Go

114 captures
5 Dec 98 - 28 Feb 09

FEB   APR   JUN   Close
◄    1    ►
2006   2007   2008    Help

# Against User Interface Copyright

October 20, 1991
The League for Programming Freedom

In June 1990, Lotus won a copyright infringement suit against Paperback Software, a small company that implemented a spreadsheet that obeys the same keystroke commands used in Lotus 1-2-3. Paperback was not accused of copying code from 1-2-3--only of supporting compatible user commands. Such imitation was common practice until unexpected court decisions in recent years extended the scope of copyright law.

Within a week, Lotus went on to sue Borland over Quattro, a spreadsheet whose usual command language has only a few similarities to 1-2-3. Lotus claims that these similarities in keystroke sequences and/or the ability to customize the interface to emulate 1-2-3 are enough to infringe.

More ominously, Apple Computer has sued Microsoft and Hewlett Packard for implementing a window system whose displays partially resemble those of the Macintosh system. Subsequently Xerox sued Apple for implementing the Macintosh system, which derives some general concepts from the earlier Xerox Star system. These suits try to broaden the Lotus decision and establish copyright on a large class of user interfaces. The Xerox lawsuit was dismissed because of a technicality; but if it had succeeded, it would probably have created an even broader monopoly than the Apple lawsuit may.

And Ashton-Tate has sued Fox Software for implementing a database program that accepts the same programming language used in dBase. This particular lawsuit was dropped by Borland, which bought Ashton-Tate in 1991, but the possibility of copyrighted programming languages remains. Adobe claims that the Postscript language is copyrighted, though it has not sued those who reject this claim. Wolfram Research claims that the language of Mathematica is copyrighted and has threatened to sue the University of California. If a programming language becomes copyrighted, the impact on users who have spent years writing programs in the language would be devastating.

While this paper addresses primarily the issue of copyright on specific user interfaces, most of the arguments apply with added force to any broader monopoly.

## What Is a User Interface?

A user interface is what you have to learn to operate a machine; in other words, it is the language you use to communicate with the machine. The user interface of a typewriter is the layout of the keys. The user interface of a car includes a steering wheel for turning, pedals to speed up and slow down, a lever to signal turns, etc.

When the machine is a computer program, the interface includes that of the computer--its keyboard, screen and mouse--plus those aspects specific to the program. These typically include the commands, menus, programming languages, and the way data is presented on the screen.

A copyright on a user interface means a government-imposed monopoly on its use. In the example of the typewriter, this would mean that each manufacturer would be forced to arrange the keys in a different layout.

## The Purpose of Copyright

In the United States, the Constitution says that the purpose of copyright is to "promote the progress of science and the useful arts." Conspicuously absent is any hint of intention to enrich copyright holders to the detriment of the users of copyrighted works.

The Supreme Court made the reason for this absence explicit, stating in *Fox Film vs. Doyal* that "The sole interest of the United States and the primary object in conferring the [copyright] monopoly lie in the general benefits derived by the public from the labors of authors."

In other words, since copyright is a government-imposed monopoly, which interferes with the freedom of the public in a significant way, it is justified only if the benefit to the public exceeds the cost to the public.

The spirit of individual freedom must, if anything, incline us against monopoly. Following either the Supreme Court or the

principle of freedom, the fundamental question is: what value does user interface copyright offer the public--and what price would we have to pay for it?

# Reason #1: More Incentive Is Not Needed

The developers of the Star, the Macintosh system, 1-2-3 and dBase claim that without interface copyright there would be insufficient incentive to develop such products. This is disproved by their own actions.

Until 1986, user interface copyright was unheard of. The computer industry developed under a system where imitating a user interface was both standard practice and lawful. Under this system, today's plaintiffs made their decisions to develop their products. When faced with the choice in actuality, they decided that they did, indeed, have "enough incentive".

Even though competitors were free to imitate these interfaces, this did not prevent most of the original products from being successful and producing a large return on the investment. In fact, they were so successful that they became *de facto* standards. (The Xerox Star was a failure due to poor marketing even though nothing similar existed.)

Even if interface copyright would increase the existing incentive, additional improvements in user interfaces would not necessarily result. Once you suck a bottle dry, more suction won't get more out of it. The existing incentive is so great that it may well suffice to motivate everyone who has an idea worth developing. Extra incentive, at the public's expense, will only increase the price of these developments.

# Reason #2: "Look and Feel" Will Not Protect Small Companies

The proponents of user interface copyright claim that it would protect small companies from being wiped out by large competitors. Yet look around: today's interface copyright plaintiffs are large, established companies. User interface copyright is crushing when the interface is an effective standard. However, a small company is vulnerable when its product is little used, and its interface is little known. In this situation, user interface copyright won't help the small company much.

Imagine a small company with 10,000 customers: a large company may believe there is a potential market of a million users, not reached by the small company, for a similar product. The large company will try to use its marketing might to reach them before the small company can.

User interface copyright won't change this outcome. Forcing the large company to develop an incompatible interface will have little effect on the majority of potential customers--those who have not learned the other interface. They will buy from the large company anyway.

What's more, interface copyright will work against the small company if the large company's product becomes an effective standard. Then new customers will have an additional reason to prefer the large company. To survive, the small company will need to offer compatibility with this standard--but, due to user interface copyright, it will not be allowed to do so.

Instead of relying upon monopolistic measures, small companies are most successful when they rely on their own inherent advantages: agility, low overhead, and willingness to take risks.

# Reason #3: Diversity in Interfaces Is Not Desirable

The copyright system was designed to encourage diversity; its details work toward this end. Diversity is the primary goal when it comes to novels, songs, and the other traditional domains of copyright. Readers want to read novels they have not yet read.

But diversity is not the goal of interface design. Users of any kind of machinery want consistency in interfaces because this promotes ease of use. Thus, by standardizing symbols on automobile dashboards, we have made it possible for any licensed driver to operate any car without additional instruction. Incompatibility in interfaces is a price to be paid when worthwhile, not a benefit.

Significantly better interfaces may be hard to think of, but it is easy to invent interfaces which are merely different. Interface copyright will surely succeed in encouraging this sort of "interface development". The result will be gratuitous incompatibility.

# Reason #4: Meaningful Competition Is Reduced

Under the regime of interface copyright, there will be no compatible competition for established products. For a user to switch to a different brand will require retraining.

But users don't like to retrain, not even for a significant improvement. For example, the Dvorak keyboard layout, invented several decades ago, enables a typist to type faster and more accurately than is possible with the standard "QWERTY" layout. Nonetheless, few people use it. Even new typists don't learn Dvorak, because they want to learn the layout used on most typewriters.

Alternative products that require such an effort by the consumer are not effective competition. The monopoly on the established interface will yield in practice a monopoly on the functionality accessed by it. This will cause higher prices and less technological advancement--a windfall for lucky businesses, but bad for the public at large.

# Reason #5: Incompatibility Does Not Go Away

If there had been a 50-year interface copyright for the steering wheel, it would have expired not long ago. During the span of the copyright, we would have got cars steered with joysticks, cars steered with levers, and cars steered with pedals. Each car user would have had to choose a brand of car to learn to drive, and it would not be easy to switch.

The expiration of the copyright would have freed manufacturers to switch to the best of the known interfaces. But if Ford cars were steered with wheels and General Motors were steered with pedals, neither company could change interface without abandoning their old customers. It would take decades to converge on a single interface.

# Reason #6: Users Invest More Than Developers

The plaintiffs like to claim that user interfaces represent large investments on their part.

In fact, the effort spent designing the user interface of a computer program is usually small compared to the cost of developing the program itself. The people who make a large investment in the user interface are the users who train to use it. Users have spent much more time and money learning to use 1-2-3 than Lotus spent developing the entire program, let alone what Lotus spent develop the program's interface *per se*.

Thus, if investment justifies ownership, it is the users who should be the owners. The users should be allowed to decide--in the marketplace--who may use it. According to *Infoworld* (mid January 1989), computer users in general expect user interface copyright to be harmful.

# Reason #7: Discrimination Against Software Sharing

User interface copyright discriminates against freely redistributable software, such as freeware, shareware and public domain software.

Although it *may* be possible to license an interface for a proprietary program, if the owner is willing, these licenses require payment, usually per copy. There is no way to collect this payment for a freely redistributable program. The result will be a growing body of interfaces that are barred to non-proprietary software.

Authors of these programs donate to the public the right to share them, and sometimes also to study and change their workings. This is a public service, and one less common than innovation. It does not make sense to encourage innovation of one sort with means that bar donation of another sort.

# Reason #8: Copyright Will Be a Tool For Extortion

The scope of interface copyright is so vague and potentially wide that it will be difficult for any programmer to be sure of being safe from lawsuits. Most programs need an interface, and there is usually no way to design an interface except based on the ideas you have seen used elsewhere. Only a great genius would be likely to envision a usable interface without a deep resemblance to current practice. It follows that most programming projects will risk an interface infringement suit.

The spirit of "Millions for defense, but not a cent for tribute" is little honored in business today. Customers and investors often avoid companies that are targets of suits; an eventual victory may come years too late to prevent great loss or even bankruptcy. Therefore, when offered a choice between paying royalties and being sued, most businesses pay, even if they would probably win a suit.

Since this tendency is well known, companies often take advantage of it by filing or threatening suits they are unlikely to win. As long as any interface copyright exists, this form of extortion will broaden its effective scope.

# Reason #9: Useful Innovation Is Inhibited

Due to the evolutionary nature of interface development, interface copyright will actually retard progress.

Fully fleshed-out interfaces don't often arise as *tours de force* from the minds of isolated masters. They result from repeated implementations, by different groups, each learning from the results of previous attempts. For example, the Macintosh interface was based on ideas tried previously by Xerox and SRI, and before that by the Stanford Artificial Intelligence Laboratory. The Xerox Star also drew on the interface ideas that came from SRI and SAIL. 1-2-3 adapted the interface ideas of Visicalc and other spreadsheets. dBase drew on a program developed at the Jet Propulsion Laboratory.

This evolutionary process resembles the creation of folk art rather than the way symphonies, novels or films are made. The advances that we ought to encourage are most often small, localized changes to what someone else has done. If each interface has an owner, it will be difficult to implement such ideas. Even assuming the owner will license the interface that is to be improved, the inconvenience and expense would discourage all but the most determined.

Users often appreciate small, incremental changes that make programs easier or faster to use. This means changes that are upwards compatible, or affect only part of a well-known interface. Thus, on computer keyboards, we now have function keys, arrow keys, a delete key and a control key, which typewriters did not have. But the layout of the letters is unchanged.

However, such partial changes as this are not permitted by copyright law. If any significant portion of the new interface is the same as a copyrighted interface, the new interface is illegal.

## Reason #10: Interface Developers Don't Want Interface Copyright

At the 1989 ACM Conference on Computer-Human Interaction, Professor Samuelson of the Emory School of Law presented a "mock trial" with legal arguments for and against user interface copyright, and then asked the attendees--researchers and developers of user interfaces--to fill out a survey of their opinion on the subject.

The respondents overwhelmingly opposed all aspects of user interface copyright, by as much as 4 to 1 for some aspects. When they were asked whether user interface copyright would harm or help the field, on a scale from 1 (harm) to 5 (help), the average answer was 1.6.

The advocates of user interface copyright say that it would provide better security and income for user interface designers. However, the survey shows that these supposed beneficiaries would prefer to be let alone.

## Do You Really Want a User Interface Copyright?

For a business, "locking in" customers may be profitable for a time. But, as the vendors of proprietary operating systems have found out, this generates resentment and eventually drives customers to try to escape. In the long run, this leads to failure.

Therefore, by permitting user interface copyright, society encourages counterproductive thinking in its businesses. Not all businesses can resist this temptation; let us not tempt them.

## Conclusion

Monopolies on user interfaces do not serve the users and do not "promote the progress of science and the useful arts." User interfaces ought to be the common property of all, as they undisputedly were until a few years ago.

## What You Can Do

- Don't do business as usual with the plaintiffs, Xerox, Lotus, and Apple. Buy from their competitors instead; sell their stock; develop new software for other computer systems rather than theirs, and port existing applications away from their systems.

- Don't work for the "look and feel" plaintiffs or accept contracts from them.

- Join the League for Programming Freedom--a grass-roots organization of programmers and users opposing software patents and interface copyrights. (The League is not opposed to copyright on individual programs.) Annual dues are $42 for employed professionals, $10.50 for students, and $21 for others. We appreciate activists, but members who cannot contribute their time are also welcome.

  Phone us at (617) 243-4091, send Internet mail to league@prep.ai.mit.edu, or write to:

  ```
  League for Programming Freedom
  1 Kendall Square #143
  ```

```
P.O. Box 9171
Cambridge, MA 02139
```

- Give copies of this paper to your friends, colleagues and customers.

- In the United States, write to your representatives and to these Congressional subcommittees:

```
House Subcommittee on Intellectual Property
2137 Rayburn Bldg
Washington, DC 20515

Senate Subcommittee on Patents, Trademarks and Copyrights
United States Senate
Washington, DC 20510
```

- The European Community has adopted a directive whose most natural interpretation imposes copyright on all kinds of interfaces, even on programming languages. Since the other countries of Europe are considering joining the EC, they also are in danger of being covered by the directive.

  Other, benign interpretations of the directive are also possible, but they are unlikely to be chosen by judges unless the governments of the individual EC countries explicitly mandate them. Convincing the governments requires political pressure from the programmers and users of Europe.

  Lobbyists working on this issue say that most legislators are unfamiliar with computers and do not understand how harmful interface copyright could be. Thus, what programmers need to do is to educate their legislators.

  One idea is to start teaching your representative the basics of using 1-2-3. Once the representative sees how much work is involved in learning to use a command language, explain that you have only taught one tenth of the subject. This should drive the point home.

  Political effectiveness requires organization. Leagues for Programming Freedom now exist in Finland, Germany, the United Kingdom, the Netherlands, Norway, and Switzerland. (In the UK, the Edinburgh Computing and Social Responsibility organization also deals with this issue.) Ask the League in the US for the address of your nation's League--or for advice and assistance in forming one.

## References

- Mock trial See the May 1990 issue of the *Communications of the ACM*, for the full results.

Last modified: Fri Apr 29 10:58:11 1994 by Tom Epperly
*epperly@osnome.che.wisc.edu*

http://lpf.ai.mit.edu/Copyright/laf-fallacies.html

WayBackMachine

55 captures
5 Dec 96 - 12 Sep 97

DEC  FEB  AUG   Close
◄   8   ►
2006  2007  2008   Help

Go

Three Common Fallacies In the User Interface Copyright Debate

By Thomas M.S. Hemnes Foley Hoag & Eliot, Boston

The Computer Lawyer, Volume 7, Number 2, February 1990

*[The author gratefully acknowledges the assistance of Laurie Woog. This article is adapted from a presentation given by the author at the University of Southern California Law Center's Tenth Annual Computer Law Institute in Los Angeles, May 1989.]*

Both proponents and opponents of copyright protection for the "user interface" of computer software commonly assume the truth of the following three propositions: l) Section 102(b) of the Copyright Act is an exception to the general rule that copying is wrongful; 2) the difficulty and expense of creating an interface supports its copyrightability; and 3) the existence of multiple alternative interfaces implies that no one of them is an unprotected "idea." Each of these propositions is a fallacy.

**Fallacy #1: Section 102(b) of the Copyright Act is an exception to the general rule that copying is wrongful.**

It is easy to fall into the trap of thinking that copying is a bad thing--a sort of tort--that copyright is designed to deter and remedy. Nothing could be further from the truth. Copying is the rule, and not the exception, in our competitive society. Federal Express invents overnight delivery using a hub-and-spoke system, and is promptly imitated by UPS, Purolator, and even the United States Postal Service.[1] Christian Dior shows his new line of dresses in Paris, and copies of them appear within weeks on the racks of United States department stores.[2] Chanel expends energy and talent in creating a new fragrance, only to have imitations sold at a fraction of the price.[3] Stiffel no sooner designs a popular lamp, than Sears offers its customers a duplicate.[4] Chrysler Corporation designs and builds a phenomenally successful line of "minivans," only to be imitated by Ford, General Motors and the Japanese automakers. Short-order restaurants endeavor to make their french fries as much like McDonalds' as humanly possible. The copyists even advertise that their products are as close as possible to the originals.[5]

All of these forms of copying--and many more besides--are protected by federal and state law. The reason is that copying serves two fundamental purposes. First, it facilitates price competition. If others were not permitted to offer the same product or service, competition as to price would be confused and blunted by distinctions as to the goods or services offered. Where the competitor offers exactly the same thing, prices are driven down, and "efficiency" in the economic sense is maximized.

Second, copying transmits society's collective store of knowledge. We learn by imitation. Art students copy the works of the great masters. Auto manufacturers buy their competitors' products and disassemble them down to the last nut and bolt to learn improved techniques of design and construction Young lawyers learn to draft agreements by "marking up"---that is, copying language out of-- other agreements.

Without copying, it would be necessary for everyone to "reinvent the wheel" before marketing a product, writing a play, performing an experiment, producing a movie, preparing a contract or undertaking any other creative activity. This would be inefficient and undesirable. In computer parlance, working from scratch creates "bugs."[6] That is why lawyers work from forms and use "boilerplate": otherwise, they would be sure to repeat the mistakes of their forebears. It would be the unsuccessful manufacturer of a screwdriver that did not start with the assumption that his screwdrivers should look and feel just about like ones already on the market. If they did not, customers might not know how to use them, and the screwdrivers might not fit the screws they are supposed to be used with.

For these reasons, the law has jealously guarded the right to copy. As Learned Hand put it, a competitor may copy any product "slavishly down to the minutest detail."[7] In Justice Holmes' words, a competitor "has a *right*...to get whatever share they can in the popularity of [another company's] product by advertising that they are trying to make the same article, and think that they succeed."[8] One of the most forceful statements of the right to copy appears in the very recent Supreme Court decision in *Bonito Boats. Inc. v. Thunder Craft Boats, Inc.*: "imitation and refinement through imitation are both necessary to invention itself and the very lifeblood of a competitive economy."[9]

At issue in *Bonito Boats* was a Florida statute that made it unlawful to duplicate products using the "plug-molding" process. That process represents the most "slavish" copying imaginable. The competitor uses the originator's product to make a mold. and then uses the mold to make duplicates of the originator s product. In the Hand/Holmes tradition, the Court found that the Florida attempt to outlaw plug-molding "[erodes] the general rule of free competition."[10] The Court based its decision in part on the fact that (at least as to patentable subject matter) there is "a federal *right* to `copy and to use.'"[11] and that "'[t]hat which is published may be freely copied as a matter of federal *right*.'"[12]

*Bonito Boats* reflects an historical and deep-seated association between patents, copyrights and monopolies.[13] This association has been most pronounced in the field of patents. The beginning of modern patent law is usually traced to the "Statute of Monopolies," enacted in 1623. Far from being a grant of patent-like rights, the Statute of Monopolies was a Parliamentary effort to curb exclusive "patents" granted by the Crown. Similarly, the first true copyright statute, the Statute of Anne, enacted in 1710, was intended in part to limit the monopolistic rights of publishers.[14] Prior to that statute, the common law had recognized few rights in authors, and rights in published works were controlled by the unpopular "Stationers' Company's monopoly."[15]

The American colonists shared this hostility; indeed, the colonists had rebelled in part because of excessive monopolies granted by the Crown. There was a strong sentiment among the founding fathers that any power in the federal government to grant monopolies,[16] and in particular monopolies in the nature of patents and copyrights, would be intolerable.[17] The most notable proponent of this view was Thomas Jefferson, who considered exclusive statutory monopolies such as patents to be an "embarrassment."[18] Jefferson was himself, of course, a redoubtable inventor and thus might judge which legal system would best foster innovation.

Jefferson eventually came around to the view that "[m]onopolies may be allowed to persons for their own productions & their own inventions in the arts," but only for limited times.[19] Thence the current constitutional provision, which empowers Congress "[T]o promote the Progress of Science and the Useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."[20] It is noteworthy that, from both a constitutional and an historical standpoint, the concern about exclusive monopolization applies to patents and copyrights equally. Particularly in a climate in which copyright has been extended to such utilitarian creations as computer software, the Constitution therefore demands that the same policy considerations inform both copyright and patent adjudication. Otherwise, all of the limitations that the courts have strived to impose on patents to guard against unwarranted or exclusive monopolization might be lost through the medium of copyright protection.

The Patent Act implements the constitutional scheme--and protects the right to copy--in two ways. First, there is a high standard for patentability. If an invention is neither new nor nonobvious, it does not merit embarrassing Jefferson with yet another monopoly.[21] Second, the patent lasts only 17 years. At the end of that time, the invention (which must be fully disclosed in the patent itself) becomes available for all to copy and use.[22] The policy favoring copying is so strong that state statutes that purport to inhibit copying of an invention that does not meet the standard of patentability, or that purport to extend protection beyond the 17-year period, are preempted.[23]

Copyright has gone about the constitutional scheme in a different manner. Rather than pinning protection[24] of the right to copy on a high threshold for protection or on a short duration,[25] the courts and Congress have severely limited the sorts of things that might be copyrighted at all. The current statute exempts from its protection "any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." Section 102(b) was intended to codify the existing law regarding what might and might not be protected by copyright.[26] Thus, its compendious list must be understood and interpreted in light of historical and Constitutional limitations on excessive monopolies, which have produced the more general procompetitive federal policy described above. The list also must be understood as incorporating the myriad of specific exceptions to copyright protection that have arisen under that policy. It excludes from protection the design of wearing apparel;[27] business forms;[28] typefonts;[29] the titles of books;[30] the results of architectural designs;[31] the formats and designs used in maps such as boundary symbols and keys,[32] any object in which the copyrightable "expression" is not capable of existing independently of its utilitarian function,[33] and all the other items that courts have held are not subject to copyright protection.

In short, copyright is but one small part of a much larger body of federal and state law that serves a variety of important policies. One policy is the provision of incentive and reward for invention. Others are the avoidance of stifling monopolies and the preservation of competition. The right to copy is a central feature of this body of law. Thus, it is fair to say that section 102(b) of the Copyright Act is the rule, to which copyright protection is a limited exception.

**Fallacy #2: The difficulty and expense of creating an interface supports its copyrightability.**

The suggestion that a computer program's "user interface" should not be protected frequently runs up against the following line of reasoning: "The plaintiff expended substantial time and effort in creating an interface that is one of the main reasons for the success of the plaintiff's product. The defendant has imitated this interface at a fraction of the plaintiff's effort. If we do not protect the plaintiff's interface, there will be no incentive to create new and better interfaces, and society will consequently suffer. Therefore, the plaintiff's interface must be protected against imitation or unauthorized use by the defendant. The greater the protection, the greater the potential reward, and therefore the greater the innovation."

This line of reasoning rests on three fallacies, one philosophical, one legal, and one factual. The philosophical error is that the argument implicitly assumes that copyright is a matter of natural right: if you create something by your own labors, it is yours, and others may not use it without your permission.[34] This argument has a powerful emotional appeal that no plaintiff's lawyer has failed to exploit. It is, nevertheless, erroneous. As the Supreme Court observed in *Graham v. John Deere*, the "natural right" theory of intellectual property rights was rejected by Jefferson in favor of a "social and economic rationale"[35] under which protection is granted by society as an inducement to new creation. Thus, the protection is a means

to an end, not an end in itself.[36] When protection would interfere with the creation of new works, it defeats the purpose and should be denied.

The fallacy of law is that the difficulty or expense of creating a thing makes it a proper subject of copyright or patent protection. There is no such legal principle. The most potent counterexample is discovery of a law of nature. It probably can be fairly said that the effort, genius, and creativity required to discover new laws of nature is unrivaled in any other field of human endeavor. Einstein's is the most famous example, but others abound. In many cases, millions of dollars, years of effort, and unparalleled individual application are required to make the most modest advance in human scientific knowledge. Nevertheless, the law accords no protection whatsoever against the exploitation of that discovery by others.[37] The reason is that such discoveries are simply too important to the common good to allow their monopolization by any one owner.[38]

The fallacy of fact is twofold. It is, in the first place, an error to assume that financial incentives are necessary or even sufficiently to motivate creative effort. Scientists devote their lives to the discovery of new laws of nature, without the slightest hope that they will have exclusive rights in the discoveries they publish.[39] What motivates them? Curiosity, a desire to be remembered as the discoverer of something valuable and important, and professional recognition, are powerful motivators for many.

On the other hand, works that are motivated solely by a need to make money are frequently of inferior quality and value to the society at large. "Potboilers" are not as a rule the best examples of great literature. An occasional excellent book is written solely for the purpose of making money (U.S. Grant's *Memoirs* comes to mind), but it is probably outnumbered 100 to 1 by good books that were written in spite of the author's sure knowledge that they would not be best-sellers.

The second error of fact is the assumption that legal protection is necessary if one is to profit from an intellectual creation. Innovations in business methods such as the Federal Express method of express delivery, and designs such as Parisian fashions and the Chrysler minivans, are neither patentable nor copyrightable. Nevertheless, they can be enormously profitable.

It thus appears that business innovations and new non-patentable designs are in fact regularly created, from which the innovators do get rich, even though there is no legal protection for them whatsoever. One important explanation for this is lead time. The first person to bring a new product to the market will have the jump on competitors; this jump can be extended by brand identification and product improvement, while the competitors are playing catch- up.[40]

This is not to say that legal protection is never required for financial reward. One of the key determinants is whether the creator provides any benefit or value other than the intellectual creation itself. In the case of an original Parisian dress, the designer's trademark has a high value. In the case of the Chrysler minivan, the particular implementation of the idea seems to be as significant as the basic idea itself. In the case of Federal Express, the clever idea for overnight delivery must be matched by near-perfect execution for the service to be a success. On the other hand, once a book is published, the author has little else to offer a potential buyer; for this reason, unrestricted copying of a book effectively eliminates the author's possibility of meaningful recovery. The lead time an author of a book would have over copyists would probably be insufficient to return any substantial recovery to the author.[41] Similarly, an unlimited right to copy the programming code of an "off the shelf" computer program would probably deprive its owner of any meaningful recovery. But the title of a book (however clever) is not protected by copyright,[42] in part for fear of creating an overly broad impediment to the creation of future books, and in part because the title alone will not sell the book: it has to read well also, just as the computer program must work well if it is to sell, even if it borrows the "user interface" of another program.

For present purposes, a vital question, therefore, is whether the creators of user interfaces are more like Chrysler with its minivan, or more like an author with his or her book, in their need for legal protection in order to earn a living. The evidence seems strong that they fall more into the Chrysler category. Like the overall concept of a minivan, the interface of a computer program is but one determinant of commercial success. The program must have features that consumers want, it must be relatively free of bugs, and it must be backed up with a credible and effective support staff, to name but a few other determinants of the commercial success of a computer program. Unlike the copyist of a book, the copyist of a user interface must add new value to the underlying program in order to compete effectively with the creator of the interface.

The conclusion seems inevitable that the creators of computer program interfaces will be--and indeed have been--able to profit handsomely, without any legal protection for their programs' "look and feel" whatsoever, just as Chrysler has been able to profit handsomely without any protection against other auto manufacturers marketing products that "look and feel" much like the Chrysler minivans.

**Fallacy #3: The existence of multiple alternative interfaces implies that no one of them is an unprotected "idea."**

The Copyright Act's list of the things that may not be protected by copyright is commonly referred to as "the idea/expression dichotomy." After a lifetime of unparalleled contribution to the law of intellectual property, Learned Hand declared, "[N]o principle can be stated as to when an imitator has gone beyond the 'idea,' and has borrowed its 'expression.'"[43] Similarly, in his *Unhurried View of Copyright*, (which should be required reading for any court addressing a question of copyright protection) Benjamin Kaplan referred to the distinction between "idea" and "expression" as "abracadabra." However,

accepting this supposed "dichotomy," courts and commentators labor endlessly to define what constitutes the "idea," and what the "expression," of a screen display, or of another element of a program's "user interface."

One of the most pernicious "tests" currently in vogue for distinguishing ideas and expressions is the "Doctrine of Merger." Under this supposed "doctrine," one asks whether there is only one way of doing whatever it is that the plaintiff has done. If so, then the "idea" and its "expression" are said to have "merged," and copyright protection is denied. If not, the plaintiff wins. [44] The plaintiff almost always wins.[45] A slightly less overbroad variant on the theme is to say that protection will be denied if there are only a few ways of "expressing" the "idea."[46]

The problem with this bogus "doctrine" is that it begs the question. Is something that can be expressed in only one way necessarily an "idea" for purposes of copyright protection? Sometimes yes; sometimes no. "Its spring and the world is mudluscious/the goatfooted balloon man whistles far and wee." Could anyone honestly say that he or she had found another way to express what ee cummings expressed in this poetry? Does the fact that the idea can be expressed in only one way imply that cummings' poem may not be copyrighted? Of course not. On the other hand, each expression of something that can be expressed in an unlimited number of ways is not necessarily "expression" for purposes of copyright protection. There are undoubtedly a vast number of ways of designing a dress,[47] or a building,[48] or of structuring the input formats of a computer program,[49] or of preparing an accounting form,[50] or of writing a conditional sales agreement;[51] yet no one of them is entitled to copyright protection. The "Doctrine of Merger" is hopelessly inadequate to explain or elucidate these results.

The fact is that for most copyrighted works, it is impossible to speak intelligently about their "ideas" as distinguished from their "expressions."[52] Not only is it impossible to make this distinction for many works; it is not necessary to do so. The Copyright Act does not state the "dichotomy"; it is entirely judge-made. While it may be a useful distinction for some works, different intellectual tools are likely to be required for most other works if courts are to succeed in implementing the underlying copyright and competitive policies.

A different vocabulary helps: focusing on the question whether elements of an interface constitute methods of operation" or "function" is probably more illuminating than inquiring whether they constitute "ideas." Even more importantly, though, the courts should more directly confront the underlying policy questions. Some suggestions for improved copyright analysis are put forward below.

**The Debate Without the Fallacies**

For the reasons described above, the argument that improvements and creativity require financial incentives, the emotional "natural rights" argument, and the "idea/expression dichotomy," are not useful tools in the debate over copyright protection for the "user interface" of computer programs. But if these are not useful tools, what are?

One must begin with thoughtful consideration of the policies of the Copyright Act in particular, and the federal law of competition, monopolization and copying in general. There is nothing all that mysterious or difficult about these underlying policies or their application. One important policy, encountered in contexts as diverse as patent cases, trademark cases. and unfair competition cases, is the preservation of competition. Another is the encouragement of innovation. A third is reward to authors for their labors.

If there is a general rule that can be distilled from the patchwork of exceptions, judge-made rules. and constitutional policies incorporated into the Patent and Copyright Acts, it is this: legal protection should be granted only when it is necessary to provide financial reward to the innovator, and when it will not substantially diminish competition, innovation or other important goals. Thus, an author can make money from a published book only if there is protection against unauthorized copying. The same is true of programming code. On the other hand, legal protection has been denied whenever the innovator can obtain a substantial financial reward without it (e.g., innovative business methods) or when there is a substantial risk that protection would materially diminish competition and innovation (as would protection for laws of nature), interfere with the standard means of creating new products (as would protection for *scenes a faire* and legal forms),[53] or conflict with other social goals such as the readability of maps (as would protection for standard map symbols, formats and designs).[54]

Applying these general principles to the user interface example, one must first inquire whether the persons who create user interfaces will be prevented from obtaining a recovery for their labors without legal protection. On this question, the balance tips against legal protection in most cases. The reason is that the interface is invariably sold as part of a computer program, and few consumers buy a program solely for its interface. The program must also operate well, and it must be backed up with a reputable company that can provide updates and other services. For these reasons, the company that creates a program with a new interface can profit from its investment even if the interface is unprotected.[55] The company s profits might not be as large as they would be if the interface were protected--but that is a good thing, not a bad thing: monopoly profits are disfavored in a competitive economy.

The second inquiry is the effect of copyright protection on competition. It seems virtually certain that copyright protection for interfaces favors monopolization by the most dominant software companies The simple reason is that interfaces take time to learn. and once one learns a particular interface, one is reluctant to invest the additional effort required to learn another one.

As a result, protection for the interface of a successful program creates a powerful barrier to entry. By contrast, the success of one novel does not threaten competition among novelists because readers are not reluctant to read novels having new characters and plots.

The third policy consideration is the effect of protection on innovation. It is frequently argued that broad protection for software interfaces is valuable because it will compel programmers to invent completely new interfaces that will be better than the existing ones. Without the broad protection the industry will stagnate at a lower level than it might otherwise have attained.

The famous example of the "QWERTY" typewriter keyboard debunks this reasoning. As is widely known, the standard QWERTY keyboard was devised in the late 19th century as a means of preventing typewriter keys from jamming.[56] As a typewriter/human interface, the QWERTY keyboard is far from ideal. It loads most of the effort onto the left hand, its most frequently used keys are not in the center row, and it compels the typist to make awkward jumps and reaches between common letter combinations. QWERTY was never protected by patent, copyright or otherwise. It nevertheless became the standard, largely as the result of a nationwide string of typing schools established by the Remington typewriter company, and the commercial success of its typewriters.

Despite QWERTY's wide acceptance, radically different and much more efficient keyboards have been devised and patented--most notably the "Dvorak simplified keyboard."[57] This proves two points. First. the lack of any legal protection for a standard "user interface" such as QWERTY does not prevent innovators from creating new and improved keyboard designs Second, the existence of legal protection for an interface has little to do with the ability of its creator to earn a reward. QWERTY was never protected, but Remington and others made plenty of money selling typewriters. On the other hand, none of the patented or unpatented keyboard designs that followed QWERTY has achieved any commercial success.[58]

The "broad protection favors innovation" line of reasoning also makes a false assumption about the nature of development in the software industry. It assumes that important innovations in software interfaces are revolutionary and not evolutionary in nature. This is wrong. It is impossible to point to a single element of any current mass-market program's interface that did not have a progenitor in one or more prior programs. Software interfaces are means of communication between programs and their users. Like other languages, they evolve over time. But each language depends on an accumulation of conventions about meaning and syntax that were established by prior languages. Extending copyright protection to any particular language would prevent others from building on its conventions of meaning and syntax and retard its evolutionary development.[59]

For all these reasons, courts be should reluctant to extend copyright protection to any part of a computer program that potential buyers would prefer not to relearn before buying a competitive product.[60] Many user interface elements--command terms, syntax, organization of command terms in a menu, to name a few--fall into this category. By contrast, many other parts of computer programs--most notably the programming code itself--can be protected without serious harm to competition and innovation in the industry.

To draw the line between what will foster the creation of improved competitive programs and what will not, it will be necessary for courts to distinguish the needs of computer programmers and users from the needs of the authors and readers of more traditional literary works. It has been all too easy for courts to assume that the same copyright principles will protect the rights of authors and programmers alike. They will not. Software is radically different from books, poems and plays. The "interface" of a book is a natural language; the "interface" of software is an artificial language. A program is written in a different language from the language by which it "interfaces" with the user; a book is not. The purpose of a book is to be read and quoted; the purpose of software is to perform functions. A court that fails to accommodate these profound differences is bound to render decisions that are unhelpful at best, and disastrous at worst, for this important industry.

Knowledge of the industry must be combined with a thoughtful and candid balancing of the underlying policies. In balancing the policies, courts need not fear treading on ground already occupied by Congress. The Copyright Act's section 102(b), its definition of "pictorial, graphic and sculptural" works, and traditional exclusions such as that of *Baker v. Selden*[61] and *scenes a faire*, give courts extraordinary latitude to decide what should and should not be copyrightable, particularly in the case of works as utilitarian as computer programs. Courts should seize this opportunity to fashion principles that will advance the science and art of computer programming. Only in this way can the constitutional purpose of copyright protection be achieved.

NOTES

1. Such copying is entirely lawful. See *Holding Security checking Co. v. Lorraine Co.*, 160 F. 467 (2d Cir. 1908) ("the law is settled that a method of doing business can be rejected as not being within the statutory classes" protected by patent law).

2. This too is lawful. See *Russell v. Trimfit, Inc.*, 425 F. Supp. 91 (E.D. Pa. 1977). See also *Societe Comptoir de L'Industrie Cotonniere Etablissements Boussac v Alexander's Department Stores, Inc.*, 299 F.2d 33, 36 (2d Cir. 1962) ("'pirating' of the design is lawful and proper").

3. *Smith v. Chanel, Inc.*, 402 F.2d 562, 563 (9th Cir. 1968).

4. *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231(1964), reh'g denied, 376 U.S. 973 (1964) (holding Sears' manufacture and sale of lamps almost indentical to Stiffel's not actionable).

5. See e.g., *Saxlehner v. Wagner*, 216 U.S. 375, 380 (1910) (Holmes, J.); *Societe Comptoir*, note 2 supra, at 35; *Smith v. Chanel*, note 3 supra, at 563.

6. It has been suggested that the OS/2 operating system contains many programming shortfalls precisely because it was created using "clean room" techniques that prevented its designers from avoiding their predecessors' mistakes.

7. *Crescent Tool Co. v. Kilborn & Bishop Co.*, 247 F. 299, 301 (2nd Cir. 1917). Of course, the competitor may not pass off its good as those of another. Id.

8. *Saxlehner v. Wagner*, 216 U.S. 375, 380 (1910) (emphasis added). ("[T]he plaintiff has no patent for the [`bitter'] water, and the defendants have a right to reproduce it as nearly as they can"). Id. at 380.

9. 109 S.Ct. 971, 975 (1989).

10. Id. at 983.

11. Id. at 985 (referring to material covered by expired patents and by potentially patentable ideas that have been "fully exposed to the public") (emphasis added).

12. Id. at 984, quoting *Bailey v. Logan Square Typographers, Inc.*, 441 F.2d 47, 51 (7th Cir. 1971) (emphasis added). The Court quoted similar language from *Inwood Labs., Inc. v. Ives Labs.*, Inc., 456 U.S. 844, 863 (1982) ("'[r]eproduction of a functional attribute is legitimate competitive activity,'" when an unpatented item is in general circulation). *Bonito Boats* at 984.

13. Many patent attorneys chafe at the suggestion that a patent is a form of monopoly, preferring to think of it as a form of property instead. This effort to clothe the wolf in lamb's clothing as *Bonito Boats* shows, has not spread to the Supreme Court.

14. *Nutshell*, Intellectual Property 279.

15. B. Kaplan, *An Unhurried View of Copyright* 3 (1967) (hereinafter, *Unhurried View*).

16. James Madison felt government was instituted to protect the "use of their physical and mental faculties" A just government would "not permit citizens to suffer under arbitrary restrictions, exceptions, or monopolies." Madison on "Property," *National Gazette*, Mar. 29, 1792, cited in *Adrienne Koch, Jefferson and Madison, The Great Collaborators* 109 (Oxford University Press, N.Y. 1950). Jefferson felt similarly, writing in 1787 to Madison from Paris decrying the omission of certain concepts from the plans for a new government: "I will tell you now what I do not like. First, the omission of a Bill of Rights, providing ...for freedom of religion, freedom of the press,...restriction of monopolies.... '" Koch and William Peden, eds., *The Life and Selected Writings of Thomas Jefferson* 437 (Random House, N.Y. 1972).

17. Jefferson's contribution to the Constitutional provision governing patents and copyrights, Article 1, sec. 8, cl. 8, was reviewed by the Supreme Court in *Graham v. John Deere Co.*, 383 U.S. 1, 7-10 (1966).

18. Id. at 8-9.

19. Id., at 8, quoting Jefferson's August 1789 letter to Madison, as cited in *V Writings of Thomas Jefferson* 113 (Ford, ed. 1895).

20. U.S. Const., art. I, sec. 8, cl. 8. Some delegates to the Constitutional Convention suggested an even greater governmental role in fostering the arts and sciences. Pinckney suggested Congress should have the power to establish public institutions, rewards, and immunities for the promotion of agriculture, commerce, trades and manufacture." *3 Notes of James Madison of the Federal Convention*, August 18, 1789 at 325.

21. *Graham v. John Deere* at 9.

22. *Bonito Boats*, supra, at 978.

23. Id. at 978, discussing *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225 (1964); *Compco Corp. v. Day-Brite Lighting Inc.*, 376 U.S. 234 (1964).

24.  It is usually said that copyright does not require newness (novelty), and that the copyright standard of originality is minimal. See *Sheldon v. Metro Goldwyn Pictures Corp.*, 81 F.2d 49 (2d Cir.) cert. denied, 298 U.S. 669 (1936) (L. Hand, J.). However, protection has been denied in certain circumstances that look suspiciously like lack of novelty. See, e.g., *Donald v. Zack Meyer's T.V. Sales and Service*, 426 F.2d 1027 (5th Cir. 1979), cert. denied, 400 U.S. 992 (1971).

25.  The duration of copyright has always been lengthy; the current statute's lifetime of the author plus 50 years (or 75 years for a work made for hire) is essentially forever in the case of a computer program

26.  *H.R.Rep. (Judiciary Committee) on the Copyright Act of 1976*, No. 1476, 94th Cong., 2d Sess. 57, reprinted in *1976 U.S. Code Cong. and Admin. News* 5670.

27.  See note 2 supra.

28.  *Baker v. Selden*, 101 U.S. 99 (1880).

29.  *Eltra Corp. v. Ringer*, 579 F.2d 294. 298 (4th Cir 1978); see also *H.R.Rep. 1476*, note 26 supra, at 55 (a typeface is not a copyrightable "pictorial, graphic or sculptural work" within the meaning of the bill).

30.  *Becker v. Loew's, Inc.*, 133 F.2d 889, 891 (7th Cir 1943).

31.  *DaSilva Construction Corp. v. Herrald*, 213 F Supp. 184, 195-196 (M.D.Fla. 1962).

32.  *United States v. Hamilton*, 583 F.2d 448 (9th Cir. 1978); see also *Andrews v. Guenther*, 60 F.2d (S.D.N.Y. 1932).

33.  17 U.S.C. sec. 101 (definition of "pictorial, graphic and sculptural" works).

34.  The Berne Convention tends to assume that a copyright is the "natural right" of an author. One might argue whether U.S.'s decision to comport with the requirements of Berne undermines the historical and constitutional rejection of the "natural rights" theory of copyright.

35.  *Graham v. John Deere*, supra note 17, 383 U.S. at 8-9.

36.  Jefferson felt that rights in intellectual property should be limited to their usefulness to society. One did not "lose" by sharing an idea. "He who receives an idea from me, receives instruction himself without lessening mine, as he who lights his taper at mine. receives light without darkening mine." The free movement of ideas was essential to man's development; therefore, "[i]nventions...cannot, in nature. be a subject of property. Society may give an exclusive right to the profits arising from them, as an encouragement to men to pursue ideas which may produce utility," but within limits. Letter of Thomas Jefferson to Isaac McPherson, cited in Federico, "Operation, of the Patent Act of 1790," *18 J. of the Pat. Off. Soc'y* 237, 241-242 (April 1936).

37.  *Diamond v. Diehr*, 450 U.S. 175, 185-186 (1981) A new discovery of, e.g., a law of nature, can in principle be protected as a trade secret, but in fact few scientific discoveries are ever protected in this manner

38.  *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948) ("He who discovers a hitherto unknown phenomenon of nature has no claim to a monopoly of it which the law recognizes. If there is to be invention from such a discovery, it must come from the application of the law of nature to a new and useful end.").

39.  As noted above, a scientist could in principle protect a law of nature as a secret. Yet how many instances have there been of scientists choosing this route, rather than publishing and receiving credit for their discoveries?

40.  Stephen Breyer, "The Uneasy Case For Copyright: A Study of Copyright in Books, Photocopies, and Computer Programs," *84 Harv. L. Rev.* 281, 299-301 (Dec. 1970).

41.  See Breyer, note 40 supra, at 302 (referring to books with heavy fixed costs and lengthy pre-recoupment periods).

42.  *Becker v. Loew's, Inc.*, 133 F.2d 889, 891 (7th Cir. 1 943)

43.  *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960).

44.  This so-called doctrine is usually traced to the "jeweled bee pin" case, *Herbert Rosenthal v. Kalpakian*, 446 F.2d 738 (9th Cir. 1971). In that rather poorly- reasoned decision, the court denied protection for a pin that was in the shape of a bee, on the ground that there was only one way to make such a pin. The premise of this argument--that one can make a jeweled bee pin in only one way--seems so manifestly incorrect that one must question the validity of the court's holding.

45.  See *Whelan Associates v. Jaslow Dental Laboratory*, 797 F.2d 1222, 1236 n.28 (3rd Cir. 1986), cert. denied, 479 U.S. 1031 (1087). The merger doctrine's resultant overbroad protection has been noted and questioned. See, e.g., Comment, "Does Form Follow Function? The Idea/Expression Dichotomy in Copyright Protection of Computer Software," *35 U.C.L.A. L. Rev* 723, 741 (April 1988) (noting that courts frequently find that alternative methods of expression exist "regardless of their impractibility.")

46.  *Morrissey v. Procter & Gamble Co.*, 379 F.2d 675, 678 (1st Cir. 1967).

47.  *Jack Adelman, Inc. v. Sonners and Gordon, Inc.*, 112 F. Supp. 187, 190 (S.D.N.Y. 1934); *Russel v. Trimfit, Inc.*, 478 F. Supp. 91 (E.D. Pa. 1977)

48.  *DaSilva Construction Corp.*, note 31 supra.

49.  See *Synercom Technology, Inc. v. University Computing Co.*, 462 F. Supp. 1003 (N.D. Tex. 1978).

50.  *Baker v. Selden*, 101 U.S. 99 (1880).

51.  *Donald v. Zack Meyer's T.V. Sales and Service*, note 24 supra.

52.  Kaplan found further support for this conclusion in modem music and visual art. It is senseless to attempt to distinguish intelligently between the "idea" and expression" of a work of modern music that is lacking in melody, or of an abstract painting that is lacking in representation. Kaplan, *An Unhurried View*, 52-53.

53.  *Donald v. Zack Meyer's T.V. Sales and Service* notes 24 and 51, supra.

54.  *United States v. Hamilton*, 583 F.2d 448 (9th Cir. 1 978).

55.  To the extent that there are some independent persons or companies engaged solely in the creation of interface elements, they can protect their recovery through contract with the companies that market the combined program interface.

56.  For an excellent discussion of the history of the QWERTY keyboard, see C. Blanchard, *The Early Word Processors* (Research Rpt. 3, Educators: Project IV, Lake George, NY 1981). See, generally, A. Dvorak, N. Merrick, W. Dealey and G. Ford, *Typewriting Behavior* (American Book Co. 1936).

57.  See Dvorak, August and Dealey, "Simplified Keyboard Arrangment," U.S. Pat. Off. Ser. No 612738 (1932). The world's record for typing speed (about 240 words per minute) was set on a Dvorak keyboard.

58.  Dvorak first patented his keyboard, and then dedicated it to the public domain in hopes of encouraging its dissemination. Other inventors have retained their patent claims. See, e.g., references in Dvorak patent, cited in note 57 supra.

59.  Drawing on the seminal work of Professors Robert Merges and Richard Nelson, one can describe computer software in general, and interfaces in particular, as a "cumulative" technology like aircraft, as opposed to an iterative one like pharmaceuticals. Each improvement in a cumulative technology necessarily accumulates and builds upon prior improvements. For such technologies, Merges and Nelson have found strong evidence that intellectual property protection can retard rather than enhance industry development. See Merges and Nelson, "On the Complex Economics of Patent Scope" (manuscript, to be published in the *Columbia Law Review* in Spring 1990).

60.  This consideration may explain the Digital Communications court's otherwise inexplicable distinction between the rule that one chooses an item from a menu by depressing the keys that correspond to letters in the command term that are capitalized on the screen, and the choice of which letters to capitalize. The rule has to be learned and remembered, whereas the capitalized letters can be read off of the screen. *Digital Communications Assoc., Inc. v. Softklone Distributing Corp.*, 659 F. Supp. 449, 459 (N.D. Ga. 1 987).

61.  101 U.S. 99 (1880).

Last modified: Fri Apr 29 10:57:49 1994 by Tom Epperly
*epperly@osnome.che.wisc.edu*

---

**T··Mobile·**

Got a laptop, tablet, iPad®, iPod touch®, or portable

---

Culture : Lifestyle

# Tetris Pressures Game Act-Alikes

Judy DeMocker ✉ 12.04.98

The falling blocks have letters, not shapes, that fit together. Otherwise Mace Software's game, Alphatris, is a lot like Te thinks so, and it's taken action to have Tetris-like games removed from gaming sites.

But Gary Mace, president of Mace Software, isn't backing down.

"If I were taking the exact Tetris game and selling it, I would understand," Mace said. "But they're trying to say the con maneuvered -- and any game that operates similar to that -- is copyrighted. They're simply wrong."

Tetris may appear to be squelching online fun, but copyright enforcer Henk Rogers says it is trying to bring the best so its own business interests.

"I don't want to come off as the jerk behind The Tetris Company. We love Tetris just as much as anybody," said Rogers charged with development, licensing, and marketing for all Tetris products. The company has licensed over 50 million most popular computer game in history.

Blue Planet also controls licenses for the gaming software that runs on PCs, Nintendo Gameboys, and Playstations, and that would add Tetris to America Online.

Although Tetris hasn't filed any lawsuits, it has sent threatening letters to dozens of small developers, demanding that removed from sites. So far, most have capitulated. But developers are resentful, claiming the game should be freely ava

"It's really a cultural issue. Everybody wants a free and open information-sharing environment on the Web, but we're n the law," said Blair Bouchier, president of Base2 Software. "We're not going to fight them on this."

Base2 removed its game, Descending Blocks, from its site two months ago.

In the age of the Internet, enforcing intellectual-property rights is tough. Dozens of Tetris knockoffs still exist out there Java Tetris and 3-D Tetris. But the differences aren't enough to qualify them as new games, said game creator Alexey P

"If somebody makes the game that has nothing to do with falling shapes, we don't care about that," said Pajitnov. "But game, with some insignificant feature, and calls it Tetris or something close to Tetris, then they're violating our rights t In other words, go make your own damned game.

## *Related Wired Links:*

### AOL Asks Online Gamers to Ante Up
17.Jun.97

     submit     **0**          

Stumble
ShareThis

## Also on Wired.com

- [Gut Microbes May Foster Heart Disease](#)

- [Ion Torrent Launches Attack Ad Against Illumina's MiSeq](#)

- [Jetsetter's New iPad App Features 360-Degree, Immersive Photos](#)

- [YouTube Gets Into The Live Stream Business](#)

- [Commodore 64: Back and Better than Ever!](#)

Search Wired

GO

Top Stories   ·

Related Topics:

## Comments (0)

Want to start a new thread or reply to a post?

Login/Register and start talking!

There are no comments

Corrections | Sitemap | FAQ | Contact Us | Wired Staff | Advertising | Press Center | Subscription Services | Newsle

**Condé Nast Web Sites:**

**Webmonkey | Reddit | ArsTechnica | Details | Golf Digest | GQ | New Yorker**

Subscribe to a magazine   ·    Condé Nast web sites:   ·

Registration on or use of this site constitutes acceptance of our User Agreement and Privacy Policy (Revised 08/01,
reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Condé Na

Ad Choices

INTERNET ARCHIVE
WaybackMachine BETA

http://www.abednarz.net/tetris.html    Go

69 captures
13 Oct 02 - 23 Jul 11

JUN
◀
2006

## The Tetris Company's Activities..

Page last updated on the 27th October 2000

Top                    Story                    Copyright Laws      Look and Feel Cases   Related Links

**What's all this?** This page chronicles how The Tetris Company is trying to remove all freeware & shareware tetris-style games from distribution. They are claiming that they have copyright on "the look and feel" and "trade dress" of Tetris. We firmly believe that this is not legal and is an invalid claim... This page has been created to be a centralised resource to enable us to fight back. As I get more information relating to The Tetris Company's actions it will be added here.

**The story so far...** Many freeware and shareware tetris game developers and distributors have received threatening e-mails from "The Tetris Company" about their game being a copyright infringement.. I received one such e-mail in December 1997 in regards to my freeware tetris clone "Bedtris". I subsequently changed the name to "Bedter" and put in disclaimers that it was not an official "Tetris" game. On the 18th of February 1999 I received another e-mail that states that I am still infringing their "look and feel" copyright. Other author's tales:

- An anonymous author wrote in how he emailed and received *Replies* from Henk Rogers!
- Richey Fellner, author of "Bricks 2000" was also given similar treatment.
- Pierre Phaneuf tried to do everything correctly for his tetris game and The Tetris Company never responded.
- Hasbro had sued a number of retro games companies over alledged copyright violations. One of those companies it sued, Webfoot Technologies has settled out of court. One of the owners of Webfoot posted a comment on slashdot and they gave me permission to repost that comment here. View Comments.

I am outraged that they are targeting us like this, however (as a student) I do not want to just ignore them and hope that I don't end up in court. I believe we should fight back. If we work together we may be able to continue to develop and play our beloved tetris games..

**US Copyright Law** An idea or concept can not be copyrighted. The Tetris Company's code, graphics, music (etc) is copyrighted, but the actual concept can not be. They can copyright the written *rules* to the game, but they can't actually copyright the generic rules themselves. This means if I copied out a section of their HOW TO PLAY manual I would be infringing copyright. At www.bitlaw.com they say the following:

*"Ideas, procedures, principles, discoveries, and devices are all specifically excluded from copyright protection. As stated in the Copyright Act:*

*In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."*

Ideas can be *patented*, however The Tetris Company is not claiming a patent on Tetris. They are claiming a "look and feel" copyright. This article at www.computerlaw.com (a law firm specialising in software) goes in-depth as to how "look and feel" can be valid or invalid. It is also interesting to note that it state look and feel copyright can be additionally protected as a trade dress. The Tetris Company are also claiming they have trade dress copyright.

Another point that might be important is that a company needs to defend a trademark for it to be valid. Since tetris clones have been out since around since it was invented and we haven't heard from them until now, one could possibly argue that they have lost any valid trademarks they had.

We can view the records of the US Copyright Office via their webpage. We get to a telnet site where we can look up copyright records. The Tetris Company does not appear to be listed *anywhere* throughout these records.

I have requested from The Tetris Company to identify their specific copyright that we are infringeing. I have not heard from them at this stage...

**International Copyright Law** I live in Melbourne, Australia. How exactly does US Copyright law hold over me? Is there special International Copyright Laws that would apply in this case? The Australian Copyright Council have a Information Sheet about Computer Software & Copyright (pdf), which seems to be on-par with the US law. They also have a Information Sheet about Games & copyright (pdf), which re-iterates the point that the concept can't be copyrighted, but the expression of the concept (ie rules) can be.

**"Look and feel" cases**

In March 1995, the 1st US Circuit Court of Appeals overturned the 1993 decision of Judge Keeton of Boston in Lotus' lawsuit against Borland. Lotus sued Borland for copyright infringement on Lotus 1-2-3. In its decision the appeals court determined that Lotus' menu structures, incorporated into Borland's Quatro Pro spreadsheet, are "an uncopyrightable method of operation".

Apple Computer sued Microsoft and Hewlett Packard for implementing a window system whose displays partially resemble those of the Macintosh system. Subsequently Xerox sued Apple for implementing the Macintosh system, which derives some general concepts from the earlier Xerox Star system. These suits try to broaden the Lotus decision and establish copyright on a large class of user interfaces. The Xerox lawsuit was dismissed because of a technicality.

In 1982 Atari took NAP (North American Philips Consumer Electronics Corp) to court for their game "K. C. Munchkin" which they claimed was a copyright infringement to "PAC-MAN". The count found that Munchkin had captured the "total concept and feel" of Atari's game...

Apparently Capcom tried suing a company claiming the company's game "Fighter's History" had the look and feel of their "Street Fighter" games. Capcom ended up loosing.

*(If anyone can supply more case studys it would help!)*

**What can I do?** If you have been contacted by The Tetris Company with similar e-mails and believe they are invalid, please send me some mail (E-Mail) with details, providing links if possible to your web site. Put links back to this page and spread the word. If we can get enough attention people will either (a) put a stop to The Tetris Company; (b) let us know exactly why our games are infringements, and what we have to do to make them acceptable (removing them from distribution is **not** acceptable! If you have detailed knowledge on local or international copyright laws then please let me know.

 Put a link to this page on your homepage. You can use this graphic or create your own.

You can email Henk Rogers at The Tetris Company with your disgust on their illegal activities.

**News Articles Relating**

- A Wired newsreport from December 1998
- The Slashdot article I posted
- Article about it at PlanetCrap

**Interesting...**

- The first threatening e-mail I recieved
- The second threatening e-mail I recieved
- Here's a look and feel article from a computer specialist law firm.
- There is an interesting collection of articles here about look and feel issues.
- Three Common fallacies in the User Interface Copyright Debate.
- An Against User Interface Copyright paper published by the League for Programming Freedom.
- Here's a photo of Henk Rogers, the guy behind The Tetris Company.
- Henk Rogers' email address.

**Information**

- The US Copyright Office
- The Australian Copyright Council

- The Lotus vs Borland look and feel case report

**Tetris Links**

- The Tetris Company Evil!
- Vadim Gerasimov's page (who did the original IBM PC Tetris). Lots of Tetris stuff.
- A very interesting article about the history of Tetris
- A news article about the death of Tetris' co-creator
- WinFiles.com's tetris game listing
- Tetris Puzzle Games webpage