Donald A. Robinson
ROBINSON, WETTRE & MILLER LLC
One Newark Center, 19th Floor
Newark, NY  07102
973-690-5400
drobinson@rwmlegal.com

Mark A. Lemley
Joseph C. Gratz
Sonali D. Maitra
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA  94111
415-362-6666

*Attorneys for Defendant*
*Xio Interactive Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| TETRIS HOLDING, LLC and THE TETRIS COMPANY, LLC, <br><br> Plaintiffs, <br><br> -against- <br><br> XIO INTERACTIVE INC., <br><br> Defendant. | Civil Action No. 3:09-CV-6115 (FLW) (DEA) <br><br> Honorable Freda L. Wolfson, U.S.D.J. <br> Honorable Douglas E. Alpert, U.S.M.J. |

**DEFENDANT'S RESPONSIVE STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OF INFRINGEMENT**

Pursuant to Local Rule 56.1, Defendant Xio Interactive Inc. ("Xio") submits this Response and Counterstatement in Opposition to Plaintiffs' Motion for Summary Judgment of Infringement. Xio assumes that the section headings in Plaintiffs' Statement are not statements of fact to which a response is required.   To the extent not expressly accepted or undisputed, Xio disputes all of Plaintiffs' alleged undisputed facts.

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| 1.  *Tetris* is an electronic puzzle game. Declaration of Henk B. Rogers in Support of Plaintiffs' Motion for Summary Judgment, dated September 29, 2011 ("HR Decl") ¶ 3; Declaration of Dr. Ian Bogost in Support of Plaintiffs' Motion for Summary Judgment, dated September 29, 2011 ("Bogost Decl.") ¶ 9, Ex. 2 (Bogost Rpt. ¶ 10); Declaration of Johanna Schmitt, Esq. in Support of Plaintiffs' Motion for Summary Judgment, dated September 30, 2011 ("Schmitt Decl.") ¶ 3, Ex. 1 (Xio's Am. Obj. and Resps. to TH's First Set of RFAs ("Xio's RFA Resps."), Resp. to RFA Nos. 27-29 (admitting that *Mino* is an electronic game and a puzzle game)), ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 97:11-21 (Mr. Begy chose not to rebut Dr. Bogost's assertion that *Tetris* is a puzzle game)), ¶ 5, Ex. 3 (D. Golen Dep. (Jan. 28, 2011) 46:2-8 ("Q. And would you call the game that you might have played called Tetris on the Game Boy a puzzle game? A. . . . I think I would safely say that could be characterized as an electronic puzzle game.")). | Undisputed. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| 2.  *Tetris* was created in the mid-1980s by a Russian computer programmer named Alexey Pajitnov.  HR Decl. ¶ 3. | Undisputed. |
| 3.  *Tetris* is an abstract and fanciful electronic puzzle game.  HR Decl. ¶ 3; Bogost Decl. ¶ 24, Ex. 2 (Bogost Rpt. ¶ 23); Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 93:15-94:9 ("Q. So in your master's thesis, you refer to Tetris as an abstract video game; is that right?  A. That's correct. . . . Q. Is it fair to say that Tetris is the best known abstract video game?  A. I would say that is probably fair, yes.")). | Xio disputes this statement: "abstract and fanciful" are ambiguous and undefined terms and are legal conclusions—improper in a statement of undisputed facts. |
| 4.  *Tetris* includes no real-world referents. HR Decl. ¶ 3; Bogost Decl. ¶ 24, Ex. 2 (Bogost Rpt. ¶ 23); Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 94:4-6 ("Q. So is it your view that Tetris is not based on any real world fiction, like a karate game?  A. Yes.")). | Undisputed. |
| 5.  Tetris Holding, LLC is the owner of the intellectual property rights in and to *Tetris*, including the copyrights and trade dress rights at issue in this case.  HR Decl. ¶ 21. | Undisputed. |
| 6.  Alexey Pajitnov and Henk Rogers are owners of Tetris Holding, LLC.  HR Decl. ¶ 21. | Undisputed. |
| 7.  Henk Rogers is an experienced game developer and designer.  HR Decl. ¶ 1. | Undisputed. |
| 8.  Mr. Rogers is the Managing Director of The Tetris Company, LLC, and is a Member of Tetris Holding, LLC.  HR Decl. ¶ 1. | Undisputed. |
| 9.  The Tetris Company, LLC is the licensee of Tetris Holding, LLC's intellectual property rights in and to *Tetris*, which in turn sublicenses the rights to other parties. HR Decl. ¶ 22. | Undisputed. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| 10. Tetris Holding, LLC, its predecessors-in-interest and their licensees have released dozens of versions of *Tetris* since the mid-1980s.  HR Decl. ¶ 4. | Undisputed. |
| 11. *Tetris* has been released on multiple platforms, including, but not limited to consoles, handheld game systems, arcade machines, computer systems (including Mac and PC), mobile and smart phones, portable media systems, and personal digital assistant (PDA) devices.  HR Decl. ¶ 5. | Undisputed. |
| 12. Since 2008, *Tetris (iPhone)* has been distributed on Apple Inc.'s iTunes App Store ("the App Store"), which offers games and other "apps" for iPhone, iPod touch, and iPad devices.  HR Decl. ¶ 6. | Undisputed. |
| 13. *Tetris* has won many industry awards and has been repeatedly recognized by critics as one of the top videogames of all time.  HR Decl. ¶ 7; Bogost Decl. ¶ 18, Ex. 2 (Bogost Rpt. ¶¶ 10, 17 & nn.4, 9). | Undisputed. |
| 14. The *Guinness World Records 2009 Gamer's Edition* ranked *Tetris* #2 on the "Top 50 Console Games of All Time."  HR Decl. ¶ 7. | Undisputed. |
| 15. In 2009, *Tetris* was named one of the "All-Time Top 10 Paid Applications" on the Apple iTunes App Store.  HR Decl. ¶ 7. | Undisputed. |
| 16. In 2009, *Edge* (a videogame magazine) named *Tetris* #7 on its "100 Best Games to Play Today" list.  HR Decl. ¶ 7. | Undisputed. |
| 17. The Nielsen Company ranked *Tetris* as the #1 game on its "Top Ten Mobile Games of 2008."  HR Decl. ¶ 7. | Undisputed. |
| 18. *Tetris Party* was nominated for "Best WiiWare Game 2008" and "Best Puzzle Game 2008" by IGN (a leading game technology company and division of News | Undisputed. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| Corporation).  HR Decl. ¶ 7. | |
| 19. | In 2008, *Entertainment Weekly*'s 1000th issue named *Tetris* #1 on its list of the top 50 games from the last 25 years.  HR Decl. ¶ 7. | Undisputed. |
| 20. | In 2007, Alexey Pajitnov received the "First Penguin Award" for *Tetris* at the Game Developers Conference.  HR Decl. ¶ 7; Schmitt Decl. ¶ 6, Ex. 4 ("This year's [First Penguin Award] will go to Alexey Pajitnov, whose creation of the now-legendary game, *Tetris*, gave birth to the casual game industry and set the bar which every puzzle game to follow would aim to match."). | Undisputed. |
| 21. | In 2007, IGN.com ranked *Tetris* #2 in the "Top 100 Games of All Time."  HR Decl. ¶ 7. | Undisputed. |
| 22. | In 2007, *Tetris* made the Top 10 list in *Edge*'s July issue featuring the "100 Best Video Games."  HR Decl. ¶ 7. | Undisputed. |
| 23. | In 2006, *Electronic Gaming Monthly* ranked *Tetris* #4 in "The Greatest 200 Videogames of Their Time."  HR Decl. ¶ 7. | Undisputed. |
| 24. | In 2001, the 100th issue of *Game Informer* (a videogame magazine) listed *Tetris* in the #3 spot on its "Top 100 Games of All Time."  HR Decl. ¶ 7. | No dispute. |
| 25. | In 1997, *Tetris* was listed as the #1 game in *Electronic Gaming Monthly*'s 100th issue.  HR Decl. ¶ 7. | Undisputed. |
| 26. | In 1989, the Software Publisher's Association awarded *Tetris* four Excellence in Software Awards, which were then considered the "Oscars" for the industry.  HR Decl. ¶ 7. | Undisputed. |
| 27. | *Tetris* kicked off its 25th anniversary celebration in June 2009, which was | Undisputed. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| widely publicized.  HR Decl. ¶ 8. | |
| 28.    On June 2, 2009, *NPR* reported, "Tetris has come a long way from its square roots. It's played by millions, not just on computers and gaming consoles but now in Facebook and the iPhone as well."  HR Decl. ¶ 8, Ex. 1 ("At 25, 'Tetris' Drops Into Place As Gaming Icon"). | Undisputed. |
| 29.    On June 2, 2009, *Reuters* reported, "In an industry where titles cost millions of dollars to develop and flame out quickly, or lose their grip on popular culture, Tetris - - a game that challenges players to rotate and conjoin cascading square and rectangular block shapes - - continues to thrive."  HR Decl. ¶ 8, Ex. 1 ("At 25, age-defying game Tetris still eyeing growth"). | Undisputed. |
| 30.    On June 4, 2009, *Macworld* reported, "*Tetris*—possibly the most casual computer game of all time—celebrates its 25th anniversary on June 6th."  HR Decl. ¶ 8, Ex. 1 ("E3 Tetris maker looks back at 25 years of falling blocks"). | Undisputed. |
| 31.    On June 12, 2009, *CNN* reported, "More than 125 million Tetris products have been sold, and Guinness World Records' 2009 Gamers' Edition book ranked Tetris No. 2 on its list of the top 50 console games of all time . . ."  HR Decl. ¶ 8, Ex. 1 ("Tetris turns 25: Is it the next Olympic sport?"). | Undisputed. |
| 32.    In celebration of the 25th anniversary of *Tetris*, Google changed the logo that appears on its homepage (referred to as the "Google Doodle") to the following *Tetris*-themed logo: | Undisputed. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
|  HR Decl. ¶ 10. | |
| 33. Few other videogames have shown the longevity and universal appeal of *Tetris*. HR Decl. ¶ 11. *See* Bogost Decl. ¶ 11 (Bogost Rpt. ¶ 10). | To the extent this is ascertainable, no dispute. |
| 34. *Tetris* is one of the most popular videogames of all time.  HR Decl. ¶ 11; Bogost Decl. ¶¶ 9, 11, Ex. 2 (Bogost Rpt. ¶ 10).  *See also* Schmitt Decl. ¶ 5, Ex. 3 (D. Golen Dep. (Jan. 28, 2011) 223:13-16 (Ms. Golen testified that the first version of *Tetris* was popular at the time that it was released.)), ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 291:14-292:24 (Mr. Begy chose not to rebut Dr. Bogost's opinion that *Tetris* is the most popular and recognizable electronic puzzle game in the world or that *Tetris* is a "pop-cultural icon.")). | Undisputed. |
| 35. *Tetris* has sold over 200 million units worldwide.  HR Decl. ¶ 12. | Undisputed. |
| 36. There have been more than 3 billion games of *Tetris* played on the Facebook website.  HR Decl. ¶ 12. | Undisputed. |
| 37. There have been more than 500 million games of *Tetris* played on TetrisFriends.com.  HR Decl. ¶ 12. | Undisputed. |
| 38. Among the thousands of games sold on mobile devices in the United States, *Tetris* maintains one of the highest market shares.  HR Decl. ¶ 13. | Undisputed. |
| 39. *Tetris* is one of the most popular paid applications on Apple Inc.'s iTunes App Store.  HR Decl. ¶ 13. | Undisputed. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| 40. *Tetris* has become a pop-cultural icon, inspiring a variety of licensed *Tetris*-themed designs for, among other things, wall graphics, jewelry, cell phone straps, magnets, crazy bands, toys, t-shirts, and card and table-top games.  HR Decl. ¶ 14; Bogost Decl. ¶ 15, Ex. 2 (Bogost Rpt. ¶ 14). | Undisputed. |
| 41. For example, *Tetris* intellectual property rights were licensed to Hallmark™ to make a *Tetris*-themed greeting card, as pictured below.<br><br>HR Decl. ¶ 15; Bogost Decl. ¶ 15, Ex. 2 (Bogost Rpt. ¶ 14). | Undisputed. |
| 42. Also, TH's *Tetris* intellectual property rights were licensed for use in connection with scratch lottery tickets in New Jersey and Idaho, as pictured below.<br><br>HR Decl. ¶ 16; Bogost Decl. ¶ 15, Ex. 2 (Bogost Rpt. ¶ 14). | Undisputed. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| 43. *Tetris* has been referenced in creative works and performance art, and has appeared on popular TV shows, such as The Office and The Simpsons. HR Decl. ¶ 18; Bogost Decl. ¶ 16, Ex. 2 (Bogost Rpt. ¶ 15). | Undisputed. |
| 44. In order to protect its intellectual property, TH instituted a worldwide enforcement policy, and repeatedly has taken action against infringers. HR Decl. ¶ 20. | Xio does not dispute that Plaintiffs have sued many developers of games with the same rules as *Tetris*. Xio disputes that they are "infringers" and that this constitutes "a worldwide enforcement policy," as the term is ambiguous and ill-defined, and connotes intellectual property infringement—a legal conclusion inappropriate in a statement of undisputed facts. |
| 45. TH's enforcement efforts have resulted in the removal of hundreds of *Tetris* copycat games from the market. HR Decl. ¶ 20. | Xio does not dispute that as a result of Plaintiffs' efforts in suing many developers of games with the same rules as *Tetris*, those games have been removed from distribution as a result. Xio disputes that Plaintiffs have practiced "enforcement efforts" and that the removed games are "copycat," as these terms are ambiguous and ill-defined, and connote intellectual property infringement—a legal conclusion inappropriate in a statement of undisputed facts. |
| 46. Tetris Holding, LLC owns the copyrights in and to the audiovisual expression of | Xio does not dispute that Plaintiffs own copyrights to the |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| *Tetris* Version 0, *Tetris* Version 1, *Tetris* Version 2, *Tetris*, *Tetris NES Edition*, *Tetris Game Boy*, *Tetris Zone*, *Tetris (EA Multiplayer)*, *Tetris Evolution (Xbox360)*, *Tetris (iPhone)*, *Tetris Pop*, *Tetris DX*, and *Tetris Mission 2009* (collectively, the "*Tetris* Games"), and The Tetris Company, LLC is its licensee of these rights.  HR Decl. ¶ 23. | audiovisual expression of these games, but here clarifies that the protected audiovisual expression does not extend to rules, game mechanics, and other functional elements of the games. |
| 47.    Tetris Holding, LLC owns the United States copyright registrations to *Tetris* Version 0 (Reg. No. PAu 1-214-036 covering "[a]udio-visual work of an electronic video game"), *Tetris* Version 1 (Reg. No. PAu 1-214-035 covering "[a]udio-visual work of [an] electronic video game"), *Tetris* Version 2 (Reg. No. PA 412-169 covering "[a]udio-visual work of an electronic video game), *Tetris* (Reg. No. PA 412-170 covering, among other things, "[a]udio-visual work of an electronic video game"), *Tetris NES Edition* (Reg. No. PAu 1-284-318 covering, among other things, "[a]udio-visual display of [an] electronic video game"), *Tetris Game Boy* (Reg. No. PA 532-076 covering, among other things, "[a]udio-visual display of [an] electronic video game"), *Tetris Zone* (Reg. No. PA 1-381-624 covering, among other things, "[a]udio-visual work of [sic] video game to be made available for download on-line"), *Tetris (EA Multiplayer)* (Reg. No. PA 1-626-333 covering "audiovisual material"), *Tetris Evolution (Xbox360)* (Reg. No. PA 1-644-901 covering "audiovisual material"), *Tetris (iPhone)* (Reg. No. PA 1-616-754 covering "audiovisual material"), *Tetris Pop* (Reg. | Xio does not dispute that Plaintiffs own copyright registrations to these games, but here clarifies that the protected audiovisual expression does not extend to rules, game mechanics, and other functional elements of the games. |

9

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| No. PA0001652926 covering "audiovisual material"), and *Tetris DX* (Reg. No. PA 0001654203 covering "audiovisual material"). HR Decl. ¶ 24, Ex. 2 (attaching copyright registrations), ¶ 25, Ex. 3 (attaching assignment agreements assigning the copyright registrations for *Tetris* Version 0 (Reg. No. PAu 1-214-036), *Tetris* Version 1 (Reg. No. PAu 1-214-035), *Tetris* Version 2 (Reg. No. PA 412-169), and *Tetris* (Reg. No. PA 412-170) to Tetris Holding, LLC), ¶ 26, Ex. 4 (attaching assignment agreements assigning the copyright registrations for *Tetris NES Edition* (Reg. No. PAu 1-284-318) and *Tetris Game Boy* (Reg. No. PA 532-076) to Tetris Holding, LLC); Schmitt Decl. ¶ 3, Ex. 1 (Xio's RFA Resps., Resp. to RFA Nos. 1-24 (admitting that TH is the "owner of record of the copyright registration[s]")). | |
| 48. The United States copyright registrations were filed less than five years after the publication date for *Tetris* Version 0 (Reg. No. PAu 1-214-036), *Tetris* Version 1 (Reg. No. PAu 1-214-035), *Tetris* Version 2 (Reg. No. PA 412-169), *Tetris* (Reg. No. PA 412-170), *Tetris NES Edition* (Reg. No. PAu 1-284-318), *Tetris Game Boy* (Reg. No. PA 532-076), *Tetris Zone* (Reg. No. PA 1-381-624), *Tetris (EA Multiplayer)* (Reg. No. PA 1-626-333), *Tetris Evolution (Xbox360)* (Reg. No. PA 1-644-901), *Tetris (iPhone)* (Reg. No. PA 1-616-754), and *Tetris Pop* (Reg. No. PA0001652926). HR Decl. ¶ 24, Ex. 2 (attaching copyright registrations which indicate publication date and registration date), ¶ 27. | Undisputed. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| 49. | *Tetris Mission 2009* was created in Korea. HR Decl. ¶ 28. | Undisputed. |
| 50. | The following visual elements appear on the screen in some or all of the *Tetris* Games:<br>– Seven (7) Tetrimino playing pieces made up of four equally-sized squares joined at their sides;<br>– The visual delineation of individual blocks that comprise each Tetrimino piece and the display of their borders;<br>– The bright, distinct colors used for each of the Tetrimino pieces;<br>– A tall, rectangular playfield (or matrix) which is 10 blocks wide and 20 blocks tall;<br>– The appearance of the movement of the Tetriminos from the top of the playfield to its bottom;<br>– The way the Tetrimino pieces appear to move and rotate in the playfield;<br>– The small display near the playfield that shows the next playing piece;<br>– The particular starting orientation of the Tetriminos, which appears both at the top of the screen and as shown in the "next piece" display;<br>– The display of a "shadow" piece beneath the Tetriminos as they fall;<br>– The color change when the Tetriminos enter lock-down mode;<br>– When a horizontal line fills across the playfield with blocks, the line disappears, and the remaining pieces appear to consolidate downward;<br>– The appearance of individual blocks automatically filling in the playfield from the bottom to the top when the game is over; | Xio does not dispute that these visual elements are contained in some or all of the *Tetris* except to the extent that the statement implies that all 7 tetrominos did not pre-exist the invention of *Tetris.* They did. *See* Xio Interactive Inc.'s Memorandum of Points and Authorities in Support of its Motion for Summary Judgment of Non-Infringement 3-4, ECF No. 46-1. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
|    – The display of "garbage lines" with at least one missing block in random order;<br>   – The screen layout in multiplayer versions with the player's matrix appearing most prominently on the screen and the opponents' matrixes appearing smaller than the player's matrix and to the side of the player's matrix.<br><br>HR Decl. ¶ 31, Ex. 7 (attaching video clips of the *Tetris* Games); Bogost Decl. ¶ 21, Ex. 2 (Bogost Rpt. ¶ 20). | |
| 51.  The Tetris playing pieces include the five "free" or unique tetrominos: the "O," "I,", "T," "L" and "S" (pictured below):<br><br><br><br>HR Decl. ¶ 33; Bogost Decl. ¶ 21, Ex. 2 (Bogost Rpt. ¶ 20). | Xio does not dispute that *Tetris* contains these tetrominos, and a choice was made to include these tetrominos, but clarifies that these tetrominos pre-existed the invention of *Tetris*. They did. *See* Xio Interactive Inc.'s Memorandum of Points and Authorities in Support of its Motion for Summary Judgment of Non-Infringement 3-4, ECF No. 46-1. |
| 52.  In designing Tetris, the choice was made to include two additional tetromino pieces as playing pieces: the "J" and "Z" (pictured below), which are reflections of the "S" and "L" tetrominos:<br><br><br><br>HR Decl. ¶ 34; Bogost Decl. ¶ 21 (Bogost Rpt. ¶ 20). | Xio does not dispute that *Tetris* contains these tetrominos, and a choice was made to include these tetrominos, but clarifies that these tetrominos pre-existed the invention of *Tetris*. They did. *See* Xio Interactive Inc.'s Memorandum of Points and Authorities in Support of its Motion for Summary Judgment of Non-Infringement 3-4, ECF No. 46-1. |
| 53.  Xio's expert, Mr. Jason Begy, admitted that electronic puzzle videogames can be made without these visual elements. Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. | Xio does not generally dispute this statement, but clarifies that Mr. Begy responded to Plaintiffs' question that "an |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| (May 10, 2011) 258:13-17 (admitting that "an electronic puzzle game could function perfectly well without using the same combination of elements as Tetris"), 229:2-5 (when asked about the long vertical rectangular playing field in *Tetris*, Mr. Begy admitted that "a game designer can design the playing field of a puzzle video game in an almost unlimited number of ways"); 229:6-17 (admitting that "there are [probably] many successful puzzle video games that do not use the same or similar playing field as Tetris" and that it was possible that "an electronic puzzle game could function perfectly well without using a playing field that's the same or similar to Tetris"), 231:6-20 (admitting that a "game designer could design the playing pieces for a video game in an almost unlimited number of other ways," and that it is "not necessary to use tetrominos or [T]etriminos to design a puzzle video game"), 232:9-13 (agreeing that an "electronic puzzle game could function perfectly well without using [T]etriminos"), 232:19-22 (admitting that "a game designer could choose an almost unlimited number of colors for the playing pieces in a puzzle video game"), 234:4-11 (admitting it is possible that "an electronic puzzle game could function perfectly well without using brightly colored playing pieces"), 234:12-17 ("someone could design an electronic puzzle without the same color choices as in Tetris"), 238:10-13 (when asked about the appearance of the playing pieces in *Tetris* at the top of the playing field, Mr. Begy admitted that "a game designer could choose a number | electronic puzzle game could function perfectly well without using the same combination of elements as Tetris" as follows: "With respect to these 15 elements, I agree." Xio further clarifies that Mr. Begy did not testify or admit that "an electronic puzzle game could function perfectly well without using brightly colored playing pieces." Xio further clarifies that when Mr. Begy was asked whether "a game designer could choose a number of different places to make the playing pieces first appear," Mr. Begy responded: "I agree that they could and those would constitute different rules." Xio further clarifies that Mr. Begy testified in response to the question: "Do you agree that an electronic puzzle game could function perfectly well if the playing pieces did not first appear at the top of the playing field?" as follows: "Hypothetically, I suppose so." Xio further clarifies that Mr. Begy, in response to the question, "Do you agree that a game designer could choose a number of different ways to design the movements of the playing pieces in an electronic puzzle game?" Mr. Begy responded "Broadly in a puzzle game, yes." Xio further |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| of different places to make the playing pieces first appear"), 239:11-16 (agreeing that "an electronic puzzle game could function perfectly well if the playing pieces did not first appear at the top of the playing field"), 239:22-240:3 (when asked about the starting orientation of the playing pieces in *Tetris*, Mr. Begy thought it sounded "reasonable" that there were "512 different possible combinations of starting orientations for all seven [T]etriminos"), 241:18-25 (admitting that "a game designer could choose a number of different ways to design the movements of the playing pieces in an electronic puzzle game" and that "it's not essential in creating a puzzle game to use downward lateral rotating [movements] of the playing pieces"), 242:22-243:4 (admitting that "an electronic puzzle game could function perfectly well without using downward lateral and rotating movements of the playing pieces in the manner that Tetris does"), 245:5-10, 246:2-7 (admitting that "to make a puzzle video game, it's not essential to remove horizontal lines from the playing field," and "an electronic puzzle game could function perfectly well without removing horizontal lines from the playing field"), 246:12-24 (admitting that "a game designer could choose a number of different ways to configure the playing field after removing objects from it," and "it's not essential in designing a puzzle video game to configure the playing field the way Alexey Pajitnov chose to do in Tetris"), 250:3-10 (admitting that "many successful multiplayer video games that don't use garbage lines" and they | clarifies that when asked whether "a multiplayer electronic game could function perfect well using a different layout for multiplayer games," Mr. Begy responded: "Depending on the layout, it's possible."  *See* Schmitt Decl. ¶ 4, Ex. 2. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| "function perfectly well without using garbage lines"), 250:24-251:19 (when asked about the appearance of blocks automatically filling from the bottom to the top of the playfield when the game is over, Mr. Begy admitted that "there are many successful multiplayer video games that do not use this feature," and "a multiplayer electronic game could function perfectly well without using [it]"), 253:9-14 (admitting that "an electronic puzzle game could function perfectly well without using a ghost or shadow piece"), 253:15-25 (admitting that "you don't need to display the next piece in advance of its appearing in order to make a puzzle video game"), 254:18-25, 255:14-19 (when asked about the change of color of the playing pieces when they are in lock down mode, Mr. Begy admitted that "a game designer could choose not to include this change of color in an electronic puzzle game," and it would still "function perfectly well"), 255:20-256:6 (admitting that that "a game designer could choose among several options for the layout of the multiplayer electronic puzzle game")). | |
| 54. TH's expert, Dr. Bogost, opined that "[m]any other game developers—including [himself]—have used the same abstract idea and rules that are implemented in *Tetris*," but "these games look very different from *Tetris*." Bogost Decl. ¶ 32, Ex. 2 (Bogost Rpt. ¶¶ 31-35 (listing 35 examples of such games). | Xio does not dispute that Dr. Bogost so opined. |
| 55. According to Mr. Henk Rogers, "there are many electronic puzzle games that look very different from *Tetris* and that do not use the above-referenced visual expression | Xio does not dispute that Mr. Rogers so declared. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| of *Tetris*." HR Decl. ¶ 35. | |
| 56.   *Tetris* was released in the United States in the 1980s. HR Decl. ¶ 38. | Undisputed. |
| 57.   TH has been using the *Tetris* Trade Dress (i.e., visual elements that appear on the screen when the game commences and is played, including: brightly colored Tetrimino playing pieces that are formed four equally-sized, delineated squares, and a long, vertical, rectangular playing field that is higher than it is wide) in the United States for years. HR Decl. ¶¶ 39-40. | Xio does not dispute that this is Plaintiffs' claimed trade dress and that Plaintiffs have been using this claimed trade dress for years. Xio disputes this statement to the extent that it implies that the 7 tetrominos used in *Tetris* did not pre-exist the invention of *Tetris*. They did. *See* Xio Interactive Inc.'s Memorandum of Points and Authorities in Support of its Motion for Summary Judgment of Non-Infringement 3-4, ECF No. 46-1. |
| 58.   The *Tetris* Trade Dress has had an overall consistent look in the United States. HR Decl. ¶ 40. | Xio disputes this to the extent it is a legal conclusion inappropriate in a statement of undisputed fact. |
| 59.   Aside from knock-off games that TH has repeatedly policed, no other electronic puzzle game in the United States incorporates the *Tetris* Trade Dress. HR Decl. ¶ 41; Bogost Decl. ¶ 44, Ex. 2 (Bogost Report ¶ 43). | Xio disputes that "knock-off games" have been "policed" as these terms are ambiguous and ill-defined, and connote intellectual property infringement—a legal conclusion inappropriate in a statement of undisputed facts. |
| 60.   TH hired Dr. Gerald Ford, who designed and caused to be conducted a survey to address the issue of secondary meaning or acquired distinctiveness with respect to the *Tetris* Trade Dress. Declaration of Dr. Gerald L. Ford in Support of Plaintiffs' Motion for Summary Judgment, dated August 22, 2011 ("Ford Decl.") ¶ 2, Ex. 1 (Ford Rpt. ¶ 2). | Undisputed. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| 61. Dr. Ford's survey showed that "61.11% of the relevant universe associates the TETRIS trade dress with an electronic game emanating from the named sole source TETRIS or a sole yet anonymous source."  Ford Decl. ¶ 11, Ex. 1 (Ford Rpt. ¶ 6). | Xio does not dispute that Dr. Ford's survey so states. |
| 62. Dr. Ford opined that his survey "supports a finding of secondary meaning or acquired distinctiveness for the TETRIS trade dress for an electronic game."  Ford Decl. ¶ 12, Ex. 1 (Ford Rpt. ¶ 7). | Xio does not dispute that Dr. Ford so opined. |
| 63. Xio put forth no expert witness to rebut Dr. Ford's survey or conclusions.  Schmitt Decl. ¶ 2. | Undisputed. |
| 64. TH hired Dr. Deborah Jay, who designed, directed and supervised the administration of a survey to determine whether people in the relevant universe "regard TETRIS as a brand name or a generic name." Declaration of Dr. E. Deborah Jay in Support of Plaintiffs' Motion for Summary Judgment, dated August 11, 2011 ("Jay Decl.") ¶¶ 4-5, Ex. 1 (Jay Rpt. at pp. 2, 6). | Undisputed. |
| 65. Dr. Jay's survey shows that 82% of the survey respondents thought TETRIS was a brand name. Jay Decl. ¶ 17, Ex. 1 (Jay Rpt. at pp. 2, 13). | Xio does not dispute that Dr. Jay's survey so states. |
| 66. Dr. Jay opined that her survey supports a finding that "TETRIS" is a brand name and not a generic or common name.  Jay Decl. ¶ 23, Ex. 1 (Jay Rpt. At pp. 2, 13, 17). | Xio does not dispute that Dr. Jay so opined. |
| 67. Xio put forth no expert witness to rebut Dr. Jay's survey or conclusions.  Schmitt Decl. ¶ 2. | Undisputed. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| 68. TH's expert, Dr. Bogost, opined that "Tetris" is not a genre or category of games.  Bogost Decl. ¶¶ 9, 27-31, Ex. 2 (Bogost Rpt. ¶ 30). | Xio does not dispute that Dr. Bogost so opined. |
| 69. Xio's expert, Mr. Begy, made no rebuttal to Dr. Bogost's opinion that "Tetris" is not a genre of games.  Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 293:5-8 ("Q. And at page 24, paragraph 29 of Dr. Bogost's report, he said that 'Tetris is not a genre.'  And you chose not to rebut that; correct?  A. Correct."). | Undisputed. |
| 70. Copies of games incorporating the *Tetris* Trade Dress have been widely distributed throughout the United States, including more than 55 million paid copies on mobile phones.  HR Decl. ¶ 42. | Xio does not dispute that copies of games incorporating Plaintiffs' claimed trade dress have been widely distributed throughout the United States, including more than 55 million paid copies on mobile phones. |
| 71. Websites featuring games that incorporate the *Tetris* Trade Dress, such as TetrisFriends.com and FreeTetris.org, have received over 100 million visits by users in the United States.  HR Decl. ¶ 43. | Xio does not dispute that websites featuring games that incorporate Plaintiffs' claimed trade dress, such as TetrisFriends.com and FreeTetris.org, have received over 100 million visits by users in the United States. |
| 72. Advertisements featuring the *Tetris* Trade Dress have widely appeared in the United States in a variety of ways, and press reports about the *Tetris* Games have pictured the *Tetris* Trade Dress.  HR Decl. ¶ 44; Schmitt Decl. ¶ 72, Ex. 70 (*NY Times* article featuring the trade dress discussing the fame and success of the *Tetris* brand), ¶ 73, Ex. 71 (article featuring the trade dress discussing that *Tetris* is the best-selling mobile game of all time), ¶ 36, Ex. 34 (same). | Xio does not dispute that advertisements featuring Plaintiffs' claimed trade dress have widely appeared in the United States in a variety of ways, and press reports about the *Tetris* Games have pictured Plaintiffs' claimed trade dress. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| 73. For example, the *Tetris* Trade Dress was featured in advertisements for online versions of *Tetris* that have appeared extensively on Facebook and Google. Examples of these advertisements are pictured below.<br><br><br><br>HR Decl. ¶ 45. | Xio does not dispute that Plaintiffs' claimed trade dress was so featured. |
| 74. In addition, the *Tetris* Trade Dress was used on billboards and other advertisements for the version of *Tetris* available for Blackberry™ mobile devices, as pictured below.  These advertisements were displayed at JFK Airport and other transportation hubs in New York City.<br><br> | Xio does not dispute that Plaintiffs' claimed trade dress was so used. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| <br>HR Decl. ¶ 46. | |
| 75. Also, the *Tetris* Trade Dress was used in advertising for the *Tetris*-themed New Jersey scratch lottery ticket, as pictured below.<br><br>HR Decl. ¶ 47. | Xio does not dispute that Plaintiffs' claimed trade dress was so used. |
| 76. Dr. Bogost opines that "the *Tetris* Trade Dress is neither related to the game's function or operation, nor is it essential to the game's use or purpose." Bogost Decl. ¶ 45, Ex. 2 (Bogost Rpt. ¶ 44). | Xio does not dispute that Dr. Bogost so opines. |
| 77. Dr. Bogost concludes that, "while having playing pieces and a playing field may be necessary to create a certain type of game generally, the shape, form, and appearance of those playing pieces and playing field need not be the same as the *Tetris* Trade Dress." Bogost Decl. ¶ 45, Ex. 2 (Bogost Rpt. ¶ 44). | Xio does not dispute that Dr. Bogost so concludes. |
| 78. Dr. Bogost stated that the particular pieces and playfield in the *Tetris* Trade Dress were "expressive choices that make TH's Tetris games look a particular way," but | Xio does not dispute that Dr. Bogost so stated. |

20

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| they are "not necessary to make a high-quality electronic puzzle game that is comparable to *Tetris*."  Bogost Decl. ¶ 45, Ex. 2 (Bogost Rpt. ¶ 44). | |
| 79. Henk Rogers states that "the *Tetris* Trade Dress is neither related to the electronic puzzle game's function or operation, nor is it essential to the electronic puzzle game's use or purpose."  HR Decl. ¶ 48. | Xio does not dispute that Henk Rogers so states. |
| 80. Henk Rogers states that "the particular pieces and playfield in the *Tetris* Trade Dress were creative choices that make TH's *Tetris* games look distinctive, and they are not essential to make a high-quality electronic puzzle game that is comparable to *Tetris*."  HR Decl. ¶ 48. | Xio does not dispute that Henk Rogers so states. |
| 81. Xio's expert, Mr. Jason Begy, testified that "an electronic puzzle game could function perfectly well without using the same combination of elements as *Tetris*." Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 258:13-17). | See Response No. 53 above. |
| 82. Mr. Begy testified that it is "possible" to design a puzzle game "that does not have a long vertical rectangular playing field or matrix which is higher than it is wide," "without seven geometric playing pieces formed by four equally-sized blocks joined at the sides," without "brightly colored" playing pieces, and without delineating the individual blocks of the playing pieces. Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 125:4-23). | See Response No. 53 above. |
| 83. Mr. Begy testified that "a game designer can design the playing field of a puzzle video game in an almost unlimited number of ways."  Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 229:2-5). | See Response No. 53 above. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| 84. Mr. Begy testified that "there are [probably] many successful puzzle video games that do not use the same or similar playing field as *Tetris*" and that it is possible that "an electronic puzzle game could function perfectly well without using a playing field that's the same or similar to *Tetris*." Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 229:6-17). | See Response No. 53 above. |
| 85. Mr. Begy testified that a "game designer could design the playing pieces for a puzzle video game in an almost unlimited number of other ways," and that it is "not necessary to use tetrominos or [T]etriminos to design a puzzle video game." Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 231:6-20). | See Response No. 53 above. |
| 86. Mr. Begy testified that an "electronic puzzle game could function perfectly well without using [T]etriminos." Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 232:9-13). | See Response No. 53 above. |
| 87. Mr. Begy testified that "a game designer could choose an almost unlimited number of colors for the playing pieces in a puzzle video game," and that it is possible that an "electronic puzzle game could function perfectly well without using brightly colored playing pieces." Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 232:19-22, 234:4-11). | See Response No. 53 above. |
| 88. Mr. Begy testified that "someone could design an electronic puzzle without the same color choices as in Tetris." Schmitt Decl. ¶ 4, Ex.2 (J. Begy Dep. (May 10, 2011) 234:12-17). | See Response No. 53 above. |
| 89. Dr. Bogost opined that "using the *Tetris* Trade Dress does not affect the time or cost associated with making a new | Xio does not dispute that Dr. Bogost so opined. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| | electronic game."  Bogost Decl. ¶ 47, Ex. 2 (Bogost Rpt. ¶ 46). | |
| 90. | Dr. Bogost stated "programming or designing a game that does not use the *Tetris* Trade Dress would not necessarily take more time or cost more to make." Bogost Decl. ¶47, Ex. 2 (Bogost Rpt. ¶ 46). | Xio does not dispute that Dr. Bogost so stated. |
| 91. | Dr. Bogost opined that "competing products, not using the *Tetris* Trade Dress, could be implemented in less time and for a lower cost than is needed to make a game with the *Tetris* Trade Dress." Bogost Decl. ¶ 47, Ex. 2 (Bogost Rpt. ¶ 46). | Xio does not dispute that Dr. Bogost so opined. |
| 92. | Xio's expert, Mr. Jason Begy, made no rebuttal to Dr. Bogost's opinion that the *Tetris* Trade Dress would not increase the time or cost of production of a videogame. Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 293:16-21 ("Q. And on page 40, paragraph 46 of Dr. Bogost's report, he said that 'Tetris's trade dress does not affect the time or cost associated with making a new electronic game.'  And you chose not to rebut that; correct?  A. Correct.")). | Undisputed. |
| 93. | Mr. Rogers states that the "*Tetris* Trade Dress does not affect the cost or development time associated with electronic puzzle games," and "programming or designing a game without the *Tetris* Trade Dress would not necessarily take more time or cost more to make."  HR Decl. ¶ 49. | Xio does not dispute that Mr. Rogers so states. |
| 94. | Dr. Bogost explained that the *Tetris* Trade Dress is "not necessary to make a high-quality product" and provides numerous examples of "highly-polished and | Xio does not dispute that Dr. Bogost so stated. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| successful titles have been created without copying the *Tetris* Trade Dress." Bogost Decl. ¶ 48, Ex. 2 (Bogost Rpt. ¶ 47). | |
| 95. Dr. Bogost opines that the *Tetris* Trade Dress "does not offer a competitive advantage" and it is "not necessary . . . to create a comparable and competitive product in the marketplace." Bogost Decl. ¶46, Ex. 2 (Bogost Rpt. ¶ 45). | Xio does not dispute that Dr. Bogost so opined. |
| 96. There are many electronic puzzle games that are comparable to and compete with TH's *Tetris* games across all platforms (including the iPhone), and that do not incorporate the Tetris *Trade* Dress. HR Decl. ¶ 50; Bogost Decl. ¶¶ 32-38, Ex. 2 (Bogost Rpt. ¶¶ 31-37 (also listing examples of such games)). | Xio does not dispute that there are other games that compete with Plaintiffs' games across all platforms (including the iPhone), and that do not incorporate Plaintiffs' claimed trade dress. Xio disputes that these games are "comparable to" *Tetris* in that they do not include the same rules, mechanics, and functional elements of *Tetris*. |
| 97. As of September 25, 2011, there were 18,341 electronic puzzle games offered on Apple Inc.'s iTunes App Store. HR Decl. ¶ 51, Ex. 8 (printout of paid electronic puzzle games offered on the App Store as of September 25, 2011) ¶ 51, Ex. 9 (printout of free electronic puzzle games offered on the App Store as of September 25, 2011). | Undisputed. |
| 98. Xio's expert, Mr. Begy, stated that he was not surprised when told that there are thousands of electronic puzzle games offered on the App Store. Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 113:6-10, 113:16-21) ("Q. Okay. So here it indicates that under paid apps that there are 9,365 currently available as of last night paid applications under the puzzle | Undisputed. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| game category.  Does that surprise you?  A. Not particularly…  Q. Okay.  Then on the third page in of [sic] the exhibit it lists 6,244 unpaid puzzle game apps currently available as of last night on the iPhone platform.  Do you see that?  A. I do.  Q. Does that surprise you?  A. No.")). | |
| 99.  Dr. Bogost opines that "[r]ather than stifling competitive advantage, making a new game look a different way would actually increase its relative appeal by allowing it to carve out a new portion of the design space of puzzle games." Bogost Decl. ¶ 46, Ex. 2 (Bogost Rpt. ¶ 45). | Xio does not dispute that Dr. Bogost so opines. |
| 100.  There are no utility patents that cover the *Tetris* Trade Dress.  HR Decl. ¶ 52. | Xio does not dispute that Plaintiffs own no patent to *Tetris*, but clarifies that a number of elements of *Tetris* were once patentable. |
| 101.  Advertising for TH's *Tetris* games does not tout the utilitarian advantages of the *Tetris* Trade Dress.  HR Decl. ¶ 53. | Xio disputes this fact to the extent that the advertising touts Plaintiffs' claimed trade dress at all, as it is utilitarian and functional in nature. |
| 102.  In October 2008, Desiree Golen decided to start a company (which would later be called Xio) with her then-boyfriend, Michael Carter. Schmitt Decl. ¶ 7, Ex. 5 (M. Carter's 30(b)(6) Dep. (Jan. 31, 2011) 76:10-20 ("Q. Isn't it true that Desiree Golen came up with the idea of starting a company to create a multiplayer iPhone game?  A. I believe that to be the case.  I think Desiree came up with the idea to start that company to build a multiplayer game.  Q. And didn't she come up with that idea in October of 2008?  I don't know exactly when she came up with that | Undisputed. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| idea, but I think it could have been around that time.")), ¶ 5, Ex. 3 (D. Golen Dep. (Jan. 28, 2011) 29:22-30:14, 78:21-79:2 (testifying she and Michael Carter were "romantically involved"), ¶ 10, Ex. 8 (XIO-DG-0000927) (Ms. Golen testified that she sent an email to her father on October 6, 2008 explaining that she was "trying to get a company started to make a multiplayer game.")), ¶ 8, Ex. 6 (XIO-0000093-94) (Xio's certificate of incorporation, naming Michael Carter as director and Desiree Golen as director and incorporator). | |
| 103. Desire Golen and Michael Carter graduated from Pomona College in 2008 and 2007, respectively.  Schmitt Decl. ¶ 5, Ex. 3 (D. Golen Dep. (Jan. 28, 2011) 27:10-12 (Ms. Golen testified that she graduated from Pomona College in 2008)), ¶ 9, Ex. 7 (M. Carter Dep. (Dec. 13, 2011) 15:8-11, 16:2-4 (Mr. Carter testified that he graduated from Pomona College in 2007)). | Undisputed. |
| 104. Xio is a for-profit New Jersey corporation and a commercial enterprise.  Schmitt Decl. ¶ 7, Ex. 5 (M. Carter 30(b)(6) Dep. (Jan. 31, 2011) 61:16-19, 161:4-22, Ex. 53 at pp. 21-23) (Mr. Carter testified that Xio was formed "for the purpose of building iPhone games and distributing any revenue from those iPhone games in an equitable manner" and testified that he and Ms. Golen "hoped, of course, to make revenue.")), ¶ 8, Ex. 6 (XIO-0000093-94) (Xio's certificate of incorporation, titled "CERTIFICATE OF INC, (PROFIT)"). | Undisputed. |
| 105. Ms. Golen stated in an e-mail to her investment banker father, dated October 6, | Xio does not dispute that Ms.Golen made such |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| 2008, that she was "trying to get a company started to make a MultiPlayer game similar to Tetris for the iPhone"; that some iPhone games "made by private developers have made 250K each in 2 months!"; TH's *Tetris* iPhone game "sells at ~ 10.00 per game and is bringing in money"; and that her planned game would "absolutely succeed" because "The concept is popular – everyone knows about it."  Schmitt Decl. ¶ 10, Ex 8 (XIO-DG-0000927), ¶ 7, Ex. 5 (M. Carter's 30(b)(6) Dep. (Jan. 31, 2011) 84:8-16 ("Q. What does Desiree's dad do for a living? … A. … it's something to do with investment banking.")). | statements in an email. |
| 106.  Desiree Golen became Xio's Chief Executive Officer, Secretary, and Treasurer.  Schmitt Decl. ¶ 13, Ex. 11 (M. Carter 30(b)(6) Dep. (Jan. 31, 2011), Ex. 53, p. 14 (Minutes of a meeting of Xio's Board of Directors show that Ms. Golen became the Chief Executive Officer, Secretary and Treasurer of the company on March 2, 2009)), ¶ 11, Ex. 9 (Xio's Resps. and Obj. to TH's First Set of Interrogs. (Mar. 11, 2010) ("Xio's Interrog. Resps."), Resp. to Interrog. No. 1). | Undisputed. |
| 107.  Ms. Golen handled Xio's finances and worked on the creation, development, marketing, and distribution of Xio's *Mino* game.  Schmitt Decl. ¶ 12, Ex. 10 (Initial Disclosures of Xio, p. 2), ¶ 11, Ex. 9 (Xio's Interrog. Resps., Resp. to Interrog. No. 1). | Undisputed. |
| 108.  Prior to forming Xio, Ms. Golen had no computer programming or game design experience.  Schmitt Decl. ¶ 5, Ex. 3 (D. Golen Dep. (Jan. 28, 2011) 27:15-18, | Undisputed. |

27

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| 221:16-19, 234:25-235:10) (Ms. Golen testified that she "had no experience in designing electronic games" prior to working on *Mino*, nor was she a computer programmer.)). | |
| 109. Michael Carter is Xio's Chief Technical Officer.  Schmitt Decl. ¶ 13, Ex. 11 (M. Carter 30(b)(6) Dep. (Jan. 31, 2011), Ex. 53 at p. 14 (Minutes of a meeting of Xio's Board of Directors show that Mr. Carter became the Chief Technical Officer of the company on March 2, 2009)), ¶ 11, Ex. 9 (Xio's Interrog. Resps., Resp. to Interrog. No. 1)). | Undisputed. |
| 110. Mr. Carter led the development of Xio's *Mino* game.  Schmitt Decl.¶ 11, Ex. 9 (Xio's Interrog. Resps., Resp. to Interrog. No. 1), ¶ 12, Ex. 10 (Initial Disclosures of Xio, p. 1). | Undisputed. |
| 111. Mario Balibrera was a friend of Mr. Carter's and became a stockholder of Xio. Schmitt Decl. ¶ 11, Ex. 9 (Xio's Interrog. Resps., Resp. to Interrog. No. 1), ¶ 14, Ex. 12 (M. Balibrera Dep. (Dec. 10, 2010) 96:6-22). | Undisputed. |
| 112. Mario Balibrera worked on the development of Xio's *Mino* game. Schmitt Decl. ¶ 12, Ex. 10 (Initial Disclosures of Xio, pp. 1-2), ¶ 11, Ex. 9 (Xio's Interrog. Resps., Resp. to Interrog. No. 1). | Undisputed. |
| 113. Alex Haro was a friend of Mr. Carter's and was an intern at Xio.  Schmitt Decl. ¶ 11, Ex. 9 (Xio's Interrog. Resps., Resp. to Interrog. No. 1), ¶ 15, Ex. 13 (A. Haro Dep. (Dec. 17, 2010) 43:24-44:25). | Undisputed. |
| 114. Alex Haro worked on the development of Xio's *Mino* game.  Schmitt Decl. ¶ 12, Ex. 10 (Initial Disclosures of Xio, p. 2), ¶ 11, | Undisputed. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| Ex. 9 (Xio's Interrog. Resps., Resp. to Interrog. No. 1). | |
| 115.  Martin Hunt is a friend of Mr. Carter's and is a stockholder of Xio.  Schmitt Decl. ¶ 11, Ex. 9 (Xio's Interrog. Resps., Resp. to Interrog. No. 1), ¶ 16, Ex. 14 (M. Hunt Dep. (Jan. 26, 2011) 13:7-8). | Undisputed. |
| 116.  Martin Hunt worked on the development of Xio's *Mino* game.  Schmitt Decl. ¶ 12, Ex. 10 (Initial Disclosures of Xio, p. 2), ¶ 11, Ex. 9 (Xio's Interrog. Resps., Resp. to Interrog. No. 1). | Undisputed. |
| 117.  Jacob Rus was a friend of Michael Carter and was an independent contractor hired by Xio.  Schmitt Decl. ¶ 11, Ex. 9 (Xio's Interrog. Resps., Resp. to Interrog. No. 1), ¶ 17, Ex. 15 (J. Rus Dep. (Dec. 15, 2010) 54:3-55:4)). | Undisputed. |
| 118.  Jacob Rus worked on the graphic design of Xio's Mino game.  Schmitt Decl. ¶ 12, Ex. 10 (Initial Disclosures of Xio, p. 2), ¶ 11, Ex. 9 (Xio's Interrog. Resps., Resp. to Interrog. No. 1). | Undisputed. |
| 119.  Kurt Ude was a friend of Mr. Carter's and an independent contractor hired by Xio.  Schmitt Decl. ¶ 11, Ex. 9 (Xio's Interrog. Resps., Resp. to Interrog. No. 1), ¶ 18, Ex. 16 (K. Ude Dep. (Jan. 24, 2011) 17:1-4). | Undisputed. |
| 120.  Kurt Ude worked on the development of Xio's *Mino* game.  Schmitt Decl. ¶ 12, Ex. 10 (Initial Disclosures of Xio, p. 2), ¶ 11, Ex. 9 (Xio's Interrog. Resps., Resp. to Interrog. No. 1). | Undisputed. |
| 121.  In at least two November 8, 2008 e-mails, Ms. Golen stated: "Tetris is my favorite game!"  Schmitt Decl. ¶ 19, Ex. 17 (XIO-DG-0001766), ¶ 20, Ex. 18 (XIO-DG-0100049). | Xio does not dispute that Ms. Golen so stated. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| 122. On October 18, 2008, one of Xio's shareholders and game developers, Martin Hunt, purchased and downloaded *Tetris (iPhone)*, and charged it to Xio as a business expense.  Schmitt Decl. ¶ 16, Ex. 14 (M. Hunt Dep. (Jan. 26, 2011) 31:21-33:14 (Mr. Hunt testified that he purchased *Tetris (iPhone)* in October of 2008.), ¶ 19, Ex. 21 (M. Hunt Dep. (Jan. 26, 2011) Ex. 5 (XIO-MH-005575) (receipt from iTunes App Store, dated October 18, 2008 for Martin Hunt's purchase of *Tetris (iPhone)*)), ¶ 9, Ex. 7 (M. Carter Dep. (Dec. 13, 2010) 73:14-74:6, 74:20-25 (Mr. Carter testified that Mr. Hunt downloaded *Tetris (iPhone)* while Xio was developing *Mino*.)), ¶ 7, Ex. 5 (M. Carter 30(b)(6) Dep. (Jan. 31, 2011) 102:7-10, 102:19-103:1, 105:21-106:3, 107:5-7 (Mr. Carter testified that Mr. Hunt downloaded *Tetris (iPhone)* and submitted the expense to Xio for reimbursement.)), ¶ 22, Ex. 20 (M. Carter's 30(b)(6) Dep. (Jan. 31, 2011) Ex. 7 (XIO-HD-XIO-0001598) (Xio expense report listing purchase of *Tetris (iPhone)* game)). | Undisputed. |
| 123. Mr. Carter testified that, during the development of *Mino*, he saw screenshots of *Tetris (iPhone)* and compared them to *Mino*.  Schmitt Decl. ¶ 9, Ex. 7 (M. Carter Dep. (Dec. 13, 2010) 81:14-23, 220:14-222:7 (Mr. Carter testified that he looked at screenshots from *Tetris (iPhone)* and *Mino* and compared their "similarities . . .")). | Undisputed. |
| 124. Ms. Golen, Mr. Carter, and other people who worked on development of *Mino* were aware of and had played *Tetris* before | Undisputed. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| development of *Mino*.  Schmitt Decl. ¶ 7, Ex. 5 (M. Carter's 30(b)(6) Dep. (Jan. 31, 2011) 85:18-86:8 (Mr. Carter testified that Xio was aware of the *Tetris (iPhone)* game in October 2008)), ¶ 5, Ex. 3 (D. Golen Dep. (Jan. 28, 2011) 29:3- 29:13, 37:6-14, 38:23-39:11, 45:23-46:1, 144:14-19, 178:8-15) (Ms. Golen testified that she was aware of *Tetris Game Boy*, had watched her brother play the game, and may have also played the game herself.)), ¶ 23, Ex. 21 (D. Golen Dep. (Feb. 10, 2011) 352:2-12)), ¶ 9, Ex. 7 (M. Carter Dep. (Dec. 13, 2010) 75:10-15, 79:3-5) (Mr. Carter testified that he had a handheld game that may have included *Tetris* and that it was possible that he played *Tetris NES Edition*)), ¶ 16, Ex. 14 (M. Hunt Dep. (Jan. 26, 2011) 32:15-22, 33:15-34:7, 36:4-8) (Mr. Hunt testified that he thinks he played the *Tetris (iPhone)* game that he purchased and that it was possible that he had played other *Tetris* games)), ¶ 17 Ex. 15 (J. Rus. Dep. (Dec. 15, 2010) 33:25-34:9, 34:20-25) (Mr. Rus testified that he saw Mr. Hunt playing *Tetris (iPhone)* and that "it's quite possible" Mr. Rus played *Tetris Game Boy*)), ¶ 18, Ex. 16 (K. Ude Dep. (Jan. 24, 2011) 37:25- 38:2, 42:10-15, 46:13-18) (Mr. Ude testified that he played *Tetris Game Boy* and that he played a version of *Tetris* online)); ¶ 15, Ex. 13 (A. Haro Dep. (Dec. 17, 2010) 74:10-25 (Mr. Haro testified that he played *Tetris Game Boy* in the 1990s). | |
| 125. During the development of *Mino*, Xio's designers admittedly reviewed TH's *Tetris (iPhone)* game.  Schmitt Decl. ¶ 9, Ex. 7 (M. Carter Dep. (Dec. 13, 2010) 73:14- | Undisputed. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| 74:6, 74:20-25, 81:14-82:6, 220:14-222:7 (Mr. Carter testified that he looked at screenshots from *Tetris (iPhone)* and *Mino* to determine the games' similarities and that Mr. Hunt downloaded *Tetris (iPhone)* while Xio was developing *Mino*.)), ¶ 7, Ex. 5 (M. Carter 30(b)(6) Dep. (Jan. 31, 2011) 102:7-10 (Mr. Carter testified that he, Mr. Hunt, and Ms. Golen looked at *Tetris (iPhone)*.). | |
| 126.  *Tetris* has been widely published and disseminated in the United States and around the world.  HR Decl. ¶¶ 4, 42. | Undisputed. |
| 127.  Development of *Mino* began in the fall of 2008.  Schmitt Decl. ¶ 7, Ex. 5 (M. Carter 30(b)(6) Dep. (Jan. 31, 2011) 90:7-25 (Mr. Carter testified that in October 2008 "there was some idea stage development where we just discussed what the game would be, what it would encompass, and talked about our goals and did project planning.")). | Undisputed. |
| 128.  During the development of *Mino*, Xio's principals and designers referred to it as "Tetris."  Schmitt Decl. ¶ 24, Ex. 22 (XIO-MH-0007567), ¶ 25, Ex. 23 (XIO-DG-0002277), ¶ 26, Ex. 24 (XIO-MC-0019056), ¶ 27, Ex. 25 (M. Carter Dep. (Dec. 13, 2011), Ex. 32 (XIO-XI-0000008), ¶ 28, Ex. 26 (XIO-XI-0000012), ¶ 29, Ex. 27 (D. Golen Dep. (Jan. 18, 2011) Ex. 18 (XIO-XI-0000020 & XIO-XI-0000022)), ¶ 30, Ex. 28 (XIO-MH-0013629), ¶ 31, Ex. 29 (XIO-XI-0000083), ¶32, Ex. 30 (XIO-HD-XIO-0000034), ¶ 34, Ex. 32 (XIO-HD-XIO-0001449). | Undisputed. |
| 129.  In a November 15, 2008 "[s]tatus [u]pdate" to one of Xio's game designers, Martin Hunt, Michael Carter (Xio's CTO) referred to Xio's game as "Tetris." | Undisputed. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| Schmitt Decl. ¶ 24, Ex. 22 (XIO-MH-0007567 ("I've been concentrated [sic] on a number of other projects, I finally sat down for a couple of days [to work] on Tetris.")). | |
| 130.  In a November 18, 2008 e-mail, Ms. Golen referred to Xio's game as "Tetris." Schmitt Decl. ¶ 25, Ex. 23 (XIO-DG-0002277 ("I have [an anonymous blog] that I'm using to generate interest for the Tetris game.")). | Undisputed. |
| 131.  In a November 22, 2008 e-mail, Mr. Carter referred to Xio's game as "Tetris." Schmitt Decl. ¶ 26, Ex. 24 (XIO-MC-0019056 ) ("[W]e have a minor logistics problem on Tetris… So all of this is to say that we are at a very unfortunate roadblock on Tetris development.")). | Undisputed. |
| 132.  In a December 28, 2008 e-mail, Mr. Carter explained that Xio's goal was to release a "tetris" game.  Schmitt Decl. ¶ 27, Ex. 25 (M. Carter Dep. (Dec. 13, 2011), Ex. 32 (XIO-XI-0000008) ("I think the most important thing is to release a working tetris game.")). | Undisputed. |
| 133.  Mario Balibrera recorded a "tetris-like" song for *Mino*.  Schmitt Decl. ¶ 28, Ex. 26 (XIO-XI-0000012), ¶ 14, Ex. 12 (M. Balibrera Dep. (Dec. 10, 2010) 151:2-152:4). | Undisputed. |
| 134.  The "tetris-like" song that Mr. Balibrera recorded is similar to the Russian folk song, *Korobeiniki*, which is typically used in most versions of *Tetris*, and for which TH owns a U.S. trademark registration in connection with, among other things, on-line electronic games.  HR Decl. ¶ 30, Ex. 6 (attaching copy of trademark registration for "tune based on a Russian folk song | Undisputed. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| named Korobeiniki"); Schmitt Decl. ¶ 14, Ex. 12 (M. Balibrera Dep. (Dec. 10, 2010) 151:2-152:4) (" Q. What did you mean by "Tetris-like song?"  A. I meant that there's a Russian sounding song I originally wrote for -- you know, as one of the songs I originally came up with for Desiree or Michael or whoever to select from. . . it was kind of based on the song called Korobeiniki … and [someone] told me that it's very similar to some Russian music they have in one of their early versions of Tetris.")). | |
| 135.   In a January 19, 2009 e-mail, Mr. Hunt referred to "tetris pieces" in *Mino*. Schmitt Decl. ¶ 29, Ex. 27 (D. Golen Dep. (Jan. 18, 2011) Ex. 18 (XIO-XI-0000020)). | Xio disputes this statement as unclear and ambiguous.  To the extent this statement implies that the playing pieces in *Mino* belong to Plaintiffs, Xio disputes this characterization as a legal conclusion improper in a statement of facts. |
| 136.   In a January 20, 2009 e-mail, Ms. Golen referred to the "Tetris pieces" in *Mino*. Schmitt Decl. ¶ 29, Ex. 27 (D. Golen Dep. (Jan. 18, 2011) Ex. 18 (XIO-XI-0000022)). | Xio disputes this statement as unclear and ambiguous.  To the extent this statement implies that the playing pieces in *Mino* belong to Plaintiffs, Xio disputes this characterization as a legal conclusion improper in a statement of facts. |
| 137.   In an e-mail trying to enlist the help of a friend to design graphics for *Mino*, dated January 27, 2009, Martin Hunt stated: "I'm working with some people on an iphone tetris game and we need some graphics."  Schmitt Decl. ¶ 30, Ex. 28 (XIO-MH-0013629). | Xio does not dispute that Mr. Hunt so stated. |
| 138.   In a February 11, 2009 e-mail, Ms. Golen asked, "is it un-tetris-like to make all of the [playing] pieces the same color . . .?" | Xio does not dispute that Ms. Golen so stated. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| Schmitt Decl. ¶ 31, Ex. 29 (XIO-XI-0000083). | |
| 139. A Xio business plan refers to the company's game as the "Tetris App." Schmitt Decl. ¶ 32, Ex. 30 (XIO-HD-XIO-0000034). | Xio does not dispute that a document entitled "Business Plan" so states. |
| 140. A document produced from Ms. Golen's files, entitled "checklist_todo", dated October 18, 2008, states in one column "Logo" and in the other column "for tetris, for xio."  Schmitt Decl. ¶ 33, Ex. 31 (XIO-HD-XIO-0001449). | Xio does not dispute that a so-entitled document so states. |
| 141. In an email dated April 28, 2009, Ms. Golen described *Mino* as having "all the features of the Nintendo classic," which is an admitted reference to TH's *Tetris* games distributed by Nintendo in the early 1990s (i.e., *Tetris Game Boy* and *Tetris NES Edition*).  Schmitt Decl. ¶ 34, Ex. 32 (XIO-DG-0100379), ¶ 35, Ex. 33 (D. Golen Dep. (Aug. 16, 2011) 45:17-20). | Xio does not dispute that the document so states. |
| 142. On Xio's website advertising *Mino*, Xio linked to and quoted from a "cool article" about a scientific study that found that playing *Tetris* had positive brain effects on adolescent girls; and Xio stated: "Take home message?  Play more *Mino*." Schmitt Decl. ¶ 5, Ex. 3 (D. Golen Dep. (Jan. 28, 2011) 288:17-290:19 (Ms. Golen testified that she posted this message for marketing purposes.)). | Undisputed. |
| 143. "Tetrimino" is the name of the playing pieces in *Tetris*.  HR Decl. ¶ 36. | Xio does not dispute that Plaintiffs refer to tetrominos as "Tetriminos."  Xio disputes that this is "the name" of the playing pieces in *Tetris*.  *See* Xio Interactive Inc.'s Memorandum of Points and Authorities in Support of its |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| | Motion for Summary Judgment of Non-Infringement 3-4, ECF No. 46-1. |
| 144. Xio originally used the name "TetraNet" for its game, but ultimately chose "Mino" as a reference to "Tetrimino." *See* Schmitt Decl. ¶ 10, Ex. 8 (XIODG-0000927), ¶ 5, Ex. 3 (D. Golen Dep. (Jan. 28, 2011) 46:9-47:4, 214:22-215:4 ("Q. But using the word 'Mino,' were you attempting to refer to Tetriminos? A. I was attempting to name the game Mino. We employed Tetriminos in our game. . . the word 'Mino' is in the word 'Tetrimino.'"), ¶ 7 , Ex. 5 (M. Carter's 30(b)(6) Dep. (Jan. 31, 2011) 111:19-112:16). | Xio does not dispute that Mino was based on the term tetromino. Xio disputes that "Mino" is a reference to the term used by Plaintiffs "Tetrimino" and disputes this mischaracterization of Ms. Golen's testimony. Xio further disputes this statement in that that it implies that all 7 tetrominos did not pre-exist the invention of *Tetris*. They did. *See* Xio Interactive Inc.'s Memorandum of Points and Authorities in Support of its Motion for Summary Judgment of Non-Infringement 3-4, ECF No. 46-1. |
| 145. Though the first letter of *Mino* is "M," Xio's logo for *Mino* incorporates a T-shaped Tetrimino playing piece (pictured below):<br><br><br><br>Schmitt Decl. ¶ 17, Ex. 15 (J. Rus. Dep. (Dec. 15, 2010) 91:11-17)). | Xio disputes this statement as Xio no longer incorporates a T-shaped tetromino playing piece in its logo. Xio does not dispute that the first letter of *Mino* is "M." Xio further disputes this statement in that that it implies that all 7 tetrominos did not pre-exist the invention of *Tetris*. They did. *See* Xio Interactive Inc.'s Memorandum of Points and Authorities in Support of its Motion for Summary Judgment of Non-Infringement 3-4, ECF No. 46-1. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| 146.  TH uses a T-shaped Tetrimino (like the one pictured below) as a logo for its *Tetris* game on certain mobile phones:<br><br><br><br>HR Decl. ¶ 37. | Xio disputes this statement in that that it implies that all 7 tetrominos did not pre-exist the invention of *Tetris*. They did. *See* Xio Interactive Inc.'s Memorandum of Points and Authorities in Support of its Motion for Summary Judgment of Non-Infringement 3-4, ECF No. 46-1. |
| 147.  On the website <appVersity.com>, a "Mino Review," dated August 5, 2009, described *Mino* as "a lot more Tetris than 'Tetris-like'" and stated "the devs [of *Mino*] knew that they were making a Tetris clone so I can only describe it like I see it.  It's a Tetris clone…." Schmitt Decl., ¶ 37, Ex. 35 (attaching a copy of website review). | Undisputed. |
| 148.  On August 8, 2009, the website <osxreality.com> posted a review of *Mino* with the title: "Care for some Multiplayer Tetris?  Take *Mino* for a Spin."  Schmitt Decl. ¶ 38, Ex. 36 (attaching a copy of website review). | Undisputed. |
| 149.  On "Friday November 14," 2008, Xio searched the U.S. Copyright Office website, which revealed that TH owned many registrations for the audiovisual expression of *Tetris*.  Schmitt Decl. ¶ 39, Ex. 37 (D. Golen Dep. (Jan. 28, 2011) Ex. 34 (printout from U.S. Copyright Office website, dated "Friday November 14," listing copyright registrations owned by TH that was produced from Ms. Golen's files)); ¶ 40, Ex. 38 (November 2008 calendar excerpt). | Undisputed. |
| 150.  All versions of *Tetris* have a copyright notice identifying TH (or its predecessors- | Undisputed. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| in-interest) as the holder of the copyright in and to *Tetris*. HR Decl. ¶ 29, Ex. 5 (attaching screenshots of copyright notices). | |
| 151. In 2008, Xio was aware of TH's enforcement efforts against people who had released games for the iPhone similar to *Tetris*. Schmitt Decl., ¶ 41, Ex. 39 (XIO-DG-0001354 (Ms. Golen wrote in an email dated October 26, 2008 that the developers of iPhone games received cease-and-desist letters from TH)). | Xio does not dispute that Plaintiffs' accuse games that incorporate the same rules as *Tetris* of infringement. Xio disputes this statement in that "enforcement" is an undefined and ambiguous term and connotes a legal conclusion of infringement, which is improper in a statement of undisputed facts. |
| 152. In 2008, Ms. Golen contacted people against whom TH had enforced its intellectual property rights, and obtained copies of TH's cease-and-desist letters, which cited TH's copyright registrations covering the audiovisual expression of *Tetris*. Schmitt Decl. ¶ 42, Ex. 40 (XIO-DG-0002046 (In an email dated Nov. 10, 2008, Ms. Golen wrote that she was in contact with a developer of an iPhone game who had sent her a copy of his cease-and-desist letter from TH), ¶ 43, Ex. 41 (XIODG-0002097 (an email dated Nov. 12, 2008 from an iPhone developer who had received a cease-and-desist letter from TH to Ms. Golen containing a link to a zip file containing materials she requested including "correspondences with [TH]")). | Xio does not dispute that Ms. Golen contacted others Plaintiffs accused of infringement. Xio disputes this statement in that "enforced" is an undefined and ambiguous term and connotes a legal conclusion of infringement, which is improper in a statement of undisputed facts. |
| 153. By November 2008, Xio was aware of a U.S. Customs Service decision, which held that the visual elements of *Tetris* are copyrightable and had been infringed by another game. Schmitt Decl. ¶ 44, Ex. 42 (XIO-DG-0002141 (email from Desiree | Xio disputes this statement in that the term "held" implies that a U.S. Customs letter is precedential authority. Xio does not dispute that Xio received a copy of this letter by |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| Golen, dated November 13, 2008, linking to the U.S. Customs Headquarters opinion)), ¶ 45, Ex. 43(D. Golen Dep. (Jan. 28, 2011) Ex. 38 (copy of the decision produced from Xio's files)). | November 2008. |
| 154. In an e-mail, dated October 18, 2008, Ms. Golen contacted TH (through its website Tetris.com) to "inquire about [its] licensing options and packages" to make "a game similar to Tetris for the mobile platform." Schmitt Decl. ¶ 46, Ex. 44 (D. Golen Dep. (Jan. 28, 2011) 124:13-23, 125:6-22, Ex. 7 (XIO-DG-0001194)). | Xio does not dispute that the referenced October 18, 2008 email so states. |
| 155. Acknowledging Ms. Golen's "interest in licensing Tetris for the mobile platform," TH's licensing agent responded on October 20, 2008 (the next business day) and denied the request. Schmitt Decl. ¶ 5, Ex. 3 (D. Golen Dep. (Jan. 28, 2011) 130:1-23), ¶ 47, Ex. 45 (D. Golen Dep. (Jan. 28, 2011) Ex. 8 (XIODG-0001220)), ¶ 48, Ex. 46 (D. Golen Dep. (Jan. 28, 2011) Ex. 9 (XIO-DG-0001297)). | Xio does not dispute that the October 20, 2008 email so states. |
| 156. In November 2008, Xio retained Jeffrey Neu, an intellectual property lawyer from New Jersey. Schmitt Decl. ¶ 49, Ex. 47 (J. Neu Dep. (Aug. 11, 2011) 35:12-15, 37:9-38:19, 72:14-21), ¶ 35, Ex. 33 (D. Golen Dep. (Aug. 16, 2011) 26:2-19). | Undisputed. |
| 157. Several months before the development of *Mino* was completed, and almost a half-year before the game was released, Xio consulted Mr. Neu for advice regarding possible infringement claims by TH. Schmitt Decl. ¶¶ 49-50, Exs. 47-48 (J. Neu Dep. (Aug. 11, 2011) 50:22-51:12, Ex. 10 (NEU0000021)), ¶¶ 35, 51, Exs. 33, 49 (D. Golen Dep. (Aug. 16, 2011) 13:22-14:12, Ex. 302 (XIO-DG-0100069, at XIO-DG- | Undisputed. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| 0100073) (during an initial email exchange with Mr. Neu in November 2008, representatives of Xio explained that they were seeking advice regarding a possible "copyright conflict" regarding their game and that they had been in contact with other game developers that had received cease and desist letters from TH.)), ¶ 53, Ex. 51 (M. Carter Dep. (Dec. 13, 2010) Ex. 18 (screenshot of App description page for *Mino* 1.0 on the App Store, which includes its May 2009 release date)). | |
| 158.  During the first e-mail exchange between Mr. Neu and Xio in early November 2008, Mr. Neu explained to Xio that TH could bring a claim for copyright infringement of the visual "imagery" of *Tetris* even if Xio did not copy the source code.  Schmitt Decl. ¶ 52, Ex. 50 (XIO-DG-0100088 (Mr. Neu wrote to Ms. Golen "[t]ake note before we chat that the claimed infringement is going to be not in regards to not just the actual game, but the similarity and likeness of the imagery on a copyright claim."), ¶ 50, Ex. 48 (J. Neu Dep. (Aug. 11, 2011) Ex. 10 (NEU0000021) (Mr. Neu wrote to Ms. Golen that "[t]he screen shots [of the game] are going to be very indicative of where you stand.")), ¶ 49, Ex. 47 (J. Neu Dep. (Aug. 11, 2011) 71:10-72:7 ("Q. But your representation included advice about the visual expression, correct?  A. I would assume so, yes.")). | Xio disputes this statement. Mr. Neu said no more than the following:<br>• "Take note before we chat that the claimed infringement is going to be not in regards to not just the actual game, but the similarity and likeness of the imagery on a copyright claim." Schmitt Decl. ¶ 52, Ex. 50.<br>• "The screen shots are going to be very indicative of where you stand."  Schmitt Decl. ¶ 50, Ex. 48. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| 159. *Mino* version 1.0 was released on the Apple iTunes Store on May 9, 2009. *See* Schmitt Decl. ¶ 53, Ex. 51 (M. Carter Dep. (Dec. 13, 2010) Ex. 18 (screenshot of App description page for *Mino* 1.0 on the App Store, which includes release date)). | Undisputed. |
| 160. *Mino* version 1.1 was released on the Apple iTunes Store on July 17, 2009. *See* Schmitt Decl. ¶ 54, Ex. 52 (M. Carter Dep. (Dec. 13, 2010) Ex. 19) (screenshot of App description page for *Mino* 1.1 on the App Store, which includes release date). | Undisputed. |
| 161. *Mino Lite* was released on the Apple iTunes Store "shortly after" *Mino* version 1.1 was released. Schmitt Decl. ¶ 7, Ex. 5 (M. Carter's 30(b)(6) Dep. (Jan. 31, 2011) 126:6-18 (Mr. Carter testified that *Mino Lite* was submitted to the Apple iTunes Store at the same time as *Mino* version 1.1, and that *Mino Lite* was released "shortly after" *Mino* version 1.1 was released; he also testified that the "business purpose" of releasing *Mino Lite* was to give people "an idea of what they might be able to expect if they were to purchase Mino.")). | Undisputed. |
| 162. *Mino* 1.0 and *Mino* 1.1 look the same. Schmitt Decl. ¶ 7, Ex. 5 (M. Carter's 30(b)(6) Dep. (Jan. 31, 2011) 127:18-129:3 ("Q. What about, did you change any of the visual expression in standard mode, which is a single player mode?  A. In standard mode.  I can't recall any changes that we made to standard mode between 1.0 and 1.1.")). | Xio disputes this statement in that "look the same" is ambiguous, undefined, and has a legal meaning—improper in a statement of undisputed facts. |
| 163. *Mino* 1.1 and *Mino Lite* look the same, as pictured below. | Undisputed. |

41

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
|  | Xio disputes this statement in that "similar" is ambiguous, undefined, and has a legal meaning—improper in a statement of undisputed facts. |

*Mino* 1.1                    *Mino Lite*

Schmitt Decl. ¶ 74.

164.   Mino is similar to the Tetris Games. Illustrative images of two of the Tetris Games and Mino are pictured below.

**Tetris® Zone     Tetris® Evolution**

***Mino***

Schmitt Decl. ¶ 75, ¶ 55, Ex. 53 (attaching video clips of *Mino* 1.1 and *Mino Lite*),

42

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| HR Decl. ¶ 54, Ex. 10 (attaching video clips of *Tetris* Games and side-by-side comparison of a video clip from *Mino* 1.1 and the *Tetris (iPhone)* game); Bogost Decl. ¶¶ 9, 49-56, Ex. 2 (Bogost Rpt. ¶¶ 9, 48-55). | |
| 165. *Mino* includes the following visual elements:<br>– Seven (7) Tetrimino playing pieces, which include the five (5) free tetrominos as well as reflections of the "S" and "L" tetrominos;<br>– The visual delineation of individual blocks that comprise each Tetrimino piece and the display of their borders;<br>– The bright, distinct colors used for each of the Tetrimino pieces;<br>– A tall, rectangular playfield which is 10 blocks wide and 20 blocks tall;<br>– The appearance of the movement of the Tetriminos from the top of the playfield to its bottom;<br>– The appearance of the Tetrimino pieces moving and rotating on the playfield;<br>– The small display near the playfield that shows the next playing piece that will appear in the playfield;<br>– The particular starting orientation of the Tetriminos, both at the top of the screen and as shown in the "next piece" display;<br>– The display of a "shadow" piece beneath the Tetriminos as they fall;<br>– The color change when the Tetriminos enter lock-down mode;<br>– When a horizontal line fills across the playfield with blocks, the line disappears, and the remaining pieces consolidate downward; | Undisputed, except to the extent that the statement implies that all 7 tetrominos did not pre-exist the invention of *Tetris*. They did. *See* Xio Interactive Inc.'s Memorandum of Points and Authorities in Support of its Motion for Summary Judgment of Non-Infringement 3-4, ECF No. 46-1. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
|   –  The appearance of individual blocks automatically filling in the playfield from the bottom to the top when the game is over;<br><br>  –  The display of "garbage lines" with at least one missing block in random order;<br><br>  –  The screen layout in multiplayer versions with the player's matrix appearing most prominently on the screen and the opponents' matrixes appearing smaller than the player's matrix and to the side of the player's matrix.<br><br>HR Decl. ¶ 54, Ex. 10 (attaching video clips of *Tetris* Games and side-by-side comparison of a video clip from *Mino* 1.1 and the *Tetris (iPhone)* game); Bogost Decl. ¶ 51, Ex. 2 (Bogost Rpt. ¶ 50); Schmitt Decl. ¶ 55, Ex. 53 (attaching video clips of *Mino* 1.1 and *Mino Lite*). | |
| 166.  TH's expert, Dr. Ian Bogost, opines that *Tetris* and *Mino* are "virtually identical" and "strikingly similar in nearly every aspect and visual feature in the games." Bogost Decl. ¶¶ 9, 49-56, Ex. 2 (Bogost Rpt. ¶¶ 9, 48-55). | Xio does not dispute that Dr. Bogost so opines. |
| 167.  Dr. Bogost found that "[v]irtually every distinctive visual feature in *Mino* was copied from *Tetris*, without exception." Bogost Decl. ¶ 52, Ex. 2 (Bogost Rpt. ¶ 51). | Xio does not dispute that Dr. Bogost so opines. |
| 168.  Dr. Bogost concluded that any visual differences are minor and "have negligible effects on the overall visual expression [of] the games." Bogost Decl. ¶ 52, Ex. 2 (Bogost Rpt. ¶ 51). | Xio does not dispute that Dr. Bogost so concludes. |
| 169.  Dr. Bogost determined the "only reasonable conclusion is that Xio intentionally copied *Tetris* in making | Xio does not dispute that Dr. Bogost so determined. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| *Mino*."  Bogost Decl. ¶ 56, Ex. 2 (Bogost Rpt. ¶ 55). | |
| 170.  Xio's expert, Mr. Jason Begy, made no attempt to rebut Dr. Bogost's opinion that the games looked virtually identical.  Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 145:3-11, 293:22-294:2). | Xio disputes this statement in that the term "virtually identical" is ambiguous, undefined, and has a legal meaning—which is improper in a statement of undisputed facts. |
| 171.  TH engaged Dr. Myron Helfgott to design and conduct a consumer survey to test likelihood of confusion between *Tetris* and *Mino*.  Declaration of Dr. Myron Helfgott in Support of Plaintiffs' Motion for Summary Judgment, dated August 17, 2011 ("Helfgott Decl.") ¶ 2, Ex. 1 (Helfgott Rpt. at pp. 4-5). | Undisputed. |
| 172.  Dr. Helfgott's survey "found that a significant portion of the relevant consumers, 18%, think that the electronic game *Mino* is made by, affiliated with, or has received permission or approval from [TH]."  Helfgott Decl. ¶ 12, Ex. 1 (Helfgott Rpt. at p. 13). | Xio does not dispute that Dr. Helfgott's survey so found. |
| 173.  Dr. Helfgott opines that Xio's display of *Mino* on the App Store "is likely to cause consumers to think that *Mino* is made by, affiliated with, or has received permission or approval from [TH]."  Helfgott Decl. ¶ 12, Ex. 1 (Helfgott Rpt. at p. 13). | Xio does not dispute that Dr. Helfgott so opines. |
| 174.  Xio did not offer an expert to rebut or criticize Dr. Helfgott's survey or conclusions.  Schmitt Decl. ¶ 2. | Undisputed. |
| 175.  Neither *Mino* nor *Tetris* were sold for more than $5.00 during the period of time when they were both offered on the Apple iTunes App Store.  HR Decl. ¶ 56; Schmitt Decl. ¶¶ 53-54, Ex. 51-52 (M. Carter Dep. (Dec. 13, 2010) Exs. 18-19 (reflecting that the price for *Mino* was $2.99); Bogost | Undisputed. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| Decl. ¶ 59, Ex. 2 (Bogost Rpt. ¶ 58). | |
| 176. On the Apple iTunes App Store, consumers tend not to spend as much time investigating the details of similar products and are able to pay via single click ("1-click") with stored account information, which make it a location for impulse buys.  Bogost Decl. ¶ 60, Ex. 2 (Bogost Rpt. ¶ 59). | Undisputed. |
| 177. *Mino* and *Tetris* were distributed through the same channel of trade -- the Apple iTunes Store.  HR Decl. ¶ 56; Schmitt Decl. ¶ 7, Ex. 5 (M. Carter 30(b)(6) Dep. (Jan. 31, 2011) 118:19-23, 119:20-23 ("Q. The bottom line was on May 9th, 2009, the Mino Version 1.0 was publicly available on the iPhone App Store, correct?  A. Yeah, the Apple App Store, that's correct."), 126:6-10)); Bogost Decl. ¶ 58, Ex. 2 (Bogost Rpt. ¶ 57). | Xio does not dispute that both *Mino* and *Tetris* were distributed on the Apple iPhone App Store.  Xio disputes this statement to the extent that "channel of trade" is a legal term or conclusion—which is inappropriate in a statement of undisputed facts. |
| 178. *Mino* and *Tetris* competed for the same customers—people who were shopping for videogames (specifically puzzle games) on the Apple iTunes App Store.  *See* HR Decl ¶ 58; Schmitt Decl. ¶ 56, Ex. 54 (M. Carter 30(b)(6) Dep. (Feb. 17, 2011) 358:24-359:16); Bogost Decl. ¶ 65, Ex. 2 (Bogost Rpt. ¶ 64). | Xio does not dispute that *Mino* and *Tetris* were competitors. |
| 179. *Mino* and *Tetris (iPhone)* coexisted on the Apple iTunes App Store for no more than three months (i.e., from May 9, 2009 to August 2009).  HR Decl. ¶ 56 (stating that "*Tetris (iPhone)* has been distributed through the Apple iTunes Store since 2008"); Schmitt Decl. ¶ 53, Ex. 51 (M. Carter Dep. (Dec. 13, 2010) Ex. 18 (screenshot of App description page for *Mino* 1.0 on the App Store, which includes release date of May 9, 2009); ¶ 5, Ex. 3 | Undisputed. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| (D. Golen Dep. (Jan. 28, 2011) 104:6-12) (testifying that *Mino* was taken down in August 2009)). | |
| 180. *Mino* is a commercial product.  Schmitt Decl. ¶ 56, Ex. 54 (M. Carter 30(b)(6) Dep. (Feb. 17, 2011) 356:1-10 ("Q. And so is it fair to say that Xio made Mino as a commercial venture?  A. . . . I think it's fair to say that we were also interested in selling our product . . .")); Bogost Decl. ¶¶ 62-64, Ex. 2 (Bogost Rpt. ¶¶ 61-63). | Undisputed. |
| 181. Xio's business plan projected that Xio could earn substantial revenue from the sale of *Mino*.  Schmitt Decl. ¶ 5, Ex. 3 (D. Golen Dep. (Jan. 28, 2011) 32:12–20 ("Q. And isn't it true that you were hoping to also make a lot of money developing a game for the App Store? . . . [A]: I'm not sure exactly what I thought at this time or when I wrote this e-mail, but I have an exclamation after 250K in two months.  So it sounds like I was excited by their achievements.")), ¶ 10, Ex. 8 (D. Golen Dep. (Jan. 28, 2011) Ex. 1 (XIO-DG-000927)), ¶ 57, Ex. 55 (D. Golen Dep. (Jan. 28, 2011) Ex. 3 (XIO-DG-0200016)), ¶ 58, Ex. 56 (K. Flynn Dep. (Jan. 25, 2011) 122:4–7 ("I assume that her venture would eventually be profitable.")). | Xio does not dispute that a document entitled "business plan" projected that Xio could earn substantial revenue from the sale of *Mino*. |
| 182. *Mino* was not created for nonprofit educational purposes.  Schmitt Decl. ¶ 8, Ex. 6 (XIO-0000093-94) (Xio's certificate of incorporation for Xio, titled "CERTIFICATE OF INC, (PROFIT)"); Bogost Decl. ¶ 63, Ex. 2 (Bogost Rpt. ¶ 62). | Undisputed. |
| 183. *Mino* is not a parody or satire of the *Tetris* Games.  Schmitt Decl. ¶ 56, Ex. 54 (M. Carter 30(b)(6) Dep. (Feb. 17, 2011) | Undisputed. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| 356:11-18, 357:6-358:5); Bogost Decl. ¶ 63, Ex. 2 (Bogost Rpt. ¶ 62). | |
| 184. *Mino* does not comment on, or criticize, the *Tetris* Games.  Schmitt Decl. ¶ 56, Ex. 54 (M. Carter 30(b)(6) Dep. (Feb. 17, 2011) 357:6-358:5); Bogost Decl. ¶ 63, Ex. 2 (Bogost Rpt. ¶ 62). | Undisputed. |
| 185. Both *Mino* and *Tetris (iPhone)* were designed to be sold on the App Store.  *See* HR Decl. ¶ 57; Schmitt Decl. ¶ 56, Ex. 54 (M. Carter 30(b)(6) Dep. (Feb. 17, 2011) 358:24-359:16), ¶ 5, Ex. 3 (D. Golen Dep. (Jan. 28, 2011) 204:20–205:2("Q. Do you consider The Tetris Company to be a competitor of Xio's?  A. . . . [T]hey were in the same space, and I would say because they're in the same space, they were competitors.")), ¶ 10, Ex. 8 (XIO-DG-0000927) ("Hey dad.  I'm trying to get a company started to make a MultiPlayer game similar to Tetris for the iPhone.")); Bogost Decl. ¶ 58, Ex. 2 (Bogost Rpt. ¶ 57). | Undisputed. |
| 186. *Mino* directly competed with *Tetris*.  *See* HR Decl. ¶ 58; Schmitt Decl. ¶ 56, Ex. 54 (M. Carter 30(b)(6) Dep. (Feb. 17, 2011) 358:24-359:16), ¶ 5, Ex. 3 (D. Golen Dep. (Jan. 28, 2011) 204:20–205:2("Q. Do you consider The Tetris Company to be a competitor of Xio's?  A. . . . [T]hey were in the same space, and I would say because they're in the same space, they were competitors.")); Bogost Decl. ¶ 65, Ex. 2 (Bogost Rpt. ¶ 64). | Undisputed. |
| 187. Dr. Bogost opines that *Mino* harmed the market for the *Tetris* Games by directly competing with *Tetris* on the Apple iTunes App Store, thereby siphoning or potentially siphoning customers away | Xio does not dispute that Dr. Bogost so opines. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| from TH's *Tetris (iPhone)* game.  Bogost Decl. ¶ 65, Ex. 2 (Bogost Rpt. ¶ 64). | |
| 188.  According to Henk Rogers, *Mino* harms the market for *Tetris* by directly competing with Tetris on the Apple iTunes App Store, thereby siphoning or potentially siphoning customers away from TH's *Tetris (iPhone)* game.  HR Decl. ¶ 58. | Xio does not dispute that Henk Rogers so stated. |
| 189.  TH earns revenue from licensing its rights to *Tetris*.  HR Decl. ¶ 59. | Undisputed. |
| 190.  According to Henk Rogers, if copycat games such as *Mino* were allowed to exist, TH would lose licensing revenue.  HR Decl. ¶ 59. | Xio does not dispute that Henk Rogers so stated.  Xio disputes the statement in that the term "copycat" is ambiguous, undefined, and implies infringement and thus a legal statement and conclusion that is inappropriate in a statement of undisputed facts. |
| 191.  Dr. Bogost opines that the widespread consequences of allowing *Mino* and other knock-off games like it would be detrimental to TH because it depends on licensing to earn revenue.  Bogost Decl. ¶ 67, Ex. 2 (Bogost Rpt. ¶ 66). | Xio does not dispute that Dr. Bogost so opines.  Xio disputes the statement in that the term "knock-off" is ambiguous, undefined, and implies infringement and thus a legal statement and conclusion that is inappropriate in a statement of undisputed facts. |
| 192.  If copycat games such as *Mino* were allowed to exist, TH would be discouraged from continuing to innovate and improve the visual design of *Tetris*.  HR Decl. ¶ 59. | Xio disputes this statement in that the term "copycat" is ambiguous, undefined, and implies infringement and thus a legal statement and conclusion that is inappropriate in a statement of undisputed facts. |
| 193.  Dr. Bogost opines, if copycat games such as *Mino* were allowed to proliferate, third-parties would be less likely to license products from TH; and TH would be | Xio disputes this statement in that the term "copycat" is ambiguous, undefined, and implies infringement and thus a |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| discouraged from continuing to innovate and come up with new versions of *Tetris*. Bogost Decl. ¶ 67, Ex. 2 (Bogost Rpt. ¶ 66). | legal statement and conclusion that is inappropriate in a statement of undisputed facts. |
| 194.  Xio's attorney, Jeffrey Neu, advised Xio to make changes to *Mino* in order to avoid infringement claims by TH.  Schmitt Decl. ¶ 59, Ex. 57 (XXXPRIV-XXX-XIO-DG-01000483) (August 5, 2009 e-mail to Desiree Golen, discussed below)), ¶ 60, Ex. 58 (XXX-PRIV-XXX-XIO-DG-0100730) (attaching "Copyright Infringement Memo" discussed below), ¶ 61, Ex. 59 (XXX-PRIVXXX-XIO-DG-0100731) (the "Copyright Infringement Memo" discussed below), ¶ 49, Ex. 47 (J. Neu Dep. (Aug. 11, 2011) 171:13-21, 172:11-173:13 (Mr. Neu testified that if he made any recommendations to change *Mino*, he did so to reduce the likelihood that an infringement claim would need to be litigated.)) | Xio does not dispute that after Plaintiffs sent a cease and desist letter to Xio, Mr. Neu advised Xio to make changes to its game in order to avoid suit entirely.  Declaration of Sonali Maitra in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment ¶ 4. |
| 195.  In an e-mail to Desiree Golen, dated August 5, 2009, Xio's counsel, Jeffrey Neu, stated: "I think there are ways to make [*Mino*] different than [TH's licensed *Tetris* for the iPhone], and I would do as much of them as possible."  Schmitt Decl. ¶ 59, Ex. 57 (XXX-PRIV-XXX-XIO-DG-01000483). | Xio does not dispute that Mr. Neu so stated, but did so to avoid suit entirely. Declaration of Sonali Maitra in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment ¶ 4. |
| 196.  In the e-mail to Ms. Golen, dated August 5, 2009, Mr. Neu enumerated the following list of elements and advised her that "[t]he less of these we have, the better":<br>  –  "Geometric playing pieces formed by four equally-sized, delineated blocks;"<br>  –  "The long vertical rectangle playing field, which is higher than wide;" | Xio does not dispute that Mr. Neu so stated, but did so to avoid suit entirely.  Declaration of Sonali Maitra in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment ¶ 4.  Xio further clarifies that this list of elements were the elements |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| – "The downward, lateral and rotating movements of the playing pieces;"<br>– "The appearance of a shadow piece at the bottom of the playing field matrix to indicate where the Tetrimino will drop;"<br>– "The appearance of a trailer effect after the Tetrimino during a 'hard drop' command;"<br>– "The display of the next Tetrimino that will fall down the matrix in a small box next to the playing field;"<br>– "The disappearance of any completed horizontal line;"<br>– "The display of a flash effect when a completed horizontal line disappears;" and<br>– "The subsequent consolidation of the playing pieces remaining on the playing field as a result of the downward shift into the space vacated by the disappearing line."<br><br>Schmitt Decl. ¶ 59, Ex. 57 (XXX-PRIV-XXX-XIO-DG-01000483). | Plaintiffs accused another developer of infringing. Schmitt Decl. ¶ 59, Ex. 57 |
| 197. On September 29, 2009, Xio's counsel, Jeffrey Neu, e-mailed Ms. Golen a legal memorandum "RE: XIO INTERACTIVE: COPYRIGHT INFRINGEMENT ANALYSIS" (the "Copyright Infringement Memo").  *See* Schmitt Decl. ¶ 60, Ex. 58 (XXX-PRIV-XXX-XIO-DG-0100730), ¶ 61, Ex. 59 (XXX-PRIV-XXX-XIO-DG-0100731). | Xio does not dispute that Mr. Neu sent this memorandum to Xio, but clarifies that the memorandum was not intended to be communicated to a client, was written by an associate, and stated positions with which Mr. Neu testified that he did not necessarily agree. Declaration of Sonali Maitra in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment ¶ 6. |
| 198. The first paragraph of the Copyright Infringement Memo states:<br>This memorandum discusses the present | Xio does not dispute this memorandum so states, but clarifies that the memorandum |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| state of copyright laws of video games.  In particular, it addresses the copyrightability of video games, and the infringement analysis the courts use to determine whether or not a video game is infringing an already copyrighted video game. Finally, this memorandum briefly addresses the issue of trade dress infringement.  Schmitt Decl. ¶ 61, Ex. 59 (XXX-PRIV-XXX-XIO-DG-0100731). | was not intended to be communicated to a client, was written by an associate, and stated positions with which Mr. Neu testified that he did not necessarily agree.  Declaration of Sonali Maitra in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment ¶ 6. |
| 199.  With regard to "access to the copyrighted work," the Copyright Infringement Memo states: "In our case, access will be easily established based on Tetris' wide availability."  Schmitt Decl. ¶ 61, Ex. 59 (XXX-PRIV-XXX-XIODG-0100731). | Xio does not dispute this memorandum so states, but clarifies that the memorandum was not intended to be communicated to a client, was written by an associate, and stated positions with which Mr. Neu testified that he did not necessarily agree.  Declaration of Sonali Maitra in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment ¶ 6. |
| 200.  The Copyright Infringement Memo states, "It is well established that video games ARE copyrightable," citing Atari Games Corp. v. Oman, 979 F.2d 242 (D.C. Cir. 1992) and noting "this is an opinion by current Supreme Court Justice Ginsburg." Schmitt Decl. ¶ 61, Ex. 59 (XXX-PRIV-XXX-XIO-DG- 0100731) (emphasis in original)). | Xio does not dispute this memorandum so states, but clarifies that the memorandum was not intended to be communicated to a client, was written by an associate, and stated positions with which Mr. Neu testified that he did not necessarily agree.  Declaration of Sonali Maitra in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment ¶ 6. |
| 201.  With regard to the copyrightability of *Tetris*, the Copyright Infringement Memo | Xio does not dispute this memorandum so states, but |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| states: "We should not waste the court's time arguing that the video game is not copyrightable UNLESS we can make a case that there is NO separable expression (separable beyond any idea) in the Tetris game. *I think this would be a losing argument and a waste of our efforts.*" Schmitt Decl. ¶ 61, Ex. 59 (XXX-PRIV-XXX-XIO-DG-0100731 (emphasis in original)). | clarifies that the memorandum was not intended to be communicated to a client, was written by an associate, and stated positions with which Mr. Neu testified that he did not necessarily agree. Declaration of Sonali Maitra in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment ¶ 6. |
| 202. The Copyright Infringement Memo listed the following possible modifications to *Mino* "to differentiate the overall feel of the game" from *Tetris*:<br><br>a. Change the playing field from a long vertical rectangle to a perfect square (or something other than a long vertical rectangle.)<br><br>b. Move the information (currently presented on the right-side of the playing field) to the top- or bottom-side of the playing field.<br><br>c. Perhaps…..Change the mino shapes so that each individual shape is comprised of different colored blocks (this would make the game visually more challenging since each shape is not a single color, but four different colors fused together into a single shape).<br><br>d. Instead of dropping the pieces from the top center every time, alternate the location from where the piece drops with each piece (not only falling from the center, but also falling from the left and right sides of the board—again, this would make the game more challenging).<br><br>e. Instead of allowing the pieces to drop | Xio does not dispute this memorandum so states, but clarifies that the memorandum was not intended to be communicated to a client, was written by an associate, and stated positions with which Mr. Neu testified that he did not necessarily agree. Declaration of Sonali Maitra in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment ¶ 6. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| in small increments, make the piece drop in a smooth movement. <br><br> f.  Likewise, make the rotations of pieces smoother so that the player can see the piece rotating, as opposed to jumping from one position into the rotated position. <br><br> g.  When a line is completed, instead of making the line flash before it disappears, have the line turn dark gray (to signify that it has been completed), and then have the line "pulled" off-screen via a pulling motion from the side of the board.  (animate the line moving off the playing field by a pull from the side direction). <br><br> h.  Eliminate any shadow piece from indicating where the piece will fall (this will make the game more challenging). <br><br> i.  Instead of creating 7 distinct pieces, create only 5 distinct pieces, and a "mirror" option which allows the pieces to be mirrored (this would make the game less challenging, but you could also implement a "lock" function which allows a user to disable the "mirror" option, which would allow the user to decide if he wanted the game to be more challenging—I'll have to do further legal analysis to see if this would be harmful in our defense of infringement, but at first pass, I think in conjunction with the other possible modification, it would not be a serious issue.) <br><br> j.  Create a storyline for the game (which Tetris does not seem to have), where a cartoon character named "Mino", with the help of the user/player is trying to | |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| collect these completed lines and "pull" them off the board, for some ultimate purpose (for instance, they could be long bricks that the character is collecting to build a wall). <br><br> k. Working in conjunction with the multi-colored shapes, maybe if the player manages to vertically stack a pre-determined number of same-colored blocks (not shapes, but blocks = one of the 4 squares that make up any shape), then the column (vertical stack) is eliminated.  (something along the lines of the iPhone game known as "bejeweled".  Again, I'm not sure if this would be protected, but in conjunction with the other possible modifications, it would not be a serious issue.) <br><br> Schmitt Decl. ¶ 61, Ex. 59 (XXX-PRIV-XXX-XIO-DG-0100731, at p. 2). | |
| 203.  The Copyright Infringement Memo recommended that Xio "*modify Mino as much as possible to differentiate the overall feel of the game.*"  Schmitt Decl. ¶ 61, Ex. 59 (XXX-PRIV-XXX-XIO-DG-0100731, at p. 2 (emphasis in original)). | Xio does not dispute this memorandum so states, but clarifies that the memorandum was not intended to be communicated to a client, was written by an associate, and stated positions with which Mr. Neu testified that he did not necessarily agree.  Declaration of Sonali Maitra in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment ¶ 6. |
| 204.  The Copyright Infringement Memo states:  "Every effort should be made to ensure that the *overall feel* and *aesthetic appeal* of Mino is different from Tetris.  Please refer to the non-exhaustive list of | Xio does not dispute this memorandum so states, but clarifies that the memorandum was not intended to be communicated to a client, was |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| recommended modifications above." Schmitt Decl. ¶ 61, Ex. 59 (XXX-PRIV-XXX-XIO-DG-0100731, at p. 4 (emphasis in original)). | written by an associate, and stated positions with which Mr. Neu testified that he did not necessarily agree.  Declaration of Sonali Maitra in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment ¶ 6. |
| 205.  Xio did not make any of the changes to *Mino* listed in the Copyright Infringement Memo.  *See* Schmitt Decl. ¶ 35, Ex. 33(D. Golen Dep. (Aug. 16, 2011) 51:7-15 ("Q. I'm asking you, of this bullet point list, did you take his recommendation and make any of these changes? . . . A. I don't -- I don't believe we made any of the changes -- any changes to our game after that point."). | Undisputed. |
| 206.  TH became aware of *Mino* at the end of July 2009.  HR Decl. ¶ 60. | Undisputed. |
| 207.  On August 3, 2009, a representative of TH sent a take-down notice pursuant to the Digital Millennium Copyright Act ("DMCA") to Apple Inc., which removed *Mino* from the Apple iTunes Store.  HR Decl. ¶ 61; Schmitt Decl. ¶ 62, Ex. 60 (M. Carter Dep. (Dec. 13, 2010) Ex. 23), ¶ 63, Ex. 61 (XIO-TETRIS- 0000005). | Undisputed. |
| 208.  On August 12, 2009, a representative of TH sent a supplemental DMCA takedown letter to Apple, which removed *Mino Lite* from the Apple iTunes Store.  HR Decl. ¶ 62; Schmitt Decl. ¶ 62, Ex. 60 (M. Carter Dep. (Dec. 13, 2010) Ex. 23), ¶ 64, Ex. 62 (TETRIS-XIO-0059611). | Undisputed. |
| 209.  Xio's attorney, Mr. Neu, sent Apple Inc. two DMCA counter-notification letters dated August 7, 2009 and September 2, 2009, requesting that *Mino* and *Mino Lite* | Undisputed. |

| Plaintiffs' Alleged Uncontested Fact | Defendant's Response |
|---|---|
| be put back on the App Store and consenting to jurisdiction in the District of New Jersey.  Schmitt Decl. ¶¶ 65-66, Exs. 63-64 (M. Carter Dep. (Dec. 13, 2010) Exs. 21-22). | |
| 210.  TH received notice from Apple Inc. of Xio's counter-notifications on November 24, 2009.  HR Decl. ¶ 63; Schmitt Decl. ¶ 71, Ex. 69 (TETRIS-XIO-0011565). | Undisputed. |
| 211.  Pursuant to the DMCA, Apple indicated that it would reinstate *Mino* on its App Store unless TH filed a lawsuit within 10 business days of receipt.  HR Decl. ¶ 63; Schmitt Decl. ¶ 71, Ex. 69 (TETRIS-XIO-0011565) (attaching e-mail from Apple Inc. to TH's counsel)). | Undisputed. |
| 212.  TH filed this action on December 2, 2009.  HR Decl. ¶ 63; Pls. Compl. (Dkt. No. 1). | Undisputed. |

Dated:  October 25, 2011         ROBINSON, WETTRE & MILLER LLC
One Newark Center, 19th Floor
Newark, New Jersey 07102
(973) 690-5400
drobinson@rwmlegal.com

By:        */s/ Donald A. Robinson*
Donald A. Robinson

-and-

Mark A. Lemley
Joseph C. Gratz
Sonali D. Maitra
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA  94111
415-362-6666

*Attorneys for Defendant*
*XIO Interactive, Inc.*

57

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 25, 2011, I caused a copy of DEFENDANT'S

RESPONSIVE STATEMENT OF MATERIAL FACTS IN SUPPORT OF

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY

JUDGMENT OF INFRINGEMENT to be served upon plaintiffs' counsel of record

via the Court's electronic filing system.

*/s/ Donald A. Robinson*
Donald A. Robinson
