Dale M. Cendali
Johanna Schmitt
Brendan T. Kehoe
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
dale.cendali@kirkland.com
johanna.schmitt@kirkland.com
brendan.kehoe@kirkland.com

Robert J. Schoenberg
RIKER DANZIG SCHERER HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962-1981
Telephone: (973) 538-0800
rschoenberg@riker.com

Attorneys for Plaintiffs
Tetris Holding, LLC and The Tetris Company, LLC

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TETRIS HOLDING, LLC and<br>THE TETRIS COMPANY, LLC,<br><br>Plaintiffs,<br><br>- against -<br><br>XIO INTERACTIVE INC.,<br><br>Defendant. | Case No. 3:09-cv-6115 (FLW)<br>(DEA)<br><br>Hon. Freda L. Wolfson, U.S.D.J.<br>Hon. Douglas E. Arpert, U.S.M.J.<br><br>**MEMORANDUM OF LAW IN<br>SUPPORT OF PLAINTIFFS'<br>OPPOSITION TO<br>DEFENDANT'S MOTION FOR<br>SUMMARY JUDGMENT**<br><br>***Document Filed Electronically*** |

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT .................................................................1

II. FACTUAL BACKGROUND.......................................................................4

III. ARGUMENT..........................................................................................7

    A.  Xio's *Mino* Game Infringes TH's Copyrights in the *Tetris* Games ...........................................................................................7

        1.  Xio Copied TH's Protectable Visual Expression ......................7

            a.  The Protectable Visual Expression of *Tetris* ...................7

            b.  The Similarities Between *Mino* and the *Tetris* Games Are Not Limited to the "Idea" or *Scenes à Faire.* ..........................................................................11

        2.  Xio's Argument that the Visual Expression of TH's Tetris Games Are the "Rules" or Are "Functional" Fails.........17

            a.  The Fanciful Visual Expression That Xio Copied Is Not the "Rules" of the *Tetris* Games ..........................17

                i.  Court Use "Idea" and "Rules" Synonymously .....................................................18

                ii. Xio's Definition of the "Rules" of *Tetris* Has No Basis in the Law .....................................20

            b.  The Fanciful Visual Expression that Xio Copied Is Not "Functional".................................................29

                i.  The Fanciful Visual Expression of the *Tetris* Games Is Not Patentable. .....................................30

                ii. The Fanciful Visual Expression of the Tetris Games Is Not A "Method of Operation.".............32

            c.  Xio's Argument that the Copied Visual Expression is a "Rule" or "Functional" Because Changing it Would Change *Tetris* Has No Legal Support................35

    B.  The *Tetris* Trade Dress Is Protectable and Has Been Infringed..........37

        1.  The *Tetris* Trade Dress Is Not Functional .................................37

## TABLE OF CONTENTS

**<u>Page</u>**

2.    TH's Trade Dress Claim Is Not Preempted ..............................38

CONCLUSION ......................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*22,000 pieces of imported "brick" games*,
  No. RR:IT:IP 467175 GFM (U.S. Cust. Serv. Nov. 4, 1999) ................... passim

*Adidas-Salomon AG v. Target Corp.*,
  228 F. Supp. 2d 1192 (D. Or. 2002) ...............................................................38

*Affil. Enters, Inc. v. Gantz*,
  86 F.2d 597 (10th Cir. 1937) ...........................................................................19

*Affil. Enters., Inc. v. Gruber*,
  86 F.2d 958 (1st Cir. 1936) ..............................................................................19

*Affil. Hosp. Prods., Inc. v. Merdel Game Mfg. Co.*,
  513 F.2d 1183 (2d Cir. 1975) ..........................................................................19

*Allen v. Acad. Games League of Am.*,
  89 F.3d 614 (9th Cir. 1996) .............................................................................19

*Anti-Monopoly, Inc. v. Gen. Mills Fun Grp.*,
  611 F.2d 296 (9th Cir. 1979) ...........................................................................32

*Atari Games Corp. v. Oman*,
  979 F.2d 242 (D.C. Cir. 1992) .........................................................................10

*Atari, Inc. v. Amusement World, Inc.*,
  547 F. Supp. 222 (D. Md. 1981) ........................................................... 15, 16, 17

*Atari, Inc. v. N. Am. Philips Cons. Elecs. Corp.*,
  672 F.2d 607 (7th Cir. 1982) ......................................................... 10, 14, 20, 25

*Bach v. Forever Living Prods. U.S., Inc.*,
  473 F. Supp. 2d 1110 (W.D. Wash. 2007) ................................................. 39, 40

*Bretford Mfg., Inc. v. Smith Sys. Mfg. Co.*,
  286 F. Supp. 2d 969 (N.D. Ill. 2003) ...............................................................40

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Bryant v. Europadisk, Ltd.*,
    No. 07-3050, 2009 WL 1059777 (S.D.N.Y. Apr. 15, 2009) ..............................5

*Cartier, Inc. v. Sardell Jewelry, Inc.*,
    294 Fed. App'x. 615 (2d Cir. 2008) ..................................................38

*Chamberlain v. Uris Sales Corp.*,
    56 F. Supp. 987 (S.D.N.Y. 1944) ....................................................19

*CMM Cable Rep, Inc. v. Keymarket Commc'ns, Inc.*,
    870 F. Supp. 631 (M.D. Pa. 1994) ............................................... 39, 40

*Coach, Inc. v. Bags & Accessories*,
    No. 10-2555, 2011 WL 1882403 (D.N.J. May 17, 2011) .................................39

*Computer Associates International, Inc. v. Altai, Inc.*,
    982 F.2d 693 (2d Cir. 1992) .........................................................34

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
    539 U.S. 23 (2003)..................................................................40

*Data East USA, Inc. v Epyx, Inc.*,
    862 F.2d 204 (9th Cir. 1988) ............................................... 15, 16, 17

*F.A. Davis Co. v. Wolters Kluwer Health, Inc.*,
    413 F. Supp. 2d 507 (E.D. Pa. 2005)..................................................37

*Fowle v. C&C Cola*,
    868 F.2d 59 (3d Cir. 1989) ..........................................................21

*Gen. Scientific Corp. v. Sheervision, Inc.*,
    No. 10-13582, 2011 WL 3880489 (E.D. Mich. Sept. 2, 2011) ..........................39

*Huebbe v. Okla. Casting Co.*,
    No. 06-306, 2009 WL 3245404 (W.D. Okla. Sept. 30, 2009) ..........................39

*Incredible Techs., Inc. v. Virtual Techs., Inc.*,
    400 F.3d 1007 (7th Cir. 2005) .............................................. 34, 35

# TABLE OF AUTHORITIES (CONT'D)

<u>Page(s)</u>

*JCW Invs., Inc. v. Novelty, Inc.*,
289 F. Supp. 2d 1023 (N.D. Ill. 2003) ............................................................. 13

*Keane v. Fox Tel. Stations, Inc.*,
297 F. Supp. 2d 921 (2004) ............................................................................... 40

*Larkin Grp., Inc. v. Acquatic Design Cons., Inc.*,
323 F. Supp. 2d 1121 (D. Ka. 2004) ................................................................. 40

*Lorillard Tobacco Co. v. Asian Am. Market*,
No. 06-948, 2007 WL 1217966 (D.N.J. Apr. 23, 2007) ..................................... 5

*Lotus Dev. Corp. v. Borland Int'l, Inc.*,
49 F.3d 807 (1st Cir. 1995) .......................................................................... 33, 34

*Lotus Dev. Corp. v. Borland Int'l., Inc.*,
788 F. Supp. 78 (D. Mass. 1992) ...................................................................... 32

*Luxury Int'l, Inc. v. United States*,
90 F. Supp. 2d 1294 (C.I.T. 2000) .................................................................... 11

*M. Kramer Mfg. Co., Inc. v. Andrews*,
783 F.2d 421 (4th Cir. 1986) ....................................................................... 10, 32

*Mazer v. Stein*,
347 U.S. 201 (1954) ........................................................................................... 32

*Med. Educ. Dev. Servs., Inc. v. Reed Elsevier Grp., PLC*,
No. 05-8665, 2008 WL 4449412 (S.D.N.Y. Sept. 30, 2008) ............................ 13

*Midway Mfg. Co. v. Bandai-Am., Inc.*,
546 F. Supp. 125 (D.N.J. 1982) ................................................................. passim

*Midway Mfg. Co. v. Dirkschneider*,
543 F. Supp. 466 (D. Neb. 1981) ......................................................... 11, 38, 39

*Morrissey v. P&G Co.*,
379 F.2d 675 (1st Cir. 1967) ............................................................................. 19

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Russell v. Ne. Publ'g Co.*,
  7 F. Supp. 571 (D. Mass. 1934) ..........................................................................19

*Schiffer Publ'g, Ltd. v. Chronicle Books, LLC*,
  No. 03-4962, 2004 WL 2583817 (E.D. Pa. Nov. 12, 2004) ..............................37

*Sheldon Abend Revocable Trust v. Spielberg*,
  748 F. Supp. 2d 200 (S.D.N.Y. 2010) ..............................................................13

*Slep-Tone Entm't Corp.*,
  No. 10-592, 2011 WL 4482082 (S.D. Oh. Sept. 26, 2011) ..............................39

*Smith v. Allentown*,
  589 F.3d 684 (3d Cir. 2009) .............................................................................21

*Sony Corp. of Am. v. Universal Studios, Inc.*,
  464 U.S. 417 (1984) ...........................................................................................4

*Sparaco v. Lawler, Matusky, Skelly, Eng'rs LLP*,
  303 F.3d 460 (2d Cir. 2002) .............................................................................13

*Stern Elecs., Inc. v. Kaufman*,
  669 F.2d 852 (2d Cir. 1982) .............................................................................10

*Tempo Music, Inc. v. Famous Music Corp.*,
  838 F. Supp. 162 (S.D.N.Y. 1994) ...................................................................37

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*,
  532 U.S. 23 (2001).............................................................................................38

*Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*,
  338 F.3d 127 (2d Cir. 2003) ...............................................................................8

*Universal City Studios, Inc. v. Nintendo Co. Ltd.*,
  615 F. Supp. 838 (S.D.N.Y. 1985) ...................................................................10

*Walker v. Time Life Films, Inc.*,
  784 F.2d 44 (2d Cir. 1986) ..................................................................... 12, 13

## TABLE OF AUTHORITIES (CONT'D)

<u>Page(s)</u>

*Whilst Club v. Foster*,
    42 F.2d 782 (S.D.N.Y. 1929)..............................................................................19

**Statutes**

17 U.S.C. § 102 .............................................................................................. 12, 30

17 U.S.C. § 301(d) .............................................................................................39

35 U.S.C. § 101 ..................................................................................................30

**Other Authorities**

*Games*, U.S Copyright Office, http://www. copyright.gov/fls/fl108.html ...............6

Merriam Webster's Collegiate Dictionary .............................................................24

Oxford English Reference Dictionary ...................................................................24

U.S. Const. art. I, § 8, cl. 8.................................................................................4

William Patry, *Electronic Audiovisual Games: Navigating the Maze*,
    31 J. of Copyright Soc'y 49 (1984) ..................................................................16

**Rules**

Fed. R. Evid. 801(c) ...........................................................................................21

**Regulations**

7 C.F.R. § 202.10 ...............................................................................................32

## I.    <u>PRELIMINARY STATEMENT</u>

In defense of TH's copyright claim, Xio makes no attempt to contest TH's ownership, and admits to its own "careful and purposeful replication . . . of *Tetris*."[1] (Xio Br. 33.)  Also, Xio does not deny that its *Mino* game looks virtually identical to *Tetris*—and even admits that the games "look alike."  (*Id.* at 2.)

Instead, Xio's *only* defense is that the fanciful visual expression of TH's *Tetris* Games that Xio brazenly copied is somehow not protected by copyright. Xio's defense fails, however, because, as discussed below, it is well-settled that this type of visual expression is protected by copyright and has not merged with the works' unprotectable "idea."  Consequently, in an apparent attempt at misdirection, Xio tries to obfuscate the law by putting forth a series of nonsensical and circular arguments that the visual expression it copied is the unprotectable "rules" or "functional" elements of *Tetris*.

With regard to Xio's claim that it only copied the "rules" of *Tetris*, Xio adopts a self-serving definition that includes *all* of the fanciful visual elements that it copied.  In doing so, Xio disregards case law (including a case from the District of New Jersey), which makes clear that, in this context, the "rules" of a videogame are essentially the same as its unprotectable "idea" and similarly abstract—as

---

[1] All capitalized terms not defined herein have been previously defined in TH's motion for summary judgment.  (Dkt No. 49-1)

opposed to the type of detailed, creative expression that Xio copied.  In support of its misguided definition, Xio relies on a theoretical discussion in an academic book by Jesper Juul, who was not an expert witness in this case and who does not address the definition of "rules" for purposes of copyright law, let alone whether Xio copied TH's expression.  In any event, even Xio's own expert concedes that many elements Xio copied are not "rules" under Dr. Juul's definition.  Also, Xio misconstrues TH's documents, which specifically provide licensees with instructions to facilitate their efforts to make a game that looks like *Tetris.*

Further, Xio's argument that it copied only "functional" elements is nonsensical given that *Tetris* is an entertaining audiovisual work─not a utilitarian article that serves a functional purpose.  *Tetris* does not *have* to look the way it does, rather its appearance is the result of a series of creative choices by its designers as even Xio's own expert repeatedly admitted.  Xio's claim that it copied elements that can only be protected by patent is unavailing as it is black-letter law that copyright protects fanciful visual expression in videogames.  Equally unavailing is Xio's claim that the copied expression is a "method of operation." Courts have found the layout of controls to operate a device to be "methods of operation"—not the visual expression at issue here.

Also, Xio's argument that the visual elements it copied are "rules" or "functional" because if they were altered, the game would change in some way

(*e.g.*, the game would be easier or harder to play) has no basis in the law. Moreover, this argument makes no sense as all works of art would "change" in some way if they were altered—but they are still protected by copyright.

Lastly, in tacit recognition of its lack of a credible defense, Xio devotes only two pages of its brief to TH's trade dress claim. Tellingly, Xio does not deny or rebut the overwhelming evidence (including three consumer surveys) that TH's *Tetris* Trade Dress is distinctive, and that Xio's copying is likely to cause confusion. Instead, Xio merely recites its claim that the *Tetris* Trade Dress is "functional"—but its argument fails as it has no basis in law or fact. In addition, Xio's argument that the claim is preempted contradicts well-established law that trade dress and copyright protect different rights and that such claims can coexist.

In short, with its motion, Xio rashly asks this Court to depart from well-established principles of intellectual property law to radically undermine the protection afforded videogames in furtherance of its own venal commercial interests. Such a result, however, would destabilize the vibrant videogame industry, which is currently thriving in the United States based, in part, on game developers being able to rely on copyright law to protect their creations. In other words, a finding for Xio would reward people who slavishly copy and free-ride others' games, and create disincentives for developers who create new audiovisual works. Such a result would contravene the Constitutional precept upon which

3

copyright law is based.  U.S. CONST. art. I, § 8, cl. 8 (Congress is authorized "[t]o promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries"); *Sony Corp. of Am. v. Universal Studios, Inc.*, 464 U.S. 417, 429 (1984) (the purpose of copyright is to "motivate the creative activity of authors and inventors by [providing] a special reward").  Thus, TH respectfully requests that the Court deny Xio's motion.

## II.   FACTUAL BACKGROUND

In the fall of 2008, Xio decided to make a game for the iPhone—which became *Mino*.  (Xio Br. 6.)  To make *Mino*, Xio does not deny that it copied *Tetris*, and even admits to its "careful and purposeful replication" of *Tetris*. (*Id.* at 33.)

Xio admits that it knew that TH had "copyright, trademark and trade dress rights to *Tetris*" early in *Mino*'s development.  (*Id.* at 6.)  Xio was aware of at least one of the U.S. Customs Service decisions, which held that the visual elements of *Tetris* (including those at issue here) are copyrightable and had been infringed by other games.  (Schmitt Decl. ¶ 70, Ex. 68 (Dkt No. 49))  Also, in November 2008, Xio hired Jeffrey Neu, Esq., an intellectual property attorney, to advise about possible claims by TH.  (*Id.* ¶ 49.)  Mr. Neu explained to Xio that TH could bring a claim for infringement even if Xio did not copy the code for *Tetris*. (*Id.* ¶ 52.)  Mr. Neu also made clear to Xio that a claim can be based on the visual "imagery" in

the games.  (*Id.*)  Indeed, after *Mino*'s release, Mr. Neu repeatedly advised Xio to change *Mino* in order to avoid claims (which advice Xio ignored).  (*Id.* ¶ 49.)

Nevertheless, Xio proceeded to make and release *Mino*, which looks virtually identical to *Tetris*.  Even Xio has been forced to admit that "[t]here is no question that *Mino* and *Tetris* look alike." (Xio Br. 2.)  Now, in its fact statement, Xio claims that it thought its brazen copying was lawful.  However, Xio's state of mind on this issue has no bearing on either side's motion on liability as copyright and trade dress infringement are strict liability offenses.  *See Bryant v. Europadisk, Ltd.*, No. 07-3050, 2009 WL 1059777, at *5 (S.D.N.Y. Apr. 15, 2009); *Lorillard Tobacco Co. v. Asian Am. Market*, No. 06-948, 2007 WL 1217966, at *2 (D.N.J. Apr. 23, 2007).  That said, as discussed below, Xio's claim fails as a matter of law.

First, Xio claims to have relied on a U.S. Copyright Office circular, which states that copyright does not protect a game's "idea."  (*Id.* at 6.)  This circular, however, does not state that visual expression of games can be copied.  To the contrary, it states that copyright protects "the particular manner of an author's expression in literary, artistic or musical form" in games, including "pictoral expression."[2]  *Games*, http://www. copyright.gov/fls/fl108.html.

Second, Xio relies on conversations with attorneys.  (Xio Br. 7.)  In support,

---

[2] Xio also claims to have relied on Internet sources—like Wikipedia (which anyone can edit) and other blogs—but none are reliable legal authority.  (Xio Br. 7.)

Xio cites to letters that Xio's CEO, Desiree Golen, wrote to two attorneys. (Maitra Decl., Exs. 19–20.) However, neither attorney responded or had any contact with Xio (much less gave it advice). (Decl. of Johanna Schmitt, Esq. in Supp. of Pl.'s Opp., dated Oct. 25, 2011 ("Opp. Schmitt Decl."), ¶¶ 15, 16, Ex. 8.) Xio also relies on an email from a Julie Turner, who allegedly thought Xio's analysis was "spot on." (Maitra Decl., Ex. 21.) But, there is no evidence that Ms. Turner—who was not Xio's attorney—had any information about the specific facts of this case, such as images of *Mino*. (Opp. Schmitt Decl. ¶ 19, Ex. 9.)

Third, to develop *Mino*, Xio claims to have "relied" on an "internal memorandum," which stated that the copied *Tetris* elements were "functional." (Maitra Decl., Ex. 22.) This memo, however, is merely a self-serving analysis that was drafted in August 2009—months <u>after</u> *Mino* was released and even <u>after</u> Xio received TH's cease and desist letter. (Opp. Schmitt Decl. ¶¶ 9, 10, Ex. 5.) Thus, it is not possible for Xio to have relied on it when making *Mino.* Also, it was drafted by Xio's CTO, Michael Carter, who is not an attorney or legal expert. (*Id.* at ¶ 6, 7, Exs. 4, 5.) Indeed, after Xio sent this memo to Mr. Neu (its attorney), Mr. Neu sent Xio a legal memo, which advised Xio to make changes to the way *Mino* looked, including the elements that Mr. Carter had previously, incorrectly deemed "functional." (Schmitt Decl. ¶¶ 60-61, Exs. 58-59.) Thus, Xio's claim that it copied *Tetris* in good faith is not plausible (nor relevant as noted above).

### III.   ARGUMENT

#### A.   Xio's *Mino* Game Infringes TH's Copyrights in the *Tetris* Games

Xio's sole defense to TH's copyright claim is a convoluted claim that the fanciful expression it copied was actually "rules" or "functional" elements that are not protected by copyright.  This argument has no support in the law.

##### 1.   Xio Copied TH's Protectable Visual Expression

###### a.   The Protectable Visual Expression of *Tetris*

The *Tetris* Games are fanciful works.  (HR Decl. ¶ 3 (Dkt. 49-21); Bogost Decl. ¶ 24 (Dkt. 49-12).)  When Alexey Pajitnov created the first version of *Tetris* in the mid-1980s, it was unique, and looked different from anything that preceded it.  (Bogost Decl. ¶ 37.)  As pictured below, *Tetris* looked very different from the physical pentamino puzzle cited by Xio that Mr. Pajitnov played in his youth.  (Xio Br. 4; Opp. Schmitt Decl., ¶ 2, Ex. 1.)  *Tetris* also looked very different from the board game *Universe* (also cited by Xio)—leaving aside that there is no evidence that Mr. Pajitnov even had access to it before he created *Tetris*.  (*Id.* at ¶¶ 4-5, Ex. 3.)  Notably, neither game is an audiovisual work, which includes the distinctive movements or sequence of images that appear in *Tetris*.

| **Pentamino Puzzle** | **Parker Bros.' *Universe*** | **Early Version of *Tetris*** |
|:---:|:---:|:---:|
|  |  |  |

The protectable visual expression of the fanciful *Tetris* Games includes the

combination of the following elements, which appear on the screen: (1) seven
Tetrimino playing pieces made up of four equally-sized squares joined at their
sides[3]; (2) the visual delineation of individual blocks that comprise each Tetrimino;
(3) the bright, distinct colors used for each of the Tetrimino pieces; (4) a tall,
rectangular playfield (or matrix), 10 blocks wide and 20 blocks tall;  (5) the small
display near the playfield that shows the next playing piece to appear in the
playfield; (6) the particular starting orientation of the Tetriminos, both at the top of
the screen and as shown in the "next piece" display; (7) the display of "garbage
lines" with at least one missing block in random order; and (8) the screen layout in
multiplayer versions with the player's matrix appearing most prominently on the
screen and the opponents' matrixes appearing smaller than the player's matrix and
to the side of the player's matrix.  (HR Decl. ¶ 31, Ex. 7; Bogost Decl. ¶ 21.)

In addition, like other audiovisual works, the protectable visual expression in
the *Tetris* Games includes the movement of its pieces and the sequence of images

---

[3] Xio's claim that Mr. Pajitnov did not invent the tetromino shape is a red herring.
(Xio. Br. 3–4.)  Wassily Kandinsky did not invent the square and J.D. Salinger did
not invent the words "Catcher" or "Rye"—but both creators used these elements to
make works deserving of strong copyright protection.  *See Tufenkian Imp./Exp.
Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 132 (2d Cir. 2003) ("[A]ll
creative works draw on the common wellspring that is the public domain,"
including "colors, letters, descriptive facts, and the catalog of standard geometric
forms . . . .").  While he did not invent the shape, Mr. Pajitnov was the first person
to choose the tetromino as a shape for pieces in an electronic puzzle game in
combination with other visual elements.  (HR Decl. ¶ 31–34; Bogost Decl. ¶ 21.)
The result of his creativity is the wholly fanciful audiovisual work known as *Tetris*.

8

that appear on the screen, such as: (1) the appearance of Tetriminos moving from the top of the playfield to its bottom; (2) the way the Tetrimino pieces appear to move and rotate in the playfield; (3) the display of a "shadow" piece beneath the Tetriminos as they appear to fall; (4) the color change when the Tetriminos enter lock-down mode; (5) when a horizontal line fills across the playfield with blocks, the line disappears, and the remaining pieces appear to consolidate downward; and (6) the appearance of individual blocks automatically filling in the playfield from the bottom to the top when the game is over.[4]  (*Id.*)

Courts—including several Circuit courts and the District of New Jersey—consistently hold that this type of expression in videogames is protected by copyright.  *See, e.g., Atari Games Corp. v. Oman*, 979 F.2d 242, 245 (D.C. Cir. 1992) (then-Circuit Judge Ginsberg holding that "the hallmark of a video game is the expression found in 'the entire effect of the game as it appears and sounds,' its 'sequence of images.'"); *M. Kramer Mfg. Co., Inc. v. Andrews,* 783 F.2d 421, 440 (4th Cir. 1986) (visual expression of poker video game, including flashing card feature and arrangement of screen display, are protected); *Atari, Inc. v. N. Am. Philips Cons. Elecs. Corp.*, 672 F.2d 607, 617 (7th Cir. 1982) ("[P]articular form

---

[4] This element was included in all released versions of *Mino*.  (Schmitt Decl. ¶ 55, Ex. 53; Schmitt Decl. ¶ 7, Ex. 5 at 127:18-129:3.)  Xio cites no evidence for its claim that this element has been removed from *Mino* other than an unsupported statement by counsel.  That said, even if this element was removed, the overall "look and feel" of *Mino* would still be virtually identical to *Tetris*.

in which [*Pac-Man*] is expressed (shapes, sizes, colors, sequences, arrangements, and sounds)" is protectable); *Stern Elecs., Inc. v. Kaufman,* 669 F.2d 852, 856–57 (2d Cir. 1982) ("repetitive sequence of a substantial portion of the sights and sounds of the [*Scramble* videogame] qualifies for copyright protection as an audiovisual work" and "the entire effect of the game as it appears and sounds" found copyrightable"); *Universal City Studios, Inc. v. Nintendo Co. Ltd.,* 615 F. Supp. 838, 859–60 (S.D.N.Y. 1985) ("[T]one and feel of *Donkey Kong* are replicated" in infringing game, and the "interaction of the characters, obstacles, background, and music in *Donkey Kong* are arbitrary, fanciful, and sufficiently distinctive such that they deserve protection from a near knock-off"); *Midway Mfg. Co. v. Bandai-Am., Inc.,* 546 F. Supp. 125, 148 (D.N.J. 1982) (protectable expression of *Galaxian* includes "such elements as the particular insectile shape of the aliens [and] their movements"); *Midway Mfg. Co. v. Dirkschneider*, 543 F. Supp. 466, 480 (D. Neb. 1981) (copyrightable expression of *Galaxian* includes "distinctive color and design of the space ships and other players").

Notably, the visual expression in the *Tetris* Games at issue here has been found to constitute protectable expression by the U.S. Customs Service in four separate decisions—one of which was affirmed by the Court of International Trade.[5]  *Luxury Int'l, Inc. v. United States,* 90 F. Supp. 2d 1294, 1299 (C.I.T.

---

[5] The Customs Decisions are attached as Exhibit 68 to the Schmitt Decl.

2000). In assessing its expression, the Customs Service held in each opinion that

the Tetrimino playing pieces and the way they moved were protected by copyright:

> [T]he copyrightable features of the TETRIS game, as covered by the
> copyright registration, includes the downward, lateral, and rotating
> movements of the differently oriented four-brick playing pieces, and
> the shape and appearance of the four-brick playing pieces,
> ...[including] the configuration of the four-brick combinations
> comprising the playing pieces.

*See, e.g., 22,000 pieces of imported "brick" games*, No. RR:IT:IP 467175 GFM, at

4 (U.S. Cust. Serv. Nov. 4, 1999), *aff'd*, *Luxury Int'l*, 90 F. Supp. 2d at 1299.

Also, the U.S. Customs Service held that other elements were protected, such as

the shape and dimensions of the playfield and disappearance of completed lines:

> Additional copyrighted features [in *Tetris*] include:…[1] the feature
> displaying the next four-brick playing piece that will fall down the
> playing field matrix, [2] the disappearance of any completed
> horizontal row, [3] the subsequent consolidation of the playing pieces
> remaining on the playing field as a result of the downward shift into
> the space vacated by the disappearing row, ….[4] the makeup of the
> playing field itself, i.e., the vertical matrix, higher than it is wide, with
> a base of ten individual "bricks" per horizontal row, and generally
> twenty individual "bricks" per vertical line….

*Id.* at 4–5. As the games at issue copied these visual elements, the U.S. Customs

Service determined that they infringed *Tetris*. Here, Xio admits that "*Mino*

contains these features," thus it is clear that *Mino* similarly infringes. (Xio Br. 5.)

### b.   The Similarities Between *Mino* and the *Tetris* Games Are Not Limited to the "Idea" or *Scenes à Faire.*

As noted above, Xio's sole defense is that the visual expression it copied is

not protectable by copyright. As explained below, Xio's position contradicts

11

controlling legal authority and the sound reasoning of the U.S. Customs Service, which found that the expression in the *Tetris* Games is protectable, has not merged with the "idea" of the game, and is not *scenes à faire.*

While copyright protects the expression of an idea (like the expression of *Tetris* described above), it is a basic principal that copyright does not protect the idea itself.  17 U.S.C. § 102(b).  As such, in copyright cases, courts must decide "whether the similarities shared by the works are something more than generalized idea or themes."  *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 48–49 (2d Cir. 1986).  If it is determined that the "expression provides nothing new or additional over the idea," the "idea and expression will coincide" or merge.  *Midway Mfg.,* 546 F. Supp. at 148.  In addition, copyright does not protect *scenes à faire*— "scenes that necessarily result from the choice of a setting or situation."  *Walker,* 784 F.2d at 50 ("[D]runks, prostitutes, vermin and derelict cars would appear in any realistic work about the work of policemen in the South Bronx.").  If the only similarities between the works are the "ideas" or *scenes à faire,* infringement will be found only if there is verbatim copying.  *Midway Mfg.,* 546 F. Supp. at 148.

In defining the "idea" of a particular work, courts uniformly hold that an "idea" is simple, abstract, and not detailed.  Otherwise, a plagiarist could escape liability simply by describing the alleged "idea" in great detail to include the

12

expression.[6]  *See Sparaco v. Lawler, Matusky, Skelly, Eng'rs LLP,* 303 F.3d 460,

469 (2d Cir. 2002) (an "idea" is "vague and abstract"); *Med. Educ. Dev. Servs.,*

*Inc. v. Reed Elsevier Grp., PLC,* No. 05-8665, 2008 WL 4449412, at *7 n.13

(S.D.N.Y. Sept. 30, 2008) (defendant cannot define the "idea" of a work "in such

detail that the description of the expression would add nothing to the idea, thus

allowing a defendant to engage in all but verbatim copying"); *JCW Invs., Inc. v.*

*Novelty, Inc.*, 289 F. Supp. 2d 1023, 1036 (N.D. Ill. 2003) (rejecting "overly

narrow and self-serving" definition of the work's "idea" as it would "essentially

permit defendant to copy [the work] with impunity").

When the works at issue are videogames, courts—including the District of

New Jersey—have applied this same analysis in determining whether the "idea"

and expression in the videogame merge.  For example, in a case involving the

audiovisual expression of *Galaxian*, the District of New Jersey analyzed the

"abstract rules and play ideas" of the videogame.  *Midway Mfg.*, 546 F. Supp. at

148.  The court held that "the description of the work for the purpose of identifying

---

[6] Put another way, it would be unjust for someone to excuse the copying of *Gone with the Wind*, for example, by arguing that the "idea" is, among other things, a story about a spoiled, beautiful young woman, named Scarlett O'Hara, who lives on a plantation called *Tara*, and who meets a rakish scoundrel, named Rhett Butler, whom she kisses while trying to flee burning Atlanta during the Civil War.  Rather, consistent with copyright law, the "idea" of *Gone with the Wind* is more simple and abstract, such as a romance and story of survival during the Civil War.  *See Sheldon Abend Revocable Trust v. Spielberg*, 748 F. Supp. 2d 200, 208 (S.D.N.Y. 2010) ("idea" of *Rear Window* is "voyeur-suspicion-peril-vindication plot").

its idea must be a simple one." *Id.* The court rejected the defendant's detailed description of the "idea"—which included the "physical characteristics of the characters involved"— because it was not simple and included the game's visual expression. *Id.* As the court explained:

> If [defendant's] reasoning were accepted, a copyright defendant could always avoid liability merely by describing a plaintiff's work in great detail and then labeling that description with the "idea" of plaintiff's work. The "idea" of any work could always be defined in such detail that the description of the expression would add nothing to the "idea", thus allowing a defendant to engage in all but verbatim copying. Such a ploy cannot be allowed.

*Id.*; *see also Atari,* 672 F.2d at 617 (the idea of *Pac-Man* "can be described accurately in fairly abstract terms").

Here, in order to determine whether *Mino* infringes, once again, the Customs Decisions are instructive and demonstrate that the elements that Xio slavishly copied are protectable expression—not the "idea" of *Tetris* or *scenes à faire*. The U.S. Customs Service held that the "idea" of *Tetris* is an electronic game using "simple squares or blocks on the screen to be assembled into specific shapes and manipulated by the player in a race against time or against the computer," [7] and that there were "many other video games" that include "protectable expression based on the same underlying idea but do not include the expression of the *TETRIS*

---

[7] TH's videogame expert, Dr. Ian Bogost, has a similar definition of the "idea" of *Tetris*. (Bogost Decl. ¶ 19.) Notably, Xio's expert, Mr. Jason Begy, did not disagree. (Schmitt Decl. ¶ 4, Ex. 2 (Begy Dep. 295:10–23, May 10, 2011).)

game." *22,000 pieces*, at 6.  It also held that there are no *scenes à faire* in *Tetris* as

it is a "wholly fanciful creation, without reference to the real world."  *Id*. at 7.

Thus, Xio's attempt to define the unprotectable "idea" of *Tetris* in great detail to

include the visual elements is contrary to law.

 In a weak attempt to support its defense, Xio cites two *scenes à faire* cases:

*Atari, Inc. v. Amusement World, Inc.,* 547 F. Supp. 222 (D. Md. 1981) and *Data

East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204 (9th Cir. 1988).  However, these

decisions are inapposite for several reasons.

First, they involved videogames whose expression was not wholly abstract

and fanciful, and thus the courts found the similarities to be inevitable in making a

game based on the same "idea."  In *Amusement World*, the court found that the

similarities between *Asteroids* and *Meteors* were "inevitable, given the

requirements of the idea of a game involving a spaceship combating space rocks"

(*e.g.,* the player must be able to move his craft, spaceships must be able to fire

weapons which can destroy targets, etc.).[8]  547 F. Supp. at 229.  Similarly, in *Data

---

[8] It should also be noted that William Patry—a legal commentator on whom Xio
relies—has criticized the decision in *Amusement World* as incorrectly finding these
similarities inevitable.  *See* William Patry, *Electronic Audiovisual Games:
Navigating the Maze*, 31 J. of Copyright Soc'y 49–50 (1984) ("While the use of a
rotating ship is common to virtually all electronic audiovisual space games, there is
no need for all such games involving spacerocks to have a ship which fires
weapons, which has increasing difficulty of play, progressively more rapid
appearance of rocks, more than one size of rock, etc.  These are not mandatory
*scenes a faire*.")

*East*, the court found that the similarities between the works were the result of making a videogame based on the "idea of depicting the performance of karate martial arts combat"—including the "number of combatants, the stance employed by the combatants, [and] established and recognized moves and motions" used in karate. 862 F.2d at 208–09 (noting "constraints inherent in the [real-life] sport of karate" and thus "karate is not susceptible to a wholly fanciful presentation"). Here, as the U.S. Customs Service held, *Tetris* is a wholly fanciful creation, with no "real-life, or at least science fiction, counterparts." *22,000 pieces*, at 7. (*See also* HR Decl. ¶ 3; Bogost Decl. ¶ 24.) As such, Xio cannot excuse its copying of TH's "abstract representation" as "obvious" or "inevitable." (*Id.*)

Further, in *Amusement World* and *Data East*, the courts found significant *differences* in the videogames at issue. *Amusement World,* 547 F. Supp. at 230 (finding differences in the "overall 'feel' of the way the games play," the "symbols that appear on the screen," and "the ways in which those symbols move around the display screen"); *Data East*, 862 F.2d at 209 (finding visual expression and backgrounds of the games were "dissimilar"). Here, *Mino* is a slavish copy of *Tetris* with an identical overall "look and feel"—and any differences between them are insignificant as Xio essentially admits. (HR Decl. ¶ 54–55; Bogost Decl. ¶ 52.)

Moreover, these two cases are not helpful because they are outdated. The limited options that designers had in the 1980s due to relatively primitive

technology were crucial to the courts' findings of non-infringement.  *Amusement World,* 547 F. Supp. at 224; *Data East,* 862 F.2d at 209.  The technological constraints described in these cases are nonexistent today—almost 30 years later— as the U.S. Customs Service held.[9]  *22,000 pieces*, at 6 ("the boundaries of expression which may have seemed fixed in the past have significantly expanded in recent times" thereby "severing unintended and undesired bonds of idea and expression"); *see also Data East,* 862 F.2d at 209 n.5.

### 2.   Xio's Argument that the Visual Expression of TH's Tetris Games Are the "Rules" or Are "Functional" Fails.

Faced with the well-settled law and the sound reasoning of the U.S. Customs Service referenced above, Xio's only recourse is to mischaracterize the fanciful visual expression of the Tetris Games as unprotectable "rules" or "functional."  As explained below, this argument is contorted and without merit.

### a.   The Fanciful Visual Expression That Xio Copied Is Not the "Rules" of the *Tetris* Games

Xio argues that the definition of the "rules" of *Tetris* is somehow more expansive than its "idea" in copyright law, and includes the fanciful visual

---

[9] TH's videogame expert, Dr. Ian Bogost, opines that Xio had an "essentially limitless" range of creative choices when making *Mino* for the iOS platform, given the devices' "advanced hardware and software features that make them far more flexible and powerful than devices of their kind in the past."  (Bogost Decl. ¶ 39.) Dr. Bogost's opinion is corroborated by the vast array of visual expression used for thousands of different puzzle games offered on the App Store.  (*Id.* ¶ 61.)  Xio's expert, Mr. Begy, did not rebut Dr. Bogost's opinion.  (Opp. Schmitt Decl. ¶ 59.)

elements cited above that Xio copied.  In other words, Xio argues that the particular shape, number, and depiction of the Tetrimino playing pieces, the shape and dimensions of the playfield, and the distinct way the pieces appear to move, among other things, are "rules" of *Tetris* and thus are free for copying.

Xio cites no legal support for its self-serving definition and ignores the fact that, as discussed below, courts use the terms "rules" and "ideas" synonymously in determining the protectable expression of videogames.  Yet, Xio desperately tries to keep its argument alive by putting forth a theoretical definition of "rules" from Jesper Juul (who was not a witness in this case) and by misconstruing TH's documents and testimony.  However, none of this evidence supports Xio's position that the fanciful visual elements it copied from *Tetris* are the "rules."

### i.      Court Use "Idea" and "Rules" Synonymously

Xio's claim that it copied only unprotectable "rules" is wholly unsupported by law.  Tellingly, Xio cites no case which holds that the unprotectable "idea" of a videogame has one definition, while the unprotectable "rules" of such videogame has another, much more detailed definition.[10]

---

[10] Xio only cites inapposite cases that discuss the "rules" of board, card and table-top games, not audiovisual works like *Tetris*, and that do not involve the pictorial expression of games.  Rather, they involve infringement of *written* rule books by other *written* rule books—which is not at issue here.  *See Allen v. Acad. Games League of Am.*, 89 F.3d 614, 617–18 (9th Cir. 1996) (written rule book for trivia game did not infringe as defendant had not slavishly copied the original but instead significantly revised and improved upon it); *Affil. Hosp. Prods., Inc. v. Merdel*

It is not surprising that Xio cannot cite any videogame case for this proposition because it is simply not the law.  Indeed, when determining whether substantial similarity exists between the video display of two videogames, courts— including the District of New Jersey—use the terms "rules" and "idea" of the videogame synonymously.  For example, the District of New Jersey defined the "abstract rules <u>and</u> play ideas" of *Galaxian* together, and distinguished them from the way the game looked—*i.e.,* the "particular forms in which [the abstract rules and play ideas] are expressed," including the "shapes, sizes, colors, sequences, arrangements, and sounds."  *Midway*, 546 F. Supp. at 148 (quoting *Atari,* 672 F.2d at 617).  Also, the Seventh Circuit held that the "idea" of *Pac-Man* is described

---

*Game Mfg. Co.*, 513 F.2d 1183, 1188–89 (2d Cir. 1975) (written rule book for the 19th C. game *Carroms* not infringed as it was not copied verbatim); *Morrissey v. P&G Co.*, 379 F.2d 675, 678 (1st Cir. 1967) (no copyright protection for language from plaintiff's rule book for a mail-in sweepstakes, stating in part, "Entrants should print name, address and social security number on a boxtop, or a plain paper . . . . [u]se the correct social security number belonging to the person named on entry"); *Affil. Enters., Inc. v. Gruber*, 86 F.2d 958 (1st Cir. 1936) (no copyright protection for lottery system); *Russell v. Ne. Publ'g Co.*, 7 F. Supp. 571, 572 (D. Mass. 1934) (no infringement of written rules and description of "Rapid Contract Bridge" excerpted from book); *Whilst Club v. Foster*, 42 F.2d 782, 782 (S.D.N.Y. 1929) ("Defendant has not infringed, because he has not copied the literary composition of plaintiff's publication, but, in language quite distinctly his own, has restated the same set of conventional precepts"); *see also Affil. Enters, Inc. v. Gantz,* 86 F.2d 597, 599 (10th Cir. 1937)  (written rules of illegal lottery not copyrightable); *Chamberlain v. Uris Sales Corp.*, 56 F. Supp. 987, 988 (S.D.N.Y. 1944) (no copyright for public domain card and table-top games).  The other cases Xio cites in footnote 5 of its brief at page 11 are also inapposite and none pertain to the pictorial or creative expression of any type of game, let alone a videogame.

19

"much in the same way as one would articulate the rules to such a game." *Atari,*

672 F.2d at 617 ("concrete details of the visual presentation constitute the

copyrightable expression of [*Pac-Man*'s] 'idea,'" and defendant's game infringed).

Here, as noted above, the U.S. Customs Service held that the "idea" of the

*Tetris* Games is that of an electronic game using "simple squares or blocks on the

screen to be assembled into specific shapes and manipulated by the player in a race

against time or against the computer." *See* p. 14 *supra*. It did not define the

"rules" of *Tetris* differently. Following the courts' reasoning in videogame cases

(like those noted above), the definition of "rules" of *Tetris* is synonymous with and

as similarly abstract as the definition of its "idea" as stated by the U.S. Customs

Service. As such, neither the "idea," nor the "rules" of *Tetris*, includes any of the

detailed, fanciful visual expression that Xio copied (see pp. 8-9 *supra*).

### ii.   Xio's Definition of the "Rules" of *Tetris* Has No Basis in the Law

Xio tries to support its self-serving definition of the "rules" of *Tetris* by

citing to an academic (and confusing) definition of "rules" by Jesper Juul and by

misconstruing TH's documents and testimony.   None of this evidence is availing,

and simply underscores Xio's attempt to obfuscate the issues.

### A.   Jesper Juul's Definition of "Rules" Is Inadmissible Hearsay and Not Probative

In support of its argument, Xio cites a definition taken from an excerpt of a

book by Jesper Juul, an academic.  (Xio Br. 22.)  As an initial matter, Dr. Juul is

not an expert witness in this case, he did not submit an expert report, he was not

deposed, and he did not submit a declaration in support of Xio's motion.  (Opp.

Schmitt Decl. ¶ 21.)  As such, this evidence is hearsay, which should not be

considered on summary judgment.[11]  Fed. R. Evid. 801(c); *Smith v. Allentown*, 589

F.3d 684, 693 (3d Cir. 2009)

      Further, even if it was admissible, Dr. Juul's definition is not probative here.

No court has relied on Dr. Juul's definition of "rules" and for good reason.[12]  As

Dr. Bogost opines, Dr. Juul's definition of "rules" as "limitations and affordances"

is "simply one of many different academic theories about the definition of 'rules'

in field of videogame aesthetics."  (Decl. of Dr. Ian Bogost in Support of Plaintiff's

Opposition ("Opp. Bogost Decl."), ¶ 4.)  Indeed, as Dr. Bogost states, his

definition "does not include or describe the audiovisual appearance of a game,"

---

[11] Also, Xio's expert, Mr. Jason Begy, submitted no declaration in support of Xio's
motion, and thus Xio's reliance on his report is improper. *See Fowle v. C&C Cola*,
868 F.2d 59, 67 (3d Cir. 1989) (finding an expert's report that was only attached to
counsel's affidavit could not be considered for summary judgment motion).

[12] Xio only cites a recent law review article by Bruce Boyden, which references Dr.
Juul's definition of "rules."  However, no court or other legal scholar has ever cited
to this article, which lacks any precedential or persuasive value.  Moreover, Mr.
Boyden is a law professor-colleague of Mark Lemley, lead counsel for Xio and
known advocate for limiting copyright protection in computer programs, and thus
it is no coincidence that the article parrots Xio's brief and cites the same materials
in support.

like the visual expression that Xio copied.  (*Id.* ¶ 5.)  Rather, in the same chapter,
Dr. Juul explains "in the case of videogames these 'limitations and affordances' are
related to computer algorithms, which generally relate to how a videogame is
programmed and not how the visual appearance of a videogame is designed."
(*Id.*)  Further, Dr. Juul does not purport to define "rules" in the context of
determining copyrightable visual expression of videogames.  (*Id.* ¶ 6.)

While Dr. Juul himself does not address how this definition would apply to
*Tetris* (*id.* ¶ 7), Xio's own expert, Mr. Begy, testified that some of the elements
that Xio copied are *not* "rules" even under Dr. Juul's definition.  These visual
elements include "[t]he seven geometric playing pieces being brightly colored . . .
The fact that the blocks are individually delineated . . . The appearance of the
blocks filling from the bottom to the top . . . The ghost piece . . . The change in
color . . . when a piece enters lockdown mode, and the layout of the matrixes in
[multiplayer.]"  (Opp. Schmitt Decl. ¶ 55, Ex. 14.)

Moreover, Xio's attempt to apply Dr. Juul's theoretical definition of "rules"
to the games of chess, sian tsy, and tic-tac-toe is inapposite and yet another attempt
to confuse the clear-cut issues in this case.  (Xio Br. 23–24.)  In essence, Xio is
attempting to compare apples to oranges.  These games are centuries-old folk
games that are in the *public domain*, and thus anyone can copy their expression to
make physical or electronic versions of them.  In contrast, *Tetris* is a modern

audiovisual work, which is wholly fanciful and creative.  Further, Xio cites no legal support for its discussion of the "rules" of chess, sian tsy, and tic-tac-toe.[13]

### B. Misconstrued Statements by TH Do Not Support Xio's Definition of the "Rules."

Xio also disingenuously mischaracterizes documents produced by TH—as well as testimony by witnesses—in an attempt to bolster its position that the creative visual expression it copied from *Tetris* is somehow unprotectable.

Xio cites to *Tetris* Design Guidelines, which instruct licensees how to make a videogame that looks like *Tetris*—just as Disney would provide its licensees with a style guide or instructions about how to render "Mickey Mouse" (e.g., his ears must be a certain size; his pants must be a certain color).  (Decl. of Henk B. Rogers in Support of Plaintiffs' Opposition ("Opp. HR Decl."), ¶ 7, Ex. A.)  Updated annually, the Design Guidelines set forth the standards to which TH's licensees should adhere when making a *Tetris*-branded game.  (*Id.*)  These standards ensure that *Tetris*-branded games are high-quality and have a consistent look.  (*Id.*)  They specify such things as the placement of the *Tetris* logo on the screen, the colors and appearance of the Tetriminos, the speed by which the Tetriminos should appear to move, and how each Tetrimino should appear to rotate. (*Id.*)

---

[13] Xio cites Mr. Pajitnov's testimony that sian tsy and chess are different games, but it is unclear how this is relevant to any issues in this case.  It certainly is not probative of the definition of the rules of these games.  (Xio Br. 24.)

The fact that the Design Guidelines may describe something as "rules" or "mechanics" in telling TH's licensees how to make a game that looks like *Tetris* is not probative about what is protectable expression under copyright law.  These non-legal documents use the word "rules" in its ordinary sense of "standards" or "guides" for licensees to follow when making a game that looks like *Tetris*.[14] (*Id.*) In other words, they are telling licensees what *Tetris* looks like as opposed to opining on the unprotectable "idea/rules" under copyright law.[15] (*Id.*)

Indeed, it is commonplace in the videogame industry for people to describe "rules" and "mechanics" loosely in a non-legal way that includes a great deal of obvious visual expression.  However, this does not mean the game's visual expression is not protected by copyright law.  For example, in Namco's *Pac-Man*, the "Rules" and "Goals" are described as follows:

> [Rules:] Chomp a Power Pellet to momentarily turn the ghosts blue. When they're blue you can eat them for bonus points.  Gobble up the fruit for extra bonus points.  Get an extra life when you reach 10,000 points.

---

[14] For example, the Oxford English Reference Dictionary defines "rule" as "prevailing custom or standard; the normal state of things," and the Merriam Webster's Collegiate Dictionary defines it as "a prescribed guide for conduct or action." (Opp. Schmitt Decl. ¶ 24, Ex. 11.)

[15] Xio also cites to a document not authored by TH. (Maitra Decl., Ex. 41; Opp. HR Decl. ¶ 8, Ex. B.)  It appears to be a proposal for a new *Tetris* version, submitted by a licensee, but does not opine on what is protectable under copyright, and thus is similarly not probative. (*Id.*)

24

[Goals:] Guide PAC-MAN through the maze and chomp all the PAC-Dots and Power Pellets to clear each maze.  Avoid the pesky ghosts!

(Opp. Schmitt Decl. ¶ 60, Ex. 15.)  The reference to pesky ghosts that turn blue, the Pac-Man gobbler character, and fruit symbols in the description of the game's rules does not render this expression unprotectable.  Indeed, the Seventh Circuit held that this very expression was protected by copyright.  *Atari,* 672 F.2d at 617.

Similarly, Sega's "Instruction Manual" for *Sonic the Hedgehog*, which provides game instructions to players, describes many visual elements from the videogame, and even includes pictures of these things:

As Sonic, you must evade traps and dodge crazed robots as you dash through six hazardous zones using your Super Sonic Spin Attack. Your goal is to rescue your friends from the nasty grasp of the demented scientist, Dr. Robotnik!

Smash open video monitors with the Super Sonic Spin Attack to get special items that help you defeat evil Dr. Robotnik!  [Such items include the "Super Ring," "Power Sneakers" and "Invincible.]

There are six action-packed zones, each with three exciting Acts. You'll square off against Dr. Robotnik at the end of every third Act. [Zones include "Green Hill Zone," with a "giant loop, tumble down tunnels," and "crumbling cliffs"; and "Marble Zone" with "pools of red-hot lava and shifting islands" and an "underground palace where massive weights and flying balls of fire block your path."]

(Opp. Schmitt Decl. ¶ 61, Ex. 16.)  The inclusion of the written description (and visual depiction) of the characters "Sonic the Hedgehog" and "Dr. Robotnik"—as well as the special items and zones that a player will encounter—in the game's instructions do not make these elements unprotectable under copyright.  Indeed,

25

Xio *admits* that these elements are part of its "expression," while claiming that the more abstract, unprotectable "rules" are only that a player "must reach a target point far away to the right of their starting point" by "running through the environment, jumping over obstacles, and jumping onto enemies."  (Xio's Br. 25.)

In addition to the Design Guidelines, Xio cites at length to "a basic *Tetris* demo" that is the output of sample source code that TH planned to give its licensees to assist them to program their games.[16]  (Xio Br. 26; Maitra Decl. Ex. 39; Opp. HR Decl. ¶¶ 9-10.)  This sample code was intended to be part of the 2009 *Tetris* Resource Kit to facilitate TH's licensees in making a game that looks like a *Tetris*-branded game.  (Opp. HR Decl. ¶ 9.)  The Resource Kit focused on instructions about the music and sound effects, and how to write code properly:

> The purpose of this document is to provide supplemental material for Tetris game development.  This material includes game music, sound effects, and engine support.  This document also alerts Tetris Licensees to common issues that arise when developing Tetris.

(*Id*.)  Xio nonetheless tries to argue that everything that appears on the screen in the basic *Tetris* demo constitutes the "rules" of *Tetris*.  The sole basis for Xio's argument is language in the Resource Kit, which states that the sample *source code*

---

[16] In discovery, TH objected to producing any code (including this sample code) to Xio because it is highly proprietary and TH was loathe to disclose it to a known copier.  (Opp. Schmitt Decl. ¶ 64.)  In a telephonic conference, Magistrate Judge Arpert agreed with TH that source code was not relevant to this case. (*Id*.)  However, with regard to this particular sample code, TH agreed to a limited inspection by Xio's expert, Mr. Begy, under strict security conditions.  (*Id*.)

(which produces the basic *Tetris* demo) will allow licensees to "better understand Tetris game rules and logic." Once again, Xio deliberately misconstrues this language. The Resource Kit does not discuss the legal definition of "rules" for the purposes of determining the protectable visual expression. (*Id.* at ¶ 11.) Rather, these words are simply used in the way they are commonly used by programmers to refer to "rules and logic" behind the technical task of programming software to achieve a particular goal. (*Id.*)

In addition, Xio's argument that everything that appears in the *Tetris* demo is an unprotectable "rule" is not only unsupported by law or the facts—it is directly contrary to the law. As pictured below, the demo looks similar to the early *Tetris* versions, which are wholly fanciful works that are clearly protected by copyright. The U.S. Copyright Office confirmed this by issuing a registration for early versions of *Tetris*. (HR Decl. ¶ 24, Ex. 2.) Indeed, as then-Circuit Judge Ginsberg held, games with graphics that are more basic than early *Tetris* versions, such as *Breakout* (pictured below), are deserving of copyright protection. *Atari*, 979 F.2d at 247 (reversing Copyright Office's refusal to issue registration for audiovisual expression in *Breakout*).

| **Early *Tetris* Game** | **Basic Tetris Demo** | **Atari's *Breakout* Game** |
|---|---|---|
|  |  |  |

Moreover, Xio's argument that the basic *Tetris* demo depicts the "rules" of Tetris is circular. According to Xio, the "rules" of *Tetris* include all of the visual elements cited by TH (*see* pp. 8-9 *supra*), and the basic demo depicts all of the "rules" of *Tetris*. However, as Xio admits, there are certain visual elements that Xio copied that do <u>not</u> appear in the basic *Tetris* demo, including the appearance of garbage lines and the layout of the playfields in multi-player versions. (Xio Br. 27 n.10.) Conversely, there are multiple visual elements in the basic *Tetris* demo that do <u>not</u> appear in certain *Tetris* games, including the delineation of the individual squares in the Tetriminos, the particular starting orientation of the playing pieces, the appearance of a ghost piece, and the change in color of the playing pieces when they enter lock-down mode. (Opp. HR Decl. ¶ 12.) Thus, according to Xio's own logic, these elements (which only appear in certain versions of *Tetris*) are not "rules" of *Tetris*. All of this underscores the folly of seizing upon language used in one context to define legal principles in another context.

Lastly, Xio cites to Mr. Pajitnov's use of the word "mechanics" in his deposition and tries to argue that he somehow meant the elements copied by Xio

are not protectable.  (Xio Br. 29.)  Leaving aside that Xio's own expert, Mr. Begy, admitted that "game mechanics is a phrase that is used frequently, and there is little common understanding over what exactly it means" (Opp. Schmitt Decl. ¶ 56, Ex. 14), Mr. Pajitnov's deposition makes clear that he was struggling as a non-native English speaker to explain complicated technical issues.  Mr. Pajitnov, who is a programmer by profession, was trying to describe his belief that certain features are "related more to your brain or to your emotions" and some "are related more to your fingers and pushing buttons."  (*Id.* at ¶ 43, Ex. 13.)  He was not opining that these features were not protected by copyright—nor was he even asked that question.  Indeed, Mr. Pajitnov made clear that the visual elements copied by Xio were things he tried to "express" and were the result of creative choices he made and that *Mino* copied them.   (*Id.* at ¶ 44, Ex. 13 (Mr. Pajitnov chose the particular shape and dimension of the playfield because it "pleased" him; he chose the brightly-colored Tetrimino pieces because he liked that shape; he described the disappearance of any completed horizontal line and subsequent downward consolidation of the remaining pieces as part of the game's "look and feel").

### b.   The Fanciful Visual Expression that Xio Copied Is Not "Functional"

Xio also tries to avoid liability by arguing that the fanciful visual expression that it admittedly copied is somehow "functional" and not entitled to copyright protection.  As explained below, Xio's contorted argument fails because TH's

visual expression is not patentable, nor is it a functional "method of operation."

### i.   The Fanciful Visual Expression of the *Tetris* Games Is Not Patentable.

Xio's argument that the fanciful visual expression it copied from *Tetris* can only be protected by patent is nonsensical.  It is a basic principle that copyright subsists "in original works of authorship fixed in any tangible medium of expression," 17 U.S.C. § 102, while a patent is available to whoever "invents or discovers any new and useful process, machine, manufacture, or composition of matter" or an improvement thereon.  35 U.S.C. § 101.  Here, TH claims infringement of its fanciful audiovisual work, which is the subject of copyright.  17 U.S.C. § 102(a)(6).  TH is not claiming infringement of a "new and useful" machine, process, or method of manufacture, which is the subject of patent.

Xio cites no case which holds that the visual expression in a videogame (such as the type it copied from the *Tetris* Games) can only be protected by patent. Indeed, this type of expression is the subject of hundreds of copyright registrations (Opp. Schmitt Decl. ¶ 62, Ex. 17), and numerous courts have held that it is protected by copyright.  *See* pp. 9-10 *supra*.  Xio cites only to inapposite cases where courts found that accounting systems or temperature recording systems were protected by patent, not copyright.  (Xio Br. 8–10.)  But, those cases do not control as *Tetris* is a wholly fanciful audiovisual work, which is intended for entertainment purposes—not a functional utilitarian work like those at issue in these cases.

In addition, Xio cites various third-party patents and one patent application (Xio Br. 11–14)—but none of them solely claim as their invention a videogame's visual expression. Instead, they claim methods of setting up or playing the games.[17] To the extent these patents reference visual expression at all, they cover ways of *creating* the visual expression, not the particular visual expression itself.

Xio's specific reliance on U.S. Patent No. 5,265,888 (the "'888 patent) is particularly misleading as it does not claim the visual expression of *Dr. Mario*. (Xio Br. 14.) Rather, the '888 Patent discloses a "game apparatus for use in playing a game" and describes how abstract "objects" will be generated, detected, and controlled in the apparatus. *See, e.g.*, '888 Patent, claims 1, 18. The claims do not even describe the particular visual expression of *Dr. Mario* (e.g., the particular dimensions of the playfield, the "capsule" and "virus"-shaped playing pieces, etc.). *Id.* at claims 1–22. The drawings of *Dr. Mario* in the patent are used simply to illustrate "one embodiment of the present invention." '888 Patent 5:31–34.[18]

Moreover, even if some part of *Tetris* could have been protected by patent, it

---

[17] For example, U.S. Patent No. 5,868,388 ("'388 patent") relates to playing a puzzle game that involves the assembly of three dimensional shapes. '388 Patent, 6:33-34, Figs. 37(a), 37(b), 37(c).

[18] Tellingly, Xio admits that *Dr. Mario* "employs many similar rules to *Tetris*," but the games do not look alike. (Xio Br. 14.) Indeed, TH's expert, Dr. Bogost, opined that *Dr. Mario* was one of many examples of electronic games that "use the idea and rules of *Tetris*"—but which have their own "distinct visual expression." (Bogost Decl. ¶ 33, Fig. 55.)

would not preclude copyright protection in its fanciful visual expression.[19]  *See* 7

C.F.R. § 202.10 ("[A]vailability of protection…under the law for a utility or design

patent will not affect the [copyright] registrability…of pictorial, graphic, or

sculptural [works]."); *see also Mazer v. Stein*, 347 U.S. 201, 217 (1954) ("[T]he

patentability of the [works] . . . does not bar copyright as work of art.  Neither the

Copyright Statute nor any other says that because a thing is patentable it may not

be copyrighted."); *M. Kramer*, 783 F.2d at 441 ("[I]ssuance of a patent will not

necessarily render a work non-copyrightable."); *Lotus Dev. Corp. v. Borland Int'l.,*

*Inc.*, 788 F. Supp. 78, 91 (D. Mass. 1992) (the fact that a computer program "may

be protected to some extent under one of these legal regimes does not mean it

cannot be protected to any extent under the other.").

### ii.   The Fanciful Visual Expression of the Tetris Games Is Not A "Method of Operation."

Also, Xio tries to equate the fanciful visual expression of the *Tetris* Games

with functional "methods of operation."  However, Xio cites no case which holds

that the type of expression it copied is an uncopyrightable "method of operation."

Instead, it only cites cases involving utilitarian business software and the layout of

---

[19]  Xio cites *Anti-Monopoly, Inc. v. Gen. Mills Fun Grp.*, but this case is inapposite as it involved the issue of whether the trademark MONOPOLY was generic. 611 F.2d 296 (9th Cir. 1979).  Moreover, this case actually undercuts Xio's position as the court expressly notes that the owner of the Monopoly game had copyright *and* patent rights on the "game equipment."  *Id.* at 299.

physical controls for videogames—which, as explained below, do not control here.

Xio tries to rely on *Lotus Development Corp. v. Borland Int'l, Inc.,* which involved the copyrightability of the "menu command hierarchy" of *Lotus 1-2-3*—a program that enabled users to "perform accounting functions electronically on a computer." 49 F.3d 807, 809 (1st Cir. 1995). The court held that the "menu command hierarchy" was an uncopyrightable "method of operation" because it "provides the means by which users control and operate Lotus 1-2-3" (e.g., if users want to "copy material … they use the 'Copy' command). *Id.*at 815 (defining "method of operation" as "the means by which a person operates something, whether it be a car, a food processor, or a computer"). As the court explained, the menu command is akin to VCR buttons, which people use to control the device and which include the common labels "Record," "Play," and "Stop/Eject." *Id.* at 817.

Xio's reliance on *Borland* is misplaced.[20] The *Tetris* Games are entertaining audiovisual works—not functional spreadsheets like Lotus 1-2-3. Also, TH is not claiming copyrights in the "method of operation" of *Tetris*, such as the layout of the buttons used to move the pieces. TH is claiming infringement of the fanciful visual expression of *Tetris*—which was not part of the "method of operation" in *Borland*. Indeed, the court stated that the "menu commend hierarchy" was

---

[20] Even Xio's own counsel, Jeffrey Neu, Esq., advised that *Borland* did not apply to the issue of whether *Mino* infringed *Tetris*. (Opp. Schmitt Decl., ¶ 63, Ex. 18.)

"different from the Lotus screen displays, for users need not 'use' any expressive aspects of the screen displays in order to operate Lotus 1-2-3; because the way the screens look has little bearing on how users control the program, the screen displays are not part of Lotus 1-2-3's 'method of operation.'"[21]   *Id.* at 816.

Xio's reliance on *Incredible Technologies, Inc. v. Virtual Technologies, Inc.* is similarly misplaced.  400 F.3d 1007 (7th Cir. 2005).  There, the court found that the layout of the trackball and buttons on the control panel of plaintiff's arcade golf game was an uncopyrightable "method of operation."  *Id.* at 1012.  This case is also not relevant here as TH is not claiming that Xio infringed the layout of the buttons by which players control the game—rather it is claiming that Xio infringed by copying the fanciful look and feel of *Tetris*.[22]

_____

[21] The inapplicability of software cases here is further underscored by the Second Circuit's decision in *Computer Associates International, Inc. v. Altai, Inc.,* which involved the nonliteral copying of computer code.  982 F.2d 693 (2d Cir. 1992).  In *Altai,* the court adopted the "abstraction-filtration-comparison" test in determining substantial similarity between the computer programs at issue.  *Id.* at 706.  Such test is not applicable here as TH is not alleging infringement of its computer program.  Rather, as discussed in TH's motion, the proper test is comparing the overall visual "look and feel" of the video games.  (TH Br. 19–20 (Dkt 49-1).)  *See also Altai,* 982 F.2d at 703 (clarifying that its decision "does not control infringement actions regarding categorically distinct works, such as certain types of screen displays").

[22] The court also found no infringement of the images of plaintiff's game because there were "significant differences" in defendant's game, and any similarities were limited to *scenes à faire* necessary to make a realistic golf game.  *Id.* at 1010, 1015.  As noted above, the golf game at issue is distinguishable from *Tetris,* which contains no real-world referents or *scenes à faire.  See* pp. 15-16 *supra.*

**c.** **Xio's Argument that the Copied Visual Expression is a "Rule" or "Functional" Because Changing it Would Change *Tetris* Has No Legal Support.**

Xio also argues that the visual elements it admittedly copied from *Tetris* are "rules" or otherwise "functional" because if they were altered, the game would change in some way (*e.g.*, the game would be easier or harder to play, end more quickly). (Xio Br. 34–43.) This argument has no basis in the law. Xio cites no case which states that the expression of a videogame is deemed a "rule" or "functional," and thus not protectable, if changing it would alter the game. Xio's argument also defies commonsense as a change to any creative work alters it in some way. For example, if *Gone with the Wind* was edited so that the movie ended with the burning of Atlanta, the film would be shorter and it would take less time to watch. If the actors spoke Latin (instead of English), the film would be more difficult to understand. If Rhett Butler did a pratfall each time he entered a scene, the film would be a comedy. But, even though these changes would alter the film, it does not mean that the film is not protected by copyright.

Xio's argument that the elements of *Tetris* it copied are not protectable because they serve some "purpose" is equally unavailing. Xio cites no case in support. Indeed, *Tetris* is an audiovisual videogame made for entertainment—it does not serve a utilitarian purpose or require certain visual elements in order to function (like business software or an accounting system). Xio's argument is

35

nonsensical as most elements in a creative work serve some "purpose"—musical leitmotifs are used to signal reoccurring themes; shadows serve the purpose of creating tension in a horror film; funny dialog serves the purpose of relieving tension in a drama; a shocking plot twist at the end of a soap opera serves the purpose of creating anticipation so that the audience tunes in the next day.

Like all artistic processes, it is clear that the combination and selection of the particular visual elements in *Tetris* were creative choices made by Mr. Pajitnov and subsequent designers.  As stated above, Mr. Pajitnov explained that he made certain design choices because they "pleased" him and he "liked" them better than the alternatives.  (Opp. Schmitt Decl. ¶ 44, Ex. 13.)  Henk Rogers (an owner of TH) testified that the appearance of the Tetriminos and their particular starting orientation were "artistic decisions," and that the shape and size of the playfield in *Tetris* was a design choice.  (*Id.* at ¶ 31, Ex. 12 *see also* HR Decl. ¶ 33, 34, 48. )  Even Xio's own expert, Mr. Begy, admits that these were design choices and Mr. Pajitnov could have designed *Tetris* in an "unlimited number" of ways.  (Opp. Schmitt Decl. ¶ 46-54, Ex. 14.)  Xio copied all of these creative choices. (Opp. HR Decl. ¶¶ 3, 5; Opp. Bogost Decl. ¶ 20; Opp. Schmitt Decl. ¶ 46-54, Ex. 14.)

This is exactly the type of creativity that copyright protects.  *See F.A. Davis Co. v. Wolters Kluwer Health, Inc.*, 413 F. Supp. 2d 507, 512 (E.D. Pa. 2005) (process to create work "requires precisely the sort of creative choices that

copyright law was intended to protect"); *Schiffer Publ'g, Ltd. v. Chronicle Books, LLC*, No. 03-4962, 2004 WL 2583817, at *1–*4, *7 (E.D. Pa. Nov. 12, 2004) (photographs deemed copyrightable based on evidence of "creative choices," including choices about which equipment to use, and the arrangement and the selection of lighting); *Tempo Music, Inc. v. Famous Music Corp.*, 838 F. Supp. 162, 168 (S.D.N.Y. 1994) (originality is determined by "creative choices" of composer in creating harmony).  Thus, Xio's defense fails.

### B.    The *Tetris* Trade Dress Is Protectable and Has Been Infringed

Xio devotes only two pages in support of its argument that TH's trade dress claim fails.  Tellingly, Xio makes no attempt to rebut (or even mention) TH's surveys or other evidence showing that the *Tetris* Trade Dress is distinctive, and that Xio's copying caused confusion.  Instead, Xio argues that the *Tetris* Trade Dress is functional, and the claim is preempted.   Neither argument has any merit.

### 1.    The *Tetris* Trade Dress Is Not Functional

Xio puts forth no evidence that the *Tetris* Trade Dress as a whole is "essential to the use or purpose" or "affects the cost or quality" of electronic puzzle games, or that the right to use it exclusively "would put competitors at a significant non-reputation-related disadvantage."[23]  *TrafFix Devices, Inc. v. Mktg. Displays,*

---

[23] In contrast, in its motion, TH put forth substantial evidence that the *Tetris* Trade Dress is nonfunctional—including testimony by its renowned videogame expert, Dr. Ian Bogost, and key admissions by Xio's expert, Mr. Jason Begy.

*Inc.*, 532 U.S. 23, 32 (2001)*; see also Cartier, Inc. v. Sardell Jewelry, Inc.*, 294 Fed. App'x. 615, 620–21 (2d Cir. 2008).  Instead, Xio weakly argues that the combination of trade dress elements is functional because it is "part of the thing that makes the game the game"—in other words, the elements "affect" game play. (*See* Xio Br. 42.)  But, as discussed in TH's motion, that is not the law, and Xio's argument is nonsensical as all parts of a product affect the product in some way, such that changing them would make a difference—but that does not mean it is "functional."  *See TrafFix*, 532 U.S. at 32*; Adidas-Salomon AG v. Target Corp.*, 228 F. Supp. 2d 1192, 1195, 1205 (D. Or. 2002) (fact that changing sole design could optimize performance did not render trade dress functional); *Midway*, 543 F. Supp. at 484–85 (rejecting argument that design of shapes and characters in *Pac-Man* was "functional" because it served "some" useful purpose in game).

### 2.    TH's Trade Dress Claim Is Not Preempted

Contrary to Xio's position, the Copyright Act does not preempt a properly pled trade dress claim under the Lanham Act.  17 U.S.C. § 301(d).  This is because trade dress and copyright law remedy distinct wrongs—trade dress protects against consumer confusion and copyright protects an author's creativity.  *See Bach v. Forever Living Prods. U.S., Inc.*, 473 F. Supp. 2d 1110, 1113, 1117–18 (W.D. Wash. 2007) (denying summary judgment on preemption grounds where plaintiffs

alleged overlapping claims for copyright and trade dress infringement).[24]  Indeed, courts in this Circuit routinely recognize that copyright and trade dress protection may subsist in the same work and both may be infringed.[25]  Xio cites no case where a trade dress claim was dismissed because it was preempted by copyright.

Further, Xio's reliance on *Dastar Corp. v. Twentieth Century Fox Film Corp.* is misplaced.  The issue in *Dastar* was whether the Lanham Act was violated by copying a work in the public domain and failing to attribute (i.e., give credit to) the original author of the work.  539 U.S. 23, 25 (2003).  By narrowly defining the meaning of "origin of the goods" in the Lanham Act as the manufacturer (and not the original author), the Court found no requirement to give credit to the author of a work in the public domain.  *Id.* at 36–37.  *Dastar* has no bearing on this case. *Tetris* is not in the public domain.  And, this is not a case about attribution—rather

---

[24] *See also Slep-Tone Entm't Corp.*, No. 10-592, 2011 WL 4482082, at *3 (S.D. Oh. Sept. 26, 2011) (no preemption because trademark and copyright remedy separate wrongs); *Gen. Scientific Corp. v. Sheervision, Inc.*, No. 10-13582, 2011 WL 3880489, at *2–*3 (E.D. Mich. Sept. 2, 2011) (no preemption because plaintiff alleged that defendants had misrepresented the source of plaintiff's copyrighted materials and not merely copying of expression); *Huebbe v. Okla. Casting Co.*, No. 06-306, 2009 WL 3245404, at *9 (W.D. Okla. Sept. 30, 2009) (denying motion for summary judgment on preemption grounds because plaintiff had alleged passing off of furniture designs and not merely copying those designs).

[25] *See Coach, Inc. v. Bags & Accessories*, No. 10-2555, 2011 WL 1882403 (D.N.J. May 17, 2011) (copyright and trade dress rights in bag design infringed by counterfeit bags)*; CMM Cable Rep, Inc. v. Keymarket Commc'ns, Inc.*, 870 F. Supp. 631 (M.D. Pa. 1994) (granting preliminary injunction on overlapping claims of copyright and trade dress infringement of promotional materials).

it is a straightforward trade dress claim, which is not preempted, or even addressed, by *Dastar*.[26]  *See Bach*, 473 F. Supp. 2d at 1118 (distinguishing *Dastar* as plaintiff was not trying to "prosecute plagiarism" though trademark law).

## <u>CONCLUSION</u>

For the reasons above, TH respectfully requests that Xio's motion be denied.

Date: October 25, 2011                 Respectfully submitted,

                                       /s/ Dale M. Cendali
                                       Dale M. Cendali
                                       Johanna Schmitt
                                       Brendan T. Kehoe
                                       KIRKLAND & ELLIS LLP

                                       /s/ Robert J. Schoenberg
                                       Robert J. Schoenberg
                                       RIKER DANZIG SCHERER
                                       HYLAND & PERRETTI LLP

                                       Attorneys for Plaintiffs

---

[26] The other cases cited by Xio are similarly inapposite.  *See Larkin Grp., Inc. v. Acquatic Design Cons., Inc.*, 323 F. Supp. 2d 1121 (D. Ka. 2004) (plaintiff did not state a claim for reverse-passing-off based on allegation that defendants' misrepresented plaintiff's goods as their own); *Keane v. Fox Tel. Stations, Inc.*, 297 F. Supp. 2d 921 (2004) (dismissing claims for failure to plead use of mark in commerce); *Bretford Mfg., Inc. v. Smith Sys. Mfg. Co.*, 286 F. Supp. 2d 969 (N.D. Ill. 2003) (use of table leg in table design without attribution did not constitute a Lanham Act violation).