Dale M. Cendali
Johanna Schmitt
Brendan T. Kehoe
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
dale.cendali@kirkland.com
johanna.schmitt@kirkland.com
brendan.kehoe@kirkland.com

Robert J. Schoenberg
RIKER DANZIG SCHERER HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962-1981
Telephone: (973) 538-0800
rschoenberg@riker.com

Attorneys for Plaintiffs
Tetris Holding, LLC and The Tetris Company, LLC Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| TETRIS HOLDING, LLC and<br>THE TETRIS COMPANY, LLC,<br><br>         Plaintiffs,<br><br>- against -<br><br>XIO INTERACTIVE INC.,<br><br>         Defendant. | Civil Action No.: 09-CV-6115 (FLW)<br>(DEA)<br><br>Honorable Freda L. Wolfson, U.S.D.J.<br>Honorable Douglas E. Alpert, U.S.M.J.<br><br>**PLAINTIFFS' RESPONSE TO<br>DEFENDANT'S STATEMENT OF<br>UNDISPUTED MATERIAL FACTS<br>IN SUPPORT OF ITS MOTION<br>FOR SUMMARY JUDGMENT<br>OF NON-INFRINGEMENT** |

Pursuant to Rule 56.1 of the Local Rules of the United States District Court of New Jersey and Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs Tetris Holding, LLC and The Tetris Company, LLC (collectively, "TH"), by and through their counsel, respectfully submit the following response to Defendant Xio Interactive Inc.'s ("Xio") Statement of Undisputed Materials Facts in Support of its Motion for Summary Judgment of Non-Infringement ("Xio's Statement").

## GENERAL OBJECTIONS

TH objects to Xio's Statement on several grounds.  First, Xio's Statement includes many statements which are not "facts"—but rather are a recitation of Xio's legal arguments.  Such argumentative statements are improper under Local Rule 56.1 and should be disregarded.  *See Decree v. UPS, Inc.*, No. 07-3674, 2009 WL 3055382, at *5 (D.N.J. 2009) (disregarding any legal argument raised in a Rule 56.1 statement).

Second, Xio fails to cite to admissible evidence in support of many of its purported "facts" as required by Local Rule 56.1.  For example, Xio cites <u>no</u> evidence for many purported "facts."  *See, e.g.,* Xio's Statement ¶¶ 29, 33, 39 and 40.  These statements should be disregarded because they fail to comply with the requirements of Local Rule 56.1.  *In re Global Outreach, S.A.*, 2011 WL 2294168, at *6 n. 4 (D.N.J. 2011) (in discussing a Rule 56.1 Statement, the court holds that

"[f]actual assertions lacking evidential support in the record cannot serve to support an award of summary judgment.")

In addition, Xio cites to evidence for many of its purported "facts" that constitute inadmissible hearsay evidence under FRE 802 and no exception applies. Tellingly, Xio has not supported its motion with a single party or expert declaration, relying instead on out-of-court statements made in the context of self-serving and misleading documents that are inadmissible for the truth of the matter asserted in such documents. *Id.*; *see Smith v. Allentown*, 589 F.3d 684, 693 (3d Cir. 2009) (holding that "[h]earsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment"). It is black-letter law that Xio must support its motion for summary judgment, and its accompanying fact statement, with admissible evidence—and not hearsay. *McCaffery v. United States*, No. 04 Civ. 3702, 2006 WL 1644816, at * 13 (D.N.J. June 7, 2006) (Wolfson, J.) (holding that a Court "cannot consider hearsay statements that would be inadmissible at trial on a motion for summary judgment"). Thus, the Court should not consider such hearsay evidence in support of Xio's motion.

Similarly, the Court should not consider any "facts" in Xio's statement that cite to the report of Xio's expert, Mr. Jason Begy, as support. Mr. Begy has submitted no declaration in support of Xio's motion for summary judgment. His report was submitted as an attachment to Xio's attorney's declaration, rather than

to a sworn statement by Mr. Begy.  Thus, the Court should not consider it.  *See Fowle v. C&C Cola*, 868 F.2d 59, 67 (3d Cir. 1989) (finding an expert's report that was only attached to an affidavit from counsel to be not competent for consideration on a motion for summary judgment); *Sarmiento v. Montclair State University*, 513 F. Supp. 2d 72, 83 n.6 (D.N.J. 2007) (unsworn report, not in the form of an affidavit, "fail[ed] to comply with the requirements of Fed. R. Civ. P. 56(e) and [was] not competent evidence to be considered in deciding . . . motion for summary judgment"); *Motson v. Franklin Covey Co.*, No. 03 Civ. 1067, 2005 WL 1541023, at *2 (D.N.J. June 30, 2005) (refusing to consider unsworn expert report).

By contrast to Xio's argumentative and largely unsupported fact statement, TH submitted its Plaintiffs' Rule 56.1 Statement of Material Facts Not in Dispute (Dkt. # 49, Attach. # 2) that was written in short, plain statements of fact and supported with sworn declarations and other admissible evidence for each and every fact that TH asserts is material and undisputed.  In addition, TH supports its opposition to Xio's motion with sworn declarations and other admissible evidence.   The difference between TH's approach and Xio's approach is telling and exemplifies Xio's seeming strategy of trying to obfuscate the law by making misleading legal arguments that are neither based in fact nor law.

## SPECIFIC OBJECTIONS

1. *Plaintiffs claim that Xio's game Mino infringes their rights to the electronic puzzle game Tetris, invented in 1984 by Alexey Pajitnov. See Declaration of Sonali D. Maitra in Support of Xio Interactive Inc.'s Motion for Summary Judgment submitted herewith ("Maitra Dec.") at Exs. 2 & 3.*

**Disputed.** TH states that the word "invented" is vague and ambiguous, and disputes this statement to the extent that it suggests that *Tetris* is not a creative work entitled to copyright protection or that it is an "invention" that is only protected by patent law. TH owns the copyrights in and to the visual expression of *Tetris* Version 0, *Tetris* Version 1, *Tetris* Version 2, *Tetris*, *Tetris NES Edition*, *Tetris Game Boy*, *Tetris Zone*, *Tetris (EA Multiplayer)*, *Tetris Evolution (Xbox360)*, *Tetris (iPhone)*, *Tetris Pop*, *Tetris DX*, and *Tetris Mission 2009* (collectively, the "*Tetris* Games"), among many other versions of *Tetris*. Dkt. # 49, Attach. # 22, Declaration of Henk B. Rogers in Support of Plaintiffs' Motion for Summary Judgment, dated September 29, 2011 ("HR Decl.") ¶¶ 21, 23.

TH does not dispute that Alexey Pajitnov created the electronic puzzle game *Tetris* in the mid-1980s.

TH adds, for clarification, that TH claims that *both* of Xio's games—*Mino* and *Mino Lite*—infringe TH's rights in and to the *Tetris* Games. Dkt. # 6, First

Amended Complaint for Copyright Infringement, False Designation of Origin, and Unfair Competition ("Amended Complaint"), dated December 10, 2009 at ¶ 1.

2.    *A YouTube demonstration of Tetris can be found here: http://www.youtube.com/watch?v=6Wz4dlYF91o. And a YouTube demonstration of Mino can be found here: http://www.youtube.com/watch?v=5X11MMZ6GUU.*

**Undisputed.** However, TH adds, for clarification, that the YouTube demonstration of *Tetris* found at http://www.youtube.com/watch?v=6Wz4dlYF91o is a video demonstration of one mode of one version of *Tetris*, (*i.e., Tetris (EA Multiplayer*)) and the demonstration does not include all asserted visual elements that are present in *Tetris (EA Multiplayer)*. For example, the demonstration does not show the screen layout in multiplayer versions with the player's matrix appearing most prominently on the screen and the opponents' matrixes appearing smaller than the player's matrix and to the side of the player's matrix, as the demonstration only shows footage of single player mode.

TH also adds, for clarification, that the YouTube demonstration of *Mino* found at http://www.youtube.com/watch?v=5X11MMZ6GUU is a video demonstration of one mode of *Mino* and does not include all asserted visual elements that are present in the game and that Xio copied. For example, the demonstration does not show the disappearance of any completed horizontal line,

because the player playing the demonstration did not complete a horizontal line during the demonstration.

      3.     *One of the predominant features of Tetris is the use of tetrominos as the puzzle pieces for the game.  See, e.g., http://www.youtube.com/watch?v=eguBGUGc8Mo (YouTube demonstration of Tetris).*

      **Disputed.**  TH states that the phrase "[o]ne of the predominant features" is vague and ambiguous and disputes it to the extent it implies that the other visual elements of *Tetris* are not as distinctive or material.  Furthermore, the phrase "[o]ne of the predominant features" makes no sense as only one feature can be "predominant" by definition.

      TH does not dispute that the protectable visual expression of the fanciful *Tetris* games includes seven distinctive Tetrimino playing pieces, which are based on the tetromino shape, and that TH coined the distinctive spelling of the word "Tetriminos."  HR Decl. ¶¶ 31-34, 38; Dkt. # 49, Attach. # 12, Declaration of Dr. Ian Bogost in Support of Plaintiffs' Motion for Summary Judgment, dated September 29, 2011 ("Bogost Decl.") ¶ 9, Ex. 2 (Bogost Rpt. ¶ 20)).

      Further, TH adds, for clarification, that the YouTube demonstration of *Tetris* found at http://www.youtube.com/watch?v=6Wz4dlYF91o (which is the only evidence that Xio cites to in support of this purported fact) is a video

demonstration of one mode of one version of *Tetris*, (*i.e., Tetris (EA Multiplayer)*)) and the demonstration does not include all asserted visual elements that are present in *Tetris (EA Multiplayer)*. *See supra* TH's Response to ¶ 2.

4.     *A tetromino is a geometric shape composed of four squares connected at the sides, just like a domino is a similar shape with two squares and a pentomino is one with five. See Martin Gardner, Hexaflexagons and Other Mathematical Diversions 124-150 (1959); J.A.H. Hunter & Joseph S. Madachy, Mathematical Diversion 79-86 (1963); Solomon W. Golomb, Polyominoes 19 (1968).*

**Undisputed.**

5.     *Mr. Pajitnov did not invent the tetrominos of Tetris. For example, as early as 1968, American mathematician Solomon Golumb depicted the tetrominos as follows, including the explanation that they could be "rotated (turned 90, 180, or 270 degrees) or reflected (flipped over)," as they are in Tetris:*



*Figure 1. The simpler polyomino shapes.*

*Id. (emphasis in original).*

**Disputed.**  TH states that the word "invented" is vague and ambiguous, and disputes this statement to the extent that it suggests that *Tetris* is not a creative

work entitled to copyright protection or that it is an "invention" that is only protected by patent law.  TH owns the copyrights in and to the visual expression of the *Tetris* Games, which includes seven Tetrimino playing pieces that have a distinctive appearance.  HR Decl. ¶¶ 23, 31-34, 48.

Further, although he did not invent the tetromino shape, Mr. Pajitnov was the first person to choose the tetromino as the basis for playing pieces in an electronic videogame in combination with other visual elements, which resulted in the wholly fanciful audiovisual work *Tetris.*  Bogost Decl. ¶¶ 21, 24, 25, Ex. 2 (Bogost Rpt. ¶ ¶ 20, 23, 24).  In addition, Mr. Pajitnov and subsequent *Tetris* designers have made numerous creative choices with regard to the appearance of the Tetriminos in *Tetris.*  For example, Mr. Pajitnov made the creative decision to base the *Tetris* playing pieces on the tetromino shape, rather than on some other shape (such as a hexagon or triangle) or other polyomino (such as pentaminos).  Declaration of Henk B. Rogers in Support of Plaintiffs' Opposition to Xio's Motion for Summary Judgment, dated October 24, 2011 ("Opp. HR Decl.") ¶ 3.  Further, Mr. Pajitnov made the creative choice to have five Tetrimino pieces based on the five tetromino shapes illustrated by Mr. Golomb above, and also decided to include two Tetrimino pieces based on the mirror-image of two of those pieces for a total of seven different Tetrimino playing pieces in *Tetris.*  HR Decl. ¶¶ 33, 34; Opp. HR. Decl. ¶ 3.  In addition, Mr. Pajitnov made the creative decision to have

9

the playing pieces rotate by 90 degrees (rather than another amount such as 45 or 180 degrees).  Opp. HR. Decl. ¶ 5.   In making *Mino*, Xio copied each of these creative decisions.   Opp. HR. Decl. ¶¶ 3, 5, 6; Declaration of Dr. Ian Bogost in Support of Plaintiffs' Opposition to Xio's Motion for Summary Judgment, dated October 24, 2011 ("Opp. Bogost Decl.") ¶ 20; Bogost Decl. ¶¶ 52-53.  Also, TH coined a distinctive spelling for the playing pieces in *Tetris*—Tetriminos—in order to differentiate them from the mathematical tetromino shapes.   *See* HR Decl. ¶ 32.

6.     *Nor did Mr. Pajitnov invent the use of such shapes in a puzzle game, as evidenced by the ancient game pentaminos—a puzzle game in which a player tries to fit pentominos together in a box.  Indeed, Mr. Pajitnov explains that the pentaminos puzzle game was the inspiration for Tetris.  Maitra Dec. Ex. 4 at 17:20- 23.  In addition, more than a decade before the invention of Tetris, Parker Brother's published a puzzle game called Universe.  See id.  ¶ 7.  In this game, players rotate brightly-colored pentominos (of which the squares are individually delineated) and fit them on a grid that ranges from ten by ten to a larger space, depending on the number of players:*



*Maitra Dec. ¶ 7 & Ex. 6.*

**Disputed.** TH states that the words "invent" and "invented" are vague and ambiguous, and disputes this statement to the extent that it suggests that *Tetris* is not a creative work entitled to copyright protection or that it is an "invention" that is only protected by patent law. TH owns the copyrights in and to the visual expression of the *Tetris* Games. HR Decl. ¶ 23. In addition, Mr. Pajitnov and subsequent *Tetris* designers made many creative choices with respect to the appearance of the Tetrimino playing pieces in *Tetris* and Xio copied each of those choices in making *Mino*. *See supra* TH's Response to ¶ 5.

TH also states that the term "such shapes" is vague and ambiguous as it is not clear from this statement what it refers to.

TH does not dispute that a small, plastic pentamino puzzle game was an inspiration for Alexey Pajitnov's creation of *Tetris*. TH disputes, however, this purported fact, including the use of the vague term "ancient," to the extent that it attempts to characterize the *Tetris* Games as lacking creativity. The *Tetris* Games are fanciful audiovisual works protected by copyright. HR Decl. ¶¶ 3, 23; Bogost Decl. ¶ 24, 25. When Mr. Pajitnov created the first version of *Tetris* in the mid-1980s, it was the first of its kind, and looked different from anything that preceded it. Bogost Decl. ¶ 24.

As pictured below, this pentamino puzzle game looks very different from Mr. Pajitnov's *Tetris* game.  The puzzle game features small plastic pieces in the shape of pentaminos that are all the same color (red).  Declaration of Johanna Schmitt, Esq. in Support of Plaintiffs' Opposition to Xio's Motion for Summary Judgment, dated October 25, 2011 ("Opp. Schmitt Decl."), ¶ 2, Ex. 1(attaching images of the pentamino puzzle game).   In contrast, in *Tetris,* the pieces are based on the tetromino shape and are not all the same color.  HR Decl. ¶¶ 31, 33, 34.  Further, in the pentamino puzzle game, the player arranges the pentamino shapes to create various designs which are depicted on a paper insert included with the puzzle game (which designs do not appear in *Tetris*), such as the following:



Opp. Schmitt Decl. ¶ 3, Ex. 2 (paper insert included with the pentamino puzzle game).  Also, the pentamino puzzle game is played at leisure–there is no race against time or point scoring.  It is not an audiovisual work and thus does not include the distinctive movements or sequence of images that appear in *Tetris.*  Opp. Schmitt Decl. ¶ 2, Ex. 1 (attaching images of the pentamino puzzle game).

**Pentamino Puzzle**[1]

**Early Version of _Tetris_**

   

In addition, TH does not dispute that Parker Brothers released a game called _Universe_ where players manipulate brightly-colored pentaminos on a grid, however, this fact is immaterial, as it does not relate to TH's asserted claims. As pictured below, _Tetris_ looks very different from the _Universe_ game. Specifically, _Universe_ is not an audiovisual work, and thus does not include the distinctive movements or sequence of images that appear in _Tetris_. Opp. Schmitt Decl. ¶ 4, Ex. 3 (attaching images of _Universe_ game). In addition, the games look significantly different because _Universe_ uses pentamino-shaped pieces whereas _Tetris_ uses Tetriminos, and _Universe_ has a playfield with a different shape and dimension. _See_ Opp. Schmitt Decl. ¶ 4, Ex. 3(attaching images of _Universe_ game); HR Decl. ¶¶ 31, 33, 34. In any event, Xio has presented no evidence that Mr. Pajitnov even had access to _Universe_ in the Soviet Union before he created _Tetris_ and thus the game is immaterial on that basis as well.

---

[1] Full-size images of the pentamino puzzle are attached as Exhibit 1 to Opp. Schmitt Declaration.

**Parker Bros' *Universe*[2]**          **Early Version of *Tetris***

   

 

Additionally, the top-down photograph of *Universe* that Xio includes in its Rule 56.1 statement (pictured below) is misleading as it makes it look more like a computer puzzle game (when it is a board game).  Moreover, Xio positioned the pieces so that they are all at the bottom of the board in a tacit effort to make it look like they would appear in that way when played, when in fact the game can look different.  Opp. Schmitt Decl.  ¶ 5. The alternate configuration of *Universe* (pictured below) is a more accurate representation:

---

[2] Full-size images of *Universe* are attached as Exhibit 3 to Opp. Schmitt Declaration.

**Parker Bros' *Universe* (as depicted in Xio's Rule 56.1 Statement)**

**Parker Bros' *Universe* (an alternative configuration)**





7.    *Plaintiffs claim copyright over, and infringement of, the following features of Tetris:*

(1)    The long vertical rectangle playing field or matrix, which is higher than wide.

(2)    The seven tetrominos as playing pieces.

(3)    The seven tetrominos being brightly colored.

(4)    The squares of the tetrominos being individually delineated.

(5)    The appearance of the tetrominos at the top of the matrix.

(6)    The starting orientation of the tetrominos.

(7)    The downward, lateral, and rotating movements of the tetrominos.

(8)    The disappearance of any completed horizontal line.

(9)    The subsequent consolidation of the tetrominos remaining on the playing field as a result of the downward shift into the space vacated by the disappearing line.

(10)    The display of "garbage lines" with at least one missing square in random order.

(11)    The appearance of a "ghost" or shadow tetromino under the tetromino.

(12)   The display of the next tetromino that will fall down the matrix above the playing field.

(13)   The change in color of the tetrominos when they are in lock-down mode.

(14)   The screen layout in multiplayer versions with the player's matrix appearing most prominently on the screen and the opponent's matrices appearing smaller than the player's matrix and to the side of the player's matrix.

(15)   The appearance of squares automatically filling in the matrix from the bottom to the top when the game is over.

*See id. Exs. 2 & 7.*

**Undisputed.**  TH adds, for clarification, that it claims that both of Xio's games, *Mino* and *Mino Lite*, infringe TH's copyrights in the visual expression of the *Tetris* Games, which include the above-referenced elements as well as the overall combination of them. Amended Complaint ¶ 1; Dkt. # 49, Attach. # 4, Declaration of Johanna Schmitt, Esq. in support of Plaintiffs' Motion for Summary Judgment, dated September 30, 2011 ("Schmitt Decl.") ¶ 75, ¶ 55, Ex. 53 (attaching video clips of *Mino 1.1* and *Mino Lite*), HR Decl. ¶ 54, Ex. 10 (attaching video clips of the *Tetris* Games and side-by-side comparison of a video clip from *Mino 1.1* and the *Tetris (iPhone)* game); Bogost Decl. ¶¶ 9, 49-56, Ex. 2 (Bogost Rpt. ¶¶ 9, 48-55).

8.   *Xio admits that Mino contains these features, but contends that none of these features are protected by copyright.*

16

**Undisputed.** TH does not dispute that *Mino* contains these features.  TH adds, for clarification, that *Mino Lite* also includes these features. Amended Complaint ¶ 1; Schmitt Decl. ¶ 75, ¶ 55, Ex. 53 (attaching video clips of *Mino 1.1* and *Mino Lite*); Bogost Decl. ¶¶ 9, 49-56, Ex. 2 (Bogost Rpt. ¶¶ 9, 48-55).

As set out in TH's General Objections, this purported "fact" contains legal argument disguised as fact and thus the Court should disregard it.  As TH states in its memorandum of law in opposition to Xio's motion for summary judgment, TH strongly disagrees with Xio's contention that none of these features are protected by copyright.  TH owns the copyrights in and to the visual expression of the *Tetris* Games.  HR Decl. ¶ 23.   This visual expression is the result of creative choices made by Mr. Pajitnov and subsequent *Tetris* designers.  *See infra* TH's Response to ¶¶ 29-35, 37, 39, 40, 42-47, 49, 52, 55, 57, 59, 60.  In addition, in four separate decisions, the U.S. Customs Service (which has expertise in copyright law) held that TH's copyrights in the audio visual expression of *Tetris*, including these elements, are enforceable.  Schmitt Decl. ¶ 70,  Ex. 68 (attaching the decisions).

9.    *In the fall of 2008, Xio CEO Desiree Golden decided she wanted to develop a game application for Apple Inc.'s iPhone.  See Maitra Dec. Ex. 8.  The developers at Xio liked Tetris games and, while Mino was still in its nascence, analyzed intellectual property laws to ensure that the game they would write would not infringe anyone's rights.  Id. Exs. 8-22.*

**Disputed, but immaterial.**   TH does not dispute that in the fall of 2008, Xio's CEO, Desiree Golen, decided she wanted to start a company to "make a MultiPlayer game similar to Tetris for the iPhone." Schmitt Decl. ¶ 10, Ex 8 (XIO-DG-0000927).   TH does not dispute that developers at Xio liked *Tetris.*  Schmitt Decl. ¶¶ 19-20, Exs. 17-18 (XIO-DG-0001766, XIO-DG-0100049 (emails from Desiree Golen in which she declares that *Tetris* is her "favorite game")).

As set out in TH's General Objections, the purported "fact" that "while *Mino* was still in its nascence, [Xio's developers] analyzed intellectual property laws to ensure that the game they would write would not infringe anyone's rights" contains legal argument that is disguised as fact and thus the Court should disregard it.

Further, this statement essentially argues that Xio thought *Mino* did not infringe TH's rights, which TH strongly disputes.  However, this point is immaterial.  As TH explains in its memorandum of law in opposition to Xio's motion for summary judgment, copyright and trade dress infringement are strict liability offenses and thus Xio's state of mind regarding whether *Mino* would infringe or not infringe *Tetris* is irrelevant to the issues of liability.  Memorandum of Law in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment dated October 25, 2011 ("TH's Opposition Brief") at 5.

TH also disputes that Xio worked to "ensure" that its game would not infringe anyone's rights as Xio cites to no admissible, non-hearsay evidence in support of this assertion and thus the Court should disregard it.

Further, TH does not dispute that Desiree Golen (Xio's CEO) and Michael Carter (Xio's CTO) purported to analyze intellectual property laws, but TH disputes that they were qualified to perform such an analysis.   Desiree Golen and Michael Carter are not attorneys, and do not have any expertise in intellectual property law on which to base such an analysis.  Schmitt Decl.  ¶ 5, Ex. 3 (D. Golen Dep. (Jan. 28, 2011) 235:11-16 (Ms. Golen admitted that she is not a lawyer, has never taken a class in intellectual property law, and does not consider herself an expert in intellectual property law)); Opp. Schmitt Decl. ¶ 6, Ex. 4 (M. Carter Dep. (Dec. 13, 2010) 175:16-21, 176:21-177:16 (Mr. Carter testified that he is not a lawyer, has not gone to law school, and does not consider himself an expert in intellectual property law)), ¶ 7, Ex. 5 (M. Carter's 30(b)(6) Dep. (Jan. 31, 2011) 184:16-24 (Mr. Carter testified that he is not a lawyer, that nobody working on *Mino* was a lawyer, and Xio did not employ an in-house lawyer)).  Further, regardless of any legal analysis done by Ms. Golen, Mr. Carter or any other Xio developer, Xio's own intellectual property attorney, Jeffrey Neu, Esq., advised Xio before this lawsuit (as detailed below): (i) that an infringement claim can be based on the similarity between the visual "imagery" of the games, (ii) to make a number

of changes to *Mino* to avoid infringement claims (which advice Xio ignored), and

(iii) that if Xio failed to make any changes to its game, Xio was likely to lose an

infringement claim brought by TH.

Moreover, contrary to "ensuring" that *Mino* did not infringe, Xio's

developers proceeded to copy *Tetris* and make *Mino* even though it had knowledge

of TH's rights and that *Mino* would infringe TH's rights.  Xio was aware of at least

one of the U.S. Customs Service decisions which held that the visual elements of

*Tetris* are copyrightable and had been infringed by another game by November

2008 before development of *Mino* began in earnest. Schmitt Decl. ¶ 44, Ex. 42

(XIO-DG-0002141 (email from Desiree Golen, dated November 13, 2008, linking

to the U.S. Customs Headquarters opinion)), ¶ 45, Ex. 43(D. Golen Dep. (Jan. 28,

2011) Ex. 38 (copy of the decision produced from Xio's files)).

In addition, Xio was aware of TH's enforcement efforts against other

infringers of *Tetris*. Schmitt Decl. ¶ 41, Ex. 39 (XIO-DG-0001354 (Ms. Golen

wrote in an email dated October 26, 2008 that the developers of iPhone games

received cease-and-desist letters from TH)).

Furthermore, in recognition of TH's rights, in an e-mail, dated October 18,

2008, Ms. Golen contacted TH (through its website Tetris.com) to "inquire about

[its] licensing options and packages" to make "a game similar to Tetris for the

mobile platform," which request was expressly denied.  Schmitt Decl. ¶ 5, Ex. 3

(D. Golen Dep. (Jan. 28, 2011)  124:13-23, 125:6-22, 130:1-23), ¶ 46, Ex. 44 (D.

Golen Dep. (Jan. 28, 2011) Ex. 7 (XIO-DG-0001194)), ¶ 47, Ex. 45 (D. Golen

Dep. (Jan. 28, 2011) Ex. 8 (XIODG-0001220)), ¶ 48, Ex. 46 (D. Golen Dep. (Jan.

28, 2011) Ex. 9 (XIO-DG- 0001297)).

In November 2008, Xio retained Jeffrey Neu, Esq., an intellectual property

lawyer from New Jersey. Schmitt Decl.  ¶ 49, Ex. 47 (J. Neu Dep. (Aug. 11, 2011)

35:12-15, 37:9-38:19, 72:14-21 (Mr. Neu testified that he is an intellectual

property lawyer from New Jersey and that he represented Xio as of November

2008), ¶ 35, Ex. 33 (D. Golen Dep. (Aug. 16, 2011) 26:2-19 (Ms. Golen testified

that Xio retained Mr. Neu following a phone call on November 14th, 2008)) , ¶¶

49-50, Exs. 47-48 (J. Neu Dep. (Aug. 11, 2011) 50:22-51:12, Ex. 10

(NEU0000021) (Mr. Neu testified that he understood that Xio was seeking an

attorney to advise them regarding potential copyright infringement issues)), ¶¶ 35,

51, Exs. 33, 49 (D. Golen Dep. (Aug. 16, 2011) 13:22-14:12, Ex. 302 (XIO-DG-

0100069, at XIO-DG-0100073) (during an initial email exchange with Mr. Neu in

November 2008, representatives of Xio explained that they were seeking advice

regarding a possible "copyright conflict" regarding their game and that they had

been in contact with other game developers that had received cease and desist

letters from TH.)).

During their first e-mail exchange in early November 2008, Mr. Neu explained to Xio that TH could bring a claim for copyright infringement even if Xio did not copy the code for *Tetris* and clarified for Xio that an infringement claim can be based on the similarity between the visual "imagery" of the games. Schmitt Decl. ¶ 52, Ex. 50 (XIO-DG-0100088 (Mr. Neu wrote to Ms. Golen "[t]ake note before we chat that the claimed infringement is going to be not in regards to not just the actual game, but the similarity and likeness of the imagery on a copyright claim."), ¶ 50, Ex. 48 (J. Neu Dep. (Aug. 11, 2011) Ex. 10 (NEU0000021) (Mr. Neu wrote to Ms. Golen that "[t]he screen shots [of the game] are going to be very indicative of where you stand.")), ¶ 49, Ex. 47 (J. Neu Dep. (Aug. 11, 2011) 71:10-72:7 ("Q. But your representation included advice about the visual expression, correct? A. I would assume so, yes.")).

In fact, Mr. Neu later explicitly told Xio that videogames are copyrightable. Schmitt Decl. ¶ 61, Ex. 59 (XXX-PRIV-XXX-XIO-DG-0100731 (Mr. Neu wrote that "It is well established that video games ARE copyrightable," citing *Atari Games Corp. v. Oman*, 979 F.2d 242 (D.C. Cir. 1992) and noting "*this is an opinion by current Supreme Court Justice Ginsburg.*") (emphasis in original)). Mr. Neu advised Xio that their position regarding the copyrightability of *Tetris* would be a losing position.  Schmitt Decl. ¶ 61, Ex. 59 (XXX-PRIV-XXX-XIO-DG-0100731 ("We should not waste the court's time arguing that the video game

is not copyrightable UNLESS we can make a case that there is NO separable expression (separable beyond any idea) in the Tetris game. *I think this would be a losing argument and a waste of our efforts.*") (emphasis in original)).

As noted above, contrary to "ensuring" that *Mino* did not infringe, Xio did not follow Mr. Neu's repeated advice that Xio to make changes to *Mino* in order to avoid infringement claims by TH as detailed below.  Schmitt Decl. ¶ 49, Ex. 47 (J. Neu Dep. (Aug. 11, 2011) 171:13-21, 172:11-173:13 (Mr. Neu testified that if he made any recommendations to change *Mino*, he did so to reduce the likelihood that an infringement claim would need to be litigated)).  For example, Mr. Neu wrote an email to Ms. Golen on August 5, 2009, recommending that Xio modify *Mino*. Schmitt Decl. ¶ 59, Ex. 57 (XXXPRIV-XXX-XIO-DG-01000483) (Mr. Neu wrote an e-mail to Desiree Golen on August 5, 2009 "I think there are ways to make [*Mino*] different than [TH's licensed *Tetris* for the iPhone], and I would do as much of them as possible.").  In that email, Mr. Neu enumerated the following list of elements and advised Ms. Golen that "[t]he less of these we have, the better":

– "Geometric playing pieces formed by four equally-sized, delineated blocks;"

– "The long vertical rectangle playing field, which is higher than wide;"

– "The downward, lateral and rotating movements of the playing pieces;"

– "The appearance of a shadow piece at the bottom of the playing field matrix to indicate where the Tetrimino will drop;"

– "The appearance of a trailer effect after the Tetrimino during a 'hard drop' command;"

– "The display of the next Tetrimino that will fall down the matrix in a small box next to the playing field;"

– "The disappearance of any completed horizontal line;"

– "The display of a flash effect when a completed horizontal line disappears;" and

– "The subsequent consolidation of the playing pieces remaining on the playing field as a result of the downward shift into the space vacated by the disappearing line."

Schmitt Decl. ¶ 59, Ex. 57 (XXX-PRIV-XXX-XIO-DG-01000483).

On September 29, 2009, Xio's counsel, Jeffrey Neu, e-mailed Ms. Golen a legal memorandum "RE: XIO INTERACTIVE: COPYRIGHT INFRINGEMENT ANALYSIS" (the "Copyright Infringement Memo"). *See* Schmitt Decl. ¶ 60, Ex. 58 (XXX-PRIV-XXX-XIO-DG-0100730), ¶ 61, Ex. 59 (XXX-PRIV-XXX-XIO-DG-0100731). The Copyright Infringement Memo listed the possible modifications to *Mino* "to differentiate the overall feel of the game" from *Tetris*.

a. Change the playing field from a long vertical rectangle to a perfect square (or something other than a long vertical rectangle.)

b. Move the information (currently presented on the right-side of the playing field) to the top- or bottom- side of the playing field.

c. Perhaps…..Change the mino shapes so that each individual shape is comprised of different colored blocks (this would make the game visually more challenging since each shape is not a single color, but four different colors fused together into a single shape).

d. Instead of dropping the pieces from the top center every time, alternate the location from where the piece drops with each piece (not only falling from the center, but also falling from the left and right sides of the board—again, this would make the game more challenging).

e. Instead of allowing the pieces to drop in small increments, make the piece drop in a smooth movement.

f. Likewise, make the rotations of pieces smoother so that the player can see the piece rotating, as opposed to jumping from one position into the rotated position.

g. When a line is completed, instead of making the line flash before it disappears, have the line turn dark gray (to signify that it has been completed), and then have the line "pulled" off-screen via a pulling motion from the side of the board. (animate the line moving off the playing field by a pull from the side direction).

h. Eliminate any shadow piece from indicating where the piece will fall (this will make the game more challenging).

i. Instead of creating 7 distinct pieces, create only 5 distinct pieces, and a "mirror" option which allows the pieces to be mirrored (this would make the game less challenging, but you could also implement a "lock" function which allows a user to disable the "mirror" option, which would allow the user to decide if he wanted the game to be more challenging—I'll have to do further legal analysis to see if this would be harmful in our defense of infringement, but at first pass, I think in

conjunction with the other possible modification, it would not be a serious issue.)

j. Create a storyline for the game (which Tetris does not seem to have), where a cartoon character named "Mino", with the help of the user/player is trying to collect these completed lines and "pull" them off the board, for some ultimate purpose (for instance, they could be long bricks that the character is collecting to build a wall).

k. Working in conjunction with the multi-colored shapes, maybe if the player manages to vertically stack a predetermined number of same-colored blocks (not shapes, but blocks = one of the 4 squares that make up any shape), then the column (vertical stack) is eliminated. (something along the lines of the iPhone game known as "bejeweled". Again, I'm not sure if this would be protected, but in conjunction with the other possible modifications, it would not be a serious issue.)

Schmitt Decl. ¶ 61, Ex. 59 (XXX-PRIV-XXX-XIO-DG-0100731, at p. 2)

The Copyright Infringement Memo recommended that Xio "*modify Mino as much as possible to differentiate the overall feel of the game.*" Schmitt Decl. ¶ 61, Ex. 59 (XXX-PRIV-XXX-XIO-DG-0100731, at p. 2 (emphasis in original)). The Copyright Infringement Memo states: "Every effort should be made to ensure that the *overall feel and aesthetic appeal* of Mino is different from Tetris. Please refer to the non-exhaustive list of recommended modifications above." Schmitt Decl. ¶ 61, Ex. 59 (XXX-PRIV-XXX-XIO-DG-0100731, at p. 4 (emphasis in original)).

As Ms. Golen's notes of her conversation with Mr. Neu reflect, Xio was likely to lose an infringement claim brought by TH if no changes were made to *Mino*. Schmitt Decl. ¶ 67, Ex. 65 ("without any changes … 45, 55 in their favor").

Xio did not make any of the changes to Mino listed in the Copyright Infringement

Memo.  *See* Schmitt Decl. ¶ 35, Ex. 33(D. Golen Dep. (Aug. 16, 2011) 51:7-15

("Q. I'm asking you, of this bullet point list, did you take his recommendation and

make any of these changes? . . . A. I don't -- I don't believe we made any of the

changes -- any changes to our game after that point.").

      10.    *Specifically, Xio researched the history of Tetris, the interaction and*

*applicability of copyright, trademark, and patent law, "look and feel" case law,*

*the processes and structure around copyright enforcement (as well as protecting*

*against spurious enforcement), copyright registrations for Tetris and its variants,*

*specific rules of Tetris as determined by industry experts and academics, and*

*articles on copyright for user interfaces.  Id. Exs. 10-15. In addition, and also in*

*the fall of 2008, Xio reviewed the following Copyright Office circular:*

> *Copyright does not protect the idea for a game, its name or title, or*
> *the method or methods for playing it.  Nor does copyright protect any*
> *idea, system, method, device, or trademark material involved in*
> *developing, merchandising, or playing a game.  Once a game has*
> *been made public, nothing in the copyright law prevents others from*
> *developing another game based on similar principles.  Copyright*
> *protects only the particular manner of an author's expression in*
> *literary, artistic, or musical form.*

*Id. Ex. 9.  This all occurred in the fall of 2008, at the very beginning of*

*development of Mino.  See id. Exs. 11, 15-17, 19-21.*

**Disputed, but immaterial**.  As set out in TH's General Objections, this purported "fact" contains legal argument disguised as fact and thus the Court should disregard it.

Further, this statement essentially argues that Xio thought *Mino* did not infringe TH's rights, which TH strongly disputes.  However, this point is immaterial.  As TH explains in its memorandum of law in opposition to Xio's motion for summary judgment, copyright and trade dress infringement are strict liability offenses and thus Xio's state of mind regarding whether *Mino* would infringe or not infringe *Tetris* is irrelevant to the issues of liability.  TH's Opposition Brief at 5.

This statement is also improper to the extent it is supported by inadmissible hearsay evidence, including Maitra Exhibits 15, 16, 17, and 21, which the Court should disregard.

TH states that the term "researched" and the phrases "'look and feel' case law," "specific rules," and "industry experts and academics" are vague and ambiguous, and disputes them to the extent they suggest that any purported legal analysis by Xio is valid.

As discussed in response to Xio's paragraph 9 herein, TH disputes that Xio was qualified to adequately "research" or analyze intellectual property law. Desiree Golen and Michael Carter are not attorneys, and do not have any expertise

in intellectual property law on which to base such an analysis. *See supra* TH's

Response to ¶ 9.  Further, regardless of any "research" Xio conducted, as discussed

in response to Xio's paragraph 9 herein, Xio retained and sought the advice of a

New Jersey intellectual property attorney, Jeffrey Neu, Esq., who advised Xio (i)

that an infringement claim can be based on the similarity between the visual

"imagery" of the games, (ii) to make a number of changes to Mino to avoid

infringement claims (which advice Xio ignored), and (iii) that if Xio failed to make

any changes to its game, Xio was likely to lose an infringement claim brought by

TH.  *See supra* TH's Response to ¶ 9.

TH does not dispute that Xio was aware of *Tetris* and TH's copyright

registrations by November 2008.  *See* Opp. Schmitt Decl. ¶ 11, Ex. 6 (copy of

website at URL specified in Maitra Decl. Ex. 13 showing that Xio searched for

"tetris company" and found a copyright registration for the audio-visual work of

*Kids Tetris* owned by TH)); Schmitt Decl. ¶ 39, Ex. 37 (D. Golen Dep. (Jan. 28,

2011) Ex. 34 (printout from U.S. Copyright Office website, dated "Friday

November 14," listing copyright registrations owned by TH that was produced

from Ms. Golen's files)); ¶ 40, Ex. 38 (November 2008 calendar excerpt)).

TH disputes that Xio researched the "specific rules of *Tetris* as determined

by industry experts and academics."  The materials cited by Xio in support of this

purported fact do not discuss any "specific rules of *Tetris*."   Moreover, Xio has

provided no evidence that any of the articles quoted or linked by Xio regarding the purported "specific rules of *Tetris*" were in fact authored by people who are "industry experts or academics."

TH does not dispute that Xio was aware of the U.S. Copyright Office circular in the fall of 2008.  *See* Maitra Decl. Ex. 9.  This circular, however, does not state that visual expression of games can be copied.  To the contrary, it states that copyright protects "the particular manner of an author's expression in literary, artistic or musical form" in games, including "pictorial expression." Opp. Schmitt Decl. ¶ 12, Ex. 7 (http://www.copyright.gov/fls/fl108.html).

11.     *Xio discovered that Plaintiffs did not own a patent to the rules, game mechanics, or functional elements of Tetris—that Plaintiffs only had copyright, trademark, and trade dress rights to the game.  See id. Ex. 8-18, 22.*

**Disputed.**  TH states that the terms "rules," "game mechanics," and "functional elements" are vague and ambiguous, and disputes this statement to the extent it suggests that TH's fanciful visual expression in *Tetris* are "rules," "game mechanics," and "functional elements."

Further, as set out in TH's General Objections, this purported "fact" contains legal argument disguised as fact and thus the Court should disregard it.

TH does not dispute it has copyright, trademark, and trade dress rights to the *Tetris* Games and that Xio was aware of such rights.

30

TH also adds, for clarification, that Xio is not accused of infringing any patent owned by TH.  *See* Amended Complaint.  Accordingly, TH disputes the materiality of this purported fact.

> 12.  *For example, in December of 2008, Xio wrote:*
>
> *The game concept of Tetris was once patentable.  However, because it was never patented, it now lies in the public domain.  Moreover, had Pajitnov patented Tetris at the time of its invention (1985), by now (23 years later), his patent rights have expired.*
>
> *What this means is that no legal framework currently protects the replication, improvement, or sale of Tetris game mechanics and rules.*

*Id. Ex. 16.*

**Undisputed that Xio's CEO, Desiree Golen, wrote the quoted text, but Disputed that this is an accurate statement of the law and that it is material.**

As set out in TH's General Objections, this purported "fact" contains legal argument that is disguised as fact and thus the Court should disregard it.  This statement essentially argues that Xio thought *Mino* did not infringe TH's rights, which TH strongly disputes.  However, this point is immaterial.  As TH explains in its memorandum of law in opposition to Xio's motion for summary judgment, copyright and trade dress infringement are strict liability offenses and thus Xio's state of mind regarding whether *Mino* would infringe or not infringe *Tetris* is irrelevant to the issues of liability.  TH's Opposition Brief at 5.

TH also disputes this assertion to the extent that Xio is offering the quoted text for the truth of the matter asserted which is inadmissible hearsay evidence and thus the Court should disregard it on that basis as well.

TH also disputes Xio's use of the word "invention" as vague, ambiguous, and misleading to the extent that Xio suggests that *Tetris* is not a work entitled to copyright protection or that it is an "invention" that is only protected by patent law. TH owns the copyrights in and to the visual expression of the *Tetris* Games. HR Decl. ¶ 23.

TH further disputes that Ms. Golen was qualified to perform any legal analyses.  As discussed in response to Xio's paragraph 9 herein, Desiree Golen is not an attorney, and does not have any expertise in intellectual property law on which to base such an analysis.  *See supra* TH's Response to ¶ 9.  Further, regardless of any "research" Xio conducted, as discussed in response to Xio's paragraph 9 herein, Xio retained and sought the advice of a New Jersey intellectual property attorney, Jeffrey Neu, Esq., who advised Xio (i) that an infringement claim can be based on the similarity between the visual "imagery" of the games, (ii) to make a number of changes to Mino to avoid infringement claims (which advice Xio ignored), and (iii) that if Xio failed to make any changes to its game, Xio was likely to lose an infringement claim brought by TH.  *See supra* TH's Response to ¶ 9.

32

13.    *Also in December 2008, Xio wrote:*

> *Copyright: prohibits others from copying the creative expression of an idea.  This covers "original works of authorship including literary, dramatic, musical, artistic and other intellectual works."  (USPTO). The Tetris Company owns a copyright on the audiovisual effects of certain Tetris Games (Family Tetris, Magical Tetris, etc.).  This means first: I can not break in, steal the TC's code, and use it for my game.  Second: it also means that I can not reproduce an audiovisual effect that does not stem directly from Tetris game mechanics.*

*Id. Ex. 17.*

**Undisputed that Xio's CEO, Desiree Golen, wrote the quoted text, but Disputed that this is an accurate statement of the law or that it is material.**  As set out in TH's General Objections, this purported "fact" contains legal argument that is disguised as fact and thus the Court should disregard it.  This statement essentially argues that Xio thought *Mino* did not infringe TH's rights, which TH strongly disputes.  However, this point is immaterial.  As TH explains in its memorandum of law in opposition to Xio's motion for summary judgment, copyright and trade dress infringement are strict liability offenses and thus Xio's state of mind regarding whether *Mino* would infringe or not infringe *Tetris* is irrelevant to the issues of liability.  TH's Opposition Brief at 5.

TH also disputes this assertion to the extent that Xio is offering the quoted text for the truth of the matter asserted which is inadmissible hearsay evidence and thus the Court should disregard it on that basis as well.

TH further disputes that Ms. Golen was qualified to perform any legal

analyses. As discussed in response to Xio's paragraph 9 herein, Desiree Golen is not an attorney, and does not have any expertise in intellectual property law on which to base such an analysis. *See supra* TH's Response to ¶ 9. Further, regardless of any "research" Xio conducted, as discussed in response to Xio's paragraph 9 herein, Xio retained and sought the advice of a New Jersey intellectual property attorney, Jeffrey Neu, Esq., who advised Xio (i) that an infringement claim can be based on the similarity between the visual "imagery" of the games, (ii) to make a number of changes to Mino to avoid infringement claims (which advice Xio ignored), and (iii) that if Xio failed to make any changes to its game, Xio was likely to lose an infringement claim brought by TH. *See supra* TH's Response to ¶ 9.

TH also states that the statement "I can not reproduce an audiovisual effect that does not stem directly from Tetris game mechanics" is vague and ambiguous to the extent it uses a double negative. TH also states that the use of the term "game mechanics" is vague and ambiguous.

14. *Xio concluded that it had "come to believe that the Tetris Company has been using its Copyright claims unjustly in order to profit from a monopoly on an un-patented game by bulling independent developers into removing their versions from the internet and now from the iPhone AppStore." Id. Ex. 19.*

**Disputed, but immaterial**. TH does not dispute that Xio's CEO, Desiree Golen, wrote the quoted text above.  However, as set out in TH's General Objections, this purported "fact" contains legal argument that is disguised as fact and thus the Court should disregard it.  This statement essentially argues that Xio thought *Mino* did not infringe TH's rights, which TH strongly disputes.  However, this point is immaterial.  As TH explains in its memorandum of law in opposition to Xio's motion for summary judgment, copyright and trade dress infringement are strict liability offenses and thus Xio's state of mind regarding whether *Mino* would infringe or not infringe *Tetris* is irrelevant to the issues of liability.  TH's Opposition Brief at 5.

TH also disputes this assertion to the extent that Xio is offering the quoted text for the truth of the matter asserted which is inadmissible hearsay evidence, and thus the Court should disregard it on that basis as well.

TH also disputes that Ms. Golen was qualified to perform any legal analyses. As discussed in response to Xio's paragraph 9 herein, Desiree Golen is not an attorney, and does not have any expertise in intellectual property law on which to base such an analysis. *See supra* TH's Response to ¶ 9.

Further, such purported "conclusion" was not credible given the advice Xio received from its own attorney, who advised Xio (i) that an infringement claim can be based on the similarity between the visual "imagery" of the games, (ii) to make

a number of changes to Mino to avoid infringement claims (which advice Xio ignored), and (iii) that if Xio failed to make any changes to its game, Xio was likely to lose an infringement claim brought by TH. *See supra* TH's Response to ¶ 9. In addition, such a purported "conclusion" was not credible given Xio's awareness by November 2008 of at least one of the U.S. Customs Service decisions which held that the visual elements of *Tetris* are copyrightable and had been infringed by another game. *See supra* TH's Response to ¶ 9.

TH disputes that it ever "bull[ied] independent developers into removing their versions" of *Tetris* from the internet or from the iTunes App Store. Rather, TH instituted a worldwide enforcement policy in order to protect its intellectual property, and has taken action against obvious infringers. HR Decl. ¶ 20. In any event, it is not "bullying" for a company to protect its intellectual property rights. *Janel Russell Designs v. Mendelson & Assocs.*, 114 F. Supp. 2d 856, 860, 866 (D. Minn. 2000) (plaintiff who took "steps to enforce her copyrights on eighty separate occasions" was "simply seeking to protect its copyright through aggressive monitoring and cease and desist letters").

TH further disputes that it is using its copyright rights unjustly and notes that Xio has voluntarily dismissed its counterclaim for misrepresentation, and has withdrawn its affirmative defenses of unclean hands and copyright misuse. Dkt. # 43, Consent Order, dated July 11, 2011; *see also* Opp. Schmitt Decl. ¶ 13.

15.     *In an effort to confirm this understanding, Xio contacted a number of attorneys.  See id. at Exs. 18-20.  And, still in the fall of 2009, one of these attorneys confirmed Xio's analysis, stating that this early legal analysis was "spot on."  Id. Ex. 21.*

**Disputed, but immaterial**. As set out in TH's General Objections, this purported "fact" contains legal argument that is disguised as fact and thus the Court should disregard it.  TH also disputes this assertion to the extent that Xio is offering the quoted text for the truth of the matter asserted which is inadmissible hearsay evidence and thus the Court should disregard it on that basis as well.

TH objects to the use of the term "this understanding" as vague and ambiguous as it is not clear from this statement what it refers to.

TH does not dispute that Xio contacted some attorneys, but it disputes that such attorneys confirmed that *Mino* did not infringe *Tetris*.  Furthermore, Xio did not get an opinion letter from any attorney stating that Xio would not infringe TH's intellectual property rights.  Opp. Schmitt Decl. ¶ 8, Ex. 5 (M. Carter's 30(b)(6) Dep. (Jan. 31, 2011) 184:25-185:4)).

For example, there is no evidence that Mr. Reback or Mr. Cormier ever responded or had any contact with Xio (much less gave it advice).  Opp. Schmitt Decl. ¶¶ 14-17, Ex. 8 (D. Golen Dep. (Jan. 28, 2011) 257:4-258:1 (Ms. Golen testified that she does not remember if she received a response from Mr. Cormier,

and does not remember ever speaking to Mr. Cormier), 258:25-259:12 (Ms. Golen

testified that she does not remember ever speaking to Mr. Reback)).

Further, TH disputes that "in the fall of 2009" an attorney stated that Xio's

legal analysis was "spot on." Julie Turner emailed Xio in November 2008, not

2009. *See* Maitra Decl. Ex. 21. TH disputes that Xio's legal analysis was "spot on"

because there is no evidence that Xio ever showed Julie Turner or any other

attorney (other than Mr. Neu) a copy of *Mino* or discussed the decisions of the U.S.

Customs Service with any attorney, and thus any purported legal "analysis" was

speculative and wholly inadequate. Opp. Schmitt Decl. ¶¶ 17-19, Ex. 9 (D. Golen

Dep. (Feb. 10, 2011) 322:20-324:20, 331:20-332:10, 333:5-336:14, 337:4-18,

338:4-18, 340:20-22 (Ms. Golen contacted various unretained attorneys but does

not remember showing them screenshots of either *Mino* or *Tetris* or discussing the

U.S. Customs Service regarding the protected expression in *Tetris*)).

16.     *Xio's legal analysis was codified in an internal memorandum entitled*

*"Tetris Company Legal Notes." Id. Ex. 22. The memo explained "[w]hile the*

*rules of games are patentable . . . The Tetris Company holds no patents*

*whatsoever, and even if they did, those patents would have long since expired."*

*Id. It concludes that copyright protection would not prevent Xio from producing*

*Mino, as it contained the rules, and only the rules, of Tetris—and specifically cites*

*the Copyright Office circular as legal support for this conclusion. Id. The*

38

*memorandum analyzes the common features of Mino and Tetris to determine that each is a rule or an otherwise functional aspect of the game. Id. It further explains how the expressive elements of Mino—including the graphics and music— were independently created (and different from) Tetris. Id.*

**Undisputed that Xio's CTO, Michael Carter, wrote the internal memorandum cited above, but Disputed that that it is an accurate statement of the law or that it is material.**

TH does not dispute that Xio's CTO, Michael Carter, wrote the quoted text above, however, as set out in TH's General Objections, this purported "fact" contains legal argument that is disguised as fact and thus the Court should disregard it.

Further, this statement essentially argues that Xio thought *Mino* did not infringe TH's rights, which TH strongly disputes. However, this point is immaterial. As TH explains in its memorandum of law in opposition to Xio's motion for summary judgment, copyright and trade dress infringement are strict liability offenses and thus Xio's state of mind regarding whether *Mino* would infringe or not infringe *Tetris* is irrelevant to the issues of liability. TH's Opposition Brief at 5.

TH also disputes this assertion to the extent that Xio is offering the quoted text for the truth of the matter asserted which is inadmissible hearsay evidence, and thus the Court should disregard it on that basis as well.

In addition, Michael Carter is not an attorney or legal expert, and thus TH disputes that it is accurate legal analysis.  *See supra* TH's Response to ¶ 9.  In any event, Mr. Carter's analysis is contradicted by legal advice given by Xio's attorney, Jeffrey Neu, Esq, who advised (i) that an infringement claim can be based on the similarity between the visual "imagery" of the games, (ii) to make a number of changes to *Mino* to avoid infringement claims (which advice Xio ignored), and (iii) that if Xio failed to make any changes to its game, Xio was likely to lose an infringement claim brought by TH. *See supra* TH's Response to ¶ 9.

TH also disputes the statement that the expressive elements of *Mino*— including the graphics and music—were independently created and are different from *Tetris*.  *See infra* TH's Response to ¶ 17.

TH states that the words "codified," "rules," and "functional" as vague and ambiguous, and disputes these terms to the extent that they suggest that *Tetris* is not a creative work entitled to copyright protection or that it is only protected by patent law.  TH owns the copyrights in and to the visual expression of the *Tetris* Games, which includes seven Tetrimino playing pieces that have a distinctive appearance.  HR Decl. ¶¶ 23. 32, 48.

17.    *And in fact, Xio wrote the computer code from scratch. See id. at Exs. 22 & 23. In addition, Xio independently created the music for the game (and scrapped a "Tetris-like" song for fear of infringement). See id. at Exs. 25-32. It independently developed the colors for the game using a unique algorithm it invented. See id. at Exs. 33 & 34. And it independently created all graphical files used in the game. See id. at Exs. 32 & 22.*

**Disputed, but immaterial.**   Xio cites to no admissible, non-hearsay evidence in support of this assertion and thus the Court should disregard it.

TH objects to the phrases "from scratch," "independently created," "independently developed," and "unique algorithm" as vague and ambiguous, and disputes them to the extent they suggest that Xio did not copy TH's *Tetris* Games.

TH does not deny that Xio created its own source code for TH's *Tetris* Games, but this fact is immaterial because TH claims that *Mino* infringes the visual expression in *Tetris*, not the source code. *See* Amended Complaint ¶¶ 32-34.

TH disputes that Xio "independently created" music for *Mino*. One of Xio's developers, Mario Balibrera, created a "Tetris-like" song that was based on the song *Korobeiniki*. Schmitt Decl. ¶ 14, Ex. 12 (M. Balibrera Dep. (Dec. 10, 2010) 151:2-152:4) ("Q. What did you mean by "Tetris-like song?"A. I meant that there's a Russian sounding song I originally wrote for -- you know, as one of the songs I originally came up with for Desiree or Michael or whoever to select from. .

. it was kind of based on the song called Korobeiniki … and [someone] told me that it's very similar to some Russian music they have in one of their early versions of Tetris.")). The Russian folk song Korobeiniki is typically used in most versions of *Tetris*, and TH owns a U.S. trademark registration for it in connection with, among other things, on-line electronic games.  HR Decl. ¶ 30, Ex. 6 (attaching copy of trademark registration for "tune based on a Russian folk song named Korobeiniki").  However, this is not material as TH claims that *Mino* infringes the visual expression in *Tetris*, not the music.  *See* Amended Complaint ¶¶ 32-34.

TH disputes that Xio independently developed the colors for the game using a unique algorithm it invented.  Xio has not cited to any evidence that Xio has patented an invention on any such "unique algorithm."  Furthermore, *Mino* copies the bright colors used for the playing pieces as *Tetris*.  Examples are pictured below:



Opp. HR Decl. ¶ 3.

TH disputes that Xio "independently created" the graphical files for *Mino* to the extent that Xio implies that they created these files without copying *Tetris*. *Mino* looks virtually identical to *Tetris*.  Bogost Decl. ¶¶ 9, 49-56, Ex. 2 (Bogost Rpt. ¶¶ 9, 48-55); HR Decl. ¶¶ 54-55.   And, Xio had seen *Tetris* prior to and during the development of *Mino*.  Schmitt Decl. ¶¶ 19-20, Exs. 17-18 (XIO-DG-0001766, XIO-DG-0100049 (emails from Desiree Golen in which she declares that *Tetris* is her "favorite game"), ¶ 7, Ex. 5 (M. Carter's 30(b)(6) Dep. (Jan. 31, 2011) 85:18-86:8 (Mr. Carter testified that Xio was aware of the *Tetris (iPhone)* game in October 2008)), ¶ 5, Ex. 3 (D. Golen Dep. (Jan. 28, 2011) 29:3- 29:13, 37:6-14, 38:23- 39:11, 45:23-46:1, 144:14-19, 178:8-15) (Ms. Golen testified that she was

aware of *Tetris Game Boy*, had watched her brother play the game, and may have also played the game herself.)), ¶ 23, Ex. 21 (D. Golen Dep. (Feb. 10, 2011) 352:2-12)), ¶ 9, Ex. 7 (M. Carter Dep. (Dec. 13, 2010) 75:10-15, 79:3-5) (Mr. Carter testified that he had a handheld game that may have included *Tetris* and that it was possible that he played *Tetris NES Edition*)), ¶ 16, Ex. 14 (M. Hunt Dep. (Jan. 26, 2011) 32:15-22, 33:15-34:7, 36:4-8) (Mr. Hunt testified that he thinks he played the *Tetris (iPhone)* game that he purchased and that it was possible that he had played other *Tetris* games)), ¶ 17 Ex. 15 (J. Rus. Dep. (Dec. 15, 2010) 33:25-34:9, 34:20-25) (Mr. Rus testified that he saw Mr. Hunt playing *Tetris (iPhone)* and that "it's quite possible" Mr. Rus played *Tetris Game Boy*)), ¶ 18, Ex. 16 (K. Ude Dep. (Jan. 24, 2011) 37:25- 38:2, 42:10-15, 46:13-18) (Mr. Ude testified that he played *Tetris Game Boy* and that he played a version of *Tetris* online)); ¶ 15, Ex. 13 (A. Haro Dep. (Dec. 17, 2010) 74:10-25 (Mr. Haro testified that he played *Tetris Game Boy* in the 1990s)).

In fact, during the development of *Mino*, Xio's designers admittedly reviewed TH's *Tetris (iPhone)* game. Schmitt Decl. ¶ 9, Ex. 7 (M. Carter Dep. (Dec. 13, 2010) 73:14-74:6, 74:20-25, 81:14-82:6, 220:14-222:7 (Mr. Carter testified that he looked at screenshots from *Tetris (iPhone)* and *Mino* to determine the games' similarities and that Mr. Hunt downloaded *Tetris (iPhone)* while Xio was developing Mino.)), ¶ 7, Ex. 5 (M. Carter 30(b)(6) Dep. (Jan. 31, 2011) 102:7-

10 (Mr. Carter testified that he, Mr. Hunt, and Ms. Golen looked at *Tetris* (*iPhone*))).

18.   *Counsel for Plaintiffs recently wrote the following to the developer of "Mattris," a game accused of infringing Tetris:*

> *As a threshold matter, we want to clarify that [Plaintiff] does not allege that the game "Mattris" infringes any patent rights in the game Tetris.  Nor does [Plaintiff] claim rights in the game mechanics or rules of the game Tetris.*

*Maitra Dec. Ex. 35.*

**Undisputed, but immaterial.**  TH adds for clarification that TH wrote to the developer of *Mattris* on August 11, 2010 and stated that *Mattris* copies many visual elements of *Tetris*, including "(1) the downward, lateral and rotating movements of the differently oriented four-brick playing pieces, as well as the configuration of the four-brick combinations comprising the playing pieces; (2) the feature displaying the next four-brick playing piece that will fall down the playing field matrix; (3) the disappearance of any completed horizontal row; (4) the subsequent consolidation of the playing pieces remaining on the playing field as a results of the downward shift into the space vacated by the disappearing row; and (6) the playing field (e.g. , the vertical matrix, higher than it is wide.)"  Maitra Decl. Ex. 35 (TETRIS-XIO-0037390 (email from J. Schmitt, Esq. to the developer of the infringing *Mattris* game)).

19.    *Xio's videogame expert, Jason Begy, provides the following definition for rules: the limitations and affordances of the game.  Maitra Dec. Ex. 36 at ¶ 16. This definition is explained by the world-renowned game designer and scholar Jesper Juul:*

> *Rules specify limitations and affordances.  They prohibit players from performing actions and this affords players meaningful actions that were not otherwise available; rules give games structure.  The board game needs rules that let the players move their pieces as well as preventing them from making illegal moves the video game needs rules that let the characters move as well as rules that prevent the character from reaching the goal immediately.*

*Jesper Juul, Half-Real 58 (2005) (emphasis in original).*

**Undisputed**.  TH does not dispute that Xio's expert, Jason Begy, quoted this language in his expert report.  However, as set out in TH's General Objections, Mr. Begy submitted no sworn declaration in support of Xio's motion for summary judgment, and thus his expert report is inadmissible hearsay evidence.  Opp. Schmitt Decl. ¶ 20.  As such, Xio cannot rely on it in support of its motion for summary judgment.

Further, Dr. Juul is not an expert witness in this case, he did not submit an expert report, he was not deposed, and he did not submit a declaration in support of Xio's motion.  Opp. Schmitt Decl. ¶ 21.  As such, this evidence is hearsay, which the Court should disregard.  Fed. R. Evid. 801(c); *Smith v. Allentown*, 589 F.3d 684, 693 (3d Cir. 2009).

Even if Dr. Juul's definition of "rules" were admissible—which it is not—it is not probative in this case. His definition of "rules" as "limitations and affordances" is simply one of many academic theories about the definition of "rules" in the field of videogame aesthetics. Opp. Bogost Decl. ¶¶ 3-4. As TH's expert, Dr. Ian Bogost, explains, there are many ways of understanding the term "rules," and he disputes this definition of "rules" set forth by Xio's expert, and explains that a more abstract interpretation of the word "rules" is more appropriate here. Opp. Schmitt Decl. ¶ 23, Ex. 10 (I. Bogost Dep. (May 6, 2011) 171:18-173:22). Dr. Bogost opines that Dr. Juul did not intend for this definition to include or describe the audiovisual appearance of a game. Opp. Bogost Decl. ¶ 5. Dr. Juul explains that these "limitations and affordances" are related to computer algorithms, which generally relate to how a videogame is programmed and not how the visual appearance of a videogame is designed. Opp. Bogost Decl. ¶ 5. Further, with this definition, Dr. Juul is not defining "rules" in the context of determining copyrightable visual expression of videogames. Opp. Bogost Decl. ¶ 6. Dr. Juul does not address how his definition of "rules" would apply to *Tetris* in particular. Opp. Bogost Decl. ¶ 7.

20.   *In his deposition, Mr. Pajitnov, the inventor of Tetris, applied this distinction. He described the game Sian Tsy, a relative of Chess. Mr. Pajitnov explained that this game is "played on the field of nine by ten"—as opposed to a*

*field of eight by eight—and that something called a "cannon piece" is similar to the rook in Chess but with a variation on the movement.  See Maitra Dec. Ex. 37 at 156:18-157:17.  When asked if this variant was properly considered chess, Mr. Pajitnov replied: "No, it is not chess . . . It is a different game."  Id.*

**Disputed, but immaterial**.  TH disputes the word "inventor" to the extent that Xio suggests that *Tetris* is not a creative work entitled to copyright protection or that it is an "invention" that is only protected by patent law.  TH owns the copyrights in and to the visual expression of the *Tetris* Games.  HR Decl. ¶ 23.

TH objects to the use of the phrase "this distinction" as vague and ambiguous as it is not clear from this statement what it refers to.

TH does not dispute that Mr. Pajitnov said the quoted text, but TH disputes that it is relevant or material to the claims or defenses in this litigation.

21.  *Xio's expert explains this distinction in the context of videogames:*

> *Take the original Super Mario Bros. and Sonic The Hedgehog games. The two have nearly identical rules.  In both games the player must reach a target point far away to the right of their starting point.  In both games this is done by running through the environment, jumping over obstacles, and jumping onto enemies.  In both games if the character runs into (as opposed to jumping on top of) an enemy, the character "dies" and the player must restart.  Both games feature "power ups" that enhance the character's abilities.  Both games feature collectible objects (coins and rings, respectively) that award the player an extra life upon collecting 100.*
>
> *The rules of these two games are very similar, but the expression given to those rules is vastly different.  Nobody would confuse Nintendo's iconic Mario with Sega's iconic Sonic.  The stories these*

> *games tell are also different: Mario is an Italian plumber, originally*
> *from Brooklyn, who travels to the Mushroom Kingdom where he*
> *repeatedly saves the Princess.  Sonic's world has no tie to the real*
> *world, and his mission is to save small animals from being*
> *transformed into killer robots and to find the "chaos emeralds"*
> *before his nemesis does.*

*Maitra Dec. Ex. 36 at ¶¶ 87-88.*

**Undisputed**.   TH does not dispute that Xio's expert, Jason Begy, quoted this language in his expert report.  However, as set out in TH's General Objections, Mr. Begy submitted no sworn declaration in support of Xio's motion for summary judgment, and thus his expert report is inadmissible hearsay evidence.  Opp. Schmitt Decl. ¶ 20.  As such, Xio cannot rely on it in support of its motion for summary judgment.  TH disputes the use of the phrase "this distinction" as vague and ambiguous as it is not clear from this statement what it refers to.

22.     *By contrast, Plaintiffs define the rules of a game as "an abstract concept and its interpretation."  Id. Ex. 38 at 24:17-25.  Plaintiffs further define the rules of Tetris as limited to the following: "an object appears on a playing field and the player manipulates the object to a final resting spot, to create a shape which is then removed from the playing field."  Id. Ex. 46 at 7.*

**Undisputed.**  TH adds, for clarification, that TH's expert, Dr. Bogost, defined "rules of the game" as "an abstract concept and its interpretation."  TH also adds that it defines the rules of *Tetris* "as an object appears on a playing field and the player manipulates the object to a final resting spot, to create a shape which is

then removed from the playing field"—which is essentially the same as the "idea" of *Tetris* as determined by the U.S. Customs Service (i.e., an electronic game using "simple squares or blocks on the screen to be assembled into specific shapes and manipulated by the player in a race against time or against the computer"). Schmitt Decl. ¶ 70, Ex. 68 (attaching Customs Decisions).

23.     *Yet Plaintiffs have provided source code for a Tetris demo (TETRIS¬XIO-0080146) that Plaintiffs' internal documentation describes as follows: "The source code for a basic Tetris demo is provided for Licensees to better understand Tetris game rules and logic." Id. Ex. 39 (emphasis added). Here is a screenshot of the demo:*



*Id. Ex. 36 at ¶ 23.*

**Undisputed, but immaterial.**

TH does not dispute that Xio's expert, Jason Begy, included this language in his expert report.  However, as set out in its General Objections, Mr. Begy submitted no sworn declaration in support of Xio's motion for summary judgment,

and thus his expert report is inadmissible hearsay evidence.  Opp. Schmitt Decl. ¶ 20.  As such, Xio cannot rely on it in support of its motion for summary judgment.

Further, TH adds for clarification that this sample source code was intended to be part of a "2009 *Tetris* Resource Kit" to facilitate TH's licensees in making a game that looks like a *Tetris*-branded game.  Opp. HR Decl. ¶ 9, Ex. C (TETRIS-XIO-0015535 (copy of 2009 *Tetris* Resource Kit)).  However, this source code was never finalized and never actually sent to licensees.  *Id.* at ¶ 10.  As the document makes clear, the Resource Kit focused on instructions about the music and sound effects, and how to write code properly:

> The purpose of this document is to provide supplemental material for Tetris game development.  This material includes game music, sound effects, and engine support.  This document also alerts Tetris Licensees to common issues that arise when developing Tetris.

*Id.* at ¶ 9.  In other words, this Resource Kit was to provide materials to licensees so that they could more efficiently write source code and design a *Tetris* version for their platforms.  *Id.* at ¶ 10.  The Resource Kit does not discuss the legal definition of "rules" for the purposes of determining the protectable visual expression.  *Id.* at ¶ 11.  Rather, these words are simply used in the way they are commonly used by programmers to refer to "rules and logic" behind the technical task of programming software to achieve a particular goal.  *Id.* at ¶ 11.

24.     *This demo does not employ any graphics files whatsoever.  Id. Ex. 36 at ¶ 25.*

**Undisputed, but immaterial.**

TH does not dispute that Xio's expert, Jason Begy, included this language in his expert report.  However, as set out in TH's General Objections, Mr. Begy submitted no sworn declaration in support of Xio's motion for summary judgment, and thus his expert report is inadmissible hearsay evidence.  Opp. Schmitt Decl. ¶ 20.  As such, Xio cannot rely on it in support of its motion for summary judgment.

TH does not dispute that the basic *Tetris* demo (produced by TH at TETRIS-XIO-0080146) uses no graphic files in rendering the visual expression that appears on the screen.  However, this fact is not relevant as creative visual expression in videogames and other digital art can be created with code alone, and without using any graphics files.  Opp. Bogost Decl. ¶¶ 21-24.

25.     *The following is a screenshot comparison of the demo with the licensed game Tetris Zone (with numbered circles added):*



*See id. Ex. 36 at ¶ 23 & Ex. 1.*

**Undisputed, but immaterial**.

TH does not dispute that Xio's expert, Jason Begy, included these screenshots in his expert report. However, as set out in TH's General Objections, Mr. Begy submitted no sworn declaration in support of Xio's motion for summary judgment, and thus his expert report is inadmissible hearsay evidence. Opp. Schmitt Decl. ¶ 20. As such, Xio cannot rely on it in support of its motion for summary judgment.

TH does not dispute that these are static screenshots of the basic *Tetris* demo and *Tetris Zone* (with numbered circles added by Xio), but adds for clarification that these static images do not depict all of the fanciful visual expression of the *Tetris* Games (including movement and sequence of images).

26.    *Electronic Arts (EA), one of Plaintiffs major licensees, concisely describes what it considers the "Basic Rules of Tetris":*

> *The object of the game is to position the falling Tetriminos (groups of Minos) across the bottom of the Matrix. The Tetriminos must be rotated as they fall and positioned across the bottom leaving no open spaces. When an entire horizontal line fills with blocks, the line clears from the Matrix. If the stack of Tetriminos reaches the top of the Matrix, the game is over!*

*Id. Ex. 41 at 5. Under a subheading in the same "Basic Rules of Tetris" section, the document describes the seven tetrominos (with the squares individually delineated), and describes the board as "The rectangular arrangement of cells*

*usually 10 columns wide by 20 rows high." It further explains: "Tetrominos fall from the top middle just above the Skyline (off screen) to the bottom." Id.*

**Undisputed, but immaterial**.

As set out in TH's General Objections, TH disputes this purported fact as being based on inadmissible hearsay evidence, and failing to comply with the requirements of Federal Rule of Civil Procedure 56(c). This document purports to have been authored by EA Mobile Canada (ULC), which was not a witness in this case.

TH does not dispute that Electronic Arts (EA) is one of its licensees, but objects to the word "major" as vague and ambiguous. TH also objects to the word "concise" as vague and ambiguous.

Further, TH adds for clarification that this document was not authored by TH and appears to describe a proposal for a new *Tetris* version. Opp. HR Decl. ¶ 8, Ex. B (TETRIS-XIO-0016436). TH does not dispute that the above-quoted language is included in the document, but disputes that the language suggests that the author was describing elements that are not protected by copyright law. This document does not purport to describe the "rules" of *Tetris* in the context of copyright law. *Id.* at ¶ 8.

27.     In addition, the 2002 version of the Tetris Design Guidelines—what
Mr. Pajitnov dubbed the "Bible" containing the rules for Tetris—describes the
following elements as the "Basic Tetris Mechanics":

> Matrix Size: The standard matrix playfield is 20 cells high by 10 cells
> wide . . . . The cells of the playfield can occupy one of two states:
> empty or filled.  The playfield starts with all cells vacant, the
> exception to this being a game with Starting Blocks[3] The playfield
> remains empty until a Tetrimino comes to rest and fills four cells.  The
> cells can then revert to an empty state when the filled lines of cells are
> cleared from the Matrix and the occupied cells above that line shift
> down.

Id. Ex. 42 at 5 (emphasis added); id Ex. 43 at 127:18-128:8 & Ex. 44.  The same
2002 Tetris Design Guidelines go on to describe "Rotation & Movement Rules" as
including the fact that tetrominos "fall from the bottom of the Matrix one cell at a
time" and that "[t]he player will be able to rotate the Tetriminos clockwise and
counter clockwise."  Id. Ex. 45 at 18.

**Undisputed, but immaterial**.  TH does not dispute that its 2002 *Tetris*
Design Guidelines contain the above-quoted language.   However, TH adds for
clarification that the purpose of the *Tetris* Design Guidelines is to instruct licensees
how to make a videogame that looks like *Tetris*.  Opp. HR Decl. ¶ 7.  In other
words, the *Tetris* Design Guidelines are like style guides that are commonly used
by licensors to make sure their licensees adhere to certain standards.  *Id.* at ¶ 7.

---

3       An accompanying diagram depicts the game with Starting Blocks as a playing field with "garbage lines" with at
least one missing square in random order.

Updated annually, the Design Guidelines set forth the standards to which TH's

licensees should adhere when making a *Tetris*-branded game.  *Id.* at ¶ 7.  These

standards ensure that *Tetris*-branded games are high quality and have a consistent

look.  *Id.* at ¶ 7.  They specify such things as the placement of the *Tetris* logo on

the screen, the colors and appearance of the Tetriminos, the speed by which the

Tetriminos should appear to move, and how each Tetrimino should appear to

rotate.  *Id.* at ¶ 7.  These are all elements that TH wants its licensees to replicate so

that the resulting videogame is high quality and resembles *Tetris*. *Id.* at ¶ 7.  The

Design Guidelines may describe something as "rules" or "mechanics" in telling

TH's licensees how to make a game that looks like *Tetris.*  The Design Guidelines

do not opine on what is protectable expression under copyright law.  *Id.* at ¶ 7.

These non-legal documents use the word "rules" in its ordinary sense of

"standards" or "guides" for licensees to follow when making a game that looks like

*Tetris.  Id.* at ¶ 7; *see also* Opp. Schmitt Decl. ¶ 24, Ex. 11 (attaching excerpts from

the *Oxford English Reference Dictionary*, which defines "rule" as "prevailing

custom or standard; the normal state of things," and from the *Merriam Webster's*

*Collegiate Dictionary*, which defines it as "a prescribed guide for conduct or

action").

    28.    *Plaintiffs have two copyrighted board games based on Tetris: Milton*

*Bradley's Tetris and the just-released Tetris Link, described on Plaintiffs' website*

*at http://www.tetris.com/products/tetris-link.aspx.  See id. ¶¶ 2, 49 and Ex. 48.*

*Tetris Link looks like this:*



*Id. at ¶ 50 & Ex. 48.  The board game Tetris Link has a number of identical*

*features to the video game Tetris: on a 10 by 20 grid, players manipulate seven*

*brightly-colored tetrominos, whose blocks are individually delineated, and which*

*rotate and move laterally and downwards.  Id. at ¶ 2.  On the box for the game,*

*there is the following statement: "Tetris ® & © 1985-2011 Tetris Holding.  Tetris*

*logos and Tetriminos are trademarks of Tetris Holding.  Trade dress owned by*

*Tetris Holding.  Licensed to the Tetris Company.  Tetris Game Design by Alexey*

*Pajitnov."*

**Undisputed, but immaterial.**

TH adds for clarification that its licensee created and distributes a table-top

game called *Tetris Link*, and that Milton Bradley released a licensed table-top

game called *Tetris*.  Opp. HR Decl. ¶ 14.  However, these table-top games are

different from the electronic *Tetris* games at issue in this case. Opp. HR Decl. ¶ 14.

TH has not accused Xio of infringing the visual expression in these table-top

games.  *See* Amended Complaint.  TH does not dispute that these table-top games were based on the electronic *Tetris* game and include some similar visual elements. However, these table-top games do not share all of the same visual expression, including, among other things, the movement and sequence of images.  Opp. HR Decl. ¶ 14.

29.     *If the standard rectangular playing field of twenty cells high by ten cells side were changed to an eight by eight grid, clearing lines might be simpler given that that fewer pieces would be needed to complete a horizontal line.  At the same time, gameplay might be more difficult in that the total space in the matrix, and, relatedly, the time to place a piece on the board, would decrease.*

**Disputed, but immaterial**.  Xio fails to cite to any admissible evidence in support of this assertion in violation of Rule 56.1 of the Local Rules of the United States District Court of New Jersey, and thus the Court should disregard this statement.

Further, TH states that these purported facts are argumentative and immaterial to the issue of whether TH's fanciful visual expression in *Tetris* is protectable under copyright and trade dress law.

TH adds for clarification that the shape and dimensions of the play field is part of the fanciful visual expression of *Tetris*.  HR Decl. ¶ 3, 31; Bogost Decl. ¶¶ 21, 24-25; Schmitt Decl. ¶ 70, Ex. 68 (attaching U.S. Customs Service decisions).

Xio's expert, Mr. Jason Begy, and TH's expert, Dr. Ian Bogost, agree that the shape and dimension of the playfield is a creative choice. Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 229:2-5 (agreeing that the playfield can be designed in "an almost unlimited number of ways"); Opp. Bogost Decl. ¶ 20.

Further, the parties' experts agree that a playfield of the same size and shape as *Tetris* is not necessary to make an electronic puzzle game. Xio's expert, Mr. Jason Begy, readily admits that it is possible to design an electronic puzzle videogame without this visual element. Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 229:6-17 (admitting that "there are [probably] many successful puzzle video games that do not use the same or similar playing field as Tetris" and that it was possible that "an electronic puzzle game could function perfectly well without using a playing field that's the same or similar to Tetris")). Furthermore, TH's expert, Dr. Ian Bogost, concludes "while having playing pieces and a playing field may be necessary to create a certain type of game generally, the shape, form, and appearance of those playing pieces and playing field need not be the same as the *Tetris* Trade Dress." Bogost Decl. ¶ 45, Ex. 2 (Bogost Rpt. ¶ 44). Dr. Bogost stated that the particular pieces and playfield in the *Tetris* Trade Dress were "expressive choices that make TH's *Tetris* games look a particular way," but they are "not necessary to make a high-quality electronic puzzle game that is comparable to *Tetris*." Bogost Decl. ¶ 48, Ex. 2 (Bogost Rpt. ¶ 47).

Also, Henk Rogers also states that "the particular pieces and playfield in the *Tetris* Trade Dress were creative choices that make TH's *Tetris* Games look distinctive, and they are not essential to make a high-quality electronic puzzle game that is comparable to *Tetris*."  HR Decl. ¶ 48.

30.     *Henk Rogers, founder and CEO of the Tetris Company, testified that shrinking the playfield to ten by ten square would result in the player having "less time to complete his task in."  Id. Ex. 49 at 58:5-13.*

**Disputed, but immaterial**.

Henk Rogers is a Member of Tetris Holding, LLC and the Managing Director of The Tetris Company, LLC.  HR Decl. ¶ 1.

TH does not dispute that Mr. Rogers made this statement, but disputes the assertion that this fact is material as it is not probative as to whether the fanciful visual expression of *Tetris* is protected by copyright or trade dress law.

TH adds for clarification that Mr. Rogers also testified that, even if the playing field was smaller, it would still be the "same game" and would not change the way that the player played the game.  Opp. Schmitt Decl. ¶ 26, Ex. 12 (H. Rogers Dep. (Jan. 11, 2011) 54:12-55:20, 58:15-59:15 (Mr. Rogers testified that game with a smaller playing field would still be the same game and would simply look and feel different)).  Mr. Rogers also stated that "the particular pieces and playfield in the *Tetris* Trade Dress were creative choices that make TH's *Tetris*

games look distinctive, and they are not essential to make a high-quality electronic puzzle game that is comparable to *Tetris*."  HR Decl. ¶ 48.

TH also adds for clarification that the shape and dimensions of the play field is part of the fanciful visual expression of *Tetris,* and the parties' experts agree that this feature is not necessary to make an electronic puzzle game.  *See supra* TH's Response to ¶ 29.

31.   *Shrinking the width only, according to Mr. Rogers, would result in having "one less button press to reach the other side," that "there would be no place to put your piece on the other side," and that this change results in "fewer places to place the pieces."  Id. Ex. 50 at 60:7-61:5 & Ex. 51 at 289:2-11.*

**Undisputed, but immaterial**.

TH does not dispute that Mr. Rogers made this statement, but disputes the assertion that this fact is material as it is not probative as to whether the fanciful visual expression of *Tetris* is protected by copyright or trade dress law.

In addition, TH objects to this statement as vague and ambiguous it is not clear what "shrinking the width only" refers to.

TH clarifies that Mr. Rogers also testified that, even if the playing field was smaller, it would still be the "same game" and would not change the way that the player played the game. Opp. Schmitt Decl. ¶ 26, Ex. 12 (H. Rogers Dep. (Jan. 11, 2011) 54:12-55:20, 58:15-59:15 (Mr. Rogers testified that game with a smaller

playing field would still be the same game and would simply look and feel different.)  Mr. Rogers also stated that "the particular pieces and playfield in the *Tetris* Trade Dress were creative choices that make TH's *Tetris* games look distinctive, and they are not essential to make a high-quality electronic puzzle game that is comparable to *Tetris*." HR Decl. ¶ 48.

TH also clarifies that the shape and dimensions of the play field is part of the fanciful visual expression of *Tetris,* and the parties' experts agree that this feature is not necessary to make an electronic puzzle game.  *See supra* TH's Response to ¶ 29.

32.   *He also explains that having a smaller playfield would result in a quicker game.  Id. Ex. 52 at 92:16-25; see also Ex. 53 at 87:11-17 (explaining that shrinking a player's operative space "complicates his play"); Id. Ex. 42 at 5 (describing this feature as a game mechanic).*

**Undisputed, but immaterial**.

TH does not dispute that Mr. Rogers made this statement, but disputes the assertion that this fact is material as it is not probative as to whether the fanciful visual expression of *Tetris* is protected by copyright or trade dress law.

TH clarifies that Mr. Rogers also testified that, even if the playing field was smaller, it would still be the "same game" and would not change the way that the player played the game. Opp. Schmitt Decl. ¶ 26, Ex. 12 (H. Rogers Dep. (Jan. 11,

2011) 54:12-55:20, 58:15-59:15 (Mr. Rogers testified that game with a smaller playing field would still be the same game and would simply look and feel different.)  Mr. Rogers also stated that "the particular pieces and playfield in the *Tetris* Trade Dress were creative choices that make TH's *Tetris* games look distinctive, and they are not essential to make a high-quality electronic puzzle game that is comparable to *Tetris*." HR Decl. ¶ 48.

Further, Mr. Pajitnov testified that there was "no reason" for his decision to design *Tetris* to have a playing field higher than it is wide; rather, this decision was simply based on his preference.  Opp. Schmitt Decl. ¶¶ 38-39, Ex. 13 (A. Pajitnov Dep. (Jan. 13, 2011) 94:23-95:13).

TH also clarifies that the shape and dimensions of the play field is part of the fanciful visual expression of *Tetris,* and the parties' experts agree that this feature is not necessary to make an electronic puzzle game.  *See supra* TH's Response to ¶ 29.

33.    *The number of squares in a playing piece directly affects the resources available to the player.  For example, reducing the number of squares in a playing piece from four to three or two—i.e., to trominos or dominos—results in fewer playing pieces in total, thereby reducing the player's options and simplifying her decisions.*

**Disputed, but immaterial.** Xio fails to cite to any admissible evidence in support of this assertion in violation of Rule 56.1 of the Local Rules of the United States District Court of New Jersey, and thus the Court should disregard this statement.

Further, TH states that these purported facts are argumentative and immaterial to the issue of whether TH's fanciful visual expression in *Tetris* is protectable under copyright and trade dress law.

TH clarifies that the seven Tetrimino playing pieces made up of four equally-sized squares joined at their sides are part of the fanciful visual expression of *Tetris*. HR Decl. ¶ 3, 31; Bogost Decl. ¶¶ 21, 24-25; Schmitt Decl. ¶ 70, Ex. 68 (attaching U.S. Customs Service decisions).

Xio's expert, Mr. Jason Begy, and TH's expert, Dr. Ian Bogost, agree that the decision to feature Tetrimino pieces is a creative choice. Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 231:6-20 (admitting that a "game designer could design the playing pieces for a videogame in an almost unlimited number of other ways"); Opp. Bogost Decl.¶ 20.

The parties' experts agree that Tetriminos are not necessary or essential to make an electronic puzzle game. Xio's expert, Mr. Jason Begy, admitted that it is possible to design an electronic puzzle videogame without using tetrominos. Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 231:6-20 (admitting that it

is "not necessary to use tetrominos or [T]etriminos to design a puzzle video game"), 232:9-13 (agreeing that an "electronic puzzle game could function perfectly well without using [T]etriminos")).  Furthermore, TH's expert, Dr. Ian Bogost, opines "while having playing pieces and a playing field may be necessary to create a certain type of game generally, the shape, form, and appearance of those playing pieces and playing field need not be the same as the *Tetris* Trade Dress." Bogost Decl. ¶ 45, Ex. 2 (Bogost Rpt. ¶ 44). Dr. Bogost stated that the particular pieces and playfield in the *Tetris* Trade Dress were "expressive choices that make TH's *Tetris* games look a particular way," but they are "not necessary to make a high-quality electronic puzzle game that is comparable to *Tetris*." Bogost Decl. ¶¶ 45, 48, Ex. 2 (Bogost Rpt. ¶¶ 44, 47).

Henk Rogers also states that "the particular pieces and playfield in the *Tetris* Trade Dress were creative choices that make TH's *Tetris* games look distinctive, and they are not essential to make a high-quality electronic puzzle game that is comparable to *Tetris*." HR Decl. ¶ 48.

Mr. Rogers also testified that the objective of a game which uses shapes made of two squares can have the same objective as other *Tetris* games.  Opp. Schmitt Decl. ¶ 27, Ex. 12 (H. Rogers Dep. (Jan. 11, 2011) 62:15-63:5 (Mr. Rogers testified that "[y]our objectives of the game is identical. You're still trying to create he same shapes, you have shapes that appear in the play field, you manipulate

them, and they are used to form shapes in the play field that are removed from the game. And so that's essentially the game, the way the game is played.")) Mr. Rogers also testified that such a game might be the same difficulty, because the player might not have any prior experience with those shapes.  Opp. Schmitt Decl. ¶ 27, Ex. 12 (H. Rogers Dep. (Jan. 11, 2011) 63:6-25).

34.    *Plaintiffs devised a Tetris "variant" entitled "Kids Tetris," involving dominos and trominos—and Mr. Rogers testified that by using these shapes, Plaintiffs had the intent "to make the game easier by simplifying the number of blocks."  See id. Ex. 53 at 202:13-20; See also Ex. 54 at 164:22-165:2.*

**Undisputed, but immaterial**.  TH does not dispute that it has a game called *Kids Tetris,* which features pieces comprised of two squares and three squares. Moreover, TH does not dispute that Mr. Rogers made this statement quoted above.

However, TH states that these purported facts are immaterial to the issue of whether TH's fanciful visual expression in *Tetris* is protectable under copyright and trade dress law.  Furthermore, TH owns a copyright registration for the visual expression of *Kids Tetris*, which is not at issue in this case.  Opp. HR Decl. ¶ 13.

TH also clarifies that Mr. Rogers also testified that a game using pieces comprised of two squares might have the same difficulty level as games using Tetriminos because the player might not have any prior experience with those shapes.  Opp. Schmitt Decl. ¶ 27, Ex. 12 (H. Rogers Dep. (Jan. 11, 2011) 63:6-25).

TH clarifies that the seven Tetrimino playing pieces made up of four equally-sized squares joined at their sides are part of the fanciful visual expression of *Tetris*, and, as the parties' experts agree, are not necessary or essential to make an electronic puzzle game.  *See supra* TH's Response to ¶ 33.

35.    *Mr. Pajitnov testified that he had originally prototyped his game as a pentomino game.  He explained that the twelve resulting pieces and their mirror images made it "too hard for [him] to remember how to operate with them so [he] decide[d] to make it smaller and downgrade it from pentomino to tetromino."  Id. Ex. 56 at 21:19-22:2.*

**Undisputed, but immaterial**.

TH does not dispute that Mr. Pajitnov considered using pentomino shapes when he created *Tetris*, or that he made the statement quoted above.  However, TH states that these purported facts are immaterial to the issue of whether TH's fanciful visual expression in *Tetris* is protectable under copyright and trade dress law.

 TH clarifies that Mr. Pajitnov testified that he made many creative choices when designing the look of *Tetris*.  For example, Mr. Pajitnov testified that he tried designing the game with some blocks already in the playing field at the start of the game instead of starting the game with an empty playing field, but he did not like the design so he changed it.  Opp. Schmitt Decl. ¶ 40, Ex. 13 (A. Pajitnov Dep.

(Jan. 13, 2011) 22:4-22:18).  Mr. Pajitnov testified that he preferred using tetrominos for his particular game design, but that other players might like playing a game with pentominos.  Opp. Schmitt Decl. ¶ 41, Ex. 13(A. Pajitnov Dep. (Jan. 13, 2011) 96:6-22).

TH clarifies that the seven Tetrimino playing pieces made up of four equally-sized squares joined at their sides are part of the fanciful visual expression of *Tetris,* and, as the parties' experts agree, are not necessary or essential to make an electronic puzzle game.  *See supra* TH's Response to ¶ 33.

36.  *He ultimately selected tetrominos because they created a game that was "not very slow" and "not very fast," but something "in the middle."  Id. Ex. 57; See also id.  Ex. 42 at 5 (describing this feature as a game mechanic).*

**Undisputed, but immaterial**.

TH does not dispute that Mr. Pajitnov made the statements quoted above. However, TH states that these purported facts are immaterial to the issue of whether TH's fanciful visual expression in *Tetris* is protectable under copyright and trade dress law.

TH clarifies that Mr. Pajitnov testified that he made many creative choices when designing the look of *Tetris. See supra* TH's Response to ¶ 35.

TH also clarifies that the seven Tetrimino playing pieces made up of four equally-sized squares joined at their sides are part of the fanciful visual expression

of *Tetris,* and, as the parties' experts agree, are not necessary or essential to make an electronic puzzle game.  *See supra* TH's Response to ¶ 33.

37.   *Mr. Pajitnov did not choose particular tetrominos, he used all the four-square shapes that exist.  See Golomb, supra at 19.*

**Disputed, but immaterial**.  Mr. Pajitnov testified that he made many creative choices when designing the look of *Tetris. See supra* TH's Response to ¶ 35.

Furthermore, although he did not invent the tetromino shape, Mr. Pajitnov was the first person to choose the tetromino as the basis for pieces in an electronic videogame in combination with other visual elements, which resulted in the wholly fanciful audiovisual work *Tetris.*  Bogost Decl. ¶¶ 21, 24, 25, Ex. 2 (Bogost Rpt. ¶¶ 20, 23, 24).

Henk Rogers states that "the particular pieces and playfield in the *Tetris* Trade Dress were creative choices that make TH's *Tetris* games look distinctive, and they are not essential to make a high-quality electronic puzzle game that is comparable to *Tetris*."  HR Decl. ¶ 48.  In designing Tetris, the creative choice was made to include the five "free" or unique tetrominos (the "O," "I,", "T," "L" and "S"), as well as two additional tetromino pieces as playing pieces (the "J" and "Z") which are reflections of the "S" and "L" tetrominos.  *See* HR Decl. ¶¶ 33-34.

TH clarifies that the seven Tetrimino playing pieces made up of four equally-sized squares joined at their sides are part of the fanciful visual expression of *Tetris,* and, as the parties' experts agree, are not necessary or essential to make an electronic puzzle game. *See supra* TH's Response to ¶ 33.

38.    *Brightly coloring the tetrominos ensures that the pieces are recognizable against the background. Mr. Rogers confirmed this fact in his deposition, responding when asked why one would brightly color the tetrominos: "So that they would be recognizable." Id. Ex. 58 at 74:2-7; see also id. Ex. 59 at 79 ("In versions that use monochrome screens, or when hardware limitations disallow all colors to be used, the Tetriminos should have distinct patterns to differentiate themselves."); id. Ex. 60 at 180:20-181:17 (explaining that brightly coloring the tetrominos is necessary "in order not to raise confusion").*

**Disputed**.  The bright, distinct colors used for each of the Tetrimino pieces are part of the fanciful visual expression of *Tetris.*  HR Decl. ¶ 3, 31; Bogost Decl. ¶¶ 21, 24-25.

TH disputes that the bright colors that it chose for its Tetrimino pieces are necessary for the game to function and the parties' experts agree that this feature is not necessary or essential to make an electronic puzzle game.  Xio's expert, Mr. Jason Begy, admitted that it is possible to design an electronic puzzle videogame without using playing pieces that are brightly colored in the same way as *Tetris*.

Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 232:19-22 (admitting that "a game designer could choose an almost unlimited number of colors for the playing pieces in a puzzle video game"), 234:4-11 (admitting it is possible that "an electronic puzzle game could function perfectly well without using brightly colored playing pieces"), 234:12-17 ("someone could design an electronic puzzle without the same color choices as in *Tetris*")).

TH's expert, Dr. Bogost, stated that the particular pieces and playfield in the *Tetris* Trade Dress were "expressive choices that make TH's *Tetris* games look a particular way," but they are "not necessary to make a high-quality electronic puzzle game that is comparable to *Tetris*." Bogost Decl. ¶¶ 45, 48, Ex. 2 (Bogost Rpt. ¶¶ 44, 47).

39.    *Delineating the individual squares of the tetromino enables a player to see where the tetromino that is in play fits on the grid and its relationship to the other tetrominos already on the board.  Without this feature, the game would be more difficult to play.*

**Disputed, but immaterial**. Xio fails to cite to any admissible evidence in support of the fact asserted in this number paragraph, in violation of Rule 56.1 of the Local Rules of the United States District Court of New Jersey, and thus the Court should disregard this statement.

Further, TH states that these purported facts are argumentative and immaterial to the issue of whether TH's fanciful visual expression in *Tetris* is protectable under copyright and trade dress law.

The visual delineation of each individual square in a Tetrimino is part of the visual expression of the *Tetris* Games.  HR Decl. ¶ 31; Bogost Decl. ¶ 21, Ex. 2 (Bogost Rpt. ¶ 20).  Mr. Rogers testified that the choice of whether to delineate individual squares of the tetromino is part of the artistic expression of the game. Opp. Schmitt Decl. ¶ 28, Ex. 12 (H. Rogers Dep. (Jan. 11, 2011) 79:2-80:6).

Xio's expert, Mr. Jason Begy, and TH's expert, Dr. Ian Bogost, agree that the visual delineation of each individual square in a Tetrimino is a creative choice. Opp. Schmitt Decl. ¶¶ 45-46, Ex. 14 (J. Begy Dep. (May 10, 2011) 211:3-19) (testifying that it is a "design choice"); Opp. Bogost Decl. ¶ 20.

This feature is also not necessary for the game to function.  In some versions of *Tetris,* the Tetrimino pieces appear to be solid.  Opp. Schmitt Decl. ¶ 29, Ex. 12 (H. Rogers Dep. (Jan. 11, 2011) 154:16-155:7 (Mr. Rogers testified that TH has allowed licensees to release versions of *Tetris* that do not have delineated Tetriminos)).

Furthermore, the parties' experts agree that it is possible to make an electronic puzzle game without this feature.  Xio's expert, Mr. Begy, testified that it is "possible" to design a puzzle game without delineating the individual blocks

of the playing pieces Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 125:4-

23).  TH's expert, Dr. Bogost, stated that the particular pieces and playfield in the

*Tetris* Trade Dress were "expressive choices that make TH's *Tetris* games look a

particular way," but they are "not necessary to make a high-quality electronic

puzzle game that is comparable to *Tetris*." Bogost Decl. ¶¶ 45, 48, Ex. 2 (Bogost

Rpt. ¶¶ 44, 47).

     40.    *If tetrominos appeared not at the top, but halfway down, the game*

*would be more difficult as players would have less time within which to place the*

*tetrominos.  Or if tetrominos appeared at one of the sides of the board, it would be*

*more difficult to get a space to the other side of the board.*

     **Disputed, but immaterial**.  Xio fails to cite to any admissible evidence in

support of the fact asserted in this number paragraph, in violation of Rule 56.1 of

the Local Rules of the United States District Court of New Jersey, and thus the

Court should disregard this statement.

     Further, TH states that these purported facts are argumentative and

immaterial to the issue of whether TH's fanciful visual expression in *Tetris* is

protectable under copyright and trade dress law.

     The appearance of Tetriminos moving from the top of the playfield to its

bottom is part of the visual expression of *Tetris*.  HR Decl. ¶ ¶ 3, 31; Bogost Decl.

¶¶ 21, 24-25.

Xio's expert, Mr. Jason Begy, and TH's expert, Dr. Ian Bogost, agree that this visual feature is a creative choice. Opp. Schmitt Decl. ¶ 47, Ex. 14 (J. Begy Dep. (May 10, 2011) 213:7-11 (testifying that it is a "design choice"); Opp. Bogost Decl.¶ 20.

Furthermore, the parties' experts agree that this visual feature is not necessary or essential to make an electronic puzzle game. Xio's expert, Mr. Jason Begy, admitted that it is possible to design an electronic puzzle videogame without using playing pieces that appear at the top of the playing field. Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 238:10-13 (when asked about the appearance of the playing pieces in *Tetris* at the top of the playing field, Mr. Begy admitted that "a game designer could choose a number of different places to make the playing pieces first appear"), 239:11-16 (agreeing that "an electronic puzzle game could function perfectly well if the playing pieces did not first appear at the top of the playing field")). TH's expert, Dr. Ian Bogost, agrees with Mr. Begy on these points. Opp. Bogost Decl. ¶ 9.

Further, Mr. Rogers testified that he did not think it would affect game play if the playing pieces appeared close to the bottom of the playing field or the middle of the playing field. Opp. Schmitt Decl. ¶ 30, Ex. 12 (H. Rogers Dep. (Jan. 11, 2011) 64:2-23).

41.     *This element is described as a rule in Plaintiffs' documentation.  See*

*id. Ex. 61 at 7 (2000 Design Guideline); Ex. 62 at 12 (2001 Design Guideline); Ex.*

*63 at 18 (2003 Design Guideline).*

**Disputed**.  TH objects to the terms "[t]his element" as vague and ambiguous

as it is not clear from this statement what it refers to.  TH disputes that the *Tetris*

Design Guidelines define the "rules" of *Tetris* in the context of copyright law;

rather, they discuss the "standards" for licensees to follow when making a game

that looks like *Tetris*.  *See supra* TH's Response to ¶ 27.

42.     *The starting orientation of the tetrominos is a rule—directly affecting*

*the functioning of the game.  The number of times a player has to rotate a piece to*

*place it in a desired spot is directly related to the starting orientation of the piece.*

**Disputed**.  Xio fails to cite to any admissible evidence in support of the fact

asserted in this number paragraph, in violation of Rule 56.1 of the Local Rules of

the United States District Court of New Jersey, and thus the Court should disregard

this statement.  This statement is also argumentative.

Further, TH disputes Xio's definition of a "rule" as something that "directly

affect[s] the functioning of the game" as vague, ambiguous and not in accordance

with copyright law or any relevant case law.  TH's expert, Dr. Bogost, defined

"rules of the game" as "an abstract concept and its interpretation."  Maitra Decl.

Ex. 38 (I. Bogost Dep. (May 6, 2011) 24:17-25).

The particular starting orientation of the Tetriminos is part of the visual expression of *Tetris.* HR Decl. ¶ 3, 31; Bogost Decl. ¶¶ 21, 24-25; Opp. Schmitt Decl. ¶ 31, Ex. 12 (H. Rogers Dep. (Jan. 11, 2011) 80:15-22 (Mr. Rogers testified that the starting orientation of the playing pieces has probably changed from the original version of Tetris because it is an "artistic decision)).  Further, changing the starting orientation of a playing piece might change the amount of times that a player has to rotate a playing piece to get into the same position, but that this determination is random and "depends on what the start position and end position is."  Opp. Schmitt Decl. ¶ 32, Ex. 12 (H. Rogers Dep. (Jan. 11, 2011) 74: 9-74:21).

Xio's expert, Mr. Jason Begy, and TH's expert, Dr. Ian Bogost, agree that this visual feature is a creative choice.  Opp. Schmitt Decl. ¶ 48, Ex. 14 J. Begy Dep. (May 10, 2011) 214:12-22 (testifying that it is a "design choice"); Opp. Bogost Decl. ¶ 20.

Furthermore, the parties; experts agree that this visual feature is not necessary or essential to make an electronic puzzle game.  Xio's expert, Mr. Jason Begy, admitted that it is possible to design an electronic puzzle videogame without using the same starting orientation as in *Tetris.* Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 239:22-240:3 (when asked about the starting orientation of the playing pieces in *Tetris*, Mr. Begy thought it sounded "reasonable" that there were "512 different possible combinations of starting orientations for all seven

[T]etriminos")).  TH's expert, Dr. Ian Bogost agrees with Mr. Begy on these points.  Opp. Bogost Decl. ¶¶ 8, 10.

43.    *The starting orientation of the tetrominos is not the same across the Tetris games that Plaintiffs accuse Xio of infringing.  See id. at ¶ 3.  As just one example, compare Tetris Pop, demonstration available at http://www.youtube.com/watch?v=LlZqiKstRHs, with Tetris DX, demonstration available at http://www.youtube.com/watch?v=6sPRJPaHENQ.*

**Undisputed, but immaterial**.  TH does not dispute that the particular starting orientation of some of the Tetriminos is not the same in all the *Tetris* Games at issue in this case.  Further, TH states that these purported facts are immaterial to the issue of whether TH's fanciful visual expression in *Tetris* is protectable under copyright and trade dress law.

The starting orientation of the playing pieces is an artistic decision.  Opp. Schmitt Decl. ¶ 31, Ex. 12 (H. Rogers Dep. (Jan. 11, 2011) 80:15-22 (Mr. Rogers testified that the starting orientation of the playing pieces has probably changed from the original version of *Tetris* because it is an "artistic decision")).  The fact that the starting orientation is not the same across all *Tetris* Games further bolsters TH's position that it is a creative choice and not necessary to make a game based on the same "idea" as *Tetris*.  *See supra* TH's Response to ¶ 42.

Further, TH adds for clarification that *Mino* and *Mino Lite* copy the starting

orientation of all of the pieces in the following games that are at issue in this case:

*Tetris (iPhone)*,*Tetris Zone*, *Tetris (EA Multiplayer)*, *Tetris Evolution (XBox360)*,

*Tetris Pop*, and *Tetris Mission 2009*. *See* Schmitt Decl. ¶ 75, ¶ 55, Ex. 53

(attaching video clips of *Mino 1.1* and *Mino Lite*); HR Decl. ¶ 31, Ex. 7 (attaching

video clips of the *Tetris* Games).  Moreover, Xio purchased *Tetris (iPhone)* when it

began developing *Mino*, and the developers reviewed it while making *Mino*.

Schmitt Decl. ¶ 16, Ex. 14 (M. Hunt Dep. (Jan. 26, 2011) 31:21-33:14 (Mr. Hunt

testified that he purchased *Tetris (iPhone)* in October of 2008.), ¶ 19, Ex. 21 (M.

Hunt Dep. (Jan. 26, 2011) Ex. 5 (XIO-MH-005575) (receipt from iTunes App

Store, dated October 18, 2008 for Martin Hunt's purchase of *Tetris (iPhone)*)), ¶ 9,

Ex. 7 (M. Carter Dep. (Dec. 13, 2010) 73:14- 74:6, 74:20-25 (Mr. Carter testified

that Mr. Hunt downloaded *Tetris (iPhone)* while Xio was developing *Mino*.)), ¶ 7,

Ex. 5 (M. Carter 30(b)(6) Dep. (Jan. 31, 2011) 102:7-10, 102:19-103:1, 105:21-

106:3, 107:5-7 (Mr. Carter testified that Mr. Hunt downloaded *Tetris (iPhone)* and

submitted the expense to Xio for reimbursement.)), ¶ 22, Ex. 20 (M. Carter's

30(b)(6) Dep. (Jan. 31, 2011) Ex. 7 (XIO-HD-XIO-0001598) (Xio expense report

listing purchase of *Tetris (iPhone)* game)).

TH adds, for clarification, that the YouTube demonstration of *Tetris Pop*

found at http://www.youtube.com/watch?v=LlZqiKstRHs does not include all

asserted visual elements that are present in *Tetris Pop*.  *See* HR Decl. ¶ 31, Ex. 7

(attaching video clips of the *Tetris* Games).  TH adds, for clarification, that the

YouTube demonstration of *Tetris DX* found at

http://www.youtube.com/watch?v=6sPRJPaHENQ does not include all asserted

visual elements that are present in *Tetris DX*.  *See* HR Decl. ¶ 31, Ex. 7 (attaching

video clips of the *Tetris* Games).

    44.    *If the tetrominos didn't move downward, lines wouldn't clear.  If they*

*didn't move laterally, it would be impossible to complete a horizontal line.*

**Disputed**.  Xio fails to cite to any admissible evidence in support of the fact

asserted in this number paragraph, in violation of Rule 56.1 of the Local Rules of

the United States District Court of New Jersey, and thus the Court should disregard

this statement.  This statement is also argumentative.

The distinctive way the Tetrimino pieces appear to move and rotate is part of

the fanciful visual expression in *Tetris*.  HR Decl. ¶ 3, 31; Bogost Decl. ¶¶ 21, 24-

25.

This distinctive way the Tetrimino pieces appear to move and rotate in the

playfield is not necessary to make an electronic game.  Mr. Rogers testified that it

is possible to design a game without the downward, lateral and rotating movement

of the playing piece.  Opp. Schmitt Decl. ¶ 33, Ex. 12 (H. Rogers Dep. (Jan. 11,

2011) 67:8-18).

Xio's expert, Mr. Jason Begy, and TH's expert, Dr. Ian Bogost, agree that the decision to have the pieces appear at the top of the playfield and move down is a creative choice. Opp. Schmitt Decl. ¶ 49, Ex. 14 (J. Begy Dep. (May 10, 2011) 216:20-25, 221:3-9 (testifying that it is a "design choice" and the pieces could have been designed to move "diagonally or side to side"); Opp. Bogost Decl.¶ 20.

Furthermore, the parties' experts agree that this visual feature is not necessary or essential to make an electronic video game.  Xio's expert, Mr. Jason Begy, admitted that it is possible to design an electronic puzzle videogame without depicting the rotating movement of playing pieces. Schmitt Decl. ¶ 4, Ex. 2 241:18-25 (admitting that "a game designer could choose a number of different ways to design the movements of the playing pieces in an electronic puzzle game" and that "it's not essential in creating a puzzle game to use downward lateral rotating [movements] of the playing pieces"), 242:22-243:4 (admitting that "an electronic puzzle game could function perfectly well without using downward lateral and rotating movements of the playing pieces in the manner that Tetris does")).  TH's expert, Dr. Ian Bogost agrees with Mr. Begy on these points.  Opp. Bogost Decl. ¶¶8, 11.

45.     *The 2000, 2001, and 2003 Tetris Design Guidelines expressly describe downward, lateral, and rotating movements of the tetrominos as a rule of the game.  See id. Ex. 45 (2002 Design Guidelines) at 18; Ex. 64 (2000 Tetris*

*Design Guidelines) at 7-8; Ex. 62 (2001 Design Guidelines) at 12; Ex. 63 (2003*

*Design Guidelines) at 18.*

**Disputed**.  TH disputes that the *Tetris* Design Guidelines define the "rules"

of *Tetris* in the context of copyright law; rather, they discuss the "standards" for

licensees to follow when making a game that looks like *Tetris*.  *See supra* TH's

Response to ¶ 27.

The downward, lateral and rotating movement of the Tetriminos is part of

the fanciful visual expression in *Tetris*, and, as the parties' experts agree, the

distinctive way the Tetrimino pieces appear to move and rotate is not necessary or

essential to make an electronic game.  *See supra* TH's Response to ¶ 44.

46.   *And the shape of the tetrominos—which Plaintiffs did not create—*

*determines how they look when they are turned.*

**Disputed**.  Xio fails to cite to any admissible evidence in support of the fact

asserted in this number paragraph, in violation of Rule 56.1 of the Local Rules of

the United States District Court of New Jersey, and thus the Court should disregard

this statement. This statement is also argumentative.

As discussed in response to Xio's paragraph 5 herein, Mr. Pajitnov and

subsequent *Tetris* designers have made numerous creative choices with regard to

the appearance of the Tetrimino playing pieces in *Tetris*, including the choice (i) to

base the *Tetris* playing pieces on the tetromino shape rather than some other shape

or polyomino, (ii) to base the *Tetris* playing pieces on the five tetrominos illustrated by Mr. Golomb, as well as the mirror-image of two of those pieces, for a total of seven different playing pieces in *Tetris*, and (iii)  to have the playing pieces appear to rotate by 90 degrees (rather than another amount such as 45 or 180 degrees).  *See supra* TH's Response to ¶ 5.  In making *Mino*, Xio copied each of these creative decisions.   Opp. Bogost Decl. ¶ 20.

TH further disputes that the shape of the Tetriminos determines how they look when they are turned.  As stated above, the asserted *Tetris* Games rotate the playing pieces by 90 degrees.  Opp. HR Decl. ¶ 5.  However, it would be possible to create a game where the playing pieces rotate by less than or more than ninety degrees (or not at all).  *Id.* at ¶ 5.

47.    *Players arrange tetrominos to create horizontal lines, which are thereby cleared from the board.  Clearing tetrominos from the board prevents stacked tetrominos from reaching the top of the playing field and ending the game. Without this feature, fundamental game functioning would change.*

**Disputed**.  Xio fails to cite to any admissible evidence in support of the fact asserted in this number paragraph, in violation of Rule 56.1 of the Local Rules of the United States District Court of New Jersey, and thus this statement should be disregarded.  This statement is also argumentative.

The disappearance of a horizontal line when it fills across the playfield with blocks, and the subsequent appearance of the remaining pieces to consolidate downward are part of the fanciful visual expression in *Tetris*.  HR Decl. ¶ 3, 31; Bogost Decl. ¶¶ 21, 24-25.

Xio's expert, Mr. Jason Begy, and TH's expert, Dr. Ian Bogost, agree that this visual element is a creative choice.  Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 246:12-17 (admitting that a "game designer could choose a number of different ways to configure the playing field after removing objects from it); Opp. Bogost Decl. ¶ 20.

TH disputes Xio's contention that these visual features are necessary for the game to function and the parties' experts agree that this feature is not necessary or essential to make an electronic puzzle game.  Xio's expert, Mr. Jason Begy, admitted that it is possible to design an electronic puzzle videogame that does not depict the disappearance of a horizontal line from the board. Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 245:5-10, 246:2-7 (admitting that "to make a puzzle video game, it's not essential to remove horizontal lines from the playing field," and "an electronic puzzle game could function perfectly well without removing horizontal lines from the playing field")). TH's expert, Dr. Ian Bogost agrees with Mr. Begy on these points.  Opp. Bogost Decl. ¶¶ 8, 12.

48.    *And, as with many rules, Plaintiffs own documentation expressly describes this feature as a rule.  See id. Ex. 64 (2000 Tetris Design Guidelines) at 7-8 (listing this feature as a "Rotation & Movement Rule"); Ex. 62 (2001 Design Guideline) at 12.*

**Disputed**.  TH disputes that the *Tetris* Design Guidelines define the "rules" of *Tetris* in the context of copyright law; rather, they discuss the "standards" for licensees to follow when making a game that looks like *Tetris*. *See supra* TH's Response to ¶ 27.

TH objects to the term "this feature" as vague and ambiguous as it is not clear from this statement what it refers to.

The disappearance of a horizontal line when it fills across the playfield with blocks, and the subsequent appearance of the remaining pieces to consolidate downward are part of the fanciful visual expression in *Tetris,* and as the parties' experts agree, these visual features are not necessary or essential for the game to function.  *See supra* TH's Response to ¶ 47.

49.    *Mr. Pajitnov stated that a game in which there was no clearance of horizontal lines would be shorter.  He explained that he would probably make the board much larger in order to provide the player with more time to place the tetrominos on the board.  See id. Ex. 65 at 63:25-63:17.*

**Undisputed, but immaterial.**

84

TH states that these purported facts are immaterial to the issue of whether TH's fanciful visual expression in *Tetris* is protectable under copyright and trade dress law.

TH clarifies that the disappearance of a horizontal line when it fills across the playfield with blocks is part of the fanciful visual expression in *Tetris.*  HR Decl. ¶ 3, 31; Bogost Decl. ¶¶ 21, 24-25; Schmitt Decl. ¶ 70, Ex. 68 (attaching U.S. Customs Service decisions).

Further, TH clarifies that Mr. Pajitnov testified that he considered various design choices when he was designing *Tetris*, and that it was possible to design a game where the completed horizontal lines did not disappear.  Maitra Decl. Ex. 65 (A. Pajitnov Dep. (Jan. 13, 2011) 62:25-63:17 ("Q.  … So how did the game work if the lines didn't clear?  … A. Well, you ask me as a designer what I would do if I would be forbidden to take away the lines, how I would design the game.  First of all, I would create kind of a shorter game and finish it when all the pieces are -- when all the field is kind of filled up.  Or I'd probably do my play field much bigger in order to give more time or whatever.  But I didn't do this because I didn't like how it looked and I [prefer] the way I did it."))  Xio's expert, Mr. Jason Begy, and TH's expert, Dr. Ian Bogost, agree that this visual feature is a creative choice.  Opp. Schmitt Decl. ¶ 50, Ex. 14 (J. Begy Dep. (May 10, 2011) 219:2-10 (testifying

that it is a "design choice" and there were "other design choices that could have been made other than having the shape disappear"); Opp. Bogost Decl.¶ 20.

Furthermore, the parties' experts agree that this visual feature is not necessary or essential to make an electronic puzzle game.  Xio's expert, Mr. Jason Begy, admitted that it is possible to design an electronic puzzle videogame that does not depict the disappearance of a horizontal line from the board. Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 245:5-10, 246:2-7 (admitting that "to make a puzzle video game, it's not essential to remove horizontal lines from the playing field," and "an electronic puzzle game could function perfectly well without removing horizontal lines from the playing field")). TH's expert, Dr. Ian Bogost agrees with Mr. Begy on these points.  Opp. Bogost Decl. ¶¶ 8, 12.

50.   *Without a downward shift subsequent to a line clear, there would be no way to reduce the height of the blocks already on the board.  As a result, it would be impossible the clear more than 20 lines on a 20 by 10 board, and the game would be over a player had time to blink.*

**Disputed**.  Xio fails to cite to any admissible evidence in support of the fact asserted in this number paragraph, in violation of Rule 56.1 of the Local Rules of the United States District Court of New Jersey, and thus this statement should be disregarded.  This statement is also argumentative.

TH objects to the phrase "the game would be over a player had time to blink" as vague and ambiguous.

The appearance of remaining pieces consolidation downward after the disappearance of a horizontal line is part of the fanciful visual expression in *Tetris.* HR Decl. ¶ 3, 31; Bogost Decl. ¶¶ 21, 24-25; Schmitt Decl. ¶ 70, Ex. 68 (attaching U.S. Customs Service decisions).

TH disputes that this visual element is necessary for the game to function and the parties' experts agree that this feature is not necessary or essential to make an electronic puzzle game.  Xio's expert, Mr. Jason Begy, admitted that it is possible to design an electronic puzzle videogame that does not depict the subsequent consolidation of the playing pieces remaining on the playing field as a result of the downward shift into the space vacated by the disappearing line. Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 246:12-24 (admitting that "a game designer could choose a number of different ways to configure the playing field after removing objects from it," and "it's not essential in designing a puzzle video game to configure the playing field the way Alexey Pajitnov chose to do in Tetris")).  TH's expert, Dr. Ian Bogost agrees with Mr. Begy on these points.  Opp. Bogost Decl. ¶ 13.

51.     *The Tetris Design Guidelines further confirm that this element is a rule. See id. Ex. 61 (2000 Tetris Design Guidelines) at 7 (listing this feature as a "Rotation & Movement Rule"); Ex. 62 (2001 Design Guideline) at 12.*

**Disputed**. TH disputes that the *Tetris* Design Guidelines define the "rules" of *Tetris* in the context of copyright law; rather, they discuss the "standards" for licensees to follow when making a game that looks like *Tetris*. *See supra* TH's Response to ¶ 27.

TH objects to the term "this element" as vague and ambiguous as it is not clear from this statement what it refers to.

The appearance of remaining pieces consolidation downward after the disappearance of a horizontal line is part of the fanciful visual expression in *Tetris,* and is not necessary for the game to function. *See supra* TH's Response to ¶ 50.

52.     *"Garbage lines"—horizontal lines placed on the board that are not completely filled—are often employed in multiplayer mode whereby a player is rewarded for good performance by placing garbage lines on her opponent's board, which raises the height of pieces on the opponent's board and brings the opponent closer to defeat.*

**Disputed, but immaterial**.  Xio fails to cite to any admissible evidence in support of the fact asserted in this number paragraph, in violation of Rule 56.1 of

the Local Rules of the United States District Court of New Jersey, and thus this statement should be disregarded.

Further, TH states that these purported facts are argumentative and immaterial to the issue of whether TH's fanciful visual expression in *Tetris* is protectable under copyright and trade dress law.

TH clarifies that the display of "garbage lines" with at least one missing block in random order is part of the fanciful visual expression in *Tetris*.  HR Decl. ¶ 3, 31; Bogost Decl. ¶¶ 21, 24-25; Schmitt Decl. ¶ 70, Ex. 68 (attaching U.S. Customs Service decisions).

Xio's expert, Mr. Jason Begy, and TH's expert, Dr. Ian Bogost, agree that this visual element is a creative choice.  Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 248:19-22 (admitting that a "game designer could choose numerous different ways to design a feature like garbage lines to attack another player"); Opp. Bogost Decl. ¶ 20.

This display is not necessary to make a game that functions and the parties' experts agree that this visual feature is not necessary or essential to make an electronic puzzle game.  Xio's expert, Mr. Jason Begy, admitted that it is possible to design an electronic puzzle videogame without the display of "garbage lines" with at least one missing block in random order.  Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 250:3-10 (admitting that "many successful multiplayer video

games that don't use garbage lines" and they "function perfectly well without using garbage lines")). TH's expert, Dr. Ian Bogost, agrees with Mr. Begy on these points.  Opp. Bogost Decl. ¶¶ 8, 14.

53.  *Mr. Rogers explained that a garbage line is a detriment to another player "because it shrinks . . . the space he has to play in."  Id. Ex. 66 at 233:3-12.*

**Disputed, but immaterial**.  Mr. Rogers testified that a garbage line could cause a detriment to another player "under certain circumstances" such as if "the player is having trouble playing and there's little room."  Opp. Schmitt Decl. ¶ 34, Ex. 12 (H. Rogers Dep. (Jan. 11, 2011) 233:9-19).  Further, TH states that these purported facts are immaterial to the issue of whether TH's fanciful visual expression in *Tetris* is protectable under copyright and trade dress law.

TH clarifies that the display of "garbage lines" with at least one missing block in random order is part of the fanciful visual expression in *Tetris,* and the parties' experts agree that this visual feature is not necessary or essential to make an electronic puzzle game. *See supra* TH's Response to ¶ 52.

54.  *Mr. Pajitnov confirmed in his deposition, explaining that garbage lines complicate game play by "shutting his operate space for manupulat[ing] the pieces" and "giv[ing] him [an] extra task to fill up these random holds."  Id. Ex. 67 at 85:4-86:19.*

**Disputed, but immaterial**.  TH does not dispute that Mr. Pajitnov made the statements quoted above, but it is unclear what Xio means by "confirmed." Further, TH states that these purported facts are immaterial to the issue of whether TH's fanciful visual expression in *Tetris* is protectable under copyright and trade dress law.

Further, TH clarifies that the display of "garbage lines" with at least one missing block in random order is part of the fanciful visual expression in *Tetris,* and the parties' experts agree that this visual feature is not necessary to make an electronic puzzle game. *See supra* TH's Response to ¶ 52.

55.    *The "ghost piece" is a shadow of the tetromino currently in play that shows where that tetromino will fall on the board.  According to design guidelines for the Tetris game Tetris Battle, the ghost piece is "an aid to the player so that he can see where the Tetrimino will land if dropped from its current position.  It can appear as an outline matching the Tetrimino color, a red outline, or a translucent 'ghost' image of the Tetrimino."  Id. Ex. 68 at 27.*

**Undisputed, but immaterial**.  Further, TH states that these purported facts are argumentative and immaterial to the issue of whether TH's fanciful visual expression in *Tetris* is protectable under copyright and trade dress law.

TH clarifies that the display of a "shadow" or "ghost" piece beneath the Tetriminos as they appear to fall is part of the fanciful visual expression in Tetris.

91

HR Decl. ¶ 3, 31; Bogost Decl. ¶¶ 21, 24-25; Schmitt Decl. ¶ 70, Ex. 68 (attaching U.S. Customs Service decisions).

Xio's expert, Mr. Jason Begy, and TH's expert, Dr. Ian Bogost, agree that the display of a "shadow" or "ghost" piece is a creative choice.  Opp. Schmitt Decl. ¶ 51, Ex. 14 (J. Begy Dep. (May 10, 2011) 223:2-10 (testifying that there were other ways to show where the piece would fall); Opp. Bogost Decl. ¶ 20.

Further, Mr. Rogers testified that the "ghost" piece does not aid all players. Opp. Schmitt Decl. ¶ 35, Ex. 12 (H. Rogers Dep. (Jan. 11, 2011) 71:23-72:24 (Mr. Rogers testified that some players do not like the ghost piece, because "they're confused between the piece that's the ghost piece and the piece that's floating" and some players get confused because they are manipulating two pieces at once)).

The display of a "shadow" or "ghost" piece beneath the Tetriminos as they appear to fall is not necessary to make a game that functions.  Not all versions of *Tetris* have this feature.  Supp. Schmitt Decl. ¶ 35, Ex. 12 (H. Rogers Dep. (Jan. 11, 2011) 71:23-72:24 (Mr. Rogers testified that some players do not like the ghost piece, because "they're confused between the piece that's the ghost piece and the piece that's floating" and some players get confused because they are manipulating two pieces at once)).

 Furthermore, the parties' experts agree that this visual feature is not necessary or essential to make an electronic puzzle game.  Xio's expert, Mr. Jason

92

Begy, admitted that it is possible to design an electronic puzzle videogame without the appearance of a "ghost" or shadow piece under the playing piece. Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 253:9-14 (admitting that "an electronic puzzle game could function perfectly well without using a ghost or shadow piece")).  TH's expert, Dr. Ian Bogost agrees with Mr. Begy on these points.  Opp. Bogost Decl. ¶¶ 8, 15.

56.     *Both Mr. Pajitnov and Mr. Rogers confirmed the usefulness of the ghost piece.  Id. Ex. 69 at 71:24-72:17 (explaining that some players liked the ghost piece because "it sort of lines up the piece where it's going to fall . . . so that they wouldn't make a mistake and land in the wrong spot"); id. Ex. 70 at 90:9-91:3 (calling the ghost piece a "useful feature" because a player "doesn't need to move his eyes back and forth all the time").  It would be harder to play a game that lacked this feature.*

**Disputed, but immaterial**.  TH states that these purported facts are argumentative and immaterial to the issue of whether TH's fanciful visual expression in *Tetris* is protectable under copyright and trade dress law.

The display of a "shadow" or "ghost" piece beneath the Tetriminos as they appear to fall is part of the visual expression of Tetris and the parties' experts agree that this visual feature is not necessary or essential to make an electronic puzzle game. *See supra* TH's Response to ¶ 55.

93

Further, Mr. Rogers testified that the "ghost" piece does not aid all players. Opp. Schmitt Decl. ¶ 35, Ex. 12 (H. Rogers Dep. (Jan. 11, 2011) 71:23-72:24 (Mr. Rogers testified that some players do not like the ghost piece, because "they're confused between the piece that's the ghost piece and the piece that's floating" and some players get confused because they are manipulating two pieces at once)).

57.    *The ability to view what piece will come next allows the player to better strategize where to place the current piece in play.  Mr. Pajitnov notes that playing without the next piece display makes for a more tactical game—and requires the player to make faster decisions. Id. Ex. 71 at 43:19-45:21.*

**Disputed, but immaterial**.  TH objects to the terms "better strategize" and "tactical" as vague and ambiguous, and disputes them to the extent they suggest that the small display near the playfield that shows the next playing piece to appear in the playfield is not protected by copyright.  TH clarifies that this element is part of the fanciful visual expression of *Tetris*.  HR Decl. ¶ 3, 31; Bogost Decl. ¶¶ 21, 24-25; Schmitt Decl. ¶ 70, Ex. 68 (attaching U.S. Customs Service decisions); Opp. Schmitt Decl. ¶ 36, Ex. 12 (H. Rogers Dep. (Jan. 11, 2011) 290:3-7 (testifying that changing this feature would "change[] the audiovisual experience").

Xio's expert, Mr. Jason Begy, and TH's expert, Dr. Ian Bogost, agree that this visual feature is a creative choice.  Opp. Schmitt Decl. ¶ 52, Ex. 14 (J. Begy

Dep. (May 10, 2011) 223:11-19 (testifying that it is a "design choice"); Opp. Bogost Decl. ¶ 20.

Further, TH states that these purported facts are argumentative and immaterial to the issue of whether TH's fanciful visual expression in *Tetris* is protectable under copyright and trade dress law.

Further, TH clarifies that this display is not necessary to make a game that functions and the parties experts agree that this visual feature is not necessary or essential to make an electronic puzzle game. Xio's expert, Mr. Jason Begy, admitted that it is possible to design an electronic puzzle videogame without the display of the next tetromino that will fall down the matrix above the playing field. Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 253:15-25 (admitting that "you don't need to display the next piece in advance of its appearing in order to make a puzzle video game")). TH's expert, Dr. Ian Bogost agrees with Mr. Begy on these points.  Opp. Bogost Decl. ¶¶ 8, 16.

Further, TH disputes whether the ability to view the next playing piece allows the player to better strategize where to place the current piece in play. Sometimes the display of the next playing piece is helpful to a player, but sometimes it makes no difference and is not helpful to a player.  Opp. Schmitt Decl. ¶ 37, Ex. 12 (H. Rogers Dep. (Jan. 11, 2011) 290:8-22).

Mr. Pajitnov testified that a game with the next piece display is neither harder nor easier than a game without a next piece display.  Maitra Decl. Ex. 71 (A. Pajitnov Dep. (Jan. 13, 2011) 44:14-45:11 (Mr. Pajitnov testified "I honestly don't think it's easier… I don't think I kind of think in those terms, easy -- it doesn't really influence on easy [sic] or difficulty of the game." )). Mr. Pajitnov also testified that he did not know how to explain the rationale behind awarding more points to a player that plays without the next piece display.  Maitra Decl. Ex. 71 (A. Pajitnov Dep. (Jan. 13, 2011) 44:9-13).

58.    *As with the ghost tetromino, it would be harder to play a game that lacked this feature.  This is why players are awarded more points for playing without the next piece display.  Id.*

**Disputed, but immaterial**.  TH states that these purported facts are argumentative and immaterial to the issue of whether TH's fanciful visual expression in *Tetris* is protectable under copyright and trade dress law.

TH clarifies that the small display near the playfield that shows the next playing piece to appear in the playfield is part of the fanciful visual expression of *Tetris*, and the parties' experts agree that this visual feature is not necessary or essential to make an electronic puzzle game. *See supra* TH's Response to ¶ 57.

Mr. Pajitnov testified that a game with the next piece display is neither harder nor easier than a game without a next piece display.  Maitra Decl. Ex. 71

(A. Pajitnov Dep. (Jan. 13, 2011) 44:14-45:11 (Mr. Pajitnov testified "I honestly don't think it's easier… I don't think I kind of think in those terms, easy -- it doesn't really influence on easy [sic] or difficulty of the game." )). Mr. Pajitnov also testified that he did not know how to explain the rationale behind awarding more points to a player that plays without the next piece display.  Maitra Decl. Ex. 71 (A. Pajitnov Dep. (Jan. 13, 2011) 44:9-13).

59.     *Lock-down mode occurs when a tetromino is no longer in play, when it settles into its final position on the board.  Changing the color of the pieces that are no longer in play communicates two messages: that the locked-down tetromino is no longer active and that a new tetromino is in play.  The player is better able to focus on the active tetromino as it descends down the board.  See id. Ex. 72 at 73:15-21 (explaining that the change in color is "[t]o make them, the actual piece you can manipulate, look more outstanding"); Ex. 73 at 91:17-92:24 (explaining that the change in color aids in distinguishing the tetromino actually in play).*

**Disputed, but immaterial.**  TH states that these purported facts are argumentative and immaterial to the issue of whether TH's fanciful visual expression in *Tetris* is protectable under copyright and trade dress law.

The color change when the Tetriminos enter lock-down mode is part of the fanciful visual expression of *Tetris*.  HR Decl. ¶ 3, 31; Bogost Decl. ¶¶ 21, 24-25; Schmitt Decl. ¶ 70, Ex. 68 (attaching U.S. Customs Service decisions).  Xio's

expert, Mr. Jason Begy, and TH's expert, Dr. Ian Bogost, agree that this visual
feature is a creative choice.  Opp. Schmitt Decl. ¶ 53, Ex. 14 (J. Begy Dep. (May
10, 2011) 224:6-20 (testifying that it is a "choice"); Schmitt Decl. ¶ 4, Ex. 2 (J.
Begy Dep. (May 10, 2011) 254:18-25 (testifying that a game designer could
choose not to include it)); Opp. Bogost Decl. ¶ 20.

   It is possible to design a game that does not include a color change when the
pieces enter lock-down mode.  The original version of *Tetris* created by Mr.
Pajitnov did not include this visual element.  Opp. Schmitt Decl.  ¶ 42, Ex. 13 (A.
Pajitnov Dep. (Jan. 13, 2011) 91:17-92:2).

   The parties' experts also agree that this visual feature is not necessary or
essential to make an electronic puzzle game.  Xio's expert, Mr. Jason Begy,
admitted that it is possible to design an electronic puzzle videogame without using
playing pieces that appear at the top of the playing field. Schmitt Decl. ¶ 4, Ex. 2
(J. Begy Dep. (May 10, 2011) 254:18-25, 255:14-19 (when asked about the change
of color of the playing pieces when they are in lock down mode, Mr. Begy
admitted that "a game designer could choose not to include this change of color in
an electronic puzzle game," and it would still "function perfectly well")).  TH's
expert, Dr. Ian Bogost agrees with Mr. Begy on these points.  Opp. Bogost Decl.
¶¶ 8, 17.

60.     *This is element of highlights a player's board over her opponents'
boards.  Reversing this—with an opponent's board as the largest—would not make
sense.  And having all boards equally sized would unnecessarily confuse the
player's board with her opponents'.*

**Disputed, but immaterial**.  TH objects to this statement as

incomprehensible and argumentative.  Further, Xio fails to cite to any admissible

evidence in support of the fact asserted in this number paragraph, in violation of

Rule 56.1 of the Local Rules of the United States District Court of New Jersey, and

thus this statement should be disregarded.  TH also states that these purported facts

are immaterial to the issue of whether TH's fanciful visual expression in *Tetris* is

protectable under copyright and trade dress law.

TH objects to the phrase "this is element of highlights" as vague and

ambiguous.

TH clarifies that the screen layout in multiplayer versions with the player's

matrix appearing most prominently on the screen and the opponents' matrixes

appearing smaller than the player's matrix and to the side of the player's matrix is

part of the visual expression of *Tetris.* HR Decl. ¶ 3, 31; Bogost Decl. ¶¶ 21, 24-

25; Schmitt Decl. ¶ 70, Ex. 68 (attaching U.S. Customs Service decisions).

Xio's expert, Mr. Jason Begy, and TH's expert, Dr. Ian Bogost, agree that

the screen layout in multiplayer mode is a creative choice.  Opp. Schmitt Decl. ¶

54, Ex. 14 (J. Begy Dep. (May 10, 2011)224:25-225:14 (agreeing that it is a "design choice" and that it can be "laid out in all sorts of different ways"); Opp. Bogost Decl. ¶ 20.

TH disputes the contention that having all playing fields equally sized in multiplayer versions of *Tetris* would unnecessarily confuse the players. Opp. Bogost Decl. ¶ 25. In fact, there are many multi-player puzzle games that feature playfields that are equally sized. Opp. Bogost Decl. ¶25. For example, the *Columns* game features two playing fields that are equally sized:



Bogost Decl. ¶ 9, Ex. 2 (Bogost Rp. ¶ 32, Fig. 52); Opp. Bogost Decl. ¶25.

Further, the parties experts agree that this visual feature is not necessary or essential to make an electronic puzzle game. Xio's expert, Mr. Jason Begy, admitted that it is possible to design a multiplayer electronic puzzle videogame with different screen layouts. Schmitt Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 255:20-256:6 (admitting that that "a game designer could choose among several options for the layout of the multiplayer electronic puzzle game")). TH's

expert, Dr. Ian Bogost agrees with Mr. Begy on this point. Opp. Bogost Decl. ¶¶ 8, 18.

61.     *All of the above elements are functional—either because they are a limitation and/or affordance of the game or because they otherwise play a functional role in the game. Each one element affects the other, and the combination of the elements working together is necessarily functional as well. Id. Ex. 36 at ¶ 79.*

**Disputed**. As set out in TH's General Objections, this purported "fact" contains legal argument disguised as fact and thus the Court should disregard it.

TH does not dispute that Xio's expert, Jason Begy, stated the following in paragraph 79 of his expert report: "Every element affects every other, and because all elements are functional, the whole of the elements working together is necessarily functional as well." However, Mr. Begy submitted no sworn declaration in support of Xio's motion for summary judgment, and thus his expert report is inadmissible hearsay evidence. Opp. Schmitt Decl. ¶ 20. As such, it should be disregarded.

Further, Mr. Begy and TH's expert, Dr. Ian Bogost, agree that the combination of visual elements in *Tetris* are not necessary or essential to make an electronic puzzle game. Mr. Begy admitted that electronic puzzle video games can be made without using the same combination of visual elements as *Tetris*. Schmitt

Decl. ¶ 4, Ex. 2 (J. Begy Dep. (May 10, 2011) 258:13-17 (admitting that "an electronic puzzle game could function perfectly well without using the same combination of elements as *Tetris*")).  TH's expert, Dr. Ian Bogost agrees with Mr. Begy on this point.  Opp. Bogost Decl. ¶¶ 8, 19.

Also, as discussed in response to Xio's paragraph 19 herein, Jesper Juul was not an expert witness in this case, nor has he submitted a declaration in support of Xio's summary judgment motion.  Opp. Schmitt Decl. ¶ 21.  As such, his definition of "rules" as "limitations and affordances" is inadmissible hearsay evidence and it should be disregarded.  In any event, his definition of "rules" is not probative here to determine the copyrightable subject matter of *Tetris*.  *See supra* TH's Response to ¶ *19*.

Dated:  October 25, 2011

/s/ Dale M. Cendali
Dale M. Cendali
Johanna Schmitt
Brendan T. Kehoe
KIRKLAND & ELLIS LLP

/s/ Robert J. Schoenberg
Robert J. Schoenberg
RIKER DANZIG SCHERER HYLAND
 & PERRETTI LLP

Attorneys for Plaintiffs