Dale M. Cendali
Johanna Schmitt
Brendan T. Kehoe
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
dale.cendali@kirkland.com
johanna.schmitt@kirkland.com
brendan.kehoe@kirkland.com

Robert J. Schoenberg
RIKER DANZIG SCHERER HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962-1981
Telephone: (973) 538-0800
rschoenberg@riker.com

Attorneys for Plaintiffs and
Tetris Holding, LLC and The Tetris Company, LLC

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| TETRIS HOLDING, LLC and THE TETRIS COMPANY, LLC,<br><br>           Plaintiffs,<br><br>   - against -<br><br>XIO INTERACTIVE INC.,<br><br>           Defendant. | Case No.   3:09-cv-6115 (FLW) (DEA)<br><br>Hon. Freda L. Wolfson, U.S.D.J.<br>Hon. Douglas E. Arpert, U.S.M.J.<br><br>**DECLARATION OF JOHANNA SCHMITT, ESQ. IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>*Document Filed Electronically* |

I, Johanna Schmitt, Esq., declare as follows:

1. I am a partner of the law firm of Kirkland & Ellis LLP, counsel to plaintiffs Tetris Holding, LLC and The Tetris Company, LLC (collectively, "TH") in this action. In addition to my previous Declaration in Support of TH's Motion for Summary Judgment (dated September 29, 2011) in this case, I submit this declaration in support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment. I make this declaration based upon my personal knowledge of matters in this action, and to place before the Court the following documents and materials.

2. Attached hereto as **Exhibit 1** are true and correct photographs of a pentamino puzzle game which I caused to be made. This pentamino puzzle game was marked as Exhibit 10 in the Rule 30(b)(6) deposition of Henk B. Rogers (the Managing Director of The Tetris Company, LLC and Member of Tetris Holding, LLC) on February 4, 2011. This pentamino puzzle game features small plastic pieces in the shape of pentaminos that are all the same color (red).

3. Attached hereto as **Exhibit 2** are true and correct copies of a paper insert included with the pentamino puzzle game referenced above.

4. Attached hereto as **Exhibit 3** are true and correct photographs of the *Universe* puzzle game which I caused to be made. This game was marked as Exhibit 2 in the Rule 30(b)(6) deposition of Henk B. Rogers (the Managing

1

Director of The Tetris Company, LLC and Member of Tetris Holding, LLC) on February 4, 2011.

5. In the image of the *Universe* puzzle game included in Xio's brief (pp. 4, 33) and 56.1 Statement (p. 3), Xio positioned the pieces at the bottom of the board in a tacit effort to make it look like they would appear in that way when played, when in fact the game can look different.

**Parker Bros' *Universe* (as depicted in Xio's Rule 56.1 Statement)**



**Parker Bros' *Universe* (an alternative configuration)**



6. Attached hereto as **Exhibit 4** is a true and correct copy of excerpts from the deposition transcript of Xio's Chief Technical Officer, Michael Carter, dated December 13, 2010. Mr. Carter testified that he is not a lawyer, has not gone to law school, and does not consider himself an expert in intellectual property law. **Exhibit 4** (M. Carter Dep. (Dec. 13, 2010) 175:16-21, 176:21-177:16).

7. Attached hereto as **Exhibit 5** is a true and correct copy of excerpts from the deposition transcript of Xio's Chief Technical Officer, Michael Carter, dated January 31, 2011, who appeared as Xio's corporate witness under Rule

2

30(b)(6). Mr. Carter testified that he is not a lawyer, that nobody working on *Mino* was a lawyer, and Xio did not employ an in-house lawyer. **Exhibit 5** (M. Carter's 30(b)(6) Dep. (Jan. 31, 2011) 184:16-24).

8. Mr. Carter testified that Xio did not get an opinion letter from any attorney stating that Xio would not infringe TH's intellectual property rights. **Exhibit 5** (M. Carter's 30(b)(6) Dep. (Jan. 31, 2011) 184:25-185:4).

9. Mr. Carter testified that *Mino 1.0* was available on the Apple iTunes App Store on May 9th, 2009. **Exhibit 5** (M. Carter's 30(b)(6) Dep. (Jan. 31, 2011) 118:19-23).

10. Mr. Carter testified that he wrote the Tetris Company Legal Notes document after August 3rd, 2009. **Exhibit 5** (M. Carter's 30(b)(6) Dep. (Jan. 31, 2011) 167:14-22).

11. Attached hereto as **Exhibit 6** is a true and correct copy of a print out from the U.S. Copyright Office's website, which includes the record of TH's copyright registration for the audiovisual expression of *Kids Tetris.* A link to this record was included in an email from Desiree Golen to herself, dated November 11, 2008, which is attached as Exhibit 13 to the Declaration of Sonali Maitra, Esq.

12. Attached hereto as **Exhibit 7** is a true and correct copy of U.S. Copyright Office circular available at http://www.copyright.gov/fls/fl108.html.

13. On September 16, 2011, Xio's counsel, Sonali Maitra, informed me

that Xio intended to withdraw its affirmative defenses of unclean hands and copyright misuse.

14. Attached hereto as **Exhibit 8** is a true and correct copy of excerpts from the deposition transcript of Xio Interactive Inc.'s ("Xio") Chief Executive Officer, Secretary, and Treasurer, Desiree Golen, dated January 28, 2011.

15. Ms. Golen testified that she does not remember if she received a response from Mr. Cormier, and does not remember ever speaking to Mr. Cormier. **Exhibit 8** (D. Golen Dep. (Jan. 28, 2011) 257:4-258:1).

16. Ms. Golen testified that she does not remember ever speaking to Mr. Reback. **Exhibit 8** (D. Golen Dep. (Jan. 28, 2011) 258:25-259:12).

17. Attached hereto as **Exhibit 9** is a true and correct copy of excerpts from the deposition transcript of Xio's Chief Executive Officer, Secretary, and Treasurer, Desiree Golen, dated February 10, 2011.

18. Ms. Golen testified that she contacted various attorneys (whom Xio did not retain), but does not remember showing any of them screenshots of either *Mino* or *Tetris* or discussing the U.S. Customs Service regarding the protected expression in *Tetris*. **Exhibit 9** (D. Golen Dep. (Feb. 10, 2011) 322:20-324:20, 331:20-332:10, 333:5-336:14, 338:4-18, 340:20-22).

19. Ms. Golen does not remember showing Julie Taylor any images of *Mino*. **Exhibit 9** (D. Golen Dep. (Feb. 10, 2011) 337:4-18).

4

20. The only expert that Xio disclosed in this case was Mr. Jason Begy. I have reviewed Xio's materials in support of its motion for summary judgment, and Mr. Begy has not submitted a declaration in support of Xio's motion.

21. Xio did not disclose Jesper Juul as an expert witness in this case, and he did not submit an expert report. Dr. Juul was not deposed in this case. I have reviewed Xio's materials in support of its motion for summary judgment, and Dr. Juul has not submitted a declaration in support of Xio's motion.

22. Attached hereto as **Exhibit 10** is a true and correct copy of excerpts from the deposition transcript of TH's expert, Dr. Ian Bogost, dated May 6, 2011.

23. Dr. Bogost testified that "there are many ways of understanding the term "rules," and he disputes this definition of "rules" set forth by Xio's expert, and explains that a more abstract interpretation of the word "rules" is more appropriate here. **Exhibit 10** (I. Bogost Dep. (May 6, 2011) 171:18-173:22).

24. Attached hereto as **Exhibit 11** are true and correct copies of the definition of "rule" from the *Oxford English Reference Dictionary*, and *Merriam Webster's Collegiate Dictionary*.

25. Attached hereto as **Exhibit 12** is a true and correct copy of excerpts from the deposition transcript of Henk B. Rogers, the Managing Director of The Tetris Company, LLC and Member of Tetris Holding, LLC, dated January 11, 2011.

26.     Mr. Rogers testified that a game with a smaller playing field would still be the same game and would simply look and feel different. **Exhibit 12** (H. Rogers Dep. (Jan. 11, 2011) 54:12-55:20, 58:15-59:15).

27.     Mr. Rogers testified that, if the shape of playing pieces was changed from tetrominos to dominos, "[y]our objective[] of the game is identical. You're still trying to create the same shapes, you have shapes that appear in the play field, you manipulate them, and they are used to form shapes in the play field that are removed from the game. And so that's essentially the game, the way the game is played." **Exhibit 12** (H. Rogers Dep. (Jan. 11, 2011) 62:15-63:5).  Mr. Rogers also testified that such a game might be the same difficulty, because the player might not have any prior experience with those shapes.  **Exhibit 12** (H. Rogers Dep. (Jan. 11, 2011) 63:6-25).

28.     Mr. Rogers testified that the choice of whether to delineate individual squares of the Tetrimino pieces is part of the artistic expression of the game. **Exhibit 12** (H. Rogers Dep. (Jan. 11, 2011) 79:2-80:6).

29.     Mr. Rogers testified that TH has allowed licensees to release versions of *Tetris* that do not have delineated Tetriminos.  **Exhibit 12** (H. Rogers Dep. (Jan. 11, 2011) 154:16-155:7).

30.     Mr. Rogers testified that he did not think it would affect game play if the playing pieces appeared close to the bottom of the playing field or the middle

of the playing field. **Exhibit 12** (H. Rogers Dep. (Jan. 11, 2011) 64:2-23).

31.   Mr. Rogers testified that the starting orientation of the playing pieces has probably changed from the original version of *Tetris* because it is an "artistic decision." **Exhibit 12** (H. Rogers Dep. (Jan. 11, 2011) 80:15-22).

32.   Mr. Rogers testified that changing the starting orientation of a playing piece might change the amount of times that a player has to rotate a playing piece to get into the same position, but that this determination is random and "depends on what the start position and end position is." **Exhibit 12** (H. Rogers Dep. (Jan. 11, 2011) 74: 9-74:21).

33.    Mr. Rogers testified that it is possible to design a game without the downward, lateral and rotating movement of the playing piece. **Exhibit 12** (H. Rogers Dep. (Jan. 11, 2011) 67:8-18).

34.   Mr. Rogers testified that a garbage line could cause a detriment to another player "under certain circumstances" such as if "the player is having trouble playing and there's little room." **Exhibit 12** (H. Rogers Dep. (Jan. 11, 2011) 233:9-19).

35.   Mr. Rogers testified that some players do not like the ghost or shadow piece, because "they're confused between the piece that's the ghost piece and the piece that's floating" and some players get confused because they think they are manipulating two pieces at once. **Exhibit 12** (H. Rogers Dep. (Jan. 11, 2011)

7

71:23-72:24).

36. Mr. Rogers testified that changing the display near the playfield that shows the next playing piece to appear in the playfield would "change[] the audiovisual experience." **Exhibit 12** (H. Rogers Dep. (Jan. 11, 2011) 290:3-7).

37. Mr. Rogers testified that sometimes the display of the next playing piece is helpful to a player, but sometimes it makes no difference and is not helpful to a player. **Exhibit 12** (H. Rogers Dep. (Jan. 11, 2011) 290:8-22).

38. Attached hereto as **Exhibit 13** is a true and correct copy of excerpts from the deposition transcript of Alexey Pajitnov, creator of *Tetris* and co-owner of Tetris Holding, LLC, dated January 13, 2011.

39. Mr. Pajitnov testified that there was "no reason" for his decision to design *Tetris* to have a playing field higher than it is wide; rather, this decision was simply based on his preference. **Exhibit 13** (A. Pajitnov Dep. (Jan. 13, 2011) 94:23-95:13).

40. Mr. Pajitnov testified that he tried designing the game with some blocks already in the playing field at the start of the game instead of starting the game with an empty playing field, but he did not like the design so he changed it. **Exhibit 13** (A. Pajitnov Dep. (Jan. 13, 2011) 22:4-22:18).

41. Mr. Pajitnov testified that he preferred using tetrominos as the basis for the pieces in his particular game design, but that other players might like

8

playing a game with pentominos.  **Exhibit 13** (A. Pajitnov Dep. (Jan. 13, 2011) 96:6-22).

42. Mr. Pajitnov testified that the original version of *Tetris* did not include the visual element of changing the color of a playing piece when it enters lockdown mode.  **Exhibit 13** (A. Pajitnov Dep. (Jan. 13, 2011) 91:17-92:2).

43. Mr. Pajitnov testified that certain features in *Tetris* are "related more to your brain or to your emotions" and some "are related more to your fingers and pushing buttons." **Exhibit 13** (A. Pajitnov Dep. (Jan. 13, 2011) 140:24-141:6).

44. Mr. Pajitnov testified that he chose the particular shape and dimension of the playfield because it "pleased" him; he chose the brightly-colored Tetrimino pieces because he liked that shape; and he described the disappearance of any completed horizontal line and subsequent downward consolidation of the remaining pieces as part of the game's "look and feel." **Exhibit 13** (A. Pajitnov Dep. (Jan. 13, 2011) 142:9-13, 94:22-95:1, 96:6-22, 146:15-147:11).

45. Attached hereto as **Exhibit 14** is a true and correct copy of excerpts from the deposition transcript of Xio's expert, Mr. Jason Begy, dated May 5, 2011.

46. Mr. Begy admitted that the delineation of each individual square in a Tetrimino piece is a "design choice." **Exhibit 14** (J. Begy Dep. (May 10, 2011) 211:3-19).

47. Mr. Begy admitted that the appearance of Tetriminos moving from the

9

top of the playfield to its bottom is a "design choice." **Exhibit 14** (J. Begy Dep. (May 10, 2011) 213:7-11).

48. Mr. Begy testified that the starting orientation of the Tetrimino playing pieces is a "design choice." **Exhibit 14** (J. Begy Dep. (May 10, 2011) 214:12-22).

49. Mr. Begy testified that the decision to have the Tetrimino pieces appear at the top of the playfield and move down is a "design choice" and the pieces could have been designed to move "diagonally or side to side." **Exhibit 14** (J. Begy Dep. (May 10, 2011) 216:20-25, 221:3-9).

50. Mr. Begy testified that the disappearance of a horizontal line when it fills across the playfield with blocks is a "design choice" and there were "other design choices that could have been made other than having the shape disappear." **Exhibit 14** (J. Begy Dep. (May 10, 2011) 219:2-10).

51. Mr. Begy testified that that there were other ways to show where the piece would fall, instead of using a "shadow" or "ghost" piece. **Exhibit 14** (J. Begy Dep. (May 10, 2011) 223:2-10).

52. Mr. Begy testified that the display of the next playing piece in a small display near the playfield is a "design choice." **Exhibit 14** (J. Begy Dep. (May 10, 2011) 223:11-19).

53. Mr. Begy testified that the color change when the Tetriminos enter

lock-down mode is a "choice".  **Exhibit 14** (J. Begy Dep. (May 10, 2011) 224:6-20).

54.    Mr. Begy testified that the screen layout in multiplayer mode is a "design choice" and can be "laid out in all sorts of different ways."  **Exhibit 14** (J. Begy Dep. (May 10, 2011) 224:25-225:14).

55.    Mr. Begy testified that some of the visual elements of *Tetris* that Xio copies are not "rules" even under Dr. Juul's definition of the term.  These visual elements include "[t]he seven geometric playing pieces being brightly colored . . . The fact that the blocks are individually delineated . . . The appearance of the blocks filling from the bottom to the top . . . The ghost piece . . . The change in color . . . when a piece enters lockdown mode, and the layout of the matrixes in [multiplayer.]"  **Exhibit 14** (J. Begy Dep. (May 5, 2011) 152:8–15).

56.    Mr. Begy testified that "game mechanics is a phrase that is used frequently, and there is little common understanding over what exactly it means."  **Exhibit 14** (J. Begy Dep. (May 5, 2011)164:9-165:4).

57.    Mr. Begy testified that he agreed that "the playfield can be designed in "an almost unlimited number of ways."  **Exhibit 14** (J. Begy Dep. (May 5, 2011) 229:2-5).

58.    Mr. Begy testified that a "game designer could design the playing pieces for a videogame in an almost unlimited number of other ways."  **Exhibit 14**

11

(J. Begy Dep. (May 5, 2011) 231:6-20).

59.  Exhibit 2 to my previous Declaration in Support of TH's Motion for Summary Judgment (dated September 29, 2011) also contains a true and correct copy of excerpts from the deposition transcript of Xio's expert, Mr. Jason Begy, dated May 5, 2011.  In those excerpts, Mr. Begy testified that (1) a "game designer could design the playing pieces for a videogame in an almost unlimited number of other ways" (J. Begy Dep. (May 10, 2011) 231:6-20); (2) a "game designer could choose a number of different ways to configure the playing field after removing objects from it (J. Begy Dep. (May 10, 2011) 246:12-17); (3) a "game designer could choose numerous different ways to design a feature like garbage lines to attack another player" (J. Begy Dep. (May 10, 2011) 248:19-22); (4) a game designer could choose not to include the color change when a playing piece enters "lockdown mode" (J. Begy Dep. (May 10, 2011) 254:18-25); and (5) he did not rebut Dr. Ian Bogost's opinion that the "development design of games on iOS devices is essentially limitless" (J. Begy Dep. (May 10, 2011) 293:9-12.

60.  Attached hereto as **Exhibit 15** is a true and correct copy of screenshots of the *Pac-Man* videogame that is currently available for download through the Apple iTunes Store for play on Apple's iPad.  The game was released by namco®.

61.  Attached hereto as **Exhibit 16** is a true and correct copy of the

12

"Instruction Manual" for the videogame *Sonic the Hedgehog* for the Sega Genesis game system.

62. Attached hereto as **Exhibit 17** are true and correct copies of printouts of over 200 records from the U.S. Copyright Office's website for copyright registrations covering the audiovisual expression of videogames, including *Guitar Hero II* (PA0001334017), *Super Mario Bros.* (PA0000273028), *Columns II* (PA0000620952) and *Trivial Pursuit* (PA0000354704). This exhibit is a representative sample, and does not represent an exhaustive search.

63. Attached hereto as **Exhibit 18** is a true and correct copy of an email from Jeffrey Neu, Esq. to Desiree Golen, dated November 12, 2008, which states "no, Borland doesn't really apply to this situation . . . .," which was produced by Jeffrey Neu, a third party, in this litigation at NEU0000056.

64. During discovery, TH objected to producing any source code (including the sample code that was used to create the "basic *Tetris* Demo") to Xio because it is highly proprietary and TH was loathe to disclose it to a known copier. In a telephonic conference, Magistrate Judge Arpert agreed with TH that source code was not relevant to this case. However, with regard to this particular sample code, TH agreed to a limited inspection by Xio's expert, Mr. Begy, under strict security conditions.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 25th day of October, 2011 at New York, New York.

*/s/ Johanna Schmitt*
Johanna Schmitt, Esq.

14