# Exhibit 04

## to the Declaration of Johanna Schmitt, Esq. in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment

# In The Matter Of:

*TETRIS HOLDING, LLC*
*v.*
*XIO INTERACTIVE INC.*

_____

## *MICHAEL CARTER - Vol. 1*
### *December 13, 2010*

_____

**MERRILL CORPORATION**

**LegaLink, Inc.**

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

MICHAEL CARTER - 12/13/2010

Page 173

```
03:37:33   1   possible, and I don't tend to delete e-mails.  And when
03:37:39   2   I work on source code, I try to keep as many copies of
03:37:43   3   that source code along the way through version control.
03:37:47   4   So this has always been my procedure before the lawsuit.
03:37:50   5       At the time of the lawsuit, for any document
03:37:53   6   that could conceivably be related to the case, my policy
03:37:58   7   and procedure has been to absolutely make sure that it's
03:38:02   8   not deleted.
03:38:03   9       MS. SCHMITT:  Q.  So even before the lawsuit,
03:38:05  10   your personal practice was not to delete e-mails?
03:38:12  11       A.  Yeah, I can't recall deleting e-mails.  In
03:38:18  12   general, I don't delete e-mails.
03:38:21  13       Q.  And what about Word documents that you
03:38:25  14   create?
03:38:27  15       A.  So most of the Word documents that I ever
03:38:31  16   create are then attached to an e-mail and preserved that
03:38:36  17   way.  I don't ever delete files, certainly not since the
03:38:44  18   lawsuit was filed.  Before the lawsuit was filed,
03:38:48  19   occasionally, I would switch computers, and I'd get a
03:38:52  20   new computer, and it would be empty.  And, you know, so
03:38:56  21   there were -- you know, my old files would be left in
03:38:59  22   the old computer, and sometimes I would throw out an old
03:39:04  23   computer, or --
03:39:04  24       Q.  Since 2008, how many computers have you
03:39:08  25   owned?
```

Page 174

```
03:39:14   1       A.  2008.  So there was, I think, two desktop
03:39:17   2   computers that I owned.  One was a Hewlett Packard, I
03:39:23   3   believe, and the other was a Dell computer.
03:39:28   4       Q.  Have you thrown away either of those
03:39:30   5   computers?
03:39:34   6       A.  I believe I have both of those computers
03:39:36   7   still.
03:39:36   8       Q.  Were they both searched -- did you search
03:39:39   9   them both for documents for production in this case?
03:39:42  10       A.  Yes.
03:39:42  11       Q.  And have you owned any laptops since 2008?
03:39:48  12       A.  I have.
03:39:49  13       Q.  And how many?
03:39:51  14       A.  So I've owned -- right now I have a MacBook
03:39:58  15   Air.  Google just mailed me a -- I don't know what they
03:40:03  16   call it -- a Chromium 48.  It's a new computer that they put
03:40:08  17   out.  I had a -- I think I had a -- I may have a broken
03:40:13  18   Toshiba that I've owned; it's a laptop.  I don't know
03:40:17  19   that I've used it since 2008, but I believe I still have
03:40:22  20   it.
03:40:22  21       Q.  Was that Toshiba laptop searched for
03:40:25  22   documents?
03:40:26  23       A.  No.
03:40:26  24       Q.  Had you used it since you started working on
03:40:28  25   the Mino project?
```

Page 175

```
03:40:32   1       A.  I don't recall using it.  I think on that
03:40:36   2   Toshiba the screen may be broken.
03:40:38   3       Q.  Did you search any lap -- of your laptops for
03:40:41   4   documents for production in this case?
03:40:43   5       A.  No.
03:40:43   6       Q.  Why not?
03:40:45   7       A.  Well, all of my work was done on those two
03:40:50   8   desktops that I had.  And the reason was that I had this
03:40:55   9   back operation, so I was unable to sit down or travel or
03:40:58  10   walk or do anything.  And so all I was physically able
03:41:02  11   to do was use a desk where I laid down on the ground,
03:41:06  12   and I did all of my work and all of my personal
03:41:14  13   interactions with the computer via those two desktops.
03:41:14  14   And so all of my Xio Interactive work was done on those
03:41:23  15   two desktops as well.
03:41:25  16       Q.  Are you a lawyer?
03:41:25  17       A.  I'm not a lawyer.
03:41:28  18       Q.  Have you ever studied law?
03:41:30  19       A.  What do you mean?
03:41:32  20       Q.  Have you ever gone to law school?
03:41:33  21       A.  I've never gone to law school.
03:41:35  22       Q.  Have you ever taken a course or class in law?
03:41:41  23       A.  I don't recall ever having a class -- you mean
03:41:45  24   like a class at a law school about the law?
03:41:48  25       Q.  No, just a class on the law in college or
```

Page 176

```
03:41:54   1   high school.
03:41:57   2       A.  I'm sure I may have been in classes that talk
03:42:00   3   about the law.  I think in high school I had a summer
03:42:06   4   school class called "Government."  I don't really
03:42:08   5   remember it that well.
03:42:09   6       Q.  Have you ever studied intellectual property
03:42:11   7   law in a class?
03:42:16   8       A.  You know, I may have had a class that touched
03:42:18   9   on intellectual property.  I don't really recall.
03:42:23  10       Q.  What do you mean that "touched on
03:42:24  11   intellectual property?"
03:42:27  12       A.  Well, I mean the term "intellectual property"
03:42:30  13   may have been used in a class I took, or potentially the
03:42:34  14   term wasn't used, but possibly something to do with
03:42:37  15   intellectual property was covered in the class, but, you
03:42:50  16   know, I don't really remember.  A lot of the classes I
03:42:51  17   took in college were computer classes, computer science,
03:42:52  18   and I don't really remember my high school classes that
03:42:55  19   well.  I don't remember a class where I studied
03:42:59  20   intellectual property.
03:43:02  21       Q.  And I think at the beginning of the
03:43:03  22   deposition, at some point, you said you don't consider
03:43:06  23   yourself an expert in intellectual property law; is
03:43:09  24   that correct?
03:43:09  25       A.  I'm not a trained expert in intellectual
```

44 (Pages 173 to 176)

MICHAEL CARTER - 12/13/2010

Page 177

| | | |
|---|---|---|
| 03:43:11 | 1 | property law. |
| 03:43:12 | 2 | Q.  Do you think you're an expert in intellectual |
| 03:43:16 | 3 | property law? |
| 03:43:17 | 4 | A.  No, I think I tend to think of experts in |
| 03:43:23 | 5 | intellectual property law as lawyers who have been |
| 03:43:27 | 6 | trained with that expertise. |
| 03:43:29 | 7 | Q.  Well, it's possible that somebody could be a |
| 03:43:32 | 8 | self-taught expert; is that true? |
| 03:43:37 | 9 | A.  I don't know that I have the expertise to even |
| 03:43:41 | 10 | answer that. |
| 03:43:44 | 11 | Q.  Do you consider yourself as self-taught |
| 03:43:46 | 12 | expert in intellectual property law? |
| 03:43:48 | 13 | A.  I do not consider myself an expert in |
| 03:43:52 | 14 | intellectual property law because I haven't been -- I |
| 03:43:56 | 15 | haven't gone to law school and I haven't been trained to |
| 03:43:59 | 16 | be a lawyer. |
| 03:44:03 | 17 | Q.  Have you read the amended complaint in this |
| 03:44:06 | 18 | case? |
| 03:44:08 | 19 | A.  I've seen the amended complaint in this case. |
| 03:44:10 | 20 | Q.  And you have a general understanding of the |
| 03:44:13 | 21 | claims -- of plaintiff's claims in this case? |
| 03:44:16 | 22 | A.  I have an understanding of the facts in the |
| 03:44:20 | 23 | case.  I'm not sure that I have a legal understanding. |
| 03:44:26 | 24 | Q.  Do you have an -- I'm sorry. |
| 03:44:28 | 25 | A.  Well, I don't have an understanding -- I don't |

Page 178

| | | |
|---|---|---|
| 03:44:30 | 1 | necessarily have an understanding of the legal concepts |
| 03:44:33 | 2 | in the case. |
| 03:44:34 | 3 | Q.  Do you have an understanding of the legal |
| 03:44:35 | 4 | issues in the case? |
| 03:44:37 | 5 | A.  I understand that there are legal issues in |
| 03:44:38 | 6 | the case and maybe, in general, what they pertain to. |
| 03:44:42 | 7 | Q.  What's your general understanding of the |
| 03:44:44 | 8 | legal issues in this case? |
| 03:44:48 | 9 | A.  My general understanding is that this is a |
| 03:44:50 | 10 | case of intellectual property, which potentially |
| 03:44:56 | 11 | includes copyright and trademark law. |
| 03:44:59 | 12 | Q.  And that's the extent of your general |
| 03:45:01 | 13 | understanding? |
| 03:45:04 | 14 | A.  I mean, I think that's, like, the general |
| 03:45:07 | 15 | topics of the case.  I'm not sure.  Is there something |
| 03:45:12 | 16 | specific you're wondering about? |
| 03:45:15 | 17 | Q.  I'm asking you about your understanding.  Do |
| 03:45:17 | 18 | you think the issues are complicated in this case? |
| 03:45:22 | 19 | A.  You know, I don't think I've seen a law suit |
| 03:45:24 | 20 | that isn't complicated.  I think that's why we have |
| 03:45:28 | 21 | lawyers and trained experts in the law.  I think |
| 03:45:34 | 22 | intellectual property is also complicated. |
| 03:45:40 | 23 | Q.  Prior to launching the Mino game, what |
| 03:45:43 | 24 | efforts, if any, did you make to learn about the |
| 03:45:46 | 25 | intellectual property rights associated with |

Page 179

| | | |
|---|---|---|
| 03:45:48 | 1 | plaintiff's Tetris games? |
| 03:45:54 | 2 | Q.  When you say the "plaintiff's Tetris games," |
| 03:45:57 | 3 | which games are you referring to? |
| 03:46:00 | 4 | Q.  Any games owned by or authorized by the |
| 03:46:05 | 5 | Tetris Company. |
| 03:46:07 | 6 | A.  Okay.  I believe that Xio Interactive did a |
| 03:46:15 | 7 | trademark search for those products. |
| 03:46:21 | 8 | Q.  What do you mean "a trademark search for |
| 03:46:23 | 9 | those products?" |
| 03:46:25 | 10 | A.  I think that there is an online registry of |
| 03:46:29 | 11 | trademarks, and I recall that there was a search run on |
| 03:46:36 | 12 | that Web site to see what the extent of the trademarks |
| 03:46:45 | 13 | were, not necessarily the plaintiff's trademarks, but |
| 03:46:49 | 14 | the trademarks surrounding the term "Tetris." |
| 03:46:53 | 15 | Q.  And who conducted that search? |
| 03:46:56 | 16 | A.  I don't remember exactly.  It was probably |
| 03:47:01 | 17 | Desiree.  I might have been there, too.  I don't |
| 03:47:04 | 18 | remember. |
| 03:47:05 | 19 | Q.  And when was that done? |
| 03:47:08 | 20 | A.  I don't remember exactly when it was done. |
| 03:47:11 | 21 | Q.  Was it -- but it was before Mino was |
| 03:47:14 | 22 | launched? |
| 03:47:16 | 23 | A.  I believe so.  I don't know for certain, but I |
| 03:47:18 | 24 | believe it was conducted before Mino was launched. |
| 03:47:20 | 25 | Q.  And how was the search conducted on the |

Page 180

| | | |
|---|---|---|
| 03:47:27 | 1 | trademark Web site? |
| 03:47:30 | 2 | A.  I think they have a form you fill out where |
| 03:47:32 | 3 | you just type in a word, and then they might have other |
| 03:47:35 | 4 | options.  I don't really remember, but I think you type |
| 03:47:39 | 5 | in the word and hit search, and then they give you some |
| 03:47:43 | 6 | sort of listing.  That was the general way that it was |
| 03:47:46 | 7 | done. |
| 03:47:46 | 8 | Q.  And was the term "Tetris" searched on this |
| 03:47:51 | 9 | Web site? |
| 03:47:53 | 10 | A.  I believe that the term "Tetris" was probably |
| 03:47:57 | 11 | searched. |
| 03:47:57 | 12 | Q.  And do you remember what the results were? |
| 03:48:01 | 13 | A.  I don't remember the exact results.  I |
| 03:48:04 | 14 | remember there were various listings under the term |
| 03:48:07 | 15 | "Tetris" for -- on this trademark Web site, I think.  I |
| 03:48:18 | 16 | don't remember exactly what they were. |
| 03:48:19 | 17 | Q.  Did anyone make a printout or otherwise save |
| 03:48:22 | 18 | these -- this -- these search results? |
| 03:48:32 | 19 | A.  I doubt anyone would have made a printout of |
| 03:48:34 | 20 | it.  They may have been saved. |
| 03:48:44 | 21 | Q.  What was done with this list of search |
| 03:48:49 | 22 | results after you ran the search? |
| 03:48:53 | 23 | A.  I think we probably read the results and |
| 03:48:57 | 24 | possibly saved them. |
| 03:49:01 | 25 | Q.  And did you take any other steps after |

45 (Pages 177 to 180)

# Exhibit 05

## to the Declaration of Johanna Schmitt, Esq. in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment

# In The Matter Of:

*TETRIS HOLDING, LLC*
*v.*
*XIO INTERACTIVE INC.*

_____

## *MICHAEL CARTER - 30(b)6*
### *January 31, 2011*

_____

**MERRILL CORPORATION**

**LegaLink, Inc.**

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

## 165

```
04:07:02  1  things that he's upset with, and one of the things he
04:07:05  2  mentions, briefly, is using one of those terms, and
04:07:07  3  then --
04:07:08  4      MS. CENDALI:  Q.  He says it was a rip-off of
04:07:10  5  Mino, that's those terms I was asking in my question,
04:07:13  6  correct?
04:07:13  7      A.  That is -- yes, that is --
04:07:14  8      Q.  And another user --
04:07:14  9      A.  -- what you were asking.
04:07:15  10     Q.  -- Somerandomdude said that Mino was copying
04:07:20  11  Tetris, right?
04:07:23  12     A.  I don't know that that's what he said.  He
04:07:30  13  didn't refer directly to Mino.  It's likely he was
04:07:33  14  referring to the post made by Grubjelly originally where
04:07:38  15  he does refer to Mino in that post, but, you know, I
04:07:42  16  don't know that this user had Mino and had it to refer
04:07:45  17  to.  So I can't tell you if he was referring to Mino or
04:07:49  18  not.
04:07:50  19     Q.  Is everything on this post about Mino?
04:07:54  20     MS. MAITRA:  Objection; overbroad.
04:07:55  21     THE WITNESS:  You know, there are 12 pages
04:07:58  22  here.  I'm not sure.
04:08:06  23     MS. CENDALI:  Q.  This is about Mino, isn't
04:08:06  24  it?  What's pictured here?  And the name of the post,
04:08:08  25  the chain starts at the top, the post is "Help remove
```

## 166

```
04:08:12  1  Mino from the App Store."  Look on Page 1.  Isn't that
04:08:16  2  the thread that everybody is writing about?
04:08:19  3      A.  Yes, I do see that.
04:08:20  4      Q.  Yes.  And the screenshots that are depicted
04:08:25  5  in this exhibit are of Mino; isn't that true?
04:08:30  6      A.  I see screenshots, and they look like it's the
04:08:32  7  user Grubjelly playing Mino.
04:08:34  8      Q.  Okay.  And when the user, Somerandomdude,
04:08:40  9  wrote the only grounds for removal right now is that
04:08:44  10 it's copying Tetris and the price seems to be funny,
04:08:48  11 when you read that, you thought he was referring to
04:08:51  12 Mino; isn't that true?
04:08:53  13     MS. MAITRA:  Objection; asked and answered.
04:08:54  14     THE WITNESS:  I don't know.  I think it's
04:08:55  15 possible that he was referring to Mino.  It seems that
04:08:59  16 since it's in this thread it's likely, but I don't know.
04:09:02  17     MS. CENDALI:  Q.  And when you posted -- you
04:09:04  18 put in a response to this -- these posts, didn't you, at
04:09:08  19 xiomc; is that right?
04:09:10  20     A.  So I authored a response to Grubjelly's
04:09:16  21 complaints.
04:09:17  22     Q.  Right.  And nowhere in your response to
04:09:20  23 Grubjelly did you say, hey, we're not a rip-off or a
04:09:24  24 copy of Tetris, do you?
04:09:28  25     A.  Well, let me first find that.  So I don't -- I
```

## 167

```
04:09:38  1  don't see any reference to that, no.
04:09:41  2      Q.  All right.  Let's take a look at what's been
04:09:50  3  marked as Exhibit 17 to this deposition.
04:09:54  4      (Whereupon, Deposition Exhibit 17 was
04:09:54  5  marked for identification.)
04:10:05  6      MS. CENDALI:  Q.  The document at the top says
04:10:06  7  "Tetris Company legal notes."  Did you write this
04:10:10  8  document?
04:10:11  9      A.  So I think, in large part, I authored this
04:10:13  10 document.  I wrote the -- well, let me make sure it's
04:10:17  11 the one I think it is.  Let me just go through it real
04:10:20  12 quick.  Yes, I think this is the document that I
04:10:34  13 authored.
04:10:35  14     Q.  And when did you write this?
04:10:43  15     A.  You know, I'm not sure exactly when I wrote
04:10:45  16 it.  I think this letter refers to August 3rd, which I
04:10:49  17 believe would be 2009, August 3rd.  So I probably wrote
04:10:53  18 this version of it after 2009, August 3rd.
04:10:58  19     Q.  After or before?  I see.  Because there's a
04:11:06  20 reference to August 3rd, it would have to be after
04:11:08  21 that.
04:11:09  22     A.  That's what I believe.
04:11:11  23     Q.  And turning to the bottom of Page 2 of the
04:11:21  24 document, you write, "Firstly, we should look at the
04:11:27  25 elements that are only present in Mino, and therefore
```

## 168

```
04:11:30  1  are not the original work of the Tetris Company."  Do
04:11:32  2  you see that?
04:11:34  3      MS. MAITRA:  I'm sorry, I don't.  Page 2?
04:11:39  4      MS. CENDALI:  Page 2 of the -- it's on Page 3
04:11:42  5  of the actual document, Page 2 of the writing.  Here.
04:11:53  6      MS. MAITRA:  I got it.
04:11:56  7      MS. CENDALI:  Q.  And then underneath that, it
04:11:57  8  says, "One, Stealth/slow button:  This button feature is
04:12:03  9  not present in any of the Tetris Company's works."  Do
04:12:06  10 you see that?
04:12:06  11     A.  I do see that.
04:12:07  12     Q.  What are you referring to when you wrote "the
04:12:10  13 Tetris Company's works"?
04:12:13  14     A.  I was referring, I believe, to my knowledge of
04:12:17  15 the works on the part of the Tetris Company.
04:12:20  16     Q.  And what -- did you do anything to come to
04:12:26  17 the conclusion that you wrote in this memo that this
04:12:29  18 button feature is not present in any of the Tetris
04:12:31  19 Company's works?
04:12:34  20     A.  Yes.  I think that I looked at a screenshot of
04:12:39  21 the gameplay in the EA Tetris that I, at that point,
04:12:42  22 believed was licensed from the Tetris Company to see if
04:12:46  23 there was a slow button, and I didn't see that slow
04:12:51  24 button there.
04:12:52  25     Q.  You wrote "in any of the Tetris Company's
```

MICHAEL CARTER - 30(b)6 - 1/31/2011

## 181

| | |
|---|---|
| 04:30:29 | 1 texture which we would then load up and display on the |
| 04:30:32 | 2 iPhone when the game started. |
| 04:30:33 | 3 Q. And that's all what you think copyright |
| 04:30:35 | 4 applies to of my client's works; is that right? |
| 04:30:38 | 5 MS. MAITRA: Objection; mischaracterizes |
| 04:30:40 | 6 testimony. |
| 04:30:40 | 7 THE WITNESS: So I'm speaking, I think, to -- |
| 04:30:46 | 8 MS. CENDALI: Q. I'm trying to understand |
| 04:30:47 | 9 when you wrote, "The small bit of copyright law that |
| 04:30:50 | 10 does apply is solely to protect the graphical features |
| 04:30:54 | 11 used on individual elements in Mino." So what were you |
| 04:30:57 | 12 thinking was protected by copyright? |
| 04:30:58 | 13 A. So -- |
| 04:31:00 | 14 MS. MAITRA: Objection; asked and answered. |
| 04:31:01 | 15 THE WITNESS: My understanding of what was |
| 04:31:03 | 16 protected by copyright included the graphical textures. |
| 04:31:09 | 17 That is to say, when Xio Interactive produced a |
| 04:31:15 | 18 graphical texture, that that exact sequence was our |
| 04:31:20 | 19 sequence that we built, and we owned, and it was |
| 04:31:24 | 20 different than the graphical sequence that the Tetris |
| 04:31:27 | 21 Company built for their game, and the two were |
| 04:31:31 | 22 discernibly different. |
| 04:31:32 | 23 And so copyright law applied to that where we |
| 04:31:36 | 24 couldn't take an exact copy of the texture files and we |
| 04:31:40 | 25 couldn't copy them onto a disk and then put them into |

## 182

| | |
|---|---|
| 04:31:42 | 1 our game, that we had to build our own unique graphical |
| 04:31:45 | 2 textures, and that's what we did. |
| 04:31:49 | 3 Q. Okay. Suppose the Walt |
| 04:31:49 | 4 Disney Company made a video game featuring Mickey Mouse. |
| 04:31:54 | 5 Do you believe that you could take that image of Mickey |
| 04:31:57 | 6 Mouse and change the texture of Mickey Mouse's pants, |
| 04:32:02 | 7 and that that would not be copyright infringement? |
| 04:32:06 | 8 MS. MAITRA: Objection; incomplete |
| 04:32:08 | 9 hypothetical; and mischaracterizes testimony. |
| 04:32:14 | 10 THE WITNESS: So it's really hard for me to |
| 04:32:17 | 11 speak to these sorts of descriptions without having some |
| 04:32:21 | 12 example in front of me. You know, I don't know what |
| 04:32:23 | 13 exactly the extent of the change you're talking about |
| 04:32:31 | 14 is. |
| 04:32:31 | 15 MS. CENDALI: Q. You never heard of Mickey |
| 04:32:32 | 16 Mouse? |
| 04:32:32 | 17 MS. MAITRA: Objection; mischaracterizes |
| 04:32:33 | 18 testimony. |
| 04:32:33 | 19 THE WITNESS: So that's not true. I have |
| 04:32:34 | 20 heard of Mickey Mouse. |
| 04:32:36 | 21 MS. CENDALI: Q. Okay. Mickey Mouse, same |
| 04:32:40 | 22 image, different graphical textures, do you believe that |
| 04:32:43 | 23 Mino could reproduce an image of Mickey Mouse with its |
| 04:32:48 | 24 own graphical image files without infringing on the Walt |
| 04:32:53 | 25 Disney Company's copyrights? |

## 183

| | |
|---|---|
| 04:32:56 | 1 MS. MAITRA: Objection; incomplete |
| 04:32:57 | 2 hypothetical. |
| 04:32:58 | 3 THE WITNESS: You know, I -- |
| 04:33:01 | 4 MS. MAITRA: And, sorry, and calls for a legal |
| 04:33:03 | 5 conclusion. |
| 04:33:03 | 6 THE WITNESS: So I don't know what the |
| 04:33:08 | 7 legalities of that would be. I'm not a lawyer, and it's |
| 04:33:13 | 8 also really hard for me to speak to hypotheticals where |
| 04:33:16 | 9 there is no example put in front of me. |
| 04:33:19 | 10 I think that this is the sort of thing that's |
| 04:33:23 | 11 very complex, and that lawyers and judges spend a long |
| 04:33:27 | 12 time with examples in front of them to determine, and |
| 04:33:29 | 13 it's a very fine line, and I don't think I can answer |
| 04:33:32 | 14 your question with this hypothetical imagining of what |
| 04:33:34 | 15 you're saying because I don't really know what you mean |
| 04:33:37 | 16 without seeing an example. So if you want to put an |
| 04:33:40 | 17 example in front of me, you know, I can talk to my |
| 04:33:43 | 18 understanding of copyright law given that I'm not a |
| 04:33:47 | 19 lawyer and as it applies to that example. |
| 04:33:50 | 20 MS. CENDALI: Q. So, basically, Xio's |
| 04:33:51 | 21 position is that you know enough about copyright law to |
| 04:33:56 | 22 try to justify that you're not intentional infringers, |
| 04:33:59 | 23 but not so much about copyright law that you can answer |
| 04:34:03 | 24 a question; is that right? |
| 04:34:04 | 25 MS. MAITRA: Objection; mischaracterizes |

## 184

| | |
|---|---|
| 04:34:07 | 1 testimony; and calls for a legal conclusion. |
| 04:34:11 | 2 MS. CENDALI: Q. That's true, isn't it? |
| 04:34:13 | 3 MS. MAITRA: Same objections. |
| 04:34:14 | 4 THE WITNESS: I don't think that's what I |
| 04:34:15 | 5 said. I think what I said was that copyright law is a |
| 04:34:20 | 6 complex thing. |
| 04:34:21 | 7 MS. CENDALI: Q. Right. And is it something |
| 04:34:24 | 8 that a lawyer should study? |
| 04:34:25 | 9 MS. MAITRA: Objection; vague. |
| 04:34:28 | 10 THE WITNESS: I don't know. I think some |
| 04:34:31 | 11 lawyers should study it. |
| 04:34:36 | 12 MS. CENDALI: Q. You believed, prior to |
| 04:34:37 | 13 releasing Mino, that copyright was a complex field of |
| 04:34:41 | 14 law; isn't that true? |
| 04:34:44 | 15 A. I probably believed that. |
| 04:34:46 | 16 Q. And you knew you weren't a lawyer, right? |
| 04:34:50 | 17 A. I knew that I wasn't a lawyer. |
| 04:34:52 | 18 Q. And nobody working on Mino was a lawyer, |
| 04:34:56 | 19 correct? |
| 04:34:57 | 20 A. I believe that's correct. |
| 04:34:57 | 21 Q. And Mino didn't have an in-house lawyer, |
| 04:35:00 | 22 right? |
| 04:35:02 | 23 A. I don't think that Xio employed a lawyer |
| 04:35:04 | 24 in-house. |
| 04:35:05 | 25 Q. And Xio did not obtain an opinion letter from |

MICHAEL CARTER - 30(b)6 - 1/31/2011

## 185

| | |
|---|---|
| 04:35:08 | 1 | a lawyer saying that it could release Mino without |
| 04:35:11 | 2 | violating the copyrights of my client's works; isn't |
| 04:35:16 | 3 | that true? |
| 04:35:17 | 4 | A. I don't recall an opinion letter. |
| 04:35:19 | 5 | Q. So now, let's keep looking at this document |
| 04:35:22 | 6 | under where it says "Copyright." Do you see that? |
| 04:35:26 | 7 | A. Yes. |
| 04:35:26 | 8 | Q. And this is you writing, "Copyright." You |
| 04:35:29 | 9 | wrote, "The Tetris Company has no relevant copyright |
| 04:35:33 | 10 | protection that would prevent us from producing and |
| 04:35:36 | 11 | selling Mino." Do you see that? |
| 04:35:37 | 12 | A. I see that. |
| 04:35:39 | 13 | Q. And that was in your opinion; is that right? |
| 04:35:41 | 14 | A. That's correct. |
| 04:35:42 | 15 | Q. Okay. Were you aware of the decision of the |
| 04:35:50 | 16 | Customs office with regard to the protectability of the |
| 04:35:58 | 17 | Tetris Company's works? |
| 04:36:00 | 18 | MS. MAITRA: And just to be clear, you're |
| 04:36:01 | 19 | asking whether Xio or whether -- |
| 04:36:04 | 20 | MS. CENDALI: Q. I'm asking whether Xio, |
| 04:36:06 | 21 | prior to launching Mino, was aware of the decision of |
| 04:36:12 | 22 | the Customs Department, in particular Judge Stump, with |
| 04:36:19 | 23 | regard to the protectability of the Tetris Company's |
| 04:36:25 | 24 | copyrights. |
| 04:36:27 | 25 | A. At the time we looked at a whole range of |

## 186

| | |
|---|---|
| 04:36:29 | 1 | legal decisions and articles, and, you know, I remember |
| 04:36:32 | 2 | reading a lot of different documents, and I don't |
| 04:36:34 | 3 | remember being intimately familiar with that at the |
| 04:36:37 | 4 | time. I do remember that it may have come up, and I |
| 04:36:42 | 5 | glanced through it. I think I've since become more |
| 04:36:45 | 6 | familiar with that since this lawsuit, but -- |
| 04:36:48 | 7 | Q. Are you -- |
| 04:36:48 | 8 | MS. MAITRA: So you're talking on behalf of |
| 04:36:50 | 9 | Xio now, not just you, Michael Carter. Okay? |
| 04:36:53 | 10 | THE WITNESS: So Xio Interactive may have been |
| 04:36:56 | 11 | peripherally aware of that decision. |
| 04:36:59 | 12 | MS. CENDALI: Q. Isn't it true that Xio |
| 04:37:00 | 13 | Interactive -- isn't it true that Xio Interactive's CEO, |
| 04:37:10 | 14 | Desiree Golen, had your sister do a memo about |
| 04:37:19 | 15 | copyrightability of computer games? |
| 04:37:22 | 16 | A. You know, I don't know that she had her do a |
| 04:37:25 | 17 | memo necessarily. I think that she asked her to |
| 04:37:27 | 18 | look into IP law as it relates to video games and as it |
| 04:37:34 | 19 | might apply to Xio Interactive. |
| 04:37:36 | 20 | Q. And isn't it true that your sister wrote a |
| 04:37:40 | 21 | memo that was provided to Xio Interactive that, among |
| 04:37:45 | 22 | other things, discussed the Customs House -- the |
| 04:37:50 | 23 | Customs Department decision? |
| 04:37:52 | 24 | A. I believe that she wrote a memo, and I'd have |
| 04:37:55 | 25 | to see me again to confirm that, but it's |

## 187

| | |
|---|---|
| 04:37:59 | 1 | possible, and, you know, I do remember that the memo |
| 04:38:04 | 2 | wasn't used in our legal analysis. I personally -- you |
| 04:38:09 | 3 | know, I wrote this legal analysis on behalf of Xio |
| 04:38:12 | 4 | Interactive, and at the time I don't remember seeing |
| 04:38:16 | 5 | that memo. |
| 04:38:18 | 6 | Q. Isn't it true Xio had in its possession |
| 04:38:27 | 7 | Exhibit 18, this copy of the Customs Department |
| 04:38:36 | 8 | decision? |
| 04:38:38 | 9 | (Whereupon, Deposition Exhibit 18 was |
| 04:38:36 | 10 | marked for identification.) |
| 04:38:43 | 11 | THE WITNESS: So it does look like, according |
| 04:38:44 | 12 | to this document, that Desiree had a copy of this |
| 04:38:47 | 13 | Customs decision. |
| 04:38:48 | 14 | MS. CENDALI: Q. Right. And so Xio had a |
| 04:38:51 | 15 | copy of the Customs House decision; isn't that true? |
| 04:38:54 | 16 | A. Yes, I think what I said was that Desiree |
| 04:38:57 | 17 | Golen, on her desktop, had a copy of this Customs |
| 04:39:02 | 18 | letter. |
| 04:39:03 | 19 | Q. And isn't it true that Desiree Golen, CEO of |
| 04:39:07 | 20 | Xio, was discussing this decision with other developers |
| 04:39:13 | 21 | of Tetris-like games? |
| 04:39:21 | 22 | MS. MAITRA: Objection; vague. |
| 04:39:22 | 23 | THE WITNESS: You know, I'm not sure what you |
| 04:39:24 | 24 | mean by that. I'm not sure which other developers |
| 04:39:28 | 25 | you're talking about and which other games you're |

## 188

| | |
|---|---|
| 04:39:31 | 1 | talking about. |
| 04:39:32 | 2 | MS. CENDALI: Q. Are you aware that she was |
| 04:39:33 | 3 | discussing this decision with Todd Bilsborrow? |
| 04:39:43 | 4 | A. I'm aware that she had discussions with Todd |
| 04:39:46 | 5 | about his situation. |
| 04:39:48 | 6 | Q. And isn't it true that you were also aware |
| 04:39:54 | 7 | that -- and discussed with Ms. Golen whether she should |
| 04:39:58 | 8 | write to Mr. Cormier, the lawyer who represented the |
| 04:40:02 | 9 | entities opposite the Tetris Company in this decision |
| 04:40:07 | 10 | of the Customs Department? |
| 04:40:12 | 11 | A. I don't know that that's true. I think when |
| 04:40:15 | 12 | you -- when you mention it, I think that Desiree may |
| 04:40:21 | 13 | have been considering writing to Mr. Cormier, and, you |
| 04:40:24 | 14 | know, I don't know exactly why. I don't think I was a |
| 04:40:29 | 15 | big part of that decision. I think she may have at the |
| 04:40:33 | 16 | time -- you know, she could have mentioned the different |
| 04:40:35 | 17 | things she was working on and talking about and said |
| 04:40:38 | 18 | she was going to contact this person, I don't know. |
| 04:40:41 | 19 | Q. So you wrote in your memo that, "The Tetris |
| 04:40:44 | 20 | Company has no relevant copyright protection that would |
| 04:40:49 | 21 | prevent us from producing and selling Mino," right? |
| 04:40:52 | 22 | A. That is correct. |
| 04:40:53 | 23 | Q. And you wrote that despite the fact that Xio |
| 04:40:56 | 24 | knew that there was a Customs Department decision that |
| 04:41:02 | 25 | discussed at length the protectable, copyrightable |

# Exhibit 06

## to the Declaration of Johanna Schmitt, Esq. in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment

# Copyright
## United States Copyright Office

Database Name: Copyright Catalog (1978 to present)
: Simple Search = tetris company
:



### Labeled View

*Kids Tetris.*

| | |
|---|---|
| **Type of Work:** | Entry Not Found |
| **Registration Number / Date:** | PA0001333348 / 2006-06-14 |
| **Title:** | Kids Tetris. |
| **Description:** | Videogame. |
| **Copyright Claimant:** | Tetris Holding, LLC |
| **Date of Creation:** | 1996 |
| **Date of Publication:** | Approx. 1Jan97 |
| **Authorship on Application:** | audio-visual work: Blue Planet Software, Inc., & the Tetris Company, LLC, employer for hires for hire. |
| **Previous Registration:** | Prior versions of video game preexisting. |
| **Basis of Claim:** | New Matter: new version including new graphics and music. |
| **Copyright Note:** | Cataloged from appl. only. |
| **Names:** | Tetris Holding, LLC |
| | Blue Planet Software, Inc. |
| | Tetris Company, LLC |

| **Record Options** | | |
|---|---|---|
| Select Download Format: | 6 | Format for Print/Save |
| Enter your email address: | | Email |
| Save results for later: | Save To Bookbag | |

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright |
Copyright Office Home Page | Library of Congress Home Page

# Exhibit 07

## to the Declaration of Johanna Schmitt, Esq. in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment

Copyright does not protect the idea for a game, its name or title, or the method or methods for playing it. Nor does copyright protect any idea, system, method, device, or trademark material involved in developing, merchandising, or playing a game. Once a game has been made public, nothing in the copyright law prevents others from developing another game based on similar principles. Copyright protects only the particular manner of an author's expression in literary, artistic, or musical form.

Material prepared in connection with a game may be subject to copyright if it contains a sufficient amount of literary or pictorial expression. For example, the text matter describing the rules of the game or the pictorial matter appearing on the gameboard or container may be registrable.

If your game includes any written element, such as instructions or directions, the Copyright Office recommends that you apply to register it as a literary work. Doing so will allow you to register all copyrightable parts of the game, including any pictorial elements. When the copyrightable elements of the game consist predominantly of pictorial matter, you should apply to register it as a work of the visual arts.

The deposit requirements will vary, depending on whether the work has been published at the time of registration. If the game is *published*, the proper deposit is one complete copy of the work. If, however, the game is published in a box larger than 12" x 24" x 6" (or a total of 1,728 cubic inches) then identifying material must be submitted in lieu of the entire game. (See "identifying material" below.) If the game is published and contains fewer than three threedimensional elements, then identifying material for those parts must be submitted in lieu of those parts. If the game is *unpublished,* either one copy of the game or identifying material should be deposited.

*Identifying material* deposited to represent the game or its three-dimensional parts usually consists of photographs, photostats, slides, drawings, or other two-dimensional representations of the work. The identifying material should include as many pieces as necessary to show the entire copyrightable content of the work, including the copyright notice if it appears on the work. All pieces of identifying material other than transparencies must be no less than 3" x 3" in size, and not more than 9" x 12", but preferably 8" x 10". At least one piece of identifying material must, on its front, back, or mount, indicate the title of the work and an exact measurement of one or more dimensions of the work.

FL-108, Reviewed November 2010

---

U.S. Copyright Office
101 Independence Ave. S.E.
Washington, D.C. 20559-6000
(202) 707-3000

Revised: 22-Dec-2010

[+]
FEEDBACK

# Exhibit 08

## to the Declaration of Johanna Schmitt, Esq. in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
---oOo---
TETRIS HOLDING, LLC and THE        )
TETRIS COMPANY, LLC,               )
                                   )
        Plaintiffs and             )
    Counterclaim-Defendants,       )
                                   )
    vs.                            ) Civil Action No.
                                   ) 3:09-CV-6115(FLW)(DEA)
XIO INTERACTIVE INC.,              )
                                   )
        Defendant and              )
    Counterclaim-Plaintiff.        )
_____)

VIDEOTAPED DEPOSITION OF

DESIREE GOLEN

January 28, 2011

REPORTED BY:
JULIE ANNE ZEIGLER, RPR, CSR 9750        JOB #432442

---

**2**

1                        I N D E X
2              INDEX OF EXAMINATIONS
3                                           Page
4    EXAMINATION BY
5    MS. CENDALI                              10
6
7           EXHIBITS MARKED FOR IDENTIFICATION
8    No.        Description                  Page
9    Exhibit 1  E-mail from Desiree Golen to   29
               Thomas Golen dated October 6, 2008.
10             Subject:  IPhone app.
               Bates stamped XIO-DG 927 - 931.
11
12   Exhibit 2  E-mail from Thomas Golen to Desiree  63
               Golen dated October 7, 2008.
13             Subject: iPhone app.  Bates stamped
               XIO-DG 200021.
14   Exhibit 88  WordWeb Online dictionary definition  70
                for "look like."
15
16   Exhibit 3  E-mail from Desiree Golen to Kathryn  78
               Flynn dated October 6, 2008.
17             Subject: iPhone app.  Bates stamped
               XIO-DG 200016 - 200019.
18   Exhibit 4  Document entitled "Securities     88
               Register."
19
20   Exhibit 5  Document entitled "Startup Expenses." 91
               Bates stamped XIO-DG 932.
21   Exhibit 6  Document entitled "Sheet 1" dated  121
               10/18/08 from Desiree Golen's desktop.
22             Bates stamped XIO-HD 1449.
23   Exhibit 7  E-mail from Desiree Golen to     124
               licensing@tetris.com dated October 18,
24             2008. Subject:  Tetris Licensing
               Packages.  Bates stamped XIO-DG 1194.
25

---

**3**

1           EXHIBITS MARKED FOR IDENTIFICATION CONTINUED
2    No.        Description                  Page
3    Exhibit 8  E-mail from Desiree Golen to Michael  130
               Carter dated October 20, 2008.
4              Subject: Tetris Licensing Packages.
               Bates stamped XIO-DG 1220 - 1221.
5
6    Exhibit 9  E-mail from Desiree Golen to Maura  131
               Carter dated October 23, 2008.
7              Subject: Tetris Licensing Packages.
               Bates stamped XIO-DG 1297 - 1298.
8    Exhibit 10  E-mail from Desiree Golen to     132
                mauracarter@gmail.com dated October
9               22, 2008. Subject: iPhone Phun!
                Bates stamped XIO-DG 1272.
10
     Exhibit 11  Document with the file name "Business  135
11               Plan."  Bates stamped XIO-HD 34.
12   Exhibit 12  Initial Disclosures of Defendant  145
                Xio Interactive, Inc.
13
     Exhibit 13  E-mail from Michael Carter to    147
14               Martin Hunt dated November 15, 2008.
                Subject:  Go see Mike Jurewitz
15               present about iPhone dev.
                Bates stamped XIO-MH 7567.
16
17   Exhibit 14  E-mail from Desiree Golen to     150
                Michael Carter dated November 20,
18              2008.  Subject: Haha Tetris Article.
                Bates stamped XIO-DG 20062.
19   Exhibit 15  E-mail from Michael Carter to    152
                Martin Hunt, cc'd Desiree Golen
20              dated November 22, 2008. Subject:
                Open GL.  Bates stamped XIO-MC
21              19056 - 19057.
22   Exhibit 16  E-mail from Michael Carter to    154
                xiointeractive@googlegroups.com
23              dated December 28, 2008. Subject:
                Feature: Multiplayer room size?
24              Bates stamped XIO-XI 8 - 9.
25

---

**4**

1           EXHIBITS MARKED FOR IDENTIFICATION CONTINUED
2    No.        Description                  Page
3    Exhibit 17  E-mail from Desiree Golen to Richard  164
                Lewis dated January 12, 2009.
4               Subject: Greetings!  Bates stamped
                XIO-DG 3936.
5
6    Exhibit 18  E-mail from Martin to Xio        167
                Interactive dated January 19, 2009.
7               Subject: Menu Screen.  Bates
                stamped XIO-XI 20 - 22.
8    Exhibit 19  E-mail from Desiree to Xio       175
                Interactive dated January 6, 2009.
9               Subject: Music.  Bates stamped
                XIO-XI 12.
10
     Exhibit 20  E-mail from Martin Hunt to       179
11               xiointeractive@googlegroups.com
                dated January 25, 2009. Subject:
12              User Input Feedback.  Bates
                stamped XIO-XI 25 - 26.
13
     Exhibit 21  E-mail from Martin Hunt to       180
14               xiointeractive@googlegroups.com
                dated February 3, 2009. Subject:
15              Multiplayer features: back to back
                line clearing bonuses.  Bates
16              stamped XIO-XI 33.
17   Exhibit 22  E-mail from Desiree Golen to     182
                xiointeractive@googlegroups.com
18              dated February 11, 2009.  Subject:
                glacier tiles.  Bates stamped
19              XIO-XI 83.
20   Exhibit 23  E-mail from Jacob Rus to         184
                xiointeractive@googlegroups.com
21              dated February 11, 2009.  Subject:
                Nightmare Mode.  Bates stamped
22              XIO-XI 91.
     Exhibit 24  E-mail from Mario Balibrera to   185
23              xiointeractive@googleroupls.com
                dated February 12, 2009.  Subject:
24              Nightmare Mode.  Bates stamped
                XIO-XI 99 - 100.
25

DESIREE GOLEN - 1/28/2011

## 257

```
06:34:16   1    Q. Let's look at Exhibit 40.
06:34:18   2       (Whereupon, Deposition Exhibit 40 was
06:34:18   3    marked for identification.)
06:34:20   4       MS. CENDALI:  Q. Is this a draft or a letter
06:34:22   5    that you wrote to a Mr. Cormier, who is a lawyer for the
06:34:29   6    entity that the Customs office deemed was infringing my
06:34:35   7    client's copyrights to the Tetris game?
06:34:39   8    A. This is a letter to Mr. Cormier, Esquire.
06:34:48   9    Q. And you understood that he was the lawyer who
06:34:49   10   was representing the party adverse to the Tetris
06:34:53   11   Company in the Customs decision, right?
06:34:56   12   A. I think I understood that at the time.
06:34:58   13   Q. Right.  And did you ever send this letter?
06:35:04   14   A. I don't know.  I'd have to check my sent
06:35:08   15   folders in Gmail.
06:35:09   16   Q. Would that indicate to you whether you've
06:35:11   17   actually sent this or not?
06:35:13   18   A. Yes.
06:35:14   19   Q. All right.  Put a note in the record and ask
06:35:17   20   you to do that.
06:35:19   21       Did you ever get any response from
06:35:20   22   Mr. Cormier?
06:35:24   23   A. I don't remember if I sent it, and I don't
06:35:25   24   remember if I got a response.
06:35:27   25   Q. Do you remember ever speaking to Mr. Cormier?
```

## 258

```
06:35:30   1    A. I don't recall speaking to him.
06:35:34   2    Q. On the second page of the letter to
06:35:35   3    Mr. Cormier, you wrote in a paragraph that starts,
06:35:39   4    "Furthermore," and you talk about Reback's victory in
06:35:44   5    Borland versus Lotus.  Do you see that?
06:35:48   6    A. Um-hum.
06:35:49   7    Q. And then you go on to state at the bottom of
06:35:51   8    that paragraph, "If this extends to the operation and
06:35:54   9    mechanics of a tetromino game, this standard should
06:35:56   10   allow software developers to create original 'clones'
06:36:02   11   of copyrighted software products without infringing the
06:36:06   12   copyright."  Do you see that?
06:36:09   13   A. Um-hum.
06:36:11   14   Q. When you refer to "clones of copyrighted
06:36:14   15   software," what were you referring to?
06:36:16   16   A. So the sentence right before it says, "If this
06:36:18   17   extends to the operation and mechanics of a tetromino
06:36:22   18   game."  So I believe I was referring to producing a
06:36:25   19   tetromino game with similar operation and mechanics.
06:36:36   20   Q. When you -- were you referring to your
06:36:38   21   proposed game that became Mino as a clone of Tetris?
06:36:46   22   A. I don't -- I don't mention Mino in this
06:36:49   23   sentence.  I wouldn't call Mino a clone.  I would call
06:36:53   24   it a tetromino game.
06:36:58   25   Q. You go on to state -- so let me also show you
```

## 259

```
06:37:10   1    Exhibit 41 to Mr. Reback, the lawyer -- one of the
06:37:19   2    lawyers involved in Lotus v. Borland.
06:37:22   3       (Whereupon, Deposition Exhibit 41 was
06:37:22   4    marked for identification.)
06:37:22   5       MS. CENDALI:  Q. Did you ever send that
06:37:23   6    e-mail?
06:37:24   7    A. I'm not really sure.  Like I said, I sent and
06:37:26   8    drafted a lot of e-mails, so I would have to check
06:37:29   9    specifically.
06:37:30   10   Q. I ask you to do so.
06:37:32   11       And did you ever speak to Mr. Reback?
06:37:35   12   A. I don't believe I spoke to Mr. Reback.
06:37:38   13   Q. And let's look at Exhibit 38.
06:37:42   14       (Whereupon, Deposition Exhibit 38 was
06:37:42   15   marked for identification.)
06:37:43   16       MS. CENDALI:  Q. Is this the copy of the
06:37:45   17   Customs decision that we were talking about that was
06:37:47   18   sent to you by Mr. Bilsborrow?
06:37:53   19       MS. MAITRA:  Bilsborrow, I think.
06:37:55   20       MS. CENDALI:  Thank you.
06:38:12   21       THE WITNESS:  This looks like the case.
06:38:14   22   Again, I haven't read it in a long time.
06:38:17   23       MS. CENDALI:  Q. Well, turning to Page 3 of
06:38:20   24   the exhibit, second page of the opinion, the third page
06:38:28   25   of the opinion itself, at the bottom of the page there's
```

## 260

```
06:38:31   1    a paragraph that starts, "Video games."  It says, "Video
06:38:37   2    games, unlike an artist's painting."  Do you see what
06:38:40   3    I'm referring to?
06:38:41   4    A. Um-hum.
06:38:41   5    Q. "Unlike an artist's painting or even other
06:38:45   6    audiovisual works, appeal to an audience that is fairly
06:38:47   7    undiscriminating insofar as their concern about more
06:38:52   8    subtle differences in artistic expression.  The main
06:38:56   9    attraction of such games lies in the stimulation
06:38:59   10   provided by the intensity of the competition.  A person
06:39:03   11   who is entranced by the play of a game would be
06:39:05   12   disposed to overlook many of the minor differences in
06:39:08   13   detail and regard their aesthetic appeal as the same."
06:39:13   14   Do you see that?
06:39:13   15   A. Um-hum.
06:39:14   16   Q. Do you agree with that?
06:39:14   17   A. That's a really, really jam-packed few
06:39:19   18   sentences.  I'm not even sure -- which part of it
06:39:28   19   exactly?  There's, I think, three, four -- there's
06:39:31   20   probably, like, five statements there.
06:39:33   21   Q. Well, the statement, "The main attraction of
06:39:35   22   such games lies in the stimulation provided by the
06:39:38   23   intensity of the competition.  A person who is
06:39:42   24   entranced by the play of the game would be disposed to
06:39:46   25   overlook many of the minor differences in detail and
```

# Exhibit 09

## to the Declaration of Johanna Schmitt, Esq. in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment

# In The Matter Of:

## *TETRIS HOLDING, LLC, ET AL.*
## *v.*
## *XIO INTERACTIVE INC.*

_____

## *DESIREE  GOLEN - Vol. 2*
### *February 10, 2011*

_____

**MERRILL CORPORATION**

**LegaLink, Inc.**

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

DESIREE GOLEN - 2/10/2011

| Time | Line | Text |
|---|---|---|
| 11:12:40 | 1 | THE VIDEOGRAPHER: Please proceed. |
| 11:12:43 | 2 | EXAMINATION BY MS. SCHMITT |
| 11:12:48 | 3 | MS. SCHMITT: Q. Thank you. I'd like to mark |
| 11:12:48 | 4 | as -- I'd like to introduce Exhibit 101. |
| 11:12:55 | 5 | (Whereupon, Deposition Exhibit 101 was |
| 11:12:59 | 6 | marked for identification.) |
| 11:12:59 | 7 | MS. SCHMITT: Q. Ms. Golen, have you seen |
| 11:13:03 | 8 | this document before? |
| 11:13:05 | 9 | A. I believe I have. |
| 11:13:09 | 10 | Q. And your counsel has represented to us that |
| 11:13:44 | 11 | you are verifying these interrogatory responses. Do |
| 11:13:53 | 12 | you understand that? |
| 11:13:58 | 13 | A. Yes. |
| 11:15:02 | 14 | Q. Can you turn to the response to interrogatory |
| 11:15:08 | 15 | number nine, which -- these pages aren't numbered, |
| 11:15:35 | 16 | but -- the first bullet point in that response says |
| 11:15:41 | 17 | Maura Carter. Do you see that? |
| 11:15:45 | 18 | A. I do. |
| 11:15:46 | 19 | Q. So this -- who is Paula Kasler? |
| 11:15:50 | 20 | A. Paula Kasler is an attorney that I met at a -- |
| 11:15:56 | 21 | kind of like a networking event in Palo Alto. |
| 11:15:58 | 22 | Q. When did you meet her? |
| 11:16:00 | 23 | A. I don't remember exactly. It was probably |
| 11:16:07 | 24 | either in 2008 or 2009, yeah. |
| 11:16:10 | 25 | Q. And when's the last time you had contact with |
| | | 319 |

| Time | Line | Text |
|---|---|---|
| | 1 | her? |
| | 2 | A. The last time I had contact with her was via |
| | 3 | e-mail sometime, I think, in 2009. She introduced me to |
| | 4 | a friend of hers who was a game designer. |
| | 5 | Q. Who was that? |
| | 6 | A. I don't exactly remember his full name. I |
| | 7 | think his -- Bernard. I think it was Bernard. |
| | 8 | Q. Bernard Schmalzried? |
| | 9 | A. Yes. |
| | 10 | Q. Okay. |
| | 11 | Julie, that's S-C-H-M-A-L-Z-R-I-E-D. |
| | 12 | And the interrogatory response provides that |
| | 13 | Xio communicated with Paula Kasler regarding the |
| | 14 | intellectual property rights of video games and |
| | 15 | Tetrimino games; is that correct? |
| | 16 | A. Yes. So at this networking event, it was just |
| | 17 | a lot of lawyers, and they were talking about what they |
| | 18 | were interested in, and I was talking a little bit about |
| | 19 | the fact that we were making a Tetrimino game. And I |
| | 20 | think I probably brought up that there were a few other |
| | 21 | Tetrimino game developers who had received cease and |
| | 22 | desist letters from the Tetris Company. So I don't |
| | 23 | exactly remember everything that we talked about, but I |
| | 24 | think I probably mentioned -- talked a little bit about |
| | 25 | intellectual property rights of video games. |
| | | 320 |

| Time | Line | Text |
|---|---|---|
| 11:15:07 | 1 | Q. And what did you talk about -- what did you |
| 11:15:09 | 2 | say about the intellectual property rights of video |
| 11:15:55 | 3 | games? |
| 11:15:58 | 4 | A. I don't remember. Again, it was, like, about |
| 11:15:58 | 5 | two years ago. So, in general, what I do remember is we |
| 11:16:05 | 6 | talked about them, that that subject was brought up. I |
| 11:16:08 | 7 | don't remember the specifics, though. |
| 11:16:08 | 8 | Q. And other than that networking event, did you |
| 11:16:26 | 9 | speak to Ms. Kasler about intellectual property rights |
| 11:16:26 | 10 | after that event? Or other than that event, sorry, did |
| 11:16:26 | 11 | you speak to Ms. Kasler about IT rights? |
| 11:16:29 | 12 | MS. MAITRA: Objection; vague. |
| 11:16:32 | 13 | THE WITNESS: I don't exactly know. I'm not |
| 11:16:36 | 14 | sure when all these communications happened. I know I |
| 11:16:38 | 15 | met her at this networking event, and I brought up that |
| 11:16:48 | 16 | we were making a Tetrimino game. And then mostly |
| 11:16:54 | 17 | likely -- I think we were in a group of people -- we |
| 11:16:58 | 18 | might have talked about video games, intellectual |
| 11:16:55 | 19 | property rights. I think, like I said, she sent me an |
| 11:16:57 | 20 | e-mail introduction to someone else. So she might have |
| 11:16:08 | 21 | asked for like a status of where we were, and I'm not |
| 11:16:00 | 22 | sure exactly what I -- any of our communications beyond |
| 11:16:04 | 23 | that. |
| 11:16:58 | 24 | MS. SCHMITT: Q. Okay. So other than the |
| 11:16:57 | 25 | e-mail that you referenced and then this networking |
| | | 321 |

| Time | Line | Text |
|---|---|---|
| | 1 | event, you can't recall any other communications with |
| | 2 | her? |
| | 3 | A. Yeah, to the best of my knowledge, I can't |
| | 4 | recall anything else. |
| | 5 | Q. And the networking event was an affair with |
| | 6 | many people in attendance? |
| | 7 | MS. MAITRA: Objection; vague. |
| | 8 | THE WITNESS: Yes, it was a -- it was just, I |
| | 9 | think, a firm's opening party. They were launching, and |
| | 10 | I was invited. |
| | 11 | MS. SCHMITT: Q. Okay. And how long did you |
| | 12 | speak to Ms. Kasler at that event? |
| | 13 | A. I don't recall exactly. We talked about other |
| | 14 | things; her daughter and, you know, I think education. |
| | 15 | So I'd say maybe an hour or so. |
| | 16 | Q. Did Ms. Kasler work for a law firm? |
| | 17 | A. I believe she did. |
| | 18 | Q. What was the name of her law firm? |
| | 19 | A. I don't recall. |
| | 20 | Q. And did you retain Ms. Kasler? |
| | 21 | A. No. |
| | 22 | Q. And did you show her the Mino game? |
| | 23 | A. No, I don't believe we did. I don't think at |
| | 24 | that time we even had a Mino game. |
| | 25 | Q. Did you show her any prototype of a Mino |
| | | 322 |

Pages 319 to 322

DESIREE  GOLEN - 2/10/2011

| | | | |
|---|---|---|---|
| 11:19:39 | 1 | game? | |

11:19:39  1  game?
11:19:37  2      A.  I don't believe so.  I don't remember what I
11:19:28  3  brought with me to that networking event.  Most likely I
11:19:29  4  had a few business cards, and, you know, I didn't really
11:19:40  5  carry much around.  So I think I probably just came with
11:19:42  6  myself and conversation.
11:19:44  7      Q.  So other than maybe a business card, you
11:19:46  8  didn't show Ms. Kasler any materials; is that correct?
11:19:49  9      A.  Not that I can recall.
11:19:50 10      Q.  Okay.  Did you discuss the Customs opinion
11:19:54 11  with her?  And when I say "Customs opinion," I mean the
11:20:00 12  Customs opinion that was marked in your deposition as
11:20:05 13  Exhibit 38, which had to do with Tetris and an
11:20:08 14  infringing Tetris game.
11:20:09 15      MS. MAITRA:  So are you going to show us the
11:20:07 16  Customs decision?
11:20:09 17      MS. SCHMITT:  Sure, if you don't remember it.
11:20:19 18  Frank, please show it to them.
11:20:23 19      MR. CARLOW:  Sure.
11:20:25 20      MS. MAITRA:  Is this Exhibit 2 to this?
11:20:30 21      MS. SCHMITT:  No.  Well, this was marked as
11:20:30 22  Exhibit 38 in Ms. Golen's -- it's already been marked.
11:20:29 23  We just don't have the marked copy back.
11:20:42 24      MS. MAITRA:  Sorry, the interrogatory was
11:20:46 25  Exhibit 1?

                                                                323

 1      MR. CARLOW:  101.
 2      MS. MAITRA:  Okay.
 3      THE WITNESS:  I'm sorry, what was your
 4  question?
 5      MS. SCHMITT:  Q.  Did you discuss this Customs
 6  decision with Ms. Kasler?
 7      A.  I don't believe I did.  I don't remember when
 8  the networking event was, and I don't remember when I
 9  read this exactly, and I don't think I would have talked
10  to her about it.  She wasn't an IP attorney.  It was
11  mostly just a good person who I met.
12      Q.  Did she -- did she say that she thought your
13  game would not infringe on my client's rights in the
14  Tetris game?
15      A.  I don't believe we talked about any specific
16  questions like that.  Again, we -- I think I might have
17  mentioned that I was doing a Tetrimino game, and we
18  might have talked a little bit about video game
19  intellectual property rights, but she wasn't an IP
20  lawyer, so we talked about other things.
21      Q.  Okay.  And who is Sean DeBruine?
22      A.  Sean DeBruine is another lawyer that I met at
23  that networking event, and I found out in passing that
24  he worked on the Lotus versus Borland case.  So I got
25  really excited.  I remember I think I had read that case

                                                                324

11:20:09  1  a few nights before, and I was super excited to meet
11:20:05  2  someone on the case.
11:20:09  3      Q.  Did the Lotus v. Borland case have to do with
11:23:00  4  video games?
11:23:05  5      A.  You know, it's been a long time since I read
11:23:02  6  that case and kind of came to -- made a strong analysis
11:23:08  7  of it in my own head.  So I don't actually remember the
11:23:15  8  specifics of that case at all.  I think it was about two
11:23:19  9  years ago that I read it for the first time.
11:22:40 10      Q.  And Sean, I'm sorry DeBruine is how you
11:22:46 11  pronounce his name?
11:22:48 12      A.  I think so.
11:22:43 13      Q.  Okay.  And you met him at the same networking
11:22:43 14  event that you met Ms. Kasler?
11:23:00 15      A.  That's correct.
11:23:04 16      Q.  Okay.  And other than that networking event, did you
11:23:09 17  have any contact with Mr. DeBruine?
11:23:12 18      A.  I think we kept in contact via e-mail a few
11:23:30 19  times, and we went out to lunch another time.  And,
11:23:43 20  again, with a lot of these lawyers, they would check in
11:23:46 21  with me and ask for a status update, and, occasionally,
11:23:48 22  I would just tell them what was going on.
11:23:54 23      Q.  What -- did Mr. DeBruine work for a firm?
11:21:59 24      A.  Yeah, he worked -- he did work for a firm.  I
11:23:32 25  don't remember the name of that firm off the top of my

                                                                325

 1  head.
 2      Q.  Did you show Mr. DeBruine Mino?
 3      A.  I don't remember exactly.  I probably didn't
 4  at that first networking event because I don't think we
 5  had Mino.  And then I don't -- I don't believe I showed
 6  him Mino.  It's possible -- it's possible that I might
 7  have sent a promo code to a few of these people, but I
 8  don't -- I don't recall off the top of my head.
 9      Q.  But you don't recall showing Mr. DeBruine
10  Mino before it was launched on the iTunes Store?
11      A.  I don't remember.  I don't remember when we
12  met for lunch, and I don't remember how that kind of
13  comes into the timeline of when we launched.  And I
14  don't -- I don't specifically remember showing him Mino.
15      Q.  Did you show Mr. DeBruine any of the games
16  called Tetris?
17      A.  By "show," what exactly do you mean?
18      Q.  Sent him a video clip of gameplay, show him
19  screenshots from a game, show him an actual game on
20  your computer or his computer, something like that.
21      A.  Can you repeat the question?
22      Q.  Yeah.
23      Can you repeat the question, Julie?
24      (Record read as follows:
         Q.  Did you show Mr. DeBruine any
25      of the games called Tetris?)

                                                                326

Merrill Corporation - San Francisco

DESIREE GOLEN - 2/10/2011

| | |
|---|---|
| 11:29:31 | 1      A. By this time -- (conference room phone rings.) |
| 11:29:31 | 2         MS. MAITRA: It's not here. |
| 11:29:33 | 3         MS. SCHMITT: No, no. it's here, sorry. |
| 11:29:34 | 4 Somebody just walked in the room. |
| 11:30:26 | 5         Anyway, I'm sorry, could we -- could we -- |
| 11:30:28 | 6 could you read back my last question? It was a little |
| 11:30:46 | 7 distracting. |
| 11:30:48 | 8         (Record read as follows: |
| 11:30:52 |          Q. But it was after you had |
| 11:30:34 | 9         decided to create Mino, correct?) |
| 11:31:36 | 10      THE WITNESS: Yes, I think that's fair to say. |
| 11:31:00 | 11         MS. SCHMITT: Q. And it was before Mino was |
| 11:29:40 | 12 launched, correct? |
| 11:29:41 | 13      A. I don't know. |
| 11:29:44 | 14      **Q. Okay. Did you produce the e-mail between --** |
| 11:33:00 | 15 **the e-mail correspondence between you and Professor** |
| 11:29:53 | 16 **Samuelson?** |
| 11:29:55 | 17      A. I turned over my Google account to my lawyers |
| 11:29:17 | 18 for production. So anything related to Xio Interactive |
| 11:30:00 | 19 should have been produced. |
| 11:30:04 | 20      **Q. And did Professor Samuelson -- did you show** |
| 11:30:07 | 21 **Professor Samuelson Mino?** |
| 11:30:30 | 22      A. When you say "show," again, are you talking |
| 11:30:34 | 23 about a screenshot, a video? |
| 11:30:36 | 24      **Q. In any way, sending her screenshots, sending** |
| 11:30:32 | 25 **her videos, sending her a link, sending her a copy of** |
| 11:30:26 |                    331 |

1 the game, anything.
2      A. I don't recall exactly.
3      **Q. Did you send her any materials about Mino?**
4      A. I don't know.
5      **Q. Do you have any reason to believe you did?**
6      A. Again, I had a lot of content that I was kind
7 of juggling, and when I was reaching out to people, I
8 would send some things their way and others not. So I
9 don't know what I would have sent to whom and when and
10 why.
11      **Q. Who on this list do you recall sending images**
12 **of Mino to?**
13      MS. MAITRA: And for the record, you're
14 referring to the further supplemental response to
15 interrogatory number nine, correct?
16      MS. SCHMITT: Yes.
17      THE WITNESS: Let's see. Sorry, was that
18 screenshots of Mino?
19      MS. SCHMITT: Q. Anything. Screenshots,
20 video clips, a copy of the game, sketches of the
21 prototype. I mean any -- anything you're showing about
22 Mino, who did you send materials like that to?
23      A. So do you want to just go through the list?
24      **Q. Sure.**
25      A. Okay. So Maura Carter, I think at one point
                   332

| | |
|---|---|
| 11:33:46 | 1 she mentioned that she had downloaded Mino off the App |
| 11:33:59 | 2 Store. So I think she had a copy of Mino. I'm not sure |
| 11:33:52 | 3 about Julie Turner. I think I might have sent her a |
| 11:32:03 | 4 promo code. |
| 11:32:06 | 5      **Q. Okay. All right. What I'm interested in is** |
| 11:32:10 | 6 **before Mino was launched on the iTunes Store.** |
| 11:32:18 | 7      A. Okay. |
| 11:32:43 | 8      **Q. So if people got a copy once it was on the** |
| 11:32:49 | 9 **iTunes store, I'm not interested in that. Who did you** |
| 11:33:55 | 10 **show Mino to before it was launched?** |
| 11:32:58 | 11      A. I actually don't really remember. All this |
| 11:32:02 | 12 happened a long time ago, and I don't recall exactly. |
| 11:32:06 | 13      **Q. So is there anybody on this list that you** |
| 11:32:08 | 14 **remember sending Mino to?** |
| 11:32:08 | 15      MS. MAITRA: And objection. You mean before |
| 11:34:12 | 16 Mino was launched, correct? |
| 11:34:16 | 17      MS. SCHMITT: Correct. |
| 11:34:18 | 18      THE WITNESS: Before Mino was launched, I |
| 11:34:31 | 19 don't recall. Again, it's probably in my e-mail. It is |
| 11:34:53 | 20 in my e-mail if I sent them anything. And I remember |
| 11:34:03 | 21 reviewing my e-mails in order to write this up, but it's |
| 11:34:06 | 22 been a few weeks since I wrote this, and I don't recall |
| 11:34:10 | 23 exactly. |
| 11:34:42 | 24      MS. SCHMITT: Q. So what you're saying is you |
| 11:34:48 | 25 don't recall anyone now. If you did send any materials |
| |                    333 |

1 about Mino to these people before Mino was launched, it
2 would be reflected in your e-mails, and those would have
3 been produced to us?
4      A. I believe that's what I'm saying.
5      **Q. Who is Joshua Cook?**
6      A. Joshua Cook is another -- I think he's an
7 intellectual property lawyer. Oh, no, Joshua is a
8 corporate lawyer that I met at a networking event, and
9 he ended up introducing me to Colin D. Chapman.
10      **Q. And was this networking event the same**
11 **networking event that you met Mr. DeBruine and**
12 **Ms. Kasler?**
13      A. No.
14      **Q. When was this networking event that you met**
15 **Mr. Cook?**
16      A. I don't remember exactly. I know it was after
17 the first networking event that I met Paula and Sean. I
18 don't remember exactly when it was other than it was
19 after that one.
20      **Q. Approximately how long after?**
21      A. I have almost no idea. Maybe between one to
22 four months. Maybe more.
23      **Q. Was it -- was this networking event before**
24 **Mino was launched?**
25      A. I don't remember.
                   334

Pages 331 to 334

DESIREE GOLEN - 2/10/2011

| | |
|---|---|
| 11:34:59 | 1 |
| 11:34:52 | 2 |
| 11:34:55 | 3 |

**Q.** Other than meeting him at the networking event, did you have further communications with Mr. Cook?

**A.** Yeah, I think he put me in touch with his -- his firm's intellectual property lawyer, Colin D. Chapman, and the three of us met sometime after that initial networking event.

**Q.** And what was the firm?

**A.** It's on the tip -- I don't remember the name of the firm. If I heard it, I could probably recognize it, though.

**Q.** Did anyone at -- did you -- sorry, excuse me. Let me start again.

Did you retain Mr. Cook's firm to represent you or Xio?

**A.** We didn't sign a retainer agreement with Joshua Cook or Colin D. Chapman or their firm.

**Q.** Did anyone at that firm, including Mr. Cook and Mr. Chapman, tell you that Mino would not infringe anyone's rights before it was launched on the App Store?

**A.** I don't exactly remember what they told me specifically, but, again, I was meeting with these lawyers to solidify my understanding of copyright and video gaming and our work with Mino. So I do remember

335

that I came out with the understanding that we could produce our own game natively in-house with our own source code, music files, graphic files, and that that was perfectly legal.

**Q.** But you did not show Mr. Cook, Mr. Chapman, or anyone else at their firm any images of your work on Mino, correct?

**A.** I don't remember if I did or if I didn't. I just don't remember.

**Q.** And you didn't show Mr. Cook or Mr. Chapman or anyone else at their firm any games called Tetris; is that correct?

**A.** Again, I don't remember what I showed them specifically.

**Q.** Do you have any reason to believe that you showed them any images from a game called Tetris?

**A.** There was at one point a -- there was a screenshot. There were two images of -- if you do a Google search, I think there's a screenshot for Tris and EA's iPhone game called Tetris, and I think I might have brought that up. I don't know exactly because I remember studying that image, but that's the only thing I can think of if I did bring that up. I might have told them to reference that.

**Q.** When did -- you said you studied that image

336

you found on Google?

**A.** I think I brought it up and I looked at it, yeah.

**Q.** And when did you look at that?

**A.** I don't remember exactly. I think there's --

**Q.** Was it before the launch of -- it was before the launch of Mino?

**A.** I think so. I think it was before the launch of Mino.

**Q.** And did you show that EA Tetris screenshot to anyone on this list in interrogatory number nine?

**A.** I don't remember exactly. I just remember that was an image. I think Michael drew up a document called Tetris Company Legal Notes, or something like that, and I think he might have used that screenshot in there as well. So I know that was -- that was something that we were kind of looking at, and we might have shown people at some point. So we might not have. I just don't remember who we did and didn't, and when we actually game into possession of that.

**Q.** Can you remember showing -- okay. My question was can you remember showing anyone on this list in interrogatory number nine the screenshot from EA's Tetris game?

**A.** I don't -- I don't remember specifically, but

337

I think with Julie Turner, we -- she might have looked at that. We all had laptops. So I think she might have pulled it up on Google. I don't remember specifically.

**Q.** Did you -- did she compare the EA Tetris screenshot to any images of Mino?

**A.** I don't remember if we showed her Mino, if we had Mino at that time. All I remember is that we were talking about the game rules of certain games, and we kind of went through a certain number of game rules with these two screenshots.

**Q.** The two screenshots being Tris and EA's Tetris game?

**A.** I believe so.

**Q.** Did Ms. Turner ever -- to your knowledge, did Ms. Turner ever compare EA's Tetris game to Mino?

**A.** I'm not sure if she compared any games to Mino. I'm not -- I don't know if she had access to Mino.

**Q.** Okay. And did Ms. -- Ms. Turner was a lawyer, right?

**A.** Um-hum.

**Q.** Or is a lawyer. Did she work for a law firm?

MS. MAITRA: Objection; asked and answered.

THE WITNESS: Yes, she does.

MS. SCHMITT: Q. And did she give you --

338

Merrill Corporation - San Francisco

800-869-9132                                    www.merrillcorp.com/law

**DESIREE  GOLEN - 2/10/2011**

Page 339

1   Ms. Turner give you -- or let me start again.
2        Did Ms. Turner ever tell you before Mino was
3   launched that it would not infringe anyone's rights?
4        MS. MAITRA:  Objection; vague.
5        THE WITNESS:  Again, when I was meeting with
6   these lawyers, the purpose was to solidify my
7   understanding of copyright and video games.  I don't
8   remember specifically what she told me or what we talked
9   about.  But in, in general, I remember that I came out
10  of these meetings with the understanding that we could
11  produce a game with our own native source code, image
12  files, music files, graphic files, and that would be
13  legal.
14       MS. SCHMITT:  Q.  I don't think you answered
15  my question.
16       Julie, would you mind reading it back, please.
17       (Record read as follows:
            Q.  Did Ms. Turner ever tell you
18          before Mino was launched that it would
            not infringe anyone's rights?)
19
20       THE WITNESS:  Anyone's rights --
21       MS. MAITRA:  Sorry, same objection.
22       THE WITNESS:  Okay.  Can you read the question
23  again?
24       (Record read as follows:
            Q.  Did Ms. Turner ever tell you
25          before Mino was launched that it would
            not infringe anyone's rights?)

Page 340

1        MS. MAITRA:  Same objection.
2        THE WITNESS:  So again, I don't know
3   specifically what she told me.  It was a long time ago,
4   and my understanding after we left was that we were in
5   the clear legally and would not have reason to believe
6   that we would be stepping on anyone's toes by making
7   Mino, and that's the understanding I had.
8        MS. SCHMITT:  Q.  But you don't recall -- but
9   you don't recall ever showing her Mino, right --
10       MS. MAITRA:  Objection --
11       MS. SCHMITT:  Q.  -- before it was launched?
12       MS. MAITRA:  Objection; asked and answered.
13       THE WITNESS:  I don't recall.
14       MS. SCHMITT:  Q.  And who is Seth Schoen?
15  A.  I think Seth was a representative at the
16  Electronic Frontier Foundation.
17  Q.  Is he a lawyer?
18  A.  I don't know if he's a lawyer.
19  Q.  I'm sorry, going back to Ms. Turner, did you
20  ever discuss the Customs opinion with her?
21  A.  I don't recall.
22  Q.  And did you ever discuss the Customs opinion
23  with Mr. Cook, Mr. Chapman, or anyone else at their
24  firm?

Page 341

1   A.  I don't recall.
2   Q.  Did you have an expectation that your
3   communications with Ms. Turner would remain
4   confidential?
5   A.  I believe I did.  Again, I'm not really a
6   lawyer, so I don't really know how these things work,
7   but I knew that when we were speaking it was a private
8   conversation about, you know, things that we were doing
9   as a company, and I was going to her for some advice,
10  and she was an attorney, yeah.
11  Q.  Okay, but you obviously think -- you didn't
12  have an expectation that that conversation was
13  privileged, right, you're talking about it now?
14  A.  My understanding of privilege is a little --
15  Sonali has to debrief me on it, like, a lot.  So it's
16  still a little confusing to me.  What do you mean by
17  "privileged"?
18  Q.  Well, privileged information is -- I mean,
19  I'm asking you whether you considered it to be
20  privileged, whatever your meaning of that word is?
21       MS. MAITRA:  Objection; vague.
22       THE WITNESS:  I don't really know.  I don't
23  think I understand enough about a privileged
24  communication.  I do know that I had these conversations
25  with her about intellectual property and video games,

Page 342

1   and our -- what our company was doing.
2        MS. SCHMITT:  Q.  Did you -- did you have an
3   expectation that conversations with Ms. Kasler would be
4   confidential or privileged?
5   A.  Again --
6        MS. MAITRA:  Objection; compound; and vague.
7        THE WITNESS:  Can you repeat the question?
8        MS. SCHMITT:  Q.  Do you have an expectation
9   that your conversations with Ms. Kasler would be
10  confidential?
11  A.  I don't really know what you mean by
12  confidential.
13  Q.  You don't know what confidential means?
14  A.  I'm assuming it has some kind of legal
15  connotation, which I'm not very familiar with.
16  Q.  Did you think Ms. Kasler was under an
17  obligation legally not to disclose what you and she
18  talked about?
19  A.  I'm not a lawyer.  I don't really know the
20  specifics of confidentiality in the legal realm.  So I
21  don't know.
22  Q.  I guess that wasn't part of the research you
23  were doing back then?
24  A.  Is that -- the research that I was doing was
25  related to intellectual property and video games.

# Exhibit 10

## to the Declaration of Johanna Schmitt, Esq. in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment

1

2      UNITED STATES DISTRICT COURT
       DISTRICT OF NEW JERSEY

3

       _____
4      TETRIS HOLDING, LLC, et al,          )
                                            )
5                         Plaintiffs,       )
                                            )
6          - against -                      )  Index No. 09-6115-FLW-DEA
                                            )
7      XIO INTERACTIVE, INC.,               )
                                            )
8                         Defendant.        )
9      _____)

10

11                    May 6, 2011
                      10:00 a.m.
12                    601 Lexington Avenue
                      New York, New York

13

14

15                    CONFIDENTIAL

16

17            DEPOSITION OF DR. IAN BOGOST, held at

18      the above-mentioned time and place, before Randi

19      Friedman, a Registered Professional Reporter,

20      within and for the State of New York.

21

22

23

24

25

Dr. I. Bogost(Confidential)

1
2    A.   Yes.
3    Q.   Do you consider it to be well thought
4 out?
5    A.   How so?
6    Q.   Do you have any understanding of the
7 term "well thought out"?
8    A.   I have some understanding of it.
9    Q.   What is that understanding?
10    A.   It could mean logically consistent; or
11 it can mean esthetically appealing; or it could
12 mean any number of things.
13    Q.   Okay.  Do you consider Half-Real to be
14 useful?
15        MS. SCHMITT:  Objection, vague.
16        THE WITNESS:  Useful for what
17 purpose?
18 BY MS. MAITRA:
19    Q.   Useful in the field of game studies.
20    A.   I suppose, although scholarship is not
21 really used.  It is -- it's an ongoing debate
22 between a number of individuals.  So usefulness
23 is not necessarily the best characterization of
24 its properties.
25    Q.   Is it smart?

170

Dr. I. Bogost(Confidential)

1
2        MS. SCHMITT:  Sorry; what did you
3 say?
4 BY MS. MAITRA:
5    Q.   Is it smart?
6        MS. SCHMITT:  Objection, vague.
7        THE WITNESS:  It's a thoughtful
8 book.
9 BY MS. MAITRA:
10    Q.   Thank you.
11        So I'd like to enter as Exhibit-12
12 Mr. Begy's report which I believe you stated
13 earlier that you read; correct?
14    A.   Correct.
15        (Whereupon, Exhibit-12, Mr. Begy's
16 report, was marked for identification.)
17 BY MS. MAITRA:
18    Q.   Turn to Paragraph 16 of his report,
19 please.
20        Do you see the definition of rules as
21 cited in Jesper Juul's work Half-Real?  Do you
22 see that definition there; specifically that
23 "Rules specify limitations and affordances.  They
24 prohibit players from performing actions and this
25 affords players meaningful actions that were not

171

Dr. I. Bogost(Confidential)

1
2 otherwise available.  Rules give games structure.
3 The board game needs rules that let the players
4 move their pieces as well as preventing them from
5 making illegal moves.  The video game needs rules
6 that let characters move, as well as rules that
7 prevent the character from reaching the goal
8 immediately."
9        Do you see that?
10    A.   I do.
11    Q.   What, if anything, do you disagree
12 with about this definition of rules?
13    A.   As I mentioned before, there are many
14 ways of understanding rules.  In fact, many have
15 illusions of different understandings of rules.
16 To me, this definition of rules sits at a level
17 lower than my understanding of rules.  This is a
18 discussion of the way rules might be interpreted
19 rather than rules themselves.
20    Q.   I see.  So what do you mean when you
21 say level lower?
22    A.   So if we're back to the idea of the
23 idea of a game which is related to the rules, and
24 then there is some system that interprets them,
25 then these characterizations exist in that system

172

Dr. I. Bogost(Confidential)

1
2 that interprets them.
3    Q.   I'm still not quite understanding.
4        Where is the notion of levels within
5 that statement?
6    A.   If we move from a higher level of
7 abstraction to a more concrete limitation, along
8 that axis.
9    Q.   So at the top of that axis is
10 abstraction.  And at the bottom of that axis is
11 concreteness?
12    A.   Or specificity perhaps.
13    Q.   Or specificity; is that right?
14    A.   Sure.
15    Q.   And your definition of rules is closer
16 to -- closer to the higher level of that axis;
17 i.e., abstraction, and Mr. Juul's definition of
18 rules is closer to the bottom of that axis; i.e.,
19 concreteness or specificity; is that right?
20        MS. SCHMITT:  Objection to form.
21        THE WITNESS:  Based on my
22 interpretation, yes.
23 BY MS. MAITRA:
24    Q.   Can you turn to Paragraph 39 of his
25 report.  That's Page 14.  Mr. Begy says, "The

173

# Exhibit 11

## to the Declaration of Johanna Schmitt, Esq. in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment

# Oxford English Reference Dictionary

Second Edition, Revised

*Edited by*

Judy Pearsall and Bill Trumble



**OXFORD**

UNIVERSITY PRESS

# OXFORD
UNIVERSITY PRESS

Great Clarendon Street, Oxford OX2 6DP

Oxford University Press is a department of the University of Oxford.
It furthers the University's objective of excellence in research, scholarship,
and education by publishing worldwide in

Oxford New York
Auckland Cape Town Dar es Salaam Hong Kong Karachi Kuala Lumpur
Madrid Melbourne Mexico City Nairobi New Delhi Taipei Toronto
Shanghai

With offices in
Argentina Austria Brazil Chile Czech Republic France Greece
Guatemala Hungary Italy Japan South Korea Poland Portugal
Singapore Switzerland Thailand Turkey Ukraine Vietnam

Oxford is a registered trade mark of Oxford University Press
in the UK and in certain other countries

Published in the United States
by Oxford University Press Inc., New York

© Oxford University Press 1995, 1996, 2002, 2003

First edition 1995
Second edition 1996
Reprinted with updates and corrections 2001
Revised second edition 2002
Reprinted with updates and corrections 2003

All rights reserved. No part of this publication may be reproduced,
stored in a retrieval system, or transmitted, in any form or by any means,
without the prior permission in writing of Oxford University Press,
or as expressly permitted by law, or under terms agreed with the appropriate
reprographics rights organization. Enquiries concerning reproduction
outside the scope of the above should be sent to the Rights Department,
Oxford University Press, at the address above

You must not circulate this book in any other binding or cover
and you must impose this same condition on any acquirer

British Library Cataloguing in Publication Data
Data available

Library of Congress Cataloging in Publication Data
Data available

ISBN 0-19-860652-4

10 9 8 7 6 5

Printed in Italy by
«La Tipografica Varese S.p.A.» Varese

fundamental. **2** incompletely developed; vestigial. □ **rudimentarily** *adv.* **rudimentariness** *n.*

**Rudolf, Lake** /ˈruːdɒlf/ the former name (until 1979) for Lake Turkana. (See TURKANA, LAKE.)

**Rudra** /ˈrʊdrə/ *Hinduism* **1** (in the Rig-veda) a Vedic minor god, associated with the storm, father of the Maruts. **2** one of the names of Siva.

**Rudras** see MARUTS.

**rue**[1] /ruː/ *v.* & *n.* ● *v.tr.* (**rues, rued, rueing** or **ruing**) repent of; bitterly feel the consequences of; wish to be undone or non-existent (esp. *rue the day*). ● *n. archaic* **1** repentance; dejection at some occurrence. **2** compassion or pity. [OE hrēow, hrēowan]

**rue**[2] /ruː/ *n.* a perennial evergreen shrub, *Ruta graveolens*, with bitter strong-scented leaves formerly used in medicine. [ME f. OF f. L *ruta* f. Gk *rhute*]

**rueful** /ˈruːfʊl/ *adj.* expressing sorrow or regret, genuine or humorously affected. □ **ruefully** *adv.* **ruefulness** *n.* [ME, f. RUE[1]]

**rufescent** /ruːˈfɛs(ə)nt/ *adj. Zool.* etc. reddish. □ **rufescence** *n.* [L *rufescens* f. *rufus* reddish]

**ruff**[1] /rʌf/ *n.* **1** a projecting starched frill worn round the neck esp. in the 16th century. **2** a projecting or conspicuously coloured ring of feathers or hair round a bird's or animal's neck. **3** a domestic pigeon like a jacobin. **4** (*fem.* **reeve** /riːv/) a wading bird, *Philomachus pugnax*, of which the male has a ruff and ear-tufts in the breeding season. □ **rufflike** *adj.* [perh. f. *ruff* = ROUGH]

**ruff**[2] /rʌf/ *n.* **1** (usu. **ruffe**) a rough-scaled fish, esp. a perchlike freshwater fish, *Gymnocephalus cernua*, found in European lakes and rivers. **2** (in full **tommy ruff**) esp. *Austral.* a rough-scaled marine food fish, *Arripis georgianus*, common in Australian waters and related to the Australian salmon. Also called *roughy*. [ME, prob. f. ROUGH]

**ruff**[3] /rʌf/ *v.* & *n.* ● *v.intr.* & *tr.* trump at cards. ● *n.* an act of ruffing. [orig. the name of a card-game: f. OF *roffle, rouffle,* = It. *ronfa* (perh. alt. of *trionfo* TRUMP[1])]

**ruffe** var. of RUFF[2].

**ruffian** /ˈrʌfɪən/ *n.* a violent lawless person. □ **ruffianism** *n.* **ruffianly** *adv.* [F *ruff*]fian f. It. *ruffiano*, perh. f. dial. *rofia* scurf]

**ruffle** /ˈrʌf(ə)l/ *v.* & *n.* ● *v.* **1** *tr.* disturb the smoothness or tranquillity of. **2** *tr.* upset the calmness of (a person). **3** *tr.* gather (lace etc.) into a ruffle. **4** *tr.* (often foll. by *up*) (of a bird) erect (its feathers) in anger, display, etc. **5** *intr.* undergo ruffling. **6** *intr.* lose smoothness or calmness. ● *n.* **1** an ornamental gathered or goffered frill of lace etc. worn at the opening of a garment esp. round the wrist, breast, or neck. **2** perturbation, bustle. **3** a rippling effect on water. **4** the ruff of a bird etc. (see RUFF[1] 2). **5** *Mil.* a vibrating drum-beat. [ME: orig. unkn.]

**rufiyaa** /ruːˈfiːˌjɑː/ *n.* (*pl.* same) the basic monetary unit of the Maldives, equal to 100 laris. [Maldivian]

**rufous** /ˈruːfəs/ *adj.* (esp. of animals) reddish-brown. [L *rufus* red, reddish]

**rug** /rʌg/ *n.* **1** a floor-mat of shaggy material or thick pile. **2** a thick woollen coverlet or wrap. □ **pull the rug from under** deprive of support; weaken, unsettle. [prob. f. Scand.: cf. Norw. dial. *rugga* coverlet, Sw. *rugg* ruffled hair: rel. to RAG[1]]

**Rugby** /ˈrʌɡbɪ/ a town in central England, on the River Avon in Warwickshire; pop. (1991) 61,106. Rugby School, where rugby football was developed in the early 19th century, was founded there in 1567.

**rugby** /ˈrʌɡbɪ/ *n.* (also **Rugby**) (in full **rugby football**) a form of football, in which points are scored by carrying (and grounding) an oval-shaped ball across the opponents' goal-line (thereby scoring a try) or by kicking it between the two posts and over the crossbar of the opponents' goal. Named after Rugby School in Warwickshire where it was developed (in 1823 or later), it is played chiefly in the UK, France, Australia, and New Zealand. The ball may be carried or kicked forwards, but a thrown pass may be made only to the side or rear. The level of physical contact is high, especially when play is restarted with a scrum. (See also RUGBY LEAGUE, RUGBY UNION.)

**Rugby League** *n.* a professional form of rugby played with a team of thirteen. It dates from the breakaway from the Rugby Union of a group of northern English clubs (called the Northern Union) in 1895.

**Rugby Union** *n.* a form of rugby played with a team of fifteen. Originally strictly amateur, the game was opened to professionalism in 1995. The name is also given to the game's governing body, formed in 1871.

**Rügen** /ˈruːɡən/ an island in the Baltic Sea off the north coast of Germany, to which it is linked by a causeway. It forms part of the state of Mecklenburg-West Pomerania.

**rugged** /ˈrʌɡɪd/ *adj.* **1** (of ground or terrain) having a rough uneven surface. **2** (of features) strongly marked; irregular in outline. **3 a** unpolished; lacking gentleness or refinement (*rugged grandeur*). **b** harsh in sound, unbending (*rugged honesty*). **d** involving hardship (*a rugged life*). **4** (esp. of a machine) robust, sturdy. □ **ruggedly** *adv.* **ruggedness** *n.* [ME, prob. f. Scand.: cf. RUG, and Sw. *rugga*, roughen]

**rugger** /ˈrʌɡə(r)/ *n. Brit. colloq.* rugby.

**rugosa** /ruːˈɡəʊzə/ *n.* a Japanese rose, *Rosa rugosa*, which has dark green wrinkled leaves and deep pink flowers. [L, fem. of *rugosus* (see RUGOSE) used as specific epithet]

**rugose** /ˈruːɡəʊz, -ˈɡəʊs/ *adj.* esp. *Biol.* wrinkled, corrugated. □ **rugosely** *adv.* **rugosity** /ruːˈɡɒsɪtɪ/ *n.* [L *rugosus* f. *ruga* wrinkle]

**Ruhr** /rʊə(r)/ a region of coal mining and heavy industry in North Rhine-Westphalia, western Germany. It is named after the River Ruhr, which flows through it, meeting the Rhine near Duisburg. The Ruhr was occupied by French troops 1923–4, after Germany defaulted on war reparation payments.

**ruin** /ˈruːɪn/ *n.* & *v.* ● *n.* **1** a destroyed or wrecked state (*after centuries of neglect, the palace fell to ruin*). **2 a** a person's or thing's downfall or elimination (*the ruin of my hopes*). **b** *archaic* a woman's loss of chastity by seduction or rape; dishonour resulting from this. **3 a** the complete loss of one's property or position (*bring to ruin*). **b** a person who has suffered ruin. **4** (*in sing.* or *pl.*) the remains of a building etc. that has suffered ruin (*an old ruin; ancient ruins*). **5** a cause of ruin; a destructive thing or influence (*will be the ruin of us*). ● *v.* **1** *tr.* **a** bring to ruin (*your extravagance has ruined me*). **b** utterly impair or wreck (*the rain ruined my hat*). **c** *archaic* seduce and abandon (a woman). **2** *tr.* (esp. as **ruined** *adj.*) reduce to ruins. **3** *intr. poet.* fall headlong or with a crash. □ **in ruins 1** in a state of ruin. **2** completely wrecked (*their hopes were in ruins*). [ME f. OF *ruine* f. L *ruina* f. *ruere* fall]

**ruination** /ˌruːɪˈneɪʃ(ə)n/ *n.* **1** the act of bringing to ruin. **2** the act of ruining or the state of being ruined. [obs. *ruinate* (as RUIN)]

**ruinous** /ˈruːɪnəs/ *adj.* **1** bringing ruin; disastrous (*at ruinous expense*). **2** in ruins; dilapidated. □ **ruinously** *adv.* **ruinousness** *n.* [ME f. L *ruinosus* (as RUIN)]

**Ruisdael** /ˈriːzdɑːl, ˈrɔɪz-, -deɪl/, Jacob van (also **Ruysdael**) (c.1628–82), Dutch landscape painter. Born in Haarlem, he painted the surrounding landscape from the mid-1640s until his move to Amsterdam in 1657, where he spent the rest of his life. His typical subject-matter was forest scenes, seascapes, and cloudscapes, and his work demonstrated the possibilities of investing landscape with subtle intimations of mood. Meindert Hobbema was his most famous pupil, while among those influenced by his work were Thomas Gainsborough, John Constable, and the Barbizon School.

**Ruiz de Alarcón y Mendoza** /ruːˌiːz deɪ ˌælɑːˈkɒn iː menˈdəʊzə/, Juan (1580–1639), Spanish dramatist, born in Mexico City. His most famous play, the moral comedy *La Verdad sospechosa*, was the basis of Corneille's *Le Menteur* (1642).

**rule** /ruːl/ *n.* & *v.* ● *n.* **1** a principle to which an action conforms or is required to conform. **2** a prevailing custom or standard; the normal state of things. **3** government or dominion (*under British rule; the rule of law*). **4** a graduated straight measure used in carpentry etc.; a ruler. **5** *Printing* **a** a thin strip of metal for separating headings, columns, etc. **b** a thin line or dash. **6** a code of discipline of a religious order. **7** *Law* an order made by a judge or court with reference to a particular case only. **8** (**Rules**) *Austral.* = AUSTRALIAN RULES FOOTBALL. ● *v.* **1** *tr.* exercise decisive influence over; keep under control. **2** *tr.* & (often foll. by *over*) *intr.* have sovereign control of (*rules over a vast kingdom*). **3** *tr.* (often foll. by *that* + clause) pronounce authoritatively (*was ruled out of order*). **4** *tr.* **a** make parallel lines across (paper). **b** make (a straight line) with a ruler etc. **5** *intr.* (of prices or goods etc. in regard to price or quality etc.) have a specified general level; be for the most part (*the market ruled high*). **6** *tr.* (in passive; foll. by *by*) consent to follow (advice etc.); be guided by. □ **as a rule** usually; more often than not. **by rule** in a regulation manner; mechanically. **rule of the road** see ROAD[1]. **rule of three** *Math.* a method of finding a number in the same ratio to one given as exists between two others given. **rule of thumb** a rule for general guidance, based on experience or practice rather than theory. **rule out** exclude; pronounce irrelevant or ineligible. **rule the roost** (or **roast**) be in control. **run the rule over** examine cursorily for correctness or adequacy. □ **ruleless** *adj.* [ME f. OF *reule, reuler* f. LL *regulare* f. L *regula* straight stick]

**Rule 43** *n.* (in the UK) a prison regulation whereby offenders can be isolated or segregated for their own protection.

Case 3:09-cv-06115-FLW-DEA   Document 52-6   Filed 10/25/11   Page 31 of 63 PageID: 2725

# Merriam-Webster's Collegiate® Dictionary

## ELEVENTH EDITION



Merriam-Webster, Incorporated
Springfield, Massachusetts, U.S.A.



## A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*Merriam-Webster*™ is the name you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

Copyright © 2007 by Merriam-Webster, Incorporated

Library of Congress Cataloging in Publication Data

Merriam-Webster's collegiate dictionary. — Eleventh ed.
    p.    cm.
    Includes index.
    ISBN-13: 978-0-87779-807-1    (Laminated unindexed : alk. paper)
    ISBN-10: 0-87779-807-9    (Laminated unindexed : alk. paper)
    ISBN-13: 978-0-87779-808-8    (Jacketed hardcover unindexed : alk. paper)
    ISBN-10: 0-87779-808-7    (Jacketed hardcover unindexed : alk. paper)
    ISBN-13: 978-0-87779-809-5    (Jacketed hardcover with CD-ROM : alk. paper)
    ISBN-10: 0-87779-809-5    (Jacketed hardcover with CD-ROM : alk. paper)
    ISBN-13: 978-0-87779-810-1    (Leatherlook with CD-ROM : alk. paper)
    ISBN-10: 0-87779-810-9    (Leatherlook with CD-ROM : alk. paper)
    ISBN-13: 978-0-87779-813-2    (Canadian)
    ISBN-10: 0-87779-813-3    (Canadian)
    ISBN-13: 978-0-87779-814-9    (International)
    ISBN-10: 0-87779-814-1    (International)
    1. English language—Dictionaries. I. Title: Collegiate dictionary. II. Merriam-Webster, Inc.
PE1628.M36    2003
423—dc21                      2003003674
                              CIP

Merriam-Webster's Collegiate® Dictionary, Eleventh Edition, principal copyright 2003

COLLEGIATE is a registered trademark of Merriam-Webster, Incorporated

All rights reserved. No part of this book covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, taping, or information storage and retrieval systems—without written permission of the publisher.

Made in the United States of America

101112TT:QWV0807

Case 3:09-cv-06115-FLW-DEA   Document 52-6   Filed 10/25/11   Page 33 of 63 PageID: 2727

**ru·go·la** \'rü-gə-lə\ *n* [prob. fr. It dial.; akin to It dial. *ruga* arugula, fr. *ruca* — more at ROCKET] (1973) : ARUGULA

**ru·go·sa rose** \rü-'gō-sə-, -zə-\ *n* [NL *rugosa*, specific epithet of *Rosa rugosa* rugose rose] (1892) : any of various hardy thorny garden roses descended from a rose (*Rosa rugosa*) introduced from China and Japan — called also *rugosa*

**ru·gose** \'rü-gōs\ *adj* [L *rugosus*, fr. *ruga*] (1676)  **1** : full of wrinkles \<~ cheeks\>  **2** : having the veinlets sunken and the spaces between elevated \<~ leaves of the sage\> — **ru·gos·i·ty** \rü-'gä-sə-tē\ *n*

**rug rat** *n* (1975) *slang* : a child not yet old enough for school

**ru·gose** \'rü-gōs\ *adj* : RUGOSE

**ru·gu·lose** \'rü-gyə-ˌlōs\ *adj* [L *rugula*, dim. of L *ruga*] (ca. 1819) : having small rugae : finely wrinkled

**ru·in** \'rü-ən, -ˌin; 'rün\ *n* [ME *ruine*, fr. AF, fr. L *ruina*, fr. *ruere* to rush headlong, fall, collapse] (12c)  **1** *a* *archaic* : a falling down : COLLAPSE (from age to age . . . the crash of ~ fitfully resounds —William Wordsworth)  **b** : physical, moral, economic, or social collapse  **2 a** : the state of being ruined — archaic except in pl. \<the city lay in ~\>  **b** : the remains of something destroyed — usu. used in pl. \<the ~s of an ancient temple\> \<the ~s of his life\>  **3** : a cause of destruction  **4 a** : the action of destroying, laying waste, or wrecking  **b** : DAMAGE, INJURY  **5** : a ruined building, person, or object — **ru·in·ate** \'rü-ə-ˌnāt, -ˌnät\ *adj* or *vt* — **ruinate** \-ˌnät\ *vt*

**²ruin** *vt* (1585)  **1** : to reduce to ruins : DEVASTATE  **2** : to damage irreparably  **3** : BANKRUPT, IMPOVERISH \<~ed by stock speculation\>  **b** : to subject to frustration, failure, or disaster \<will ~ your chances of promotion\> ~ *vi* : to become ruined — **ru·in·er** *n*

**ru·in·ous** \'rü-ə-nəs\ *adj* (14c)  **1** : DILAPIDATED, RUINED  **2** : causing or tending to cause ruin — **ru·in·ous·ly** *adv* — **ru·in·ous·ness** *n*

**¹rule** \'rül\ *n* [ME *reule*, fr. AF, fr. L *regula* straightedge, rule, fr. *regere* to keep straight, direct — more at RIGHT] (13c)  **1 a** : a prescribed guide for conduct or action  **b** : the laws or regulations prescribed by the founder of a religious order for observance by its members  **c** : an accepted procedure, custom, or habit  **d** (1) : a usu. written order or direction made by a court regulating court practice or the action of parties  (2) : a legal precept or doctrine  **e** : a regulation or bylaw governing procedure or controlling conduct  **2 a** (1) : a usu. valid generalization  (2) : a generally prevailing quality, state, or mode \<fair weather was the ~ yesterday —*N.Y. Times*\>  **b** : a standard of judgment : CRITERION  **2** : a regulating principle  **d** : a determinate method for performing a mathematical operation and obtaining a certain result  **3 a** : the exercise of authority or control : DOMINION  **b** : a period during which a specified ruler or government exercises control  **4 a** : a strip of material marked off in units used esp. for measuring : RULER  **3**, TAPE MEASURE  **b** : a metal strip with a type-high face that prints a line  **c** : a straightedge *also* : a linear design produced by or as if by such a strip  **syn see** LAW — **as a rule** : for the most part : GENERALLY

**²rule** *vb* **ruled; rul·ing** *vt* (13c)  **1 a** : to exert control, direction, or influence on \<the passions that ~ our minds\>  **b** : to exercise control over esp. by curbing or restraining \<~ a fractious horse\> \<*ruled* his appetites firmly\>  **2 a** : to exercise authority or power over often harshly or arbitrarily \<the speaker *ruled* the legislature with an iron hand\>  **b** : to be preeminent in : DOMINATE  **3** : to determine and declare authoritatively; *esp* : to command or determine judicially  **4 a** (1) : to mark with lines drawn along or as if along the straight edge of a ruler  (2) : to mark (a line) on a paper with a ruler  **b** : to arrange in a line ~ *vi* **1** : to exercise supreme authority  **2** : to be first in importance or prominence : PREDOMINATE \<the physical did not ~ in her nature —Sherwood Anderson\>  **2** : to exist in a specified state or condition  **3** : to lay down a legal rule  **4** *slang* : to be extremely cool or popular — used as a generalized term of praise or approval \<for a little attitude at the right price, sneakers ~ —Tish Hamilton\>  **syn** see DECIDE

**ruled surface** *n* (1862) : a surface generated by a moving straight line with the result that through every point on the surface a line can be drawn lying wholly in the surface

**rule·less** \'rül-ləs\ *adj* (15c) : not restrained or regulated by law

**rule of the road** (1871) : a customary practice (as driving always on a particular side of the road or yielding the right of way) developed in the interest of safety and often subsequently reinforced by law; *esp* : any of the rules making up a code governing ships in matters relating to mutual safety

**rule of thumb** (1692)  **1** : a method of procedure based on experience and common sense  **2** : a general principle regarded as roughly correct but not intended to be scientifically accurate

**rule out** *vt* (1869)  **1** : EXCLUDE, ELIMINATE  **2** : to make impossible : PREVENT \<heavy rain *ruled out* the picnic\>

**rul·er** \'rü-lər\ *n* (14c)  **1** : one that rules; *specif* : SOVEREIGN  **2** : a worker or a machine that rules paper  **3** : a smooth-edged strip (as of wood or metal) that is usu. marked off in units (as inches) and is used as a straightedge or for measuring — **rul·er·ship** \-ˌship\ *n*

**²ruling** *n* (15c) : an official or authoritative decision, decree, statement, or interpretation (as by a judge on a point of law)

**²ruling** *adj* (1593)  **1 a** : exerting power or authority \<the ~ party\>  **b** : CHIEF, PREDOMINATING \<a ~ passion\>  **2** : generally prevailing

**ruly** \'rü-lē\ *adj* [back-formation fr. *unruly*] (1837) : OBEDIENT, ORDERLY \<a ~ crowd\>

**¹rum** \'rəm\ *n* [prob. short for obs. *rumbullion* rum] (1654)  **1** : an alcoholic beverage distilled from a fermented cane product (as molasses)  **2** : alcoholic liquor \<the demon ~\>

**²rum** *adj* **rum·mer; rum·mest** [origin unknown] (1752)  **1** *chiefly Brit* : QUEER, ODD \<writing is a ~ trade —Angela Thirkell\>  **2** *chiefly Brit* : DIFFICULT, DANGEROUS

**Rumanian** *var of* ROMANIAN

**rum·ba** *also* **rhum·ba** \'rəm-bə, 'rüm-, 'rüm-\ *n* [AmerSp] (1916) : a ballroom dance of Cuban origin in ¾ or ⅞ time with a basic pattern of step-close-step and marked by a delayed transfer of weight and pronounced hip movements; *also* : the music for this dance

**rum·ble** \'rəm-bəl\ *vb* **rum·bled; rum·bling** \-b(ə-)liŋ\ *vb* [ME; akin to MHG *rummeln* to rumble] *vi* (14c)  **1** : to make a low heavy rolling sound (thunder *rumbling* in the distance)  **2** : to travel with a low reverberating sound (wagons *rumbled* into town)  **3** : to speak in a low rolling tone  **4** : to engage in a rumble ~ *vt*  **1** : to utter or emit in a low rolling voice  **2** *Brit* : to reveal or discover the true character of — **rum·bler** \-b(ə-)lər\ *n*

**²rumble** *n* (14c)  **1 a** : a low heavy continuous reverberating often muffled sound (as of thunder)  **b** : low frequency noise in phonographic playback caused by the transmission of mechanical vibrations by the turntable to the pickup  **2** : a seat for servants behind the body of a carriage  **3** : a widespread expression of dissatisfaction or unrest  **b** : a street fight esp. among gangs

**rumble seat** *n* (1912) : a folding seat in the back of an automobile (as a coupe or roadster) not covered by the top

**rumble strip** *n* (1962) : a strip of corrugated pavement (as along the edge of a highway) that causes rumbling and vibration when driven over

**rumbling** *n* (14c)  **1** : RUMBLE  **2** : general but unofficial talk or opinion often of dissatisfaction — usu. used in pl. \<~s of political trouble —Anthony Burgess\>

**rum·bly** \'rəm-b(ə-)lē\ *adj* (1874) : tending to rumble or rattle

**rum·bus·tious** \ˌrəm-'bəs-chəs\ *adj* [alter. of *robustious*] (1778) *chiefly Brit* : RAMBUNCTIOUS — **rum·bus·tious·ly** *adv*, *chiefly Brit* — **rum·bus·tious·ness** *n*, *chiefly Brit*

**ru·men** \'rü-mən\ *n*, *pl* **ru·mi·na** \-mə-nə\ *or* **rumens** [NL *rumin-*, *rumen*, fr. L] (ca. 1728) : the large first compartment of the stomach of a ruminant in which cellulose is broken down by the action of symbiotic microorganisms — compare ABOMASUM, OMASUM, RETICULUM — **ru·mi·nal** \-mə-nᵊl\ *adj*

**¹ru·mi·nant** \'rü-mə-nənt\ *n* (1661) : a ruminant mammal

**²ruminant** *adj* (1691)  **1 a** (1) : chewing the cud  **2** : characterized by chewing again what has been swallowed  **b** : of or relating to two suborders (Ruminantia and Tylopoda) of herbivorous even-toed hoofed mammals (as sheep, oxen, deer, and camels) that chew the cud and have a complex 3- or 4-chambered stomach  **2** : given to or engaged in contemplation : MEDITATIVE \<stood there . . . in this attitude of ~ relish —Thomas Wolfe\> — **ru·mi·nant·ly** *adv*

**ru·mi·nate** \'rü-mə-ˌnāt\ *vb* **-nat·ed; -nat·ing** [L *ruminatus*, pp. of *ruminari* to chew the cud, muse, fr. *rumin-*, *rumen* rumen; perh. akin to Skt *romantha* act of chewing the cud] *vi* (1533)  **1** : to go over in the mind repeatedly and often casually or slowly  **2** : to chew repeatedly for an extended period ~ *vt*  **1** : to chew again what has been chewed slightly and swallowed : chew the cud  **2** : to engage in contemplation : REFLECT  **syn** see PONDER — **ru·mi·na·tion** \ˌrü-mə-'nā-shən\ *n* — **ru·mi·na·tive** \'rü-mə-ˌnā-tiv\ *adj* — **ru·mi·na·tive·ly** *adv* — **ru·mi·na·tor** \-ˌnā-tər\ *n*

**¹rum·mage** \'rə-mij\ *vb* **rum·maged; rum·mag·ing** [*rummage*] *vi* (1582)  **1** : to make a thorough search or investigation  **2** : to engage in an undirected or haphazard search ~ *vt*  **1** : to make a thorough search through : RANSACK \<*rummaged* the attic\>  **2** : to examine minutely and completely  **3** : to discover by searching — **rum·mag·er** *n*

**²rummage** *n* [obs. E *romage* act of stowing cargo, modif. of MF *arrimage*, fr. *arrimer* to stow, fr. *a-* (fr. L *ad*-) + *-rimer*, fr. ME *rimen* to open up, make room for, fr. OE *rȳman* — more at REAM] (1598)  **1 a** : a confused miscellaneous collection  **b** : items for sale at a rummage sale  **2** : a thorough search esp. among a confusion of objects

**rummage sale** *n* (ca. 1898) : a usu. informal sale of miscellaneous goods; *esp* : a sale of donated articles conducted by a nonprofit organization (as a church or charity) to help support its programs

**rum·mer** \'rə-mər\ *n* [G *or* D; G *Römer*, fr. D *roemer*] (1654) : a large-bowled footed drinking glass often elaborately etched or engraved

**rum·my** \'rə-mē\ *adj* **rum·mi·er; -est** [²rum] (1828) : QUEER, ODD \<feeling a little ~ from our trip up the escalator —*New Yorker*\>

**²rummy** *n*, *pl* **rummies** [¹rum] (1851) : DRUNKARD

**³rummy** *n* [perh. fr. ¹rummy] (1915) : any of several card games for two or more players in which each player tries to assemble groups of three or more cards of the same rank or suit and to be the first to meld them all

**¹ru·mor** \'rü-mər\ *n* [ME *rumour*, fr. AF, fr. L *rumor* clamor, gossip; akin to OE *rēon* to lament, Skt *rauti* he roars] (14c)  **1** : talk or opinion widely disseminated with no discernible source  **2** : a statement or report current without known authority for its truth  **3** *archaic* : talk or report of a notable person or event  **4** : a soft low indistinct sound : MURMUR

**²rumor** *or* **ru·mored; ru·mor·ing** (1594) : to tell or spread by rumor

**ru·mor·mon·ger** \-ˌməŋ-gər, -ˌmäŋ-\ *n* (1884) : a person who spreads rumors — **ru·mor·mon·ger·ing** \-gər-iŋ\ *n*

**ru·mour** \'rü-mər\ *chiefly Brit var of* RUMOR

**rump** \'rəmp\ *n* [ME, of Scand origin; akin to Dan *rumpe* rump; akin to MHG *rumph* torso] (15c)  **1 a** : the upper rounded part of the hind quarters of a quadruped mammal  **b** : BUTTOCKS  **c** : the sacral or dorsal part of the posterior end of a bird  **2 a** : a cut of meat (as beef) between the loin and round — see BEEF illustration  **3** : a small or inferior or remnant or offshoot; *esp* : a group (as a parliament) carrying on in the name of the original body after the departure or expulsion of a large number of its members

**rum·ple** \'rəm-pəl\ *n* (ca. 1520) : FOLD, WRINKLE

**²rumple** *vb* **rum·pled; rum·pling** \-p(ə-)liŋ\ [D *rompelen*; akin to OHG *rimpfan* to wrinkle] *vt* (1603)  **1** : WRINKLE, CRUMPLE  **2** : to make unkempt : TOUSLE ~ *vi* : to become rumpled

**rum·ply** \'rəm-p(ə-)lē\ *adj* **rum·pli·er; -est** (1833) : having rumples

**rum·pus** \'rəm-pəs\ *n* [origin unknown] (1764) : a usu. noisy commotion

**rumpus room** *n* (1939) : a room usu. in the basement of a home that is used for games, parties, and recreation

**rum·run·ner** \'rəm-ˌrə-nər\ *n* (1920) : a person or ship engaged in bringing prohibited liquor ashore or across a border — **rum–run·ning** \-ˌrə-niŋ\ *adj* or *n*

**¹run** \'rən\ *vb* **ran** \'ran\ *run; run·ning** [ME *ronnen*, alter. of *rinnen*, *rennen*, v.i. (fr. OE *iernan*, *rinnan* & ON *rinna*) & of *rennen*, v.t., fr. ON *renna*; akin to OHG *rinnan*, v.i., to run, Skt *riṇāti* he causes to flow, and prob. to L *rivus* stream] *vi* (bef. 12c)  **1 a** : to go faster than a walk; *specif* : to go steadily by springing steps so that both feet leave the ground for an instant

[pronunciation key]

\ə\ abut  \ᵊ\ kitten, F table  \ər\ further  \a\ ash  \ā\ ace  \ä\ mop, mar
\aú\ out  \ch\ chin  \e\ bet  \ē\ easy  \g\ go  \i\ hit  \ī\ ice  \j\ job
\ŋ\ sing  \ō\ go  \ö\ law  \ói\ boy  \th\ thin  \t̸h\ the  \ü\ loot  \ú\ foot
\y\ yet  \zh\ vision, beige  \k̸, ⁿ, œ, ɶ, ᵜ\ see Guide to Pronunciation

# Exhibit 12

## to the Declaration of Johanna Schmitt, Esq. in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment

1

1

2 UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

3 _____

4 TETRIS HOLDING, LLC and THE TETRIS

COMPANY, LLC,

5

                           Plaintiffs,

6

              -against-

7

XIO INTERACTIVE INC.,

8

                           Defendant.

9

Civil Action No. 3:09-cv-6115 (FLW)(DEA)

10 _____

11

                        January 11, 2011

12                      10:19 a.m.

13

14

15

16          HIGHLY CONFIDENTIAL DEPOSITION

17 of HENK ROGERS, taken by Defendant,

18 pursuant to Notice, held at the offices of

19 KIRKLAND & ELLIS, LLP, 601 Lexington

20 Avenue, New York, New York before Wayne

21 Hock, a Notary Public of the State of New

22 York.

23

24

25

**54**

H. Rogers -- HIGHLY CONFIDENTIAL

1
2    A.   The game would not be identical        11:28:17
3 if you changed it.                    11:28:25
4    Q.   So my question was whether it       11:28:26
5 would change the way a player played the       11:28:29
6 game.                             11:28:31
7         MS. CENDALI: Objection to form.      11:28:32
8    A.   It depends on how much you          11:28:33
9 changed it.                          11:28:43
10    Q.   Okay.                      11:28:43
11         So let me give you a specific.      11:28:44
12         Let's say the long vertical         11:28:46
13 rectangle playing field or matrix which is      11:28:49
14 higher than wide had the dimensions ten by    11:28:54
15 twenty, let's say that I changed it to ten     11:28:57
16 by ten.                            11:29:00
17         Would that change the way a         11:29:00
18 player played that game?                11:29:02
19         MS. CENDALI: Objection to form.      11:29:04
20    A.   No.                        11:29:05
21    Q.   It would not?                  11:29:07
22    A.   No.  It would -- no.            11:29:08
23    Q.   It would not change the way a       11:29:11
24 player played in any way?               11:29:13
25         MS. CENDALI: Asked and answered.    11:29:15

**55**

H. Rogers -- HIGHLY CONFIDENTIAL

1
2    A.   Asked and answered.              11:29:18
3    Q.   Okay.                       11:29:21
4         Let's say that I changed the ten     11:29:21
5 -- the ten by twenty matrix to nine by       11:29:27
6 twenty, to a nine by twenty matrix.         11:29:32
7         Would that change the way a         11:29:39
8 player played the game?                 11:29:39
9         MS. CENDALI: Objection to form.      11:29:40
10 Objection.  Asked and answered.            11:29:41
11    A.   No.                        11:29:43
12    Q.   And why not?                   11:29:43
13    A.   Because a player -- the basic       11:29:48
14 activity would still be the same.  An        11:29:51
15 object would appear at the top of the        11:29:51
16 screen or somewhere near the play field.     11:29:53
17 A player would manipulate it and it would    11:29:53
18 set down.  A player would be trying to       11:29:57
19 create shapes of some type and they would    11:30:00
20 be removed from the playing field.          11:30:03
21    Q.   Would the player have all the       11:30:05
22 same movements in the first game with the    11:30:07
23 ten by twenty matrix as the second game     11:30:09
24 with the ten by ten matrix?              11:30:13
25    A.   They would have all the same       11:30:15

**56**

H. Rogers -- HIGHLY CONFIDENTIAL

1
2 movements.  They wouldn't have the same     11:30:17
3 amount of space to complete them in.        11:30:19
4    Q.   And how would that different        11:30:21
5 amount of space to complete them in change   11:30:25
6 the game?                          11:30:27
7         MS. CENDALI: Objection.  Assumes     11:30:29
8 facts not in evidence.  Misstates his       11:30:30
9 testimony.  Form.                     11:30:33
10    A.   I don't know.  If you were to      11:30:33
11 play soccer on a smaller soccer field,       11:30:41
12 would it still be soccer?               11:30:45
13    Q.   I'm not asking whether it would    11:30:47
14 still be Tetris.  I'm asking whether it      11:30:49
15 would change the way a player played the    11:30:51
16 game.  So for example, in your soccer       11:30:55
17 analogy, I'm not asking whether it would    11:30:58
18 still be soccer, I'm asking whether a       11:31:03
19 smaller playing field would affect the way  11:31:05
20 the player played the game.              11:31:08
21         MS. CENDALI: Objection.  Asked       11:31:10
22 and answered.                       11:31:12
23    A.   Very slightly.                 11:31:12
24    Q.   Okay.                      11:31:14
25         So in what way?                 11:31:15

**57**

H. Rogers -- HIGHLY CONFIDENTIAL

1
2    A.   They would have less room to        11:31:17
3 play the game in.                     11:31:19
4    Q.   Okay.                       11:31:20
5         So does that mean that the          11:31:21
6 player would make different movements on    11:31:23
7 on the playing field?                   11:31:26
8         MS. CENDALI: Objection.            11:31:27
9 Speculation.                         11:31:29
10         You can answer.                 11:31:31
11    A.   I don't think so.                11:31:31
12    Q.   Okay.                      11:31:34
13         Would the game end sooner if the    11:31:34
14 playing field were ten by ten versus ten    11:31:38
15 by twenty and the player had all the same   11:31:41
16 movements?                         11:31:43
17         MS. CENDALI: Objection.            11:31:44
18    A.   It depends on which variant of     11:31:46
19 Tetris we're talking about.  There are      11:31:49
20 many variants of Tetris.  Some it would     11:31:51
21 affect and some it wouldn't affect.         11:31:55
22    Q.   Okay.                       11:31:57
23         In which cases would it affect?     11:31:57
24    A.   If you were to make the analogy    11:32:00
25 of soccer and shrink the soccer field to    11:32:03

15  (Pages 54 to 57)

VERITEXT REPORTING COMPANY

212-267-6868                                516-608-2400

**58**

H. Rogers -- HIGHLY CONFIDENTIAL

2  two meters by two meters, it would be          11:32:07
3  unplayable.  So if you shrank the play          11:32:10
4  field down to tiny, tiny size, it would no      11:32:13
5  longer fit.  So it you were to change it        11:32:16
6  from twenty by ten to ten by ten, there         11:32:18
7  would be a slight difference in the way         11:32:22
8  the game is played.                             11:32:22
9     Q.  I'm asking what that difference          11:32:24
10 would be.                                       11:32:25
11    A.  The player would have less time          11:32:26
12 to complete his task in or get a lower          11:32:28
13 score.                                          11:32:30
14    Q.  I see.                                   11:32:31
15        And what about the nine by              11:32:31
16 twenty playing field versus the ten by          11:32:37
17 twenty playing field?                           11:32:40
18        MS. CENDALI: Objection to form.          11:32:41
19 Objection.  Asked and answered.                 11:32:42
20    A.  It's -- again, it's the same             11:32:43
21 game but it just looks and feels                11:32:49
22 different.                                       11:32:53
23    Q.  Okay.                                    11:32:53
24        And how exactly does it look and        11:32:54
25 feel different?                                  11:32:58

**59**

H. Rogers -- HIGHLY CONFIDENTIAL

2        MS. CENDALI: Objection.                   11:32:58
3  Incomplete hypothetical.  Objection to          11:32:59
4  form.                                           11:33:01
5     A.  You have nine columns instead of         11:33:01
6  ten columns to put your pieces in.              11:33:05
7     Q.  Does that make the game more             11:33:07
8  difficult?                                       11:33:11
9        MS. CENDALI: Objection to form.           11:33:15
10 Incomplete hypothetical.                        11:33:17
11    A.  No, it's just different.                 11:33:18
12    Q.  Okay.                                    11:33:20
13        So just different.                       11:33:20
14        Does it make it easier?                  11:33:21
15    A.  No, just different.                      11:33:24
16    Q.  Okay.                                    11:33:31
17        And again, exactly how does it          11:33:31
18 make it different?                               11:33:33
19        MS. CENDALI: Objection to form.          11:33:35
20    Q.  So let's wait for her to enter           11:33:35
21 objections and then you can answer.             11:33:38
22        MS. CENDALI: Objection to form.          11:33:39
23    A.  Yeah, so basically if you're             11:33:40
24 used to playing it one way and then you're      11:33:44
25 playing it a different way, you have to         11:33:48

**60**

H. Rogers -- HIGHLY CONFIDENTIAL

2  adjust.  But if you didn't have another         11:33:49
3  way to play it then it would mean no            11:33:52
4  difference.  In other words, the activity       11:33:55
5  is the same.                                     11:33:57
6     Q.  Okay.                                    11:33:59
7        So I'm not asking whether the            11:34:00
8  activity is the same or whether the game        11:34:02
9  would be the same.  I'm asking you whether      11:34:05
10 changing the dimensions of the playing          11:34:07
11 field from ten by twenty to nine by twenty      11:34:10
12 would change the way the player played the      11:34:15
13 game.                                           11:34:20
14        MS. CENDALI: Asked and answered.         11:34:21
15    A.  Slightly.                                11:34:21
16    Q.  Okay.                                    11:34:22
17        And exactly how?                         11:34:22
18        MS. CENDALI: Asked and answered.         11:34:26
19    A.  Exactly how?  When you move the          11:34:26
20 piece from one side to the other side,          11:34:32
21 you'd have one less button press to reach       11:34:34
22 the other side.                                  11:34:39
23    Q.  So there would be fewer buttons          11:34:39
24 that the player would press; is that fair?      11:34:42
25    A.  To get from one side to the              11:34:45

**61**

H. Rogers -- HIGHLY CONFIDENTIAL

2  other side, yes.  But it would be more --       11:34:47
3  it would be different because there would       11:34:52
4  be no place to put your piece on the other      11:34:59
5  side.                                           11:35:01
6     Q.  So the next element, the seven           11:35:01
7  geometric playing pieces formed by four         11:35:06
8  equally sized blocks joined at the sides.       11:35:09
9        Let's say that I changed -- and          11:35:12
10 we're talking about tetrominoes here;           11:35:18
11 correct?                                         11:35:21
12        MS. CENDALI: Objection to form.          11:35:22
13    A.  Seven -- the seven tetrominoes           11:35:23
14 instead of tetrominoes, because there was       11:35:33
15 only five tetrominoes and there's seven         11:35:33
16 tetriminoes.  Okay.                             11:35:37
17        So what's your question?                 11:35:38
18    Q.  No, my question, I think you            11:35:40
19 answered it, which is basically this is         11:35:43
20 referring to tetrominoes with an I?             11:35:45
21    A.  Yes.                                     11:35:49
22    Q.  What if I changed that to               11:35:56
23 dominos meaning a two-squared shape, would      11:35:56
24 that change the way a player played the         11:35:56
25 game?                                           11:35:58

16 (Pages 58 to 61)

VERITEXT REPORTING COMPANY

212-267-6868                          516-608-2400

62

```
1        H. Rogers -- HIGHLY CONFIDENTIAL
2        MS. CENDALI: Objection to form.    11:35:58
3    Objection.  Incomplete hypothetical.    11:36:00
4    A.   Are you asking whether it still    11:36:02
5    would be Tetris?                        11:36:06
6    Q.   No, I'm asking you whether it      11:36:07
7    would change the way the player played the  11:36:09
8    game.  I'm not asking you whether the name  11:36:12
9    of the game would be different or the idea  11:36:15
10   of the game would be different.         11:36:17
11   A.   No.                     11:36:19
12   Q.   Okay.                    11:36:20
13       So let me be clear on what         11:36:22
14   question you're answering.              11:36:24
15       If I were to change the            11:36:25
16   tetriminos with an I to dominos, would   11:36:28
17   that change gameplay?                   11:36:33
18       MS. CENDALI: Objection.  Asked     11:36:35
19   and answered.                   11:36:37
20   A.   No.                     11:36:38
21   Q.   Why not?                  11:36:40
22   A.   Your objectives of the game is     11:36:45
23   identical.  You're still trying to create  11:36:48
24   the same shapes, you have shapes that    11:36:50
25   appear in the play field, you manipulate  11:36:53
```

63

```
1        H. Rogers -- HIGHLY CONFIDENTIAL
2    them, and they are used to form shapes in  11:36:57
3    the play field that are removed from the  11:36:59
4    game.  And so that's essentially the game,  11:37:02
5    the way the game is played.             11:37:04
6    Q.   I see.                    11:37:07
7        So might it change how quickly     11:37:08
8    the lines cleared on the playing field?  11:37:11
9        MS. CENDALI: Objection to form.    11:37:13
10   Speculation.                    11:37:16
11       You can answer.                11:37:16
12   A.   Quickly meaning how much time it   11:37:17
13   takes to clear a line?                  11:37:21
14   Q.   Yes.                     11:37:22
15   A.   So to speak?                11:37:23
16   Q.   Yes.                     11:37:25
17   A.   It might.                  11:37:25
18   Q.   Why might it?                11:37:26
19   A.   Because the pieces are shaped     11:37:28
20   different and a player might have I'm    11:37:33
21   going to say no prior experience with    11:37:35
22   those shapes.  No, I think it would be   11:37:38
23   about the same.  If you were to ask me to  11:37:42
24   design that game, I would design that game  11:37:46
25   and it would work.                      11:37:49
```

64

```
1        H. Rogers -- HIGHLY CONFIDENTIAL
2    Q.   Right.                    11:37:50
3        So how about let's move to the     11:37:51
4    appearance of the playing pieces at the  11:38:00
5    top of the matrix.                      11:38:04
6        Let's say that the playing         11:38:05
7    pieces appeared close to the bottom of the  11:38:07
8    matrix instead of the top of the matrix.  11:38:10
9        How would that affect gameplay?    11:38:13
10       MS. CENDALI: Objection.  Assumes   11:38:15
11   facts not in evidence.                  11:38:17
12   A.   It wouldn't.  I don't think it    11:38:18
13   would.                          11:38:19
14   Q.   Would it provide the player less  11:38:20
15   time in which to place the piece on the  11:38:23
16   board?                          11:38:25
17   A.   Well, you're saying they appear   11:38:26
18   at the bottom of the screen.            11:38:30
19   Q.   Or the middle.                11:38:31
20   A.   Or the middle?                11:38:32
21   Q.   Yes.                     11:38:34
22   A.   It depends which way the piece    11:38:34
23   moved afterwards.                       11:38:37
24   Q.   Okay.                    11:38:38
25       But would it allow fewer cells     11:38:38
```

65

```
1        H. Rogers -- HIGHLY CONFIDENTIAL
2    in which for the player -- in which the  11:38:42
3    player could move to place a piece on the  11:38:46
4    board?                          11:38:49
5        MS. CENDALI: Objection.           11:38:49
6    Speculation.  Incomplete hypothetical.   11:38:50
7    A.   Again, if you ask me to design a  11:38:51
8    game where the piece started there --    11:38:55
9    Q.   That's not what I'm asking.       11:38:57
10       MS. MAITRA: So could you repeat    11:39:00
11   the question.                   11:39:03
12       (Whereupon the requested portion   11:39:03
13   was read back by the reporter)          11:39:20
14       MS. CENDALI: Objection to form.    11:39:20
15   A.   Yeah, I would have to see the     11:39:22
16   game.                           11:39:24
17   Q.   So you wouldn't know unless you   11:39:24
18   actually saw it?                        11:39:26
19   A.   Yeah.                     11:39:27
20   Q.   Okay.                    11:39:27
21       Let me give you a hypothetical     11:39:36
22   that I thought up the other day.         11:39:37
23       Picture a Tetris championship or   11:39:40
24   a Tetris Olympics, if you will, and say   11:39:43
25   two players were playing each other in   11:39:47
```

17 (Pages 62 to 65)

66

1    H. Rogers -- HIGHLY CONFIDENTIAL
2    this championship.  And say that one          11:39:49
3    player had a ten by ten matrix in which to     11:39:53
4    play the game and another player had a ten     11:39:58
5    by ten matrix.  In all other respects the      11:40:03
6    games are identical except for that one        11:40:08
7    element.                                        11:40:11
8         Would one of the players say no           11:40:16
9    fair?                                           11:40:19
10        MS. CENDALI: Objection to form.           11:40:20
11   Objection.  Incomplete hypothetical.           11:40:23
12        You can answer.                            11:40:25
13   A.   I would have to see the game.  I          11:40:25
14   would have to see that Olympic --              11:40:28
15   Q.   So you couldn't tell me one way           11:40:31
16   or the other whether changing the game in      11:40:33
17   that respect at the Tetris Olympics and        11:40:37
18   only that respect would be fair?               11:40:43
19   A.   I can imagine but I wouldn't              11:40:44
20   know for sure.                                  11:40:47
21   Q.   What would be your best guess?           11:40:48
22        MS. CENDALI: Objection.  The              11:40:49
23   witness should not guess.                       11:40:55
24   A.   So you want me to guess?                  11:40:57
25   Q.   Yes.                                       11:40:58

67

1    H. Rogers -- HIGHLY CONFIDENTIAL
2         MS. CENDALI: Objection to form.           11:41:00
3    A.   I would guess that if there were          11:41:01
4    two identical players playing, that they       11:41:05
5    would not want to play under those             11:41:10
6    conditions.                                     11:41:12
7    Q.   Okay.                                      11:41:12
8         Let's go to the next element,             11:41:13
9    the downward, lateral, and rotating            11:41:20
10   movement of the playing pieces.                11:41:22
11        What if I changed this element?           11:41:24
12   What if the pieces couldn't rotate, would      11:41:29
13   that change gameplay at all?                   11:41:36
14        MS. CENDALI: Objection to form.           11:41:38
15   Objection.  Hypothetical.                      11:41:40
16        You can answer.                            11:41:42
17   A.   The gameplay, it would still be           11:41:43
18   able to maintain gameplay.                     11:41:49
19   Q.   And when you say gameplay, what           11:41:51
20   exactly do you mean?                           11:41:54
21   A.   I mean what I said earlier which          11:41:54
22   is that an object would appear on the play     11:41:56
23   field and be manipulated by the player and     11:41:59
24   then a shape would be removed from the         11:42:03
25   play field.                                     11:42:07

68

1    H. Rogers -- HIGHLY CONFIDENTIAL
2    Q.   Okay.                                      11:42:08
3         Would -- so let me give you a             11:42:08
4    definition of gameplay and then you can        11:42:12
5    use that definition.                           11:42:15
6         Let's say gameplay means                  11:42:16
7    changing the moves that a player would         11:42:19
8    make.                                           11:42:24
9         Okay?                                      11:42:26
10        So under that definition of               11:42:28
11   gameplay, would it change gameplay if the      11:42:31
12   pieces couldn't rotate and all else was        11:42:39
13   the same?                                       11:42:39
14        MS. CENDALI: I object to your             11:42:40
15   definition.  Objection to form.                11:42:42
16   A.   When you say change gameplay,             11:42:44
17   are you asking whether it would be any         11:42:48
18   less fun or more fun to play?                  11:42:51
19   Q.   No, not my question.                      11:42:53
20   A.   Or -- can you repeat the                  11:42:55
21   question?                                       11:43:08
22        MS. MAITRA: Could you repeat it,          11:43:09
23   please?  Read it back.                         11:43:11
24        (Whereupon the requested portion          11:43:12
25   was read back by the reporter)                 11:43:35

69

1    H. Rogers -- HIGHLY CONFIDENTIAL
2         MS. CENDALI: Objection to form.           11:43:35
3    A.   Gosh, I would really have to see          11:43:37
4    it.                                             11:43:43
5    Q.   Okay.                                      11:43:44
6         Is that true that you would have          11:43:44
7    to actually see the game for the remaining     11:43:47
8    elements and similar hypotheticals if I        11:43:50
9    changed those elements?                        11:43:53
10   A.   Pretty much.                              11:43:54
11   Q.   Let's take one, last one.                 11:43:58
12        The display of garbage lines              11:43:59
13   with at least one missing block in random      11:43:59
14   order.                                          11:44:02
15        If I changed that element, let's          11:44:02
16   say there weren't any garbage lines in the     11:44:04
17   playing field, would that change the moves     11:44:07
18   the player would make on the screen?          11:44:10
19        MS. CENDALI: Objection to form.           11:44:15
20   Incomplete hypothetical.                       11:44:19
21        You can answer.                            11:44:19
22   A.   So any change you make would             11:44:20
23   change the moves, but would it change the      11:44:22
24   gameplay?                                       11:44:27
25   Q.   Under my definition.                      11:44:28

18  (Pages 66 to 69)

VERITEXT REPORTING COMPANY

70

1        H. Rogers -- HIGHLY CONFIDENTIAL
2        A.   Under your definition?        11:44:30
3             Could we be specific like are       11:44:32
4    you talking about which buttons get       11:44:35
5    pressed?              11:44:37
6        Q.   Sure.  Yes.          11:44:38
7        A.   Would it change which buttons       11:44:39
8    get pressed?            11:44:42
9        Q.   Yes.             11:44:42
10            MS. CENDALI: Objection to form.     11:44:43
11       A.   Yes, it would change which       11:44:44
12   buttons get pressed.            11:44:51
13       Q.   Would it make it easier if there    11:44:53
14   were no garbage lines?          11:44:55
15            MS. CENDALI: Asked and answered.    11:44:58
16       A.   Easier?  No.         11:44:59
17       Q.   Do garbage lines in general make    11:45:05
18   gameplay more difficult?          11:45:08
19       A.   No.              11:45:10
20       Q.   Why not?             11:45:10
21       A.   Sometimes they help and        11:45:12
22   sometimes they hinder.  It depends on what   11:45:15
23   your immediate objective in the game is.     11:45:19
24       Q.   Okay.             11:45:22
25       A.   It might be a way for you to get    11:45:22

71

1        H. Rogers -- HIGHLY CONFIDENTIAL
2    quicker to your objective of some shape      11:45:25
3    than not.             11:45:29
4        Q.   So let's be specific.        11:45:30
5             Let's say that the garbage lines    11:45:32
6    were not shaped in a well, for example.      11:45:34
7    Let's say that the garbage lines had the     11:45:40
8    missing square in different places at       11:45:43
9    different cells.            11:45:49
10            Okay?            11:45:53
11            MS. CENDALI: Objection to form.     11:45:53
12   Objection.  Vague.           11:45:55
13       A.   Maybe you could draw it for me.     11:45:56
14       Q.   I do have some examples.  I'll      11:45:59
15   get to that in a minute.          11:46:02
16            But you would have no real way      11:46:03
17   of knowing whether garbage lines make it     11:46:06
18   easier or difficult without actually       11:46:09
19   seeing a version of the game?         11:46:12
20       A.   Without actually playing --        11:46:13
21       Q.   Actually playing it?         11:46:14
22       A.   Yeah.            11:46:16
23       Q.   Okay.  All right.         11:46:17
24            The appearance of a ghost or       11:46:19
25   shadow piece under the playing piece,        11:46:22

72

1        H. Rogers -- HIGHLY CONFIDENTIAL
2    let's say that element was changed,        11:46:25
3    say there was no ghost or shadow piece       11:46:29
4    under the playing piece, would it be       11:46:32
5    easier to play the game without a ghost or   11:46:34
6    a shadow piece?           11:46:37
7             MS. CENDALI: Objection to form.     11:46:38
8    Objection.  Hypothetical.          11:46:39
9        A.   It's really subjective.  It's up    11:46:40
10   to the player.  Some players like it, some   11:46:43
11   players don't.            11:46:46
12       Q.   Why do some players like it?       11:46:47
13       A.   Because it sort of lines up the     11:46:49
14   piece where it's going to fall.        11:46:55
15       Q.   So why would they like that?       11:46:57
16       A.   So they wouldn't make a mistake     11:47:00
17   and land in the wrong spot.          11:47:03
18       Q.   Why would some players not like     11:47:06
19   it?                11:47:08
20       A.   Because they're confused between    11:47:08
21   the piece that's the ghost piece and the     11:47:11
22   piece that's floating and there's two        11:47:13
23   pieces that they're manipulating and so      11:47:14
24   they are confused.           11:47:15
25       Q.   In Tetris, is there a way to        11:47:16

73

1        H. Rogers -- HIGHLY CONFIDENTIAL
2    differentiate the shadow piece from the      11:47:19
3    actual piece?            11:47:22
4        A.   Yeah, there's a visual         11:47:23
5    difference.             11:47:26
6        Q.   And that visual difference        11:47:26
7    allows a player to differentiate the       11:47:29
8    shadow piece from the actual piece?        11:47:32
9        A.   Yeah, except that not everybody     11:47:34
10   thinks that way.            11:47:37
11       Q.   But the purpose of making it       11:47:37
12   different from the actual piece is to help   11:47:41
13   differentiate it; right?          11:47:45
14       A.   Yes.             11:47:47
15       Q.   The change in color of playing     11:47:48
16   pieces when they're in lockdown mode, why    11:47:56
17   change the color of the playing pieces       11:47:59
18   when they're in lockdown mode?         11:48:03
19       A.   To make them, the actual piece      11:48:05
20   that you can manipulate, look more        11:48:08
21   outstanding.             11:48:13
22       Q.   Why would you want to make it       11:48:14
23   look more outstanding?          11:48:16
24       A.   So that it's easier to see.        11:48:17
25       Q.   Okay.            11:48:19

19  (Pages 70 to 73)

VERITEXT REPORTING COMPANY

212-267-6868                                516-608-2400

74

```
1        H. Rogers -- HIGHLY CONFIDENTIAL
2        Why make the tetrominoes        11:48:20
3   brightly colored?                     11:48:32
4        MS. CENDALI: Objection.          11:48:34
5   Foundation.                           11:48:35
6        A.   So that they would be       11:48:36
7   recognizable.                         11:48:38
8        Q.   Okay.                       11:48:38
9        What about the starting          11:48:42
10  orientation of the playing piece? Let's  11:48:47
11  say I changed that element.  Let's say the  11:48:50
12  starting orientation of the L piece was on  11:48:53
13  its back as opposed to on its butt.   11:48:58
14       A.   I don't think that would make  11:49:02
15  any difference.                       11:49:04
16       Q.   Would it change the amount of  11:49:04
17  times that a player had to rotate a piece  11:49:06
18  to get into the same position?        11:49:10
19       A.   It depends on what the start  11:49:12
20  position and the end position.  It's  11:49:14
21  random.                               11:49:16
22       Q.   Let's say that I wanted the same  11:49:16
23  end position in both versions.        11:49:18
24       Would the starting orientation   11:49:22
25  affect the number of times the player had  11:49:26
```

75

```
1        H. Rogers -- HIGHLY CONFIDENTIAL
2   to rotate the piece?                  11:49:29
3        A.   If you were trying -- there's no  11:49:31
4   particular reason why you would want to  11:49:33
5   have the L piece in a final position  11:49:43
6   rotation.  There's four different ways you  11:49:43
7   can land an L piece.                  11:49:43
8        Q.   Right.                      11:49:44
9        And I'm giving you in this       11:49:45
10  hypothetical --                       11:49:46
11       MS. CENDALI: Please do not       11:49:47
12  interrupt the witness.                11:49:49
13       Q.   That was my fault.  Please  11:49:49
14  continue.                             11:49:51
15       A.   There are four different ways of  11:49:51
16  landing an L piece and the four different  11:49:54
17  ways have different benefits in different  11:49:56
18  times.  So the starting position to  11:49:59
19  achieve any of those four positions would  11:50:01
20  be random.                            11:50:04
21       Q.   Right.                      11:50:04
22       So in my hypothetical -- and I   11:50:05
23  understand that and thank you for that  11:50:07
24  clarification.                        11:50:09
25       In my hypothetical, I'm asking   11:50:09
```

76

```
1        H. Rogers -- HIGHLY CONFIDENTIAL
2   you to assume that we started with an  11:50:11
3   position to be the same in both       11:50:16
4   circumstances.                        11:50:17
5        So assuming that, would the      11:50:19
6   player have to rotate the piece       11:50:24
7   differently if the starting orientation  11:50:27
8   were different?                       11:50:32
9        MS. CENDALI: Objection to form.  11:50:33
10  Objection.  Incomplete hypothetical.  11:50:34
11  Vague.                                11:50:39
12       A.   Sure.  Yes.                  11:50:40
13       Q.   So going back to the list, can  11:50:41
14  you tell me -- and we'll go through each  11:50:54
15  one of them -- can you tell me when    11:50:58
16  exactly that feature was included in the  11:51:00
17  game of Tetris, whether it was the     11:51:02
18  original Tetris or another version of  11:51:04
19  Tetris that came after that?          11:51:07
20       So the first, the long vertical  11:51:09
21  rectangle playing field or matrix which is  11:51:12
22  higher than wide, was that in the original  11:51:15
23  version of Tetris?                    11:51:19
24       A.   It was in the original      11:51:20
25  audiovisual expression of the game, yes.  11:51:22
```

77

```
1        H. Rogers -- HIGHLY CONFIDENTIAL
2        Q.   Okay.                       11:51:26
3        And are you differentiating      11:51:27
4   between -- I'm sorry, you said it was in  11:51:30
5   the original audiovisual expression of the  11:51:36
6   game?                                 11:51:38
7        A.   Uh-huh.                     11:51:38
8        Q.   Is that Tetris version zero?  11:51:39
9        A.   It's the Electronika 60 version  11:51:42
10  of Tetris.                            11:51:46
11       Q.   So when I say original Tetris  11:51:47
12  version, you understand that to mean the  11:51:50
13  Electronika 60 version?               11:51:52
14       A.   Yes.                        11:51:55
15       Q.   Seven geometric playing pieces  11:51:55
16  formed by four equally sized blocks joined  11:52:00
17  at the sides, was that in the original  11:52:03
18  version of Tetris?                    11:52:05
19       A.   Seven geometric playing pieces  11:52:06
20  formed by four equally sized blocks joined  11:52:11
21  at the sides?  Visually, no.          11:52:15
22       Q.   Why not?                    11:52:17
23       A.   Because there were no graphics  11:52:18
24  on the original machine.              11:52:20
25       Q.   Okay.                       11:52:22
```

20  (Pages 74 to 77)

```
                                            78
 1         H. Rogers -- HIGHLY CONFIDENTIAL
 2         What was in the original      11:52:22
 3  machine?  You said there was a long   11:52:24
 4  vertical rectangle playing field.     11:52:26
 5     A.  Yeah, it was, but the pieces   11:52:28
 6  were made out of little brackets, text 11:52:31
 7  brackets.  So there are no rectangles. 11:52:32
 8     Q.  I see.              11:52:35
 9         No rectangles?            11:52:36
10     A.  There were no blocks.  It was   11:52:39
11  pairs of square parentheses.          11:52:42
12     Q.  I see.              11:52:47
13         Were there tetrominoes?       11:52:48
14     A.  They didn't have color yet.    11:52:51
15  Tetromino seven shapes.  Tetrominoes, yes. 11:52:59
16     Q.  So you said they weren't       11:53:04
17  colored, so I guess the seven geometric 11:53:08
18  playing pieces being brightly colored,  11:53:08
19  that wasn't in the original.          11:53:10
20         At what version did the pieces 11:53:11
21  become colored?          11:53:13
22     A.  At the very next version, in the 11:53:14
23  DOS version.          11:53:19
24     Q.  And what year was that?        11:53:20
25     A.  I'm not sure.  In the mid 80s.  11:53:21
```

```
                                            79
 1         H. Rogers -- HIGHLY CONFIDENTIAL
 2     Q.  The blocks of the seven        11:53:25
 3  geometric playing pieces being        11:53:28
 4  individually delineated.          11:53:32
 5         Now, I know you said there     11:53:33
 6  weren't blocks in the original version, 11:53:35
 7  but were the pieces, the bracket pieces, 11:53:38
 8  separately delineated in the original   11:53:41
 9  version?          11:53:43
10     A.  What do you mean by separately  11:53:44
11  delineated?          11:53:47
12     Q.  You said you recognized this as 11:53:48
13  belonging in one of the games of Tetris. 11:53:50
14         Which game does this belong to? 11:53:52
15     A.  I can't say.  I don't know which 11:53:56
16  one.          11:53:58
17     Q.  Can you think of any?          11:53:58
18     A.  Individually delineated?  I'm   11:54:00
19  just trying to understand what the word 11:54:02
20  here means.          11:54:04
21     Q.  So I believe it means that you  11:54:05
22  can actually see the individual mino    11:54:08
23  versus it being a completely solid shape. 11:54:11
24     A.  Oh.              11:54:16
25     Q.  That's what I believe.         11:54:16
```

```
                                            80
 1         H. Rogers -- HIGHLY CONFIDENTIAL
 2     A.  That's been here and there.    11:54:17
 3  There have been versions of Tetris where 11:54:21
 4  they are individually delineated and there 11:54:23
 5  are versions where they're not.  That's  11:54:27
 6  part of the artistic expression, I guess. 11:54:29
 7     Q.  And was it in the original     11:54:32
 8  version?          11:54:35
 9     A.  In the original version, yeah,  11:54:35
10  they were individually delineated.      11:54:39
11     Q.  The appearance of playing pieces 11:54:41
12  at the top of the matrix, was that in the 11:54:43
13  original version?          11:54:46
14     A.  Yes, it was.          11:54:47
15     Q.  The starting orientation of the 11:54:48
16  playing pieces, now it's not specific as 11:54:53
17  to what exactly the starting orientation 11:54:56
18  is, but has the starting orientation     11:54:59
19  changed from the original version of     11:55:02
20  Tetris?          11:55:04
21     A.  Probably.  It's an artistic     11:55:04
22  decision.          11:55:10
23     Q.  Right.          11:55:10
24     A.  It's not -- yeah.          11:55:11
25     Q.  It's not what?          11:55:12
```

```
                                            81
 1         H. Rogers -- HIGHLY CONFIDENTIAL
 2     A.  It's not an artistic -- I mean  11:55:13
 3  it's an artistic decision.          11:55:16
 4     Q.  I'm sorry, you were going to say 11:55:18
 5  it's not a --          11:55:20
 6     A.  It's not a -- how can I say,     11:55:21
 7  accord to the gameplay.          11:55:25
 8     Q.  Right.          11:55:25
 9         No, I'm not asking whether it's 11:55:25
10  accord to the gameplay or whether it's   11:55:25
11  artistic, I'm asking whether the starting 11:55:28
12  orientation of the playing pieces has     11:55:32
13  changed since the original version of    11:55:36
14  Tetris.          11:55:37
15     A.  I don't know.          11:55:38
16     Q.  But you said probably?         11:55:39
17     A.  Probably because it doesn't     11:55:40
18  matter.          11:55:42
19     Q.  And why doesn't it matter?      11:55:42
20     A.  Because it doesn't affect       11:55:44
21  gameplay.          11:55:46
22     Q.  But it does affect the number of 11:55:47
23  times the player presses the button, I   11:55:51
24  think you said before.          11:55:54
25         MS. CENDALI: Objection.        11:55:55
```

21 (Pages 78 to 81)

154

1       H. Rogers -- HIGHLY CONFIDENTIAL
2   and how the game feels, then I would say       13:59:01
3   yes, it does have some contribution to          13:59:03
4   that.                                            13:59:06
5       Q.   Okay.                                   13:59:06
6       Is it fair to say that failing        13:59:06
7   to follow the standards outlined in this        13:59:14
8   guideline might result in a different           13:59:18
9   gameplay?                                        13:59:28
10      MS. CENDALI: Objection to form.       13:59:28
11  Vague.                                           13:59:32
12      A.   No.  Again, we've allowed many   13:59:33
13  other games that are very close to this         13:59:39
14  that are not this.                               13:59:41
15      Q.   I see.                                  13:59:42
16      So sitting here today, can you        13:59:43
17  think of any deviations from this               13:59:45
18  guideline that you have allowed?                 13:59:47
19      MS. CENDALI: Objection to form.       13:59:51
20      A.   Yes, I've allowed different      13:59:53
21  additional blocks in the screen, for            14:00:01
22  example, that are not tetrominoes.  I've        14:00:05
23  -- or we have allowed different shapes of       14:00:09
24  play field that is not ten by twenty.           14:00:13
25  What else?  We have allowed games where         14:00:18

155

1       H. Rogers -- HIGHLY CONFIDENTIAL
2   the tetrominoes are not delineated as           14:00:26
3   separate blocks.  Actually, there's a lot       14:00:30
4   of visual things that we've allowed that        14:00:41
5   we didn't think of in the guideline for         14:00:43
6   sure.  I mean, every licensee creates           14:00:47
7   something different.                             14:00:49
8       Q.   Is there a sort of line that you  14:00:49
9   draw in terms of what you will allow a          14:00:52
10  licensee to do and what you will not allow      14:00:58
11  a licensee to do?                                14:00:58
12      A.   What we allow licensees to do is   14:00:58
13  basically to create a better game than we       14:01:00
14  license them.  So if the game is                14:01:03
15  substantially less -- a lower quality,          14:01:05
16  then we will not allow the game.  But at        14:01:09
17  the end of the game -- so it has to look        14:01:12
18  and feel like Tetris and it has to be of a      14:01:14
19  quality level that is acceptable to us.         14:01:17
20      Q.   And would you say in general if    14:01:19
21  a licensee was to follow the guidelines         14:01:23
22  outlined in this document, that they would      14:01:28
23  create a game that had the look and feel        14:01:30
24  of Tetris?                                       14:01:33
25      MS. CENDALI: Objection.               14:01:33

156

1       H. Rogers -- HIGHLY CONFIDENTIAL
2   Overbroad.                                       14:01:34
3       A.   We hope so.  But I mean, we've    14:01:35
4   given the guideline to people who have          14:01:38
5   failed.                                          14:01:40
6       Q.   Failed to follow the guideline?   14:01:41
7       A.   Well, failed to make a good       14:01:43
8   product.                                         14:01:45
9       Q.   Right.                                 14:01:45
10      So is it possible to still            14:01:46
11  follow the guideline but nonetheless make       14:01:48
12  a bad product?                                   14:01:51
13      A.   Yes.                                    14:01:52
14      Q.   Okay.                                   14:01:52
15      So now my question is limited to     14:01:53
16  instances in which a licensee has not           14:01:58
17  followed the guideline.                          14:02:01
18      Are there instances where a           14:02:02
19  licensee has not followed the guideline         14:02:05
20  but the game still has a look and feel of       14:02:07
21  Tetris?                                          14:02:12
22      A.   Yes.                                    14:02:12
23      Q.   Can you tell me any examples of   14:02:16
24  such a case?                                     14:02:18
25      A.   Well, there are a number of       14:02:19

157

1       H. Rogers -- HIGHLY CONFIDENTIAL
2   instances of games that are in, for             14:02:20
3   example Tetris Pop which is one of our          14:02:26
4   licensee's product or Tetris Party or the       14:02:28
5   Game Boy -- sorry, Nintendo DS's Tetris         14:02:36
6   which I would say don't follow the              14:02:40
7   guideline but still I would look at it and      14:02:42
8   say, yeah, everybody would agree that's         14:02:43
9   Tetris.  So they're covered by our              14:02:46
10  licensing.                                       14:02:50
11      Q.   And how exactly did not they      14:02:50
12  follow the guideline?                            14:02:52
13      A.   I don't recall the exact         14:02:54
14  instances.  In fact, I didn't review every      14:02:58
15  single pop variant.  But I do know that         14:03:00
16  some of them the pieces aren't falling or       14:03:03
17  some of them the lines don't clear.             14:03:06
18      Q.   Okay.                                   14:03:09
19      A.   I mean, these are all outside of  14:03:09
20  the visual expression that we think of as       14:03:12
21  Tetris.                                          14:03:14
22      Q.   Okay.                                   14:03:14
23      But would you say that if you         14:03:15
24  had a game as the one that you described        14:03:17
25  where the lines didn't clear, that it           14:03:20

40  (Pages 154 to 157)

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

230

1    H. Rogers -- HIGHLY CONFIDENTIAL
2    record?                          16:28:33
3        A.   This describes the animation and    16:29:11
4    then a bunch of other things.    16:29:14
5        Q.   What are the bunch of other    16:29:17
6    things?                          16:29:19
7        A.   Like what you can do with the    16:29:19
8    game pieces, how they move on the screen.    16:29:21
9    It describes soft drop, hard drop, hold.    16:29:25
10       Q.   So I think my question was does    16:29:30
11   it describe the animation of the playing    16:29:33
12   pieces on the board.             16:29:36
13       A.   Right.                     16:29:38
14           And what I'm saying is some of    16:29:38
15   this language describes the animation of    16:29:42
16   the pieces on the play field.    16:29:45
17       Q.   Okay.                      16:29:47
18           And does it describe the    16:29:47
19   rotation and movement of the pieces on the    16:29:48
20   screen?                          16:29:51
21           MS. CENDALI: Asked and answered.    16:29:51
22   And form.                        16:30:01
23       A.   Among other things, yes.    16:30:02
24       Q.   So if you could turn to    16:30:36
25   Exhibit 16 now.  It's the 2003.  It's the    16:30:38

231

1    H. Rogers -- HIGHLY CONFIDENTIAL
2    one we just looked at.           16:30:42
3        If you could turn to page    16:31:25
4    seventeen of the document.       16:31:27
5        A.   Okay.                      16:31:45
6        Q.   Are you on page twenty-seven?    16:31:45
7        A.   Page seventeen?           16:31:47
8        Q.   I'm sorry, page twenty-seven.    16:31:49
9    That was my mistake.             16:31:52
10       A.   Okay.                      16:31:59
11       Q.   So do you see where it says in    16:32:01
12   the second to last paragraph, "multiple    16:32:03
13   lines of garbage set at the same time for    16:32:05
14   share the same gap placement," and I think    16:32:10
15   the "for" was a sic.  "For instance, if a    16:32:14
16   Tetris sends four lines of garbage to the    16:32:14
17   opponent, the four garbage lines will have    16:32:18
18   a gap in the same horizontal column    16:32:21
19   creating a vertical well four cells deep.    16:32:24
20   This arrangement can make it easy for the    16:32:28
21   opponent to retaliate with a Tetris."    16:32:28
22           Can you explain how this would    16:32:31
23   be a retaliation for the Tetris?    16:32:36
24           MS. CENDALI: Objection.    16:32:38
25   Foundation.  Form.               16:32:39

232

1    H. Rogers -- HIGHLY CONFIDENTIAL
2        A.   In -- yes.                 16:32:42
3        Q.   Okay.                      16:32:48
4           Can you please do so.      16:32:49
5        A.   In certain variations of Tetris,    16:32:51
6    you can actually play with another or    16:32:59
7    against another player.  And when you    16:33:02
8    clear a certain number of lines, it causes    16:33:13
9    a detrimental effect to another player.    16:33:17
10   The detrimental effect to another player    16:33:21
11   is that garbage line appearing in the play    16:33:25
12   field.                           16:33:27
13       Q.   So is it fair to say that    16:33:27
14   certain garbage lines in the playing field    16:33:30
15   causes a detriment to the other player?    16:33:35
16           MS. CENDALI: Objection to form.    16:33:39
17       A.   This has to do with a variant of    16:33:49
18   Tetris.                          16:33:49
19       Q.   So I'm asking you whether --    16:33:49
20       A.   Sometimes.                 16:33:49
21       Q.   Okay.                      16:33:49
22           But I believe that you said that    16:33:49
23   the detrimental effect to another player    16:33:51
24   is that garbage line appearing in the    16:33:55
25   playing field; correct?          16:34:00

233

1    H. Rogers -- HIGHLY CONFIDENTIAL
2        A.   Correct.                   16:34:01
3        Q.   So I'm asking you now why is it    16:34:01
4    that the appearance of a garbage line is a    16:34:04
5    detriment to another player?     16:34:07
6        A.   Oh, because it shrinks his --    16:34:09
7    the space he has to play in.     16:34:11
8        Q.   Okay.                      16:34:14
9           So shrinking space that a player    16:34:14
10   has to play in causes a detriment to that    16:34:19
11   player?                          16:34:22
12       A.   I would say under certain    16:34:23
13   circumstances, yes.              16:34:28
14       Q.   Okay.                      16:34:29
15           What are those circumstances?    16:34:30
16       A.   If the player is having trouble    16:34:31
17   playing and there's little room,    16:34:37
18   decreasing that room could cause him to    16:34:42
19   reach the end game condition.    16:34:46
20       Q.   So the last paragraph of this    16:34:50
21   page says, "there is an additional    16:35:10
22   strategy that is effective if a player can    16:35:12
23   score many triples or doubles in    16:35:12
24   succession since the garbage line sent    16:35:14
25   will have gaps in different places for    16:35:17

59  (Pages 230 to 233)

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

290

1    H. Rogers -- HIGHLY CONFIDENTIAL
2    reasoning.                          18:24:01
3    Q.   Well, I'm asking do you believe   18:24:01
4    that if you're able to see the next piece   18:24:03
5    it makes gameplay easier?           18:24:08
6    A.   It changes the audiovisual       18:24:10
7    experience.                         18:24:17
8    Q.   So yes or no, does seeing the     18:24:17
9    next piece make the gameplay easier?       18:24:22
10       MS. CENDALI: Objection to form.   18:24:27
11   A.   Does seeing the next piece --    18:24:28
12   that's subjective. Some people benefit by   18:24:34
13   it, other people it makes no difference.   18:24:38
14   It's up to the player.              18:24:40
15   Q.   What about you?                 18:24:41
16   A.   About me?                       18:24:44
17   Q.   Yes.                           18:24:45
18   A.   Me? Gosh. And again, it          18:24:45
19   depends on which version of Tetris, which   18:24:52
20   variant of Tetris I'm playing. Sometimes   18:24:55
21   it helps and sometimes it makes no     18:24:58
22   difference.                         18:25:00
23   Q.   Okay.                          18:25:00
24       What does it help?             18:25:01
25   A.   It helps when I am planning      18:25:02

291

1    H. Rogers -- HIGHLY CONFIDENTIAL
2    where to put pieces.                18:25:08
3    Q.   Okay.                          18:25:11
4        So it does help when you are    18:25:11
5    planning where to put pieces?       18:25:13
6    A.   For me sometimes it does.        18:25:16
7    Q.   I have one more clip. I'm        18:25:23
8    sorry, let me tell you what portion of the   18:25:38
9    clip it is. So it's minute nineteen   18:25:40
10   second thirty-five to minute twenty second   18:25:44
11   twenty-eight.                       18:25:47
12       (Whereupon an audio clip was     18:25:55
13       played)                        18:25:59
14   Q.   So you say here that when you're   18:26:01
15   really in a pinch, instead of having to   18:26:47
16   make three rotations, you can just make   18:26:49
17   one rotation because the Game Boy allowed   18:26:52
18   for both left and right rotation; is that   18:26:56
19   right?                              18:27:06
20   A.   That's what I said.            18:27:06
21   Q.   Do you disagree with that        18:27:06
22   statement?                          18:27:06
23   A.   I'm saying that that helps some   18:27:06
24   players and it doesn't help other players.   18:27:07
25   There's other players that never use the   18:27:10

292

1    H. Rogers -- HIGHLY CONFIDENTIAL
2    other rotate button.                18:27:14
3    Q.   And why might it help some        18:27:16
4    players?                            18:27:18
5    A.   For the reason I said on the      18:27:18
6    interview. It might reduce the number of   18:27:23
7    button presses.                     18:27:25
8    Q.   So reducing the number of button   18:27:27
9    presses for some players makes the game   18:27:30
10   easier for those players?           18:27:33
11   A.   It changes their experience.     18:27:34
12   Q.   But you say it was really when    18:27:36
13   you were in a pinch.                18:27:43
14   A.   Yeah, I know.                   18:27:44
15       Again, it's specific to a player   18:27:45
16   and it's not a general thing. We think   18:27:51
17   about things like that but it's not a   18:27:54
18   given.                              18:27:59
19   Q.   Okay.                          18:28:02
20   A.   It may never happen.           18:28:02
21   Q.   But in your opinion, for some     18:28:04
22   players, when they're really in a pinch,   18:28:07
23   it's easier to rotate once instead of   18:28:10
24   three times?                        18:28:14
25       MS. CENDALI: Objection to form.   18:28:15

293

1    H. Rogers -- HIGHLY CONFIDENTIAL
2    A.   Theoretically.                  18:28:16
3    Q.   Well, you theorized about that;   18:28:18
4    correct?                            18:28:22
5    A.   No, I didn't.                  18:28:22
6    Q.   What did you say that was        18:28:23
7    different in the audio interview?       18:28:24
8        MS. CENDALI: Objection to form.   18:28:26
9    A.   I'm not sure what you're saying.   18:28:27
10   Q.   So in the audio interview you     18:28:31
11   said, when you're really in a pinch, you   18:28:33
12   can make one rotation versus three.   18:28:36
13   A.   That would be a justification     18:28:38
14   for having a second button. Another   18:28:40
15   justification would be that Nintendo's   18:28:44
16   game machine has two buttons and they were   18:28:48
17   just looking for something to do with the   18:28:50
18   other button.                       18:28:54
19   Q.   So taking away the issue of       18:28:54
20   whether there's one button or two, I'm   18:28:58
21   asking specifically about whether the fact   18:29:01
22   that you would have to make one rotation   18:29:02
23   instead of three makes the gameplay   18:29:04
24   easier.                             18:29:09
25       MS. CENDALI: Asked and answered.   18:29:09

74  (Pages 290 to 293)

VERITEXT REPORTING COMPANY

212-267-6868                                      516-608-2400

# Exhibit 13

## to the Declaration of Johanna Schmitt, Esq. in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment

1

1

2   UNITED STATES DISTRICT COURT
    DISTRICT OF NEW JERSEY

3   _____

4   TETRIS HOLDING, LLC and THE TETRIS
    COMPANY, LLC,

5
                              Plaintiffs,

6
                  -against-

7
    XIO INTERACTIVE INC.,

8
                              Defendant.

9
    Civil Action No. 3:09-cv-6115 (FLW)(DEA)

10  _____

11
                          January 13, 2011

12                        9:22 a.m.

13

14

15

16          HIGHLY CONFIDENTIAL DEPOSITION

17  of ALEXEY PAJITNOV, taken by Defendant,

18  pursuant to Notice, held at the offices of

19  KIRKLAND & ELLIS, LLP, 601 Lexington

20  Avenue, New York, New York before Wayne

21  Hock, a Notary Public of the State of New

22  York.

23

24

25

**22**

```
 1      A. Pajitnov -- HIGHLY CONFIDENTIAL
 2   from pentomino to tetromino.              09:46:23
 3   Q.   I understand.                        09:46:25
 4        Is there anything else that you      09:46:26
 5   remember changing to make the game more   09:46:35
 6   fun or interesting?                       09:46:35
 7      A.   Again, it's more fun and          09:46:35
 8   interesting for me.                       09:46:53
 9        Yes, I do remember I try other       09:46:55
10   stuff but I came back and I try other     09:46:58
11   stuff and I came back, and this is a      09:47:01
12   normal process for any design, yes.       09:47:04
13        For example, I tried to start        09:47:08
14   the game not on the empty field but with  09:47:12
15   some set up pieces inside, but then I     09:47:18
16   didn't like it and I change it back to the 09:47:24
17   empty field.  That's another example which 09:47:27
18   I can recollect from that time.           09:47:32
19   Q.   Anything else that you can think     09:47:34
20   of?                                       09:47:37
21      A.   Not now.  Well, maybe you will    09:47:38
22   ask me more question, maybe I might       09:47:44
23   remember something.  At this time, no.    09:47:50
24   Q.   Maybe I will.                        09:47:53
25        Did the first version of Tetris      09:47:55
```

**23**

```
 1      A. Pajitnov -- HIGHLY CONFIDENTIAL
 2   that you worked on include any graphics?  09:47:57
 3      A.   Define graphics, please.          09:48:03
 4   Q.   What do you understand the term      09:48:05
 5   "graphics" to mean?                       09:48:08
 6      A.   Well, there are lots of           09:48:09
 7   different understandings of this word.  In 09:48:12
 8   my technical world under graphics people  09:48:14
 9   understand ability to manipulate every    09:48:21
10   pixel on the screen, for example.  In your 09:48:27
11   world, graphic is something what you could 09:48:31
12   see by your eyes.  That agree with me that 09:48:34
13   this is two very different definitions.    09:48:40
14   Q.   So I'm just trying to understand     09:48:43
15   the two understandings that you gave.     09:48:48
16        The technical -- in your            09:48:50
17   technical world, graphics people          09:48:51
18   understand the ability to manipulate every 09:48:56
19   pixel on the screen; is that right?       09:48:59
20      A.   Uh-huh.                           09:49:01
21   Q.   Okay.                                09:49:02
22        So I don't quite understand          09:49:02
23   that.                                     09:49:11
24        Could you explain that to me?        09:49:11
25      A.   You ask me does my game have any  09:49:13
```

**24**

```
 1      A. Pajitnov -- HIGHLY CONFIDENTIAL
 2   graphics.  Well, if you see anything on   09:49:18
 3   the screen, there is a sort of graphics.  09:49:22
 4   In this respect, yes, my game has         09:49:24
 5   graphics.  In technical sense, I didn't   09:49:29
 6   have ability to manipulate every pixel on 09:49:29
 7   the screen so I didn't have a graphics at 09:49:33
 8   all.                                      09:49:36
 9   Q.   Okay.  So I understand.              09:49:36
10      A.   So your definition is absolutely  09:49:38
11   vital to have my truthful answer on this  09:49:41
12   question.                                 09:49:45
13   Q.   Right.                               09:49:45
14        And so under your technical          09:49:46
15   definition of graphics, which is the      09:49:49
16   ability to manipulate pixels on the       09:49:51
17   screen, there were no graphics?           09:49:54
18      A.   That's correct.                   09:49:56
19        MS. MAITRA: Okay.  Thank you.  I     09:50:08
20   understand.                               09:50:10
21        I'd like to mark as Exhibit 31 a     09:50:13
22   document starting with the Bates          09:50:43
23   numbers TETRIS-XIO-0025966.               09:50:45
24        (Whereupon, a five-page document     09:50:52
25   was marked Defendant's Exhibit 31         09:50:52
```

**25**

```
 1      A. Pajitnov -- HIGHLY CONFIDENTIAL
 2   for identification.)                      09:51:27
 3   Q.   If you could look through the        09:51:27
 4   document and tell me when you're done     09:51:29
 5   looking through it, please.               09:51:32
 6      A.   (Reviewing).                      09:51:33
 7        I can make mark on this paper;       09:51:46
 8   no?                                       09:54:38
 9   Q.   It's probably best if you don't.     09:54:41
10        MS. CENDALI: It's definitely         09:54:44
11   best if you don't.                        09:54:47
12   Q.   And you should also know, Mr.        09:54:55
13   Pajitnov, if you write anything, we get to 09:54:58
14   look at it, so you probably don't want to 09:55:00
15   write anything.  It's your choice.        09:55:02
16      A.   (Reviewing).                      09:55:16
17        Okay.                                09:57:38
18   Q.   You're done?                         09:57:39
19      A.   Uh-huh.                           09:57:40
20   Q.   Do you recognize this document?      09:57:41
21      A.   Yeah, it seems familiar to me.    09:57:42
22   Q.   Okay.                                09:57:47
23        What is it?                          09:57:48
24      A.   I think it's one of the           09:57:48
25   interviews I gave some journalist.  I     09:57:50
```

7 (Pages 22 to 25)

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

90

```
 1        A. Pajitnov -- HIGHLY CONFIDENTIAL
 2   shadow piece under the playing piece.      11:47:16
 3        MS. CENDALI:  Objection to form.      11:47:21
 4        Q.   Was that something that was       11:47:23
 5   included in the original version of        11:47:27
 6   Tetris, the Electronika 60 version of      11:47:29
 7   Tetris?                                     11:47:35
 8        A.   No.                               11:47:35
 9        Q.   Do you know when it was           11:47:35
10   incorporated?                              11:47:37
11        A.   I can't remember.  I'm sorry, it  11:47:37
12   was some versions during history.  At one  11:47:46
13   point it appears and it was a very useful  11:47:49
14   feature so it remained in most of our      11:47:54
15   versions.                                  11:47:59
16        Q.   You said it was a very useful     11:47:59
17   feature.                                   11:48:01
18        Why was it a useful feature?          11:48:01
19        A.   Well, because it simplify -- not  11:48:05
20   simplify, it make player feel more         11:48:12
21   comfortable at the game because he doesn't 11:48:18
22   need to move his eyes back and forth all   11:48:20
23   the time.  That's my understanding why     11:48:23
24   it's useful.  But just my feeling it was   11:48:38
25   useful.  I liked it.  I saw it and I said  11:48:41
```

91

```
 1        A. Pajitnov -- HIGHLY CONFIDENTIAL
 2   that's cool and that's how it end up in    11:48:44
 3   the game.                                  11:48:47
 4        Q.   I see.                            11:48:47
 5        Now, I think we discussed this,       11:48:48
 6   but the next feature is the display of the 11:48:51
 7   next playing piece that will fall down in  11:48:54
 8   the matrix or the playing field, and I     11:48:58
 9   think you referred to that as the          11:49:00
10   predictive --                              11:49:02
11        A.   Prediction.                       11:49:04
12        Q.   Prediction, yes.                  11:49:05
13        So that was in the original           11:49:06
14   version of Tetris, the Electronika 60      11:49:07
15   version?                                   11:49:10
16        A.   Yes.                              11:49:10
17        Q.   Now, this I actually would like  11:49:14
18   you to actually explain this to me because 11:49:16
19   I don't quite understand it.  The change   11:49:19
20   in color of the playing pieces when they   11:49:21
21   are in lockdown mode.                      11:49:24
22        First I assume this wasn't in         11:49:26
23   the original version of Tetris because you 11:49:28
24   couldn't change the color in the original  11:49:30
25   version of Tetris; correct?               11:49:32
```

92

```
 1        A. Pajitnov -- HIGHLY CONFIDENTIAL
 2        A.   Yes, correct.                     11:49:34
 3        Q.   So what exactly is this feature?  11:49:36
 4        A.   Well, when your piece moves --    11:49:38
 5   well, if you are a player and when your    11:50:04
 6   piece moves, it is colored in order for    11:50:04
 7   you to see it clearly and follow by eyes   11:50:08
 8   and again so it's some kind of color       11:50:16
 9   coding involved so it might help the       11:50:20
10   beginner player to recognize the piece     11:50:25
11   easily or whatever.  But as it's locked    11:50:29
12   down, its border becomes the part of the   11:50:32
13   play field so -- and for many versions     11:50:41
14   it's no reason to keep the color there     11:50:45
15   because it doesn't help anymore.  You      11:50:49
16   don't need to recognize the lockdown piece 11:50:53
17   as a piece anymore so what is important is 11:50:59
18   the separate blocks there.  And in order   11:51:03
19   to not have this play field very colorful, 11:51:05
20   many colors, it's just -- well, in some    11:51:12
21   versions they put it in one color as soon  11:51:16
22   as it's background so you clearly see the  11:51:21
23   play field in one color and the colorful   11:51:25
24   piece coming down.                         11:51:27
25        Q.   Okay.  I understand.  Thank you.  11:51:28
```

93

```
 1        A. Pajitnov -- HIGHLY CONFIDENTIAL
 2        The screen layout in multiplayer      11:51:31
 3   versions with the player's matrix          11:51:39
 4   appearing most prominently on the screen   11:51:41
 5   and the opponents' matrices appearing      11:51:45
 6   smaller than the player's matrix to the    11:51:47
 7   side of the player's matrix.               11:51:48
 8        First, were you involved in the       11:51:50
 9   development of the multiplayer versions of 11:51:56
10   Tetris?                                    11:51:59
11        A.   Development?  Please clarify it.  11:51:59
12        Q.   Did you contribute at all to the 11:52:06
13   -- did you make any contribution to the    11:52:11
14   multiplayer versions of Tetris?            11:52:14
15        A.   Yes, I did participate in        11:52:17
16   several designs of the multiplayer         11:52:19
17   versions.  Not the first one, by the way.  11:52:22
18        Q.   And what about this particular    11:52:25
19   feature where the player's matrix is most  11:52:26
20   prominent on the screen and the opponents' 11:52:31
21   matrices are smaller than the player's     11:52:33
22   matrix?                                    11:52:37
23        MS. CENDALI:  Wait a minute.          11:52:38
24   Objection to form.                         11:52:39
25        You can answer.  Objection to         11:52:41
```

24  (Pages 90 to 93)

VERITEXT REPORTING COMPANY

212-267-6868                                              516-608-2400

94

```
 1        A. Pajitnov -- HIGHLY CONFIDENTIAL
 2   form.                          11:52:44
 3   Q.   Sorry, continue.          11:52:45
 4        Would you like that read back?   11:52:48
 5        MS. CENDALI: I'm actually not    11:52:56
 6   sure what the pending question is.    11:52:58
 7   A.   Excuse me, could you please      11:52:59
 8   repeat the essence of the question?   11:53:03
 9        MS. MAITRA: I need to restate it 11:53:06
10   because it wasn't a proper question,  11:53:08
11   so let me ask it properly.      11:53:09
12   Q.   Were you involved in the    11:53:12
13   development of this particular feature 11:53:14
14   which is the player's matrix appearing 11:53:15
15   most prominently on the screen and the 11:53:21
16   opponents' matrices appearing smaller than 11:53:29
17   the player's matrix and to the side of the 11:53:29
18   player's matrix?                11:53:29
19   A.   To the best of my knowledge, I  11:53:30
20   wasn't involved in the -- I didn't do any 11:53:35
21   contribution for this particular feature. 11:53:37
22   Q.   Okay. Thank you.           11:53:39
23        So I'd like to unfortunately   11:53:40
24   stick on this list and ask you if there 11:53:47
25   was any sort of game design reason for  11:53:50
```

95

```
 1        A. Pajitnov -- HIGHLY CONFIDENTIAL
 2   having a long vertical rectangle playing 11:53:54
 3   field or matrix which is higher than wide. 11:54:00
 4        MS. CENDALI: Objection to form.  11:54:03
 5   Vague.                          11:54:04
 6        You can answer.            11:54:05
 7   A.   You know, when we design, we    11:54:06
 8   don't usually think why the reasons. We  11:54:14
 9   try this, try that, we try more kind of 11:54:21
10   balance this stuff rather than take some 11:54:26
11   reasoning under it. So I can answer that 11:54:27
12   no, there was no reason. It was just my 11:54:30
13   preference.                     11:54:33
14   Q.   Okay. I understand.         11:54:33
15        So would the seven geometric   11:54:36
16   playing pieces formed by four equally   11:54:42
17   sized blocks joined at the sides, do you 11:54:45
18   understand that to mean a tetromino?    11:54:48
19   A.   Technically this is not correct. 11:54:49
20   Q.   Okay.                      11:54:51
21        Tell me why not.           11:54:52
22   A.   Because there are just five    11:54:53
23   tetromino existing in the whole        11:54:58
24   definition of this shape, of the       11:55:09
25   tetromino. So basically I add two more  11:55:10
```

96

```
 1        A. Pajitnov -- HIGHLY CONFIDENTIAL
 2   symmetrical form pieces which were      11:55:14
 3   isometrical in order to have very pleasant 11:55:18
 4   for me number seven of the acting       11:55:23
 5   tetrominoes.                    11:55:27
 6   Q.   And earlier you had mentioned   11:55:28
 7   that you had tried the game with        11:55:31
 8   pentominoes and there were too many of  11:55:35
 9   them, there were twelve; right?         11:55:37
10   A.   Much more than twelve.        11:55:39
11   Q.   Oh, right, if you take also the 11:55:41
12   mirror images of all of them.          11:55:44
13        So to your mind there were too 11:55:46
14   many for the game to be fun?           11:55:49
15   A.   For the game I want to play,    11:55:55
16   yes. Because actually I was shown the   11:55:58
17   game with five pieces fully developed   11:56:01
18   afterwards, it was in the other country, 11:56:05
19   and it's some kind of playable version. 11:56:07
20   So I couldn't imagine that some people  11:56:13
21   really enjoy it. They even have full fun 11:56:18
22   club of it.                     11:56:21
23   Q.   But you didn't enjoy it?      11:56:21
24   A.   No.                       11:56:23
25   Q.   Why not?                   11:56:23
```

97

```
 1        A. Pajitnov -- HIGHLY CONFIDENTIAL
 2   A.   The way I want my game to play  11:56:24
 3   is I want to have a kind of certain tempo 11:56:31
 4   of receiving the pleasure out of the game 11:56:40
 5   experience.                     11:56:45
 6   Q.   Tempo. Okay.               11:56:46
 7   A.   I don't want to think too much  11:56:47
 8   or to have the game very slow. I don't  11:56:51
 9   want it to be really fast. But I have a  11:56:54
10   feeling that some in the middle it's    11:56:57
11   something very right to have.          11:57:00
12   Q.   I see.                     11:57:02
13        So it -- so with the          11:57:02
14   pentominoes, you feel like you would have 11:57:08
15   to think too much but with maybe a domino 11:57:10
16   you would think maybe too little and the 11:57:20
17   tetromino you sort of have to think at   11:57:23
18   exactly the right tempo?               11:57:26
19        MS. CENDALI: Just a second.    11:57:28
20        Objection to form.         11:57:29
21   A.   Well, I did try several stuff.  11:57:30
22   And yes, it doesn't feel exactly right   11:57:40
23   generally, but it feel very right for me 11:57:45
24   to enjoy.                       11:57:48
25   Q.   Right.                     11:57:49
```

25  (Pages 94 to 97)

138

```
 1        A. Pajitnov -- HIGHLY CONFIDENTIAL
 2   and accessories?"                        14:13:35
 3        MS. CENDALI: As used in this        14:13:36
 4   document? Objection.                     14:13:38
 5        A.  Well, usually when I use the    14:13:39
 6   word "rule," I try to please the people  14:13:46
 7   very unfamiliar with the game production 14:13:52
 8   and industry, because that's what they   14:13:55
 9   know about the game.  But what I really  14:13:58
10   mean under this is the features of the   14:14:03
11   game which determine what I want to      14:14:06
12   express, what I want to play myself.  And 14:14:10
13   those stuff are -- well, pretty much     14:14:12
14   covered with the list on Exhibit 34.     14:14:21
15        Q.  Okay.                           14:14:24
16        Do people who are unfamiliar        14:14:24
17   with the game production and industry    14:14:32
18   understand, in your opinion, the word    14:14:38
19   "rules" differently than you?            14:14:42
20        MS. CENDALI: Objection.             14:14:44
21   Foundation.                              14:14:45
22        You can answer.                     14:14:45
23        A.  Yes, like a grandfather -- like 14:14:46
24   a grandmother listen for her grandson and 14:14:54
25   he say, oh, I played these games and the 14:14:59
```

139

```
 1        A. Pajitnov -- HIGHLY CONFIDENTIAL
 2   word "game" is immediately associated in 14:15:03
 3   the brain of the grandmother with the    14:15:07
 4   rules, so she asks what is the rules.  So 14:15:08
 5   this is kind of everyday association and 14:15:11
 6   that's why I mentioned it.  That's why   14:15:14
 7   sometimes in my interview I mentioned    14:15:18
 8   rules when I have in mind the real       14:15:20
 9   features and maybe sometimes mechanics of 14:15:23
10   the game or something like that.         14:15:28
11        Q.  Okay.                           14:15:30
12        So it is fair to say the items      14:15:33
13   on Exhibit 35 are the mechanics of the   14:15:35
14   game?                                    14:15:39
15        A.  Thirty-four you mean?           14:15:39
16        Q.  Thirty-four, yes.               14:15:41
17        MS. CENDALI: Asked and answered.    14:15:44
18        You can answer.                     14:15:46
19        A.  For the sake of simplicity, yes. 14:15:46
20   It is some respect in the word           14:16:00
21   "mechanics," but it is very professional. 14:16:03
22   I don't think you're interested in it.   14:16:08
23        Q.  I am interested.                14:16:10
24        Could you explain what you mean     14:16:14
25   -- please explain what you mean.         14:16:18
```

140

```
 1        A. Pajitnov -- HIGHLY CONFIDENTIAL
 2        A.  So the game itself as a product  14:16:21
 3   is the kind of complicated psychological  14:16:24
 4   product.  It appeals to the human mood, to 14:16:30
 5   the human pleasure, and whatever.  And    14:16:37
 6   there are some features in the game which 14:16:40
 7   end up serving this stuff.  From the other 14:16:43
 8   hand, it's a very technical product,      14:16:49
 9   especially computer games.  It requires   14:16:52
10   programming, it requires kind of proper   14:16:56
11   functioning of certain hardware, and      14:17:01
12   property of this hardware.  So in this    14:17:05
13   respect, some of the game properties are  14:17:10
14   more related to the game as a program.    14:17:15
15        So when we call -- when I use        14:17:19
16   personally the word "mechanics of the     14:17:23
17   game," I usually refer to more kind of    14:17:27
18   technical aspect of the game, rather      14:17:31
19   program than psychological piece of       14:17:35
20   enjoyment or happiness or whatever you    14:17:42
21   wish to call it.                          14:17:43
22        Q.  But for the sake of             14:17:44
23   simplicity --                            14:17:46
24        A.  All of them are features.  Some  14:17:48
25   of those features which kind of related   14:17:51
```

141

```
 1        A. Pajitnov -- HIGHLY CONFIDENTIAL
 2   more to your brain or to your emotions and 14:17:57
 3   some of these features are related more to 14:18:04
 4   your fingers and pushing buttons and your 14:18:06
 5   blinking or whatever you do while you play 14:18:12
 6   the game.                                 14:18:15
 7        Q.  Can we actually look back at the 14:18:16
 8   list, Exhibit 34?                         14:18:22
 9        You say that some of them relate     14:18:24
10   more to emotions and others relate to your 14:18:27
11   fingers and pushing buttons.             14:18:30
12        A.  Uh-huh.                          14:18:32
13        Q.  Could you tell me, let's go      14:18:33
14   through them, the long vertical rectangle 14:18:35
15   playing field or matrix which is higher   14:18:41
16   than wide.                                14:18:44
17        MS. CENDALI: Objection.              14:18:45
18        Q.  Which of the two categories does 14:18:46
19   this one fall in?                         14:18:50
20        MS. CENDALI: Objection to form.      14:18:53
21        A.  So get me right.  So what I      14:18:53
22   tried to mention that all of them are     14:18:59
23   features.  Some of them are related to    14:19:04
24   this and other related to this, but every 14:19:06
25   one has a mixture of both.  So sometimes I 14:19:10
```

36  (Pages 138 to 141)

142

```
1      A. Pajitnov -- HIGHLY CONFIDENTIAL
2   would have a very difficult time to        14:19:15
3   categorize whether it's mechanics or        14:19:17
4   whatever or it's just a feature.  And       14:19:19
5   basically it's my use of the word           14:19:22
6   "mechanics." Some people could not agree    14:19:29
7   with me and they're absolutely right.       14:19:33
8      Q.   Fine.                               14:19:35
9      A.   So coming back to your question,    14:19:36
10  this rectangle stuff is more kind of        14:19:43
11  emotional.  I am more pleased to play on    14:19:52
12  vertical screen rather than horizontal,     14:19:59
13  for example, myself.                        14:20:03
14     Q.   And what about the seven            14:20:04
15  geometric playing pieces formed by four     14:20:06
16  equally sized blocks joined at the sides?   14:20:09
17     MS. CENDALI: Objection to form.          14:20:13
18     A.   Again, that's a mixture of          14:20:33
19  mechanical and if we want to -- I never     14:20:47
20  tried to separate this issue kind of        14:20:48
21  strictly between this and this.  It's not   14:20:51
22  a category which I have in my mind.         14:20:53
23     But if you ask me, I would say           14:20:55
24  that originally it was more kind of         14:20:59
25  mechanics of the game but later on it       14:21:07
```

143

```
1      A. Pajitnov -- HIGHLY CONFIDENTIAL
2   becomes emotional stuff because we get      14:21:13
3   attached to these pieces, we like to play   14:21:15
4   it, and somehow they really pleased us, to  14:21:19
5   some extent.                                14:21:25
6      Q.   I understand.                        14:21:26
7      Why was it originally part of            14:21:26
8   the mechanics?                              14:21:30
9      MS. CENDALI: Objection to form.          14:21:34
10     A.   Well, when I got this principle     14:21:38
11  of real-time game and I had my              14:21:43
12  pentominoes, it seems to me that I want to  14:21:48
13  use this abstract geometrical object to     14:21:54
14  serve in my game, it was my instrument, it  14:22:04
15  was my tools to design this game            14:22:08
16  experience.  And the fact that they have    14:22:12
17  good variety and more or less consistent    14:22:17
18  to each other make it a rather mechanical   14:22:24
19  feature rather than really emotional.       14:22:31
20  It's nothing to do with emotional -- with   14:22:33
21  emotions, just all the geometrical shape.   14:22:39
22     Q.   What about the seven geometric      14:22:45
23  playing pieces being brightly colored?      14:22:51
24     A.   I think I just answered your        14:22:54
25  that.                                       14:22:56
```

144

```
1      A. Pajitnov -- HIGHLY CONFIDENTIAL
2      Q.   No, we were talking about the       14:22:56
3   seven geometric playing pieces being        14:22:58
4   formed by four -- so I'm talking about the  14:23:01
5   second one, the seven geometric playing     14:23:01
6   pieces being brightly colored, the fact     14:23:04
7   that they were brightly colored.            14:23:05
8      MS. CENDALI: Objection to form.          14:23:08
9      Objection.  Relevance.                    14:23:09
10     You can answer.                          14:23:11
11     A.   Well, it is definitely emotional    14:23:11
12  stuff.  Brightly colored, not brightly      14:23:17
13  colored.  If you have bad old device, it    14:23:22
14  wouldn't be that bright.                    14:23:26
15     Q.   What about the next one, the        14:23:32
16  blocks of the seven geometric playing       14:23:33
17  pieces being individually delineated?  Do   14:23:35
18  you believe that is part of the mechanics   14:23:39
19  or part of the emotion of the game?         14:23:42
20     MS. CENDALI: Objection to form.          14:23:45
21     A.   It's really hard to say.  I'd       14:23:48
22  say it's a mixture.                         14:23:59
23     Q.   Okay.                               14:24:01
24     What about the appearance of the         14:24:01
25  playing pieces at the top of the matrix?    14:24:05
```

145

```
1      A. Pajitnov -- HIGHLY CONFIDENTIAL
2      MS. CENDALI: Objection to form.          14:24:07
3      A.   Well, again it's rather a           14:24:08
4   mixture of both.  Maybe it was definitely   14:24:28
5   more mechanical stuff because it's easier   14:24:32
6   to scroll something -- program-wise, it's   14:24:35
7   easier for programmer to scroll something   14:24:41
8   down rather than go in the other            14:24:45
9   direction.  It saved me kind of maybe       14:24:47
10  fifteen minutes of extra programming or     14:24:51
11  something like that.  But that's not a      14:24:54
12  decisive kind of argument in this respect.  14:24:57
13     Q.   I understand.                        14:25:02
14     What about the starting                  14:25:02
15  orientation of the playing pieces?          14:25:06
16     MS. CENDALI: Objection to form.          14:25:08
17     Q.   Sorry, we're at one, two, three,    14:25:15
18  four, five, six.                            14:25:18
19     A.   We clarified it before what does    14:25:20
20  it mean exactly.                            14:25:22
21     Q.   Sure.                               14:25:23
22     A.   But I kind of lost this point,      14:25:24
23  so starting orientation?  Well, for me      14:25:30
24  it's -- it is a feature in the game but in  14:25:38
25  different versions they are different, so   14:25:43
```

37  (Pages 142 to 145)

**146**

1    A. Pajitnov -- HIGHLY CONFIDENTIAL
2    I don't know.  It refers to both.        14:25:47
3        Q.    Okay.                          14:25:51
4        What about the downward,             14:25:51
5    lateral, and rotating movement of the    14:25:56
6    playing pieces, do you consider this to be  14:25:59
7    a game mechanic or a feature?            14:26:01
8        MS. CENDALI: Objection to form.      14:26:06
9        A.    This is definitely both because  14:26:16
10   it needs certain efforts to program it and  14:26:17
11   the programming is a big part of it, but  14:26:20
12   it's very significant for the player how  14:26:25
13   he manipulates the pieces and that really  14:26:28
14   determine his game.                      14:26:31
15       Q.    And the next one, the          14:26:33
16   disappearance of any completed horizontal  14:26:35
17   line.                                    14:26:38
18       Is this a game mechanic or is it    14:26:39
19   a feature?                               14:26:45
20       MS. CENDALI: Objection to form.      14:26:45
21       A.    Those stuff are also both.     14:26:46
22       Q.    Okay.                          14:26:53
23       Why?                                 14:26:54
24       A.    Well, first of all, it really  14:26:54
25   give a very big investment in how the game  14:27:06

**147**

1    A. Pajitnov -- HIGHLY CONFIDENTIAL
2    look and feel.  That's what people       14:27:09
3    recognize and that's what people         14:27:11
4    understand, so in this respect it's a    14:27:13
5    definitely feature of the game.          14:27:18
6        Mechanical stuff, well, it is        14:27:21
7    mechanical because it needs to be kind of  14:27:26
8    described to the programmer or whatever  14:27:30
9    what exactly should happen and it's not  14:27:32
10   kind of very trivial stuff to do.  In this  14:27:37
11   respect, it might be mechanical.         14:27:41
12       Q.    Okay.  Thank you.              14:27:43
13       The subsequent consolidation of      14:27:44
14   the playing pieces remaining on the      14:27:51
15   playing field as a result of the downward  14:27:52
16   shift into the space vacated by the      14:27:54
17   disappearance line.                      14:27:57
18       And I know that you corrected        14:27:58
19   this to be part of the playing pieces;   14:27:59
20   correct?                                 14:28:03
21       A.    Yeah.                          14:28:03
22       Q.    So with that understanding of  14:28:04
23   the feature, with that correction to the  14:28:08
24   feature, do you consider this to be a game  14:28:09
25   mechanic?                                14:28:12

**148**

1    A. Pajitnov -- HIGHLY CONFIDENTIAL
2        MS. CENDALI: Objection to form.      14:28:13
3        Sorry, let me just clear that        14:28:20
4    sentence again.                          14:28:22
5        The subsequent consolidation of      14:28:23
6    the playing pieces remaining on the      14:28:26
7    playing field as a result of the downward  14:28:28
8    shift in the space vacated by the        14:28:31
9    disappearing line.                       14:28:34
10       Do you consider this to be a         14:28:36
11   game mechanic?                           14:28:38
12       MS. CENDALI: Objection to the        14:28:38
13   form.                                    14:28:39
14       A.    That's both.                   14:28:40
15       Q.    Okay.                          14:28:41
16       A.    That's both.                   14:28:42
17       Q.    And why is it both?            14:28:43
18       A.    In game, because it is a very  14:28:44
19   significant part of the look and feel and  14:28:47
20   your -- the player's understanding of the  14:28:48
21   game.  But from the other hand, it's a   14:28:52
22   certain algorithm should be performed and  14:29:03
23   debugged and implemented.                14:29:03
24       Q.    The display of garbage lines   14:29:06
25   with at least one missing block in random  14:29:15

**149**

1    A. Pajitnov -- HIGHLY CONFIDENTIAL
2    order.                                   14:29:19
3        Is this a game mechanic?            14:29:19
4        MS. CENDALI: Objection.              14:29:21
5        A.    Actually, it's both.           14:29:21
6        As a mechanic, it's -- well, as     14:29:28
7    a mechanic, it should be -- it is certain  14:29:31
8    rules how many -- well, somebody need to  14:29:36
9    specify how many holes or how random they  14:29:39
10   are at at which moment the line appears.  14:29:47
11   But it is definitely the instrument to   14:29:51
12   kind of really play the game for one     14:29:55
13   opponent to the other one.               14:30:07
14       Q.    I see.                         14:30:09
15       What about the appearance of         14:30:09
16   blocks automatically filling from the    14:30:14
17   bottom to the top when the game is over?  14:30:16
18   Is this a game mechanic?                 14:30:19
19       MS. CENDALI: Objection to form.      14:30:21
20       A.    No, it's not a game mechanic.  14:30:22
21   It's rather than a visual feature which   14:30:31
22   kind of made the game more recognizable.  14:30:36
23   The game is over.                        14:30:41
24       Q.    Okay.                          14:30:45
25       What about the appearance of a       14:30:45

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

# Exhibit 14

## to the Declaration of Johanna Schmitt, Esq. in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment

1

J. BEGY

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY


-----------------------------x

TETRIS HOLDING, LLC, AND THE
TETRIS COMPANY, LLC,

     Plaintiffs and
     Counterclaim Defendants,
                            Civil Action No.
vs.                            3:09-CV-6115(FLW)(DEA)

XIO INTERACTIVE INC.,

     Defendant and
     Counterclaim Plaintiff.

-----------------------------x



             VIDEOTAPED DEPOSITION OF JASON SCOTT

     BEGY, a witness called by the Plaintiffs,

     taken pursuant to the applicable provisions of

     the Federal Rules of Civil Procedure, before

     James A. Scally, RMR, CRR, a Notary Public in

     and for the Commonwealth of Massachusetts, at

     the offices of Ropes & Gray LLP, 800 Boylston

     Street, Boston, Massachusetts, on Tuesday, May

     10, 2011, commencing at 8:48 a.m.

150

J. BEGY

1       J. BEGY
2    A.  Uh-huh.
3    Q.  You state, "Furthermore, whether an alteration to
4  a game has an effect on how it is played is a litmus test
5  for whether that alteration was to a rule."
6        Do you see that?
7    A.  I do.
8    Q.  So in your view, then, anything that alters how a
9  game is played is a game rule; is that right?
10   A.  That is one way of testing, correct.
11   Q.  And -- well, that's what you said is your litmus
12  test; right?
13   A.  Uh-huh.
14   Q.  And in your view, anything that's a game rule is
15  not expressive; correct?
16   A.  As I understand it, yes.
17   Q.  And in your view as you understand it, game rules
18  aren't protected by copyright.  Anybody can copy them;
19  right?
20   A.  As I understand it, yes.
21   Q.  Okay.  So in the various legal bits of information
22  provided you, were you given any legal authority for what
23  constituted a rule?
24   A.  No, I was not.
25   Q.  Did you ask?

151

J. BEGY

1       J. BEGY
2    A.  No, I did not.
3    Q.  But you are nonetheless giving an extra -- expert
4  opinion as to whether "under the legal framework provided
5  to me Xio's video game Mino infringes Tetris's copyright,
6  trademark, or trade dress rights"; correct?
7    A.  Correct.
8    Q.  So under your definition of "rule," what, in your
9  opinion, are the rules of Tetris?
10   A.  Well, they include most of the elements listed
11  here.  So things like the clearing of the lines, moving of
12  the blocks, rotation of the blocks, the next piece, like
13  the garbage lines, the size of the matrix, the fact that
14  it's taller than it is wide, the way -- the starting
15  orientation, how they appear at the start, and the -- the
16  fact that the blocks are tetrominos.  And then other things
17  that are not listed in here that would be considered rules
18  might be like scoring.  So, for example, how many points is
19  a given action worth.
20   Q.  So in your view, all the 15 things listed in
21  paragraph 14 of your expert reports are rules of Tetris,
22  and everybody should be free to copy them separately or
23  collectively; is that right?
24       MS. MAITRA:  Objection.  Compound and
25       mischaracterizes testimony.

152

J. BEGY

1       J. BEGY
2    A.  Well, in my report, I distinguish between things
3  that are rules and things that are functional.  So not all
4  of the elements are rules.
5    Q.  Okay.  So let's go back to paragraph 14 of your
6  report.
7    A.  Uh-huh.
8    Q.  Which of those 15 things are not rules?
9    A.  The seven geometric playing pieces being brightly
10  colored is functional.  The fact that the blocks are
11  individually delineated is functional.  The appearance of
12  the blocks filling from the bottom to the top is
13  functional.  The ghost piece is functional.  The change in
14  color is functional, when a piece enters lockdown mode, and
15  the layout of the matrixes in multiple.
16   Q.  I don't think you understood my question, or I
17  wasn't clear in how I asked it.
18   A.  Sorry.
19   Q.  My question is of the -- do you believe that
20  everything listed in paragraph 14 of your report are the
21  rules of Tetris?
22   A.  No.
23       MS. MAITRA:  Objection.  Asked and
24       answered.
25   Q.  No, okay.  So in your mind, there's a difference

153

J. BEGY

1       J. BEGY
2  between something that's a rule and something that is
3  functional?
4    A.  As -- as my understanding of it is, and as I
5  outlined here, a rule is functional, but because something
6  is functional does not make it a rule.
7    Q.  Okay.  So you're not claiming that everything in
8  paragraph 14, the 15 elements, are all rules; correct?
9    A.  Correct.
10   Q.  And you're not claiming that all these things are
11  functional; is that right?
12       MS. MAITRA:  Objection.
13       Mischaracterizes testimony.
14   A.  I am claiming that they are functional.
15   Q.  I just asked you which of these things are not
16  rules, and you started saying that certain aspects, certain
17  ones, were -- were functional; right?
18   A.  Correct.  So --
19   Q.  Does that mean that other ones aren't functional?
20   A.  No.  It means that rule is a subset of functional.
21   Q.  Rule -- can you explain what you mean?
22   A.  Sure.  I mean that in the context of a game, the
23  game rules are functional.  That does not mean that any
24  functional element is also a rule.  So there's a broad
25  category of functional elements under which falls rules.

162

J. BEGY

1
2    Q.  Isn't it true that you have never in your life
3  before being retained in this case had any conversation
4  with anyone about what is protectable in a video game?
5    A.  That is kind of -- that's an impossible question
6  to answer, because I can't 100 percent account for every
7  conversation I've ever had.
8    Q.  You can't recall one, though, can you?
9    A.  It seems likely that I've talked about it with
10  someone at some point, but I can't say for certain.
11    Q.  And you can't point to any of your articles or
12  panels that you were on about Mystery Science Theater 3000
13  or anything like that that talks about the protectable
14  expression of video games; right?
15    A.  Correct.
16    Q.  And were you given all of Dr. Bogost's report,
17  including all the exhibits?
18    A.  Honestly, I don't -- I don't remember if the
19  exhibits were given or not.
20    Q.  Did you think to ask -- well, let's look at
21  Exhibit E to his report.  It's the very end, last page of
22  the document -- second-to-the-last page of the document.
23  Forgive me.  And the document I'm referring to is Exhibit
24  11 to your deposition.
25        This is a CD containing a DVD containing

---

163

J. BEGY

1
2  executable or video files for Tetris games and Mino and
3  Mino Lite.  Do you see that?
4    A.  I do.
5    Q.  Did you ever get that CD?
6    A.  I definitely didn't get anything physical.
7    Q.  So you never got the CD, the DVD containing copies
8  of various Tetris games that he analyzed in his report;
9  right?
10        MS. MAITRA:  Objection.
11        Mischaracterizes testimony.
12    A.  I think -- I'm not 100 percent, but I think I was
13  given a digital version of this.  But it's not something I
14  really considered in the report.
15    Q.  Isn't it true you got a PDF of the report that Dr.
16  Bogost did and you didn't get a hard copy with the physical
17  DVD?
18    A.  Yes.
19    Q.  Okay.  And you didn't ask for it either?
20    A.  No, I did not.
21    Q.  And paragraph 17 of your expert report says, "Game
22  mechanics do not substantively differ from game rules in
23  the context of Tetris."
24        Do you see that?
25    A.  I do.

---

164

J. BEGY

1
2    Q.  And you say, "Like rules, a video game's game
3  mechanics are the formal properties of the system which
4  specify the limitations and affordances placed on the
5  player.  Thus I use these terms interchangeably in this
6  report."
7        Do you see that?
8    A.  I do.
9    Q.  There's no citation here to any definition of
10  "game mechanics" by anyone; isn't that true?
11    A.  That's true.
12    Q.  Why?
13    A.  Because "game mechanics" is a phrase that is used
14  frequently, and there is little common understanding over
15  what exactly it means.  I have been present at many debates
16  over what it -- what it could mean, and there -- I've never
17  seen a resolution.
18    Q.  So some -- so it's an imprecise term; is that
19  right?
20    A.  It can --
21        MS. MAITRA:  Objection.
22        Mischaracterizes testimony and vague.
23    A.  It can be imprecise.
24    Q.  And some people use "game mechanics" to describe
25  some things and some people use it to describe other

---

165

J. BEGY

1
2  things; right?
3        MS. MAITRA:  Objection.  Vague.
4    A.  As far as I can tell, yes.
5    Q.  So in your expert report, you've chosen to equate
6  "game mechanics," "rules"; right?  You use them
7  interchangeably; correct?
8    A.  Correct.
9    Q.  But not everybody would agree with that definition
10  in the field of studying video games; right?
11    A.  That seems possible, yes.
12    Q.  Then you go on to say -- well, do game mechanics
13  differ from game rules in games other than Tetris?
14    A.  Well, without a certain understanding of what
15  mechanics are, it's not an answerable question.
16    Q.  Then in paragraph 18, you go on to state,
17  "Functional game elements, which include game rules and
18  game mechanics, are those elements that serve a purpose or
19  function in the game beyond fanciful expression."
20        Do you see that?
21    A.  I do.
22    Q.  Where did you come up with this definition for
23  what constitutes a functional game element?
24    A.  You know, I don't know that there -- it's not like
25  there was a place.  It was based on, you know, my

210

J. BEGY

1      A.  Again, it's hard to say without having a concrete
2  example, but I mean certainly shape defines differences
3  between these pieces.
4      Q.  So if I looked at the I piece of the Tetris game,
5  that looks different than the S piece of the Tetris game;
6  right?
7      A.  True.
8      Q.  And you could tell them apart without them being
9  the same -- different colors; right?
10     A.  Well, I mean a solid principle in design is to
11  have these things -- have differences marked in multiple
12  ways so that it requires less effort on the part of the
13  player to distinguish them.  So, yes, they could be
14  distinguished solely on shape alone, but it's more
15  effective to have multiple features.
16     Q.  Well, the pentomino puzzle that inspired Alexey
17  Pajitnov, isn't it true that the pieces were all the same
18  color?
19     A.  I don't know exactly which version of the puzzle
20  he had.  I have seen versions where they're all one color.
21     Q.  Well, it was part of the exhibits to his
22  deposition, so it was available to you, since you said you
23  read his deposition and looked at the exhibits, but I guess
24  you didn't look at that exhibit; right?
25

211

J. BEGY

1      A.  I don't recall looking at it.
2      Q.  And if someone were inspired to create a video
3  game that's based on the pentomino puzzle, the -- it would
4  be a design choice as to whether to have the individual
5  mino blocks delineated; right?
6           MS. MAITRA:  Objection.  Asked and
7              answered and vague and ambiguous.
8      A.  As with having them brightly colored, it is a
9  design choice, but it is also a wise choice from a
10  usability standpoint.
11     Q.  But other choices could have been made too; right?
12          MS. MAITRA:  Objection.  Vague.
13     A.  I suppose they could not have been delineated, but
14  that would make them harder to distinguish and evaluate
15  where they fit.
16     Q.  And you're aware of versions of Tetris that don't
17  have the tetromino pieces individually delineated; right?
18     A.  I am.
19     Q.  And if you were inspired to create a video game
20  based on the pentomino puzzle, there's no reason that the
21  playing field had to be taller than it's wide; right?
22          MS. MAITRA:  Objection.  Vague.
23     A.  I mean, again, this is incredibly like -- it
24  depends on the game.  I mean this is hypothetical, so I

212

J. BEGY

1  can't say either way for certain.
2      Q.  Well, it's not hypothetical.  You've given an
3  expert report about functionality and what's required to be
4  in the Tetris video game; right?
5      A.  Correct.
6      Q.  Okay.  So we're not hypothetical.  This is your
7  expert opinion in this case.  And my question to you, since
8  you opined in your report that Alexey Pajitnov was inspired
9  by the pentomino puzzle, and you style yourself as somebody
10  who allegedly designs games, isn't it true that if you were
11  designing a game based on the pentomino puzzle, you could
12  have just as easily had a playing field horizontal as
13  opposed to with a vertical configuration; right?
14          MS. MAITRA:  So, objection.  Form,
15              compound, and vague and ambiguous.
16     A.  While it would be possible to do it any way I
17  want, the ending result and the final choice would be
18  influenced by the overall design, and -- among other
19  things.
20     Q.  Well, sure, you would -- in designing a game, you
21  would take different things into account, but isn't it true
22  that before Alexey Pajitnov designed Tetris, there's no --
23  there was no stone on which it was written that Tetris had
24  to have a playing field that was taller than it was wide;
25

213

J. BEGY

1  correct?
2      A.  Correct.
3      Q.  And you, as a creative guy, could have designed a
4  video game inspired by the pentomino puzzle perhaps even
5  with a circular playing field; right?
6           MS. MAITRA:  Objection.  Vague.
7      A.  Presumably.
8      Q.  Or a square playing field; right?
9      A.  Correct.
10     Q.  And if you were creating a video game inspired by
11  the pentomino puzzle, there was no reason that playing
12  pieces would have to start at the top of the playing field;
13  right?
14          MS. MAITRA:  Objection.  Vague.
15     A.  Correct.
16     Q.  You could design a video game where playing pieces
17  start on the side or on the bottom; isn't that true?
18     A.  That's true.
19     Q.  And isn't it true that if you were inspired to
20  create a game based on a pentomino puzzle, the pieces could
21  have started in the game in any orientation?
22     A.  That's true.
23     Q.  When you're playing a pentomino puzzle, the pieces
24  are just sitting there in front of you.  You can turn them
25

214

J. BEGY
1
2 any way you want; right?
3    A.  That's true.
4    Q.  They don't -- they don't start in any particular
5 position; correct?
6    A.  Correct.
7    Q.  So it's a design choice to decide that "I want the
8 piece to appear on the top of the screen"; correct?
9        MS. MAITRA:  Objection.  Vague and
10       ambiguous.
11   A.  Correct.
12   Q.  And it's a design choice to say that "I want the
13 L-shaped piece to first appear in a certain orientation";
14 correct?
15   A.  Correct.
16       MS. MAITRA:  Same objection.
17       Just give me a chance.
18   Q.  And it's a design choice to decide how each of
19 those seven pieces would first appear; correct?
20       MS. MAITRA:  Objection.  Vague and
21       ambiguous.
22   A.  Correct.
23   Q.  And if you were -- in a pentomino puzzle, there's
24 no aspect of line clearing, is there?
25       MS. MAITRA:  Objection.  Vague and

215

J. BEGY
1
2       ambiguous.
3    A.  No, there's not.
4    Q.  In a pentomino puzzle, you put the pieces together
5 to make a rectangular shape; is that right?
6    A.  If that, for you as the player, is your goal.
7    Q.  Okay.  There could be lots of different shapes, in
8 fact, in a pentomino puzzle that someone has as a goal;
9 correct?
10   A.  Correct.
11   Q.  And isn't it true that the game usually comes with
12 a little guide saying you can make myriad different shapes
13 as part of your goal?
14       MS. MAITRA:  Objection.  Calls for
15       speculation.
16   A.  Not having ever purchased one or seen one bought,
17 I couldn't say.
18   Q.  So you're not aware that the one that inspired
19 Alexey Pajitnov had a -- an insert that challenged people
20 to rearrange the pieces in various shapes other than a
21 horizontal line?
22   A.  I was not aware of that.
23   Q.  And isn't it possible if you wanted to, in light
24 of the fact that a pentomino puzzle did not have a
25 horizontal line clearance, there's no reason if that if you

216

J. BEGY
1
2 were inspired to make a game based on such a puzzle that
3 you had to use a horizontal line clearance; right?
4        MS. MAITRA:  Objection.  Form and
5        vague and ambiguous.
6    A.  Well, again, depending on the game you're making,
7 but there would be no hard-and-fast rule.
8    Q.  Right.  And you could have designed a game so that
9 the shape you had to create was a -- was a square or a
10 sphere if you wanted to; correct?
11   A.  Correct.
12   Q.  And there's no reason in designing a game inspired
13 by the pentomino puzzle that the pieces had to move down
14 from the top to the bottom of the screen; right?
15   A.  Correct.
16   Q.  Because in an actual pentomino puzzle, the pieces
17 don't move at all.  You just pick them up and put them
18 where you want; right?
19   A.  Correct.
20   Q.  So it was a design choice to decide to have the
21 puzzle pieces start at the top of the screen and move down;
22 correct?
23       MS. MAITRA:  Objection.  Vague and
24       ambiguous.
25   A.  As I understand it, yes.

217

J. BEGY
1
2    Q.  And in terms of those pieces, isn't it also
3 possible that not visually distinguishing the pieces would
4 be a valid creative choice?
5        MS. MAITRA:  Objection.  Vague and
6        ambiguous and form.
7    A.  How do you mean distinguishing the pieces?
8    Q.  Well, you were talking earlier about how you
9 thought having the pieces different colored would help
10 people tell them apart; isn't that right?
11   A.  That's correct.
12   Q.  Okay.  And that you thought -- that it was -- it
13 would be maybe easier for the player if they were different
14 colors; is that right?
15   A.  That's correct.
16   Q.  But isn't it true that an equally valid design
17 choice would be to have them all the same color and make
18 the game more challenging?
19       MS. MAITRA:  Objection.  Vague and
20       ambiguous.
21   A.  I mean the word "valid" is tricky there.  I think
22 that if you did not give another means of distinguishing
23 them, common feedback from play testers and players would
24 be that there should be a way.
25   Q.  Well, you don't know whether that's true; right?

55 (Pages 214 to 217)

218

J. BEGY

1    A.  I don't know for certain, no.
2    Q.  No.  And isn't it true that in the actual
3  pentomino game that inspired Mr. Pajitnov, the pieces were
4  all the same color?
5    A.  I believe so.
6         MS. MAITRA:  Objection.  Asked and
7    answered.
8    Q.  Now --
9         MS. MAITRA:  Just give me a chance.
10   Q.  When you -- if you were designing a game inspired
11 by the pentomino puzzle, there's -- and you chose to have
12 a -- to have part of the goals of the game to create a
13 horizontal shape, there wouldn't have been any requirement
14 that that shape had to disappear to be removed from the
15 playing field; right?
16   A.  There would not have had to have been a
17 requirement, no.
18   Q.  Right.  So in the pentomino game that inspired Mr.
19 Pajitnov, there wasn't anything that disappeared; right?
20   A.  I would assume not, no.
21   Q.  Right.  We're talking about physical pieces of
22 plastic.  It would be unlikely that they would be
23 disappearing; correct?
24   A.  Yes.  I would think so, yes.

219

J. BEGY

1    Q.  Right.  So it was a design choice to have the
2  shape that was created disappear; right?
3    A.  Correct.
4    Q.  And there were other design choices that could
5  have been made other than having the shape disappear;
6  right?
7         MS. MAITRA:  Objection.  Vague and
8    ambiguous.
9    A.  Correct.
10   Q.  For example, Alexey Pajitnov could have designed
11 the game to have the shape turn to water and drip off the
12 sides of the screen, for example?
13        MS. MAITRA:  Objection.  Form.
14   A.  I don't understand how that's different from
15 disappearing.
16   Q.  Well, you would see it turn to water and see it
17 drip off as opposed to instantly disappearing; isn't that
18 true?
19        MS. MAITRA:  Objection.  Vague and
20   ambiguous.
21   A.  I -- I suppose.  I mean I'd have to see it.
22   Q.  There'd be lots and lots of different ways you
23 could have -- you could form -- there's lots of choices on
24 what shape could be formed; right?

220

J. BEGY

1    A.  Correct.
2    Q.  And there's lots of choices on whether that shape
3  would be removed from the playing field in a particular
4  way; right?
5    A.  Correct.
6    Q.  And if you were designing a game inspired by the
7  pentomino puzzle, the playing pieces didn't need to
8  consolidate downward after the shape was removed; right?
9         MS. MAITRA:  Objection.  Vague and
10   ambiguous.
11   A.  I suppose they wouldn't have to, although I have a
12 hard time imagining enjoying such a game.
13   Q.  Well, the shape could have traveled upwards,
14 disturbing the playing pieces, and they could have remained
15 in those locations; right?
16        MS. MAITRA:  Objection.  Vague and
17   ambiguous.
18   A.  I suppose, but this is more of a compound rules
19 change now at this point.
20   Q.  Well, you in your master's thesis were thinking
21 about doing a version of Tetris where the pieces moved up;
22 right?
23   A.  I was discussing what such a thing would be like,
24 correct.

221

J. BEGY

1    Q.  Right.  And when Alexey Pajitnov was designing
2  Tetris, there hadn't been Tetris before.  He could have had
3  the pieces move up, he could have had the pieces move down,
4  or he could have had them move diagonally or side to side;
5  right?
6    A.  Correct.
7    Q.  Those were all choices he made; right?
8    A.  Correct.
9    Q.  And in designing a game inspired by a pentomino
10 puzzle, it was not necessary to use garbage lines; right?
11   A.  I suppose not, no.
12   Q.  And if there were garbage lines, there was no
13 obligation that the garbage lines had to appear in a
14 particular place on the screen; right?
15        MS. MAITRA:  Objection.  Vague.
16   A.  I'm sorry, can you repeat just the last part?
17   Q.  Sure.  If there were garbage lines, they could
18 have appeared anywhere; right?
19        MS. MAITRA:  Same objection.
20   A.  Well, assuming nothing else has changed, they
21 probably couldn't appear at the very top, but.
22   Q.  Well, they could have had more than one missing
23 block; isn't that true?
24   A.  That's true.

222

J. BEGY

1
2     Q.   And if you were designing a game based on the
3   pentomino puzzle, you didn't need to have blocks
4   automatically filled from the bottom to the top when it was
5   over; right?
6     A.   That's correct.
7     Q.   And if you were designing a game based on a
8   pentomino puzzle, there's no reason a ghost piece was
9   needed; right?
10    A.   Again, it's clearly something that helps, but it's
11  not necessary.
12    Q.   And some people might like the ghost piece, and
13  some people might not like the ghost piece; right?
14    A.   Correct.
15    Q.   Some people like games to be more challenging than
16  other games; right?
17    A.   Correct.
18    Q.   There's some players who get bored if the game is
19  too easy; right?
20    A.   Correct.
21    Q.   And there were alternatives to a ghost piece to --
22  if you wanted to let people know what the next piece was;
23  right?
24         MS. MAITRA:  Objection.  Vague and
25      form.

223

J. BEGY

1
2     Q.   Excuse me.  If you didn't want to use a ghost
3   piece, as Alexey Pajitnov did, you could have done
4   something else to show where the piece would fall; isn't
5   that true?
6     A.   Yes.
7     Q.   You could have had guiding lines down with the
8   side, for example; right?
9         MS. MAITRA:  Objection.  Vague.
10    A.   Sure.
11    Q.   And if you were designing a game based on the
12  pentomino puzzle, you didn't need to have -- to display the
13  next piece that -- that was next going to be coming; right?
14    A.   True.
15    Q.   And that was another design choice Alexey made;
16  correct?
17         MS. MAITRA:  Objection.  Vague and
18      ambiguous.
19    A.   True.
20    Q.   He could have said, "I don't want to show the next
21  piece"; correct?
22    A.   Correct.
23    Q.   Or he could have said, "You know what, I'm going
24  to show the next three pieces in different sizes"; right?
25    A.   How do you mean "different sizes"?

224

J. BEGY

1
2     Q.   What I meant was he could have shown the next, you
3   know, two or three pieces if he wanted to in different
4   spots?
5     A.   True.
6     Q.   And if you were designing a game that was inspired
7   by a pentomino puzzle, there was no requirement that the
8   playing pieces needed to change color in lockdown mode;
9   right?
10         MS. MAITRA:  Objection.  No.  Strike
11      that.  Sorry.
12    A.   Again, I suppose there's no hard-and-fast rule,
13  but it's a good usability design.
14    Q.   But he didn't need to design it that way; right?
15         MS. MAITRA:  Objection.  Vague and
16      ambiguous.
17    Q.   It was a choice; correct?
18         MS. MAITRA:  Objection.  Compound and
19      vague and ambiguous.
20    A.   It was a choice, yes.
21    Q.   Okay.  And if you were designing a game based on a
22  pentomino puzzle, there's no reason that you would have
23  even needed a multiplayer mode; right?
24    A.   It would depend on the design of the game.
25    Q.   Right.  But even the idea -- the idea of having a

225

J. BEGY

1
2   multiplayer mode is a design choice; correct?
3     A.   That's correct.
4     Q.   And the screen layout in a multiplayer mode could
5   have looked very different depending on what the designer
6   wanted to do; right?
7         MS. MAITRA:  Objection.  Vague and
8      ambiguous.
9     A.   It really depends on the nature of the multiplayer
10  mode.
11    Q.   But you could configure the multiplayer -- you've
12  seen multiplayer modes laid out in all sorts of different
13  ways in video games; right?
14    A.   That's true.
15    Q.   So isn't it true that Alexey Pajitnov made a whole
16  series of creative choices when he designed Tetris?
17         MS. MAITRA:  Objection.
18      Mischaracterizes testimony, vague and
19      ambiguous.
20    A.   Well, again, I think that these are all functional
21  elements, which I see as different than being creative in
22  this regard.
23         MS. CENDALI:  Move to strike as
24      nonresponsive.
25    Q.   Let me ask you again.  Isn't it true that Alexey

226

J. BEGY

1
2  Pajitnov made a whole series of creative choices when he
3  designed Tetris?
4          MS. MAITRA: Same objections.
5      A. And it's also, you know, I'm not -- I was not
6  privy to his process in making Tetris.
7      Q. He talked all about it in his deposition; right?
8      A. That's true.
9      Q. Okay. And you've mentioned some documentary you
10 saw; right?
11     A. True.
12     Q. So isn't it true that Alexey Pajitnov made a whole
13 series of creative choices when he designed Tetris?
14         MS. MAITRA: Objection. Asked and
15     answered and vague and ambiguous.
16     A. I don't -- again, I don't believe that these
17 choices were creative in that sense.
18     Q. So just to be clear, you don't believe in
19 designing a game inspired by a pentomino puzzle that any of
20 the elements reflected in paragraph 14 of your expert
21 report are a creative choice?
22         MS. MAITRA: Objection. Asked and
23     answered.
24     A. Again, I would characterize them more as an
25 inventive choice in determining how it works, but not

227

J. BEGY

1
2  creative in the sense of creative expression.
3      Q. So the answer to my question is no, you don't
4  believe any of the elements in paragraph 14 are creative
5  choices?
6          MS. MAITRA: Same objections, asked and
7      and answered, and vague and ambiguous.
8      A. Yes.
9      Q. And how many video games created 25 years ago are
10 still popular today?
11     A. I couldn't say.
12     Q. Can you name any other than Tetris?
13     A. Well, I don't have -- I can speak to games that
14 still certainly seem to have some degree of cultural
15 resonance, but I could not objectively measure popularity.
16     Q. Okay. Tell me the name of a game that in your
17 opinion was created 25 years ago and is still as popular as
18 Tetris is today.
19         MS. MAITRA: Objection.
20     Mischaracterizes testimony and lacks
21     foundation.
22     A. Again, I can speak to things that are -- that
23 resonate in the culture, but as popular as Tetris, I mean I
24 don't know what -- how one would quantify Tetris's
25 popularity.

228

J. BEGY

1
2      Q. Okay. So what would resonate in the culture?
3      A. Well, certainly like the Super Mario Brothers
4  games still, Pacman, Space Invaders, which was much more
5  than 25 years ago.
6      Q. And there are not very many, are there?
7      A. Well, in my knowledge, no. I'm not as familiar
8  with Asian or European markets and what might still be
9  popular there.
10     Q. Okay. Now, turning to paragraphs 38 to 42 of your
11 report.
12     A. Uh-huh.
13     Q. In this section you talk about the long vertical
14 rectangular playing field of the game, right --
15     A. Correct.
16     Q. -- in Tetris. And you believe that the long
17 vertical rectangular playing field is -- is part of the
18 rules of Tetris; is that right?
19     A. That's right.
20     Q. What is your basis for saying that the shape of
21 that playing field is part of the rules of Tetris?
22     A. In that, following Juul's definition, it
23 determines the limitations and affordances placed on the
24 player and that having the matrix be a different size would
25 affect the viable strategies in the game.

229

J. BEGY

1
2      Q. Do you agree that a game designer can design the
3  playing field of a puzzle video game in an almost unlimited
4  number of ways?
5      A. I would agree.
6      Q. Turning to -- do you agree that there are many
7  successful puzzle video games that do not use the same or
8  similar playing field as Tetris?
9      A. Well, without a concrete understanding of what
10 defines success, I would say probably.
11     Q. And do you agree that an electronic puzzle game
12 could function perfectly well without using a playing field
13 that's the same or similar to Tetris?
14         MS. MAITRA: Objection. Vague and
15     ambiguous.
16     A. Again, it's hard to say, because it's
17 hypothetical. But I imagine it would be possible.
18     Q. Well, aren't there a lot of examples in Dr.
19 Bogost's report of puzzle video games that use playing
20 fields of different shapes than Tetris?
21     A. There are some, yes.
22     Q. And are you aware that there are certain versions
23 of Tetris that use a different size and shape playing
24 field?
25         MS. MAITRA: Objection. Lacks

230

J. BEGY

1
2    foundation.
3    A.  I seem to recall reading as much, but I can't
4    think of an example.
5    Q.  Are you aware that Tetris 360 for the Radica hand-
6    held device uses a square playing field?
7    A.  I've never heard of either of those things.
8    Q.  I'll represent to you that's true.  If that's the
9    case, isn't it true that the shape of the playing field
10   isn't critical to the game play of Tetris?
11   A.  Well, if the shape is different, then certainly
12   the options and strategies available to me would be
13   different, and so playing on a square matrix would be a
14   different experience.
15   Q.  Well, turning in your report, in section
16   paragraphs 43 to 47 --
17   A.  Uh-huh.
18   Q.  -- that's where you talk about the size and shape
19   of the playing pieces, what The Tetris Company calls
20   tetriminos; right?
21   A.  Yes.
22   Q.  And in your view, the size and shape of the
23   playing pieces in Tetris is functional; right?
24   A.  Correct.
25   Q.  And what's your basis for that?

231

J. BEGY

1
2    A.  As with the matrix, affecting the -- or altering
3    the size and shape of the playing pieces would alter the
4    player's limitations and affordances and thereby alter how
5    one would play the game.
6    Q.  Do you agree that a game designer could design the
7    playing pieces for a puzzle video game in an almost
8    unlimited number of other ways?
9        MS. MAITRA:  Objection.  Vague.
10   A.  I would assume so, yes.
11   Q.  So it's not essential to use tetrominos to -- or
12   tetriminos in designing a puzzle game, right, puzzle video
13   game?
14       MS. MAITRA:  Objection.
15       Mischaracterizes testimony and vague.
16   Q.  Right?
17   A.  So, I'm sorry, just to repeat the question --
18   Q.  Sure.  It's not necessary to use tetrominos or
19   tetriminos to design a puzzle video game; right?
20   A.  Correct.
21   Q.  And the size and shape of the playing pieces in
22   Tetris do not offer a competitive advantage over other
23   puzzle video games, do -- do they?
24       MS. MAITRA:  Objection.  Vague and
25       ambiguous.

232

J. BEGY

1
2    A.  I have no way of saying either way.
3    Q.  But would you agree that the size and shape of the
4    playing pieces in Tetris don't affect the time or cost
5    associated with making an electronic puzzle game?
6        MS. MAITRA:  Objection.  Compound and
7        vague.
8    A.  I couldn't say for certain.
9    Q.  Do you agree that an electronic puzzle game could
10   function perfectly well without using tetriminos?
11       MS. MAITRA:  Objection.  Vague and
12       ambiguous.
13   A.  Yes.
14   Q.  Then in paragraphs 48 to 50 of your report, that
15   discusses the bright colors of the tetriminos in Tetris,
16   and you opine that those bright colors are a functional
17   aspect of the game; correct?
18   A.  Correct.
19   Q.  Do you agree that a game designer could choose an
20   almost unlimited number of colors for the playing pieces in
21   a puzzle video game?
22   A.  I agree.
23   Q.  And using brightly colored playing peaches --
24   pieces in Tetris does not offer a competitive advantage
25   over other puzzle video games, does it?

233

J. BEGY

1
2        MS. MAITRA:  Objection.  Vague and
3        ambiguous.
4    A.  I couldn't say for certain, but my intuition would
5    be that a game where you can see the pieces would be
6    slightly more successful than a game where you cannot see
7    the pieces.
8    Q.  Well, there'd be other ways you could see the
9    pieces other than the choices made in Tetris; right?
10   A.  That's true.
11   Q.  Do you agree that the brightly colored playing
12   pieces in Tetris do not affect the time or cost associated
13   with making an electronic puzzle game?
14       MS. MAITRA:  Objection.  Compound and
15       vague and ambiguous.
16   A.  Again, I couldn't speak to that either way.
17   Q.  Do you agree that there are many successful puzzle
18   video games that don't use brightly colored playing pieces?
19       MS. MAITRA:  Objection.  Vague and
20       ambiguous.
21   A.  Again, it depends on -- I'm not sure what
22   "successful" means in that, so I couldn't speak to it
23   either way.
24   Q.  Well, commercially on sale, available for people
25   to make money on the App Store.

59 (Pages 230 to 233)