**\*FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

The Honorable Freda L. Wolfson, U.S.D.J.

|  |  |  |
|---|---|---|
| | : | |
| TETRIS HOLDING, LLC and | | Civil Action No. 09-6115 |
| THE TETRIS COMPANY, LLC | : | |
| | | |
| Plaintiffs, | : | **OPINION** |
| | | |
| vs. | : | |
| | | |
| | : | |
| XIO INTERACTIVE, INC. | | |
| | : | |
| Defendant. | | |
| | : | |

**For Plaintiff:**
Dale M. Cendali
Johanna Schmitt
Brendan T. Kehoe
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022

Robert J. Schoenberg
Riker Danzig Scherer Hyland & Perretti LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962

**For Defendant:**
Donald A. Robinson
Robinson, Wettre, & Miller LLC
One Newark Center, 19th Floor
Newark, New Jersey 07102

Mark A. Lemley
Joseph C. Gratz
Sonali D. Maitra
Durie Tangri LLP
217 Leidesdorff Street
San Francisco, California 94111

**WOLFSON, United States District Judge:**

Presently before the Court are cross-motions for summary judgment. Plaintiffs Tetris Holding, LLC and the Tetris Company, LLC (collectively "Tetris Holding" or Plaintiffs") claim that Defendant Xio Interactive, Inc. ("Xio" or "Defendant") has infringed the copyright and trade-dress of Plaintiffs' video game *Tetris*. Xio does not raise any issue of fact in response, but makes a purely legal argument that because it meticulously copied only non-protected elements, in particular the rules and functionality of the game, and not its expressive elements, that judgment should be entered in its favor. The motions stem from Tetris Holding's First Amended Complaint that alleges (1) Xio infringed Tetris Holding's copyright under 17 U.S.C. §§ 101 et seq. (Count One); (2) Xio's actions constituted unfair competition, false endorsement, and false designation of origin under 15 U.S.C. § 1125(a)(1)(A), including infringing Tetris Holding's trade dress (Count Two); (3) Trade Dress Infringement and Unfair Competition under the New Jersey Fair Trade Act (Count Three); (4) Xio's actions constituted common law unfair competition (Count Four); and (5) Xio was unjustly enriched by its actions at Tetris Holding's expense (Count Five).[1] Although the parties frame their motions as seeking summary judgment as to all claims, only Counts One and Two, the federal causes of action, are addressed in full by their briefs. It may very well be that the remaining counts flow from the issues disposed of today, but the Court will not *sua sponte* grant summary judgment on these causes of action without the parties addressing the remaining counts. Therefore, I will treat the motions as seeking summary judgment only as to Counts One and Two.

---

[1] Plaintiffs have subsequently withdrawn their unjust enrichment claim. Pl. Motion, at 45, n.22.

For the reasons that follow, Plaintiffs' motion is granted and Defendant's motion is denied.

## I.     BACKGROUND

The Court only recounts the facts necessary to resolve the parties' motions.  The following facts are undisputed by the parties.  The game of *Tetris* gained fame in the United States during the late 1980s and early 1990s as an electronic video game initially played on Nintendo's portable platform, the Gameboy, and on its console systems.  Since that time, Tetris Holding has developed many versions for modern platforms.

*Tetris* is a facially simple puzzle game in which the player is tasked with creating complete horizontal lines along the bottom of the playing field by fitting several types of geometric block pieces (called tetrominos) together.  The game becomes more complex and more difficult as you progress and are left with fewer options to arrange the pieces and less area of the playing field is available.  Originally developed in Russia during the mid-1980s by Russian computer programmer Alexy Pajitnov, *Tetris* was exported to the United States and has since been adapted for the myriad electronic video game platforms available to consumers, including Apple Inc.'s iPhone.  Pajitnov formed Tetris Holding, LLC, along with game designer, Henk Rogers.  Tetris Holding, LLC owns the copyrights to the visual expression of the numerous *Tetris* iterations and licenses those rights to Tetris Company, LLC, which then sublicenses its rights.  Companies have licensed Tetris Holding's intellectual property rights for a number of reasons.  For example, Tetris Holding licensed the visual look of *Tetris*: (1) to Hallmark so it could design a *Tetris*-themed greeting card, (2) to states, such as New Jersey and Idaho, to create *Tetris*-themed lottery cards; and (3) to various television shows to use and reference *Tetris* in episodes.  In the years since its development, *Tetris* has won

numerous awards and accolades, and has been ranked high on several lists as one of the greatest video games of all time.  It has sold over 200 million units worldwide.  And *Tetris* continues to enjoy success through smart phones and social networking, with billions of games of *Tetris* being downloaded and played online.

Tetris Holding's success has also bred many unauthorized attempts at imitation. In response, *Tetris* has vigorously made a concerted effort to protect its intellectual property by pursuing such infringers through the legal process and removing hundreds of imitation games from the market.  Tetris Holding alleges that Xio is one such company that has infringed its intellectual property, namely its copyrights and its trade dress, trading off the creative aspects of its work without authority.

Xio was formed by Desiree Golden, a recent college graduate, who decided to create a multiplayer puzzle game for the iPhone called "*Mino*" and admittedly used *Tetris* as inspiration.[2]  Indeed, Xio was more than inspired by *Tetris* as Xio readily admits that its game was copied from *Tetris* and was intended to be its version of *Tetris.* Plaintiffs point to Ms. Golden's statements that she was "trying to get a company started to make a MultiPlayer game similar to Tetris for the iPhone;" that some iPhone games "made by private developers have made 250K each in 2 months!;" and that Xio's game would "absolutely succeed" because "The concept is popular – everyone knows about it." Pl. Stmt. Of Undisputed Fact, ¶ 105.  Plaintiffs also point to admissions by Xio's principals that Xio downloaded Tetris's iPhone application for the purpose of developing its own version and used it in the development of *Mino.* Id. ¶ 121-125.  Xio does not dispute any of these facts.  Yet, Xio says, it copied *Tetris* in such a way so as to

---

[2] The name *Mino* comes from the name of the Tetris playing piece: tetromino.

not copy any protected elements after diligently researching intellectual property law, and that it also tried to obtain a license from Tetris Holding, but was refused.

Xio released *Mino* version 1.0 in May 2009, *Mino* version 1.1 in July 2009, and *Mino Lite* shortly thereafter.[3]  Tetris Holding became aware of *Mino* and *Mino Lite* and in August 2009, sent take-down notices pursuant to the Digital Millennium Copyright Act to Apple, Inc., which removed *Mino* and *Mino Lite* from its online apps marketplace. Xio's counsel sent two counter-notifications soon after and Apple, Inc. informed Tetris Holding that the games would be reinstated unless Tetris Holding filed a lawsuit.  This litigation was then commenced in December 2009.

Tetris Holding argues that *Mino* infringed the following copyrightable elements:

1.  Seven Tetrimino playing pieces made up of four equally-sized square joined at their sides;

2.  The visual delineation of individual blocks that comprise each Tetrimino piece and the display of their borders;

3.  The bright, distinct colors used for each of the Tetrimino pieces;

4.  A tall, rectangular playfield (or matrix), 10 blocks wide and 20 blocks tall;

5.  The appearance of Tetriminos moving from the top of the playfield to its bottom;

6.  The way the Tetrimino pieces appear to move and rotate in the playfield;

7.  The small display near the playfield that shows the next playing piece to appear in the playfield;

---

[3] The differences between these versions are not relevant to resolving the parties' motions.

8.  The particular starting orientation of the Tetriminos, both at the top of the screen and as shown in the "next piece" display;

9.  The display of a "shadow" piece beneath the Tetriminos as they fall;

10. The color change when the Tetriminos enter lock-down mode;

11. When a horizontal line fills across the playfield with blocks, the line disappears, and the remaining pieces appear to consolidate downward;

12. The appearance of individual blocks automatically filling in the playfield from the bottom to the top when the game is over;

13. The display of "garbage lines" with at least one missing block in random order; and

14. The screen layout in multiplayer versions with the player's matrix appearing most prominently on the screen and the opponents' matrixes appearing smaller than the player's matrix and to the side of the player's matrix.

Pl. Motion, at 17.

## II.   LEGAL STANDARD

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56(c). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In determining

whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law."  Kaucher, 455 F.3d at 423.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp., 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.; Monroe v. Beard, 536 F.3d 198, 206-07 (3d Cir. 2008).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts."  Id. at 206 (quoting Matsushita, 475 U.S. at 586).

## III.   DISCUSSION

### 1.   Copyright Infringement

"To establish a claim of copyright infringement, a plaintiff must establish: (1) ownership of a valid copyright; and (2) unauthorized copying of original elements of the plaintiff's work." Dun & Bradstreet Software Services, Inc. v. Grace Consulting, 307 F.3d 197, 206 (3d Cir. 2002); see Feist Pub'lns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991); Mortg. Mkt. Guide, LLC v. Freedman Report, LLC, No. 06-140, 2008 U.S. Dist.

LEXIS 56871, *93 (D.N.J. July 28, 2008).

The parties agree that there are no genuine issues of fact in connection with their motions on either the copyright or federal trade dress claim.  The question before the Court then is not whether summary judgment is appropriate, but rather, which party is entitled to summary judgment.  There are no issues of material facts, in part, because Xio concedes much.  Xio acknowledges that Tetris Holding owns the registered copyrights to the various iterations of *Tetris* and further admits that Xio copied *Tetris*, purposefully and deliberately, in designing *Mino*.  Xio does not dispute that it downloaded Tetris Holding's iPhone application and used it to develop its own iPhone *Tetris*-like application for profit.  What Xio does not concede is that it copied any protected elements.  Instead, it argues the elements it copied were not original expression, because they were part of the game itself—the rules, function, and expression essential to the game play—which is not protected.  Before releasing its product, Xio researched copyright law, both through its own independent studying and based on advice of counsel,[4] before designing its game.  Based on this research, Xio believed it could freely copy any part of *Tetris* that was based on a "rule of the game" or that Xio viewed as being functional to the game.  There is no question that Xio thought of its game as essentially a version of *Tetris*.  Xio's principals referred to their game as "*Tetris*" multiple times during its development and admitted that their intention was to market and profit from making a *Tetris*-type product for the iPhone, using as much of

---

[4] Def. Motion, at 6-7.  A related issue is that Xio was compelled by the Court to produce certain attorney-client communications in this case because Xio had first voluntarily produced some privileged documents in support of its case, thus invoking the sword and shield dichotomy.  The parties argue extensively about what these compelled documents ultimately say and how they should be weighed in my decision.  However, I find that the purely legal issues involved here can be resolved without resorting to the allegedly protected documents.

the look and feel of *Tetris* that it thought it could copy based on its view of copyright

law.  According to Defendant:

> There is no question that *Mino* and *Tetris* look alike.  But the only
> similarities between the games are elements not protected by copyright.
> This is no coincidence.  Before developing its games, Xio analyzed the
> intellectual property laws to determine what parts of *Tetris* they could use
> and what parts they couldn't.  Xio discovered that no one had a patent to
> the rules and other functional elements of *Tetris*.  Xio carefully,
> intentionally, and purposefully crafted its game to exclude all protected,
> expressive elements.

Def. Motion, at 2.  Implied, but not stated, in this admission is that Xio's careful,

intentional, and purposeful attempt to exclude all protected elements was based on its

opinion of what it believed was protected; the validity of that opinion, or lack thereof,

underlies this litigation.

### i.   Idea-Expression Dichotomy

To resolve the claim of copyright infringement, I must first determine which

elements of Plaintiffs' *Tetris* game are protected and which are not.  I begin with the

relevant language from 17 U.S.C. § 102.  Subsection (a) outlines what a copyright

protects, and reads in part:

> Copyright protection subsists, in accordance with this title, in original
> works of authorship fixed in any tangible medium of expression, now
> known or later developed, from which they can be perceived, reproduced,
> or otherwise communicated, either directly or with the aid of a machine or
> device.

17 U.S.C. § 102(a).  Courts in this Circuit and others have long held that elements of

computer programs may be protected by copyright law.  This includes both the code for

the program as well as the graphical elements for programs such as video games.  Apple

Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1249 (3d Cir. 1983) ("Thus a

computer program, whether in object code or source code, is a 'literary work' and is

protected from unauthorized copying, whether from its object or source code version.");
Midway Mfg. Co. v. Bandai-America, Inc., 546 F. Supp. 125, 139 (D.N.J. 1982) ("It is also
unquestionable that video games in general are entitled to copyright protections as
audiovisual works."); Hart v. Elec. Arts, Inc., 808 F. Supp. 2d 757, 778 (D.N.J. 2011)
(discussing copyrightability of video games in the context of First Amendment issues);
see also Midway Mfg. Co. v. Arctic Intern. Inc., 704 F.2d 1009, 1012 (7th Cir. 1983) ("We
thus conclude that video games are copyrightable as audiovisual works under the 1976
Copyright Act and we note that every other federal court (including our own) that has
confronted this issue has reached the same conclusion.").  Conversely, subsection (b)
outlines what copyright law will not protect:

> In no case does copyright protection for an original work of authorship
> extend to any idea, procedure, process, system, method of operation,
> concept, principle, or discovery, regardless of the form in which it is
> described, explained, illustrated, or embodied in such work.

17 U.S.C. § 102(b).

Together § 102(a) and § 102(b) codify what courts have come to call the "idea-
expression dichotomy."  Whelan Assocs., Inc. v. Jaslow Dental Laboratory, Inc., 797
F.2d 1222, 1234 (3d Cir. 1986); H.R. Rep. No. 1476, 94th Cong., 2d Sess. 57 (1976),
reprinted in 1976 U.S.C.C.A.N. 5659, 5670 ("Section 102(b) in no way enlarges or
contracts the scope of copyright protection under the present law. Its purpose is to
restate, in the context of the new single Federal system of copyright, that the basic
dichotomy between expression and idea remains unchanged."); see also Mazer v. Stein,
347 U.S. 201, 217 (1954) ("Unlike a patent, a copyright gives no exclusive right to the art
disclosed; protection is given only to the expression of the idea—not the idea itself").

The doctrine is simple to state—copyright will not protect an idea, only its

expression—but difficult to apply, especially in the context of computer programs.  As Judge Stahl of the First Circuit aptly wrote: "Applying copyright law to computer programs is like assembling a jigsaw puzzle whose pieces do not quite fit."  Lotus Dev. Corp. v. Borland Int'l, 49 F.3d 807, 820 (1st Cir. 1995); see also Melville Nimmer, et al., NIMMER ON COPYRIGHT § 2.18[H] ("Accordingly, analyzing the substantial similarity of computer programs is especially challenging") (hereinafter "Nimmer").[5]  Different circuits have developed different tests for how to separate unprotectible ideas from protectible expression pertaining to computer software.

      The Third Circuit was perhaps the first to weigh in on this issue in Whelan, although this decision has been criticized outside this Circuit.[6]  Computer Assocs. Int'l v. Altai, 982 F.2d 693, 705 (2d Cir. 1992) ("We think that Whelan's approach to separating idea from expression in computer programs relies too heavily on metaphysical distinctions and does not place enough emphasis on practical considerations.") (collecting cases and academic articles criticizing Whelan); Plains Cotton Coop. Ass'n v. Goodpasture Computer Serv., Inc., 807 F.2d 1256, 1262 (5th Cir. 1987) (criticizing and declining to adopt Whelan); Sega Enters. v. Accolade, Inc., 977 F.2d 1510, 1525 (9th Cir. 1992) ("The Whelan rule, however, has been widely—and soundly—criticized as simplistic and overbroad."); Gates Rubber Co. v. Bando Chem. Indus., 9 F.3d 823, 840,

---

[5] Judge Hand famously described the difficulty of a court's task in deciphering an idea from its expression: "Obviously, no principle can be stated as to when an imitator has gone beyond the 'idea,' and has borrowed its 'expression.' Decisions must therefore inevitably be *ad hoc*." Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir. 1960).

[6] Both Whelan and Altai, discussed *infra*, involved circumstances where the courts were considering the structure of the program rather than its graphical interface or visual displays.  Nevertheless, these cases are instructive for how one analyzes copyright issues involving computer programs generally, especially in this instance when Xio argues so strenuously that Plaintiffs' expression is unprotected because it is functional.

n.17 (10th Cir. 1993).  Yet even in the face of such criticism, the Third Circuit, sitting *en banc*, has declined to abandon its holding.  In Southco, Inc. v. Kanebridge Corp., 390 F.3d 276 (3d Cir. 2004), the Circuit briefly discussed the holding in Whelan, but left it untouched, denying there was any tension between the holding there and in Whelan.  Id. at 285 n.4

 Shortly thereafter, the Second Circuit developed the abstraction-filtration-comparison that purported to depart from Whelan.  Altai, 982 F.2d at 706 ("[W]e think that district courts would be well-advised to undertake a three-step procedure, based on the abstractions test utilized by the district court, in order to determine whether the non-literal elements of two or more computer programs are substantially similar.").  Unlike Whelan, this test has been widely accepted by other courts.  See Atari Games Corp. v. Nintendo of Am. Inc., 975 F.2d 832, 839 (Fed. Cir. 1992) (employing Altai's abstraction-filtration-comparison method); Sega Enters. Ltd. v. Accolade, Inc., 977 F.2d 1510, 1525 (9th Cir. 1992) ("the Second Circuit's approach is an appropriate one"); Gates Rubber Co. v. Bando Chem. Indus., Ltd., 9 F.3d 823, 834 (10th Cir. 1993); Engineering Dynamics, Inc. v. Structural Software, Inc., 26 F.3d 1335, 1342, 1343 (5th Cir. 1994); Bateman v. Mnemonics, Inc., 79 F.3d 1532, 1543 n.24, 1544 (11th Cir. 1996); Comprehensive Technologies Int'l, Inc. v. Software Artisans, Inc., 3 F.3d 730, 734-735 (4th Cir. 1993) (also citing Third Circuit opinion in Whelan, discussed below).

 I do not find, however, that these approaches require widely differing analyses, at least based on the facts before me today; both rest on similar premises and applications. In Whelan, the court held "*the purpose or function of a utilitarian work would be the work's idea, and everything that is not necessary to that purpose or function would be part of the expression of the idea*. Where there are various means of achieving the

desired purpose, then the particular means chosen is not necessary to the purpose; hence, there is expression, not idea." Id. at 1236 (emphasis in original).  The computer program at issue was aimed at helping business operations for dental laboratories.  Id. at 1238.  The court addressed other doctrines, such as scènes à faire and fact intensive works, in conjunction with its analysis and then applied these concepts to address whether there was substantial similarity between the original and allegedly copied programs.  Id.

In Altai, the Second Circuit suggested district courts undertake much the same analysis, albeit in three distinct steps.  First, a court should "abstract" the program at issue, then filter out the unprotected material, and finally compare whatever remains (the protected expression) to the copied work.  The last two steps are mostly identical to what the Third Circuit did in Whelan.  It is the first step of the analysis, the abstraction, where differences purportedly lie.  To abstract a computer program, the Second Circuit suggested that: "a court would first break down the allegedly infringed program into its constituent structural parts."  Altai, 982 F.2d at 706.  This is an overly complicated way of saying a court should first try to understand the principles or ideas driving the program and the essential processes and functions by which it achieves those purposes.  See id. ("Upon any work a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out.  The last may perhaps be no more than the most general statement of what the work is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the author could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended.") (internal quotation and alterations omitted).  This is similar, at least in principle, to what the Third Circuit

expressed: "[t]he line between idea and expression may be drawn with reference to the end sought to be achieved by the work in question." Whelan, 767 F.2d at 1236.  In any event, what needs to be "abstracted" or considered and how one achieves this will depend greatly on the type of program at issue and what precisely is being accused of copyright infringement.  For example, analyzing whether source code was misappropriated would likely entail a different inquiry—or different abstraction—than analyzing whether the graphical interface or display of a program was copied.  The Whelan Court was careful to note that its analysis would vary depending on the underlying facts.  Id. at 1238, n.34.  ("We do not mean to imply that the idea or purpose behind every utilitarian or functional work will be precisely what it accomplishes, and that structure and organization will therefore always be part of the expression of such works.").

Indeed, criticism of Whelan seems aimed more at its application than the general principles underlying the holding inasmuch as the court found only one unprotectible idea at issue.  Nimmer, § 13.03[F][1] ("The crucial flaw in this reasoning it that it assumes that only one 'idea,' in copyright law terms, underlies any computer program, and that once a separable idea can be identified, everything else must be expression."); Gates Rubber Co., 9 F.3d at 840, n.17 ("The criticisms of the Whelan analysis primarily concern the high level of abstraction at which the court chose to separate idea from expression. The criticisms of the Whelan decision are valid when the opinion is read to imply that a computer program can have only one idea.").  But the Whelan Court never explicitly said or suggested a program can have only one idea behind it.  Perhaps in 1983 when the case was decided such a result was more conceivable, but three decades and exponential increases in the power, range, and scope

of computer programs make it less likely today.

At the end of the day, no matter how one expresses the test, the task is clear: because copyright only protects original expression, I must delineate between the copyrightable expression in *Tetris* and the unprotected elements of the program, then evaluate whether there is substantial similarity between such expression and Defendant's *Mino* game.  The starting point in this analysis must be to understand the ideas and concepts of *Tetris* itself.

>      ii.   Doctrines of Merger and Scènes à Faire

In determining what elements are not protected, two related doctrines must be considered: merger and scènes à faire.  Merger exists when an idea and its particular expression become inseparable.  Kay Berry, Inc. v. Taylor Gifts, Inc., 421 F.3d 199, 209 (3d Cir. 2005) ("In some instances, there may come a point when an author's expression becomes indistinguishable from the idea he seeks to convey, such that the two merge.").  If the law were to protect expression in such instances, then the copyright holder would have an unacceptable monopoly over that idea.  In striking the balance between the two unenviable positions of either allowing an infringer to unlawfully copy another's expression or preventing the use of ideas rightly in the public domain, it is better to allow such copying rather than suffer the loss of future works that would have been developed based on those ideas.  See Educ. Testing Services v. Katzman, 793 F.2d 533, 539 (3d Cir. 1986) ("When the idea and the expression of the idea coincide, then the expression will not be protected in order to prevent creation of a monopoly on the underlying art.") (citation omitted).  Merger is appropriate when "there are no or few other ways of expressing a particular idea." Id. (quotation omitted).  But "if the same idea can be expressed in a plurality of totally different manners, a plurality of copyrights

may result" and merger will not prevent protection of one's expression.  Id. (quotation

omitted) ("If other methods of expressing that idea are not foreclosed as a practical

matter, then there is no merger.").  Indeed, the Third Circuit has explained that merger

"is rare."  Kay Berry, 421 F.3d at 209.

      The second, related doctrine, known as "scènes à faire" (literally meaning a scene

that must be done), applies to expression that is so associated with a particular genre,

motif, or idea that one is compelled to use such expression.  Jackson v. Booker, No. 11-

3400, 2012 U.S. App. LEXIS 3024, at *12-13 (3d Cir. 2012) (describing scènes à faire as

the "incidents, characters or settings which are as a practical matter standard in the

treatment of" a particular subject); Hoehling v. Universal City Studios, Inc., 618 F.2d

972, 979 (2d Cir. 1980) ("Because it is virtually impossible to write about a particular

historical era or fictional theme without employing certain 'stock' or standard literary

devices, we have held that scènes à faire are not copyrightable as a matter of law.").  For

much the same reason as merger, such scenes are unprotectible by copyright law.

Whelan, 797 F.2d at 1236 ("It is well-settled doctrine that scènes à faire are afforded no

copyright protection."); Mortg. Mkt. Guide, 2008 U.S. Dist. LEXIS 56871, at *104-105

("[W]hen similar features in a videogame are as a practical matter indispensable, or at

least standard, in the treatment of a given idea, they are treated like ideas and are

therefore not protected by copyright.") (quotation omitted).

### iii.  Copyright Law As Applied to Games

      With these principles and doctrines in mind, I now turn to the law as it has

developed with regard to games and videogames in order to parse out the unprotected

elements of *Tetris* from Plaintiffs' protectible expression.  Neither party disputes that a

game is deserving of some copyright protection.  The game mechanics and the rules are

not entitled to protection, but courts have found expressive elements copyrightable, including game labels, design of game boards, playing cards and graphical works. Affiliated Hosp. Prods., Inc. v. Merdel Game Mfg. Co., 513 F.2d 1183, 1189-90 (2d Cir. 1975) ("The rules of the game are perforce in the public domain as well as the game itself.  Affiliated's copyright only protects Affiliated's arrangement of the rules and the manner of their presentation, and not their content"); Anti-Monopoly, Inc. v. General Mills Fun Group, Inc., 611 F.2d 296, 300, n.1 (9th Cir. 1979) ("The copyright laws are not involved in this case because business ideas, such as a game concept, cannot be copyrighted...."); Hoopla Sports & Entertainment v. Nike, Inc., 947 F. Supp. 347, 354 (N.D. Ill. 1996) ("Courts have also held that 'games' themselves (as opposed to the cards, boards, instruction books, etc. with which games may be played) are not copyrightable."); Nimmer, § 2.18[H].  In particular, courts have found the audiovisual display of a video game to be expression.  Atari Games Corp. v. Oman, 979 F.2d 242, 245 (D.C. Cir. 1992) ("The hallmark of a video game is the expression found in 'the entire effect of the game as it appears and sounds,' its 'sequence of images.'") (per then-Judge Ginsburg); Atari, Inc. v. North American Philips Consumer Electronics Corp., 672 F.2d 607, 617 (7th Cir. Ill. 1982) (finding copyright protection extends "to at least a limited extent the particular form in which [a game] is expressed (shapes, sizes, colors, sequences, arrangements, and sounds)" and holding that defendant's use of similar video game characters infringed plaintiff's copyright); Midway, 546 F. Supp. at 139 (finding graphical characters of video game were protectible expression).  This distinction then between a game's rules and its appearance is merely the application of the familiar idea-expression dichotomy as applied to the particular field of games.[7]  See,

---

[7] Xio argues that some independent principle protects game rules rather than it being

e.g., Durham Industries, Inc. v. Tomy Corp., 630 F.2d 905, 913 (2d Cir. 1980)
(discussing copyright as applied to games and stating that "[j]ust as copyright protection
extends to expression but not ideas, copyright protection extends only to the artistic
aspects, but not the mechanical or utilitarian features, of a protected work.").

      Rather than following this analysis, Defendant's primary argument takes a
somewhat different path.  Xio repeatedly emphasizes that Tetris Holding cannot protect
by copyright what is only protectible by patent and therefore not only are the ideas of
*Tetris* (or the rules of the game) not protectible, but neither are the "functional aspects"
of the game or expressive elements related to the game's function or play.  Def. Motion,
at 6.  As part of this argument, Xio conflates the doctrines of merger and scènes à faire
to say that Tetris Holding cannot protect expression inseparable from either game rules
or game function.

      Xio's brief devotes many pages to explain how patents protect particular aspects
of intellectual property while copyright protects other, distinct aspects, but I find that
Defendant extracts much from this distinction—too much.  Xio is correct that one
cannot protect some functional aspect of a work by copyright as one would with a
patent.  But this principle does not mean, and cannot mean, that *any and all expression*
related to a game rule or game function is unprotectible.  Such an exception to copyright
would likely swallow any protection one could possibly have; almost all expressive
elements of a game are related in some way to the rules and functions of game play.
Tetris Holding is as entitled to copyright protection for the way in which it chooses to
express game rules or game play as one would be to the way in which one chooses to

---

the natural extension of the idea-expression dichotomy applied to games.  I find no case
law or support for such a premise.

express an idea.

The cases Xio cites in support of its argument do not stand for expanding the law so that any expression related to functionality is *a fortiori* outside the ambit of copyright law. Rather, expression is not protected only when it is integral or inseparable from the idea or the function under the doctrines of merger or scènes à faire. Defendant relies on the seminal case, Baker v. Selden, as the starting point for its analysis. There the Supreme Court held that plaintiff could not copyright certain forms used in his new system of bookkeeping ostensibly as a means to protect the idea underlying that system. Baker v. Selden, 101 U.S. 99, 103 (1879). The defendant in Baker developed similar charts, although arranged differently, and plaintiff sued him for copyright infringement arguing defendant's work embodied the system that plaintiff originally described. But the plaintiff did not have rights to his new bookkeeping idea, nor to those elements that were a necessary accompaniment to the idea. Id. The Court explained its holding this way:

> The copyright of a work on mathematical science cannot give to the author an exclusive right to the methods of operation which he propounds, or to the diagrams which he employs to explain them, so as to prevent an engineer from using them whenever occasion requires. The very object of publishing a book on science or the useful arts is to communicate to the world the useful knowledge which it contains. But this object would be frustrated if the knowledge could not be used without incurring the guilt of piracy of the book. And where the art it teaches cannot be used without employing the methods and diagrams used to illustrate the book, or such as are similar to them, such methods and diagrams are ***to be considered as necessary incidents to the art***, and given therewith to the public; not given for the purpose of publication in other works explanatory of the art, but for the purpose of practical application.

Id. (emphasis added). That the charts (i.e. the expression of the idea) were "necessary incidents" is key in applying this case here; the art was unusable without that expression. The Court, holding plaintiff's expression unprotectible, in essence applied

18

the merger doctrine to prevent the plaintiff from precluding the use of his idea, which he had already donated to the public domain.  But the Court did not hold that any expression, even if related to a use or method of operation, was beyond the boundary of copyright.  Indeed, it said the opposite: "But as embodied and taught in a literary composition or book, their essence consists only in their statement. This alone is what is secured by the copyright. The use by another of the same methods of statement, whether in words or illustrations, in a book published for teaching the art, would undoubtedly be an infringement of the copyright." Id. at 104.

Many of the other cases cited by Xio reach the same result based on the same reasoning.  In Taylor Instrument, the court found that plaintiff's chart was an integral part of its recording thermometer and therefore an object of use not entitled to copyright protection.  Taylor Instrument Cos. v. Fawley-Brost Co., 139 F.2d 98 (7th Cir. 1943) ("The description of the art in a book, though entitled to the benefit of copyright, lays no foundation for *an exclusive claim* to the art itself.  The object of the one is explanation; the object of the other is use.") (emphasis added); see also Brown Instrument Co. v. Warner, 161 F.2d 910, 911 (D.C. Cir. 1947) ("Since the machines which cooperate with the charts in suit *are useless without them*, to copyright the charts would in effect continue appellant's monopoly of its machines beyond the time authorized by the patent law.").

The case that appears to come closest to Defendant's point is Lotus Development Corp. v. Borland International, Inc., 49 F.3d 807 (1st Cir. 1995).  The First Circuit held that a nearly identical menu hierarchy in a computer program could not be protected by copyright because it was a method of use.  In particular, Xio cites to the following language: "Accepting the district court's finding that the Lotus developers made some

expressive choices in choosing and arranging the Lotus command terms, we nonetheless hold that that expression is not copyrightable because it is part of Lotus 1-2-3's 'method of operation.'" Id. at 816.  I am not convinced, however, that this means that *no expression* is copyrightable if it is part of a method of operation.  There the court was reviewing a simple menu hierarchy that has commands such as "Save," "Exit," or "Quit."  It analogized such a system to the buttons on a VCR remote control and explained: "That the buttons are arranged and labeled does not make them a 'literary work,' nor does it make them an 'expression' of the abstract 'method of operating' a VCR via a set of labeled buttons.  Instead, the buttons are themselves the 'method of operating' the VCR." Id. at 817.  Under this premise, there was no expression—there was only the method of operation because the menu titles were themselves the useful tool.  Id.  ("Just as one could not operate a buttonless VCR, it would be impossible to operate Lotus 1-2-3 without employing its menu command hierarchy. Thus the Lotus command terms are not equivalent to the labels on the VCR's buttons, but are instead equivalent to the buttons themselves.").  Moreover, the court's holding implicates the merger doctrine because there are few ways of expressing such commands.  Xio, in quoting from the opinion, omits the following crucial language and replaces it with an ellipse: "If specific words are essential to operating something, then they are part of a 'method of operation' and, as such, are unprotectible." Id. at 816; see also id. ("Concluding, as we do, that users operate Lotus 1-2-3 by using the Lotus menu command hierarchy, and that the entire Lotus menu command hierarchy is essential to operating Lotus 1-2-3, we do not inquire further whether that method of operation could have been designed differently."); id. at 818 ("When there are a limited number of ways to express an idea, however, the expression 'merges' with the idea and becomes uncopyrightable.").  I do

not find that this opinion stands for a proposition as broad as Xio suggests.[8]  Of course,

Tetris Holding cannot copyright a method of operation, but may copyright an

expression of a method of operation if it is distinguished from the method itself and is

not essential to its operation.

Xio also relies on a number of opinions discussing video games.  In no case,

however, did a court find that expression was unprotectible merely because it was

related to a game rule or game function.  Xio cites to Atari, Inc. v. North American

Philips Consumer Elecs. Corp., 672 F.2d 607, 616 (7th Cir. 1982) to argue that

infringement cannot be found based on "functional commonalities."  Def. Motion, at 17.

But the Seventh Circuit found that certain elements of Atari's *Pac-Man* game, (the maze

design, scoring table, and "dots") were unprotected not because of functional

commonalities but because "[c]ertain expressive matter…should be treated as scènes à

faire and receive protection only from virtually identical copying."  Atari, 672 F.2d at

617.  Nevertheless, the court went on to find that "the substantial appropriation of the

*Pac-Man* characters" qualified as copyright infringement.  Id.  The characters

"functioned" in the same manner in both games.  This District also analyzed *Pac-Man*

and found the following to be protected by copyright: the characters, the sequences and

arrangements of the graphics, the characters' motions and actions, the musical theme,

and the introductory cartoon sequence.  Midway Mfg. Co. v. Bandai-America, Inc., 546

F. Supp. 125, 152 (D.N.J. 1982).  The court did not suggest whether there were

functional similarities or whether these expressive elements were related to the "game

[8] Xio says that Lotus was affirmed by the Supreme Court.  This is technically true, but
deserves a brief comment of explanation. The Supreme Court granted certiorari on the
First Circuit's opinion, but one week after oral argument, Justice Stevens recused
himself and the Court announced that it was equally divided and left the First Circuit's
decision undisturbed without comment or opinion.

rules."

The <u>Midway</u> decision also involved the copyright of the video game *Galaxian*. There the defendant argued that *Galaxian* had no copyright in its game because the game *Space Invaders* was a pre-existing work.  The court disagreed because it was only the basic structure or concept of the game that was copied:  "Nonetheless, the most cursory perusal of the two works indicates that the only similarity between them is in the idea of the underlying games, i.e., outer space games wherein a defendant base or rocket ship, controlled by the player, attempts to fend off attacking hordes of aliens...When the expressions of the *Galaxian* and *Space Invaders* works are compared, it is clear there is no similarity beyond that of idea."  <u>Id.</u> at 144-45.  Again the court included under the umbrella of expression the look and feel of the characters and how they move and act.  Midway took the unprotectible idea and found a new, novel way to express it.

In <u>Data East USA, Inc. v. Epyx, Inc.</u>, 862 F.2d 204 (9th Cir. 1988), the Ninth Circuit followed a similar approach to that of the Seventh Circuit in <u>Atari</u>.  The game at issue involved a karate fighting simulation and the court found that "karate is not susceptible of a wholly fanciful presentation" and the characters, their actions, the scenery, and the like, were not subject to copyright because they were scènes à faire.  <u>Id.</u> at 209.  This did not foreclose the possibility of protection for other expressive content that was not "indispensable or at least standard in the treatment of a given idea."  <u>Id.</u> Tellingly, the court noted that its holding was in part mandated by the limited abilities of computers in 1988: "Furthermore, the use of the Commodore computer for a karate game intended for home consumption is subject to various constraints inherent in the use of that computer. Among the constraints are the use of sprites, and a somewhat

limited access to color, together with limitations upon the use of multiple colors in one visual image."  Id.

Finally, in another Seventh Circuit decision, the court analyzed arcade golf games and found no infringement because the expressive elements were not protected under the scènes à faire doctrine:

> In contrast, we see no error of law in Judge Kennelly's finding that the Global VR video display is subject to the scènes à faire doctrine. Like karate, golf is not a game subject to totally "fanciful presentation."  In presenting a realistic video golf game, one would, by definition, need golf courses, clubs, a selection menu, a golfer, a wind meter, etc.  Sand traps and water hazards are a fact of life for golfers, real and virtual.  The menu screens are standard to the video arcade game format, as are prompts showing the distance remaining to the hole. As such, the video display is afforded protection only from virtually identical copying.

Incredible Techs., Inc. v. Virtual Techs., Inc., 400 F.3d 1007 (7th Cir. 2005).[9]  Also, the two games each employed a track ball, which the user would roll back to simulate a back stroke and then roll forward to simulate the swing itself.  The court found the use of the trackball itself to be functional and not subject to copyright.  While Xio relies heavily on this analysis, it is inapposite to the facts here.  There is no equivalent functional, structural element at issue here.  Tetris Holding is not arguing that some particular controller or mechanism is infringed, only its visual expression.

Nonetheless, from the foregoing cases, Xio draws the following conclusion: "where a feature of a videogame is dictated by functional considerations, regardless of whether there may be a number of different ways to implement that feature's functionality, copyright does not protect that feature."  Def. Motion, at 22.  This is

---

[9] The court in Incredible Techs was deciding whether a preliminary injunction was appropriate and in particular whether Incredible Technology had a likelihood of success on the merits.  Such success was unlikely because the court found that there were sufficient differences in the presentations of the two games.

incorrect as a matter of law and fails as a matter of logic.  If an expressive feature is dictated by functional considerations then there cannot be a number of ways to implement it.  Rather, one's original expression is protected by copyright—even if that expression concerns an idea, rule, function, or something similar—unless it is so inseparable from the underlying idea that there are no or very few other ways of expressing it.  "If other methods of expressing that idea are not foreclosed as a practical matter, then there is no merger."  Educational Testing Services, 793 F.2d at 539. Moreover, Xio does not dispute that *Tetris* is a purely fanciful game, meaning it has no grounding in the real world, unlike a video game simulating a karate match or a golf game.  Therefore, the analyses in Data East and Incredible Technologies are largely inapplicable; the scènes à faire doctrine has little weight in instances such as this because there are no expressive elements "standard, stock, or common" to a unique puzzle game that is divorced from any real world representation.

> iv.   Substantial Similarity of *Tetris* and *Mino*

With this framework, I can compare the audio-visual aspects of the two games at issue: *Tetris* and *Mino*.  To separate ideas from expression, the parties offer competing definitions of game rules, but I do not need to articulate a rigid, specific definition. While the unenviable task of dissecting a game's ideas from its expression is difficult, I am guided by case law and common sense, and find that the ideas underlying *Tetris* can be delineated by understanding the game at an abstract level and the concepts that drive the game.  See, e.g., Atari, 672 F.2d at 617 ("In applying the abstractions test, we find that plaintiffs' game can be described accurately in fairly abstract terms, much in the same way as one would articulate the rules to such a game."); Midway, 546 F. Supp. at 144 (describing the "idea" of a Space Invader type game as an "outer space game[]

wherein a defendant base or rocket ship, controlled by the player, attempts to fend off attacking hordes of aliens"); id. at 153 (adopting the Seventh Circuit's description of the PAC-MAN game idea: "PAC-MAN is a maze-chase game in which the player scores points by guiding a central figure through various passageways of a maze and at the same time avoiding collision with certain opponents or pursuit figures which move independently about the maze."). These decisions further make clear that the idea of a game is expressed, in part, through its rules. *Tetris* is a puzzle game where a user manipulates pieces composed of square blocks, each made into a different geometric shape, that fall from the top of the game board to the bottom where the pieces accumulate. The user is given a new piece after the current one reaches the bottom of the available game space. While a piece is falling, the user rotates it in order to fit it in with the accumulated pieces. The object of the puzzle is to fill all spaces along a horizontal line. If that is accomplished, the line is erased, points are earned, and more of the game board is available for play. But if the pieces accumulate and reach the top of the screen, then the game is over. These then are the general, abstract ideas underlying *Tetris* and cannot be protected by copyright nor can expressive elements that are inseparable from them.

The parties argue over a number of particular features of both games, which I will address in turn. Before that, however, I note that it is appropriate to compare the two works "as they would appear to a layman" concentrating "upon the gross features rather than an examination of minutiae." Universal Athletic Sales Co. v. Salkeld, 511 F.2d 904, 908 (3d Cir. 1975); Atari, 672 F.2d at 614 ("It has been said that this test does not involve 'analytic dissection and expert testimony,' but depends on whether the accused work has captured the 'total concept and feel' of the copyrighted work."); Oman, 979

F.2d at 245 (criticizing an administrative opinion for "its apparent focus on the individual screens, rather than the flow of the game as a whole").

Xio has provided the court with links to uploaded videos at www.youtube.com showing the game play of both *Tetris* and *Mino*; Tetris Holding has provided similar video evidence. The Court has reviewed these videos as well as screen shots of the individual game screens, the declarations and attached exhibits, and the parties' respective statements of fact. Screenshots of both games are shown here side by side:



The first is *Tetris* and the second is *Mino*. Without being told which is which, a common user could not decipher between the two games. Any differences between the two are slight and insignificant. If one has to squint to find distinctions only at a granular level, then the works are likely to be substantially similar. Reviewing the videos of the game play bolsters this conclusion as it is apparent that the overall look and feel of the two games is identical. There is such similarity between the visual expression of *Tetris* and

*Mino* that it is akin to literal copying.[10]  While there might not have actually been "literal copying" inasmuch as Xio did not copy the source code and exact images from *Tetris*, Xio does not dispute that it copied almost all of visual look of *Tetris*.  This leaves one to wonder what Xio believed was protectible expression.  After the purportedly careful analysis it undertook to understand copyright law, apparently Xio believed it could engage in wholesale copying of the *Tetris* look and relate almost every visual element to a "rule," finding none of *Tetris's* visual expression copyrightable.

In particular, the style of the pieces is nearly indistinguishable, both in their look and in the manner they move, rotate, fall, and behave.  Similar bright colors are used in each program, the pieces are composed of individually delineated bricks, each brick is given an interior border to suggest texture, and shading and gradation of color are used in substantially similar ways to suggest light is being cast onto the pieces.  Showing the pieces in more detail highlights these similarities: the first piece of each pair is from *Tetris* and the second is from *Mino*.



Pl. Stmt. of Undisputed Fact, ¶¶ 51, 163.[11]  Xio was also free to design a puzzle game using pieces of different shapes instead of using the same seven pieces used in *Tetris*.

---

[10] Interestingly, the case that Defendant relies on so heavily, <u>Lotus v. Borland</u>, suggests that I need not engage in any abstraction in instances of literal copying: "Nonetheless, the implication is that for literal copying, 'it is not necessary to determine the level of abstraction at which similarity ceases to consist of an "expression of ideas," because literal similarity by definition is always a similarity as to the expression of ideas.'" <u>Lotus</u>, 49 F.3d at 815, n.8 (citing Nimmer § 13.03[A][2]).  Nevertheless, I am not convinced this case is one of literal copying *per se*.

[11] In the event that the color of these figures is not shown due to the publication process, the Court notes that they are virtually identical.

The pieces in *Tetris* are based on combining four equally sized squares in different patterns, but the idea of *Tetris*—fitting different shaped pieces together to form complete lines—can be achieved with nearly limitless shaped pieces and geometric shapes.  Xio's expert, Jason Begy, agreed at his deposition that a "a game designer could design the playing pieces for a video game in an almost unlimited number of ways" and that the specific *Tetris* pieces were "not necessary...to design a puzzle video game."  Pl. Stmt of Undisputed Fact, ¶ 53.  The video evidence also shows how the pieces move in precisely the same manner.  Again, there are almost unlimited options for expressing the pieces' movement and rotation and one can play the same game even if different styles are used or the game has a different look and feel to it, which was also admitted by Xio's expert during his deposition.  Id.  The style, design, shape, and movement of the pieces are expression; they are not part of the ideas, rules, or functions of the game nor are they essential or inseparable from the ideas, rules, or functions of the game.

Without even considering the other allegedly infringing aspects, courts have found copyright infringement based on the fact that video game characters or pieces are nearly identical.  In both Atari and Midway, the Seventh Circuit found infringement entirely on the substantial similarities between the style, color, and movement of the game characters.  Atari, 672 F.2d at 617; Midway, 546 F. Supp. at 144 (finding infringement on the same elements as well as copied music and introduction animation).  As described above, Xio's argument that the *Tetris* pieces are unprotectible because they are related to a rule or function of the game is without merit.  The idea of *Tetris* does not necessitate the particular characteristics of the audio-visual display.  And *Tetris's* copyright is not protecting the style and movement of the pieces as methods of operation, but instead the expression associated with those elements.  There are many

ways Xio could have expressed these same concepts.  To accept Xio's reasoning would give a copyright defendant free reign to copy another's expression, to pilfer another's creativity, merely by describing that expression in sufficient detail related to a rule or a function.  Tetris Holding has given the rules of its game to the public domain, but has kept the rights to its expression.  Tetris Holding made specific and deliberate design choices and its product has enjoyed great success; to allow Xio to profit off that expression, and that success, by blatant copying, without offering any originality or ingenuity of its own, defies the very purpose of copyright law.  Any game expression can always be defined as relating to a game rule and be defined in such detail that the description of the expression would add nothing to the idea.  There was no necessity for *Mino* to mimic *Tetris's* expression other than to avoid the difficult task of developing its own take on a known idea.[12]

I am not convinced that either the doctrine of merger or scènes à faire applies here.  The latter, as discussed earlier, is inapposite because *Tetris* is a wholly fanciful presentation; it is a unique puzzle game and does not have stock or common imagery that must be included.  Nor does merger apply because there are many novel ways Xio could have chosen to express the rules of *Tetris*.  Xio's own expert admitted there are "almost unlimited number" of ways to design the pieces and the board and the game would still "function perfectly well."  Pl. Motion, at 35.  Xio itself points to an example from the early 1990s.  Dr. Mario was a video game, published by Nintendo Co. Ltd., that used the rules of *Tetris* expressed in a unique way.  Nintendo obtained a patent in the

---

[12] As noted earlier, Defendant also discusses at length how some of the individuals associated with Xio researched the contours of copyright law in order to avoid infringing Tetris Holding's intellectual property.  It is no defense for one to say it thought it knew and applied the law correctly but actually failed to do so.

game mechanics and in the specification described itself as a variation on the rules of *Tetris*, but with a more exciting theme and expression.  That expression was shown by the patentees in the patent drawings, for example:



U.S. Patent No. 5,265,888, Figures 10(c), 10(f).  Instead of using bricks to form complete rows, the user aligns pills and viruses of different colors to form patterns and eliminate the viruses as part of the pattern based on the color of the objects.  Considering the exponential increase in computer processing and graphical capabilities since that unique variation on *Tetris*'s rules, the Court cannot accept that Xio was unable to find any other method of expressing the *Tetris* rules other than a wholesale copy of its expression.[13]

> v.  <u>Other Discrete Copyrightable Elements of *Tetris*</u>

I turn now to the other elements of *Tetris* that Xio allegedly infringed.  In

---

[13] When the copied elements are "nearly identical" to the original—such as is the case here—then merger will not apply even if the ideas and the expression were found to be inseparable, which the Court does not find here.  <u>See</u> <u>Mortg. Mkt. Guide</u>, 2008 U.S. Dist. LEXIS 56871, at *104-105 (<u>citing</u> <u>Apple Computer, Inc. v. Microsoft Corp.</u>, 35 F.3d 1435, 1444 (9th Cir. 1994)).

addition to the design and movement of the playing pieces as discussed above (including the use of bright colors, the individually delineated squares within the pieces, and the downward, lateral, and rotating movement), I find the following elements are also protected expression and further support a finding of infringement: the dimensions of the playing field, the display of "garbage" lines, the appearance of "ghost" or shadow pieces, the display of the next piece to fall, the change in color of the pieces when they lock with the accumulated pieces, and the appearance of squares automatically filling in the game board when the game is over.  None of these elements are part of the idea (or the rules or the functionality) of *Tetris*, but rather are means of expressing those ideas. I note that standing alone, these discrete elements might not amount to a finding of infringement, but here in the context of the two games having such overwhelming similarity, these copied elements do support such a finding.  It is the wholesale copying of the *Tetris* look that the Court finds troubling more than the individual similarities each considered in isolation.

Xio defends copying the exact size of the playing field—20 units high by 10 units wide—by saying that a rule of the game is to have a board that it higher than it is wide. Def. Motion, at 34.  But having a board higher than it is wide is not the issue; Xio copied a field that was the exact same dimensions as *Tetris*.  Even assuming it is a rule to have a field higher than it is wide, which the Court does not necessarily find, it is not a rule to have the playfield be exactly 20 units by 10 units.  Xio was free to program a puzzle game with the playing field designed "in an almost unlimited number of ways" as admitted by Xio's expert.  Pl. Stmt. Of Undisputed Fact, ¶ 53.  Xio was not limited to those precise dimensions and was free to take the general idea of having a long game board and express it in its own unique way.   For example, it could have had a field three

31

times as high as it is wide or 15 units high by 8 units wide, without copying the exact game dimensions and infringing the look and feel of *Tetris's* expression. Thus, I find this to be protectible expression that Xio infringed.

Similarly, *Mino* also displays "garbage" lines, "ghost" pieces, and a preview of the next piece to fall in order to enhance game play as does *Tetris*. A garbage line is when the computer randomly generates a line of blocks and places them on the game board and a ghost piece is an outline of the current piece that appears in the location where the piece would fit unless it is moved or rotated. A preview piece shows the user the next piece that will fall after she fits the one currently in play. Xio argues that because garbage lines add a limitation on a player and ghost lines and preview pieces aid the player, they are rules of the game. I am not persuaded that these features constitute either the ideas or rules of *Tetris* or are necessitated by game play. Moreover, even if these were rules, it is Xio's copying the same look and feel of these features that lead me to find it has infringed Tetris Holding's copyright. Xio was free to design other ways to alter game play, making it more or less difficult, using its own original expression to express these features, which it has chosen not to do.

Lastly, in both *Tetris* and *Mino* the color of the piece changes from a bright active color into a darker color when the piece becomes locked with the accumulated pieces to show it is inactive and when a player loses, the screen fills up with blocks to show that the game is over.[14] Neither feature is part of the idea of *Tetris* or its game

---

[14] From my review of the game play videos, it does not appear that the colors of the pieces change (at least significantly) in either *Tetris* or *Mino*. But Xio does not argue this point or refute this feature as an undisputed fact. Second, Xio argues that its current version of *Mino* removed the feature of the screen by filling with blocks when the game is over. Tetris Holding argues that the feature was not removed. Pl. Opp., at 9 n.4. My analysis, however, is concerned with the versions of *Mino* that Xio released.

play.  They are both visualizations designed as expressions, creative choices made as part of the look and feel of the game.  Xio argues the change in color is a "function" because it helps the user to see what pieces are in play and what pieces are locked.  But, like Defendant's arguments as to the elements already discussed, this defines function too broadly and potentially engulfs all of *Tetris's* expression.  It is not an idea of the game to have pieces that change color or to show the end of the game with a particular visualization.  These elements are aesthetic choices that the designers of *Tetris* made to show or express game play; the game would function that same with or without these expressions or if Xio had designed its own expressions instead of copying from *Tetris*.  I note also, this District has found expression and infringement for video game animation sequences, albeit at the beginning of the game rather than at the end, which is the case here.  See <u>Midway</u>, 546 F. Supp. at 152 (finding copyright infringement for opening scene of computer animated imagery).

Tetris Holding also cites four decisions by the U.S. Customs Service that held the visual expression of *Tetris* to be copyrightable expression and attaches the opinions to its motion.  Schmitt Decl., Ex. 68.  In each, the Customs Service found Tetris Holding had broad protection in the graphical elements of its game:

> In the present case the copyrightable features of the TETRIS game...includes downward, lateral, and rotating movements of the differently oriented four-brick playing pieces, and the shape and appearance of the four-brick playing pieces, both in the "dots" that appear within the individual bricks themselves, as well as in the configuration of the four-brick combinations comprising the playing pieces.  Additional copyrighted features include: the scoring features, the feature displaying the next four-brick playing piece that will fall down the playing field matrix, the disappearance of any completed horizontal row, the subsequent consolidation of the playing pieces remaining on the playing

---

Xio does not dispute that this element could potentially form the basis for a finding of infringement.  Def. Motion, at 6 n.2.

> field as a result of the downward shift into the space vacated by the
> disappearing row, the resulting score, the background music, the specific
> sounds...the makeup of the playing field itself, i.e., the vertical matrix,
> higher than it is wide, with a base of ten individual "bricks" per horizontal
> row, and generally twenty individual "bricks" per vertical line.

Id. Xio argues these opinions should have no weight on my decision. It goes without saying I am not bound by such administrative decisions nor am I necessarily persuaded by them as I do not find that all the content described by the Customs Service is part of the protectible expression of *Tetris*. Nevertheless, I reference these decisions only to show that other tribunals have independently reached the same conclusion as to those elements that I do find were infringed expression.

As to the remaining features implicated by Tetris Holding, I cannot find as a matter of law that these features are wholly expressive. Nor do I need to reach these issues because it is clear that the two games are substantially similar even without considering these remaining elements.

Xio raises a fair use defense, but only to the extent that the Court finds "the infringing elements are a very small portion of the overall copyrighted work." Def. Opp., at 14. Xio concedes all other elements of the fair use defense.[15] Because Xio has infringed a substantial amount of the overall copyrighted work, I find that its fair use defense must necessarily fail.

Xio's defenses fail as a matter of law and there are no issues of fact regarding Tetris Holding's claim of copyright infringement. Accordingly, summary judgment is

---

[15] 17 U.S.C. § 107 requires courts to consider the following four non-exclusive factors when considering a fair use defense: (1) purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) nature of the copyrighted work; (3) amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) effect of the use upon the potential market for or value of the copyrighted work.

granted on Count One in favor of Plaintiffs.

### 2. Trade Dress

Tetris Holding also moves for summary judgment on Count Two arguing that Xio willfully infringed its trade dress under federal law; Xio moves that Tetris Holding's trade dress is functional and therefore it is entitled to summary judgment.  To establish trade dress infringement, Tetris Holding must prove that (1) the trade dress is distinctive in that it has acquired secondary meaning; (2) the trade dress is not functional, and (3) there is a likelihood that consumers will confuse Xio's *Mino* product for that of Plaintiffs' *Tetris* product.  See Knorr-Nahrmittel A.G. v. Reese Finer Foods, Inc., 695 F. Supp. 787, 791 (D.N.J. 1988).  Tetris Holding claims its trade dress is comprised of the following: "the brightly-colored Tetriminos, which are formed by four equally-sized, delineated blocks, and the long vertical rectangle playfield, which is higher than wide."  Pl. Mot., at 27.[16]  Tetris Holding's allegations are not based on the game play as is its copyright allegations, but instead based on the manner in which *Mino* advertised and packaged its game to potential users, which could potentially cause confusion as to whether *Mino* was an authorized iteration of *Tetris*.

In addition to raising an affirmative defense, Xio only disputes the second element and argues that Tetris Holding's trade dress is functional.[17]  To make this argument, Xio relies on precisely the same arguments it makes in support of its

---

[16] Plaintiffs' description of its trade dress includes the qualifier "including, but not limited to."  Pl. Mot., at 27.  Plaintiffs have had sufficient time to determine exactly the contours of the alleged trade dress violation and for purposes of this motion, this is the trade dress that I will consider.

[17] I note that Xio's apparent concession that there is a likelihood customers will confuse the two products also supports my finding of substantial similarity between *Tetris's* copyrightable content and *Mino*.

copyright arguments—that the infringed *Tetris* elements are not protectible because they are related to a function of the game.  As I discuss above, neither the color and style of the pieces nor the game board being 20 units by 10 units are functional in the context of copyright law.  Nor do I find that they are functional in the context of trade dress law.

The Supreme Court has explained that a feature is functional if: "it is essential to the use or purpose of the device or when it affects the cost or quality of the device" or the right to use it exclusively "would put competitors at a significant non-reputation-related disadvantage," meaning it is "essential to effective competition in a particular market." Traffix Devices v. Mktg. Displays, 532 U.S. 23, 33 (2001).  The color and style of the pieces are not functional under any one of these standards.  These elements are not mandated by the use or purpose of the game because numerous other choices are available to a game designer without affecting the functionality of the game.  As I noted earlier, Xio's own expert admitted that there are "almost unlimited number" of ways to design the pieces and the board and the game would still "function perfectly well."  Pl. Stmt. of Undisputed Fact, at ¶ 53.  Nor has Defendant shown that other choices would at all affect either the cost or quality of the device or that these choices are essential to effective competition.

Instead, Xio points to language in Traffix where the Supreme Court said: "There is no need, furthermore, to engage as did the Court of Appeals, in speculation about other design possibilities...."  Traffix, 532 U.S. at 33-34.  But this was after the Court had already found that the trade dress was "not an arbitrary flourish" and instead was "the reason the device works."  Id.  Thus, it was explaining that once trade dress has been found to be functional a court should not engage in a speculative analysis about other design alternatives.  Here, however, Tetris Holding's design choices were essentially

"arbitrary flourishes" and were in no way related to the reason the game works or functions.

Xio also argues that Tetris Holding's trade dress claim is preempted as per the Supreme Court's decision in <u>Dastar Corp. v. Twentieth Century Fox Film Corp.</u>, 539 U.S. 23 (2003). In particular, Xio relies on the Court's language explaining that one cannot bring unfair competition claims based on illegal copying when the copied materials are in the public domain. Def. Motion, at 44-45 (citing <u>Dastar</u>, 539 U.S. at 35). In <u>Dastar,</u> the plaintiff's cause of action was essentially a copyright action that he tried to shoehorn into a Lanham Act claim because the copyright had expired and his work was therefore in the public domain. <u>Id.</u> The Supreme Court held that claims of false authorship and reverse passing off are not cognizable under the Lanham Act, but should instead be brought as copyright actions. <u>Id.</u> at 37. Plaintiffs are not merely restating their copyright claim under the Lanham Act, but their trade dress claims are meant to address the consumer confusion that developed because *Xio* packaged and advertised its game in the same manner as *Tetris.* <u>See</u> <u>Profoot, Inc. v. MSD Consumer Care, Inc.</u>, No. 11-7079, 2012 U.S. Dist. LEXIS 51888, at *9-10 (D.N.J. Apr. 11, 2012) ("[<u>Dastar</u>] does not stand for the proposition that all trade dress infringement cases are preempted when copyright provides an adequate remedy. It stands only for the proposition that the Lanham Act cannot be interpreted to permit a backdoor into establishing a copyright infringement claim.")

In light of the above and there being no issues of fact raised by either party, summary judgment is granted on Count Two, Plaintiffs' claim of trade dress infringement, in favor of Plaintiffs.

## IV.    CONCLUSION

Plaintiffs' motion for summary judgment on Counts One and Two is granted. Defendant's motion for summary judgment is denied.  An order will be entered consistent with this Opinion.


Dated: May 30, 2012                                      /s/    Freda L. Wolfson
                                                         Honorable Freda L. Wolfson
                                                         United States District Judge